UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - x
                               :

UNITED STATES OF AMERICA      :
                               :

     - v. -                      :

                               :    S1 17 Cr. 649 (GBD)

TERRELL POLK,         :

                               :

          Defendant.       :

                               :

                               :

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - x

## **GOVERNMENT'S MOTION *IN LIMINE***

GEOFFREY S. BERMAN
United States Attorney for the
Southern District of New York
Attorney for the United States
of America

Michael K. Krouse
Nicholas S. Folly
Assistant United States Attorneys
     - Of Counsel -

## TABLE OF CONTENTS

PRELIMINARY STATEMENT ............................................................................ 2

BACKGROUND ................................................................................................. 2

DISCUSSION .................................................................................................... 3

    I.    CO-CONSPIRATOR STATEMENTS IN FURTHERANCE OF THE
        CONSPIRACY ARE ADMISSIBLE UNDER RULE 801(d)(2)(E)    3

        A. Applicable Law ..................................................................................... 4

        B. Discussion ............................................................................................ 5

    II.    EVIDENCE OF CO-CONSPIRATORS' PRIOR ARRESTS AND BAD
        ACTS RELATED TO DRUGS AND FIREARMS ARE ADMISSIBLE AS
        DIRECT EVIDENCE OF THE CHARGED CONSPIRACY OR, IN THE
        ALTERNATIVE, UNDER RULE 404(B)    6

        A. Applicable Law ..................................................................................... 7

        B. Discussion .......................................................................................... 10

    III. CERTAIN OUT-OF-COURT STATEMENTS ARE ADMISSIBLE AS NON-
        HEARSAY OR AS EXCITED UTTERANCES    13

        A. Victim-1's Statements ......................................................................... 13

            a.  Applicable Law ............................................................................ 14

            b.  Discussion .................................................................................... 14

        B. A Witness's Statement Regarding the August 4, 2015 Shooting .......... 15

            a.  Applicable Law ............................................................................ 15

            b.  Discussion .................................................................................... 16

    IV. THE COURT SHOULD PRECLUDE CROSS EXAMINATION OF CW-1
        ON TOPICS NOT RELEVANT TO CREDIBILITY    17

        A. Applicable Law ................................................................................... 18

        B. Discussion .......................................................................................... 19

    V. THE COURT SHOULD DENY THE DEFENDANT'S REQUEST TO
        LIMIT THE SCOPE OF THE GOVERNMENT'S BALLISTICS EVIDENCE    21

        A. Relevant Facts .................................................................................... 21

        B. Applicable Law ................................................................................... 22

        C. Discussion .......................................................................................... 25

    CONCLUSION ............................................................................................. 34

## PRELIMINARY STATEMENT

The Government respectfully submits these motions *in limine* in advance of the trial of Terrell Polk (the "defendant") scheduled to begin on September 10, 2018.  As set forth below, the Government seeks pretrial rulings from the Court to:  (1) admit co-conspirator statements made in furtherance of the conspiracy under Federal Rule of Evidence 801(d)(2)(E); (2) admit evidence of prior arrests and seizures as direct proof of the charged narcotics conspiracy; (3) admit statements made by the shooting victims as non-hearsay and/or as excited utterances under Federal Rule of Evidence 803(2); and (4) preclude cross examination of CW-1 on topics not relevant to credibility.

The Government also submits that the Court should deny the defendant's request to limit the scope of the Government's ballistics evidence.

## BACKGROUND

Defendants Terrell Polk, Jamel Moss, Kevin Corbett, and Timothy Smith were all charged in an Indictment in this case with conspiring, from 2013 to 2017, to distribute crack cocaine and marijuana in the Highbridge Section of the Bronx.  At trial, the Government expects that the evidence will show that in order to protect their drug trafficking activities, these defendants shared access to several guns.  During the summer of 2015, Terrell Polk used these shared guns to shoot three people in two separate shooting incidents.

First, on July 25, 2015, Polk used a .40 caliber pistol to shoot one male victim ("Victim-1") in front of 1055 University Avenue in the Bronx.  NYPD officers found several .40 caliber shell casings at the scene and recovered surveillance video that clearly shows the shooting.  This video also shows that defendants Kevin Corbett and Timothy Smith were present during the shooting, and that Corbett also fired a shot at the victim as the victim fled.

The Government expects that the evidence will establish that this shooting was in furtherance of the defendants' narcotics conspiracy.  Specifically, the Government expects that the

evidence will show that the defendants controlled narcotics distribution within the building located at 1055 University Avenue; used several empty apartments within that building to stash drugs and guns; and were willing to use violence to protect their drug trafficking activities within that building.  The evidence will also establish that Polk shot Victim-1 in part because Victim-1 was selling marijuana in the vicinity of 1055 University Avenue.

Second, on August 4, 2015, Polk used a shotgun to shoot two victims ("Victim-2" and "Victim-3") inside of a store located at 950 Anderson Avenue in the Bronx (the "Store").  NYPD officers found lead pellets at the scene and recovered surveillance video showing Polk running into the Store carrying a gun.  The Government's evidence will establish that at the time Polk pulled up in a car in front of 950 Anderson Avenue, Victim-2 and Victim-3 were standing in front of the Store.  Someone who was also in the vicinity of the Store saw that Polk was carrying a gun, and shouted out, in sum and substance, "gun."  In response, Victim-2 and Victim-3 fled into the back of the Store.  Polk pursued Victim-2 and Victim-3 into the Store, and Victim-2 and Victim-3 hid inside of a room in the back of the Store in order to escape Polk.  Polk shot through the door of the room with his shotgun, wounding both victims.

## DISCUSSION

## I.   CO-CONSPIRATOR STATEMENTS IN FURTHERANCE OF THE CONSPIRACY ARE ADMISSIBLE UNDER RULE 801(d)(2)(E)

The Government anticipates calling one cooperating witness at trial (CW-1).   CW-1 was a member of the drug distribution conspiracy charged in this case, and he witnessed the July 25, 2015 shooting.  At trial, the Government will seek to introduce statements between CW-1 and the defendants or their co-conspirators about narcotics trafficking, and violence in furtherance of narcotics trafficking.  These statements are admissible as co-conspirator statements in furtherance of the conspiracy.

3

In addition to co-conspirator statements recalled by CW-1 that were made in furtherance of the narcotics conspiracy, the Government also anticipates introducing co-conspirator statements at trial in the form of prison phone calls that were recorded by the prison facility in which the defendant was incarcerated.

## A.  Applicable Law

Rule 801(d)(2)(E) of the Federal Rules of Evidence provides, in relevant part, that "[a] statement is not hearsay if . . . the statement is offered against an opposing party and was made by the party's co-conspirator during and in furtherance of the conspiracy."   Fed. R. Evid. 801(d)(2)(E).  To admit a statement pursuant to this rule, a district court must find two facts by a preponderance of the evidence: *first*, that a conspiracy that included the defendant and the declarant existed; and *second*, that the statement was made during the course and in furtherance of that conspiracy.  *Bourjaily v. United States*, 483 U.S. 171, 175 (1987); *United States v. Gigante*, 166 F.3d 75, 82 (2d Cir. 1999).

Once a conspiracy is shown to exist, the "evidence sufficient to link another defendant to it need not be overwhelming," and "the 'in furtherance' requirement of Rule 801(d)(2)(E) is satisfied" when, for example, "a co-conspirator is apprised of the progress of the conspiracy, or when the statements are designed to induce his assistance."  *United States v. Paone*, 782 F.2d 386, 390 (2d Cir. 1986).  Although admissible co-conspirator statements are limited to those made "in furtherance" of the conspiracy, this standard is not unduly restrictive.  It permits introduction of any co-conspirator statement that "reasonably [can] be interpreted as encouraging a co-conspirator or other person to advance the conspiracy, or as enhancing a co-conspirator or other person's usefulness to the conspiracy."  *United States v. Tarantino*, 846 F.2d 1384, 1412 (D.C. Cir. 1988).

