I9AKPOL1–CORRECTED

```
UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
------------------------------x

UNITED STATES OF AMERICA,

            v.                        17 CR 649 (GBD)

TERRELL POLK,

              Defendant.

------------------------------x

                                  New York, N.Y.
                                  September 10, 2018
                                  9:50 a.m.

Before:

              HON. GEORGE B. DANIELS,

                                  District Judge
                                  – and a Jury –


                    APPEARANCES


GEOFFREY S. BERMAN,
     United States Attorney for the
     Southern District of New York
MICHAEL KIM KROUSE
NICHOLAS FOLLY
MAX NICHOLAS
     Assistant United States Attorneys

RICHARD B. LIND
     Attorney for Defendant


ALSO PRESENT:

JONATHAN CONCEPCION, U.S. Attorney's Office Paralegal
JESSICA ALVARADO, NYPD
```

I9AKPOL1-CORRECTED

1          (Case called)

2          THE LAW CLERK:  Will the parties please stand up and

3     state their appearances for the record, beginning with the

4     government.

5          MR. KROUSE:  Good morning, your Honor.  Michael

6     Krouse, Nicholas Folly, and Max Nicholas, for the United

7     States.  With us at counsel table is Jonathan Concepcion, a

8     paralegal in our office, and Detective Alvarado, from the New

9     York City Police Department.

10          THE COURT:  Good morning.

11          MS. ALVARADO:  Good morning.

12          MR. LIND:  Good morning, Judge.  Richard Lind, for the

13     defendant, and Mr. Polk is standing next to me.

14          THE COURT:  Good morning.

15          We should have a jury panel in about half an hour.  I

16     know there are some issues that are outstanding.

17          Let me first address the issue of scheduling.

18     Mr. Lind, you indicated that you received some material on

19     Friday.  Basically -- I think it's basically notes from

20     interviews of a witness and the criminal history of that

21     witness.

22          What's your situation?  Have you had an opportunity to

23     review that material?

24          MR. LIND:  Well, I went over it with my client, but

25     he's still going over it.  The government, at my request, did a

I9AKPOL1-CORRECTED

 1   CD of that, because we don't want to have written material

 2   being in the MCC -- I'm sorry, Judge, let me stand up -- and

 3   I'm still making the same request that I made in my letter.  My

 4   client is facing a lot of time in jail, Judge, and I think a

 5   few hours' difference would be very helpful in connection with

 6   that.

 7          THE COURT:  I'm not quite sure what you want to do.

 8          MR. LIND:  Well, my request in the letter would be to

 9   recess after the selection of the jury.

10          THE COURT:  To recess and to do what when?

11          MR. LIND:  So I can review the material in person with

12   Mr. Polk.

13          THE COURT:  How much time would you want to do that?

14          MR. LIND:  About two hours.

15          THE COURT:  Is there a reason that that can't be done

16   at the end of the day today?

17          MR. LIND:  No, there's no real reason, Judge, except

18   that they take him back to the MCC, I have to spend time there

19   then waiting for him to be brought up to his room -- not his

20   room, the third floor.  And for reasons like that, Judge, I'm

21   asking for a little bit of time.

22          THE COURT:  Well, I don't want to start and stop.  I

23   don't want to delay the jury, and I don't even know to whose

24   prejudice it would be for the jury to get started, and then

25   have to sit around and wait for us.  I'm not quite sure how

I9AKPOL1-CORRECTED

1    much time you need and when you think you will be ready to
2    proceed.

3           MR. LIND:  Well, your Honor, after I spend time
4    reviewing the most recent 3500, I think I would be ready to
5    proceed.

6           If your Honor wants to wait after we select the jury,
7    and I can meet with Mr. Polk at that time before we proceed,
8    that would be a suitable alternative to what I'm asking for.

9           THE COURT:  I'm just trying to figure out -- and I
10   will hear from the government on their schedule.  I'm just
11   trying to figure out whether we need -- this witness is not
12   going to testify today?

13          MR. KROUSE:  No, your Honor.

14          THE COURT:  So that's what I'm trying to figure out.
15   I'm trying to figure out whether we need to delay other
16   witnesses today in order to accommodate you in some way.

17          MR. LIND:  Okay, Judge.  That's your call.

18          THE COURT:  I'm trying to make an educated call.  Is
19   there a reason for us to do that?

20          MR. LIND:  Your Honor, no.  Then my alternative would
21   be to have Mr. Williams called a little bit out of turn.  He
22   was going to be called tomorrow morning, and I would rather
23   that he be called sometime late in the morning rather than --
24   you know, substitute some other witness, so I have sufficient
25   time to go over this stuff with my client.

I9AKPOL1-CORRECTED

1              THE COURT:  Okay.

2              Let me find out from the government what the schedule

3      is.

4              MR. KROUSE:  Your Honor, just for a little bit of

5      background:  The government produced -- first, the Court

6      ordered the production of 3500 to be last Tuesday,

7      September 4th.  The government produced the 3500 for

8      Mr. Williams well in advance of that deadline.  We produced it

9      on August 30th, which is the Thursday before.  So five days

10     earlier, the government produced the vast bulk of the 3500 for

11     Mr. Williams.  It consisted of around 344 pages.  And then in

12     the course of going through the 3500, the government discovered

13     that 26 of the files that had been produced in 3500 were

14     duplicates instead of actual -- so 26 files were left out.  So

15     the government noticed that, immediately called Mr. Lind, told

16     him that there are these 26 other files.  That consisted of

17     around 90 pages of material.  The bulk of it was arrest reports

18     from sealed arrests of the defendant.

19             So your Honor is familiar, the actual substance of

20     those reports are basically a paragraph that describes why the

21     cooperator was arrested on that day.  There were proffer notes

22     in there, around 37 pages worth of proffer notes.  Some of

23     those proffer notes concern Mr. Polk, some of the proffer notes

24     concerned other matters that Mr. Williams had provided

25     information to the government about.

I9AKPOL1-CORRECTED

1          So we're talking about a sum total of around 90 pages,

2     and it's not a voluminous amount that had been left out.  So

3     the government produced that on Friday afternoon last week.

4          From the government's perspective, as we said,

5     Mr. Williams is not testifying today.  Our strong preference

6     would be to select a jury, open on the case, and then call

7     whatever witnesses we have time for.  We have today four

8     witnesses that would be available to testify who are testifying

9     before Mr. Williams.  Tomorrow, we would have one additional

10    witness before Mr. Williams, who's a law enforcement officer,

11    and then our intention would be to call Mr. Williams at that

12    time.

13         We anticipate Mr. Williams being on the stand for

14    direct testimony for approximately four hours, give or take.

15    So our view is that after the one law enforcement witness

16    testifies and Mr. Williams testifies, that would be the bulk of

17    the day tomorrow.  We don't see any real reason to delay.

18         One alternative would be to proceed as planned today,

19    and then tomorrow, get started a little bit later in the day,

20    so maybe instead of 9:30, getting started at 10:30, to allow

21    Mr. Lind to spend the morning with his client discussing the

22    materials and also give him the opportunity to do it tonight,

23    and then proceed with him Tuesday and give the jury both

24    witnesses that the government is planning to call on Tuesday.

25         THE COURT:  So you have approximately five witnesses

I9AKPOL1-CORRECTED

 1   before this witness testifies?

 2          MR. KROUSE:  Yes, your Honor.

 3          THE COURT:  Approximately how long would it take to

 4   present those five witnesses?

 5          MR. KROUSE:  Those witnesses are all either law

 6   enforcement officers or -- and in one instance, it's an

 7   individual from our office who extracted a cell phone.  I don't

 8   think any of those witnesses are particularly long, so

 9   depending on the volume of cross-examination, I think we could

10   be done with all five of those witnesses in a few hours.

11          THE COURT:  And you anticipate approximately how long

12   with this witness we're talking about?

13          MR. KROUSE:  Your Honor, four to five hours on direct,

14   and then cross-examination would probably also be fairly

15   extensive.

16          THE COURT:  So it's not likely that we're going to get

17   to cross-examination of this witness before after lunch

18   tomorrow?

19          MR. KROUSE:  No, we will not get to cross-examination

20   before lunch tomorrow on this witness.  I don't think so, your

21   Honor.

22          THE COURT:  All right.

23          Mr. Lind, this is what I'm going to do then:  I

24   usually promise the jury we're going to move forward

25   efficiently and on schedule.  I'd still like to go ahead and

I9AKPOL1-CORRECTED

1    pick a jury today, have opening statements, and begin with the

2    first one to three witnesses, depending on how far we are, and

3    I anticipate maybe we can start with the first witness.

4            I'm willing to adjourn a little early, so that you can

5    have some discussions with your client about this material this

6    evening.  I'm willing to start a little later tomorrow if you

7    want some further time to discuss it with him further tomorrow,

8    and we will have both lunchtime today that you can discuss it

9    with him and lunchtime tomorrow where you can discuss it with

10   him.  If it warrants some further delay, then we can discuss

11   what the reason for that further delay is and what's a

12   reasonable amount of time further to go over this material.

13           I understand you're saying that what you want is

14   further opportunity for your client to review it and you to

15   discuss it with your client, not necessarily that you haven't

16   had the material and you haven't had an opportunity to review

17   the material.

18           MR. LIND:  You're absolutely right, Judge.  I'm not

19   trying to delay this indefinitely.

20           THE COURT:  I understand.

21           MR. LIND:  I appreciate your Honor's suggestion.  I

22   think what your Honor has suggested -- I would rather go over

23   it with him for lunch today and start maybe an hour, hour and a

24   half, a little bit later tomorrow.  That way, there wouldn't be

25   any problem in going forward.

I9AKPOL1-CORRECTED

1          Once again, I'm not -- there was not an

2     antagonistic --

3          THE COURT:  No, I understand that.

4          MR. LIND:  -- reason for my -- it's more a

5     professional responsibility.

6          THE COURT:  I understand.

7          MR. LIND:  Okay.

8          THE COURT:  Let's do this:  Let's see where we are.  I

9     anticipate that it's not likely that we're going to get through

10    more than one or two witnesses today, and we will adjourn

11    sometime between 4:30 and a quarter to 5:00, so you can start

12    talking to your client.  You'll continue whatever discussions

13    you had with him over lunch with regard to this material, or at

14    least give him an opportunity to review this material further

15    before you discuss it with him, and then we'll see how early or

16    late we can start tomorrow.  I don't want to start too late

17    tomorrow because I don't want to start out with the jury

18    telling them to come in here necessarily 10:30, 11:00 o'clock

19    on the very first day of the trial, which I anticipate that

20    kind of delay could end up pushing it back a day or two in

21    terms of their time.

22          So I'll give you a reasonable opportunity to further

23    have your client review it and for you to discuss it with him,

24    but, obviously, what's most important is that before you have

25    to cross-examine this witness, that you had an opportunity to

I9AKPOL1-CORRECTED

1   fully prepare for the cross-examination of this witness with

2   your client and the 3500 material that was produced on Friday.

3          I will factor in that extra time needed to do that,

4   and we'll talk about --

5          MR. LIND:  I don't want to delay the trial either,

6   Judge.  I think your Honor's suggestions and even the

7   government's suggestions are well taken.  I think it would be

8   better if I meet him for lunch.  Maybe he can be kept up here

9   for lunch, or he has to be brought back down?

10          (Discussion off the record)

11          MR. LIND:  Okay.  So I'll meet him for lunch, and

12   we'll see where we are at that point, Judge.

13          THE COURT:  All right.

14          Let me start talking about some of the motions.  I

15   guess we'll start with the government's motions in limine

16   because I really need to get a little bit more context from the

17   government about the nature of the proof at this trial, so I

18   can make an informed judgment about how all this evidence fits

19   in.

20          Give me the nature of the proof, the time frame we're

21   dealing with, an outline of how that's going to be

22   demonstrated.

23          MR. KROUSE:  Yes, your Honor.

24          The indictment charges, as far as time frame, a

25   narcotics conspiracy spanning from 2013 to 2017.

I9AKPOL1-CORRECTED

1        THE COURT:  Right.

2        MR. KROUSE:  The nature of the proof will be that that

3   conspiracy consisted primarily of, but not exclusive of, five

4   individuals -- Mr. Polk, the defendant, Mr. Williams, the

5   cooperating witness, Mr. Smith, Mr. Corbett, and Mr. Moss, who

6   are three other defendants who were before your Honor on the

7   same indictment -- and then various other individuals whose

8   names will come up during the trial.  Mr. Williams will testify

9   about the nature of that drug conspiracy.

10        Mr. Polk was in prison until March of 2014 --

11        THE COURT:  When you say "until," starting when and

12   ending when?

13        MR. KROUSE:  Yes, your Honor.  Starting in

14   approximately 2007.

15        THE COURT:  Okay.

16        MR. KROUSE:  Or I believe maybe 2006.  Excuse me.

17        So he was in on a 924(c) prior conviction before Judge

18   Keenan where he received a sentence of seven years.  So he

19   served that sentence, he was released in March 2014, and he

20   went on supervised release.  So the government's theory will be

21   that the conspiracy was in existence in 2013 through 2017.

22   Mr. Polk was released from prison and joined the conspiracy at

23   that time.

24        He then -- Mr. Polk, that is -- was arrested on August

25   26, 2015, in one of the incidents that will come out at trial,

I9AKPOL1-CORRECTED

1   which was a car stop that was the subject of a suppression

2   hearing that your Honor presided over.  The car stop, Mr. Polk

3   was arrested for that period of time -- or on that date,

4   August 26, 2015.  He was then incarcerated until December 13,

5   2016, when he was released on that charge.

6        The charge in the Bronx was dismissed.  He was brought

7   here on a supervised release violation, and he received bail.

8   So he was out, then, on December 13, 2016.  He was then

9   arrested again February 3rd, 2017, pursuant to a search that

10  was conducted on his apartment where a quantity of crack

11  cocaine was recovered.  He was then brought into custody on the

12  violation of supervised release, and he's been incarcerated

13  since that time.

14        So, Mr. Lind, in his motion, just to address that, he

15  argued that the conspiracy, to the extent Mr. Polk was involved

16  in it, he ended that involvement August 26, 2015, when he was

17  arrested for the car stop.  The government's view is:  From the

18  period he was arrested on August 26, 2015, he continued to

19  participate in the conspiracy while in prison, speaking on the

20  phone about matters related to the conspiracy on these prison

21  calls that the government would seek to introduce.

22        THE COURT:  Give me an example of that.

23        MR. KROUSE:  So, for example, your Honor, there's a

24  phone call with Mr. Polk and Mr. Smith, Tim Smith, where

25  Mr. Smith is talking about an ongoing dispute that's occurring

I9AKPOL1-CORRECTED

1   between Mr. Polk's crew and this other crew in Highbridge, and

2   Mr. Smith says that he went and got a gun and confronted this

3   crew, and then he says, I need you out here to Mr. Polk.  And

4   Mr. Polk says, in sum and substance:  Kevin -- which is Kevin

5   Corbett, the other defendant who is a member of this

6   conspiracy -- is going to take this charge, is going to take

7   the gun charge, and then I'll be out.

8        He also -- Mr. Polk also has conversations about

9   selling guns, in the government's view, on these phone calls.

10  He has conversations about where he keeps his guns on these

11  prison phone calls.

12       And then while he is incarcerated -- the government's

13  only seeking to introduce about seven phone calls from prison

14  that occurred in August and September of 2015.  Mr. Polk then

15  gets out in December, and the proof, from the cooperator, will

16  be that Mr. Polk took over crack cocaine sales for the

17  cooperator, who was then incarcerated.  So the cooperator also

18  was incarcerated at various times during this conspiracy, and I

19  can provide the dates for that, but it will come out in the

20  cooperator's testimony that he went in for a supervised release

21  violation for about four months.  He also went in for another

22  supervised release violation for about 60 days, and then he was

23  arrested on a separate indictment in November of 2016.

24       Mr. Polk then got out on his state charge

25  December 2016, and Mr. Williams will testify that Mr. Polk then

I9AKPOL1-CORRECTED

1    took over crack sales in a particular location that

2    Mr. Williams was selling crack at, and then, in the

3    government's view, that would be corroborated by the fact that

4    in February of 2017, when Mr. Polk's apartment was searched,

5    crack cocaine was recovered next to his bed.

6           So, all of which is to say, the government's theory

7    will be the crack cocaine conspiracy spanned 2013 to 2017.

8    Various members were in and out of prison during that time, but

9    the conspiracy continued, and there was no withdrawal of

10   Mr. Polk upon his arrest on August 26, 2015.  He continued

11   engaging in the criminal conspiracy from prison, on prison

12   phone calls, and then when he got out of prison, continued

13   selling crack cocaine with the same coconspirators and actually

14   possessed crack cocaine in February of 2017.

15          THE COURT:  And you said crack cocaine -- that the

16   charges are both crack cocaine and marijuana?

17          MR. KROUSE:  Yes, your Honor.  Thank you.  That's

18   something I should clarify.

19          The proof will be that the conspiracy, he sold both

20   drugs.  Crack cocaine was the primary drug that they sold.

21   Mr. Smith, who was a member of the conspiracy, primarily or

22   only sold marijuana, and he got that marijuana from Mr. Moss,

23   who was another member of the conspiracy.  So the proof will be

24   that Mr. Moss had two people that worked for him, Kevin Corbett

25   and Timothy Smith.  Kevin Corbett sold crack for him, Timothy

1    Smith sold marijuana for him.

2         Importantly, for this conspiracy, Mr. Smith had a

3    dispute with one of the victims of the shooting in a building

4    where this crew controlled drug sales in, and Mr. Smith was

5    selling marijuana in that building and so was the victim, and

6    the dispute arose over who was permitted to sell marijuana in

7    that building, and that's what ultimately led to that

8    individual, the victim, being shot by Mr. Polk.

9         So the marijuana is also a part of this conspiracy,

10   although the defendant himself and the cooperating witnesses

11   primarily sold crack cocaine.

12        THE COURT:  What's the evidence with regard to the use

13   of firearms?

14        MR. KROUSE:  Your Honor, the evidence will be that

15   part of what bound this conspiracy together was that they all

16   shared firearms and shared access to firearms.  So the

17   testimony will be that there were five separate firearms owned

18   effectively by this conspiracy and shared amongst all the

19   members.  There were two pistols, semiautomatic pistols, one

20   revolver, a sawed-off shotgun, and an assault rifle.

21        The proof will be that those firearms were all shared.

22   They were shared for the purpose of maintaining the drug crew's

23   territory, to keep out rivals, to enforce their primacy in that

24   location, and the proof will be that two of those five firearms

25   were used by Mr. Polk in these two shootings that the

I9AKPOL1-CORRECTED

1  government will primarily be proving up.  So the one shooting

2  at 1055 University Avenue, which was committed with a .40

3  caliber semiautomatic pistol --

4            THE COURT:  Was what date?

5            MR. KROUSE:  July 25, 2015, your Honor.

6            -- and then a second shooting, which was committed on

7  August 4, 2015, about ten days later.  And that shooting was

8  committed with a sawed-off shotgun, which is another firearm

9  that was owned and shared amongst the members of the

10  conspiracy.

11            THE COURT:  One or both of these incidents are on

12  video?