"In determining the existence and membership of the alleged conspiracy, the court must consider the circumstances surrounding the statement, as well as the contents of the alleged coconspirator's statement itself." *United States v. Gupta*, 747 F.3d 111, 123 (2d Cir. 2014).  When determining whether the predicate conspiracy has been established, the district court is not bound by the rules of evidence, *see* Fed. R. Evid. 104(a), and "the district court may consider the hearsay statement itself" as part of the evidence of "the existence of a conspiracy." *United States v. Padilla*, 203 F.3d 156, 161 (2d Cir. 2000).

To be in furtherance of a conspiracy, the statement must in some way have been designed to promote or facilitate achievement of a goal of the ongoing conspiracy.  Statements are in furtherance of the conspiracy if they:  (1) inform or provide an update as to the status or progress of the conspiracy, *see United States v. Desena*, 260 F.3d 150, 158 (2d Cir. 2001); (2) "prompt the listener . . . to respond in a way that promotes or facilitates the carrying out of a criminal activity," *United States v. Maldonado-Rivera*, 922 F.2d 934, 958 (2d Cir. 1990); (3) "seek to induce a coconspirator's assistance," *Desena*, 260 F.3d at 158 (internal quotations omitted); (4) "provide reassurance," *id.*; (5) "serve to foster trust and cohesiveness," *id.*; *United States v. Simmons*, 923 F.2d 934, 945 (2d Cir. 1991); (6) "facilitate and protect" the conspiratorial activities, including "drug dealing activities," *United States v. Diaz*, 176 F.3d 52, 87 (2d Cir. 1999); or (7) inform a co-conspirator of "the identity and activities of his coconspirators," *United States v. Rastelli*, 870 F.2d 822, 837 (2d Cir. 1989); *United States v. Rahme*, 813 F.2d 31, 36 (2d Cir. 1987).

**B.  Discussion**

The co-conspirator statements in the form of cooperating witness testimony that the Government intends to introduce are limited to those made in furtherance of the conspiracy, and therefore admissible under Rule 801(d)(2)(E).  As will be established at trial, members of the drug

conspiracy charged in this case were engaged in narcotics trafficking and related violence. Discussions about narcotics sales in the drug crew's territory, drug turf, rivalry with other drug crews and between members of the crew, and the use of weapons in connection with drug trafficking, are plainly within the heartland of statements in furtherance of the conspiracy, and about the status and progress of the conspiracy.  *See, e.g.*, *Rahme*, 813 F.2d at 36 (statements designed to "apprise a co-conspirator of the progress of the conspiracy" are statements in furtherance of the conspiracy); *Simmons*, 923 F.2d at 945 (statements between co-conspirators that "provide reassurance, serve to maintain trust and cohesiveness among them, or inform each other of the current status of the conspiracy," further the conspiracy).  That includes statements about other members of the conspiracy, and about who is considered part of the conspiracy.  *United States v. Russo*, 302 F.3d 37, 47 (2d Cir. 2002) ("One of the objectives that members of a criminal organization share as co-conspirators is the transmission of information regarding the organization's membership.").

The same is true of the call intercepts the Government intends to introduce.  The Government intends to introduce, for example, intercepted calls between Polk and Timothy Smith, and Polk and Jamel Moss about confrontations between rival drug crews, and about the use of and possession of firearms to defend against rival drug crews.

## II.    EVIDENCE OF CO-CONSPIRATORS' PRIOR ARRESTS AND BAD ACTS RELATED TO DRUGS AND FIREARMS ARE ADMISSIBLE AS DIRECT EVIDENCE OF THE CHARGED CONSPIRACY OR, IN THE ALTERNATIVE, UNDER RULE 404(B)

The Government intends to present evidence—including physical evidence and testimony of law enforcement—of the following instance of co-conspirators' possession and distribution of narcotics during and before the time period charged in the Indictment:

- May 25, 2013, law enforcement officers from the New York City Police Department ("NYPD") arrested co-defendants Jamel Moss and Kevin Corbett after conducting an

6

undercover purchase of crack cocaine at 1055 University Avenue in the Bronx, New York.

- August 11, 2012, law enforcement officers from the NYPD arrested co-defendant Jamel Moss in a first-floor apartment located within 1055 University Avenue in the Bronx, New York (the "Apartment"). At the time of Moss's arrest, officers from the NYPD found, among other things, inside of the Apartment: two small amounts of cocaine, a crack pipe, 44 glassine envelopes, and a cooking pot containing crack cocaine.

The Government seeks to introduce evidence related to the circumstances of these arrests, and the seizure of this evidence at the upcoming trial. For the reasons set forth below, this evidence is admissible at trial as direct proof of the charged narcotics conspiracy.

### A. Applicable Law

#### 1. Other Acts Evidence as Intrinsic or Direct Proof

The Second Circuit has repeatedly held that evidence of uncharged criminal activity is admissible when it constitutes intrinsic or direct proof of a charged crime. Evidence of uncharged criminal conduct may thus be admitted without reference to Rule 404(b) if it constitutes direct proof of charged criminal conduct, if it provides the jury with background for the events alleged in the indictment, or if it arose out of the same transaction or series of transactions as the charged offenses. *See, e.g.*, *United States v. Gonzalez*, 110 F.3d 936, 941 (2d Cir. 1997) (holding that background evidence may be admitted to show the circumstances surrounding the events alleged in the indictment or to furnish an explanation of the understanding or intent with which certain acts were performed). As the Second Circuit has explained:

> [E]vidence of uncharged criminal conduct is not evidence of "other crimes, wrongs, or acts" under Rule 404(b) if that conduct is "inextricably intertwined with the evidence regarding the charged offense." *United States v. Towne*, 870 F.2d 880, 886 (2d Cir. 1989). In such circumstances, the uncharged crime evidence is necessary to "complete the story of the crime on trial," *id.*, and, thus, appropriately treated as "part of the very act charged," or, at least, proof of that act, *United States v. Concepcion*, 983 F.2d [369, 392 (2d Cir. 1992)].

*United States v. Quinones*, 511 F.3d 289, 309 (2d Cir. 2007); *see also United States v. Carboni*, 204 F.3d 39, 44 (2d Cir. 2000) (same); *see also* Weinstein's Federal Evidence, § 404.20[2][b] (noting that evidence of other wrongs is admissible without regard to Rule 404(b) where those wrongs "were necessary preliminaries to the crime charged"); § 404.20[2][c] (noting that evidence of other acts "is admitted if it contributes to an understanding of the event in question, even if it reveals crimes other than those charged, because exclusion under those circumstances would render the testimony incomplete and confusing").

With regard to charges of conspiracy, in particular, it is well established that the Government may offer proof of acts not included within the indictment, where those acts fall within the scope of the conspiracy, and thus are direct evidence of the conspiracy charged. *United States v. Bagaric*, 706 F.2d 42, 64 (2d Cir. 1983), *abrogated on other grounds by Nat'l Org. for Women, Inc. v. Scheidler*, 510 U.S. 249 (1994); *see also United States v. Lam Lek Chong*, 544 F.2d 58 (2d Cir. 1976). As the Second Circuit has repeatedly held, "[a]n act that is alleged to have been done in furtherance of the alleged conspiracy . . . is not an 'other' act within the meaning of Rule 404(b); rather, it is part of the very act charged." *Concepcion*, 983 F.2d at 392.

Finally, any evidence offered at trial must also satisfy Federal Rule of Evidence 403. Evidence is not unduly prejudicial under Rule 403 when it is not "more inflammatory than the charged crime[s]." *United States v. Livoti*, 196 F.3d 322, 326 (2d Cir. 1999). Thus, the touchstone of the prejudice analysis under Rule 403 is whether the proffered evidence does "not involve conduct any more sensational or disturbing than the crimes with which" the defendant is charged. *United States v. Roldan Zapata*, 916 F.2d 795, 804 (2d Cir. 1990); *see also United States v. Robinson*, 702 F.3d 22, 37-38 (2d Cir. 2012) (same).