13            MR. KROUSE:  Both incidents have associated video

14  surveillance.  So the first shooting, there is a video of the

15  actual shooting, you will see the physical act of shooting, the

16  gun firing at this victim.  The other shooting, there is video

17  surveillance of the outside.  The shooting happened inside of a

18  store.  There is video surveillance from a building showing the

19  car pulling up, the car stopping in the middle of the street,

20  an individual who we believe to be Mr. Polk jumping out of the

21  car, running into a store armed, and then running back out of

22  the store about 15 seconds later, jumping back in the car, and

23  driving away while everyone on the street is running down the

24  street because they heard the gunshot.

25            So it would just be an exterior video, but you won't

I9AKPOL1-CORRECTED

1    see the actual shooting on that video.

2              THE COURT:  Which gun did you say that was?

3              MR. KROUSE:  That was the sawed-off shotgun, your

4    Honor.

5              THE COURT:  And the sawed-off shotgun was which date?

6              MR. KROUSE:  August 4, 2015.

7              THE COURT:  The other one was?

8              MR. KROUSE:  The .40 caliber pistol, so a handgun in

9    that instance.

10             THE COURT:  What is the 8/26?

11             MR. KROUSE:  So that's about three weeks later.  On

12   August 26th, 2015, there's a car stop with Mr. Polk, Mr. Smith,

13   and Mr. Corbett, and that's a new .9 millimeter pistol.

14             THE COURT:  That's a third weapon?

15             MR. KROUSE:  Third weapon, yes, your Honor.

16             THE COURT:  What about the ammunition?

17             MR. KROUSE:  The ammunition, that firearm was loaded

18   with a round in the chamber and two in the magazine.  Various

19   shell casings and bullets were recovered at each of the two

20   shootings, so there will be .40 caliber shell casings recovered

21   from the first shooting incident, and there was what's known as

22   buckshot, red pellets, that were recovered from the second

23   shooting, which was the shotgun.

24             THE COURT:  What is the charge in Count Four?

25             MR. KROUSE:  Count Four, the ammo -- the possession of

I9AKPOL1-CORRECTED

1    ammunition after being a convicted felon, that relates to the

2    July 25th shooting, the shell casings that were recovered.  And

3    there's a stipulation between the parties that those shell

4    casings came from bullets that traveled in interstate commerce.

5              THE COURT:  So you're only charging the bullets,

6    you're not charging the gun?

7              MR. KROUSE:  That's correct, your Honor.  The

8    government didn't recover that firearm, and we didn't --

9              THE COURT:  Did not recover?

10             MR. KROUSE:  Did not, no.

11             THE COURT:  But it recovered the casings?

12             MR. KROUSE:  The casings, yes, your Honor.

13             THE COURT:  What is it that you want -- let's start

14   with coconspirator statements.  What coconspirator statements

15   are at issue here?

16             MR. KROUSE:  Your Honor, there will be various

17   coconspirator statements only through the cooperating witness.

18   The cooperating witness will testify in certain instances to

19   things that, for instance, Mr. Moss told him, or that

20   Mr. Corbett told him, or that Mr. Smith told him.

21             It's a little bit difficult to parse out individual

22   statements.  The government would be able to lay the

23   foundation, in our view, that the conspiracy existed, that the

24   various members of the conspiracy were these individuals, and

25   that these statements are related to the conspiracy and

I9AKPOL1–CORRECTED

1    occurred during the time frame of the conspiracy.

2            So, it's not a lot.  There are various statements that

3    the government will introduce that Mr. Polk made to the

4    cooperating witness, but there are some statements that were

5    also made to Mr. Williams from members of the conspiracy.  So,

6    for instance, I can provide one example that might be helpful:

7    When Mr. Williams went into prison himself on a supervised

8    release violation, that was on August 13th, so Mr. Williams was

9    present for the first shooting, the July 25th, 2015 shooting,

10   and is an eyewitness to that shooting.  He learned about the

11   August 4th shooting himself from Mr. Polk.  The same day it

12   happened, he was told about it, and the government will

13   introduce evidence of that.

14           At that point, Mr. Williams then went into prison for

15   a supervised release violation on August 13th.  So he was not

16   out when the other car stop happened, where the other gun was

17   recovered, but once he got out of prison on the supervised

18   release violation in October, he did learn some details about

19   what happened with that car stop from Mr. Moss, who is a member

20   of the conspiracy, and in the government's view, those would be

21   coconspirator statements in furtherance of the conspiracy,

22   those statements made by Mr. Moss to Mr. Williams about what

23   had happened with their other three coconspirators.

24           THE COURT:  What is the nature of those statements?

25           MR. KROUSE:  The statements were that there were three

I9AKPOL1-CORRECTED

1    people in a car -- Mr. Polk, Mr. Corbett, and Mr. Smith -- they

2    got stopped, a firearm was recovered, and that the firearm was

3    not one of the firearms that was jointly owned by the five of

4    them, it was a new firearm that had been obtained after

5    Mr. Williams went into prison.

6             THE COURT:  Obtained --

7             MR. KROUSE:  No, excuse me, after Mr. -- after

8    Mr. Williams went into prison.  There's no details about how it

9    was obtained, just that it was a new firearm that Mr. Williams

10   wasn't familiar with.

11            THE COURT:  All right.

12            What is the prior arrest or acts of the coconspirators

13   that you want to offer?

14            MR. KROUSE:  The only one we seek to admit is a

15   May 25th, 2013 arrest of Mr. Moss and Mr. Corbett.

16            THE COURT:  2015?

17            MR. KROUSE:  2013.

18            THE COURT:  '13?

19            MR. KROUSE:  Yes.

20            THE COURT:  Arrest?

21            MR. KROUSE:  Arrest of Mr. Moss and Mr. Corbett for an

22   undercover crack cocaine purchase by an undercover officer.

23            THE COURT:  And what's the nature of that testimony?

24            MR. KROUSE:  Your Honor, the testimony would come in

25   from the undercover officer that she purchased a quantity of

I9AKPOL1-CORRECTED

1    crack cocaine from Mr. Moss from this building, 1055 University

2    Avenue, which is an important building for this case.  It's the

3    building where the victim of the first shooting was shot.

4    That's where the first shooting happened.  The testimony will

5    be from the cooperating witness that that was one of the

6    buildings that the crew controlled drug sales in.

7          So, the fact that Mr. Moss and Mr. Corbett were

8    selling crack cocaine from that building, and there is an

9    undercover officer who arrested them on that date, is, in the

10   government's view, proof of the conspiracy existing at that

11   time in 2013.  The government acknowledges, and Mr. Lind

12   mentions in his papers, that Mr. Polk was still in prison at

13   that time, until March 2014, and that is true, but, in the

14   government's view, to establish the conspiracy starting in

15   2013, which is what is charged, the government would seek to

16   admit that single arrest that occurred on that date.

17         THE COURT:  Let me just move on.  I think our jury is

18   ready and on its way.  Let me just move on to the out-of-court

19   statements which you want to offer.

20         MR. KROUSE:  Yes, your Honor.

21         We previously moved on out-of-court statements made by

22   the victim.  We've withdrawn that motion.  We aren't going to

23   seek to admit out-of-court statements by the victim, which we

24   viewed as untrue and, therefore, not introduced for the truth,

25   but we're not going to seek to admit that anymore.

I9AKPOL1-CORRECTED

1           THE COURT:  Okay.

2           MR. KROUSE:  The only other out-of-court statement we

3    have are these excited utterances that we seek to admit, and

4    those are just somebody yelling gun -- we don't know who -- and

5    somebody saying, they're gone.

6           THE COURT:  Some yelling gun when?

7           MR. KROUSE:  In the second shooting, your Honor.

8           So the government will seek to introduce testimony

9    from one of the victims in the second shooting.  So there were

10   two men who were shot on that date with a shotgun.

11          THE COURT:  One of them is going to be a witness?

12          MR. KROUSE:  One of them is going to be a witness, and

13   he will say that he was standing on the street, somebody yelled

14   gun, and that he and the other victim ran into the store, and

15   ran into the back room, and held the door shut, somebody came,

16   shot through the door, they were wounded, still holding the

17   door, and then somebody else came and said, he's gone, you can

18   come out now.

19          So those would be the two sort of excited utterances,

20   he's gone, you can come out now, and gun.

21          THE COURT:  Who is going to testify that the defendant

22   was the shooter?

23          MR. KROUSE:  He will not be testifying that the

24   defendant --

25          THE COURT:  Who?

I9AKPOL1-CORRECTED

1      MR. KROUSE:  The cooperating witness will testify that

2  Mr. Polk told him that he committed that shooting.

3      THE COURT:  Okay.

4      Is there other evidence indicating that it was

5  Mr. Polk who was the shooter?

6      MR. KROUSE:  Your Honor, there is other evidence.

7  There is a vehicle that was used in both shootings, and the

8  cooperating witness will also testify about this.  It was a

9  silver Camry.  It was seen in the video for the first shooting.

10  It was also seen in the video for the second shooting, where

11  Mr. Polk got out and ran in the store.  That vehicle was

12  recovered.  DNA swabs were taken from it, and Mr. Polk's DNA

13  was on the gearshift of that vehicle.

14      So, in addition to Mr. Williams saying that Mr. Polk

15  told him he committed that shooting, there will also be that

16  corroboration.

17      THE COURT:  What is it that you don't want the defense

18  to cross-examine your cooperating witness about?

19      MR. KROUSE:  Your Honor, there are some domestic

20  violence arrests, no convictions, but arrests for Mr. Williams.

21  In our view, those domestic violence incidents are not proper

22  grounds for cross.  They don't have anything to do with

23  Mr. Williams' credibility on the stand or acts of dishonesty.

24  Those are acts that are inflammatory to the jury and don't go

25  to his credibility, and, in our view, they should be excluded.

I9AKPOL1-CORRECTED

1        THE COURT:  What is the nature of the ballistics

2   testimony that you anticipate?

3        MR. KROUSE:  It's fairly limited, your Honor.  It's

4   that those three shell casings that were recovered from the

5   first shooting, the shell casings that concerned Count Four,

6   all came from the same firearm, based on the ballistics

7   expert's opinion.  And it's not groundbreaking testimony, in

8   our view, but it's important testimony nonetheless, in that it

9   shows that these aren't just shell casings that were lying

10   around from a previous shooting, these are three shell casings

11   that are related to the shooting that just happened.  He will

12   also testify that based on his opinion, the fragments or

13   pellets that were recovered from the second shooting are

14   consistent with what a shotgun would fire, the ammunition that

15   a shotgun would fire.

16        THE COURT:  The nature of his opinion will be in the

17   nature of what the defense is objecting to or not?

18        MR. KROUSE:  Your Honor, my understanding of what the

19   defense is seeking to have -- force the government to do is to

20   say that -- instead of saying something to the effect of

21   scientific certainty or something like that, say something like

22   reasonable or more likely than not.  In our view, that's not

23   supported by the law.

24        The government would seek to just qualify Detective

25   Fox as a witness, an expert witness, testify about the analysis

I9AKPOL1-CORRECTED

1     that he conducted upon these various ballistics, and then to

2     say, in his expert opinion, these three shell casings came from

3     the same gun, in his expert opinion, these pellets came from a

4     shotgun, words to that effect.

5          THE COURT:  How do you intend to elicit the nature of

6     that expert opinion?  What language?

7          MR. KROUSE:  Your Honor, just to add, Detective Fox,

8     in your expert opinion, what did you conclude after examining

9     the three shell casings that were recovered on July 25, 2015?

10          We don't intend to elicit anything like the -- in any

11     sort of scientific certainty or anything like that, just that,

12     in his opinion, based on his training and experience, based on

13     his examination of these ballistics, he draws these two

14     conclusions.

15          THE COURT:  All right.

16          Mr. Lind --

17          MR. LIND:  Yes.

18          THE COURT:  -- what issues are in dispute here?

19          MR. LIND:  What issues are in dispute?  A number.

20          THE COURT:  So where do you want to start?

21          MR. LIND:  I want to start with the transcripts, first

22     of all, Judge, the transcripts of the prison phone calls.

23          THE COURT:  Yes.

24          MR. LIND:  There was -- I think there are about five

25     or six.  I think the government may be knocking out one or two.

I9AKPOL1-CORRECTED

1   But there is one specific call, which I had seen, which is

2   marked 802-T, the transcript, and there was a designation of

3   Mr. Smith on that call.  I told the government that that's not

4   his name.  For some reason, it seems like it's on one -- I

5   have, like, a desk breaking amount of volumes from the

6   government here, but mine have Mr. Smith still on it.  There's

7   no longer --

8           MR. KROUSE:  That one has been corrected, your Honor.

9           MR. LIND:  So it has an unknown male?

10          MR. KROUSE:  Yes.

11          MR. LIND:  I just want to make sure.

12          THE COURT:  Just make sure he has a copy of the

13  transcript.

14          MR. KROUSE:  Yes, your Honor.

15          MR. LIND:  My recollection, Judge -- and let me go

16  through all of these for one second before I burden the

17  Court --

18          THE COURT:  Sure.

19          MR. LIND:  -- the first one is between Mr. Polk and an

20  unknown female.  The second one, which used to be between

21  Mr. Polk and Mr. Smith, is between Mr. Polk and an unknown

22  male.  The third one, 803-T, is between Mr. Polk and an unknown

23  male.

24          Are you playing 804, or is that one out?

25          MR. KROUSE:  No, that one is out.

I9AKPOL1-CORRECTED

1              MR. LIND:  Okay.

2              MR. KROUSE:  804 and 805 are out.

3              MR. LIND:  So then you have 806?

4              MR. KROUSE:  Yes.

5              MR. LIND:  None of these are between Mr. Polk and a

6    coconspirator.  They're between Mr. Polk and an unknown person.

7              THE COURT:  Okay.

8              MR. LIND:  So this has nothing to do with furthering

9    the conspiracy or language in terms of aiding the conspiracy.

10             THE COURT:  I don't know the exact nature of the

11   conversation, but it is either in furtherance of the conspiracy

12   or it's an admission.  To the extent -- it doesn't matter

13   who -- even if it wasn't a coconspirator conversation, if it's

14   an admission by the defendant of his participation in that

15   crime, it would be admissible on that basis.

16             MR. LIND:  Right, Judge, I understand your point.  I

17   just wanted to correct --

18             THE COURT:  No.

19             MR. LIND:  -- the coconspirator type of -- so you have

20   talking about various things.  I don't think it's as clear as

21   the government -- we will dispute that, also.

22             But at the end of the day, what happens here is that

23   Mr. -- and this is something I would request of the Court --

24   Mr. Polk had his DNA taken, all three defendants had their DNA

25   taken with respect to the gun.

I9AKPOL1-CORRECTED

1          THE COURT:  Right.

2          MR. LIND:  The other two, there was some basis for

3   them to --

4          THE COURT:  Which gun?  The gun in the car?

5          MR. LIND:  In the August -- the one that your Honor

6   presided over a hearing on.

7          THE COURT:  Right.

8          MR. LIND:  Him, by contrast, there's proof that he is

9   not -- didn't touch the car.

10         THE COURT:  Is anybody's DNA on that gun?

11         MR. LIND:  Yes.

12         THE COURT:  All right.

13         MR. LIND:  The other two occupants of the car.

14         THE COURT:  Both?

15         MR. LIND:  Yes.

16         THE COURT:  Okay.

17         MR. LIND:  So when he's talking about, you know, the

18   case and getting out of jail, what he is talking about

19   eventually and what happens eventually is that he gets the DNA

20   results, and the case is dismissed.  And that's why I wanted to

21   have that admitted into evidence, because they had no case

22   after that.  He was arrested --

23         THE COURT:  Well, I don't --

24         MR. LIND:  You don't follow me or you don't accept my

25   argument?

I9AKPOL1-CORRECTED

1          THE COURT:  I don't accept the argument that it's

2    dismissible that the state decided not to prosecute him,

3    particularly in light of the feds deciding to prosecute him.

4    You say that would be admissible evidence of what, his

5    innocence, because the state decided that they wouldn't

6    prosecute him and the Feds decided that they would?

7          MR. LIND:  They arrested him, Judge, based on --

8          THE COURT:  The police officers arrested him.

9          MR. LIND:  The police officers arrested based on his

10   possession of a gun, which is under that presumption, which I

11   requested your Honor to take judicial notice of.

12         THE COURT:  Right.

13         MR. LIND:  And once they realized they didn't have

14   any -- at a certain point, they realized that he didn't have

15   possession of the gun.

16         THE COURT:  Well, what evidence is there of that?

17         MR. LIND:  The DNA testing.

18         THE COURT:  You're saying they dismissed the case

19   against him after they received the DNA results?

20         MR. LIND:  Oh, yes, absolutely.

21         THE COURT:  Okay.

22         MR. LIND:  I'd like to get the dismissal in --

23         THE COURT:  But why would -- I've never heard argument

24   that the dismissal is somehow admissible evidence of the

25   defendant's guilt or innocence.

I9AKPOL1-CORRECTED

1          MR. LIND:  All right.  I'm --

2          THE COURT:  I don't understand that legal theory.

3          MR. LIND:  Well --

4          THE COURT:  That because they decided not to prosecute

5     him for that gun, that that's evidence that the jury should

6     consider to decide that that means they thought he was not

7     guilty.

8          MR. LIND:  Well, Judge, I'm offering it as a

9     counterargument to the government's theory that's discussed

10    here, that someone else should take the weight by doing the

11    gun, whereas Mr. Polk was able to -- we're able to show that he

12    had no -- his DNA was not on the gun.

13         THE COURT:  I understand the argument with regard to

14    the DNA.

15         MR. LIND:  Okay.

16         THE COURT:  If there's going to be DNA evidence, and

17    the evidence is going -- if there's going to be an expert who

18    testifies that certain people's DNA was found on the gun, then

19    you obviously can either cross-examine the DNA expert as to

20    whether or not this defendant's DNA was found on the gun, or

21    call that witness, or whichever expert who tested it and did

22    not find Mr. Polk's DNA on the gun.

23         MR. LIND:  All right.  Fair enough.

24         THE COURT:  That's obviously an area for you to

25    explore either on cross-examination or calling that as your own

I9AKPOL1-CORRECTED

1   witness.  I have no problem with that.

2          MR. LIND:  Fair enough.  I understand your Honor's

3   point.  I tried.  Your Honor rejected it.

4          THE COURT:  Yes.  And I just want to make sure, so

5   you're not prejudiced -- your client is not prejudiced, that

6   with regard to DNA results, whatever DNA results you want to

7   offer, if the government wants to offer with regard to the

8   defendant or coconspirators and whatever other DNA results you

9   want to offer with regard to coconspirator -- alleged

10  coconspirators and/or your client, I don't see any reason that

11  they have to object, that you have the right to call -- if they

12  have a right to call a witness that says that they did a DNA

13  test, you have the right to call a witness to say that they did

14  a DNA test, compared it with DNA of the defendant, and the

15  defendant's DNA wasn't recovered.

16         MR. LIND:  Okay.

17         THE COURT:  I don't have any problems with that.

18         But to sort of say that somebody in the DA's office

19  made some determination that they weren't going to prosecute

20  the defendant, and we're supposed to assume that that means

21  because they decided that either the defendant was innocent or

22  that they couldn't prove the case, there is no legal theory

23  that that's admissible.

24         MR. LIND:  Fair enough, Judge.

25         Let me now go to the issue of --

I9AKPOL1-CORRECTED

1              THE COURT:  I think our jurors are here.

2              MR. LIND:  Should I stop, Judge?

3              THE COURT:  No.  We'll go for a couple of more

4    minutes, we have the jury here, and then we can pick up.

5              MR. LIND:  Let's go to this arrest of this guy, Moss.

6    In 2013, my client is in jail.  I think that that's totally

7    inadmissible, Judge, for a variety of reasons.