### 2.   Other Acts Evidence Pursuant to Rule 404(b)

Rule 404(b) provides in pertinent part that evidence of other criminal acts is not admissible to prove a person's character, or actions in conformity therewith, but may be admissible for other purposes, such as proving motive, opportunity, intent, knowledge, and identity.  Fed. R. Evid. 404(b).  Indeed, evidence of "other acts"—including prior criminal convictions—is admissible under Rule 404(b) if it is (1) advanced for a proper purpose; (2) relevant to the crimes for which the defendant is on trial; and (3) has probative value which is not substantially outweighed by any unfair prejudicial effect.  *United States v. Brand*, 467 F.3d 179, 196 (2d Cir. 2006).  If requested, such evidence must be admitted with limiting instructions to the jury.  *See United States* v. *Zackson*, 12 F.3d 1178, 1182 (2d Cir. 1993).

Notably, the Second Circuit has adopted an "inclusionary approach" which permits the admission of other crimes or acts for "any purpose other than to show a defendant's criminal propensity, as long as the evidence is relevant and satisfies the probative-prejudice balancing test of Rule 403 of the Federal Rules of Evidence."  *United States v. Inserra*, 34 F.3d 83, 89 (2d. Cir. 1994); *see also United States v. Moran-Toala*, 726 F.3d 334, 345 (2d Cir. 2013).  In particular, the Second Circuit has held that other acts are admissible under Rule 404(b) to "inform the jury of the background of the conspiracy charged, to complete the story of the crimes charged, and to help explain to the jury how the illegal relationship between the participants in the crime developed." *United States v. Williams*, 205 F.3d 23, 33-34 (2d Cir. 2000) (quoting *United States v. Pitre*, 960 F.2d 1112, 1119 (2d Cir. 1992)).  When other act evidence is offered to show knowledge or intent, "such evidence must be sufficiently similar to the conduct at issue to permit the jury to draw a reasonable inference of knowledge or intent from the other act."  *United States v. Cadet,* 664 F.3d 27, 32 (2d Cir. 2011).  The other act evidence "need not be identical to the charged conduct to

show knowledge or intent pursuant to Rule 404(b)" but it must "provide[] a reasonable basis for inferring knowledge or intent." *Id.* at 32-33.

Such evidence must also satisfy Federal Rule of Evidence 403, meaning that its probative value may not be substantially outweighed by the danger of unfair prejudice.  Fed. R. Evid. 403.

## B.  Discussion

### 1.  The Co-Conspirators' Sale and Possession of Narcotics in Their Territory Both Before and During the Charged Conspiracy is Direct Evidence

Evidence of the co-conspirators' arrests for drug possession and distribution within the crew's drug territory during the period charged in the Indictment is admissible as direct proof of the charged conspiracy.  These acts are part of the very crime charged.  *Concepcion*, 983 F.2d at 392.  Courts in this Circuit have routinely admitted evidence from prior narcotics arrests as direct proof of a narcotics conspiracy where the arrests "involved the same types of drugs [a d]efendant is alleged to have conspired to traffic in, and occurred within the same time period and at the same geographic location as the charged narcotics conspiracy."  *United States v. Taylor*, No. 10 Cr. 268 (DLI), 2012 WL 5546825, at *4 (E.D.N.Y. Nov. 14, 2012); *see also United States v. Thai*, 29 F.3d 785, 812 (2d Cir. 1994) ("When the indictment contains a conspiracy charge, uncharged acts may be admissible as direct evidence of the conspiracy itself.").  Moreover, there is no danger of unfair prejudice because these instances of possession and distribution do not involve conduct more sensational or inflammatory than the charged offenses, and because *other* co-conspirators were arrested (not Polk).  *Roldan Zapata*, 916 F.2d at 804.  Accordingly, the Court should grant the Government's motion to admit evidence from the co-conspirators' drug arrests during the time period charged in the Indictment as direct proof of the conspiracy.

Evidence of the co-defendants' arrests for drug possession and distribution within the crew's drug territory prior to the time period charged in the Indictment are likewise admissible as

direct proof of the charged conspiracy because it provides background of the conspiracy and is essential to completing the story of the crimes charged in the Indictment.   Moreover, these categories of evidence are inextricably intertwined with the Government's other evidence described above in telling a cohesive story regarding the history of the conspiracy.   *See, e.g.*, *United States v. Christie*, No. 08 Cr. 1244 (RWS), 2010 WL 286617 (S.D.N.Y. Jan. 14, 2010) (evidence of defendants' importation of narcotics six years period to charged narcotics conspiracy was admissible as direct evidence of the charged conspiracy as background and as intertwined with the story of the conspiracy).   This evidence establishes that the co-conspirators were members of a crew who sold drugs in the organization's territory for years, and therefore is directly probative of the defendants' membership in, and acts on behalf of, the drug trafficking organization during the time period charged in the Indictment.

Evidence of these prior arrests is also necessary and admissible to explain to the jury how and where the drug trafficking organization operated.   Indeed, the evidence corroborates the anticipated testimony of CW-1, who will describe how the drug crew was selling narcotics out of the building located at 1055 University Avenue as early as 2012.   Courts routinely admit evidence of events outside the Indictment for this very purpose.   In *United States v. Lopez*, for example, the district court admitted cooperating witness testimony about drug deals with the defendant three years prior to the charged conspiracy as direct evidence.   No. 09 Cr. 525 (JFK), 2010 WL 3452380 (S.D.N.Y. Sept. 1, 2010).   The court reasoned that the testimony corroborated the existence of the conspiracy and its members, and constituted evidence of a continuous and evolving relationship with the defendant that was inextricably intertwined with the charged conspiracy and would complete the jury's understanding of how the conspiracy came to be.   *See also United States v. Reed*, No. 10-CR-0826 JS, 2012 WL 928259, at *1 (E.D.N.Y. Mar. 19, 2012) (permitting co-

conspirator testimony about the witness's history selling narcotics with the defendant, even though it predated the charged conspiracy, because it was "intertwined with the evidence regarding the charged offense").   The co-conspirators' prior narcotics arrests explain "how the co-conspirators came to interact with each other, and it render[s] more plausible their joint participation" in the charged conspiracy.  *United States v. Lasanta*, 978 F.2d 1300, 1307 (2d Cir. 1992), *abrogated on other grounds by Florida v. White*, 526 U.S. 559 (1999); *see also United States v. Romero-Padilla*, 583 F.3d 126, 130 (2d Cir. 2009) (*per curiam*) (although evidence of defendant's previous plans with a co-conspirator to import narcotics into the United States through Mexico and the Dominican Republic "did not concern the charged conspiracy, it was relevant background evidence inasmuch as it corroborated the charge that [the co-conspirator] and [defendant] were partners during the charged conspiracy" such that Rule 404(b) did not apply).

Specifically, as relevant to Moss's August 11, 2012 arrest, the Government expects to establish at trial that the co-conspirators controlled the sale of narcotics at 1055 University Avenue, and also used several empty apartments in that building to store drugs and guns.  Evidence that Moss had access to an apartment at 1055 University Avenue that was being used to store and distribute crack cocaine is therefore direct evidence of this drug conspiracy, and also serves to corroborate CW-1's expected testimony.