8              THE COURT:  What part is inadmissible?

9              MR. LIND:  What part is inadmissible?

10             THE COURT:  Yes.

11             MR. LIND:  His sale to an undercover officer.

12             THE COURT:  Okay.

13             MR. LIND:  I think that's what the government wants to

14   admit.

15             THE COURT:  Right.

16             MR. LIND:  Obviously, they can't admit statements by

17   him.  He's not a member -- they might want to show the

18   background start of the conspiracy.

19             Now, they offered two grounds, and let me just finish,

20   Judge.  One is the intrinsic evidence, direct evidence kind of

21   stuff, which has to be much stronger.  I think I pointed out in

22   my brief, it's got to be much stronger.  It has to be essential

23   to show the background in the development of the conspiracy.

24   This is not anything of the sort.  I cite a whole bunch of

25   cases.

I9AKPOL1—CORRECTED

1          It's not intrinsic or direct proof of anything.

2          THE COURT:  Well, it's proof of a conspiracy.

3          MR. LIND:  Right.

4          THE COURT:  So the question is, they have to prove two

5   things.  They have to prove that there was a conspiracy, and

6   then they have to prove that the defendant joined that

7   conspiracy.

8          MR. LIND:  Right.

9          THE COURT:  They can prove that there was a conspiracy

10  before the defendant joined the conspiracy, and if the

11  defendant joined the conspiracy knowing the objectives of the

12  conspiracy, then the coconspirator statements, even statements

13  made before the defendant joined the conspiracy, can be

14  admissible.

15         MR. LIND:  I understand that, Judge.

16         Let me just go to the case law regarding direct

17  evidence.

18         THE COURT:  Right.

19         MR. LIND:  There are two things, once again, that the

20  government is claiming.  There is case law, and I quote Judge

21  Keenan and Judge Haight.  For example, Judge Keenan says:

22  Although the proffered evidence is certainly relevant to show

23  the background of the charged conspiracy, it does not appear to

24  be inexorably intertwined.

25         THE COURT:  Right.  But that's background before the

I9AKPOL1-CORRECTED

1      conspiracy.

2              MR. LIND:  No --

3              THE COURT:  When you say background, that's background

4      before the conspiracy.

5              MR. LIND:  I don't think that's necessarily so.  I

6      think that that's background of the conspiracy.

7              THE COURT:  Well, it's not background of the

8      conspiracy.  It's either proof that a conspiracy existed in

9      2013, and they charged him with joining a conspiracy that began

10     in 2013.

11             MR. LIND:  Yes.

12             THE COURT:  So the arrest, at least the sale of drugs

13     in 2013, if they can demonstrate that that was the conspiracy

14     that the defendant joined, then that is direct evidence of the

15     conspiracy.  That is not background evidence of the conspiracy.

16             What would be background evidence of the conspiracy

17     would be to argue that they were selling drugs before this

18     conspiracy began, and so they want to show that because they

19     were selling drugs before this conspiracy, that that somehow is

20     proof of the future -- a different conspiracy or the conspiracy

21     with this defendant.  If their position is that these people

22     were conspiring -- that the conspiracy that's charged in the

23     indictment, if this is evidence of that conspiracy, it doesn't

24     matter at what point the defendant joined that conspiracy.

25             Now, I understand what you say about background.  If

1   that's supposed to be evidence of some other separate

2   conspiracy that this defendant didn't join, that's different,

3   but the defendant is liable for the conspiracy that he joined,

4   and the evidence followed that the conspiracy started before he

5   joined it is admissible evidence of the existence of the

6   conspiracy.  It's not necessarily admissible evidence of his

7   participation in the conspiracy.

8              MR. LIND:  No, I understand, Judge.

9              Also, I'm not trying to cut you off, but I think that

10  the case law makes it much more stringent a rule before you

11  start admitting it, the Court admitting it.  The case law says

12  it must meet the Gonzalez criteria, citing a case, such as by

13  being inextricably intertwined with the charged conduct.  This

14  is not inextricably intertwined with the charged conduct,

15  particularly, Judge -- let me just finish, it will just take a

16  second -- the indictment charges a conspiracy that starts in

17  2014.

18             THE COURT:  No.

19             MR. LIND:  I think so.

20             THE COURT:  No.  The indictment charges from at least

21  in or about 2013 through --

22             MR. LIND:  Okay.

23             THE COURT:  -- in or about 2017, 2013 to 2017.  This

24  is not prior to the alleged conspiracy.

25             MR. LIND:  Well, Judge, okay, then I'll finally go

I9AKPOL1-CORRECTED

1    with this other quote I had:  While the Second Circuit

2    intrinsic evidence standard appears at first glance to be

3    fairly broad, in practice, it's often been limited to instances

4    where the intrinsic evidence is contemporaneous with the

5    charged conduct.

6            THE COURT:  Well, that is contemporaneous with the

7    charged conduct.  If it's 2013 conduct of this conspiracy

8    that's alleged, and the conspiracy is alleged to have begun in

9    2013, evidence in 2013 of this conspiracy is part of the

10   conspiracy.

11           MR. LIND:  All right.  Fair enough, Judge.

12           THE COURT:  Again, if you say that, Judge, they want

13   to show that they were selling drugs before this conspiracy

14   took place, maybe that would be a different argument, but as I

15   understand it now, the parts that they want to offer -- they're

16   not saying, well, we want to show that Moss sold drugs in 2010

17   on his own and then offer that as evidence against this

18   defendant when we've alleged that he's in a conspiracy with

19   these individuals in 2013.

20           What they're saying -- and I don't know how it's going

21   to come out, but I'm just taking it as it's proffered to me --

22   is that these guys were in a conspiracy to sell these drugs,

23   and that conspiracy was at least -- began before your client

24   joined that conspiracy.  So proof of the existence, proof of

25   the beginning of that conspiracy, proof of the existence of

I9AKPOL1-CORRECTED

that conspiracy before your client joined it, proof of the

existence of that conspiracy when he joined it, and proof that

he knew of the objects of that conspiracy when he joined it

seem to all be inextricably intertwined with the conspiracy

that's alleged between 2013 and 2017.

Now, if any of this evidence is prior to 2013, then

I'll hear argument about whether or not it's proof of the

conspiracy being the same conspiracy having begun earlier, or

it's evidence that they were on their own, or they were

involved in some other different conspiracy with a different

set of folks that this Defendant didn't join.  I can understand

that.  But it seems to me, as you say it, I understood your

argument, your legal argument, with regard to prior background

information, but the facts that you are giving me don't support

that legal argument because the facts are not background.  It

says that we had a conspiracy that existed in 2013, this is the

conspiracy we were involved in, and sometime after 2013, in

2014, this defendant joined that conspiracy.  So he joined the

conspiracy knowing what we were involved in, and this is what

we were involved in.

So if they can prove that, then I think -- if they can

demonstrate that this is that conspiracy, and that conspiracy

was going on at that point in time, then it would be admissible

as a coconspirator statement, and the defendant is obviously

responsible for that ongoing conspiracy once he joins it,

I9AKPOL1-CORRECTED

1    knowing its objectives and knowing what that conspiracy -- that

2    it's a conspiracy to sell drugs, even before he got there.

3                THE MR. LIND:  Well, Judge, I agree with virtually

4    everything your Honor just said, except for your Honor's

5    mention of coconspirator statements.

6                THE COURT:  Okay.

7                MR. LIND:  In order for a coconspirator's statement to

8    be admissible, he has to be a member of the conspiracy.  He was

9    not a member of the conspiracy in 2013.

10               THE COURT:  Okay.

11               MR. LIND:  Now, if there is a sale to show background

12   of the conspiracy, that's one thing, but for him to be burdened

13   with a coconspirator statement that happened a year or so

14   before he got out of prison, I would -- I think that that would

15   go against the Federal Rules of Evidence.

16               THE COURT:  I'm not quite sure if that's what we're

17   talking about.

18               MR. LIND:  Well, your Honor just mentioned that.

19               THE COURT:  No, I understand, and you may correct me,

20   and that may be so.  I'm not sure I agree with that.  For

21   example, if coconspirators, the day before he joined the

22   conspiracy, said, we are going to murder X, and he's not there,

23   and then the next day, he joins the conspiracy, and they said,

24   we told him all of the objectives, including that we were going

25   to murder X, I'm not sure you can argue that their statement

I9AKPOL1-CORRECTED

1    the day before he joined the conspiracy as coconspirator

2    statements, that we are going to murder X, is not admissible

3    against your client.

4              I'll look back at that --

5              MR. LIND:  I think it's 801(d)(2)(E).  I forget the

6    section.  I don't have my rulebook.

7              THE COURT:  No, I understand.

8              MR. LIND:  But I think in order for a coconspirator

9    statement to come in, I think it has -- someone has to be a

10   member of the conspiracy.

11             THE COURT:  Someone has to be a member of the

12   conspiracy, but I don't know --

13             MR. LIND:  I think the defendant --

14             THE COURT:  -- the defendant has to be a member of the

15   conspiracy at the time those statements were made by

16   codefendants in furtherance of that conspiracy.

17             MR. LIND:  I may be wrong.

18             THE COURT:  I may be wrong, too, but we'll look at

19   that.

20             MR. LIND:  That's my argument.

21             THE COURT:  We'll look at that before we get to that.

22             Coconspirator statement --

23             MR. LIND:  Then there's the excited utterance.  I'll

24   just rest on what I have in my brief.

25             THE COURT:  I understand he wants to -- they want to

I9AKPOL1-CORRECTED

1   offer the victim's testimony that the victim heard someone say

2   gun.  It seems to me that that would qualify as an excited

3   utterance.

4           The part that they say that I guess he's gone or

5   something like that, I'd say that's probably more so present

6   tense impression rather than -- it could qualify as an excited

7   utterance, but it also further qualifies as present-tense

8   impression.  And then when I balance it, even -- always

9   balancing the probative value against the prejudice, quite

10  frankly, the prejudice is minimal to your client because it's

11  not identifying your client.  It just says somebody just shot

12  at me, and we know that there's testimony and video of the

13  shooting, and somebody says gun just before somebody gets shot

14  at, and then somebody says he's gone after the shooting is over

15  with.  It has probative value.  Undue prejudice?  I'm not sure

16  one could argue that that has undue prejudice.  And I think the

17  first one would qualify as an excited utterance if it's coming

18  out in the manner that they proffer, and the second would

19  qualify as present-tense impression if it's going to coming out

20  the way --

21           MR. LIND:  All right.  Fair enough, Judge.

22           Let me move on to the domestic violence issue.

23           THE COURT:  Sure.

24           MR. LIND:  For the reasons I cited in my memo, I think

25  that this goes to the question of his untruthfulness.  He's

I9AKPOL1-CORRECTED

1    required under the judgments to report to the probation office

2    within 72 hours of being arrested, any arrests.

3              THE COURT:  Okay.

4              MR. LIND:  And he didn't do this with a whole slew.

5    It's not just domestic violence, a lot of these things.

6              THE COURT:  So what do you want to ask him?

7              MR. LIND:  I would ask him, isn't it a fact that you

8    deceived the Court, you didn't live up to this, and you

9    basically deceived the court by not telling them about your

10   arrest for X, Y, and Z, including a domestic violence incident?

11             THE COURT:  Let me make sure factually I understand

12   what the situation is.  He was on supervised release?

13             MR. LIND:  Right.  You were the judge.

14             THE COURT:  Okay.  Then he was on supervised release

15   before me.

16             MR. LIND:  I don't know if you remember him, but he

17   was sentenced by you in 2012.

18             THE COURT:  The reason I don't remember him is because

19   I don't have his name, I just have him as CW.

20             MR. LIND:  I won't mention the name, then.

21             THE COURT:  Maybe it's in the papers that I have, and,

22   no, I didn't recognize it because I just know this as being --

23             MR. LIND:  I thought you knew.  Okay, Judge, whatever.

24             THE COURT:  Is it in the papers, the name?

25             MR. LIND:  It's in the exhibits.

I9AKPOL1-CORRECTED

1          THE COURT:  Oh, it is in the papers.  I know his name.

2     I do know his name.  It's a common name, but I didn't recognize

3     it.  All right.

4          So he was placed on supervised release by this Court?

5          MR. LIND:  Right.

6          THE COURT:  He was arrested for domestic violence?

7          MR. LIND:  He was arrested for a lot of different

8     things.

9          THE COURT:  Okay.  Well, which ones do you want to ask

10    him about?

11         MR. LIND:  All of them, frankly.

12         THE COURT:  That's what I'm saying.  Other than the

13    domestic violence, what else was he arrested for?

14         MR. LIND:  He was arrested for selling, I think,

15    crack.  I think he got -- if I may have a moment, Judge?

16         THE COURT:  Yes.

17         MR. LIND:  I have the 3500 --

18         MR. KROUSE:  Your Honor, it may be helpful, I will

19    just clarify the record:  Mr. Williams was on supervised

20    release before you from November 2012 until October 2015.

21         THE COURT:  Okay.

22         MR. KROUSE:  He was found to have violated his

23    supervised release on two separate occasions.  Both times, your

24    Honor sentenced him to prison.  He got four months on the first

25    violation; 60 days on the second.

I9AKPOL1-CORRECTED

1          None of the domestic violence arrests that the

2   government is seeking to preclude cross-examination on occurred

3   during the time that Mr. Williams was on supervised release.

4          THE COURT:  Okay.

5          MR. KROUSE:  So one of them is from 2006, another is

6   from 2008, another is from 2009, and then there are two in

7   2016.  Mr. Williams was off supervised release in 2016.

8          THE COURT:  What was the basis for revocation?

9          MR. KROUSE:  The first revocation, your Honor, was

10  marijuana was found in his apartment, and it was a distribution

11  quantity, a package for distribution.  He pled to a violation

12  of possessing with intent to distribute marijuana and received

13  four months for that.

14          Th second was -- there's a variety of specifications,

15  but it's all related to not reporting in a timely fashion.  He

16  had a drug use test, a positive test, for marijuana, and he

17  failed to report to his drug treatment, I believe.

18          THE COURT:  So it wasn't the domestic violence

19  charges?

20          MR. KROUSE:  None of it was the domestic violence, and

21  none of his arrests for domestic violence that the government

22  is seeking to preclude cross-examination on happened during the

23  time that he was on supervised release, which is furthermore

24  why it doesn't go to any form of dishonesty with the Court or

25  anyone else.

I9AKPOL1-CORRECTED

1          THE COURT:  So specifically, Mr. Lind, which one do

2      you want to ask him about?

3          MR. LIND:  Well, there's one here -- I don't know.  I

4      have a copy of the violations petition, I forget what date it

5      is, but it says on or about June 26, 2015, in the Bronx, when

6      he was still on supervised release, supervised releasee

7      committed a state crime, assault with intent to cause physical

8      injury in the third degree.

9          THE COURT:  All right.

10          MR. LIND:  In that, the cooperating witness slapped

11      his girlfriend in the face.

12          THE COURT:  Okay.

13          MR. LIND:  This was not reported to the probation

14      office, as far as I'm aware.

15          THE COURT:  All right.

16          What I need from you is, I need you to lay out

17      specifically what instances you want to ask him about and what

18      you want to ask him about then.

19          MR. LIND:  Okay.

20          THE COURT:  I have a bunch of arrest reports, but I'm

21      not sure which ones you consider to be relevant because --

22          MR. LIND:  I don't think it's in the arrest reports,

23      but I'll go into the ones that are cited in the violation

24      report.

25          THE COURT:  Okay.  We can come back to it.  Lay that

I9AKPOL1-CORRECTED

1    out before you --

2                MR. LIND:  I definitely will, Judge.

3                THE COURT:  I can see which, if any, of those are

4    appropriate for cross-examination.

5                MR. LIND:  Finally, Judge --

6                THE COURT:  What is the government going to bring out

7    with regard to his criminal history?

8                MR. KROUSE:  There is a lot of criminal history to

9    bring out, your Honor, and that's another argument.  It's not

10   like a witness who doesn't have a lot to talk about.  There

11   will be multiple shooting incidents that he was involved in,

12   many of which he fired weapons at individuals, hitting certain

13   individuals as well, there will be several assaults that he

14   committed that we will elicit, and there will be extensive

15   drug-trafficking activity that we will elicit.

16                In our view, all of that is fair game for Mr. Lind to

17   cross on as well.  It's only the domestic violence incidents

18   which the government believes is not probative of the witness'

19   credibility.  It's inflammatory --

20                THE COURT:  When you said several assaults, several

21   assaults for which he was convicted?

22                MR. KROUSE:  No, your Honor.  That he told the

23   government about in proffer sessions, and that we disclosed.

24                THE COURT:  What makes those assaults somehow

25   probative of his credibility as a witness and the assaults on

I9AKPOL1-CORRECTED

1    the girlfriend not?

2           MR. KROUSE:  It's not necessarily, your Honor.  In one

3    instance, one of the assaults, actually the only real assault

4    other than the shootings that we are eliciting, it's an assault

5    on an individual with a firearm where he pistol-whipped that

6    individual.  In the government's view, it's part of his conduct

7    of carrying firearms and is related in that way.  So it's a

8    much more serious assault than using a firearm and hitting

9    somebody and injuring that person.

10          Not to minimize at all the arrest for domestic

11   violence, he was never convicted for any domestic violence

12   incidents.  These were all sealed cases, for the most part,

13   that were dismissed upon his arrest.

14          In our view, it's not probative of his credibility.

15   There will be ample information before the jury about this

16   cooperating witness, and Mr. Lind will have a lot of material

17   to cross him on.

18          THE COURT:  Well, again, Mr. Lind, why don't you look

19   at specifically what you think -- in addition to what's already

20   going to come out, what you think is probative of his

21   credibility as a witness, and tell me which incidents you want

22   to ask him about, and what you want to ask him about, and then

23   I'll make a determination as to whether or not --

24          MR. LIND:  Judge, they basically relate to his

25   dishonesty in terms of the court rather than other incidents,

I9AKPOL1-CORRECTED

1    which obviously I'll go into, also, but I'll lay those out for

2    you, Judge.

3          THE COURT:  Yes, because they're saying that --

4          MR. LIND:  I have a lot of stuff to do, your Honor.

5          THE COURT:  Yes.  But they say it didn't happen while

6    he was on supervised release, so --

7          MR. LIND:  Well, the first one, the one I just

8    mentioned, Judge, did happen when he was on supervised release.

9          THE COURT:  All right.

10         MR. LIND:  Is that right, Mr. Krouse?  The one in

11   2015 --

12         MR. KROUSE:  I have to look into that.

13         But I guess we're only then taking off the table all

14   the ones that happened when he wasn't on supervised release

15   because the majority, which I just mentioned, 2006 --

16         MR. LIND:  I have no interest in the ones going back

17   15 years ago, Judge.  It probably would be just that one.

18         THE COURT:  Again, just identify the ones you want to

19   use, and then tell me information about that, and what you want

20   to probe, and then I'll make a determination.

21         MR. LIND:  Okay.

22         Lastly, Judge -- and I will be very brief -- the issue

23   of Detective Fox's testimony --

24         THE COURT:  Yes.

25         MR. LIND:  -- the standard, I think both sides cite

I9AKPOL1-CORRECTED

1    this case, U.S. against Gil, it was in front of Judge Koeltl,

2    and it basically said the district court communicated to the

3    jury that ballistics is a subjective inquiry.  It's not like

4    DNA, it's not like blood testing, something like that, it's at

5    the other end of the spectrum.