### 2.  In the Alternative, the Proposed Narcotics Arrest and Conviction Evidence is Admissible Under Rule 404(b)

The co-conspirators' prior arrests for possessing and selling drugs are also independently admissible under Rule 404(b) as they provide background of the charged conspiracy, and establish the defendants' opportunity, knowledge, intent and identity.  The arrests that occurred within the drug crew's territory show the defendants' ability to access narcotics, and confirm their identity as individuals CW-1 will explain sold narcotics as part of the drug crew.  The Second Circuit has

12

held repeatedly that corroboration of Government witnesses is an appropriate, non-propensity purpose for admitting other acts evidence. *See, e.g.*, *United States v. Everett*, 825 F.2d 658, 660 (2d Cir. 1987) ("Under Rule 404(b) evidence of 'other crimes' has been consistently held admissible to corroborate crucial prosecution testimony.") (citations omitted); *United States v. Williams*, 577 F.2d 188, 192 (2d Cir. 1978) (holding that other acts evidence is admissible "for corroboration purposes, provided that the corroboration is direct and the matter corroborated is significant").

## III.  CERTAIN OUT-OF-COURT STATEMENTS ARE ADMISSIBLE AS NON-HEARSAY OR AS EXCITED UTTERANCES

### A.  Victim-1's Statements

On July 25, 2015, law enforcement officers went to the hospital to interview Victim-1 about the shooting in which he was injured.  During this interview, Victim-1 provided a fake name for himself, and concocted a story about the circumstances of the shooting.  Specifically, Victim-1 told law enforcement officers that, at the time of the shooting, Victim-1 was on Webster Avenue in the Bronx, New York, and that Victim-1 was shot as he was exiting a bodega by a liquor store.

The evidence will show that these statements were false.  Among other things, the Government will seek to admit surveillance video that shows that Victim-1 was shot at 1055 University Ave., in the Bronx, New York, after having a verbal dispute with Polk.  For the reasons set forth below, Victim-1's false statements, which are *not* being presented for the truth of the matter asserted, are admissible at trial.

### a. Applicable Law

For out-of-court statements to be received in evidence for a purpose other than their truth, the proponent must satisfy Federal Rules of Evidence 401 and 403, that is: (1) the non-hearsay purpose for which the evidence is offered must be relevant; and (2) the probative value of the evidence for this non-hearsay purpose must not be outweighed by the danger of unfair prejudice. *See United States v. Paulino*, 445 F.3d 211, 217 (2d Cir. 2006). Here, the Government satisfies both rules.

### b. Discussion

The Government will seek to admit Victim-1's statements at trial for the non-hearsay purpose of showing that Victim-1 lied to law enforcement about his name, where the shooting occurred, and other circumstances of the shooting. The fact that Victim-1 lied when law enforcement officers interviewed him is relevant, in that it helps to show that Victim-1 was hiding something—namely, that Victim-1 was a drug dealer who dealt drugs at 1055 University Avenue, and that Polk shot him due to a drug dispute. Moreover, the fact that Victim-1 was a drug dealer who was present at 1055 University Avenue on the night of the shooting will corroborate CW-1's expected testimony that Polk confronted and shot Victim-1 because Victim-1 was selling marijuana in front of 1055 University Avenue, which was Polk and his co-conspirators' drug turf.

Because these statements are not hearsay, the only basis to exclude them is if they are not relevant, or if the probative value is substantially outweighed by unfair prejudice. Here, the statements are relevant to showing that the shooting was committed in furtherance of the drug trafficking conspiracy, in that they help show that Victim-1 was himself a drug dealer. Moreover, there is no unfair prejudice to the defendant—the statements do not concern the defendant, and the Government does not seek to introduce Victim-1's statements for their truth.

### B.  A Witness's Statement Regarding the August 4, 2015 Shooting

The Government anticipates calling a witness to the August 4, 2015 shooting at trial (the "Witness").  As explained above, Polk pulled up in front of the Store, got out of his car, and chased Victim-2 and Victim-3 into the back of the Store.  Victim-2 and Victim-3 ran into a room at the back of the Store, and attempted to keep the door to the room closed with their bodies pressed against it.  Unable to open the door, Polk then shot through the door, hitting Victim-2 and Victim-3.

At trial, the Government will seek to introduce two statements that the Witness heard immediately before and after the shooting.  First, the Witness heard someone shout "gun," at the time that Polk pulled up in his car.  Second, the Witness heard someone say to Victim-2 and Victim-3, in sum and substance, "he's gone"—within seconds after Polk had shot the shotgun through the door and hit Victim-2 and Victim-3.

For the reasons set forth below, these statements are admissible as excited utterances under Rule 803(2) of the Federal Rules of Evidence.

#### a.  Applicable Law

Under Rule 803(2) of the Federal Rules of Evidence, the normal bar on hearsay testimony does not apply to "[a] statement relating to a startling event or condition, made while the declarant was under the stress of excitement that it caused."  Fed. R. Evid. 803(2).  The availability of the declarant is immaterial.  Fed. R. Evid. 803.

Excited utterances are admissible because such statements are made "under circumstances that eliminate the possibility of fabrication, coaching, or confabulation, and . . . therefore the circumstances surrounding the making of the statement provide sufficient assurance that the statement is trustworthy and . . . cross-examination would be superfluous."  *Idaho* v. *Wright*, 497

U.S. 805, 820 (1990).  In other words, "the excitement of the event limits the declarant's capacity to fabricate a statement and thereby offers some guarantee of its reliability."  *United States* v. *Tocco*, 135 F.3d 116, 127 (2d Cir. 1998).

There are three requirements for admission as an excited utterance under Rule 803(2). First, there must be a startling event.  Second, the statement must have been made while the declarant was under the stress or excitement of the startling event.  Third, the statement must relate to the startling event.  *United States* v. *Brown*, 254 F.3d 454, 458 (2d Cir. 2001).

### b.  Discussion

The excited utterances the Government seeks to admit are: (1) the statement "gun" that someone shouted out as Terrell Polk arrived in front of the Store; and (2) the statement "he's gone" that someone made to Victim-2 and Victim-3 immediately after Polk had shot the shotgun through the door and hit Victim-2 and Victim-3.

First, the circumstances under which the statements were made qualifies as a "startling event" under Federal Rule of Evidence 803(2).  The standard is whether the "declarant was under the stress of excitement caused by the event or condition."  Fed. R. Evid. 803(2).  In determining whether a startling event occurred, the prevailing rule is that the excited utterance itself may be "sufficient proof of the exciting event without resort to independent corroborating evidence."  *See Brown*, 254 F.3d at 459.  Further, courts have held that "the appearance, behavior and condition of the defendant may establish, without other independent evidence, that a startling event occurred." *Id*.

In this case, the evidence will demonstrate that a startling event occurred.  First, someone observed Polk carrying a gun.  Then Polk then chased Victim-2 and Victim-3 into the back of the

Store and fired a shotgun through a door, hitting the victims. Polk then immediately ran out of the Store, jumped into his car, and drove away.

Second, the statements were "made while the declarant was under the stress of excitement caused by the event or condition." Fed. R. Evid. 803(2); *United States* v. *Joy*, 192 F.3d 761, 766 (7th Cir. 1999). Here, the statement "gun," was made immediately after the declarant saw the gun (which is startling). The subsequent statement that "he's gone," was also made within seconds of the shooting, when the declarant was still under the severe stress of that event. *See Brown*, 254 F.3d at 460 ("excited utterance," in order to be admissible, need not "be contemporaneous with the startling event, but rather only with the excitement caused by the event"); *see also United States* v. *Cruz*, 156 F.3d 22, 30 (1st Cir. 1998) ("likely that [declarant] continued to suffer from the trauma of the beating" approximately four hours after attack when statements were made).