6              THE COURT:  Right.  But what you did -- the way you --

7    you objected to him giving certain type of expert opinion.

8    They say he's not going to give that kind of an opinion.  So

9    I'm not sure what else you want me to do.  Do you want me to

10   limit him in how he answers the question, or you want me to

11   tell him he has to answer the question in a certain way?

12             MR. LIND:  No, neither of those, Judge.

13             THE COURT:  Okay.  So what --

14             MR. LIND:  It mostly goes to the -- maybe I can refine

15   it better.

16             THE COURT:  If you want to cross-examine him about the

17   nature of his expertise, that's fine, or whether or not this is

18   scientific as opposed to something else, but expert testimony

19   is not necessarily just scientific testimony.

20             MR. LIND:  No, I fully understand that.  It probably

21   goes more to the issue of how the jury should be charged, that

22   the jury hears "expert," and so he's infallible.

23             THE COURT:  I will give them the standard expert

24   charge which says that they shouldn't do that.

25             MR. LIND:  Okay.  Fair enough, Judge.  I don't think

I9AKPOL1-CORRECTED

1     there's a big separation here.  And maybe we'll just see how it

2     goes during my cross-examination.

3                    THE COURT:  Sure.  Okay.

4                    (Continued on next page)

I9AAAPOL4

```
1          (Jury present)

2          THE COURT:  Be seated.  Thank you.

3          So that will be your assigned seats so we'll know

4     who's here.

5          At this point could you swear-in the jury.

6          THE CLERK:  All rise.

7          (A panel of 12 jurors and two alternates sworn)

8          THE COURT:  You can be seated, ladies and gentlemen.

9          Members of the jury, at this point I am required by

10    law to instruct you generally concerning your basic functions,

11    duties and certain rules which apply to every jury so that

12    you'll better be able to assess and weigh the evidence as it's

13    presented and reach a proper verdict.  The trial as commenced

14    with the selection of the jury.  The next step in the trial

15    will be an opening statement by the government to outline for

16    you what the prosecution intends to prove by way of the

17    evidence to be presented in the case.

18         Now after the government's attorney makes his opening

19    statement, the defendant's attorney, if he desires, may also

20    but he is not required to make an opening statement.  What

21    counsel for either side says in an opening statement is not

22    evidence.  You may consider the opening statement as a preview

23    of what each side intends to prove by way of evidence in the

24    case.

25         Now after the opening statement or statements the
```

I9AAAPOL4

1   Assistant United States Attorneys will present one or more

2   witnesses who will be questioned by them.  This is called

3   "direct-examination".  And after the Assistant United States

4   Attorney completes questioning, defense counsel will be given

5   an opportunity to question that witness.  This is called

6   "cross-examination".  After the government has concluded the

7   calling of its witnesses and the introduction of any exhibits

8   which are admissible into evidence, the defendant may but is

9   not required to offer evidence in his own defense.

10          After both side rest, the government's attorney may

11   make a closing argument, followed by closing argument of

12   defendant's attorney and the government's attorney may then

13   take a brief rebuttal in response.  Then I will instruct on the

14   law and you will retire to deliberate for the purpose of

15   reaching a verdict.  This is a general outline of trial

16   procedure.

17          I am going to ask to you listen carefully to the

18   testimony.  There is no real need to take notes.  The court

19   reporter will be taking everything down and will have copies of

20   the transcript if you want any testimony read back to you

21   during your deliberations.

22          Now the evidence in this case consists of testimony of

23   witnesses under oath and exhibits which are admitted into

24   evidence, plus any stipulations agreed upon by the attorneys.

25   Questions in and of themselves are not evidence.  Therefore,

I9AAAPOL4

you cannot infer any fact from the mere asking of a question.
It is the answer coupled with the question which constitutes
evidence.  For example, if a witness was asked a question,
"Don't you own an automobile"?  And the witness answers "no",
you may not infer from the mere asking of the question that the
witness does own an automobile.

  During the coursing of the trial the Assistant United
States Attorney or defense counsel may object to a question or
an answer on the ground that somehow it's illegally improper or
inadmissible.  If I sustain the objection this means that
question or the answer was in some way improper.  If the answer
was already been given I'll instruct you to disregard it and
therefore the answer is no longer evidence in the case.

  (Continued on next page)

I9AKPOL3

1          THE COURT:  (Continuing)  If I overrule the objection,

2     then it means that the question is proper, and I will permit it

3     to be answered, or if already answered, I will permit the

4     answer to remain as evidence in the case.

5          Now, please do not resent the fact that an attorney

6     makes objections.  This is their duty and do not hold it

7     against either side if I rule against them.

8          Now, as I will explain to you in detail in my

9     instructions at the end of the case, as jurors, in this case,

10     you are the sole judges of the facts, and I am the sole judge

11     of the law, and you must accept the law as I give it to you

12     without hesitation or reservation even if you privately

13     disagree with it.  You must keep an open mind.

14          From this point until the time that you retire to

15     deliberate on your verdict, it is your duty not to discuss this

16     case with each other and to remain -- and do not express any

17     opinion as to the outcome of this case until I finally give the

18     case to you.

19          You must neither offer, nor express an opinion about

20     the guilt or innocence of the defendant or reach any conclusion

21     about what the verdict should be until I finally give the case

22     to you.

23          If at any time during the course of the trial, any

24     person attempts to talk to you or to communicate with you about

25     this case, either in or out of the courthouse, you should

I9AKPOL3

immediately report that attempt to me through my deputy.

In this regard, let me also emphasize that the attorneys -- the parties in this case and people associated with them are instructed not to speak to the jurors.  So don't consider it rude if they see you outside of this courtroom, and they don't acknowledge your presence.  Obviously, if someone were to see you speaking to one of the parties or one of the -- any of the people associated with them, they might draw an improper inference even though it may be a perfectly innocent conversation unrelated to the case.

You should not do any research or investigation on your own.  You are to decide this case solely on the evidence presented at this trial.

Now, ladies and gentlemen, we are on schedule.  As I indicated to you, I think it should take approximately four or five days to present the evidence to you for your consideration.  So I think we are on schedule for giving the case to you by the end of the week or by the beginning of next week.  I'll let know, depending on where we are every day, as I said, as to whether or not we are on schedule, behind schedule, or ahead of schedule.  Let me also emphasize that we're a team, and we can't start until everybody's here, so I'd ask everyone to try to be prompt in the morning and then when we come back from the breaks.

So, ladies and gentlemen, with those instructions, we

1    will now proceed with the next step in the trial, which will be

2    the opening statement by the government.

3          Mr. Krouse.

4          MR. KROUSE:  Thank you, your Honor.

5          In the summer of 2015, a man was shot in the

6    Highbridge section of the Bronx.  The shooter used a .40

7    caliber handgun, and he fired five shots, hitting the victim

8    once.

9          That same summer, just ten days later, two more men

10   were shot in Highbridge.  This second shooting was in broad

11   daylight, just blocks away from the first shooting.  This time,

12   the shooter chased two men into the back room of a store, and

13   when the shooter couldn't get into that room, he used a

14   sawed-off shotgun to blast a hole through the door.  He hit

15   both men behind that door.

16         These two shootings have something in common.  They

17   were both committed by that man, Terrell Polk, the defendant.

18   They were senseless acts of violence that Polk committed using

19   guns he carried for his day job selling crack cocaine near and

20   in the Highbridge housing projects.

21         For several years, Polk treated this residential area

22   of the Bronx like it was his personal territory, territory that

23   he could control through acts of violence and intimidation, a

24   territory where he could make money selling drugs.  And that's

25   exactly what he did until he was caught.

I9AKPOL3                    Opening – Mr. Krouse

1      Because of this criminal conduct, Polk now stands

2   charged with federal narcotics and firearms offenses.  And at

3   the end of this trial, once you have seen and heard all of the

4   evidence, we will ask you to hold Polk accountable for the

5   crimes that he has committed.

6      This opening statement is the government's chance to

7   give you a brief overview of the case and to explain the

8   evidence that you are going to see and hear during this trial.

9      First, I will tell you what the government expects the

10  evidence will show during the trial, and second, I will talk

11  about how the government will prove its case and the types of

12  evidence that you will see and hear during the trial.

13      First, what will the evidence in this case show?  The

14  evidence will show that beginning around 2014, Polk worked

15  together with four other men to sell drugs in this residential

16  section of the Bronx.  The crew sold some marijuana, but the

17  main drug the crew sold was crack cocaine.  The members of this

18  drug-dealing crew, including Polk, worked together by supplying

19  one another with drugs, by steering customers to one another,

20  and by sharing the physical territory that they used to run

21  their operation.  Polk and his crew controlled drug sales in

22  those housing projects in Highbridge and in a building just

23  south of the projects, 1055 University Avenue.

24      And you are going to see that Polk and the members of

25  his crew shared more than just drugs, customers, and territory.

They also shared guns, and they had a lot of them.  The crew

shared semiautomatic pistols and a revolver.  The crew also

shared a sawed-off shotgun and an assault rifle.  They stashed

those guns in their apartments, and they carried them around

when they were dealing drugs, and they used those guns to

protect their drug territory.

        The guns were necessary to keep away rival dealers or

anyone else who could get in the way of the crew's ability to

make money.  And you will hear that this is exactly what Polk

used these guns for - to protect his drug-dealing and to

protect his profits.

        Let me just talk briefly about the two shootings that

you are going to hear evidence about at this trial, here, the

shootings that I spoke about at the beginning, and to be

completely clear, Polk committed these two shootings.

        First, on July 25th, 2015, Polk and another member of

his drug crew were driving around their territory in

Highbridge.  Polk spotted a man he knew as Euro.  Now, Polk had

learned the day before that Euro was selling marijuana in 1055

University Avenue, and he didn't have permission from Polk or

anyone else in his drug crew, and this was against the rules.

And on July 25th, Polk spotted Euro standing just outside 1055

University Avenue.

        Polk had a gun on him, one of the guns he shared with

his crew, a .40 caliber pistol.  Polk got out of his car,

1    argued with Euro, pointed the pistol at Euro, and fired five

2    shots at him, hitting him once.

3            About ten days later, on August 4th, 2015, Polk struck

4    again.  You are going to learn that around noon that day, Polk

5    was driving near his drug territory, again just blocks away

6    from where the first shooting occurred, and he saw a man he

7    knew as Ryan.  A few days before, Ryan's crew and Polk's crew

8    had had a confrontation in a public pork.  This was Polk's

9    chance to strike back.  Again, Polk was carrying with him one

10   of the guns that he shared with his crew, and this time, it was

11   a bigger gun, a sawed-off shotgun.  Polk stopped his work,

12   grabbed his shotgun, and ran after Ryan.

13           Ryan and another bystander on the street ran into a

14   store and tried to hide from Polk.  They ran into the back room

15   of that store.  And when Polk wasn't able to get into that

16   room, he fired a single shotgun blast through that door, and he

17   hit both men.

18           In the span of only ten days, Polk had just shot three

19   people in the same general area.

20           Just weeks after the second shooting, yet another gun

21   was found in a car that Polk and his crew was driving, this

22   time during a search by law enforcement officers.  You will

23   learn that the two men in the car with Polk that day were the

24   same two men who were also with Polk during that first

25   shooting, the shooting of Euro.  These two men were members of

1    Polk's crew.

2            Ladies and gentlemen, that is what the evidence is

3    going to show in this case.  It will show that Polk was a core

4    member of a crew that sold crack cocaine to people in

5    Highbridge.  It will show that Polk and his crew shared an

6    arsenal of guns to protect their drug territory, and it will

7    show that over a ten-day period, Polk personally used those

8    guns to commit two shootings and to wound three men.

9            So how will the government prove that Polk committed

10   these crimes?  The types of evidence you are going to see and

11   hear over the next few days will fall into a couple of basic

12   categories:  First, you will see various forms of physical

13   evidence, including surveillance video that captures parts of

14   both shootings.  You will see video footage of the shooting

15   from 1055 University Avenue, the Euro shooting, the first

16   shooting that I discussed.  You will see Euro get shot on

17   video.

18           You will also see video footage from outside the store

19   from when Polk shot Ryan and the bystander through the door

20   with the shotgun.  Unlike the Euro shooting, you won't see the

21   store shooting on video, but you will see that Polk drove the

22   same car to the shooting, and you will see the people on the

23   street running for their lives after hearing that gunshot.

24           You will also see other forms of physical evidence.

25   You will see bags of crack cocaine that law enforcement agents

recovered from a search of Polk's apartment in 2017, right next
to his bed.  You will see that the crack was packaged for sale
to customers in individualized bags.

You will see the actual gun that was seized from
Polk's car and the ammunition that that gun was loaded with.
You will see evidence taken from a cell phone used by a member
of Polk's crew, including video and photographs.  You will see
the medical records for all three victims of Polk's shooting
rampage.  You will see the bullets and the shell casings that
were left behind from those shootings, and you will see
photographs of the crime scenes from both shootings.  And for
the second shooting, you will see the blood on the walls and on
the floor that was left behind after Polk shot through the door
with that shotgun.

You will hear audio recordings of Polk himself on
phone calls he made from prison after he was arrested.  You
will hear Polk talking to other members of his crew.  You will
hear Polk talking about guns and disputes with rivals.  And you
will hear Polk talking about wanting to get out of jail, so he
can help settle those disputes.

In addition to all of this physical evidence, you will
also hear testimony from witnesses.  You are going to hear from
several law enforcement witnesses, including police officers.
Some of these officers photographed crime scenes, some of them
seized guns and drugs from Polk and his crew, and some of them

1    recovered evidence like shell casings and bullets from the two

2    shootings that Polk committed.

3            You're going to hear, also, from two expert witnesses.

4    You will hear from an expert who will testify about the types

5    of firearms that were used at both shootings Polk committed.

6    And you will hear from a DNA expert, who will explain that the

7    DNA on the gun seized from Polk's car did not match Polk, but

8    it did match the two other men that Polk was with, the two

9    members of Polk's crew.

10           The DNA expert will also explain that Polk's DNA was a

11   match for the DNA taken from the car that was used to commit

12   both shootings.

13           Finally, you will hear from a witness who has inside

14   knowledge of the crimes that Polk has committed.  This witness

15   was himself a member of Polk's drug crew.  He committed crimes

16   alongside Polk for years, and he was with Polk when Polk shot

17   Euro in front of 1055 University Avenue, the first shooting

18   that I mentioned.

19           The name of this witness is Cicero Williams.  Williams

20   will tell you firsthand about Polk selling crack near the

21   Highbridge projects, including out of the building at 1055

22   University Avenue.  Williams will tell you about the many guns

23   he's shared with Polk and with members of their crew and about

24   the violence that they both committed.  Williams will testify

25   that he personally saw Polk shoot Euro.  And Williams will also

1    tell you that Polk told him firsthand that he chased Ryan into

2    a store and shot him through a closed door with a shotgun.

3            Now, make no mistake about it, Williams is himself a

4    criminal.  Like Polk, Williams sold drugs for years.  He

5    possessed guns, and he shot people.  And you will hear that

6    Williams entered into an agreement with the government to

7    cooperate, to provide information and truthful testimony in the

8    hopes of receiving less jail time.  But your common sense will

9    tell you, only someone who committed crimes alongside Polk can

10   give you the inside details about how Polk's crew operated and

11   what Polk and the other members of the crew were doing to

12   advance and to protect their drug operation.

13           So please listen carefully when Cicero Williams

14   testifies, scrutinize what he tells you, and consider whether

15   what he tells you is consistent with all the other testimony

16   and all the other physical evidence in this case.

17           Ladies and gentlemen, even though I do not expect this

18   to be a long trial, you're going to hear from a number of

19   different witnesses, and you're going to see a lot of different

20   types of evidence.  This evidence is not going to all come in

21   chronological order.  But at the end of the trial, you'll have

22   a chance to consider all the evidence that's been presented to

23   you together, and it will establish Polk's guilt beyond a

24   reasonable doubt.

25           I'm about to sit down.  Later on, at the end of this

1    trial, we will have another chance to speak to you about how

2    the evidence proves each of these charges against Polk, but

3    between now and then, I'm going to ask you to do three things:

4    First, pay attention to all the physical evidence and listen

5    carefully to all the testimony; second, follow Judge Daniels'

6    instructions; and, third, use your common sense, the same

7    common sense you use in your everyday lives as New Yorkers.

8           If you do those three things, the defendant will get a

9    fair trial, the government will get a fair trial, and you will

10   reach the only verdict consistent with the evidence, the law,

11   and your common sense, that Terrell Polk is guilty.

12          THE COURT:  Mr. Lind, would you like to make an

13   opening statement.

14          MR. LIND:  Yes, Judge.

15          Judge Daniels, prosecution team, Mr. Polk, ladies and

16   gentlemen:  Good afternoon.

17          Let me reintroduce myself.  I'm Richard Lind.  I am

18   privileged to have the job of representing Mr. Polk here this

19   afternoon and throughout the trial.

20          Now, Mr. Krouse has just given you a preview of what

21   the government intends to prove during the trial.  I want to

22   emphasize, underscore the term "intends," because, you see,

23   Mr. Krouse had no personal knowledge, was not there, during any

24   of the events that he talked to you about this afternoon.

25   He's, in large part, going to rely on witness testimony,

1    particularly Cicero Williams, who I'll get to in a moment.  And

2    whether or not Mr. Williams has told them the truth is for you

3    to determine as you're judging and listening to this case.

4            You'll also know -- I think the Judge has told you

5    this -- that Mr. Polk has pleaded guilty to each of the charges

6    in this case -- not guilty -- to the narcotics conspiracy,

7    possessing and aiding the discharge of firearms, et cetera.

8    And because of that, two very important things are triggered:

9    First of all, you must presume that Terrell Polk is innocent

10   throughout the course of this trial, which is what the Judge

11   mentioned also in the questioning here today, and, also,

12   throughout the course of the trial, Mr. Polk doesn't have to do

13   anything.  The defense doesn't have to call witnesses or

14   cross-examine any government testimony, although I assure you,

15   I will cross-examine most, if not all, of the government's

16   witnesses.

17           Secondly, in order to prevail, the government must

18   prove him guilty beyond a reasonable doubt, the most stringent

19   burden of proof our law imposes.  I want to give you a couple

20   of examples of what I'm talking about.  Mr. Krouse was talking

21   about an arrest of Mr. Polk that they found some small amount

22   of crack in his apartment.  This is about a year and a half

23   ago.  The reason they were there, ladies and gentlemen, was not

24   to seize crack.  This just happened.

25           MR. KROUSE:  Objection, your Honor.

1          THE COURT:  No, overruled.  I'll allow it.

2          MR. LIND:  They were seeking a gun.  That's what they

3    were seeking that day.  They went as far as opening up a safe,

4    believing that the gun was there.

5          You know what?  There was no gun there.  There was a

6    small amount of crack.  And who possessed that crack?  There

7    were other people living in that apartment.  There were three

8    grams of crack, about a hundred dollars worth of crack.  That's

9    what they found.

10         Then there was also commentary by Mr. Krouse about --

11   I think you'll hear about both of these issues that Mr. Krouse

12   addressed -- him being arrested with two other so-called

13   members of his crew, three of them in the car, and they found a

14   gun.  Well, as Mr. Krouse mentioned, they later did DNA swabs

15   from all three of the people in that car.  Mr. Polk had no DNA

16   on that gun.  He had no connection with that gun whatsoever.

17   So you've got to keep an open mind.  You've got to remember,

18   they have the burden of proof of proving this.