Finally, the statements here plainly relate to the startling event or condition as the statements directly describe Polk carrying the gun, and leaving the Store after firing the gun. Therefore, the District Court should admit the statements as excited utterances.[1]

## IV.  THE COURT SHOULD PRECLUDE CROSS EXAMINATION OF CW-1 ON TOPICS NOT RELEVANT TO CREDIBILITY

The defense should be precluded from cross-examining CW-1 about domestic disputes that did not result in any convictions. Specifically, CW-1 has several sealed arrests for domestic

---

[1] For similar reasons, these two statements are also admissible under Federal Rule of Evidence 803(1) as present sense impressions. As defined by the Federal Rules of Evidence, a present sense impression is a statement "describing or explaining an event or condition made while the declarant was perceiving the event or condition, or immediately thereafter." Such statements are considered to be trustworthy because the contemporaneity of the event and its description limits the possibility for intentional deception or failure of memory. *See United States v. Jones*, 299 F.3d 103, 112 (2d Cir. 2002). The first statement "gun" appears to have been made by the declarant as the declarant was observing Terrell Polk arriving in his car, armed with a gun. The second statement, "he's gone," was made within seconds after Terrell Polk shot the shotgun and ran back out of the Store. These statements were therefore made nearly contemporaneous with the events they described, and are admissible under Rule 803(1).

violence: (1) on or about March 16, 2006, CW-1 was arrested due to a physical confrontation in which a female victim alleged that she suffered a cut finger; (2) on or about August 17, 2008, CW-1 was arrested after a female victim alleged that CW-1 punched her, causing a swollen lip, and that CW-1 scratched her hand, leaving a small abrasion; (3) on or about October 12, 2009, CW-1 was arrested after a female victim alleged that CW-1 punched her in the face; (4) on or about January 12, 2016, CW-1 was arrested after a female victim alleged that CW-1 grabbed her around the neck and applied pressure to her airway; and (5) on or about May 11, 2016, CW-1 was arrested after a female victim alleged that CW-1 threatened her in front of her children.

### A.  Applicable Law

The Federal Rules of Evidence limit the circumstances under which evidence of specific acts of a witness may be introduced into evidence.  Rule 608(b) provides that "[e]xcept for a criminal conviction under Rule 609, extrinsic evidence is not admissible to prove specific instances of a witness's conduct in order to attack or support the witness's character for truthfulness." Fed. R. Evid. 608. The Court "may, on cross-examination, allow [those prior acts] to be inquired into," but only if such acts "are probative of the character for truthfulness or untruthfulness of . . . the witness." Fed. R. Evid. 608(b)(1).  Any such cross-examination also must also satisfy Rule 403— the probative value must not be substantially outweigh by the danger of unfair prejudice, confusion of the issues, or misleading the jury.  *See* Fed. R. Evid. 403; *Sasso*, 59 F.3d at 347-48.

Furthermore, Rule 611 provides that "[c]ross-examination should not go beyond the subject matter of the direct examination and matters affecting the witness's credibility," and that the Court should "avoid wasting time" and "protect witnesses from harassment or undue embarrassment." Fed. R. Evid. 611.  It is well settled that "[t]he scope and extent of cross-examination lies within the discretion of the trial judge." *United States v. Scarpa*, 913 F.2d 993,

1018 (2d Cir. 1990) (internal quotation marks omitted).  "As long as a defendant's right to confront the witnesses against him is not violated, limitations on cross-examination are not grounds for reversal," *Roldan Zapata*, 916 F.2d at 806, and "[t]he decision of the trial court to restrict cross-examination will not be reversed on appeal unless its broad discretion has been abused," *United States v. Maldonado-Rivera*, 922 F.2d 934, 956 (2d Cir. 1990). "A trial judge does not abuse his discretion by curtailing cross-examination as long as the jury has 'sufficient information to make a discriminating appraisal of the particular witness's possible motives for testifying falsely in favor of the government.'" *United States v. Scarpa*, 913 F.2d 993, 1018 (2d Cir. Aug. 23, 1990) (quoting *United States v. Singh*, 628 F.2d 758, 763 (2d Cir. 1980)).

Further, even if such prior conduct is relevant, the Court may still exclude cross-examination of such conduct if it finds that the "probative value [of the testimony] is substantially outweighed by the danger of unfair prejudice, confusion of the issues, or misleading the jury, or by considerations of undue delay, waste of time, or needless presentation of cumulative evidence." Fed. R. Evid. 403; *accord United States* v. *Devery*, 935 F. Supp. 393, 407-08 (S.D.N.Y. 1996) ("Such [prior] acts are only admissible insofar as they bear on a witness's propensity for truthfulness or untruthfulness, and, even if the prior act does concern the witness's character for truthfulness under Rule 608(b), its probative value must not be substantially outweighed by its unfairly prejudicial effect under Rule 403.").

### B. Discussion

Courts in this Circuit have repeatedly barred cross-examination regarding violent conduct, including domestic acts, that has no bearing on a witness's credibility.  *See, e.g.*, *United States v. Jeffers*, 402 F. App'x 601, 603 (2d Cir. 2010) (summary order) (affirming preclusion of cross-examination of cooperating witness regarding prior acts of domestic violence based on

"determination that the purported prior acts of violence were not probative of [the witness's] credibility"); *United States v. Flaharty*, 295 F.3d 182, 191 (2d Cir. 2002) (affirming preclusion of cross-examination of cooperating witness regarding his role in a murder because the "murder was not relevant to [the witness's] credibility," and noting that "there was ample other material through which defendants could test his credibility and expose any bias"); *United States v. Fama*, No. 12 Cr. 186 (WFK), 2012 U.S. Dist. LEXIS 173879, at *1 (E.D.N.Y. Dec. 7, 2012) (precluding cross-examination regarding prior acts of domestic violence because they "are not probative of [the witness's] credibility and do not indicate a lack of truthfulness"); *United States v. Agostini*, 280 F. Supp. 2d 260, 262 (S.D.N.Y. 2003) (precluding cross-examination regarding witness's prior arrests for allegedly assaulting his girlfriend, finding that "they do not involve instances of dishonesty or making false statements," were unduly prejudicial, and noting "the Second Circuit's inclination to preclude the discussion of a witness's prior commission of violent crimes because of such crimes' lack of relevance to the issue of the witness's veracity").

Here, as in those cases, the domestic incidents did not involve dishonesty or deception, and they have no bearing on the credibility of CS-1. Any questioning regarding the domestic incidents would be inflammatory and unfairly prejudicial. Moreover, there is "ample other material" through which CW-1 can be cross-examined. The defense will be able to cross-examine CW-1 about, among other things, his drug dealing, violent activities, and his incentives to testify based on cooperation agreements with the Government. *See United States v. Laljie*, 184 F.3d 180, 192 (2d Cir. 1999) ("Cross-examination is not improperly curtailed if the jury is in possession of facts sufficient to make a 'discriminating appraisal' of the particular witness's credibility."). Accordingly, the Government requests that the Court preclude the defense from cross-examining CW-1 about domestic disputes that did not result in a conviction.

## V.     THE COURT SHOULD DENY THE DEFENDANT'S REQUEST TO LIMIT THE SCOPE OF THE GOVERNMENT'S BALLISTICS EVIDENCE

On August 15, 2018, the defendant filed a letter in which he argued that the Government's proposed ballistics testimony should be "drastically limited in scope" at trial.  (Dkt. 69).  On August 22, 2018, the defendant filed another letter in which he argued that "[t]rial courts have limited the weight to be given by juries to testimony of ballistics 'experts.'"  (Dkt. 72).  Although the relief sought by the defendant is unclear, the Government respectfully submits that the expert testimony the Government seeks to introduce is both relevant and admissible under longstanding Second Circuit precedent and should be admitted.

More specifically, the Government proposes to allow Detective Fox to testify that he reached his conclusions "to a reasonable degree of certainty in the field of ballistics."  This formulation is consistent with recent guidance from the Second Circuit.  *See also United States v. Gil*, 680 F. App'x 11, 14 (2d Cir. 2017) (finding no manifest error in the district court's decision to allow the government's ballistics expert to testify that he reached his conclusions "to a reasonable degree of certainty in the field of ballistics").