19         Now, I could go on with further examples, but I don't

20   want to bore you.  The most important thing I think you also

21   should keep an open mind about is the government's principal,

22   if not only, cooperating witness in this case.  This is a man

23   who has been a lifelong criminal, an animal, who, from the days

24   of being a teenager up until the time he was nabbed again after

25   numerous times of confronting the law, and was confronted with

being in prison for the rest of his life, and so he then became

a government witness.  Under his agreement, he has a chance of

getting out of prison really quick.  He doesn't have to do 30

or 40 years in prison.  He pled guilty to certain offenses, but

he's looking for a deal to stay out of prison and to get out of

prison for the rest of his life.

You'll hear about the fact -- if the government

doesn't bring it out, I'll bring it out -- about his numerous

convictions starting as a teenager up until about a year ago.

And what he was convicted for in state court were relatively

minor things.  Then he moved on to much more serious offenses.

In fact, a couple of the offenses were in front of Judge

Daniels here.  And he got out on what's called supervised

release after he served a bit of time, a couple of months of

time, and when you're on supervised release, you're supposed to

keep your -- you're supposed to live within the law.  You have

to report to the probation officer.  What did he do, keep on

doing?  He kept on selling drugs, involving himself in illegal

activity.  And then after his supervised release was ending, he

moved beyond that, starting shooting people, trying to kill

them.  That's what he did.  That's the man that the government

is going to rely on to testify about Mr. Polk.

Now, ladies and gentlemen, once again, you're going to

hear from certain experts, two experts.  One is the expert

regarding the DNA.  She'll testify, I believe, that the DNA

1   wasn't found on the gun.  The other one -- the other part of

2   her testimony is going to be about Mr. Polk's DNA being found

3   on the gearshift of the particular car he was in.

4           Well, that was the only person whose DNA she got from

5   the government.  Didn't ask about the 50 or 80 other people who

6   may have touched it, or when that person touched the gearshift,

7   or where that person was when he touched the gearshift.  Didn't

8   mention that.  So what I'm trying to get at is you've got to

9   keep an open mind, which I'm sure all of you will do, and don't

10  make assumptions.  Have them prove beyond a reasonable doubt.

11          Now, you'll also hear tapes -- you'll hear tapes about

12  Mr. Polk talking to people while he's in prison.  And you will

13  see, the names of these people, you don't know who he's talking

14  to.  It's an unidentified male, an unidentified female.  He's

15  not explicitly talking about drugs.  You'll hear them.  I can't

16  wait for you to hear them.  They're not as incendiary or

17  illegal as the government would have you suppose.  So you've

18  got to keep an open mind.

19          Now, just getting back to Mr. Williams:  He is under

20  the government's control.  He is at their bidding.  Whatever

21  they want him to do, he's going to do, because at the end of

22  the day, they can write a letter for him, and he can get out of

23  jail.  He can get out of jail, he can get a very low sentence.

24  It's a pretty good deal for a low life like this.

25          As even Mr. Krouse stressed, a government cooperator,

I9AKPOL3                    Opening - Mr. Lind

his testimony must be scrutinized with the utmost care because

of his deal with the government gives him a motive to lie.

Nevertheless, despite the government's efforts, I submit to

you, you will see by the end of this trial, the government has

failed to prove its case against Terrell Polk.

I'm coming to the conclusion of my remarks, and I'm

sure you're glad to hear that, but there are a few final points

I'd like to make.

Please, ladies and gentlemen, as the Judge told you,

this is not going to be a very long trial, so please do not

rush to judgment when -- in your own mind and when you start

deliberating to decide on the outcome of this case.  This is

not like reading a novel or watching a movie where you try to

figure out who did what after the first few minutes of any

witness' testimony or any presentation of exhibits.  In fact --

and I'm sure you can understand it -- your duty is the complete

opposite.  It's only after listening to and viewing all the

evidence in this case and after the Judge makes his final

instructions, gives you -- that you should then start

deliberating and reach a verdict.

If you remember nothing else that I said to you,

please do not rush to judgment in this case, and if you keep

your eye on the ball here and follow the Court's instructions,

you will see that Terrell Polk decided to go to trial, is on

trial, because he's not guilty.

1              Thank you.

2              THE COURT:  Mr. Krouse, would you call the

3    government's first witness.  Or Mr. Folly.

4              MR. FOLLY:  The government calls Juan Rios.

5              THE COURT:  Sir, you can step up.

6    JUAN RIOS,

7          called as a witness by the Government,

8          having been duly sworn, testified as follows:

9              THE COURT:  You can be seated, sir.  You can just

10   point that microphone towards you.

11             You can inquire, Mr. Folly.

12   DIRECT EXAMINATION

13   BY MR. FOLLY:

14   Q.  Good afternoon, Mr. Rios.

15             Are you here voluntarily today?

16   A.  No.

17   Q.  Are you here because you are being compelled by a court

18   subpoena?

19   A.  Yes.

20   Q.  How old are you?

21   A.  Thirty-three.

22   Q.  What do you do for a living?

23   A.  I do residential commercial power washing of windows.

24   Q.  Where did you grow up?

25   A.  In the Bronx.

I9AKPOL3                          Rios - Direct

1   Q.   Directing your attention to August 4th, 2015, did something

2   happen on that day?

3   A.   Yes.

4   Q.   What happened?

5   A.   I got shot.

6   Q.   We'll discuss the circumstances of when you got shot in

7   more detail in just a moment, but before we do, can you tell

8   the jury where you were on that day before you were shot?

9   A.   Excuse me?  Say it again.

10  Q.   Can you tell the jury where you were on that day before you

11  were shot?

12  A.   I was in the Bronx.

13  Q.   What area of the Bronx were you in?

14  A.   Anderson.

15  Q.   Is that Anderson Avenue?

16  A.   Yes.

17  Q.   Are you familiar with that area?

18  A.   Yes.

19  Q.   How are you familiar with it?

20  A.   I grew up over there.

21  Q.   If you can look in the binder beside you there at what's

22  been marked as Government Exhibits 534 and 535.

23          MR. FOLLY:  And, Mr. Concepcion, if you could also

24  show those on the screens to the witness.

25  Q.   Do you see those two documents?

I9AKPOL3                        Rios - Direct

1   A.  Yes.

2   Q.  Do you recognize those?

3   A.  Yes.

4   Q.  What are they?

5   A.  That's the location where I got shot.

6   Q.  Are those photographs of the location you got shot?

7   A.  Yes.

8           MR. FOLLY:  Your Honor, the government offers

9   Government Exhibits 534 and 535.

10          THE COURT:  Any objection?

11          MR. LIND:  No, Judge.

12          THE COURT:  They will be admitted into evidence.

13          (Government's Exhibits 534 and 535 received in

14   evidence)

15          MR. FOLLY:  Mr. Concepcion, can you please publish

16   these exhibits to the jury.  As well as 535.

17   BY MR. FOLLY:

18   Q.  Looking first at Government Exhibit 534, can you describe

19   for the jury where you were standing on the day of the shooting

20   before you were shot?

21   A.  Yes.  I was standing by the tobacco shop.

22   Q.  Is that the sign on the left that reads "A1 Tobacco Shop"?

23   A.  Yes.

24          MR. FOLLY:  Let the record reflect the witness is

25   identifying the deli and tobacco shop on the left side of

I9AKPOL3                      Rios - Direct

1    Government Exhibit 534.

2    Q.   Were you alone at that time, or were you with anyone?

3    A.   I was alone.

4    Q.   Did there come a time, before you were shot, when you were

5    joined by someone else?

6    A.   Yes.

7    Q.   How did you know that individual?

8    A.   He's a friend of my brother's.

9    Q.   What time of day was this?

10   A.   Around noonish.

11   Q.   What were the two of you doing in front of the tobacco

12   shop?

13   A.   Well, I was getting brunch for my mother, and he happened

14   to pass by.

15   Q.   What did you do at that time?

16   A.   At that time, he asked me for my brother and we began a

17   small conversation.

18   Q.   What happened next?

19   A.   A car pulls up, somebody said, "Gun," we ran into the

20   store, went into the back of the room, and closed ourself into

21   the room.

22   Q.   Did you see anyone in the car when it pulled up?

23   A.   No.

24   Q.   Did you get a good look at the face of the individual who

25   came out of the car?

1    A.   No.

2    Q.   Did you get a good look at that person's face at any

3    time --

4    A.   No.

5    Q.   -- during this incident?

6    A.   No.

7    Q.   What happened after -- you said a moment ago someone pulled

8    out and shouted, "Gun."  What happened after that?

9    A.   After that, we ran into the store that says tobacco shop,

10   closed ourself into a room, felt someone tried to get in, and

11   about 30 seconds later we heard a gunshot.

12   Q.   Looking at Government Exhibit 534, you said you ran into

13   the tobacco shop.  Can you just circle that for the jury, where

14   you're referring to?

15   A.   How do you circle it?

16   Q.   Are you touching the screen?

17            MR. FOLLY:  It doesn't appear to be working.

18   Q.   Is that the same tobacco shop you were describing earlier?

19   A.   Yes.

20   Q.   Please explain to the jury what happened when you started

21   running into the tobacco shop.

22   A.   I closed the door behind us, felt someone try to get in,

23   and then 30 seconds later we heard a gunshot.

24   Q.   When you say you closed the door behind you, where were you

25   in the tobacco shop at that time?

1   A.  The back of the shop.

2   Q.  Can you describe that area to the jury?

3   A.  Just go to the back, and there's a door on the left.

4   Q.  What is that room?

5   A.  It's a stock and bathroom.

6   Q.  When you got to the back room of the tobacco shop, who were

7   you with, if anyone?

8   A.  My brother's friend.

9   Q.  What happened after you got to the back of the tobacco shop

10  and closed the door to that room?

11  A.  Felt someone try to open it, 30 seconds later heard a

12  gunshot wound -- well, heard a gunshot.  Excuse me.

13  Q.  And what were you doing at the time someone tried to open

14  that door?

15  A.  Pressing up against the door.

16  Q.  In an effort to keep the door shut?

17  A.  Correct.

18  Q.  Was it just you that was pressing up against the door, or

19  were you both pressed against the door?

20  A.  Both.

21  Q.  Now, you said that after that, there was a gunshot --

22  A.  Yes.

23  Q.  -- correct?

24  A.  Yes.

25  Q.  Did you get hit?

1   A.  Yes.

2   Q.  Where were you hit?

3   A.  I got hit on my right leg and my left hand.

4   Q.  Approximately how many places did you get hit on your leg?

5   A.  Seven.

6   Q.  The other individual you were with, was he hit?

7   A.  Yes.

8   Q.  Where was he hit?

9   A.  I wasn't sure at the time.

10  Q.  Were you bleeding?

11  A.  Yes.

12  Q.  Where were you bleeding from?

13  A.  From my leg and my hand, my left hand.

14          MR. FOLLY:  If we could show the witness what's been

15  marked as Government Exhibits 501 through 506.

16  Q.  Those are also in the binder in front of you.

17          Do you recognize those photographs?

18  A.  Yes.

19  Q.  How do you recognize them?

20  A.  This is the door where we went into.

21  Q.  When you say the door where you went into, is that in the

22  back area of the store?

23  A.  Yes.

24  Q.  Did you review these photographs before testifying today?

25  A.  Excuse me?

1   Q.  Had you seen these photographs before testifying today?

2   A.  No.

3          MR. LIND:  I'm sorry, I didn't answer his answer.  Was

4   that no?

5          THE WITNESS:  No.

6   BY MR. FOLLY:

7   Q.  I'm sorry, have you seen these photographs before

8   testifying?

9   A.  Oh, photographs?

10  Q.  Yes.

11  A.  Yes, yes, correct.

12         MR. FOLLY:  Your Honor, the government would offer

13  Government Exhibits 501 through 506.

14         THE COURT:  Any objection?

15         MR. LIND:  No.

16         THE COURT:  They will be admitted into evidence.

17         (Government's Exhibits 501 through 506 received in

18  evidence)

19         MR. FOLLY:  Mr. Concepcion, if you could start with

20  Government Exhibit 501, can you please publish that to the

21  jury.

22  Q.  Mr. Rios, can you describe for the jury what is shown in

23  this picture here?

24  A.  Yes.  This is the door we went in and closed.

25  Q.  What side of the door were you on after you closed the

I9AKPOL3                          Rios - Direct

1   door?

2   A.  I was on -- if you look in front, I was on the left side.

3   So if you close it, I was on the right.

4   Q.  Was that on the side of the door where the items are

5   located or on the inside, on the other side?

6   A.  On the inside.

7   Q.  Turning now to Government Exhibit 502, what is shown in

8   that photograph?

9   A.  That seems to be where the bullet entered.

10  Q.  Looking at Government Exhibit 503 side by side with 506,

11  can you describe for the jury what is shown in this photo?

12  A.  Yes.  This is the stockroom.

13  Q.  And that's the stockroom that you were hiding in during

14  this incident?

15  A.  Yes.

16          MR. FOLLY:  Can we turn now to Government Exhibit 504

17  side by side with 505.

18  Q.  Can you describe for the jury what is shown in this

19  photograph?

20  A.  Yes.  That's the blood that came off my body.

21  Q.  What happened after you were shot?

22  A.  After I was shot, I was bleeding.  Someone came in and

23  said, are you guys okay?  At that point we opened the door,

24  came out, and I proceeded to call the ambulance.

25  Q.  What happened at that point?

1    A.  At that point, I sat down.  My neighbor came, wrapped my

2    leg to stop the blood, I smoked a cigarette and waited for the

3    ambulance to come.

4    Q.  Were you eventually transported to the hospital?

5    A.  Yes.

6    Q.  How long were you in the hospital for?

7    A.  Three to four days.

8            MR. FOLLY:  If we could show the witness what's been

9    marked as Government Exhibit 526 as well as 527.

10   Q.  Mr. Rios, do you recognize those photographs?

11   A.  Yes.

12   Q.  How do you recognize them?

13   A.  That's me.  That's...

14   Q.  That's you in the photographs?

15   A.  Yes.

16   Q.  What are these photographs?

17   A.  My leg and hand, when I got shot.

18           MR. FOLLY:  Your Honor, the government offers

19   Government Exhibits 526 and 527.

20           MR. LIND:  I have no objection.  I would just request

21   that in the future, Judge, he show the exhibits only to counsel

22   before he --

23           THE COURT:  Sure.

24           MR. LIND:  -- he admits them.

25           I may have stipulated to them, but I don't recall that

I9AKPOL3                          Rios - Direct

1    one.

2              THE COURT:  All right.  526 and 527 will be admitted

3    into evidence.

4              (Government's Exhibits 526 and 527 received in

5    evidence)

6              MR. FOLLY:  Mr. Concepcion, can you please publish to

7    the jury Government Exhibit 526.

8    Q.  Mr. Rios, can you describe for the jury what's shown in

9    that photograph?

10   A.  That is the leg, where I got hit.

11   Q.  Where are you in this photograph?

12   A.  I'm laying in the bed.

13   Q.  The bed where?  Are you in the hospital?

14   A.  Yes, I'm in the hospital, yes.

15             MR. FOLLY:  Mr. Concepcion, can you please go to

16   Government Exhibit 527.

17   Q.  Mr. Rios, what's shown in this photograph?

18   A.  That's the hand, where I got hit also.

19   Q.  Was this photo also taken while you were in the hospital?

20   A.  Yes.

21             MR. FOLLY:  No further questions, your Honor.

22             THE COURT:  Cross-examination?

23             MR. LIND:  I have no questions.

24             THE COURT:  Thank you, sir.  You can step down.

25             (Witness excused)

I9AKPOL3

1        THE COURT:  Would you call the government's next
2    witness.
3        MR. FOLLY:  Your Honor, before we call our next
4    witness, we'd just like to read into the record a section of
5    the stipulation of Government Exhibit 1005.
6        THE COURT:  1005?
7        MR. FOLLY:  Yes.
8        And, your Honor, we're only going to read at this time
9    paragraph 3 of that stipulation.
10        THE COURT:  Okay.
11        MR. FOLLY:  The parties stipulate that:  On or about
12    August 4, 2005, Juan Rios was shot inside of a store located at
13    950 Anderson Avenue, in the Bronx, New York.
14        Juan Rios was admitted to Lincoln Medical and Mental
15    Health Hospital on the same day, August 4, 2015, where he
16    received medical treatment for gunshot wounds to his left hand
17    and right leg.
18        Government Exhibits 526 and 527 are true and accurate
19    photographs taken on August 4, 2015, of the gunshot wounds to
20    Juan Rios' left hand and right leg.
21        Government Exhibit 303 is a true and accurate copy of
22    business records maintained by Lincoln Medical and Mental
23    Health Hospital from Juan Rios' hospital visit on August 4,
24    2015.
25        Your Honor, pursuant to this stipulation, the

I9AKPOL3

1  government would offer Government Exhibit 303 at this time.

2          THE COURT:  303?

3          MR. FOLLY:  Yes.

4          MR. LIND:  I have no objection.

5          THE COURT:  It will be admitted into evidence.

6          (Government's Exhibit 303 received in evidence)

7          MR. FOLLY:  I may have misspoke regarding the exhibit

8  number.  It's 1005.

9          THE COURT:  303 is what?

10         MR. FOLLY:  Is the business records maintained by

11 Lincoln Medical and Mental Health Hospital?

12         THE COURT:  Medical records?

13         MR. FOLLY:  Yes.

14         If I misspoke about the date, that was August 4, 2015.

15         THE COURT:  Yes.  It will be admitted into evidence.

16         MR. FOLLY:  Your Honor, we'd just like to publish

17 certain portions of Government Exhibit 303 to the jury.

18         THE COURT:  Yes.

19         MR. FOLLY:  Mr. Concepcion, can you please publish

20 Government Exhibit 303.

21         I'm going to read into the record a certain portion of

22 this exhibit.

23         The name in the upper right corner is Juan Rafael

24 Rios.  Towards the top of the page, there's a checkmark next to

25 "Tier 1 trauma activation."

I9AKPOL3

1          The date below that is August 4, 2015.

2          And the arrival time is 12:42.

3          Looking further down the page, the chief complaint is

4   GSW in RLE and L and what appears to be a hand.

5          If we could please turn to the fourth page of this

6   exhibit.  If we could zoom in on the body chart on the left.

7          Next to the left hand of the first body chart are the

8   letters GSW.  Next to the right leg, that's circled, there is

9   GSW as well.  And it appears that there is an X with a number 7

10  written next to it in that same box that's been highlighted on

11  the screen.

12          Can we please turn to page 7 of this same exhibit.

13          Under "Consultant Findings:  Imaging revealed fracture

14  of left second metacarpal with retained foreign body in palmar

15  aspect, fracture of right fibula."

16          If we could please turn now to page 10.  Looking at

17  the impression line, it reads:  "Status of post gunshot wound

18  to the hand with bullet overlying second metacarpal bone

19  fracture, second metacarpal."

20          If we could now turn to page 12.  Can we do that side

21  by side with page 13.  Starting at the top, the first large

22  paragraph:  "There is a single GSW to the dorsum" -- you can

23  zoom back out so the top portion is there -- "there is a single

24  GSW to the dorsum of left hand between second and third

25  metacarpal."

1           Now, looking further down on that same page, under the

2     very, very last line, which reads, "Right tibia/fibula x-ray,"

3     it starts there and continues on to the next page and says,

4     "Single view of right tibia and fibula shows metallic fragments

5     bullet and comminuted fracture of mid shaft of right fibula."