### A.  Relevant Facts

The only ballistics evidence the Government seeks to admit is the testimony of Detective Jonathan Fox of the New York City Police Department's ("NYPD") Firearms Analysis Section. Detective Fox was asked to conduct a ballistics comparison between three .40 caliber shell casings recovered at the scene of a shooting that occurred on July 25, 2015.  Detective Fox concluded that, based on his opinion, all three shell casings were fired from the same weapon.  Detective Fox was also asked to examine the deformed bullets that were recovered at the scene of a shooting that occurred on August 4, 2015.  The Government anticipates that Detective Fox will testify that these deformed bullets appear consistent with the ammunition fired from a shotgun.

Among other qualifications, Detective Fox: (i) has been qualified as an expert witness, including as an expert in the microscopic examination of firearms, approximately 320 times in state and federal courts; (ii) has been employed by the Firearms Analysis Section of the NYPD for approximately fourteen years; (iii) has received extensive training from the NYPD, including courses in firearms operability analysis and microscopic analysis; (iv) has passed proficiency exams given each year by the NYPD in firearms operability and microscopic analysis; and (v) has been engaged in the microscopic examination of firearms for approximately ten years, during which time he has examined and opined on thousands of pieces of ballistics evidence.

During his proposed testimony, the Government expects Detective Fox to testify about (i) his training, qualifications, and experience in the field of firearms and ballistics examination; (ii) the foundations of the field of firearms and ballistics examination, including the operation of firearms, the effects of the manufacturing process on firearms and ballistics evidence, toolmark identification, and use of the comparison microscope; and (iii) his opinions, based on his training and experience, about the ballistics matches described above, and that those opinions are based on the application of his training and experience to the microscopic examination and comparison of the relevant ballistics evidence and the toolmarks and ballistics impressions present on that evidence.

**B. Applicable Law**

Rule 702 of the Federal Rules of Evidence provides:

> If scientific, technical, or other specialized knowledge will assist the trier of fact to understand the evidence or to determine a fact in issue, a witness qualified as an expert by knowledge, skill, experience, training, or education, may testify thereto in the form of an opinion or otherwise, if (1) the testimony is based upon sufficient facts or data, (2) the testimony is the product of reliable principles and methods, and (3) the witness has applied the principles and methods reliably to the facts of the case.

With respect to the admissibility of expert opinion testimony under Rule 702, the Supreme Court has adopted a two-step inquiry to determine "whether the reasoning or methodology underlying the [expert's] testimony is . . . valid and . . . whether that reasoning or methodology properly can be applied to the facts in issue." *Daubert* v. *Merrell Dow*, 509 U.S. at 592-93.  Before admitting such testimony, the district court must determine (1) that the proffered testimony is scientifically based and therefore reliable; and (2) that the proffered testimony will be relevant and helpful to the trier of fact.  *See United States* v. *Kwong*, 69 F.3d 663, 668 (2d Cir. 1995) (finding that the *Daubert* standard requires that "the proffered scientific evidence is both relevant and reliable").  In *Kumho Tire Co.* v. *Carmichael*, 526 U.S. 137, the Supreme Court held that "the basic gatekeeping obligation" of *Daubert* applies to all expert testimony, including from fields other than the physical or natural sciences.  *Id.* at 147.

While the proponent of expert testimony has the burden of establishing by a preponderance of the evidence that the admissibility requirements of Rule 702 are satisfied, *see Daubert*, 509 U.S. at 593 n.10, the District Court is the ultimate gatekeeper.  The Federal Rules of Evidence assign to the Court "the task of ensuring that an expert's testimony both rests on a reliable foundation and is relevant to the task at hand."  *Id.* at 597.  In *Daubert*, the Supreme Court set out a list of non-exclusive factors that the trial court may consider in determining whether an expert's reasoning or methodology is reliable: (1) whether the theory or technique used by the expert can be, and has been, tested; (2) whether the theory or technique has been subjected to peer review or publication; (3) the known or potential rate of error of the method used; (4) whether there are standards controlling the technique's operation; and (5) whether the theory or method has been generally accepted within the relevant scientific community.  *Daubert*, 509 U.S. at 593-94.

In *Kumho Tire*, the Supreme Court emphasized that *Daubert* is to be applied flexibly and that "*Daubert*'s list of specific factors," "neither necessarily nor exclusively applies to all experts or in every case." 526 U.S. at 141. In fact, a "'review of the case law after *Daubert* shows that the rejection of expert testimony is the exception rather than the rule.'" *Travelers Property & Cas. Corp.* v. *General Elec. Co.*, 150 F. Supp. 2d 360, 363 (D. Conn. 2001) (citing Fed. R. Evid. 702 Advisory Committee Notes, 2000 Amendments). Indeed, the Second Circuit uses a particularly broad standard in determining the admissibility of expert opinion testimony under Rule 702. *See, e.g.*, *Boucher* v. *United States Suzuki Motor Corp.*, 73 F.3d 18, 21 (2d Cir. 1996) (holding that testimony is to be admitted unless purely conjectural or based on totally unfounded assumptions).

In carrying out its gatekeeping function, the Court must keep in mind the Supreme Court's admonition in *Daubert* that, "[v]igorous cross-examination, presentation of contrary evidence, and careful instruction on the burden of proof are the traditional and appropriate means of attacking shaky but admissible evidence." *Daubert*, 509 U.S. at 596; *see also United States v. Barone*, 09 Cr. 91 (NRB), 2010 WL 2976502, at *1 (S.D.N.Y. July 14, 2010); *United States* v. *Monteiro*, 407 F. Supp. 2d 351, 359 (D. Mass. 2006); 4 Joseph M. McLaughlin, Jack B. Weinstein & Margaret A. Berger, *Weinstein's Federal Evidence* § 702.02[5], at 702-20 (2d ed. 2005) ("Trial courts should be aware of the curative powers of the adversary system when faced with an objection that is solely on the basis of confusion."). As one District Court noted:

> *Daubert* does not require that a party who proffers expert testimony carry the burden of proving to the judge that the expert's assessment of the situation is correct. As long as an expert's scientific testimony rests upon "good grounds, based on what is known," *Daubert*, 509 U.S. at 590, . . . , it should be tested by the adversary process - competing expert testimony and active cross-examination - rather than excluded from jurors' scrutiny for fear that they will not grasp its complexities or satisfactorily weigh its inadequacies. In short, *Daubert* neither requires nor empowers trial courts to determine which of several competing scientific theories has the best

provenance.  It demands only that the proponent of the evidence show that the expert's conclusion has been arrived at in a scientifically sound and methodologically reliable fashion.

*Monteiro*, 407 F. Supp. 2d at 358 (internal citations omitted).

### C. Discussion

#### 1.      Courts Have Uniformly Admitted Expert Ballistics Testimony

The underlying principle of firearms identification is that each firearm will transfer a unique set of marks on bullets when ammunition is fired from that gun.  Patterns produced on bullets and cartridge cases from contact with barrels and firing pins can be microscopically compared to determine if they have originated from a common source.  The theory is that, due to tiny manufacturing variations, no two firearms will produce exactly the same microscopic features on bullets and cartridge cases, just as no two people share the same fingerprints.  *United States v. Diaz*, No. 05-Cr-167, 2007 WL 485967, at *8 (N.D. Cal. Feb. 12, 2007) (citing Erich D. Smith, "Cartridge Case and Bullet Comparison Validation Study with Firearms Submitted in Casework," 36 AFTE J. 130 (2004)).  Therefore, by using a comparison microscope to compare ammunition test-fired from a recovered gun with spent bullets and shell casings from a crime scene, a trained and experienced firearms examiner can determine whether the recovered ammunition was fired from that particular gun.  *See Monteiro*, 407 F. Supp. 2d at 359 (quoting Smith, "Cartridge Case and Bullet Comparison Validation Study" for its finding that with respect to consecutively manufactured Ruger pistols "variations, combined with other imperfections and irregularities that occurred during the manufacturing process, result in unique, individual breechface marks that can be positively identified").  For decades, courts throughout the United States have admitted expert ballistics evidence premised precisely on this principle.  *See, e.g.*, *United States v. Hicks*, 389 F.3d 514, 526 (5th Cir. 2004) ("[W]e have not been pointed to a single case in this or any other circuit

suggesting that the methodology . . . is unreliable" and "the matching of spent shell casings to the weapon that fired them has been a recognized method of ballistics testing in this circuit for decades.").