6           We can take this down.

7           Your Honor, at this time, the government calls

8     Probation Officer Joseph Lombardo.

9      JOSEPH LOMBARDO,

10          called as a witness by the Government,

11          having been duly sworn, testified as follows:

12          THE DEPUTY CLERK:  Can you please spell your name for

13     the record.

14          THE WITNESS:  Joseph, J-o-s-e-p-h, Lombardo,

15     L-o-m-b-a-r-d-o.

16          THE COURT:  You can inquire, Mr. Folly.

17          MR. FOLLY:  Thank you, your Honor.

18     DIRECT EXAMINATION

19     BY MR. FOLLY:

20     Q.  Officer Lombardo, where do you work?

21     A.  United States Probation Department for the Southern

22     District of New York.

23     Q.  What is your title there?

24     A.  Senior United States Probation Officer.

25     Q.  How long have you been a probation officer?

1    A.  Approximately 14 years.

2    Q.  What are your duties and responsibilities as a probation

3    officer?

4    A.  I'm assigned to the supervision division, and I supervise

5    predominantly high-risk cases, and I'm also the coordinator of

6    our search-and-seizure team.

7    Q.  What are your duties and responsibilities in connection

8    with searches?

9    A.  I manage the personnel and overall operation of the team.

10   Q.  Do you also participate in searches?

11   A.  I do.

12   Q.  Did there come a time when you participated in a search of

13   the residence of Terrell Polk?

14   A.  Yes, there did.

15   Q.  Was Terrell Polk present at the residence at the time of

16   the search?

17   A.  Yes, he was.

18   Q.  When was that?

19   A.  February 3rd, 2017.

20   Q.  Do you see Terrell Polk in the courtroom today?

21   A.  I do.

22   Q.  Can you identify him by an article of clothing?

23   A.  Yes.  He is seated at the back table, wearing a blue shirt.

24          MR. FOLLY:  Let the record reflect that the witness

25   has identified the defendant, Terrell Polk.

I9AKPOL3                          Lombardo - Direct

1            THE COURT:  The record will so reflect.

2            MR. FOLLY:  If we could publish just for the witness

3    Government Exhibit 1.

4    Q.  Do you recognize that photograph?

5    A.  I do recognize this photo.

6    Q.  What is it?

7    A.  It's a photograph of Mr. Polk.

8            MR. FOLLY:  Your Honor, the government offers

9    Government Exhibit 1.

10           THE COURT:  Any objection?

11           MR. LIND:  No objection.  May I have a quick voir dire

12   before I --

13           THE COURT:  Sure.

14   VOIR DIRE EXAMINATION

15   BY MR. LIND:

16   Q.  When was that photo taken?

17   A.  I'm not sure of the date.

18   Q.  You didn't take that photo, right?

19   A.  I did not.

20   Q.  Five years ago?  Ten years ago?  Recently?

21   A.  I'm not sure.  I did not take the photo, sir.

22   Q.  Okay.

23           MR. LIND:  I'll withdraw any objection.

24           THE COURT:  All right.  It will be admitted as

25   Government Exhibit 1.

I9AKPOL3                           Lombardo – Direct

1                    (Government's Exhibit 1 received in evidence)
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25

BY MR. FOLLY:

Q.  Let's now discuss the details of the February 3rd, 2017, search that you mentioned a moment ago.

          What time of day was that search conducted?

A.  In the morning.

Q.  Were you alone or with other law enforcement officers at that search?

A.  I was accompanied by other law enforcement officers.

Q.  What location did you search?

A.  1145 University Avenue, Apartment 4A, as in alpha.

Q.  What type of residence is that?

A.  It's a two-bedroom apartment.

Q.  Why did you go to that particular location?

A.  Because that's Mr. Polk's residence.

Q.  Was the search pursuant to a search warrant?

A.  Yes, it was.

Q.  Let's walk through the events of that day.

          What happened when you first arrived at the residence?

A.  Law enforcement personnel knocked on the door of Apartment 4A.  After a slight delay, the door of the apartment was opened by Mr. Polk and another female.

Q.  What happened -- when you say Mr. Polk, is that the same individual you identified in the courtroom a moment ago?

A.  Yes.

Q.  After Polk answered the door, what happened next?

1    A.   He was detained for officer safety, by myself and another

2    law enforcement officer.

3    Q.   What happened after that?

4    A.   Two officers remained with Mr. Polk.  Myself and the

5    remaining law firms officers conducted a safety sweep of the

6    residence.

7    Q.   Can you describe what you mean when you say you conducted a

8    safety sweep?

9    A.   It's a sweep of the residence conducted for officer safety

10   to ensure that all occupants of the residence are accounted

11   for.

12   Q.   What happened after you conducted the -- were there any

13   additional residents found at that time?

14   A.   Yes.  There were two other occupants in the residence.

15   Q.   What happened after you conducted the safety sweep?

16   A.   We commenced a search of the residence.

17   Q.   What area of the residence did you search?

18   A.   The search commenced in the bedroom, Mr. Polk's bedroom.

19   Q.   You say you searched Mr. Polk's bedroom.  How did you know

20   that it was Mr. Polk's bedroom?

21   A.   We had located mail addressed to Mr. Polk.

22   Q.   What happened after you began to search Mr. Polk's bedroom?

23   A.   We located a safe in the closet, up on a shelf.

24   Q.   What happened after you located the safe?

25   A.   A law enforcement officer spoke to Mr. Polk, asking if

1    there was a key for the safe, at which time he indicated a key

2    was within a pocket of a sweatshirt in the closet.

3    Q.   What happened next?

4    A.   I then took the key, opened the safe.

5    Q.   What was inside of the safe?

6    A.   $433 of U.S. currency.

7    Q.   What happened after you opened the safe?

8    A.   Continued the search of the bedroom, and located a white

9    plastic sandwich bag containing smaller bags of a white

10   substance.

11   Q.   Where did you locate that plastic bag that you just

12   referenced?

13   A.   It was located to the right of the bed, on top of a blue

14   storage, plastic storage container.

15   Q.   What appeared to be inside of the bag?

16   A.   Narcotics.  There was approximately two dozen smaller

17   baggies with white powder inside the large bag.

18   Q.   I'm showing you what's been marked as Government Exhibit

19   100.

20            Do you recognize that?

21   A.   I do recognize it.

22   Q.   What is it?

23   A.   It is the narcotics seized from the residence, including

24   the packaging and a field test kit.

25   Q.   How do you recognize it?

I9AKPOL3                    Lombardo - Direct

1    A.  By the packaging and also the label on the outside, and I

2    also reviewed this exhibit prior to testifying today, and put

3    my initials on the exhibit.

4              MR. FOLLY:  Your Honor, the government offers

5    Government Exhibit 100.

6              MR. LIND:  No objection.

7              THE COURT:  It will be admitted into evidence as

8    Government Exhibit 100.

9              (Government's Exhibit 100 received in evidence)

10             MR. FOLLY:  May we publish this to the jury, your

11   Honor?

12             THE COURT:  Yes.

13             MR. FOLLY:  Could we also, please, show to the witness

14   Government Exhibits 100-A and 100-B.

15   Q.  Do you recognize those?

16   A.  I do.

17   Q.  How do you recognize them?

18   A.  It's the same items that you just showed -- it's the

19   packaging, the field test, and the label -- and I was present

20   when these items were seized.

21   Q.  Are these photographs?

22   A.  Yes, they're photographs.

23             MR. FOLLY:  Your Honor, the government offers

24   Government Exhibits 100-A and 100-B.

25             MR. LIND:  Can we just have one moment, Judge?

1          THE COURT:  Yes.

2          MR. LIND:  I have no objection.

3          THE COURT:  They will be admitted into evidence as

4     100-A and 100-B, Government Exhibits.

5          (Government's Exhibits 100-A and 100-B received in

6     evidence)

7          MR. FOLLY:  Mr. Concepcion, can we first publish

8     Government Exhibit 100-A to the jury, please.

9     Q.  You mentioned earlier that there was a bag next to Polk's

10    container that contained smaller bags inside of it.  Is that

11    accurate?

12    A.  Yes.

13    Q.  Are those shown in this photograph?

14    A.  Yes, sir.

15    Q.  Can you please describe to the jury where in this

16    photograph they are?

17    A.  Below the field test kit, which is on the top; so all along

18    the bottom.

19    Q.  Earlier the screen wasn't working, but do you mind just

20    trying to see if the touch can work?

21    A.  It's not working.

22          MR. FOLLY:  Your Honor, let the record reflect, the

23    witness was describing the lower portion of this plastic bag

24    that appears to contain smaller plastic items within it.

25          THE COURT:  The record will so reflect.

1   BY MR. FOLLY:

2   Q.  What, if anything, else did you find during the course of

3   your search of the bedroom?

4   A.  We found mail and also unused plastic baggies.

5   Q.  Can you describe the size or appearance of those baggies,

6   for the jury?

7   A.  They're small, smaller Ziploc type bags.

8            MR. FOLLY:  We can take this exhibit down.

9            (Continued on next page)

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

I9AKPOL3                          Lombardo - Direct

1    BY MR. FOLLY:

2    Q.  If you could please look in your binder at Government

3    Exhibits 500 and 500-A.

4            MR. FOLLY:  Mr. Concepcion, if you could also put

5    those on the screen so defense counsel could see them.

6            (Pause)

7    Q.  Do you recognize those?

8    A.  I do.

9    Q.  How do you recognize them?

10   A.  It's a photograph of the blue storage container located in

11   the bedroom that I previously testified about.

12   Q.  And where was this located within the bedroom?

13   A.  To the right of the bed if you were standing at the foot of

14   the bed.

15           MR. FOLLY:  Your Honor, the government offers

16   Government Exhibits 500 and 500-A.

17           MR. LIND:  No objection.

18           THE COURT:  They'll be admitted into evidence.

19           (Government's Exhibits 500 and 500-A received in

20   evidence)

21           MR. FOLLY:  Mr. Concepcion, if you could please

22   publish Government Exhibit 500 to the jury.

23   Q.  Officer Lombardi, can you explain what is shown in this

24   photograph?

25   A.  It is a photograph of the blue storage container that was

1    located to the right of the bed and contains the narcotics, a

2    cellphone, Nestle Crunch bar and some clothing items.

3    Q.  Looking at this photograph, where in this photograph is

4    what you referred to as a the narcotics?

5    A.  Trying to circle.  It's not working.  Just below the

6    cellphone a little to the right.

7             MR. FOLLY:  Please turn now to Government Exhibit

8    500-A.

9    Q.  What's shown in this photograph.

10   A.  Just a close up of the narcotics, cellphone and other

11   miscellaneous items.

12   Q.  Which side of the screen are the narcotics on?

13   A.  To the right side, lower right corner.

14   Q.  What did you do after you found these narcotics?

15   A.  The narcotics were field tested by law enforcement

16   personnel on the screen and then seized the evidence.

17   Q.  When you say they were "field tested", what does that mean?

18   A.  It's a kit that's used by -- it was a kit used by the law

19   enforcement officers that were there that day that

20   presumptively indicated that material substances contained in

21   the plastic bag was cocaine.

22   Q.  Going back to Government Exhibit 100-B, can you indicate

23   where in this photograph the field test is that you mentioned

24   earlier?

25   A.  It's directly underneath the label.  You can see there's a

I9AAAPOL4                         Lombardo - Cross

1    pink circle, a blue circle and then a half blue/half pink

2    circle.

3    Q.  Outside of this search did you have any additional

4    involvement in this case?

5    A.  No, I did not.

6              MR. FOLLY:  No further questions, your Honor.

7              THE COURT:  Cross-examination?

8              MR. LIND:  Yes.

9    CROSS-EXAMINATION

10   BY MR. LIND:

11   Q.  Good afternoon.

12              I guess it is Officer Lombardo?

13   A.  Yes, sir.  That's fine.

14   Q.  Now you say you have been working with the search and

15   seizure team or what is it called, a unit that you work with?

16   A.  It's a special operations response team.

17   Q.  OK.  And you were in charge of the search and seizure of

18   this residence on that particular day, correct?

19   A.  There was a team leader.  I am overall in charge of the

20   team but there was a team leader designated for that day.

21   Q.  OK.  And you did this search and seizure pursuant to a

22   search warrant, correct?

23   A.  Yes, sir.

24   Q.  You've seen that search warrant, correct?

25   A.  I have not.

I9AAAPOL4                    Lombardo - Cross

Q.   You have not seen the search warrant.  Do you know that the

search warrant called for a seizure of a weapon at that

location?

            MR. FOLLY:  Objection, your Honor.

            THE COURT:  Come to the side bar.

            (Continued on next page)

1          (side bar)

2          THE COURT:  What point are you trying to make?

3          MR. LIND:  That the search and seizure was just for a

4   gun and they didn't find a gun, that's basically my point, your

5   Honor.

6          THE COURT:  Well --

7          MR. FOLLY:  You can elicit the fact that they didn't

8   find a gun but it was irrelevant whether it was probable cause

9   for a judge --

10          MR. KROUSE:  Question of the reason why law

11   enforcement was there searching why a warrant was issued is

12   irrelevant is the same reason why the government objected on

13   opening.

14          THE COURT:  Understood.  But I am not quite sure -- I

15   mean, seems to me like this is a two-edged sword.  You can

16   arguing whatever you want to argue from it.  You want to argue

17   that they were there, that a search warrant that gave him

18   probable cause to look for a gun as opposed to probable cause

19   to look for drugs.  And I'm not sure what the two of you want

20   to argue from that.

21          MR. NICHOLAS:  Your Honor, just one other issue.  I

22   think the witness testified that he didn't see the warrant.  So

23   I actually don't think he is competent to say whether the

24   warrant was for a gun.  So I think he's now testified to that.

25   So I'm not sure the question wasn't it for a gun is proper even

1  under foundation.

2          THE COURT:  I could tell you that my view of this is

3  probably similar to the jury's view of this.  I don't know why

4  it's important or what difference does it make to me whether

5  they were looking for guns, found drugs, looking for guns and

6  drugs or just looking for drugs.

7          MR. LIND:  OK.

8          THE COURT:  But I'm not sure -- if you think this is

9  important I may let you have it but if this witness can say he

10  went there looking for guns in your guys apartment, the fact

11  that he is looking for guns and he found drugs, I am not sure

12  what either side wants to do with that but they seem to object

13  to the fact that they were looking for guns in his apartment.

14          MR. KROUSE:  Just any objection on any inquiry into

15  why they were there because that's a legal question.  The

16  search warrant was issued, there was probable cause to what

17  they found --

18          THE COURT:  But they were there pursuant to lawful

19  search warrant and a lawful search warrant gave them the right

20  to search for something.  I am not quite sure why it's

21  inadmissible to say if he knows.  We had a search warrant and

22  the basis of the search went, they were there looking for guns

23  and we happened to find drugs.

24          MR. KROUSE:  Our view is he does.

25          MR. LIND:  I'll tell you what the reason for this is.

I9AAAPOL4                      Lombardo – Cross

1    The government's going to try to play prison goals and talking

2    about putting a basketball in a safe.  OK?  And I think they

3    are going to try to link that to his apartment that the

4    basketball is not a basketball but it's a gun.  And I want to

5    show that they found no gun in the safe.  OK?

6              THE COURT:  Well, you can ask him --

7              MR. KROUSE:  Was a gun found in the safe?

8              THE COURT:  Can you ask him what he was searching for

9    and you can ask him what he found and whether he found a gun or

10   not, I will allow you.

11             MR. LIND:  OK.

12             (Continued on next page)

13

14

15

16

17

18

19

20

21

22

23

24

25

 1              (In Open Court)

 2    BY MR. LIND:

 3    Q.   Let me just direct your attention, what exactly were you

 4    searching for in the apartment to your recollection, what

 5    items?

 6    A.   Narcotics and a firearm.

 7    Q.   The basis for looking for a firearm was what?

 8    A.   Again, sir, I was not the applicant of the search warrant.

 9    I was just one of the personnel that was present.  So I was not

10    the applicant of the search warrant.

11    Q.   How did you know to search for a firearm if you didn't know

12    anything about this?

13    A.   I was debriefed by the team leader for the day and told us

14    what we were searching for.

15    Q.   So we're searching for a gun, correct?

16    A.   Narcotics.

17    Q.   And firearm?

18    A.   I was told narcotics and a firearm.

19    Q.   OK.  And part of your search was going into a safe,

20    correct?

21    A.   Yes, sir.

22    Q.   That was one of the areas that the team leader told you to

23    search?

24    A.   No.  We identified a safe that was in the residence.

25    Q.   And that safe as far as you knew contained a firearm,

1    correct?

2    A.  I didn't know what it contained at that time.  It was

3    locked, sir.

4    Q.  When you opened up the safe, did you find a firearm to in

5    that safe?

6    A.  No, I did not.

7    Q.  Did you find a firearm or your team find a firearm any

8    place in that location?

9    A.  No, it did not, sir.

10   Q.  Now, the amount of -- it was crack or crack cocaine or

11   regular cocaine that you found?

12   A.  We tested -- when I tested it with the other personnel came

13   back just as cocaine.  That's what the test yielded.

14   Q.  And it turned out to be about three grams worth of cocaine,

15   correct?

16   A.  I don't know what the total amount was, sir.  We did a

17   presumptive test and then it was sent to a laboratory.

18              MR. LIND:  May I have just one moment, judge?

19              THE COURT:  Yes.

20              (Pause)

21   Q.  And the amount I think that's been stipulated by the

22   parties is about three grams, correct, three and a half grams?

23              THE COURT:  I haven't seen --

24              MR. FOLLY:  Three and a half grams.

25              THE COURT:  Is there a stipulation that it was three

1    and a half grams of crack cocaine that was seized from the

2    apartment?

3                 MR. LIND:  Yes.

4    Q.  Is that correct; do you recall that?

5                 THE COURT:  He says he doesn't know.  So, it's got to

6    be pursuant to your stipulation.

7                 MR. LIND:  Yes.

8                 THE COURT:  OK.

9                 MR. LIND:  Nothing further.

10                 THE COURT:  Any further questions of this witness?

11                 MR. FOLLY:  No redirect, your Honor.

12                 THE COURT:  Thank you, sir.  You can step down.

13                 MR. FOLLY:  Your Honor, before we call the next

14    witness I would like to read a stipulation into the record.

15                 THE COURT:  Sure.

16                 MR. FOLLY:  The parties stipulate that the Government

17    Exhibit 100 contains 34 individual bags containing a white

18    rocklike substance.  The substance contained inside the

19    individual bags was analyzed by a forensic chemist and tested

20    positive for the presence of cocaine base commonly known as

21    "crack".  The crack cocaine contained in Government Exhibit 100

22    weighed approximately 3.5 grams.

23                 THE COURT:  Yes.

24                 MR. KROUSE:  Your Honor, the government calls Sergeant

25    Stephen Schoefer to the stand.

1    STEPHEN SCHOEFER,

2         called as a witness by the Government,

3         having been duly sworn, testified as follows:

4    DIRECT EXAMINATION

5    BY MR. KROUSE:

6    Q.  Good afternoon Sergeant Schoefer.  Where do you currently

7    work?

8    A.  I am in the Three-Three Detective Squad.

9    Q.  Is that with the NYPD?

10   A.  Yes.

11   Q.  How long have you been with the NYPD?

12   A.  Twelve years.

13   Q.  How long have you been with the Three-Three Detective

14   Squad?

15   A.  About a year.

16   Q.  Before you joined the Three-Three Detective Squad where

17   were you?