Many of the *Daubert* criteria are met in this field. First, the methods applied to the microscopic examination of toolmarks has been frequently tested over the years. The Scientific Working Group for Firearms and Toolsmarks collected numerous studies reporting on such methodological testing (a list of these studies can be found at http://www.swggun.org/index.php?option=com_content&view=article&id=5:testability-of-the-scientific-principle&catid=9:ark&Itemid=18). Furthermore, various scientific journals such as the Association of Firearm and Toolmark Examiners Journal, the Journal of Forensic Sciences, and Forensic Science International have peer review processes that subject writer works to reviewers for critique. Error rates in the field are frequently measured by asking trained examiners to match casings to other casing and firearms where the testers know which firearm they came from. In one such study in 2014, the examiners found a false positive rate of 1.01% and a false negative rate of .367%. Baldwin, Morris and Zamrow, "A Study of False-Positive and False-Negative Error Rates in Cartridge Case Comparisons", Presented at 45th Association of Firearm & Tool Mark Examiners Training Seminar, Seattle WA, May 15, 2014 (synopsis found at http://www.swggun.org/index.php?option=com_content&view=article&id=6:error-rate-resources&catid=9:ark&Itemid=18, along with the author's PowerPoint presentation on the study).

Every court to have addressed the admissibility of this type of ballistics analysis under *Daubert* has consistently determined that the field of ballistics evidence, and the microscopic examination of ballistics evidence in particular, is the proper subject of expert testimony and is

admissible under Rule 702 and the standards set forth in *Daubert*. *See, e.g., United States v. Willock*, 696 F.Supp.2d 536, 568 (D. Md. 2010) ("[E]very federal court to have examined the issue in a written opinion . . . [has] concluded that [ballistic toolmark analysis] is sufficiently plausible, relevant, and helpful to the jury to be admitted in some form."); *Diaz*, 2007 WL 485967, at *5 (noting that "[a]t least 37 jurisdictions have approved [firearm toolmark identification] by appellate opinion" and "[n]o reported decision has ever excluded firearms identification expert testimony under *Daubert*."); *United States v. Santiago*, 199 F. Supp. 2d 101, 111 (S.D.N.Y. 2002) ("The Court has not found a single case in this Circuit that would suggest that the entire field of ballistics identification is unreliable.") (Marerro, J.); *see also United States v. Sheffer*, 523 U.S. 303, 313 (1998) (contrasting polygraph evidence with more established, reliable evidence, such as ballistics); *United States v. Davis*, 103 F.3d 660, 672 (8th Cir. 1996) (upholding the use of firearms identification testimony to link bullets from a crime scene to a firearm associated with the defendant); *United States v. O'Driscoll*, 2003 WL 1402040, at *2 (M.D. Pa. 2003) ("[T]he field of ballistics is a proper subject for expert testimony and meets the requirements of Rule 702."); *United States v. Cooper*, 91 F. Supp. 2d 79, 82 (D.D.C. 2000).[1]  The use of ballistics evidence has, in fact, become so routine that its admissibility is more often presumed than litigated.

The defense brief does not and cannot cite a single case in which a court held the methodology employed in this case—microscopic comparison of spent shell casings—was not sufficiently reliable to be admitted as expert testimony under Rule 702.  Indeed, the very case cited by the defense in support of their argument against admissibility of ballistics pattern-matching

---

[1] Nor is the Government aware of any state court that has precluded expert ballistics testimony.  *See People v. Givens*, 30 Misc. 3d 475, 478, 912 N.Y.S.2d 855, 857 (N.Y. Sup. Ct. 2010) ("This Court was unable to find any cases where firearms and toolmark identification was found to be unreliable or no longer scientifically acceptable. Nor were there instances where the testimony was ruled to be inadmissible.")

testimony proves just the opposite.  In *United States* v. *Glynn*, 578 F. Supp. 2d 567 (S.D.N.Y. 2008) (Rakoff, J.), on which the defendant almost exclusive relies, the Court ultimately concluded that expert ballistics testimony *is* admissible and that such testimony in fact rests on a sufficient foundation.  *Id.* at 574-75 ("[Ballistics examination] methodology has garnered sufficient empirical support as to warrant its admissibility.").  Other courts that have considered the methodology involved have reached similar conclusions.  *See*, *e.g.*, *Monteiro*, 407 F. Supp. 2d at 372 ("The Court concludes that the methodology of firearms identification is sufficiently reliable."); *Diaz*, 2007 WL 485967, at *11 (permitting ballistics expert to testify that casings or bullets were fired from a particular firearm "to a reasonable degree of ballistic certainty"); *United States v. Green*, 405 F. Supp. 2d 104, 123 (D. Mass. 2005) (permitting expert ballistics testimony with limitations and noting that "precedent plainly points *in favor* of admissibility") (emphasis in original)).

More specifically, in *Glynn*, Judge Rakoff held a *Daubert* hearing and reviewed the relevant literature at length.  *See* 578 F. Supp. 2d 567.  The Court found that, although the science of ballistics identification "has not been put to the rigorous testing that science demands, it has been sufficiently well-documented to support a reasonable hypothesis of its validity."  The Court added that while the "assumption that [the] unique characteristics of each firearm are to an appreciable degree copied onto some or all bullets and casings fired from that gun" is "never proven to a degree of scientific certainty, this assertion is both plausible and sufficiently documented by experience as to provide a good working assumption for most practical purposes." *Id.*  Given these conclusions, Judge Rakoff permitted the Government's ballistics expert to testify about his conclusions that the casings and firearms in question constituted ballistics matches, in his opinion.  The Court did limit the expert's characterization of his level of certainty as to his

28

findings, ruling that the expert could only testify that his conclusions were "more likely than not." *Id*. at 574-75.  Similarly, in *United States v. Green*, while the District Court noted that "precedent plainly points *in favor* of admissibility," it precluded the ballistics expert from giving his opinion that particular shell casings were fired from a particular gun "to the exclusion of every other firearm in the world." *Id.* at 123.  The expert, however, was allowed to detail his findings about the ways in which the shell casings were similar to those test-fired from the gun in question.  *Id.* at 109.

As stated above, the Government proposes to allow Detective Fox to testify that he reached his conclusions "to a reasonable degree of certainty in the field of ballistics."  This formulation is consistent with the Second Circuit's most recent guidance.  *See also United States v. Gil*, 680 F. App'x 11, 14 (2d Cir. 2017) (finding no manifest error in the district court's decision to allow the government's ballistics expert to testify that he reached his conclusions "to a reasonable degree of certainty in the field of ballistics").  The defendant will then, of course, have an opportunity, during his cross-examination of the witness, to challenge Detective Fox's examination in this case, the degree of certainty of his conclusions, and his qualifications to make those conclusions.

## 2. A Hearing Is Not Required

The Second Circuit has made eminently clear that although the District Court's gatekeeping function under *Daubert* requires the Court to ascertain the reliability of a ballistics expert's methodology, it does not necessitate a separate hearing to do so.  *United States v. Williams*, 506 F.3d 151, 161 (2d Cir. 2007).  In *Williams*, the defendant moved for a pretrial *Daubert* hearing to challenge the Government's expert ballistics testimony, contending that the Government had yet to establish its admissibility under Rule 702.  *Id*. at 157.  The District Court denied the motion without a hearing, citing several cases upholding the use of ballistics expert testimony as reliable

under Rule 702. *Id.* On appeal, the defendant challenged the District Court's decision (1) denying him a *Daubert* hearing and (2) failing to undertake an adequate inquiry into the reliability of the Government's expert's firearms identification methodology. The Second Circuit rejected the defendant's contention that the District Court abused its discretion by denying his request for a hearing, holding that the reliability of an expert's methodology properly can be determined by the District Court's consideration of the use of ballistics expert testimony in other cases and by ensuring that before expert testimony is presented to a jury, the proponent of that testimony provides a foundation for the witness's expertise including the witness's experience and training. *Id.* at 161.