18   A.  I was in Bronx Borough Crime.

19   Q.  How long were you Bronx Borough Crime?

20   A.  About a year also.

21   Q.  And before that, where were you?

22   A.  I was assigned to Four-Four Precinct.

23   Q.  Is the Four-Four Precinct, the 44th Precinct?

24   A.  Yes.

25   Q.  What borough is that located in?

1    A.  The Bronx.

2    Q.  What part of the Bronx, approximately?

3    A.  The area around Yankee Stadium, so South Bronx.

4    Q.  How long were you with the Four-Four Precinct?

5    A.  Approximately, two years.

6    Q.  During those two years with the Four-Four Precinct what

7    were you responsibilities and duties?

8    A.  I was assigned as the anticrime sergeant.

9    Q.  Could you describe what the duties and responsibilities are

10   of the anticrime sergeant?

11   A.  Yeah.  We work in plain clothes and unmarked vehicles and

12   we are assigned within the precinct to violent crime areas.

13   Q.  You conduct patrols as part of that role?

14   A.  Yes.

15   Q.  Directing your attention to August 26, 2015, were you the

16   anticrime sergeant for 44th Precinct on that date?

17   A.  Why he.

18   Q.  Were you on patrol that date?

19   A.  Yes.

20   Q.  What kind of patrol?

21   A.  I was the anticrime sergeant assigned to an unmarked

22   vehicle working in plainclothes.

23   Q.  Can you describe for the jury what you do on an anticrime

24   patrol?

25   A.  We would receive intelligence and we would be directed to a

1   certain area, might be for spike in robberies or shootings,

2   usually for violent crime in an effort to prevent violent

3   crimes.

4   Q.  Can you describe to the jury, you said you were in an

5   unmarked vehicle.  What does it mean to be in an unmarked

6   vehicle?

7   A.  Basically, there's nothing indicating on the outside that

8   it's a police vehicle.  All the lights are inside.  There were

9   no lights on top and it's usually a black car.

10  Q.  In this context, what does it mean to be in plainclothes?

11  A.  Again, I would have my shield tucked in my shirt, handing

12  around my neck but inside my shirt and we wouldn't have

13  anything on the outside indicating that you were a police

14  officer.

15  Q.  Were you alone or with another person that day?

16  A.  I had a partner.

17  Q.  Who was your partner?

18  A.  Officer Spina.

19  Q.  And were you the person driving the car or were you the

20  passenger?

21  A.  I was the passenger.

22  Q.  Around what time did you begin your vehicle patrol that

23  day?

24  A.  My tour of duty started at 5:30 in the afternoon.

25  Q.  Directing your attention to around 11:45 p.m. that same

1   night did you notice anything at that time?

2   A.  Yes.

3   Q.  What did you notice?

4   A.  I noticed a vehicle in the gas station parking lot in the

5   area of 167 Street.

6   Q.  And 167 and what street, do you recall?

7   A.  Be about Ogden and University.

8   Q.  You say you noticed a vehicle in the gas station?

9   A.  Correct.

10  Q.  What was the vehicle doing?

11  A.  It was parked.

12  Q.  What made you notice that vehicle?

13  A.  I had noticed the vehicle days prior after I received

14  intelligence that --

15          MR. LIND:  Objection as to hearsay, judge.

16          THE COURT:  I'm sustain.

17          MR. KROUSE:  Your Honor, it's not for the truth, just

18  for Sergeant Schoefer's next steps.

19          MR. LIND:  Still objection, judge.

20          THE COURT:  I am going to sustain the objection.  He

21  can say what he did as a result of receiving the intelligence.

22          MR. KROUSE:  Yes, your Honor.

23          Mr. Concepcion, could you please put on the screen for

24  the witness only what has been marked as Government Exhibit 525

25  for identification.

1   Q.  Do you see a photograph?

2   A.  Yes.

3   Q.  Do you recognize it?

4   A.  Yes.

5   Q.  What is it?

6   A.  It's the vehicle Mr. Polk was driving.

7   Q.  Is this photograph a true and accurate depiction of the

8   vehicle that you saw on August 26, 2015?

9   A.  Yes.

10          MR. KROUSE:  The government offers Government Exhibit

11  525.

12          MR. LIND:  No objection.

13          THE COURT:  Admitted into evidence.

14          (Government's Exhibit 525 received in evidence)

15          MR. KROUSE:  Your Honor, may we publish the photograph

16  to the jury?

17          THE COURT:  Yes.

18  Q.  You said this already.  Where was the car located when you

19  saw it?

20  A.  In the gas station parking lot.

21          MR. KROUSE:  Mr. Concepcion, can you put on the screen

22  for the witness only what has been marked as Government Exhibit

23  202.

24  Q.  Do you see that photograph?

25  A.  Yes.

I9AAAPOL4                          Schoefer – Direct

1    Q.  What is it?

2    A.  It's the area of the 44th Precinct on the west side.

3    Q.  You said this but where was the car located when you saw

4    it?

5    A.  167 Street and Ogden.

6    Q.  Do you see that location on this map?

7    A.  Yes.

8    Q.  Is this a fair and accurate representation of the streets

9    and landmarks in this area?

10   A.  Yes.

11           MR. KROUSE:  The government offers Government Exhibit

12   202.

13           THE COURT:  Any objection?

14           MR. LIND:  No objection.

15           THE COURT:  It'll be admitted.

16           (Government's Exhibit 202 received in evidence)

17           MR. KROUSE:  Mr. Concepcion, could you please publish

18   that exhibit for the jury please.

19           (Pause)

20   Q.  Could you point out on this map where 167 and Ogden Street

21   is?

22   A.  Do you want me to like draw a circle on it?

23   Q.  That will be fine if it's working right now.  So, where on

24   the map is it?

25   A.  It's not working.

I9AAAPOL4                        Schoefer - Direct

1   Q.  OK.  Just describe it?

2   A.  It would be West 167 and then you see Ogden come across.

3   Ogden is the next avenue.  To the left would be University, so

4   that would be the area right there.

5   Q.  At the time you saw the vehicle did you have a reason to

6   believe who was driving that vehicle?

7   A.  Yes.

8   Q.  Who did you believe was driving that vehicle?

9   A.  Terrell Polk.

10  Q.  What was that belief based on?

11  A.  We had spoken to the detective squad.

12          MR. LIND:  Objection, judge.

13          THE COURT:  I am going to sustain as to the form of

14  the question.

15  Q.  At the time of the car stop you believed that Mr. Polk was

16  driving that vehicle, correct?

17  A.  Yes.

18  Q.  Prior to the car stop, had you learned anything about

19  whether Mr. Polk was permitted to drive?

20          MR. LIND:  Objection.

21  A.  Yes.

22          THE COURT:  Overruled.  You can answer that.

23  Q.  You may answer the question.

24  A.  Yes.

25  Q.  What had you learned?

1   A.   His driver's license was suspended.

2   Q.   And at the time of the car stop what, if anything, had you

3   learned about whether Mr. Polk had an open arrest warrant?

4           MR. LIND:   Objection.

5           THE COURT:   I'll sustain the objection.

6   Q.   Before the car stop, had you seen photographs of Mr. Polk?

7   A.   Yes.

8   Q.   Is it fair to say you knew what he looked like?

9   A.   Yes.

10  Q.   When you saw the car, what did you and your partner decide

11  to do?

12  A.   We made a U-turn and at that time the car had started to

13  pull out of the parking lot.

14  Q.   Did you notice anything about the car itself?

15  A.   Yes.

16  Q.   What did you notice about the car?

17  A.   It had tinted windows.

18  Q.   Did you notice anything else about the car?

19  A.   It was missing a front license plate.

20  Q.   And are those two items you just mentioned violations of

21  the vehicle and traffic laws?

22  A.   Yes.

23  Q.   What did you do after you pulled up behind the car?

24  A.   We turned on the lights and initiated a traffic stop.

25  Q.   Did the car stop?

1   A.  Yes.

2   Q.  What did you do then?

3   A.  I approached the passenger side and my partner, Officer

4   Spina, approached the driver's side.

5   Q.  And on the passenger side when you got to the vehicle what,

6   if anything, happened?

7   A.  I approached the passenger side of the vehicle, told them

8   to roll down the windows and I noticed Mr. Polk was driving,

9   and I got a smell of marijuana coming from the vehicle.

10   Q.  Can you describe a smell of marijuana?

11   A.  I don't know -- what do you mean?

12   Q.  Are you familiar with what marijuana smells like?

13   A.  Yes.

14   Q.  So when you approached the vehicle describe what you

15   smelled?

16   A.  I could smell the distinct smell of marijuana.

17   Q.  When did you notice the smell of the marijuana?

18   A.  As I'm communicating with the passengers inside the car.

19   Q.  Is that before or after the windows were rolled down?

20   A.  After.

21   Q.  You mentioned this, but who was driving the car when you

22   pulled it over?

23   A.  Mr. Polk.

24          MR. KROUSE:  Mr. Concepcion, can you put on screen

25   Government Exhibit One which is in evidence.

1   Q.  Do you recognize person in this photograph?

2   A.  Yes.

3   Q.  Who is it?

4   A.  Mr. Polk.

5           MR. KROUSE:  The government offers Government Exhibit

6   1A, which is the nameplate "Terrell Polk".

7           THE COURT:  One-A?

8           MR. KROUSE:  Yes, your Honor.

9           MR. LIND:  No objection.

10          THE COURT:  It'll be admitted in evidence.

11          (Government's Exhibits One and One-A received in

12  evidence)

13          MR. KROUSE:  Your Honor, with the Court's permission

14  can we place the faceplate photograph Government Exhibit One

15  which is in evidence and Government Exhibit One-A which is the

16  nameplate underneath that photograph?

17          THE COURT:  Yes.

18          (Pause)

19  Q.  When you approached the vehicle was anyone else in it?

20  A.  Yes.

21  Q.  How many people were in the car other than Mr. Polk?

22  A.  Two.

23  Q.  Was there someone seated in the front passenger seat?

24  A.  Yes.

25  Q.  Did you later learn who that person was?

1    A.  Yes.

2    Q.  Who was it?

3    A.  Mr. Corbett.

4    Q.  Does Mr. Corbett have a first name?

5    A.  Kevin.

6            MR. KROUSE:  Mr. Concepcion, can you please put on the

7    screen for the witness only what has been marked as Government

8    Exhibit Two for identification.

9            (Pause)

10   Q.  Do you recognize this individual?

11   A.  Yes.

12   Q.  Who is it?

13   A.  Kevin Corbett.

14           MR. KROUSE:  The government offers Government Exhibit

15   Two and Two-A which is the nameplate "Kevin Corbett".

16           MR. LIND:  No objection.

17           THE COURT:  That'll be admitted into evidence.

18           (Government's Exhibits 2 and 2A received in evidence)

19           MR. KROUSE:  And publishing it on the board, your

20   Honor.

21           THE COURT:  Yes, sir.

22   Q.  Was there an individual in the backseat?

23   A.  Yes.

24   Q.  Who was in the backseat?

25   A.  Timothy Smith.

1           MR. KROUSE:  Mr. Concepcion, can you put on the screen

2   for the witness only what's been marked as Government Exhibit

3   Four for identification.

4           (Pause)

5   Q.  Do you recognize this individual?

6   A.  Yes.

7   Q.  Who is it?

8   A.  Timothy Smith.

9           MR. KROUSE:  The government offers Government Exhibit

10  Four and Four-A which is the nameplate "Timothy Smith"?

11          MR. LIND:  No objection.

12          THE COURT:  It'll be admitted into evidence.

13          (Government's Exhibits 4 and 4A received in evidence)

14  Q.  When you got to the car what, if anything, was Mr. Polk

15  told to do?

16  A.  Officer Spina asked him to step out.

17  Q.  Why was that?

18  A.  For off -- based on the smell of marijuana and for officer

19  safety reasons.

20  Q.  Was Mr. Polk placed under arrest?

21  A.  Yes.

22  Q.  Why?

23  A.  His suspended license.

24  Q.  And he was seen driving at that time?

25  A.  Yes.

1   Q.  What happened to Kevin Corbett and Timothy Smith?

2   A.  I had asked them to step out and step to the back of the

3   vehicle.

4   Q.  Were those two individuals also placed under arrest?

5   A.  No.

6   Q.  Why not?

7   A.  At that time we did not have any probable cause to arrest

8   those two individuals.

9   Q.  Then what happened after all three men were outside of the

10  vehicle?

11  A.  I stayed.  They were placed at the back of the vehicle

12  along the trunk and I stayed with them while Officer Spina went

13  inside the vehicle.

14  Q.  Why was the vehicle searched?

15  A.  The smell of marijuana.

16  Q.  Were there other reasons for searching the vehicle?

17  A.  Officer safety.

18  Q.  What would -- excuse me.  What, if anything, would have

19  been done after Mr. Polk was arrested with the vehicle?

20  A.  The vehicle would have been searched for inventory

21  purposes.

22  Q.  Taken where?

23  A.  To the precinct.

24  Q.  What, if anything, was found in the vehicle when it was

25  searched?

1    A.   A firearm was found.

2    Q.   Where was the firearm found?

3    A.   It was in the backseat.  If you take down the arm rest it

4    was behind in the arm rest.

5    Q.   Inside the arm rest?

6    A.   Yes.

7    Q.   Was the firearm loaded?

8    A.   Yes.

9    Q.   How many rounds were in the gun; do you recall?

10   A.   Three.

11   Q.   Do you recall where in the firearm the rounds were?

12   A.   Two were in the magazine and one was in the chamber, I

13   believe.

14   Q.   Could you describe what the significance of that is?

15   A.   So you would have a firearm with a magazine which is where

16   the bullets would go that would go into the gun.  And to make

17   it ready to fire a bullet, when you pulled the trigger you

18   would have rack the top which would bring one bullet from the

19   magazine into the top of the firearm.

20   Q.   When you recovered that firearm was there a round already

21   in the chamber?

22   A.   Yes.

23   Q.   And two others in the magazine?

24   A.   Yes.

25            MR. KROUSE:  Mr. Concepcion, can you place on the

1  screen for the witness only what's been marked as Government

2  Exhibit 522 for identification.

3  Q.  Do you recognize this photograph, sergeant?

4  A.  Yes.

5  Q.  What is it?

6  A.  It's where the firearm was found.

7  Q.  Is this a true and accurate depiction of where the firearm

8  was found that day?

9  A.  Yes.

10         MR. KROUSE:  The government offers Government Exhibit

11  522.

12         MR. LIND:  No objection.  Admitted into evidence.

13         (Government's Exhibit 522 received in evidence)

14         MR. KROUSE:  You may publish the exhibit,

15  Mr. Concepcion.

16  Q.  So this is where the firearm was found that night, correct?

17  A.  Correct.

18  Q.  Is there a closer photograph of where the gun was found as

19  well?

20  A.  Yes.

21         MR. KROUSE:  Mr. Concepcion, can you place on the

22  screen for the witness only what is marked as Government

23  Exhibit 521 for identification.

24  Q.  Do you recognize this photograph?

25  A.  Yes.

1   Q.  Is this just a closer image of where the firearm was found?

2   A.  Yes.

3          MR. KROUSE:  The government offers Government Exhibit

4   521.

5          MR. LIND:  No objection.

6          (Government's Exhibit 521 received in evidence)

7          THE COURT:  Admitted into evidence.

8          MR. KROUSE:  Could we publish that to the jury please?

9   Q.  After the firearm was recovered what, if anything,

10  happened?

11  A.  Mr. Smith and Mr. Corbett were then placed under arrest

12  also.

13  Q.  Why were they arrested?

14  A.  Because of the found firearm in the vehicle.

15  Q.  Did you have any idea at that time two the firearm belonged

16  to?

17  A.  No.

18  Q.  Aside from the gun, were there any other items of

19  evidentiary value recovered?

20  A.  Marijuana was recovered.

21  Q.  Where was the marijuana recovered?

22  A.  From Mr. Smith.

23  Q.  Was there also an electronic device recovered?

24  A.  Yes.

25  Q.  What was that electronic device?

1   A.  Cellphone.

2   Q.  Where was that recovered?

3   A.  From the vehicle.

4            MR. KROUSE:  Your Honor, may we approach the witness?

5            THE COURT:  Yes.

6            MR. KROUSE:  The government is handing the witness

7   what has been marked as Government Exhibit 110 for

8   identification.

9   Q.  Sergeant, do you recognize that exhibit?

10  A.  Yes.

11  Q.  What is it?

12  A.  It's the cellphone that was recovered.

13  Q.  How do you know that?

14  A.  I recognize it and I have my initials on it.

15  Q.  This is the cellphone that was recovered from the car that

16  was stopped on August 26, 2015, correct?

17  A.  Correct.

18  Q.  Was the firearm also vouchered into evidence?

19  A.  Yes.

20           MR. KROUSE:  Your Honor, may I approach the witness?

21           THE COURT:  Yes.

22           MR. KROUSE:  Your Honor, I am handing the witness what

23  has been marked as Government Exhibit 101.  It's a firearm

24  that's been made safe and checked by court security officers,

25  and Government Exhibit 101-A.

1   Q.  Taking Government Exhibit 101 first, sergeant, do you

2   recognize that item?

3   A.  Yes.

4   Q.  Feel free to pick it up and look at it.

5            What is Government Exhibit 101?

6   A.  This is the firearm that was found in the vehicle.

7   Q.  That's the firearm that was recovered --

8   A.  Yes.

9   Q.  -- from the vehicle?

10  A.  Correct.

11  Q.  How do you recognize it?

12  A.  I recognize it from the night and I have my initials on it.

13           MR. KROUSE:  The government offers Government Exhibit

14  101, your Honor?

15           MR. LIND:  No objection.

16           THE COURT:  It'll be admitted into evidence.

17           (Government's Exhibit 101 received in evidence)

18  Q.  Now, Sergeant Schoefer, I am going to take Government

19  Exhibit 101-A now.  Do you recognize that?

20  A.  Yes.

21  Q.  What's contained in the bag marked 101-A?

22  A.  This is the magazine and the bullets.

23  Q.  Those were the bullets that were inside the gun?

24  A.  Correct.

25  Q.  How do you recognize 101-A?

1   A.  I recognize it from being vouchered that day.

2           MR. KROUSE:  Your Honor, the government offers

3   Government Exhibit 101-A.

4           MR. LIND:  Can I just have a quick voir dire?

5           THE COURT:  Yes.

6   VOIR DIRE EXAMINATION

7   BY MR. LIND:

8   Q.  When was last time you saw 101-A?

9   A.  Previously the attorney showed it to me.

10  Q.  A few days ago?

11  A.  Correct.

12  Q.  Before that when was the last time you had seen it?

13  A.  The night of the arrest.

14  Q.  You don't know -- what did you do with it that day?  Did

15  you say see it that night?

16  A.  Yes.

17  Q.  What did you do with the magazine that you saw that night?

18  A.  Evidence Collection responded, processed the firearm.  Then

19  they would give it to Officer Spina and then I will sign-off on

20  the voucher.  I will check his voucher.  Make sure everything

21  is placed, itemized correctly.  Then he'll seal it in front of

22  me and I'll sign-off on if and then I'll bring it downstairs to

23  be sent to the lab.

24  Q.  Then what happened after that happened?

25  A.  Then it's sent to the lab for processing.

I9AAAPOL4                        Schoefer - Direct

1   Q.  After it went to the lab what happened?

2   A.  What do you mean?

3          MR. KROUSE:  Your Honor, objection to the lack of

4   foundation.