Likewise rejecting the defendant's request for a *Daubert* hearing prior to the admission of expert ballistics testimony, a District Court in the Southern District of New York noted that "a trial judge is *not required* to hold an evidentiary hearing if the parties have provided a sufficient basis for a decision." *Santiago*, 199 F. Supp. 2d at 111 (Marerro, J.) (emphasis added) (citing Weinstein's Federal Evidence § 702.02[2] at 702-7 to 702-8 (2d ed. 2000)). Judge Marerro also found as follows:

> The Court has not conducted a survey, but it can only imagine the number of convictions that have been based, in part, on expert testimony regarding the match of a particular bullet to a gun seized from a defendant or his apartment. It is the Court's view that the Supreme Court's decisions in *Daubert* and *Kumho Tire,* did not call this entire field of expert analysis into question. It is extremely unlikely that a juror would have the same experience and ability to match two or more microscopic images of bullets. In fact, in one recent opinion, the Supreme Court used the example of expert testimony on ballistics to provide a contrast to the marginal utility of polygraph evidence. The Court stated "unlike expert witnesses who testify about factual matters outside the juror's knowledge, such as the analysis of fingerprints, ballistics, or DNA found at a crime scene, a polygraph expert can supply the jury only with another opinion, in addition to its own,

> about whether the witness was telling the truth." *See United States v. Scheffer*, 523 U.S. 303, 312 (1998).

*Id.*

There is no need for this Court to hold a *Daubert* hearing to determine the admissibility of expert ballistics evidence. Consistent with the Second Circuit's holding in *Williams* that the reliability of an expert's methodology properly can be determined by the District Court's consideration of the use of ballistics expert testimony in other cases, this Court should rely on the myriad other Courts who have admitted expert ballistics testimony, several of which followed an in-depth review of the relevant academic literature and lengthy *Daubert* hearings in which multiple experts testified.

### 3.      Ballistics Evidence Has Not Been Discredited

As previously mentioned, the underlying principle of firearms identification is that each firearm will transfer a unique set of marks on bullets and cartridge cases when ammunition is fired from that gun. Patterns produced on bullets and cartridge cases from contact with barrels and firing pins can be microscopically compared to determine if they have originated from a common source. The theory underlying firearms identification is that no two firearms will produce exactly the same microscopic features on bullets and cartridge cases, just as no two people share the same fingerprints. *Diaz*, 2007 WL 485967, at *8 (citing Erich D. Smith, *Cartridge Case and Bullet Comparison Validation Study with Firearms Submitted in Casework*, 36 AFTE J. 130 (2004)). Recent scientific studies have demonstrated that the underlying principle that firearms leave unique marks on ammunition has continuing validity. *See, e.g.,* Smith, *supra*, at 130-31 (noting that studies have confirmed that tests have showed that consecutively manufactured gun barrels left unique marks on bullets fired through them); Amy C. Coody, *Consecutively Manufactured Ruger P-89 Slides*, 35 AFTE J. 157 (2003) (finding that with respect to consecutively

manufactured Ruger pistols "variations, combined with other imperfections and irregularities that occurred during the manufacturing process, result in unique, individual breechface marks that can be positively identified."); *see also* Stephen G. Bunch and Douglas P. Murphy, *A Comprehensive Validity Study for the Forensic Examination of Cartridge Cases*, 35 AFTE J. 201 (2003) (finding error rates among trained FBI firearms examiners to be 0%); Francesco Vinci, Piazza Giulio Cesare, Carlo P. Campobasso, James A. Bailey, *Morphological Study of Class and Individual Characteristics Produced by Firing 2500 Cartridges in a .45 Caliber Semi-Automatic Pistol*, 37 AFTE J. 368 (2005); Robert J. Shem and Peter P. Striupaitis, *Comparison of 501 Consecutively Fired Bullets and Cartridge Cases From a 25 Caliber Raven Pistol*, 15 AFTE J. 109 (1983); Yoshimitsu Ogihara, *Comparison of 5000 Consecutively Fired Bullets and Cartridge Cases From a 45 Caliber M19111A1 Pistol*, 15 AFTE J. (1983); Shane J. Kirby, *Comparison of 900 Consecutively Fired Bullets and Cartridge Cases From a 455 Caliber Smith & Wesson Revolver*, 15 AFTE J. (1983).  Such studies show the continuing acceptance of ballistic comparisons with the forensic science community.

Whether or not characterized as "science," as Rule 702 and the cases make clear, expert testimony is not limited to those disciplines universally deemed "science."  *See Glynn*, 578 F. Supp. 2d at 573 (ballistics evidence admissible even though ballistics could not fairly be called a "science" on the theory that "unique characteristics of each firearm are to an appreciable degree copied onto some or all bullets and casings fired from that gun . . . is both plausible and sufficiently documented by experience as to provide a good working assumption for most practical purposes"); *Willock*, 696 F. Supp. 2d at 571 (admitting ballistics evidence and noting that "while, on the existing record, it may be debatable whether it is 'science,' it clearly is technical or specialized, and therefore within the scope of Rule 702").

In sum, there is no basis for the Court to preclude Detective Fox's testimony as a general matter, nor is any hearing necessary on the issue.  The Government is unaware of a single federal case excluding ballistics testimony of this type on Rule 702 grounds, nor has the defendant cited any such case.  To the contrary, the cases relied upon by the defendant have each found the testimony admissible.  Therefore, the Government respectfully submits that the defendant's motion to preclude should be denied.

### 4.     The Particular Expert Testimony Offered by the Government is Admissible

While the defendant challenges the wholesale admissibility of ballistics expert testimony, he does not challenge the particular ballistics evidence in this case.  The defendant has not pointed to any specific aspect of Detective Fox's proffered testimony that makes it unreliable.  Moreover, should Detective Fox be permitted to testify at trial, the jury will hear him describe his bases for his conclusions, and defense counsel will have the opportunity to cross-examine him as to those bases.  The Government respectfully submits that cross-examination (by counsel who, based on his motion, is clearly familiar with the potential issues related to ballistics examination) as to the criticisms of ballistics analysis—e.g., error rates, the possibility that another examiner could reach a different conclusion, the subjective aspects of the generally-accepted methodology in ballistics examination, and so on—will be more than adequate to alleviate the defendant's concerns.

Moreover, before asking Detective Fox to state his conclusions, the Government will elicit testimony about the methods used by him in performing his ballistics analysis.  *See Santiago*, 199 F. Supp. 2d at 112 (rejecting need for *Daubert* hearing and noting that the reliability of the expert's testimony "can be answered through the foundation that the Government must establish before the Court accepts the [witness] as an expert witness, [including] . . . the methods he used to match the bullets with the guns in question").  Indeed, the defendant has the ability to retain his own expert

to dispute the Government's expert's conclusions.  The adversarial process, including "vigorous cross-examination" and the "presentation of contrary evidence," will be more than sufficient to address any criticism of ballistics testimony.  *See Daubert*, 509 U.S. at 596.

## CONCLUSION

For all of the foregoing reasons, the Government respectfully requests that the Court grant the Government's motions *in limine* in their entirety.  The Government also respectfully requests that the Court deny the defendant's request to limit the scope of Detective Fox's expert testimony.

Dated: New York, New York
      August 22, 2018

<div style="margin-left:40%">

Respectfully submitted,

GEOFFREY S. BERMAN
United States Attorney for the
Southern District of New York

By: _____
Michael K. Krouse
Nicholas S. Folly
Assistant United States Attorneys
(212) 637-2279/1060

</div>