5          THE COURT:  I'll give you two more questions.  Most of

6   this may be cross-examination.

7          MR. LIND:  OK.  I'll withdraw any objection.

8          THE COURT:  OK.  It'll be admitted into evidence as

9   101-A.

10          (Government's Exhibit 101-A received in evidence)

11  BY MR. KROUSE:

12  Q.  Sergeant, just a couple questions on based on what defense

13  counsel asked you.  After the firearms recovered, you said that

14  Evidence Collection then processed it, correct?

15  A.  Correct.

16  Q.  Is that the standard operating procedure of the NYPD?

17  A.  Correct.

18  Q.  Once Evidence Collection which are other officer, correct?

19  A.  Correct.

20  Q.  Once they processed the firearm, what would generally

21  happen to it?

22  A.  It would be the arresting officer going to his possession

23  and then he will voucher it.

24  Q.  By "vouchering" what do you mean?  Can you explain that to

25  the jury?

1   A.  The gun, the magazines and bullets will all be placed into

2   what we call security envelopes, placed in a bag.  They'll

3   itemize each item that's placed in the bag, each bullet, the

4   firearm itself, the magazine and then it'll be sealed.

5   Q.  Now, when you met with the government about a week ago I

6   believe were you shown the firearm and the magazine and the

7   bullets?

8   A.  Yes.

9   Q.  Were they all in sealed bags already?

10  A.  Yes.

11  Q.  And were those sealed bags with the vouchering information

12  that the NYPD attached to it?

13  A.  Yes.

14  Q.  And then were those sealed bags cut open in front of you?

15  A.  Yes.

16  Q.  Did you have an opportunity to check the vouchers and check

17  the paperwork associated with the firearm that was sealed up in

18  those bags?

19  A.  Yes.

20  Q.  And what, if anything, did you conclude from the vouchers

21  that were attached to the bag?

22  A.  It was the same items.

23  Q.  They were in sealed bags, correct?

24  A.  Correct.

25  Q.  And once they were cut open and evidence stickers were

I9AAAPOL4                          Schoefer - Direct

1    placed on them, that was all done in front of you, correct?

2    A.  Correct.

3    Q.  Then they were placed in separate evidence bags, correct?

4    A.  Correct.

5    Q.  And based on your review of the voucher that you had

6    signed-off on and the voucher that was attached to the evidence

7    bag containing the gun, the magazine and bullets, what was your

8    conclusion about those physical items?

9    A.  There was no discrepancies.

10             MR. KROUSE:  Your Honor, may I have a moment?

11             THE COURT:  Yes.

12             (Pause)

13             MR. KROUSE:  Your Honor, permission to publish

14   Government Exhibit 101-A by handing it to the jury and then

15   Government Exhibit 101 which is the firearm by just walking

16   across and showing it to the jury?

17             THE COURT:  Yes.

18             (Pause)

19             MR. KROUSE:  Let the record reflect the government's

20   retrieving Government Exhibit 101-A which is the bullets and

21   magazines and handing it to Juror No. 1 and retrieving

22   Government Exhibit 101 which is the firearm and publishing it

23   the jury by showing it to them.

24             (Pause)

25             MR. KROUSE:  No further questions, your Honor.

I9AAAPOL4                        Schoefer - Cross

1           THE COURT:  Mr. Lind, did you want to cross?

2           MR. LIND:  Yes.

3   CROSS-EXAMINATION

4   BY MR. LIND:

5   Q.  Good afternoon, sergeant.

6   A.  Good afternoon.

7   Q.  Just briefly, when you first saw the car it had the windows

8   up, correct?

9   A.  Correct.

10  Q.  Including on the driver's side, correct?

11  A.  Correct.

12  Q.  And all the windows are tinted --

13          MR. LIND:  Could we place back up on the screen 525.

14          Can the jury see that?

15          THE COURT:  Yes.

16  Q.  All windows was tinted.  It was around midnight.  You

17  couldn't see who was driving that car?

18  A.  Correct.

19  Q.  So how did you know to stop a car that could have been

20  driven by someone else?

21  A.  I stopped the car based on the traffic violations of it, of

22  the equipment violation and that goes back to the intelligence

23  that I received that Mr. Polk be operating this vehicle.

24  Q.  When you say "traffic violation", talking about the missing

25  license plate?

1   A.  The tints also.

2   Q.  That's why you stopped him.

3           The narcotics that you found that night, were you --

4   who found the narcotics?

5   A.  I'm not sure what actually recovered the marijuana.

6   Q.  But they were recovered on someone other than Mr. Polk,

7   correct?

8   A.  Correct.

9   Q.  I think it was recovered by Mr. Smith or someone else in

10  the car, Mr. Corbett or Mr. Smith, correct?

11  A.  Correct.

12          MR. LIND:  I have no further questions.

13          THE COURT:  Any further questions of this witness?

14          MR. KROUSE:  No questions, your Honor.  Thank you.

15          THE COURT:  Thank you.  Sir, you can step down.

16          Did you want to do anything else?

17          MR. KROUSE:  Your Honor, we have a short witness who

18  is here.

19          THE COURT:  OK.  Let's move forward with that witness.

20          MR. KROUSE:  Yes, your Honor.

21          The government calls Detective Jason Baker.

22          While we wait for the witness the government will read

23  a brief stipulation.  This is marked as Government Exhibit

24  1001.

25          The parties stipulate that on February 7, 2007,

I9AAAPOL4                        Baker – Direct

1     Terrell Polk was convicted of a felony punishable by

2     imprisonment for a term exceeding one year.  This conviction

3     occurred prior to the time that the defendant is alleged to

4     have possessed the ammunition as charged in the indictment.

5              The government offers this stipulation which is

6     Government Exhibit 1001.  And signed by both parties.

7              THE COURT:  That would be admitted into evidence.

8              MR. LIND:  I have no objection to that judge.

9              (Government's Exhibit 1001 received in evidence)

10             THE COURT:  Step up, sir.

11      JASON BAKER,

12          called as a witness by the Government,

13          having been duly sworn, testified as follows:

14    DIRECT EXAMINATION

15    BY MR. KROUSE:

16    Q.  Detective Baker, where do you currently work?

17    A.  Four-Four precinct.

18    Q.  Is that part of the New York City Police Department?

19    A.  Yes, it is.

20    Q.  By "Four-Four" do you mean the 44th precinct?

21    A.  Yes.

22    Q.  Where does that geographically cover?

23    A.  Located in the Bronx, New York.

24    Q.  In a particular area of the Bronx?

25    A.  South Bronx, Highbridge.

1   Q.  In total, how many years have been with the NYPD?

2   A.  A little over 14 years.

3   Q.  What is your title there?

4   A.  Detective.

5   Q.  How long have you been a detective?

6   A.  A little over five years.

7   Q.  What are your duties and responsibilities as a detective

8   with the NYPD?

9   A.  Investigate all sorts of cases, anything from financial

10  crimes to violent felonies.

11  Q.  And drawing your attention now to July 25, 2015, were you

12  involved with an NYPD investigation on that date?

13  A.  Yes, I was.

14  Q.  Were you assigned to the 44 Precinct on that day?

15  A.  Yes.

16  Q.  What was the nature of that investigation?

17  A.  I was in charge of a, lead detective in regards to a

18  nonfatal shooting.

19  Q.  Where was that nonfatal shooting, where did it take place?

20  A.  1055 University Avenue.

21  Q.  Is that located within the Four-Four precinct?

22  A.  Yes.  It's within the confines.

23  Q.  Approximately, what time was a person shot?

24  A.  A little past midnight.

25  Q.  Where does 1055 University located just to situate the

1  jurors?

2  A.  It's on the westernmost part of the precinct.  It runs

3  parallel to the Major Deegan highway.

4          MR. KROUSE:  Mr. Concepcion, can you place on the

5  screen for everyone what's been admitted in evidence as

6  Government Exhibit 202.

7  Q.  Detective Baker, do you have that photo on your screen?

8  A.  Yes, I do.

9  Q.  Do you see 1055 University Avenue marked on your screen?

10  A.  Yes, I do.

11  Q.  And where is it in relation to the streets?  What street is

12  it on?

13  A.  I am sorry.  Could you repeat the question.

14  Q.  What street is that building on?

15  A.  The cross streets here, it's between Sedgewick and Major

16  Deegan.

17  Q.  Are you sure about that?

18  A.  One-six-five.  I am sorry, counsel.

19  Q.  One-six-five and what?

20  A.  165 and University.

21  Q.  What kind of building is 1055 University Avenue?

22  A.  1055 University is a residential building.

23  Q.  Is there another kind of establishment on the ground floor

24  of that building?

25  A.  Yes.  On the street level there is a bodega grocery store.

1          MR. KROUSE:  Mr. Concepcion, can you place on the

2      screen for the witness what has been marked for identification

3      as Government Exhibit 530.

4              (Pause)

5      Q.  Do you recognize this photograph, Detective Baker?

6      A.  Yes, I do.

7      Q.  What is it?

8      A.  That is the entrance of 1055 University and also shows the

9      deli.

10     Q.  Is that a true and accurate depiction of 1055 university

11     Avenue?

12     A.  Yes.

13          MR. KROUSE:  The government offers Government Exhibit

14     530, your Honor?

15          MR. LIND:  One, question.  Where is the entrance on

16     that photo?  OK.  I see it.  OK.  I apologize.  No objection.

17          THE COURT:  Then it'll be admitted into evidence.

18              (Government's Exhibit 530 received in evidence)

19          MR. KROUSE:  May we publish the exhibits,

20     Mr. Concepcion?

21              (Pause)

22     Q.  Detective Baker, where on the photograph is the address

23     listed; do you see that?

24     A.  Yes.  It's on the top of the gate there.

25     Q.  Towards the middle of the photograph?

1    A.   That's correct.

2    Q.   And you mentioned this but is the deli on the left side of

3    photograph, the deli you mentioned that was on the ground floor

4    of that building?

5    A.   Yes.

6            MR. KROUSE:   Mr. Concepcion, can you place on the

7    screen what's been marked as Government Exhibit 514 for the

8    witness.

9            (Pause)

10   Q.   Is this just another angle of 1055 University Avenue?

11   A.   Yes.

12           MR. KROUSE:   The government offers Government Exhibit

13   514.

14           MR. LIND:   No objection.

15           THE COURT:   It'll be admitted into evidence.

16           (Government's Exhibit 514 received in evidence)

17           MR. KROUSE:   Can we publish the exhibit?

18   Q.   Is this a fuller picture of the deli located at 1055

19   University Avenue?

20   A.   Yes.

21   Q.   Detective Baker, you mentioned that you were part of an

22   investigation into a shooting that occurred at 1055 University

23   Avenue on July 25, 2015, correct?

24   A.   Correct.

25   Q.   Was one of your tasks in that investigation to retrieve

1  video surveillance?

2  A.  Yes.

3  Q.  Did you in fact retrieve video surveillance from that

4  shooting?

5  A.  Yes, I did.

6  Q.  Where did you retrieve the video surveillance from?

7  A.  From inside the bodega food deli grocery.

8  Q.  That's the food deli depicted here on Government Exhibit

9  514?

10  A.  That's correct.

11  Q.  When you say you retrieved it from that deli, can you

12  describe how you go about retrieving video surveillance from an

13  establishment like this deli?

14  A.  Yes.  I went to the location with my partner, asked the

15  manager of the bodega if we could have access to the video

16  surveillance DVR system.  I reviewed it and at that time we

17  recovered two video angles.

18  Q.  You said you did this on July 25, 2015?

19  A.  That's correct.

20  Q.  The same day as the shooting?

21  A.  Yes.

22  Q.  How many exterior cameras were located at this deli?

23  A.  Two.

24  Q.  Did you retrieve video surveillance footage from both

25  cameras?

1   A.  Yes.

2   Q.  When you collect video surveillance what, if anything, do

3   you do to make sure the date and time are accurate?

4   A.  Look at the live time feed on the DVR to see what time it

5   says and compared that to the department issued cellphones.

6   Q.  Did you do that here?

7   A.  Yes.

8   Q.  What, if anything, did you conclude about the date and

9   timestamps of the video surveillance at this deli?

10  A.  That it was accurate and there were no discrepancies.

11              MR. KROUSE:  Your Honor, may I approach the witness.

12              THE COURT:  Yes.

13              MR. KROUSE:  Handing the witness what has been marked

14  Government Exhibit 701 which is a CD.

15  Q.  Detective Baker, do you recognize that CD?

16  A.  Yes, I do.

17  Q.  How do you recognize it?

18  A.  My initials are on the bottom.

19  Q.  And were you briefly shown the contents of this CD by the

20  government in a meeting?

21  A.  Yes.

22  Q.  And did you review the contents of the CD?

23  A.  Yes, I did.

24  Q.  And what were the contents of the CD?  What was on there?

25              MR. LIND:  Objection, judge.  It's like a very general

1   way, the answers.

2          THE COURT:  I'm not sure.  What part did you object

3   to?

4          MR. LIND:  He wants the contents of the CD which is

5   not yet admitted into evidence.

6          THE COURT:  Well, why don't you rephrase the question.

7   Q.  What in general were the contents of CD?

8   A.  A copy of the video surveillance footage that I recovered.

9   Q.  The two video surveillances from the both cameras?

10  A.  That's correct.

11  Q.  Were the videos on the disk labeled 701-A and 701-B?

12  A.  Yes.

13  Q.  You reviewed the contents of 701-A and 701-B before you

14  came to court to testify today?

15  A.  Yes.

16  Q.  Does that disk contain a true and accurate correct copy

17  that you received from 1055 University Avenue on July 25, 2015?

18  A.  Yes.

19         MR. KROUSE:  Your Honor, the government offers

20  Government Exhibit 701 which is a disk containing Government

21  Exhibit 701-A and 701-B, which is also offered into evidence.

22         MR. LIND:  No objection.

23         THE COURT:  They'll be admitted into evidence.

24         (Government's Exhibits 701-A and 701-B received in

25  evidence)

1          MR. KROUSE:  Your Honor, may I approach the witness?

2          THE COURT:  Yes.

3  Q.  Detective, I am handing you a stack of photographs.

4  They're marked Government Exhibits 701-A1, 701-A2, 701-A3,

5  701-A4 and 701-A6.

6          If you could flip through those photographs and look

7  up when you're done.  Based on your review of the surveillance

8  videos already admitted, what are those photographs?

9  A.  These are still photos from the footage that was captured

10  by myself.

11          MR. KROUSE:  The government offers Government Exhibit

12  701-A1, 701-A2, 701-A4 and 701-A6.

13          MR. LIND:  Judge, can my client have a chance to look

14  at these?

15          THE COURT:  Why don't we do this.  You are not going

16  to do anything with them this afternoon.  So I'll rule on the

17  admissibility by tomorrow morning where you'll have further

18  opportunity to review it.

19  Q.  Detective Baker, just to be clear, when you say "screen

20  shots", what do you mean screen shoots from the video?

21  A.  They were a perfect still stopped screen image of the

22  footage.

23  Q.  Of the footage that's been admitted in evidence?

24  A.  That's correct.

25          MR. KROUSE:  Your Honor, may I approach the witness?

1            THE COURT:  Yes.

2            MR. KROUSE:  The government's handing the witness

3    what's been marked as Government Exhibit 701-B1, 701-B2 and

4    701-B3.

5    Q.  Detective Baker, could you look through those three

6    photographs and look up when you are done.

7            Based on your review of the surveillance video

8    admitted as 701-B, what are those three photographs?

9    A.  Those also are still photos that are captured from the

10   surveillance.

11   Q.  From the surveillance camera, correct.

12   A.  That is correct.

13           MR. KROUSE:  The government offers 701-B1, 701-B2 and

14   701-B3.

15           MR. LIND:  Same objection, judge.

16           THE COURT:  I'll reserve decision on that.  You can

17   look at it further.

18           MR. KROUSE:  No further questions, your Honor.

19           THE COURT:  Did you have questions?

20           MR. LIND:  No, I don't, judge.

21           THE COURT:  OK.  Can we excuse him or do you want him

22   brought back tomorrow?

23           MR. LIND:  Yes, excuse him.

24           THE COURT:  Thank you, sir.  You can step down.

25           THE WITNESS:  Thank you, your Honor.

I9AAAPOL4                           Baker – Direct

1          THE COURT:  Ladies and gentlemen, we are going to

2     adjourn for the day.  I'm going to ask you to be in the jury

3     room before 10:15 tomorrow.  My goal is to try to get the

4     testimony, all the evidence before you by the end of the week

5     and at the latest give you the case to decide on Monday.

6     That's what I am shooting for right now.  I think we're on

7     schedule.  We may even be a little ahead of schedule because

8     we've already done four witnesses.  So I will see if we can

9     continue moving efficiently tomorrow and I'll keep you informed

10    as to where I think we are.

11         Don't discuss the case.  Keep an open mind and we'll

12    continue tomorrow at 10:15.

13         (Jury not present)

14         THE COURT:  OK.  Is there anything we need to address

15    before we adjourn?

16         MR. LIND:  No, judge.

17         THE COURT:  OK all right.  So take some time tomorrow

18    and we'll start at 10:15.  You can let me know, Mr. Lind,

19    whether we're all ready to proceed.

20         MR. LIND:  Yes judge.

21         THE COURT:  OK.  Then, I'll see you all at 10:15.

22         (Adjourned to September 11, 2018 at 10:15 a.m.)

23

24

25

```
 1                         INDEX OF EXAMINATION

 2     Examination of:                              Page

 3     JUAN RIOS

 4     Direct By Mr. Folly  . . . . . . . . . . . . .69

 5     JOSEPH LOMBARDO

 6     Direct By Mr. Folly  . . . . . . . . . . . . .83

 7     Cross By Mr. Lind  . . . . . . . . . . . . . .95

 8     STEPHEN SCHOEFER

 9     Direct By Mr. Krouse . . . . . . . . . . . . 103

10     Cross By Mr. Lind  . . . . . . . . . . . . . 125

11     JASON BAKER

12     Direct By Mr. Krouse . . . . . . . . . . . . 127

13                         GOVERNMENT EXHIBITS

14     Exhibit No.                              Received

15      534 and 535  . . . . . . . . . . . . . . . .71

16      501 through 506  . . . . . . . . . . . . . .76

17      526 and 527  . . . . . . . . . . . . . . . .79

18      303  . . . . . . . . . . . . . . . . . . . .81

19      1  . . . . . . . . . . . . . . . . . . . . .86

20      100  . . . . . . . . . . . . . . . . . . . .90

21      100-A and 100-B  . . . . . . . . . . . . . .91

22      500 and 500-A  . . . . . . . . . . . . . . .93

23      525  . . . . . . . . . . . . . . . . . . . 107

24      202  . . . . . . . . . . . . . . . . . . . 108

25      One and One-A  . . . . . . . . . . . . . . 112
```

1    s 2 AND 2A   . . . . . . . . . . . . . . 113

2    4 and 4A    . . . . . . . . . . . . . . 114

3    522   . . . . . . . . . . . . . . . . . 117

4    521   . . . . . . . . . . . . . . . . . 118

5    101   . . . . . . . . . . . . . . . . . 120

6    101-A   . . . . . . . . . . . . . . . . 122

7    1001   . . . . . . . . . . . . . . . . . 127

8    530   . . . . . . . . . . . . . . . . . 130

9    514   . . . . . . . . . . . . . . . . . 131

10   701-A and 701-B   . . . . . . . . . . . 134

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25