I9B6POL1

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

------------------------------x

UNITED STATES OF AMERICA,

                    v.                         17 CR 649 (GBD)

TERRELL POLK,

                    Defendant.

------------------------------x

                                          New York, N.Y.
                                          September 11, 2018
                                          10:15 a.m.

Before:

                    HON. GEORGE B. DANIELS,

                                          District Judge
                                           - and a Jury -

                              APPEARANCES

GEOFFREY S. BERMAN,
     United States Attorney for the
     Southern District of New York
MICHAEL KIM KROUSE
NICHOLAS FOLLY
MAX NICHOLAS
     Assistant United States Attorneys

RICHARD B. LIND
     Attorney for Defendant


ALSO PRESENT:

JONATHAN CONCEPCION, U.S. Attorney's Office Paralegal
JESSICA ALVARADO, NYPD

I9B6POL1

1              (In open court; jury not present)

2              THE COURT:  Mr. Lind, are you prepared to move

3     forward?

4              MR. LIND:  We are, Judge.  Unfortunately I guess there

5     was some delay, but I have talked to Mr. Polk for about 15 or

6     20 minutes about this.  Maybe during a break before Mr.

7     Williams comes on the stand if we can have another 15 minutes?

8              THE COURT:  Sure.  The government offered these

9     photographs.  Do you have an objection to the photographs?  You

10    wanted to look at those further.

11             MR. LIND:  Which photographs?

12             THE COURT:  The ones from the video.

13             MR. LIND:  Can I have a moment, Judge?

14             THE COURT:  701 A and B.

15             MR. LIND:  I don't think I do, Judge.

16             Government, can I look at yours?

17             I don't have an objection to 701 A1, Judge.

18             THE COURT:  I think there is one through six and 701

19    B1 through 3.

20             MR. LIND:  Why don't you go through them.

21             I am okay with that one.

22             I don't object to this one, 701 A3.

23             THE COURT:  So when we bring the jury back out, the

24    government can reoffer those.

25             MR. LIND:  701 A4 is fine.

I9B6POL1

1          How many others?

2          Just give me a moment, Judge.

3          THE COURT:  Sure.

4          MR. LIND:  I have no problem with 701 A6.

5          MR. KROUSE:  That is B1 through 3.

6          MR. LIND:  No problem with B1.  No problem with B2.

7     No problem with B3.

8          THE COURT:  What did you want to resolve before you

9     got to cross-examination with this witness?  I know we hadn't

10    resolved the issue with domestic violence.  Did you figure out

11    what you wanted to cross-examine on?

12         MR. LIND:  In other words, Judge, the government

13    wanted to have a blanket prohibition on my cross-examining him

14    about domestic violence.

15         THE COURT:  Okay.

16         MR. LIND:  Mr. Krouse, correctly points out while my

17    objection to that was that he was on supervised release and he

18    had a navigation to tell the Court about any arrests within 72

19    hours.

20         THE COURT:  What did you want to ask?

21         MR. LIND:  I wanted to talk about this one time I

22    think in 2013 he slapped some woman around.

23         THE COURT:  I thought there was some dispute about

24    whether or not he was on supervised release.

25         MR. LIND:  That one there is no dispute.

I9B6POL1

1           THE COURT:  Which?

2           MR. LIND:  Let me find it, Judge.

3           THE COURT:  We can resolve that now.  We are still

4    missing one or two jurors.

5           MR. LIND:  It is 2015.  It is in 3500-69, Judge.  I

6    don't know if you have that up is there.  It's towards the

7    back, 3501-69.

8           THE COURT:  Okay.  Is that the supplemental

9    submissions?

10           MR. KROUSE:  No, your Honor.  It should be in the

11    original 3500 provided for the witness.

12           THE COURT:  Okay.

13           MR. LIND:  If you want, Judge, I can bring up my copy.

14           THE COURT:  I think I have it.  You said?

15           MR. LIND:  3501-69.  It's at the end.

16           THE COURT:  I have it.  So that is probation report.

17           MR. LIND:  Right.  Was that the last one or the next

18    one?

19           In any event, if you go to page 5 of that document, in

20    the middle of the page at No. 4.

21           THE COURT:  Okay.

22           MR. LIND:  He slapped his girlfriend on the face.

23           THE COURT:  What did you want to ask him?

24           MR. LIND:  That he did not tell the Court about this

25    incident.

I9B6POL1

1     THE COURT:  I am not sure that that is true.  Where
2   does it say he didn't report it?
3     MR. LIND:  As far as I am aware, he did not report
4   that.
5     THE COURT:  He wasn't supposed to tell me.  He was
6   supposed to tell his Probation officer.  It doesn't say the
7   Probation officer was unaware of it.
8     MR. LIND:  Well, it doesn't.  You are right, Judge.
9     THE COURT:  It says the Probation officer was aware of
10  it.
11    MR. LIND:  Maybe she subsequently found out.
12    THE COURT:  Right.
13    MR. KROUSE:  Possibly he told the Probation officer
14  about it.
15    THE COURT:  Right.  When you say that he didn't notify
16  the Court or Probation, I don't see where it indicates that he
17  didn't notify the Court or Probation.
18    MR. LIND:  Fine, Judge.  That was my point.
19    THE COURT:  It may be the case, but that is not what
20  is here.
21    MR. LIND:  Okay.
22    THE COURT:  I will see what the government brings out
23  on direct in terms of his prior criminal history and if we need
24  to discuss some other part of his prior criminal history before
25  cross-examination.

I9B6POL1

1          MR. KROUSE:  Just to clarify on this one point, your

2     Honor.  The government moved in limine on the five arrests that

3     Mr. Williams had for domestic violence incidents.  All of those

4     were outside the time period of his supervised release.  This

5     is the only incident that was during his supervised release.

6     As your Honor pointed out, it appears to us that Probation was

7     aware of that incident.  Mr. Williams was not arrested on that

8     incident, yet they learned about it possibly from him.

9          THE COURT:  Well, why do you say he wasn't arrested?

10    I don't know whether he was arrested and convicted.

11         MR. KROUSE:  It says underneath that the New York City

12    Police Department was contacted.  However, upon their arrival,

13    Williams had left and was not arrested.

14         THE COURT:  Sorry.  Where are you reading from?

15         MR. KROUSE:  From that same paragraph that Mr. Lind

16    pointed out to the Court, 3501-69, page 4.  In the third

17    paragraph from the top where it says that the Probation Office

18    has also learned that Williams slapped his girlfriend.  It then

19    goes on to say that he was not arrested.  He had been

20    previously arrested.

21         THE COURT:  I was looking at Specification No. 4.

22         MR. KROUSE:  So on page 4 of that same report.

23         THE COURT:  I am looking at page 5, Specification No.

24    4.  Is that not the same thing?

25         MR. KROUSE:  No.  On page 4 the Probation Office

I9B6POL1

1    explains the circumstances behind that specification on page 4.

2              THE COURT:  Okay.

3              MR. KROUSE:  It says at the third paragraph from the

4    top starting there, The Probation Office has also learned that

5    Williams slapped his girlfriend.  It says that the New York

6    City Police Department was contacted.  However, upon their

7    arrival to his girlfriend's residence, Williams had already

8    left and was not arrested.

9              Based on our review of his arrest reports, he was

10   never arrested or convicted of this offense.  It appears that

11   Probation added that as a specification nonetheless.

12             MR. LIND:  Are you sure they are talking about

13   Specification No. 4?

14             MR. KROUSE:  Yes.

15             I am fairly sure, your Honor.  I can't be positive,

16   but on Specification No. 4 it outlines the same incident.  It

17   says, cicero Williams slapped his girlfriend Diesha Coal in the

18   face.  That is what is described in this paragraph as well.

19             MR. LIND:  I don't know where she comes up with the

20   citation or various other statutes in here, Judge.

21             THE COURT:  That gives me the impression that he was

22   charged with those offenses.

23             MR. LIND:  That is what gave me the impression also.

24             MR. KROUSE:  He was not charge the, though, your

25   Honor.  He was not arrested.  At least in my experience

I9B6POL1

1   sometimes Probation will learn of an incident and then identify

2   a statute that would cover that incident in state law and then

3   just add that as a specification.  They don't need the person

4   to have been charged with it to add it as a specification of a

5   violation especially if the defendant is telling them that he

6   committed that offense.  There is no arrest report, sealed or

7   otherwise, associated with this incident.  So from the

8   government's review of the records, he was not arrested on this

9   incident.

10          MR. LIND:  Judge, there is also another one with the

11  same woman further on.  I think it is the same document.  It

12  seems to me that it is a different incident with the same woman

13  if you go further on in that same document, Judge.

14          THE COURT:  What page?

15          MR. LIND:  It goes through page 2.  It is right at the

16  end of that document.

17          MR. KROUSE:  Page 2?

18          MR. LIND:  I don't know.  Maybe I have this out of

19  order.

20          THE COURT:  We were reading from page 4 and 5.

21          MR. LIND:  Right.  I am talking about something that

22  is a little bit further along.

23          THE COURT:  After page 5?

24          MR. LIND:  Yes.  It is after page 8.

25          THE COURT:  All right.  I see it.  There is another

I9B6POL1

1    report.

2            MR. LIND:  Then if you go to the fourth paragraph of

3    that other page --

4            THE COURT:  Right.

5            MR. KROUSE:  -- that's the same incident.

6            MR. LIND:  No, it is not.

7            THE COURT:  It's the same date, June 26th.

8            MR. LIND:  Oh, I am sorry.  I thought it was a

9    different date.  I apologize.  It's the same date.

10           THE COURT:  We'll take this step by step if we need to

11   address this again before we get to that point.

12           Is this the witness that you are calling next?

13           MR. KROUSE:  No, your Honor.  We have two other

14   witnesses before Mr. Williams.

15           Two issues that might come up during Mr. Williams's

16   testimony --

17           THE COURT:  Yes.

18           MR. KROUSE:  There are two facts that may be elicited.

19   One is that Mr. Polk was on probation.  That will not be

20   elicited through the witness.  But the phone calls, the

21   recorded prison calls, Mr. Polk does reference a couple times

22   that he is on probation in his call.  So we just wanted to

23   alert the Court about that.  We're not eliciting it, but it is

24   part of the recorded phone call that the government plans to

25   play with that witness.

I9B6POL1

| | |
|---|---|
| 1 | MR. LIND:  Is that witness being called today? |
| 2 | MR. KROUSE:  Yes.  It is Mr. Williams. |
| 3 | MR. LIND:  No.  I am talking about the phone calls. |
| 4 | MR. KROUSE:  Those will be played with the witness on |
| 5 | the stand, Mr. Williams. |
| 6 | MR. LIND:  Well, Judge, I think that these phone calls |
| 7 | are -- we went over this.  I don't see the relevancy of any of |
| 8 | these phone calls.  I didn't realize they were going to be |
| 9 | played with Mr. Williams. |
| 10 | THE COURT:  Well, I don't know the content of the |
| 11 | phone calls.  My understanding was that they were discussions |
| 12 | about in furtherance of the conspiracy, about acts involving |
| 13 | the charges in this indictment, their activity. |
| 14 | MR. KROUSE:  That is correct, your Honor. |
| 15 | MR. LIND:  I don't think that is correct, Judge. |
| 16 | THE COURT:  Do you have the transcripts? |
| 17 | MR. KROUSE:  Yes.  They are marked as exhibits, |
| 18 | Government Exhibit 800 T. |
| 19 | THE COURT:  How many transcripts are you using? |
| 20 | MR. KROUSE:  800 T through 808 T, your Honor. |
| 21 | THE COURT:  How many are there? |
| 22 | MR. KROUSE:  It is 801, 802, 803, 806, 807 and 808. |
| 23 | It is seven phones calls, your Honor. |
| 24 | THE COURT:  These are the ones placed in evidence? |
| 25 | MR. KROUSE:  They have not been placed in evidence, |

I9B6POL1

1    your Honor.  These are prison calls.  We have a stipulation as

2    to the authenticity of these calls and the accuracy of the

3    transcripts.  Mr. Lind has reserved the ability to object on

4    relevance grounds.

5            MR. LIND:  That's correct, Judge.

6            THE COURT:  Let me look through them.  I think the

7    jurors are all here.  Let's proceed.  We'll take a break before

8    we get to that.

9            How long do you think the other two witnesses will

10   take?

11           MR. KROUSE:  Probably around 45 minutes, your Honor.

12   Maybe less.

13           As to one more point, your Honor, the prison calls I

14   will note will be later in the witness's testimony.  So I think

15   we can address it at the afternoon break.  There is another

16   fact, which is that Mr. Polk was in prison for a portion as

17   your Honor knows of this indictment.  So the indictment alleges

18   in or about 2013 to in or about 2017.  Mr. Polk was in prison

19   up to March 18th, 2014 on his first federal conviction.  He

20   then was out for over a year and went back to prison on

21   August 26th, 2015 on the gun arrest.  That testimony was given

22   yesterday.  He then was released again in December of 2016 and

23   then was out again until January 3rd, 2017, which is when he

24   was arrested with the crack cocaine in his apartment.

25           MR. LIND:  February 3rd.

I9B6POL1

1           MR. KROUSE:  February 3rd, excuse me.

2           So the government believes that Mr. Lind is going to

3    argue that Mr. Polk couldn't have been involved in the

4    conspiracy from its inception at least because he was in

5    prison.  The government's argument is that he joined the

6    conspiracy with the cooperating witness who was aware of

7    Mr. Polk's absence from the community due to his incarceration.

8    The government would seek to elicit that Mr. Williams was

9    involved in a conspiracy starting around the end of 2012

10   through 2013 and that Mr. Polk wasn't there because he was in

11   prison and then Mr. Polk was released from prison in March 2014

12   and then joined the conspiracy.  That would be the nature of

13   the testimony.  We wanted to flag that for the Court that the

14   fact that Mr. Polk's incarceration may be elicited.

15           THE COURT:  You haven't reached any stipulation as to

16   the time periods that he was incarcerated?

17           MR. KROUSE:  The government has a proposed

18   stipulation.

19           THE COURT:  Did you intend to elicit that, Mr. Lind?

20           MR. LIND:  Well, I was going to elicit it in a

21   different way, your Honor.  That he was not in New York, rather

22   than he was in prison.  I think the government's stipulation

23   goes to the question of prior felony.

24           Isn't that right?

25           MR. KROUSE:  Yes.  We have a prior felony stipulation.

I9B6POL1

1          MR. LIND:  I don't know anything about this other

2     stipulation.

3          Is that the same stipulation you are talking about?

4          MR. KROUSE:  No.  I am saying we can have a

5     stipulation about Mr. Polk's dates of incarceration.

6          THE COURT:  You don't have one at this point?

7          MR. KROUSE:  No, your Honor.

8          THE COURT:  What do you want to argue to the jury,

9     Mr. Lind.

10          MR. LIND:  Well, that he was not in New York until

11     March 2014.  And anything that happened before -- I realize

12     your Honor is going to admit certain evidence.

13          THE COURT:  It has already been mentioned either

14     through a witness or by the lawyers that he was incarcerated.

15     The jury already knows that.

16          MR. LIND:  I think that that relates to the state

17     incarceration.

18          Is that right or am I wrong?

19          MR. KROUSE:  There is a second incarceration, which is

20     the August 26th incarceration for the firearm in the vehicle.

21          THE COURT:  Right.  When you say he wasn't in the New

22     York, how do we know he wasn't in New York?

23          MR. LIND:  Because he was in Pennsylvania in prison.

24          THE COURT:  He was in Pennsylvania what period of

25     time?  I assume he was in New York at some period.

I9B6POL1

```
 1              MR. LIND:  I think 2007.

 2              THE COURT:  These phone calls are from jail.

 3              MR. LIND:  Those are after the arrest on the car

 4    search.

 5              THE COURT:  Okay.

 6              MR. LIND:  These are made from state jail.

 7              THE COURT:  Okay.

 8              MR. LIND:  There is no dispute that he is in jail

 9    during that period of time.

10              THE COURT:  Okay.

11              MR. LIND:  He was in jail on that until December of

12    2016 when the case was dismissed against him.  Then he was

13    released and then he was arrested two months later after that

14    search that was conducted at his residence.

15              THE COURT:  Okay.

16              MR. LIND:  He was brought back into federal custody.

17              THE COURT:  What is the evidence going to be before

18    the jury as to when he was arrested and placed into custody?

19              MR. LIND:  Are you talking to me, Judge?

20              THE COURT:  Either one.

21              MR. LIND:  That is irrelevant that he was arrested in

22    2006 and 2007 and then was in jail until 2014.  What I want to

23    have in front of the jury is that he wasn't in New York.

24              THE COURT:  What do you want them to conclude from the

25    fact that he wasn't in New York?
```

I9B6POL1

1              MR. LIND:  That he wasn't a member of the conspiracy.

2              THE COURT:  How does that prove that he is not a

3    member of the conspiracy because he wasn't in New York?

4              MR. LIND:  Well, let the government argue that it

5    doesn't prove anything.  I don't want it to seem that he is

6    there from 2012 or 2013.

7              THE COURT:  You want who to testify to what?

8              MR. LIND:  I would ask for a stipulation.  I can put

9    in a record document that would show that he was --

10             THE COURT:  He was where?

11             MR. LIND:  -- in jail.

12             THE COURT:  That is what I am trying to understand.

13   If the two of you cannot agree on this, what form do you intend

14   to elicit it?  If you can agree on it, I don't care.  If you

15   can't agree upon some stipulation, what do you want the witness

16   to say?

17             MR. LIND:  I will have to --

18             THE COURT:  Who is going to say what?

19             MR. LIND:  I can get a document from the MCC that has

20   all of his--

21             THE COURT:  The issue that they just raised is the

22   fact that it is going to come out that he was in prison and you

23   are saying you want to have testimony that he was out of state.

24             MR. LIND:  Judge --

25             THE COURT:  Who is going to testify he was out of

I9B6POL1

1   state?  He wasn't on vacation.

2            MR. LIND:  Judge, when they are talking about him

3   being in prison relates to the 2015 time period.

4            Am I wrong?

5            MR. KROUSE:  No.

6            MR. LIND:  Relates to the 2014?

7            MR. KROUSE:  Yes.

8            THE COURT:  That relates to the same period you are

9   talking about?

10           MR. LIND:  Right.  What is the probative value of

11   that?

12           THE COURT:  Well, it depends on what you say the

13   probative value is.

14           MR. LIND:  They are the ones who want to introduce he

15   was in prison.

16           THE COURT:  But you are the one who wants to introduce

17   that he was out of state.

18           MR. LIND:  Correct.

19           THE COURT:  He was in prison.  You want the jury to

20   know that he wasn't in New York, but you don't want them to

21   know that he was in prison.  They want them to know he was in

22   prison.

23           MR. LIND:  I think that is prejudicial.

24           THE COURT:  What is the basis for your wanting to

25   argue that because he happens to be in Rochester that he is not

I9B6POL1

1    a participant in the conspiracy?

2             MR. LIND:  What is the evidence that he participated

3    in a conspiracy?

4             THE COURT:  I don't know.

5             MR. LIND:  That is what I would like to know from the

6    government.  They are going to try to introduce prejudicial

7    evidence.

8             MR. KROUSE:  We're happy not to introduce the fact

9    that he was in prison.  Our view is that Mr. Lind wanted that

10   to rebut the claim that he could have participated in the

11   conspiracy from 2013.  If Mr. Lind is not intending to argue on

12   that point, then I guess we're fine.

13            THE COURT:  What is the point in time that you say

14   that he joined the conspiracy?

15            MR. KROUSE:  Our view is that he joined the conspiracy

16   when he got out of prison in March of 2014.

17            THE COURT:  So what difference does it make where he

18   was or what he was doing prior to that?

19            MR. KROUSE:  Your Honor, I think we would want to

20   elicit that one of the reasons why he wasn't a member of the

21   conspiracy was because he was gone.  He wasn't in the

22   neighborhood with the rest.

23            MR. LIND:  That is not the same as saying he was in

24   jail, Judge.

25            MR. KROUSE:  We're fine of having it not been in jail

I9B6POL1

1    as long as Mr. Lind is not going to argue that he couldn't have

2    been a member of the conspiracy because he was in jail.  We

3    thought he wanted to do that with the fact that his prior

4    conviction is already in and that that is what he was

5    incarcerated for.  So the prejudicial value or the prejudicial

6    effect we think would be fairly minimal.

7         If Mr. Lind is taking that off the table and doesn't

8    wish to argue that Mr. Polk couldn't have participated in the

9    conspiracy until 2014 because he was in prison, then that is

10   fine from the government's perspective.  It is not that we want

11   to tar him for being in prison.  Those facts are already

12   actually out there.  It is that we want it to be clear for the

13   jury what the government's theory is, which is that the

14   conspiracy was running from 2013 with these other participants.

15   Mr. Polk was unavailable at the beginning of the conspiracy,

16   but then came back off of his prison stint and became promptly

17   a member of the conspiracy and was a member through 2017.

18        THE COURT:  What is going to be the testimony about

19   how he joined the conspiracy?

20        MR. KROUSE:  The testimony will be that Mr. Williams

21   was selling crack cocaine and marijuana with these three other

22   men and Mr. Polk was gone.  He was in prison.

23        THE COURT:  Did he know Mr. Polk at that time?

24        MR. KROUSE:  Yes.  He has known Mr. Polk since they

25   were growing up.  He knew Mr. Polk was in prison and he will

I9B6POL1

1    say that when Mr. Polk came out of prison and came back to the

2    neighborhood in 2014, he started selling crack cocaine and

3    marijuana with the same group that Mr. Williams was a part of.

4              THE COURT:  Mr. Lind, what do you want?

5              MR. LIND:  Well, may I talk to my client about that?

6              THE COURT:  Sure.

7              MR. LIND:  Is this going to be right at the outset?

8              THE COURT:  No.

9              MR. KROUSE:  This will be at least in the -- not the

10   first questions but within the first hour.

11             THE COURT:  All right.  Let's do the other two

12   witnesses first and then we'll come back to him.  You can speak

13   further with your client.

14             MR. LIND:  Yes, Judge.

15             THE COURT:  The jurors are here.  I don't want to keep

16   them waiting.  Let's bring them in.

17             (Continued on next page)

18

19

20

21

22

23

24

25

I9B6POL1                         Santos – direct

1                (In open court; jury present)

2                THE COURT:  You may be seated.

3                Good morning, everyone.

4                Mr. Krouse, will you call the government's next

5      witness.

6                MR. KROUSE:  Your Honor, the government calls Enrique

7      Santos.

8                The government will reoffer Government Exhibits 701

9      A1, A2, A3, A4, and A6.

10               THE COURT:  And 701 B.

11               MR. LIND:  Yes, 701 B1, B2 and B3.

12               THE COURT:  Any objection?

13               MR. LIND:  No objection.

14               THE COURT:  They will be admitted.

15               (Government's Exhibits 701 A1, A2, A3, A4, A6, 701 B1,

16     B2, B3 received in evidence)

17               THE COURT:  Please step up.

18      ENRIQUE SANTOS,

19          called as a witness by the Government,

20          having been duly sworn, testified as follows:

21     DIRECT EXAMINATION

22     BY MR. KROUSE:

23     Q.  Good morning, Mr. Santos.

24     A.  Good morning.

25     Q.  Where do you currently work?

I9B6POL1                        Santos - direct

1  A.  The U.S. Attorney's Office for the Southern District of New

2  York.

3  Q.  What is your position with the U.S. Attorney's Office?

4  A.  I am an administrative support specialist.

5          THE COURT:  Keep your voice up.  Pull the microphone

6  towards you.

7  Q.  Can you describe your duties as an administrative support

8  specialist?

9  A.  I perform forensic extractions and analysis of mobile

10  devices such as cell phones, commuter tablets, and GPS devices.

11  I operate and maintain an evidence involve.  I do some

12  purchasing.  And sometimes I schedule interpreters for

13  meetings.

14  Q.  How long have you worked at the U.S. Attorney's Office?

15  A.  10 years.

16  Q.  You mentioned cell phone forensic extraction; correct?

17  A.  Yes.

18  Q.  That is one of your duties?

19  A.  Yes.

20  Q.  Have you received special training in cell phone forensic

21  extraction?

22  A.  Yes.

23  Q.  Can you describe some of that training to the jury?

24  A.  I have approximately 160 hours' worth of formal classroom

25  training regarding mobile forensics.  I have received

I9B6POL1                    Santos - direct

1    certifications for each of the forensic tools that I use.  I

2    have attended numerous forensic-related workshops and

3    conferences.  And I have examined over a thousand mobile

4    devices.

5    Q.  Can you explain to the jury in general what a forensic

6    extraction of a cellular device entails?

7    A.  Usually when we receive a device, we want to try to examine

8    that device in its original state.  We don't want to write new

9    data onto the device or accidentally delete any data that is on

10   the device.  So what we'll do is when we receive it if the

11   device is locked, we'll try to unlock it and then we'll connect

12   it to a machine that will download the data and.  Once we have

13   downloaded that data, we'll usually create a report so that the

14   prosecutors or the agents can go through it and they will look

15   through the phone and look for whatever information is relevant

16   to their investigation.

17   Q.  So is it fair to say that the report just contains the data

18   that is on the cell phone?

19   A.  Yes.

20   Q.  What sorts of data are generally on cell phones that you

21   extract?

22   A.  So it varies by device.  We can get some -- we can get more

23   information from some of the devices than others.  Usually it

24   is things like call history, text messages, photos, videos, web

25   browsing history.  Things of that nature.

I9B6POL1                         Santos - direct

1   Q.   When you say you can get more data from some phones and not

2   others, can you explain that?

3   A.   That is just the limitation of each device.  Some devices

4   are easier to work with because they have maybe a certain

5   operating system.  Some manufactures may implement a certain

6   security patch or something that purposely is meant to keep

7   some data more secure than others.  So those are just some of

8   the reasons why.

9   Q.   You mentioned forensic tools that you have been trained on

10  and that you use.  Can you describe what those tools are?

11  A.   Sure.  I will mention two of them most popular tools that

12  we'll use.  Cellebrite UFED is by far the one that we use most

13  frequently.  I have certifications for that tool.  Another one

14  is call the XRY by Micro Systemation.  So that is one of the

15  other tools that we use.

16  Q.   Mr. Santos, did you performance an extraction of the cellar

17  phone in this case?

18  A.   Yes.

19  Q.   Which tool did you use to perform that extraction?

20  A.   The Cellebrite UFED.

21  Q.   That is the one you said is the most commonly used; right?

22  A.   Yes.

23        MR. KROUSE:  Your Honor, permission to approach the

24  witness?

25        THE COURT:  Yes.

I9B6POL1                    Santos - direct

1           MR. KROUSE:  I am handing the witness what has been

2    marked as Government Exhibit 110.

3    BY MR. KROUSE:

4    Q.  Mr. Santos, do you recognize what I just hand you?

5    A.  I do.

6    Q.  What is it?

7    A.  This is a cell phone that I examined for this case.  It is

8    a Samsung Galaxy S III.

9    Q.  Were you shown Government Exhibit 110 before you were

10   called to testify today?

11   A.  Yes.  I had a chance to review this phone before I came

12   here today and I initialed it so that I could recognize it in

13   court.

14   Q.  How were you able to recognize it as the exact cell phone

15   that you extracted?

16   A.  I compared it to a report that I created.  And the number

17   on the back is called an IMEI number.  It matches.

18   Q.  Is that a unique identifier for that cell phone?

19   A.  Yes.

20   Q.  Did you create an extraction report for this cell phone

21   when you performed the extraction?

22   A.  Yes.

23   Q.  Can you describe for the jury -- I think you did a little

24   bit -- what is an extraction report?

25   A.  An extraction report just has all the information that is

I9B6POL1                         Santos - direct

1    pulled from that device.  So for this specific phone, for

2    example, we had some call history, photos, some videos, web

3    browsing history.  It will just list it in a PDF format.

4    Q.  When you performed the extraction of this cell phone, did

5    you have any idea who the phone belonged to?

6    A.  No.

7             MR. KROUSE:  Mr. Concepcion, can you put on the screen

8    for the witness what has been marked as Government Exhibit 901

9    for identification.

10   Q.  Mr. Santos, do you recognize the first page of this

11   document?

12   A.  My screen is actually not working.  I don't see anything.

13            MR. KROUSE:  Can we have a moment, your Honor?

14            THE COURT:  Yes.

15            (Pause)

16            MR. KROUSE:  Your Honor, for this witness we'll

17   proceed with the paper copy.

18            THE COURT:  Okay.

19            MR. KROUSE:  May I approach the witness, your Honor?

20            THE COURT:  Yes.

21            MR. KROUSE:  Handing the witness a binder of exhibits.

22   BY MR. KROUSE:

23   Q.  Mr. Santos, could you turn to the tab marked Government

24   Exhibit 901.

25   A.  Yes.

I9B6POL1                        Santos – direct

1   Q.  Do you recognize the first page of this document?

2   A.  I do.

3   Q.  What is it?

4   A.  This is the first page of the report that I created.  It

5   just lists some basic information about the case including the

6   time and date that the extraction was performed and just some

7   basic information about the cell phone model that was examined,

8   what kind of extraction was performed, and what the version of

9   that forensic tool was that I used at the time of the

10  extraction.

11  Q.  Is it fair to say this is the type of information that is

12  always included in an extraction report's first page?

13  A.  Yes.

14  Q.  Could you flip through the pages of Government Exhibit 901

15  in front of you and look up when you are done.

16          (Pause)

17  A.  Okay.

18  Q.  What are those other pages from?

19  A.  So these are excerpts of the report.  Some of these are

20  emails.  Some of these are Internet browsing history.  Some of

21  these are images.  Some of them are videos.

22  Q.  Those are select pages from the extraction report that you

23  performed; correct?

24  A.  Yes.

25          MR. KROUSE:  Your Honor, the government offers

I9B6POL1                          Santos – direct

1   Government Exhibit 901.

2              MR. LIND:  I have no objection.

3              THE COURT:  It will be admitted as 901.

4              (Government's Exhibit 901 received in evidence)

5              MR. KROUSE:  Your Honor, may we publish the first page

6   of Government Exhibit 901 for the jury?

7              THE COURT:  Yes.

8              MR. KROUSE:  Can we zoom in on the middle two

9   portions, the summary and the source extraction.

10  BY MR. KROUSE:

11  Q.  Let's briefly review some of the information contained

12  here.

13              What is the information contained here regarding your

14  extraction report?

15  A.  So like I mentioned it is some information about the

16  extraction like the date that the extraction was created.  My

17  name is on here as well as the division that I work in, the

18  cell phone model that was analyzed, what type of extraction was

19  performed, the time that the extraction was started and the

20  time that it ended.

21  Q.  The type of extraction, where it says "Physical

22  Bootloader"--

23  A.  Yes.

24  Q.  -- what does that mean?

25  A.  A physical extraction is probably the most comprehensive

I9B6POL1                        Santos - direct

1   type of extraction that you can perform on a device.  It will

2   recover some of that data that has been deleted.  So our goal

3   is always to start with that type of extraction.

4   Q.  So you can recover information that has actually been

5   deleted from the phone; correct?

6   A.  Yes.

7   Q.  You have in front of you Government Exhibit 110.  Is that

8   the model and make reflected in the extraction report?

9   A.  I am sorry.  Can you repeat that?

10  Q.  Looking at the actual physical cell phone, is that the same

11  cell phone as the selected manufacturing device name that is

12  listed on the extraction report?

13  A.  Yes.  It is the same model -- make and model.

14          MR. KROUSE:  Mr. Concepcion, can you please move to

15  page 2 of the extraction report.

16  Q.  Mr. Santos, looking at page 2 in front of you, is there any

17  particular information --

18          MR. KROUSE:  Mr. Concepcion, can you zoom in on the

19  device information.

20  Q.  Mr. Santos, is there any information in this section of the

21  extraction report?

22  A.  Yes.  So this is a continuation of the device information.

23  Here you will have a more specifics about the device.  It will,

24  for example, tell you who the carrier for the device was.  It

25  will have information that would connect this device to a

1   specific account on that carrier.  So you'll have information

2   about the time zones.  Lower -- lower down you will have some

3   information about image harsh details, which kind of is

4   information used to tell you -- it is like a fingerprint for

5   the forensic image that was created.  So you can load that up

6   on another computer and make sure that you are seeing the exact

7   same data that I am seeing on another computer.  So different

8   types of data.

9   Q.  Is it fair to say this is more detailed information about

10  the device that you extracted?

11  A.  Yes.

12          MR. KROUSE:  Mr. Concepcion, can you move to page 3 of

13  the exhibit.

14  Q.  Based on your extraction of this cell phone, were you able

15  to get a sense of whom the phone belonged to?

16  A.  Yes.

17  Q.  How were you able to get a sense of that?

18  A.  We were able to pull information from -- well, we were able

19  to pull some emails and an account that is tied to an email

20  account and that account it had a name associated with it of

21  Timothy Smith and there is a G-Mail address that is associated

22  that is TimSmith01967@Gmail.com.

23          MR. KROUSE:  Mr. Concepcion, can you zoom in on that

24  and highlight the Timothy Smith name on the left as well.

25  Q.  So you said you were able to get some emails.  Is that

1   because there is an email account linked to the phone?

2   A.  Yes.

3   Q.  Is that how a lot of people use their phone to check their

4   email; correct?

5   A.  Yes.

6   Q.  So these emails were actually on the cellar phone; correct?

7   A.  Yes.

8   Q.  Do you have any idea who Timothy Smith is?

9   A.  No.

10          MR. KROUSE:  If we can jump to page 5, Mr. Concepcion.

11          Thank you.

12          If you can zoom in on entry number 90, please.

13  Q.  Mr. Santos, do you see that entry number 90?

14  A.  Yes.

15  Q.  Can you explain to the jury what this entry shows and what

16  it relates to in your cell phone extraction?

17  A.  So this section of the report is the Internet browsing

18  history.  These were websites that were visited using the

19  browser on the phone.  So entry number 90 shows that a search

20  was performed for "University Shooting 2015."

21  Q.  That is a Google search; correct?

22  A.  Yes.

23  Q.  The Google search terms were what?

24  A.  University Shooting 2015.

25  Q.  That was a Google search performed from the cell phone that

I9B6POL1                    Santos - direct

1   you extracted; correct?

2   A.  Yes.

3          MR. KROUSE:  Mr. Concepcion, can you zoom in on entry

4   number 89.

5   Q.  Mr. Santos, in entry number 89 is that another Google

6   search?

7   A.  Yes.

8   Q.  What does that one say?

9   A.  This was a search for "165th University Shooting."

10  Q.  I should have asked at the last one, what is the date on

11  this Google search?

12  A.  For the last one it was July 26th, 2015 at 6:24 p.m.

13  Q.  What about this one?

14  A.  Same date.  July 26th, 2015; 6:25 p.m.

15  Q.  They were about a minute apart; is that fair?

16  A.  Yes.

17  Q.  Moving to entry number 87.

18  A.  Yes.

19  Q.  What does that entry reflect?

20  A.  This shows that a Bronx 12 news article was visited.  It's

21  a news article entitled "Police:  Man shot in Highbridge."

22  Q.  What date and time was used to visit that website?

23  A.  July 26th, 2015 at 7:38 p.m.

24         MR. KROUSE:  If you can move to page 4 and go to entry

25  number 83.

I9B6POL1                        Santos - direct

1    Q.  What is this entry in that browsing history?

2    A.  So this is another Google search.  It looks like it is for

3    Highbridge shooting, except Highbridge is misspelled.  This was

4    performed on July 26th, 2015 at 7:55 p.m.

5         MR. KROUSE:  Mr. Concepcion, if you can zoom in on 79

6    and 80.

7    Q.  Are those two more Google searches, Mr. Santos?

8    A.  Yes.

9    Q.  For Highbridge shooting?

10   A.  Correct.

11   Q.  What are the dates and times on those two?

12   A.  July 28th, 2015; 2:07 a.m.

13        MR. KROUSE:  Finally, Mr. Concepcion, can you zoom in

14   on 78.

15   Q.  What is entry number 78?

16   A.  This was a website that was visited.  The website is a PIX

17   11 News.  It an article entitled "Police Searching for 2

18   Suspects Involved in Bronx Shooting."

19   Q.  What is the date and time of when that website was

20   accessed?

21   A.  July 28th, 2015 at 4:33 a.m.

22   Q.  Is there a link to this shooting article in this entry?

23   A.  Yes.

24   Q.  That is the HTTP, colon, slash, PIX 11 link?

25   A.  Correct.

1   Q.  Did you follow that link to a web page?

2   A.  Yes.

3           MR. KROUSE:  Mr. Concepcion, can you put on the

4   witness's screen only what has been marked as Government

5   Exhibit 902.

6   Q.  Mr. Santos, you have it in front of you; correct?

7           Do you recognize this document?

8   A.  I do.

9   Q.  What is it?

10  A.  This is the web page that appears when you click on that

11  link, and it is the news article for Police Searching for 2

12  Suspects Involved in Bronx Shooting.

13  Q.  So to be clear this article is associated with the link

14  that is in entry 78, which is part of the phone extraction that

15  you did for the phone belonging to Timothy Smith; correct?

16  A.  Yes.

17          MR. KROUSE:  The government offers Government

18  Exhibit 902.

19          MR. LIND:  No objection.

20          THE COURT:  It will be admitted as such.

21          (Government's Exhibit 902 received in evidence)

22          MR. KROUSE:  Mr. Concepcion, can you publish this for

23  the jury.

24  BY MR. KROUSE:

25  Q.  Mr. Santos, during your extraction of this phone, did you

1    also find videos and photographs on the phone?

2    A.  Yes.

3    Q.  Can you explain to the jury how videos and photographs are

4    extracted from a phone?

5    A.  So they just come off the phone along with the rest of the

6    information that is stored on there.  So they are just

7    downloaded at the same time as the rest of the phone.

8    Q.  Could those be pictures or videos taken by the phone?

9    A.  They include photos and videos taken by the phone.  They

10   could be photos and videos included as part of websites that

11   were visited.  They could be a number of different sources.

12             MR. KROUSE:  Your Honor, may I approach the witness?

13             THE COURT:  Yes.

14             The government is handing the witness a disc marked

15   Government Exhibit 900.

16   Q.  Mr. Santos, do you recognize that disc?

17   A.  I do.

18   Q.  What is it?

19   A.  This is a disc that contains a video from this phone.

20   Q.  How do you recognize it as a disc that contains the video

21   that was found on the phone?

22   A.  I reviewed it before coming here today and I initialed it

23   so I could recognize it in court.

24             MR. KROUSE:  The government offers Government Exhibit

25   900.

1          MR. LIND:  No objection.

2          THE COURT:  It will be admitted into evidence.

3          (Government's Exhibit 900 received in evidence)

4    BY MR. KROUSE:

5    Q.  Mr. Santos, there is one video file on this disc admitted

6    into evidence; correct?

7    A.  Yes.

8          MR. KROUSE:  The government requests permission to

9    play the single video file, which is marked as Government

10   Exhibit 900 A.

11         THE COURT:  Yes.

12         (Video Played)

13   BY MR. KROUSE:

14   Q.  Mr. Santos, when you extract a video that is stored on a

15   phone, are you able to obtain information about that video?

16   A.  Sometimes when we extract videos from a phone, it will come

17   with something called metadata.  Metadata usually includes

18   information about like what camera took that video.  Sometimes

19   it includes the date that the video was created.  Sometimes it

20   may include information about where that video was taken.

21   Q.  For Government Exhibit 900 A were you able to obtain some

22   of that metadata?

23   A.  Yes.

24         MR. KROUSE:  Mr. Concepcion, can you put Government

25   Exhibit 901 back on the screen for everyone.

1                Could you go to page 7, please.

2                Could you zoom in on entry number 110.

3     Q.   Mr. Santos, you have that paper copy in front of you;

4     correct?

5     A.   I do.

6     Q.   Directing your attention to entry 110, is that the entry

7     for the video that was just admitted as Government Exhibit 900

8     A?

9     A.   Yes.

10    Q.   Is there some metadata associated with that entry?

11    A.   Yes.  So here we just have the dates that the video was

12    created and then next to it it also tells me the location on

13    the phone or where that videos was found.  It is in the folder

14    where videos created by that phone are stored.

15                MR. KROUSE:  Mr. Concepcion, can you highlight

16    "Created," "Modified," and "Accessed."

17    Q.   Mr. Santos, what were the dates and times associated with

18    those three entries -- Created, Modified and Accessed?

19    A.   The Created date shows July 27th, 2015 at 12:25 p.m.  The

20    Modified date showing July 27th, 2015 at 12:26 p.m.  The last,

21    Accessed date is showing July 27th, 2015 at 12:25 p.m.

22    Q.   So those are all July 27th, 2015; correct?

23    A.   Yes.

24    Q.   Mr. Santos, did you also extract photographs from this cell

25    phone?

I9B6POL1                          Santos – direct

```
 1    A.  I did.
 2    Q.  Mr. Santos, can you flip to Government Exhibit 903 in your
 3    binder.
 4              Mr. Santos, what is that exhibit?
 5    A.  This is an enlarged photo version of a photo that was on
 6    the phone.
 7    Q.  So this is one of the photographs that was on the phone;
 8    correct?
 9    A.  Yes.
10              MR. KROUSE:  Your Honor, the government offers
11    Government Exhibit 903.
12              MR. LIND:  No objection.
13              THE COURT:  It will be admitted into evidence.
14              (Government's Exhibit 903 received in evidence)
15              MR. KROUSE:  May we publish the exhibit, your Honor?
16              THE COURT:  Yes.
17    BY MR. KROUSE:
18    Q.  Mr. Santos, when you obtain photographs in a phone, can you
19    similarly obtain metadata like you can with a video?
20    A.  Yes.
21    Q.  Is that the same types of metadata that you can obtain?
22    A.  Yes.
23    Q.  And for Government Exhibit 903 were you able to obtain that
24    information?
25    A.  Yes.
```

1          MR. KROUSE:  Mr. Concepcion, can you put on the screen

2    Government Exhibit 901 and go to page 6, please, and if you can

3    zoom in on entry 2754.

4    Q.  Is this the entry in your extraction report associated with

5    that photograph that was just admitted as Government

6    Exhibit 903?

7    A.  Yes.

8    Q.  Are you able to tell from this report when this photograph

9    was taken?

10   A.  Yes.

11   Q.  When was it taken?

12   A.  July 27th, 2015 at 12:25 p.m.

13   Q.  Did you also obtain other metadata for this photograph?

14   A.  Yes.

15   Q.  Can you explain that?

16   A.  Right below create date, we had information about the

17   camera that created this image.  So here it is showing that it

18   is a Samsung SCH-I535, which is the make and model of the phone

19   that I have here.

20   Q.  So what do you conclude from that?

21   A.  That this image was taken with this phone.

22   Q.  Mr. Santos, can you go to tab Government Exhibit 904 in

23   your binder?

24   A.  Yes.

25   Q.  Do you recognize this exhibit?

I9B6POL1                          Santos - direct

 1    A.  Yes.

 2    Q.  Is this another one of the photographs extracted from the

 3    phone, Government Exhibit 110?

 4    A.  Yes.

 5              MR. KROUSE:  Your Honor, the government offers

 6    Government Exhibit 904.

 7              MR. LIND:  No objection.

 8              THE COURT:  It will be admitted as such.

 9              (Government's Exhibit 904 received in evidence)

10              MR. KROUSE:  May we publish the exhibit?

11              THE COURT:  Yes.

12    BY MR. KROUSE:

13    Q.  Mr. Santos, were you also able to obtain metadata for this

14    photograph?

15    A.  Yes.

16              MR. KROUSE:  Mr. Concepcion, can you put back on the

17    screen Government Exhibit 901, please, and go to page 6.

18    Q.  Mr. Santos, directing your attention to entry 2749 at the

19    top of the page, is that the photograph that was admitted as

20    Government Exhibit 904?

21    A.  Yes.

22    Q.  Are you able to tell in your extraction report when that

23    photograph was taken?

24    A.  Yes.

25    Q.  When was it taken?

I9B6POL1                          Santos – direct

1   A.  July 24th, 2015 at 3:48 p.m.

2   Q.  Was additional metadata obtained for that photograph?

3   A.  Yes.

4   Q.  What data?

5   A.  It shows me the camera that was used to create the image,

6   and that was a Samsung SCH-I535.

7   Q.  That is the camera for the cell phone that you have;

8   correct?

9   A.  Correct.

10              (Continued on next page)

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

1        MR. KROUSE:  Mr. Concepcion, could you put on my

2   screen Government Exhibit 905.

3   Q.  And Mr. Santos, could you flip to the tab Government

4   Exhibit 905.  Is this another photograph that was extracted

5   from the phone from Exhibit 110?

6   A.  Yes.

7        MR. KROUSE:  Government offers Government Exhibit 905.

8        MR. LIND:  No objection.

9        THE COURT:  It will be admitted into evidence.

10        MR. KROUSE:  May I publish the exhibit, your Honor?

11        THE COURT:  Yes.

12        (Government's Exhibit 110 received in evidence)

13        (Photograph published to the jury)

14   BY MR. KROUSE:

15   Q.  Mr. Santos, were you also able to obtain metadata for this

16   photograph?

17   A.  Yes.

18        MR. KROUSE:  Mr. Concepcion, could you bring back on

19   the screen Government Exhibit 901, page 6, and highlight and

20   zoom out entry 2752.

21   Q.  Mr. Santos, directing your attention to that entry, 2752,

22   was that the photograph admitted as Government Exhibit 105?

23   A.  Yes.

24   Q.  Are you able to tell from this extraction report when this

25   photograph was taken?

I9BHPol2                        Santos - Cross

1    A.  Yes.

2    Q.  When was it taken?

3    A.  July 25, 2015, 11:17 p.m.

4    Q.  And it was taken by the phone that you have in front of

5    you, Government Exhibit 110, correct?

6    A.  Correct.

7              MR. KROUSE:  Your Honor, no further questions.

8              THE COURT:  Cross-examination.

9              MR. LIND:  May we replay Government Exhibit 900A?

10             Can we stop right there.

11   CROSS-EXAMINATION

12   BY MR. LIND:

13   Q.  Do you recognize who the driver is in that video?

14   A.  No, sir.

15   Q.  When you look at his arms, do you see both his right and

16   left arms have very pronounced tattoos on them?

17   A.  I can vaguely see the video because my screen's not

18   working, but I can see a little bit of it from where I'm

19   sitting here.

20             MR. LIND:  Can the jury see the video?

21             Keep going forward, and I'd like you to play it back

22   again, OK?  Why don't you rewind for a moment.

23             (Video played)

24             MR. LIND:  Stop.

25   Q.  Do you see the tattoos on his arms?

I9BHPol2                      Santos - Cross

1    A.  Yes, sir.

2    Q.  On both arms they're fairly pronounced, correct?

3    A.  Yes.

4    Q.  Both in the lower part of the arm and the upper part of the

5    arm, correct?

6    A.  Yes.

7    Q.  Right now we're looking at the right arm.  Did you see also

8    the tattoos on his left arm?

9    A.  I can see that there are tattoos, but I can't make out what

10   they are of.

11          MR. LIND:  I'm sorry to burden you with this.  Could

12   you rewind it again and stop when you can see both arms.

13          (Video played)

14          MR. LIND:  Just right there.

15   Q.  Do you see the pronounced tattoos on the left arm as well?

16   A.  Yes.

17          MR. LIND:  I have no further questions.

18          THE COURT:  Any further questions?

19          MR. KROUSE:  No, your Honor.

20          THE COURT:  Thank you, sir.  You can step down.

21          (Witness excused)

22          THE COURT:  Government can call its next witness.

23          MR. FOLLY:  Your Honor, the government calls Detective

24   Rosalind Jaime.

25   ROSALIND JAIME,

I9BHPol2                        Jaime - Direct

1           called as a witness by the Government,

2           having been duly sworn, testified as follows:

3    DIRECT EXAMINATION

4    BY MR. FOLLY:

5    Q.  Good morning, Detective Jaime.  Where do you work?

6    A.  Gun crime suppression division.

7    Q.  Is that a division of the New York City Police Department?

8    A.  Yes.

9    Q.  What is your title there?

10   A.  Detective.

11   Q.  How long have you been a detective?

12   A.  Four years.

13   Q.  In total, how many years have you been with the NYPD?

14   A.  Eleven and a half years.

15   Q.  What are your duties and responsibilities as a detective in

16   the NYPD?

17   A.  We get investigations in which we have to interview

18   witnesses, do debriefings on perpetrators, and collect video

19   surveillance.

20   Q.  You mentioned that one of your duties is to collect video

21   surveillance?

22   A.  Yes.

23   Q.  Can you explain to the jury what you mean by that.

24   A.  So we have to canvass, do a canvass of video where the

25   incident took place.  And if there's any surveillance of

I9BHPol2                    Jaime - Direct

1    probative value, then we'll collect the video.

2    Q.  What types of locations do you typically look for video

3    surveillance at?

4    A.  It could be a business, apartment building, any

5    exterior/interior cameras.

6    Q.  What is your standard procedure for retrieving video

7    surveillance?

8    A.  So once we canvass and we locate any video surveillance

9    that is of value, we check the date and time of the video

10   surveillance, and we collect the times needed of the incident.

11   Q.  And you said you check the date and time of the video.

12   What do you mean by that?

13   A.  Depending if -- if the video's not the correct time when

14   the incident took place, then we have to note that.  And we'll

15   go back to it and, you know, and -- not go back to it.  We'll

16   fix, you know -- we'll note it that it wasn't, you know, the

17   correct date and time.

18   Q.  In other words, did you --

19          MR. LIND:  I don't understand the answer, Judge.  I'm

20   sorry.

21          THE COURT:  You can further explore it.

22          Go ahead, Mr. Folly.

23   Q.  In other words, when you are canvassing and checking a

24   particular video, do you check to see if the date and time

25   that's reflected on that video surveillance reflects the

I9BHPol2                     Jaime - Direct

1   current date and time that you're viewing it?

2   A.  Yes, that's correct.

3   Q.  And ensure that it's accurate?

4   A.  Yes.

5   Q.  And if you discover that it's not the accurate date and

6   time, what do you do?

7   A.  We'll document it.  And if it's, like, three hours, you

8   know, ahead of time, then we'll go three hours ahead from the

9   present time.

10  Q.  Directing your attention to August 4, 2015, were you

11  involved with an NYPD investigation on that date?

12  A.  Yes.

13  Q.  What was the nature of the investigation?

14  A.  It was two males shot.

15  Q.  What was the location of the shooting?

16  A.  950 Anderson Avenue.

17  Q.  Is that in the Bronx, New York?

18  A.  Yes.

19  Q.  Approximately what time did the shooting occur?

20  A.  Approximately 12 p.m., around.

21  Q.  What was your primary task for the investigation?

22  A.  To do video canvasses.

23  Q.  Did you retrieve video surveillance on that day?

24  A.  Yes.

25  Q.  Where did you retrieve video surveillance from?

I9BHPol2                          Jaime - Direct

1    A.  From 946 Anderson Avenue.

2    Q.  Can you explain for the jury what steps you took to

3    retrieve the video surveillance from that location.

4    A.  So we went to 946 Anderson, and there was video

5    surveillance of the incident.  I collected the video and saved

6    it in USB file.

7    Q.  How many exterior cameras were at that location?

8    A.  Two.

9    Q.  Did you review video surveillance from both of those

10   cameras?

11   A.  Yes.

12   Q.  Did you download video surveillance from both of those

13   cameras?

14   A.  Yes.

15   Q.  You mentioned earlier that it's your practice to check the

16   date and time and to record any offset for the date and time.

17   Did you check the date and time of the videos you retrieved on

18   this day?

19   A.  Yes.

20   Q.  What did you observe?

21   A.  The date and time was correct from the time of incident.

22   Q.  If you could please look in the binder next to you on the

23   witness stand at Government Exhibit 532.

24           If we could also publish that just for the witness.

25           It should also be on the screen in front of you there

I9BHPol2                    Jaime - Direct

1   to your right.

2   A.  OK.

3   Q.  Do you recognize that?

4   A.  Yes.

5   Q.  What is it?

6   A.  It's a picture of 946 Anderson and 950 Anderson.

7           MR. FOLLY:  Your Honor, the government offers

8   Government Exhibit 532.

9           MR. LIND:  Did you take that -- may I just have a

10  quick voir dire?

11          THE COURT:  Yes.

12  VOIR DIRE EXAMINATION

13  BY MR. LIND:

14  Q.  Did you take that photo?

15  A.  No, sir.

16  Q.  Who took that photo?

17  A.  I'm not aware who took the photo.

18  Q.  Was it on the day that you got the videos that that photo

19  was taken?

20  A.  No, not that.

21  Q.  Do you know when it was taken?

22  A.  No.

23  Q.  How do you know it's 946 Anderson Avenue?

24  A.  Because I've worked in the 44 precinct for ten years, and I

25  know that location.

1          MR. LIND:  OK.  I have no objection, Judge.

2          THE COURT:  It will be admitted into evidence.

3          (Government's Exhibit 532 received in evidence)

4          MR. FOLLY:  Mr. Concepcion, can you please publish

5   Exhibit 532 for the jury.

6          (Photograph published to the jury)

7   DIRECT EXAMINATION CONTINUED

8   BY MR. FOLLY:

9   Q.  You mentioned a moment ago that you were looking for video

10  surveillance in the vicinity of 950 Anderson Avenue?

11  A.  Yes.

12  Q.  Can you please point out where that is located in this

13  photograph here.

14  A.  It's to my left from where I'm looking at the picture.

15  It's to my left, and it's the area -- this area right here

16  where the stores are at.

17  Q.  If you want, I think the touch screen is working.

18  A.  Not from here, not from this.

19  Q.  Oh, you don't have a screen at all?

20  A.  No, not at all.

21  Q.  It looked like you were circling the left side of this

22  photograph where there are several businesses shown there.

23  Does the address 950 Anderson Avenue, is that comprised of

24  several businesses?

25  A.  Yes.

1    Q.  And those are the businesses to the left with the blue

2    awnings, correct?

3    A.  Yes.

4    Q.  Now, you also mentioned that you retrieved video

5    surveillance from 946 Anderson Avenue.  Can you describe for

6    the jury which building that is in this photo.

7    A.  It is the building right next to it, to my right, and it's

8    the one with the red door inside.

9    Q.  Is that the building with the sort of brick-colored top

10   portion of the building and gold-colored lower portion?

11   A.  Yes.

12   Q.  If you could now look at what's in your binder as

13   Government Exhibit 201.  Do you recognize that?

14   A.  Yes.

15   Q.  What is it?

16   A.  It's a map of the location of the incident.

17   Q.  Did you review Government Exhibit 201 before coming into

18   court today?

19   A.  Yes.

20   Q.  Is the map a fair and accurate depiction of the area you

21   were canvassing and eventually retrieved video surveillance

22   from?

23   A.  Yes.

24          MR. FOLLY:  Your Honor, the government offers

25   Government Exhibit 201.

I9BHPol2                          Jaime - Direct

1              MR. LIND:  No objection.

2              THE COURT:  It will be admitted into evidence.

3              (Government's Exhibit 201 received in evidence)

4              MR. FOLLY:  Mr. Concepcion, can you please publish the

5    map to the jury.

6              (Photograph published to the jury)

7    BY MR. FOLLY:

8    Q.  You mentioned a moment ago that you were looking for video

9    surveillance in the vicinity of 950 Anderson Avenue.  Where is

10   that shown on the map?

11   A.  By the red letters and dot.

12   Q.  And that's there in the center with the bright red little

13   marker there?

14   A.  Yes.

15   Q.  You also mentioned you retrieved video surveillance from

16   946 Anderson Avenue.  Where is that located in relationship to

17   950 Anderson Avenue?

18   A.  It's southbound on -- right next to 950.

19   Q.  If you could now look in your binder.  In the front sleeve

20   there is an exhibit marked as 702.  Do you recognize that?

21   A.  Yes.

22   Q.  How do you recognize it?

23   A.  By my initials in the front.

24   Q.  What is it?

25   A.  It's video surveillance from 946 Anderson.

I9BHPol2                         Jaime - Direct

1   Q.  Is that the same video surveillance that you described

2   earlier that you retrieved from that location?

3   A.  Yes.

4   Q.  And on that disc are the videos labeled Government

5   Exhibit 702A and 702B?

6   A.  Yes.

7   Q.  Did you review the contents of that exhibit before coming

8   into court today?

9   A.  Yes.

10  Q.  How do you know that's the same disc that you reviewed?

11  A.  Because of my initials in the front.

12  Q.  Does this disc contain true and correct copies of the video

13  surveillance you retrieved on August 4, 2015?

14  A.  Yes.

15          MR. FOLLY:  Your Honor, the government offers

16  Government Exhibit 702 as well as the subexhibits that are on

17  the disc, 702A and 702B.

18          MR. LIND:  I have no objection.

19          THE COURT:  They'll be admitted into evidence.

20          (Government's Exhibits 702, 702A, and 702B received in

21  evidence)

22          MR. FOLLY:  Mr. Concepcion, can you please play

23  Government Exhibit 702A for the jury.

24          (Video played)

25          MR. FOLLY:  Can we play it from the beginning.  Can we

1  pause it there for just a moment.

2  BY MR. FOLLY:

3  Q.  Could you read the timestamp aloud.

4          Sorry.  Can you see the screen?

5  A.  Yes, I can.  12:05 p.m.

6          MR. FOLLY:  OK.  We can continue.

7          (Video played)

8          MR. FOLLY:  Can you pause it there.

9  Q.  Can you read the very, very top portion of the date stamp,

10  the upper right-hand corner of the screen.

11          If we could just go back slightly and pause it there.

12  A.  8/4/2015.

13          MR. FOLLY:  And if we could now go to Government

14  Exhibit 702B, and if we could play it from the beginning.

15          (Video played)

16  Q.  Can you read the timestamp there?

17  A.  12:05 p.m.

18          MR. FOLLY:  We can continue.

19          (Video played)

20          MR. FOLLY:  Can you pause it there.

21  Q.  And can you read aloud the date stamp.

22  A.  8/4/2015.

23          MR. FOLLY:  We can continue.

24          (Video played)

25          MR. FOLLY:  Your Honor, may I have just a moment?

1                THE COURT:  Yes.

2                (Counsel confer)

3                MR. FOLLY:  Mr. Concepcion, can you just publish, not

4     for the jury but for the rest of the courtroom, 702A-1, 702A-2,

5     and 702B-1, which are three still images from the video that

6     was just played.

7                Your Honor, the government would offer those three

8     still images at this time.

9                MR. LIND:  At this time, Judge, I have an objection in

10    terms of who created these photos.

11               THE COURT:  Do you have any testimony through this

12    witness about these photos?

13    BY MR. FOLLY:

14    Q.  Were you able to see the photos on the screen?

15    A.  No.

16               MR. FOLLY:  Can we start back from the beginning and

17    show the three still images.

18    Q.  Detective Jaime, if you can't see it, it would be OK if you

19    step out of the box.

20    A.  I can see it now.

21    Q.  Do you recognize what's shown in the three photos?

22    A.  Yes.

23    Q.  Are those still images from the video that you were -- the

24    two videos you were just discussing?

25    A.  Yes.

1              MR. FOLLY:  Your Honor, we'd offer those at this time.

2              MR. LIND:  No objection.

3              THE COURT:  That will be admitted into evidence.

4              (Government's Exhibits 702A-1, 702A-2, and 702B-1

5      received in evidence)

6              MR. FOLLY:  No further questions.

7              THE COURT:  Mr. Lind.

8              MR. LIND:  Just one moment, Judge.

9              (Counsel conferred with defendant)

10             MR. LIND:  I have no questions.

11             THE COURT:  You can step down.  Thank you.

12             (Witness excused)

13             THE COURT:  Mr. Krouse.

14             MR. KROUSE:  Your Honor, the witness we discussed

15     previously is the government's next witness.  Could we take a

16     short morning break?

17             THE COURT:  Sure.

18             Ladies and gentlemen, we're going to take a 15-minute

19     break.  Don't discuss the case.  Keep an open mind.  I'll bring

20     you back out in 15 minutes.  You don't have to stay in the jury

21     room.  Just be back in less than 15 minutes.

22             (Jury excused)

23             (Recess)

24             (Continued on next page)

25

I9BHPol2

1              (Jury not present)

2              THE COURT:  Yes.

3              MR. LIND:  May I talk?

4              THE COURT:  Yes.

5              MR. LIND:  I just noticed something which I didn't

6    notice before, Judge.  Mr. Krouse was nice enough to give me a

7    copy of some of the exhibits that he's going to go over with

8    Mr. Williams, and there's the plea agreement in there, Judge,

9    and there are a couple things which I'd like to bring to the

10   Court's attention, if I might.

11             It's Government Exhibit, it's 3500 material, 3501-62.

12   I don't know if the government is going to admit that or -- do

13   you intend to admit it?

14             MR. KROUSE:  Yes, your Honor, in the government's

15   view, the door was opened on opening when Mr. Lind attacked the

16   credibility of the cooperator.

17             THE COURT:  Did you want it in or you wanted it out,

18   Mr. Lind?

19             MR. LIND:  Well, there's certain portions which I

20   definitely want out, Judge.

21             THE COURT:  You want out or in?

22             MR. LIND:  The whole thing, it's all or nothing?

23             THE COURT:  That's usually the way it works.

24             MR. LIND:  OK.  I don't want it to come in.

25             THE COURT:  OK.  You say he's opened the door to

I9BHPol2

1    which?

2           MR. KROUSE:  There were multiple statements made by

3    Mr. Lind where he said Mr. Williams has a huge incentive to lie

4    because he's entered into a cooperation agreement with the

5    government, that this is his ticket out of jail, or words to

6    that effect.  The government's view is that the actual

7    agreement should be entered into evidence so the defense can

8    make arguments from it, the government can make arguments from

9    it, and the jury can decide for themselves what the terms of

10   that cooperation agreement are and whether, in fact, it is what

11   Mr. Lind purported it to be during his opening.

12          MR. LIND:  Judge, may I just very briefly respond?

13          THE COURT:  Yes.  Which is it, 35 what?

14          MR. LIND:  3501-62.  I don't know if it's in your

15   copy, Judge, but the government just gave me a copy of it.

16          THE COURT:  Go ahead, Mr. Lind.

17          MR. LIND:  On page 3, Judge, the second paragraph,

18   full paragraph:  "It is understood that Williams' truthful

19   cooperation with this office will likely reveal" --

20          THE COURT:  I'm sorry.  You have to slow down.

21          MR. LIND:  I apologize.  Can you see the paragraph I'm

22   referring to, Judge?

23          THE COURT:  Which paragraph?

24          MR. LIND:  It's on page 3, the second full paragraph:

25   "It is understood" --

I9BHPol2

1                    THE COURT:  Yes.

2                    MR. LIND:  -- "that Williams' truthful cooperation is

3        likely to reveal activities of individuals who might use

4        violence, force, and intimidation against Williams, his family,

5        and loved ones."

6                    I've gone through a lot of these in the past, Judge.

7        I don't think that this is appropriate.  I think that should be

8        redacted.

9                    MR. KROUSE:  We can agree to redact that paragraph,

10       your Honor.

11                   MR. LIND:  Also, Judge, on the third line down on

12       page 3, little (e) in parens, they are going to sort of

13       whitewash it, "several instances of alleged domestic violence."

14                   THE COURT:  I'm sorry.  Where are you?

15                   MR. LIND:  "Several instances of domestic violence in

16       and around 2016," if they want to leave that in, that's fine.

17       I'm just highlighting it.

18                   THE COURT:  I'm sorry.  Is that in the same paragraph?

19                   MR. LIND:  No, it's not, Judge.  It's the third line

20       down on page 3.

21                   THE COURT:  The third line down.  Oh, I see.

22                   OK.  All right.  So tell me what you want to do,

23       Mr. Lind.  Let me see if I can give you what you want.  You

24       want it in as redacted?

25                   MR. LIND:  I want it in --

I9BHPol2

```
 1              THE COURT:  Not in?  What do you want?

 2              MR. LIND:  I want the paragraph regarding redaction

 3     that the government's already agreed to redact.  The rest of it

 4     I have no problem with it being in.

 5              THE COURT:  All right.  And they agreed they would

 6     redact that paragraph?

 7              MR. KROUSE:  Yes, your Honor.  We agree.  And on the

 8     domestic violence, we're not seeking to redact that, although

 9     we still stand by our argument that Mr. Lind should not be able

10     to cross-examine on it.

11              MR. LIND:  I'm sorry.  You agree to redact that?

12              MR. KROUSE:  We are not going to redact that portion.

13              MR. LIND:  OK.

14              MR. KROUSE:  But Mr. Lind should still not be

15     permitted to cross-examine on those instances.

16              MR. LIND:  Well, Judge, I think I should be,

17     particularly because he now gets a benefit as part of this

18     agreement that he will not be further prosecuted for domestic

19     violence.  That's a benefit that he gets in this agreement.

20              THE COURT:  If the agreement is going to come in and

21     not reference this in there and that is a part of what this

22     agreement covers and it basically says that he will not be

23     further prosecuted for those things, then you can question him

24     about that portion of the plea agreement.

25              MR. LIND:  Fine, Judge, I want that in.  That's what
```

I9BHPol2

1    I'm saying.

2              THE COURT:  If that's his understanding that that's

3    the benefit he gets, then you can question him about whether or

4    not that's a term of his plea agreement.

5              MR. KROUSE:  So, your Honor, understood, but the

6    government moved on multiple incidents that occurred as well

7    before 2016, and we would still seek to exclude any mention or

8    any cross-examination on anything that's not mentioned in the

9    plea agreement, which would be the domestic violence incidents

10   from 2006 through 2010.

11             MR. LIND:  I have no problem with that, your Honor.

12             THE COURT:  As it's referenced here, several instances

13   of alleged acts of domestic violence in or around 2016, you can

14   question the witness as to what his understanding is and what

15   benefit he thinks he's deriving in that regard from this plea

16   agreement and his cooperation.

17             MR. LIND:  Thank you, Judge.

18             MR. KROUSE:  Your Honor, the government and defense

19   counsel, we've conferred regarding the issue of Mr. Polk's

20   previous prison sentence and the time he spent in prison.  Our

21   agreement is that we will elicit from the defendant -- or

22   excuse me, the witness his knowledge of the fact that Mr. Polk

23   was out of the area in 2013, up until around March 2014, and

24   that he returned to the area in March 2014 and began committing

25   crimes with the witness in or about that time period,

I9BHPol2

1    March 2014.  The government would request permission to lead

2    the witness to ensure that that comes in without the witness

3    mentioning that Mr. Polk was in prison during that period.

4              THE COURT:  Mr. Lind.

5              MR. LIND:  That's fine with me, Judge.

6              THE COURT:  Sure.  We'll proceed on that basis.

7              MR. KROUSE:  Thank you, your Honor.

8              Just to put a matter on the record that occurred

9    yesterday, government agents in this case noticed when

10   Mr. Rios, the victim of the second shooting, was taking the

11   stand, that Mr. Polk, the defendant, made some sort of hand

12   gesture to a member of the audience.  It appeared to be some

13   sort of phone gesture to a member of the audience, and the

14   member of the audience then left the courtroom.

15             Government counsel didn't see this and don't know what

16   it would mean if we did see it, but we did want to put it on

17   the record and just request that the Court admonish Mr. Polk or

18   to let him know that he's not to be making hand gestures to

19   members of the audience, and of course, I think it goes without

20   saying that there's not to be any attempts to contact

21   government witnesses by either Mr. Polk or by any people acting

22   on behalf of Mr. Polk.  I'm not saying that that's what's

23   happening.  I'm just, in the abundance of caution, raising it

24   with the Court and asking that that warning be delivered.

25             THE COURT:  Well, Mr. Lind, I'm going to leave it up

I9BHPol2

```
 1    to you to advise your client as to what's in his best interest,
 2    and it's clearly not in his best interest for the jury, before
 3    this jury, for the jury to observe any kind of conduct that the
 4    government's describing.  So without me making any
 5    determination as to what occurred, obviously, you know the
 6    appropriate advice you should give to your client with regard
 7    to his proper conduct and with regard to what's in his best
 8    interest.
 9              MR. LIND:  That's correct, Judge.  I just want to let
10    you know I did not see it either.  It was brought to me at the
11    end of the day, and I've talked to Mr. Polk about it, and he
12    understands what the rules are.
13              THE COURT:  All right.  Yes.
14              MR. KROUSE:  Your Honor, just briefly on the timing
15    point, the government believes that this witness will be on
16    direct examination for a fairly lengthy period of time.  We're
17    not sure exactly how long, three to four hours, perhaps.
18              THE COURT:  OK.
19              MR. KROUSE:  We don't have any additional witnesses
20    lined up for today.  Our view is in the amount of time that we
21    have left, it's unlikely that we'll get through this witness
22    entirely.  If we do, just so the Court's aware, we only have
23    six to seven other short witnesses for Wednesday.
24              THE COURT:  Which you might finish on Wednesday?
25              MR. KROUSE:  We will finish on Wednesday if we get
```

I9BHPol2

1    close to finishing Mr. Williams today.

2            THE COURT:  OK.

3            MR. KROUSE:  The Wednesday witnesses are not

4    particularly long.

5            THE COURT:  All right.

6            MR. KROUSE:  Just in discussing the schedule amongst

7    ourselves and Mr. Lind, it occurs to us that we have a charge

8    conference that we would need to have.  If that could be

9    scheduled for maybe the afternoon of Wednesday, assuming

10   Mr. Lind doesn't have a case.  If he does, perhaps that takes

11   up the afternoon of Wednesday.  But if the government rests in

12   and around lunchtime on Wednesday and Mr. Lind doesn't have a

13   defense case, then I guess the request would be that the jury

14   be dismissed at that point, we have the charge conference on

15   Wednesday afternoon, and then do closing arguments on Thursday

16   morning.

17           THE COURT:  All right.  Well, let's see where we are.

18   I don't have any problems with that, but let's see how far we

19   are.  I don't want to bring them in for two hours on Wednesday

20   and then just send them home, but let's see how much of

21   Wednesday we get to use and whether or not we'll have

22   summations on Thursday and charge.  Or if we don't have a full

23   afternoon, maybe it makes sense to have summations on Wednesday

24   afternoon.  But I may accommodate you and put both on Thursday,

25   depending on where we are tomorrow.

I9BHPol2

1              MR. KROUSE:  Yes, your Honor.

2              THE COURT:  All right.  Then let's get the jury, and

3    let's proceed with this witness.

4              (Continued on next page)

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

1           (Jury present)

2                THE COURT:  You can be seated.  Thanks.

3                Will the government call its next witness.

4                MR. KROUSE:  Yes, your Honor.  The government calls

5     Cicero Williams.

6     CICERO WILLIAMS,

7          called as a witness by the Government,

8          having been duly sworn, testified as follows:

9     DIRECT EXAMINATION

10    BY MR. FOLLY:

11    Q.  Good morning, Mr. Williams.

12    A.  Good morning.

13    Q.  Mr. Williams, how old are you?

14    A.  Thirty-seven.

15    Q.  Do you go by any other names other than Cicero Williams?

16    A.  Yes.

17    Q.  What other names?

18    A.  "Bull," "Tubes," "Booby."

19    Q.  Where did you grow up?

20    A.  In Highbridge.

21    Q.  Which borough is that in?

22    A.  In the Bronx.

23    Q.  In what part of Highbridge did you grow up?

24    A.  In University 165.

25    Q.  Did you go to school in the Bronx?

1  A.  Yes, I did.

2  Q.  How far did you go in school?

3  A.  Ninth grade.

4  Q.  When you were living in the Bronx, what did you do to make

5  a living?

6  A.  I sold crack cocaine.

7  Q.  Did you sell any other drugs?

8  A.  A little bit of marijuana.

9  Q.  What was the primary drug that you sold?

10  A.  Crack cocaine.

11  Q.  Mr. Williams, where do you currently live?

12  A.  In Queens in jail.

13  Q.  Is that a prison facility?

14  A.  Yes, it is.

15  Q.  What are you currently in prison for?

16  A.  For crack cocaine, possession of handguns and shootings and

17  tampering with witness.

18  Q.  Mr. Williams, were you previously convicted of selling

19  crack cocaine?

20  A.  Yes.

21  Q.  What sentence did you receive for that conviction?

22  A.  Two years.

23  Q.  Approximately when did you get out of prison on that first

24  crack cocaine conviction?

25  A.  2012.

1   Q.   Do you recall what month?

2   A.   November.

3   Q.   November 2012?

4   A.   Yes.

5   Q.   When you got out of prison in late 2012, did you start

6   committing crimes again?

7   A.   Yes, I did.

8   Q.   What kind of crimes did you start committing after you got

9   out of prison?

10  A.   Selling crack cocaine and possession of handguns.

11  Q.   Did you also commit shootings during that time period?

12  A.   Yes, I did.

13  Q.   In late 2012 and through 2013, I'll direct you to that time

14  period first, who were you committing crimes with during that

15  time period?

16  A.   "Buddha," Kevin, and Tim.

17  Q.   When you say "Buddha," do you know Buddha's real name?

18  A.   Yes.

19              (Continued on next page)

20

21

22

23

24

25

I9B6POL3                    Williams - direct

1   BY MR. KROUSE:

2   Q.  What is it?

3   A.  Jamel Moss.

4   Q.  Was Mr. Polk in the area when you got out of prison in late

5   2012?

6   A.  No, he wasn't.

7   Q.  Was he in the area through the year 2013?

8   A.  No.

9   Q.  Did Mr. Polk return to the area in March 2014?

10  A.  Yes.

11  Q.  And when Mr. Polk returned to the area in March 2014, did

12  you begin committing crimes with him?

13  A.  Yes.

14  Q.  What kinds of crimes did you begin committing with

15  Mr. Polk?

16  A.  Selling crack cocaine, handguns and shootings.

17  Q.  Do you see Mr. Polk in the courtroom today?

18  A.  Yes.

19  Q.  Can you identify him?

20          MR. LIND:  Identification conceded, Judge.

21          THE COURT:  You can proceed.

22  Q.  Can you identify Mr. Polk by identifying where he is seated

23  and by stating an item of clothing he is wearing?

24  A.  White shirt.

25          MR. KROUSE:  Let the record reflect that the witness

1    identified the defendant, Terrell Polk.

2              THE COURT:  The record will so reflect.

3              MR. KROUSE:  Mr. Concepcion, can you put on the screen

4    Government Exhibit 1, which is in evidence.

5    BY MR. KROUSE:

6    Q.  Mr. Polk, is your screen working?

7    A.  Yes.

8    Q.  Excuse me, Mr. Williams.

9              Do you see Government Exhibit 1?

10   A.  Yes.

11   Q.  Who is depicted in Government Exhibit 1?

12   A.  Mr. Polk.

13   Q.  Did he use any other names for Mr. Polk other than Terrell?

14   A.  Rell.

15             MR. KROUSE:  The government offers Government

16   Exhibit 1B as a nameplate for the name Rell.

17             MR. LIND:  No objection.

18             THE COURT:  It will be admitted into evidence.

19             MR. KROUSE:  1B, your Honor, which is the separate

20   nameplate for the name Rell.

21             (Government's Exhibit 1B received in evidence)

22             MR. KROUSE:  Mr. Folly, please, place the faceplate

23   and nameplate on the board.

24   BY MR. KROUSE:

25   Q.  Mr. Williams, how long have you known Mr. Polk?

I9B6POL3                         Williams - direct

1    A.  All my life.

2    Q.  What kinds of crimes did you commit with Mr. Polk in this

3    time frame, 2014 to 2015?

4    A.  Selling crack cocaine and the shootings and possession of

5    handguns.

6    Q.  I am going to first ask you about your drug-dealing

7    activities and then move onto the firearms and the shootings.

8           You mentioned this earlier, but what kinds of drugs

9    did you and the people you were associated with sell?

10   A.  Crack cocaine.

11   Q.  Did you sell any other drugs?

12   A.  A little bit of marijuana.

13   Q.  You mentioned that you sold drugs with Mr. Polk; correct?

14   A.  Yes.

15   Q.  Did you ever personally see Mr. Polk sell drugs?

16   A.  Yes.

17   Q.  What kinds of drugs did you personally see Mr. Polk sell?

18   A.  Crack cocaine.

19   Q.  Still focusing on the same time period, 2014 to 2015, did

20   you and Mr. Polk work together with other people to sell drugs?

21   A.  Yes.

22   Q.  Who were the people that you and Mr. Polk worked with to

23   sell drugs?

24   A.  Buddha, Kevin, Tim.

25          MR. KROUSE:  Mr. Concepcion, can you put on the screen

1   only for the witness what has been marked as Government

2   Exhibit 3 for identification, please.

3   Q.  Mr. Williams, do you recognize this photograph?

4   A.  Yes.

5   Q.  How do you recognize him?

6   A.  That is my friend.

7   Q.  Who is he?

8   A.  Jamel Moss.

9   Q.  You said this before, but does he have a nickname?

10  A.  Buddha.

11  Q.  Is it Buddha and Buddha Man?

12  A.  Buddha Man.

13          MR. KROUSE:  The government offers Government

14  Exhibit 3, Government Exhibit 3A with the nameplate Jamel Moss

15  and Government Exhibit 3D with the name Buddha Man.

16          MR. LIND:  No objection.

17          THE COURT:  It will be admitted into evidence.

18          (Government's Exhibits 3, 3A, 3D received in evidence)

19          MR. KROUSE:  May we publish the exhibits, your Honor?

20          THE COURT:  Yes.

21  BY MR. KROUSE:

22  Q.  How long have you known Mr. Moss, Mr. Williams?

23  A.  All my life.

24  Q.  Did you ever personally see Mr. Moss sell drugs?

25  A.  Yes.

1    Q.  What kinds of drugs did he sell?

2    A.  Crack cocaine, marijuana.

3    Q.  Still focusing on this same time period, did you see other

4    people selling drugs for Mr. Moss?

5    A.  Yes.

6    Q.  Who did you see selling drugs for Mr. Moss?

7    A.  Tim, Kevin.

8    Q.  What did Kevin sell for Mr. Moss?

9    A.  Crack cocaine.

10          MR. KROUSE:  Mr. Concepcion, can you put on the screen

11   what is in evidence as Government Exhibit 2.

12   Q.  Mr. Williams, do you see this photograph?

13   A.  Yes.

14   Q.  Who is this a photograph of?

15   A.  Kevin.

16   Q.  Did you refer to Kevin using any other name?

17   A.  Kev.

18          MR. KROUSE:  The government offers Government

19   Exhibit 2B, which is the nameplate Kev.

20          MR. LIND:  No objection.

21          THE COURT:  Admitted into evidence.

22          (Government's Exhibit 2B received in evidence)

23          MR. KROUSE:  Request permission to publish the

24   exhibit, your Honor?

25          THE COURT:  Yes.

1  BY MR. KROUSE:

2  Q.  You also mentioned an individual named Tim.

3  A.  Yes.

4  Q.  Did Tim ever sell crack cocaine?

5  A.  No.

6  Q.  What did Tim sell for Moss?

7  A.  Marijuana.

8  Q.  What didn't Tim sell crack cocaine?

9  A.  He couldn't.

10 Q.  Can you explain what it means that he couldn't?

11 A.  That is how we had it on our block.  You couldn't sell

12 certain things if we wouldn't let you.

13 Q.  By "we," who would make that decision?

14 A.  Me, Buddha, Terrell.

15        MR. KROUSE:  Mr. Concepcion, can you put on the screen

16 Government Exhibit 4, which is in evidence.

17 Q.  Do you recognize this photograph, Mr. Williams?

18 A.  Yes.

19 Q.  Who is it?

20 A.  Tim.

21        MR. KROUSE:  The government offers Government

22 Exhibit 4B, which is the nameplate Tim.

23        MR. LIND:  No objection.

24        THE COURT:  It will be admitted into evidence.

25        (Government's Exhibit 4B received in evidence)

1          MR. KROUSE:  The government requests permission to

2    publish the exhibit.

3          THE COURT:  Yes.

4    BY MR. KROUSE:

5    Q.  Mr. Williams, how do you know that Kevin and Tim each

6    worked for Mr. Moss?

7    A.  Because I was there a few times when Moss gave them

8    packages.

9    Q.  Can you describe for the jury what a package is?

10   A.  A package is contained with drug substance in it that you

11   sell.

12   Q.  If somebody gives another person a package, what is the

13   arrangement between those two people?

14   A.  The arrangement is he is selling it and hopefully get a

15   profit off it.

16   Q.  So the person providing it will get some money from that

17   too as well?

18   A.  Yes.

19   Q.  Did you personally see Moss give packages to Kevin and Tim?

20   A.  Yes.

21   Q.  What kind of package did you see Moss give to Kevin?

22   A.  Crack cocaine.

23   Q.  What kind of package did you see Moss give to Tim?

24   A.  Weed.

25   Q.  Weed as in marijuana?

I9B6POL3                         Williams - direct

1   A.  Yes.

2          MR. KROUSE:  Mr. Concepcion, can you show the witness

3   only what is Government Exhibit 5.

4   BY MR. KROUSE:

5   Q.  Mr. Williams, who is this a photograph of?

6   A.  That is me.

7          MR. KROUSE:  The government offers Government

8   Exhibit 5 and the nameplate Government Exhibit 5A for the name

9   Cicero Williams.

10          MR. LIND:  No objection.

11          THE COURT:  It will be admitted.

12          (Government's Exhibits 5 and 5A received in evidence)

13   BY MR. KROUSE:

14   Q.  Still focusing on the time period of 2014 to 2015, was

15   there a particular geographic area where you, Polk, Moss, Tim

16   and Kevin sold drugs?

17   A.  Basically from 1055 University all the way to the projects.

18   Q.  Are these buildings all in Highbridge?

19   A.  Yes.

20   Q.  When you say 1055 University, do you mean 1055 University

21   Avenue?

22   A.  Yes.

23          MR. KROUSE:  Mr. Concepcion, can you please place on

24   the screen what has been marked as Government Exhibit 200 for

25   identification just for witness.

1    Q.  Mr. Williams, do you recognize the area depicted on this

2    map?

3    A.  Yes.

4    Q.  What is it?

5    A.  Picture of Highbridge projects where we -- University

6    Avenue.

7    Q.  How long did you live in that area of the Bronx, this

8    section of the Bronx depicted on this map?

9    A.  All my life.

10          MR. KROUSE:  The government offers Government

11   Exhibit 200.

12          MR. LIND:  No objection.

13          THE COURT:  It will be admitted into evidence.

14          (Government's Exhibit 200 received in evidence)

15          MR. KROUSE:  May we publish this exhibit, your Honor?

16          THE COURT:  Yes.

17   BY MR. KROUSE:

18   Q.  Mr. Williams, is this map an accurate depiction of the

19   Highbridge area of the Bronx in relation to Manhattan?

20   A.  Yes.

21          MR. KROUSE:  Mr. Concepcion, can you put on the screen

22   Government Exhibit 202, which is in evidence.

23   Q.  Mr. Williams, is this a zoomed in version of Government

24   Exhibit 200?

25   A.  Yes.

1    Q.  Mr. Williams, you just tested that you Polk, Moss, Tim, and

2    Kevin sold drugs at 1055 University Avenue; correct?

3    A.  Yes.

4    Q.  Do you see 1055 University Avenue marked on this map?

5    A.  Yes.

6    Q.  You mentioned that you also sold in certain housing

7    projects; correct?

8    A.  Yes.

9    Q.  Where in relation to 1055 University Avenue are those

10   housing projects?

11   A.  166 University.

12   Q.  If this could work, we'll see, could you touch the screen

13   and see if you can circle the housing projects where you grew

14   up.

15           MR. KROUSE:  Let the record reflect the witness has

16   circled towards the top of the map on Government Exhibit 202.

17           Mr. Concepcion, can you please put on the witness

18   screen what has been marked as Government Exhibit 204.

19   Q.  Mr. Williams, can you press clear on your screen.

20           Do you recognize this document, Mr. Williams?

21   A.  Yes.

22   Q.  What is it?

23   A.  Picture of the project buildings.

24   Q.  How long had you lived in these project buildings?

25   A.  All my life.

I9B6POL3                        Williams - direct

1    Q.  Is this map an accurate depiction of the buildings and the

2    layout of this area of the Bronx?

3    A.  Yes.

4           MR. KROUSE:  The government offers Government

5    Exhibit 204.

6           MR. LIND:  No objection.

7           THE COURT:  It will be admitted into evidence.

8           (Government's Exhibit 204 received in evidence)

9           MR. KROUSE:  Your Honor, may we publish Government

10   Exhibit 204?

11          THE COURT:  Yes.

12   BY MR. KROUSE:

13   Q.  Mr. Williams, what do the pink buildings on this map

14   represent?

15   A.  Project buildings.

16   Q.  Are there six project buildings here?

17   A.  Yes.

18   Q.  Which of the project buildings did you live in growing up?

19   A.  First one, 1065.

20   Q.  Can you circle that building.

21          Did any the other people you have been testifying

22   about live in this building, 1065 University Avenue?

23   A.  Yes.

24   Q.  Who else lived in that same building with you?

25   A.  Buddha Man.

1   Q.  That is Buddha Man as in Jamel Moss; correct?

2   A.  Yes.

3   Q.  Did you know what building Terrell Polk lived in?

4   A.  1145.

5   Q.  Could you circle that building on the map.

6           Do you see 1055 University Avenue on this map as well?

7   A.  Yes, I do.

8   Q.  Can you circle that 1055 University Avenue.

9           So fair to say that building is directly south of the

10  project buildings?

11  A.  Yes.

12  Q.  Now, still focusing on this time period of 2014 to 2015,

13  where on this map would you personally sell drugs?

14  A.  On from 165 University all the way up to 166 University all

15  through the projects.

16  Q.  So throughout the projects and at 1055 University Avenue?

17  A.  Yes.

18  Q.  Where did Mr. Polk sell crack cocaine during this same time

19  period?

20  A.  Through -- all through 165 to 166 University.

21  Q.  What about Mr. Moss, Tim and Kevin, where would they sell

22  drugs?

23  A.  Same as well.

24  Q.  So in addition to selling drugs in the same area, did you,

25  Mr. Polk, Moss, Tim and Kevin work together in other ways?

I9B6POL3                          Williams - direct

1   A.  As far as steering customers to each other.

2   Q.  Could you describe to the jury what it means to steer a

3   customer?

4   A.  It is when one of us got no work, no drugs, the other one

5   will send the customer to one of us that got drugs.

6   Q.  So did it sometimes occur that a customer would ask you for

7   crack and you didn't have any?

8   A.  Yes.

9   Q.  When that would happen, what would you typically do?

10  A.  Send them to one of them.

11  Q.  By "one of them," who do you mean?

12  A.  It Buddha Man, Terrell, Kevin.

13  Q.  The same question for marijuana, if a customer came up to

14  you and asked for marijuana and you didn't have any, what would

15  you do?

16  A.  Send him to Tim.

17  Q.  Send him to Tim?

18  A.  Yes.

19  Q.  In 2014 and 2015 did you ever send customers to Mr. Polk?

20  A.  Yes.

21  Q.  In that same time period, did Mr. Polk ever send customers

22  to you?

23  A.  Yes.

24  Q.  How would you know if Mr. Polk sent a customer to you?

25  A.  The customer would tell me.

1    Q.  As another example did you ever supply Mr. Polk or Mr.

2    Moss?

3    A.  Once in a blue.

4    Q.  In 2014 and 2015 did you ever personally supply Mr. Polk

5    with crack cocaine?

6    A.  Yes.

7    Q.  Why would Mr. Polk need you to supply him with crack

8    cocaine?

9    A.  Well, his connect.  The person that he get drugs from

10   didn't have none, so he came to me and I got it for him.

11   Q.  You got it for him from whom?

12   A.  From my supplier.

13   Q.  So in 2014 and 2015 how many times did you supply Mr. Polk

14   with crack?

15   A.  Four or five time.

16   Q.  Were you Mr. Polk's main supplier?

17   A.  No.

18   Q.  How much crack would you give to Mr. Polk on those four or

19   five occasions?

20   A.  15, 20 grams.

21   Q.  Each time?

22   A.  Yes.

23   Q.   So that is around 60 to 100 grams of crack?

24           MR. LIND:  Judge, I object to the calculation of the

25   government.

1           THE COURT:  Overruled.  You can cross-examine.

2   Q.  You just testified that you provided --

3           THE COURT:  Is that a question?

4           MR. KROUSE:  Yes, your Honor.

5           THE COURT:  He didn't answer.

6           What is your question?

7           MR. KROUSE:  I will restate the question, your Honor.

8   Q.  So that is around 60 to 100 grams of crack cocaine in

9   total?

10  A.  In the vicinity, yeah.

11  Q.  You said you knew Mr. Polk since you were child; correct?

12  A.  Yes.

13  Q.  Did you ever know Mr. Polk to use crack cocaine?

14  A.  No.

15  Q.  Was Mr. Polk a crack addict?

16  A.  No.

17  Q.  So when you supplied Mr. Polk with crack, what was your

18  understanding of what Mr. Polk was going to do with it?

19  A.  Sell it.

20  Q.  You said this already, but did you personally see Mr. Polk

21  sell crack cocaine to customers?

22  A.  Yes, I did.

23          MR. LIND:  Objection to repetition, Judge.

24          THE COURT:  Overruled.  You can answer.

25  Q.  You mentioned possessing guns as one of the crimes you

1   committed; correct?

2   A.  Yes.

3   Q.  Were those guns yours only or were they shared?

4   A.  They were shared.

5   Q.  And who all shared the guns together?

6   A.  Me, Polk, Buddha Man, Kevin, Tim.

7   Q.  Basically everyone who is on the board in front of the

8   jury; correct?

9   A.  Yes.

10  Q.  How many guns did you as a group share during this time

11  period, 2014 to 2015?

12  A.  About five.

13  Q.  What was the reason to have and to share all of these guns?

14  A.  Protect our territory.

15  Q.  When you say "territory," what do you mean?

16  A.  Where we lived at and where we get money at hustling.

17  Q.  By "hustling," what do you mean?

18  A.  Sell crack cocaine, marijuana.

19  Q.  Who did you need to protect your drug territory from?

20  A.  From other people that wanted to come over there and sell.

21  Q.  Would you just allow people come and sell in your

22  territory?

23  A.  No.

24  Q.  Why not?

25  A.  Because that is our territory.  We don't want nobody else

1    to come over there and get money.

2    Q.  So the guns were meant to ensure that competing drug

3    dealers didn't take over your territory; is that fair?

4    A.  Yes.

5    Q.  Based on what you personally saw, were the guns that you

6    testified about ever fired at people?

7    A.  Yes.

8    Q.  By whom?

9         Who fired those guns?

10   A.  I fired them.  Polk fired them.  Kevin.

11   Q.  We'll come back to the guns and the shootings later.  Let's

12   go back to the drugs that you and your group sold.

13        Let's talk about how much crack cocaine you, Polk,

14   Moss and Kevin were selling during this time period, 2014 to

15   2015.

16        Do you have a sense of how much crack you personally

17   sold each month in that time period?

18   A.  I estimate 100, 150 grams.

19   Q.  Per month?

20   A.  Yeah.

21   Q.  Did you have suppliers for your crack cocaine?

22   A.  Yes.

23   Q.  What would you get from your suppliers, crack or powder

24   cocaine?

25   A.  Powder cocaine.

1              MR. KROUSE:  Mr. Concepcion, can you take the screen

2       down for the jury.

3       Q.  How much would you pay for 100 grams of powder cocaine from

4       your suppliers?

5       A.  About 3600.

6       Q.  $3,600?

7       A.  Yes.

8       Q.  What would you do with the powder cocaine once you received

9       it from your supplier?

10      A.  I would cook it up.

11      Q.  What do you mean cook it up?  Can you explain that?

12      A.  Form it into crack cocaine, big rocks.  Get a coffee pot,

13      baking soda, and then put it in water and cook it up.

14      Q.  After you cook the powder cocaine with those items, what

15      would it turn into?

16      A.  It would turn into a big rock.

17      Q.  Big rock of what?

18      A.  Crack cocaine.

19      Q.  Once you had that big rock of crack cocaine, what would you

20      do with it?

21      A.  I would chop it up, bag it up, and sell it.

22      Q.  What do you mean by chop it up and bag it up?

23      A.  Break it down into little pieces and put it into sandwich

24      bags for $10 a piece and sell it.

25      Q.  So you said $10 a piece.  What would you $10 hit of crack

1   cocaine look like?

2   A.   Two little crumbs, two little pebbles.  Put it in a

3   sandwich bag and tie it up.

4   Q.   You twist the top; is that right?

5   A.   Yes.

6   Q.   That is one hit of crack cocaine for a customer; correct?

7   A.   Yes.

8   Q.   That would cost how much?

9   A.   $10.

10          MR. KROUSE:  Mr. Concepcion, can you put on the screen

11   what is in evidence as Government Exhibit 100 B.

12   Q.   Mr. Williams, can you press the "Clear" button again on

13   your screen.

14          Mr. Williams, do you see those small baggies depicted

15   at the bottom of this photograph?

16          MR. KROUSE:  Mr. Concepcion, please zoom in on the

17   bottom of this photograph.

18   A.   Yes.

19   Q.   So what are those baggies that you see at the bottom of

20   that photograph?

21   A.   Crack cocaine.

22   Q.   Are those the individual hits that you just testified

23   about?

24   A.   Yes.

25   Q.   That are twisted at the top?

1    A.  Yes.

2           MR. KROUSE:  Mr. Concepcion, can you zoom out and zoom

3    in on the other portion of the bottom.

4    Q.  Mr. Williams, do you see that zoomed in portion of the

5    photograph?

6    A.  Yes.

7    Q.  What does that portion of the photograph depict?

8    A.  Crack cocaine.

9    Q.  That is what crack looks like?

10   A.  Yes.

11          MR. KROUSE:  Mr. Concepcion, you can take the exhibit

12   down.

13   Q.  Now, how much would one twisted baggie like we just saw

14   cost a customer?

15   A.  $10.

16   Q.  Is that considered one hit of crack?

17   A.  Yes.

18   Q.  How much would 10 hits of crack cost?

19   A.  $100.

20   Q.  How much would that $100 worth of crack weigh

21   approximately?

22   A.  A gram.

23   Q.  1 gram?

24   A.  Yes.

25   Q.  So if you had a 100 grams of crack, what would the street

1  value be of that?

2  A.  $10,000.

3  Q.  Would you expect to make $10,000 for every hundred grams of

4  crack that you sold?

5  A.  No.

6  Q.  Why not?

7  A.  Because it comes with shorts.  Some people don't come with

8  exact $10.  They might come with $7, $8, $9.

9  Q.  If someone showed up with $7, would you sell them a $10 hit

10  of crack?

11  A.  Yes.

12  Q.  Why would you do that?

13  A.  So we can keep the customer and sometimes we can get

14  credit.  They can get credit from you and you can double up on

15  them.

16  Q.  What do you mean "double up on them"?

17  A.  They owe you $20.

18  Q.  If you gave them $10 on credit, they would pay you 20

19  later?

20  A.  Yeah.  Yes.

21  Q.  So how much money would you expect to make from selling 100

22  grams of crack cocaine?

23  A.  At least 7600, 7500.

24  Q.  You testified that you pay around 3600 for the 100 grams of

25  cocaine; right?

I9B6POL3                    Williams - direct

1    A.  Yes.

2    Q.  That is around a $4,000 profit?

3    A.  Yes.

4    Q.  You testified that Mr. Polk sold crack in the projects at

5    1055 University Avenue; correct?

6    A.  Yes.

7    Q.  Still focusing on this 2014 to 2015 time period, did you

8    know whether Mr. Polk cooked his own crack or whether he bought

9    the crack already cooked?

10   A.  We both -- we both cooked our own crack.

11   Q.  How do you know that?

12   A.  We discussed it amongst each other.

13   Q.  What did you discuss?

14   A.  Who cooked the best.

15   Q.  What did Mr. Polk say about the crack that he cooked?

16   A.  He cooked better than me.

17   Q.  Do you have an understanding of whether Mr. Polk used your

18   same supplier for powder cocaine or whether he had his own

19   supplier?

20   A.  He had his own supplier.  He wouldn't came to me if he had

21   my supplier.

22   Q.  Explain that.

23   A.  It means a person that got his own supplier would not come

24   to another person and ask them about their supplier if they

25   supplier had drugs.  Or he had my supplier, he wouldn't have to

1  go through me.

2  Q.  So when he came to you it was because his supplier didn't

3  have cocaine; correct?

4  A.  Yes.

5  Q.  If he was using the same supplier as you, he couldn't

6  wouldn't have to come to you at all; correct?

7  A.  Yes.

8  Q.  You testified earlier that you occasionally supplied

9  Mr. Polk with crack cocaine?

10  A.  Yes.

11  Q.  You said four or five times around 15 to 20 grams each

12  time; correct?

13  A.  Yes.

14  Q.  You personally saw Mr. Polk sell that crack to customers;

15  correct?

16  A.  Yes.

17  Q.  Where did you see Mr. Polk sell to customers?

18          MR. LIND:  Judge, I am going to object to this.  He

19  keeps on repeating the same location and this is the third time

20  where he is asking where he saw him sell this crack.

21          THE COURT:  Well, let's move forward.  Just be more

22  specific.

23          MR. KROUSE:  Yes, your Honor.

24  Q.  Where specifically did you see Mr. Polk sell to customers?

25  A.  In front of 166 University where I sell crack at.

1   Q.  Did he make the sells inside the building or outside the

2   building?

3   A.  Sometimes we make them inside or sometimes we make it

4   outside.

5   Q.  You also testified that Mr. Moss and Kevin sold crack in

6   the projects at 1055 University Avenue; correct?

7   A.  Yes.

8   Q.  Did you know whether Mr. Moss cooked his own crack?

9   A.  No.

10  Q.  You don't know or did he?

11  A.  No, he don't.

12  Q.  He does not cook his own crack?

13  A.  No.

14  Q.  How did he get his crack?

15  A.  Already cooked up already.

16  Q.  How much crack would Mr. Moss get at a time?

17  A.  10 to 15 grams.

18  Q.  Once he got the 10 to 15 grams of crack, what would Mr.

19  Moss do with it?

20  A.  Bag it up, chop it up, and give it to the people.

21  Q.  When you say "give it to the people," who do you mean?

22  A.  He will give it to Kevin and he will sell it.

23  Q.  So he would sell himself and give some of it to Kevin to

24  sell?

25  A.  Yes.

1    Q.  Did you ever supply Mr. Moss with crack cocaine?

2    A.  Yes.  A few times.

3    Q.  How much crack would you give to Mr. Moss at a time?

4    A.  Five, 10 grams.

5    Q.  Around how many times did you supply Mr. Moss with crack?

6    A.  About five, six times.

7    Q.  Five or six times?

8    A.  Yes.

9    Q.  Did you have regular customers that you sold crack to?

10   A.  Yes.

11   Q.  Around how many regular crack customers did you have?

12   A.  10 to 12.

13   Q.  Did those customers also buy crack from Mr. Polk, Mr. Moss

14   and Kevin?

15   A.  Yes.

16   Q.  How did you know that you were sharing customers with these

17   individuals?

18   A.  We all hustle in the same spot for one and we all know the

19   customers.

20   Q.  By hustling you mean selling drugs?

21   A.  Yes.

22   Q.  How many hours in a day would you in your group sell crack?

23   A.  Say, all day.  Every day.

24   Q.  How many days a week would you sell crack?

25   A.  Six.

1    Q.  Six days a week?

2    A.  Yeah.  Maybe seven.

3    Q.  Based on your own observations how many days a week on

4    average did you Polk selling crack?

5    A.  Every day.

6    Q.  How many hours a day would you see him selling crack?

7    A.  It depends how long he was with me.  You know, if I be out

8    there for eight hours, he might be out there for eight hours.

9    It just depends.  But all day we selling crack.

10   Q.  How many days a week would you see Mr. Polk on average

11   during this time period, 2014 to 2015?

12   A.  Every day of the week.

13   Q.  I am going to go back to the guns that you mentioned

14   sharing with Mr. Polk, Moss, Kevin, and Tim.

15        Focusing still on this time period, 2014 to 2015, you

16   mentioned that you all shared five guns; correct?

17   A.  Yes.

18   Q.  What were the five guns that you shared with Mr. Polk,

19   Moss, Kevin, and Tim?

20   A.  Short rifle, shotgun, a revolver, a .40, and a .9.

21   Q.  When you say a .40 and a .9, what kind of guns are those?

22   A.  Handguns.

23   Q.  Those are caliber sizes for those handguns?

24   A.  Yes.

25   Q.  Are those pistols or revolvers?

1   A.  Pistols.

2   Q.  Now, do you know the difference between a pistol and a

3   revolver?

4   A.  Yes.

5   Q.  Can you describe that to the jury?

6   A.  Pistol is the -- the pistol the shells come out -- as you

7   discharging the gun, the shell come out of the gun -- the head

8   of the gun.  A resolver, the shell stay in the gun.

9   Q.  So when you fire a pistol, the shells are ejected from the

10  gun?

11  A.  Yes.

12  Q.  But with a revolver the shells stay inside; correct?

13  A.  Yes.

14  Q.  You said that your group had two pistols; correct?

15  A.  Yes.

16  Q.  That is the 40 caliber and the 9-millimeter?

17  A.  Yes.

18  Q.  And that you also had a revolver; correct?

19  A.  Yes.

20  Q.  You also mentioned a shotgun that you possessed as a group?

21  A.  Yes.

22  Q.  Do you know the difference between a pistol and a shotgun?

23  A.  Yes.

24  Q.  Could you describe that difference to the jury?

25  A.  A pistol is smaller and like I said the shells pop out --

1   pop out of the head.  And a shotgun when it shoot, it will

2   shoot pellets or it shoot slugs.

3   Q.  When you say "pellets," what do you it mean by pellets?

4   A.  I mean, pellets is separates when it comes out of the

5   valve.

6   Q.  So multiple pellets are fired from the shotgun?

7   A.  Yes.

8   Q.  Is that different from the ammunition that is fired out of

9   a pistol?

10  A.  Yes.

11  Q.  What is fired out of a pistol?

12  A.  It is one -- one bullet.

13  Q.  One single bullet?

14  A.  At a time.

15  Q.  At the time did you know who actually owned which of these

16  five firearms?

17  A.  I owned -- owned most of them and Polk owned.

18  Q.  Let's go gun by gun.  Who owned the 40 caliber pistol?

19  A.  I did.

20  Q.  Who owned the 9-millimeter pistol?

21  A.  I did.

22  Q.  Who owned the 38 caliber revolver?

23  A.  Polk.

24  Q.  Mr. Polk?

25  A.  Yes.

1   Q.  Who owned the shotgun?

2   A.  Polk.

3   Q.  Who owned the assault rifle?

4   A.  I did.

5   Q.  Now, the shotgun you mentioned, can you describe it for the

6   jury?

7   A.  It is short, silver, rubber handle on the end of it.  And

8   the back –– the hammer, it cocks back.

9   Q.  When you say it is short, what do you mean by that?

10  A.  That means that the front of it is cut off.

11  Q.  What is that called when the front of a shotgun is cut off?

12  A.  Sawed-off shotgun.

13  Q.  So is this shotgun that you shared with the group, was that

14  a sawed-off shotgun?

15  A.  Yes.

16  Q.  Your testimony is that Mr. Polk owned that sawed-off

17  shotgun; correct?

18  A.  Yes.

19  Q.  In 2014 and 2015, where did you, Mr. Polk, Mr. Moss, Kevin

20  and Tim store these five guns that you shared amongst each

21  other?

22  A.  Either at my house, his house, other houses.

23  Q.  How would you describe who held which gun on a different

24  day?

25  A.  It didn't matter.  Whoever left with a gun on them that

1   day, either take it home or take it to one of our houses -- the

2   closest house that is around.

3   Q.  So was there a specific place that the 40 caliber was

4   supposed to be held or did it vary?

5   A.  No.  It just whatever -- whatever house is.  Polk house is

6   closest, he store it at his how many.  If Buddha Man's is

7   closest, he store it at his house.  If we somewhere, I take

8   mines home.

9   Q.  If you needed a gun but didn't have one, what would you do?

10  A.  I -- I go -- I go to Polk house, Buddha house, Tim house,

11  Kevin house pick up one if it is there.

12  Q.  Did you ever personally pick up a gun that was stored at

13  Polk's house?

14  A.  Yes.

15  Q.  Where did Mr. Polk store his guns?

16  A.  In his house in his room.

17  Q.  In his room?

18  A.  Yes.

19  Q.  Anywhere in particular in his room?

20  A.  In his closet, his safe.

21  Q.  When you say "his safe," did he have a safe in his closet?

22  A.  Yes.

23  Q.  Would he store guns in that safe?

24  A.  Yes.

25  Q.  Have you personally seen Mr. Polk take out and put in guns

I9B6POL3                        Williams – direct

1    in that safe?

2    A.   Yes.

3    Q.   Now, you testified that you and this group on the board

4    shared access to these guns?

5    A.   Yes.

6    Q.   Focusing on 2014 and 2015, did you ever see Mr. Polk

7    possess any of the guns that you testified about?

8    A.   Yes.

9    Q.   Which ones did you see Mr. Polk personally possess?

10   A.   All of them.

11   Q.   All five of them?

12   A.   Yes.

13   Q.   Did you ever see Mr. Moss possess any of the guns that you

14   testified about?

15   A.   Yes.

16   Q.   Which guns did you personally see him possess?

17   A.   All of them.

18   Q.   Did you ever see Kevin possess any of the guns you

19   testified about?

20   A.   Yes.  We all shared all of them.

21   Q.   All five men shared all five guns; correct?

22   A.   Yes.

23   Q.   Day-to-day did you personally carry a gun on your person?

24   A.   Yes.

25   Q.   Why did you carry a gun day-to-day?

1  A.  For my protection and the life I was living, as far as

2  being on the street and selling drugs and got to protect myself

3  from other people that want to step on my toes or sell drugs

4  where I sell drugs at.

5  Q.  Did you see whether Mr. Polk typically carried a gun on his

6  person?

7  A.  Yes.

8  Q.  Did he personally carry guns on his person day-to-day?

9  A.  Yes.

10  Q.  Where did he typically carry his firearms?

11  A.  Carried it in our pocket or on our waist.

12  Q.  In talking to you did Mr. Polk ever refer to guns using a

13  code name?

14  A.  We used plenty of code names -- ratchet, demonstration.

15  Many terms that other people won't understand.

16  Q.  Why did you not want other people to understand that you

17  were talking about guns?

18  A.  They might call police on us knowing what we be doing or we

19  don't want them in our business.

20  Q.  You testified earlier that some of these guns that you

21  talked about that you shared with this group were used in

22  shootings; correct?

23  A.  Yes.

24  Q.  I am going to ask you some questions about shootings now.

25        First, directing your attention to the night of July

1   25th, 2015, was there something notable that happened that

2   night?

3   A.  Somebody got shot.

4   Q.  When you say "somebody got shot," who got shot?

5   A.  Kid name Euro.

6   Q.  Who shot Euro?

7   A.  Terrell.

8   Q.  That is Terrell Polk, the defendant?

9   A.  Yes.

10  Q.  Did you know Euro at the time he was shot by Mr. Polk?

11  A.  Not -- not personally, but I did see him.

12  Q.  By "see him," what do you mean?

13  A.  I was hustling in the same building that he lived in.

14  Q.  Which building was that?

15  A.  1055.

16  Q.  1055 University Avenue?

17  A.  Yeah.

18  Q.  When you say you were hustling inside the same building he

19  lived in, what does hustling mean?

20  A.  Selling crack cocaine, marijuana.

21  Q.  Did you know how Euro supported himself?

22  A.  Selling weed.

23  Q.  In that same building?

24  A.  Yes.

25  Q.  How do you know if Mr. Polk shot Euro that night?

1    A.  I was there.

2    Q.  Where did this shooting take place?

3    A.  165 University.

4    Q.  In front of which building?

5    A.  1055.

6    Q.  1055 University Avenue?

7    A.  Yes.

8    Q.  Was the shooting at night or during the day?

9    A.  At night.

10          MR. KROUSE:  Mr. Concepcion, can you put on the screen

11   Government Exhibit 202, which is in evidence.

12   Q.  Mr. Williams, is that 1055 University Avenue marked with

13   the red pointer?

14   A.  Yes.

15   Q.  That is where the shooting occurred?

16   A.  Yes.

17          MR. KROUSE:  Mr. Concepcion, can you put on the screen

18   Government Exhibit 514, which is in evidence.

19   Q.  Mr. Williams, what is this a photo of?

20   A.  1055 University Avenue.

21   Q.  That is the building on the right with the kind of light

22   brown building?

23   A.  Yes.

24   Q.  With the deli downstairs?

25   A.  Yes.

 1              MR. KROUSE:  Mr. Concepcion, can you put on the screen

 2      what has been admitted as Government Exhibit 530.

 3      Q.  Mr. Williams, is this also a photograph of 1055 University

 4      Avenue?

 5      A.  Yes.

 6      Q.  Is the address there marked on the gate?

 7      A.  Yes.

 8      Q.  Looking beyond 1055 University Avenue, do you see some

 9      other buildings further down the road?

10      A.  Yes.

11      Q.  What are those buildings?

12      A.  Project buildings.

13      Q.  So those are the buildings that you lived in; correct?

14      A.  Yes.

15      Q.  Who were you with the night of July 25th, 2015?

16      A.  Terrell Polk.

17      Q.  What were you and Mr. Polk doing that night?

18      A.  Riding around.

19      Q.  Riding around, were you in a vehicle?

20      A.  Yes.

21      Q.  Who was driving that vehicle?

22      A.  Polk.

23      Q.  What car was Mr. Polk driving?

24      A.  Camry.

25      Q.  Is that a Toyota Camry?

1    A.  Yes.

2    Q.  What color was the Camry?

3    A.  Silver.

4    Q.  Mr. Polk was driving.  Where were you seated?

5    A.  In the passenger.

6    Q.  Was anyone else in the car other than you and Mr. Polk?

7    A.  No.

8    Q.  While the two of you were driving, did Polk say something

9    to you?

10   A.  As we -- as we approached 165 University by 1055, he had

11   told me that he had an incident with Euro late the night

12   before.

13   Q.  Did he describe what that incident was that Mr. Polk had

14   with Euro?

15   A.  He said they started arguing, beefing because Tim and Kevin

16   were hustling down in 1055.

17   Q.  Who was hustling down in 1055?

18   A.  Euro.

19   Q.  What was Euro specifically doing?

20   A.  Selling weed.

21   Q.  Inside 1055 University Avenue?

22   A.  Yes.

23   Q.  Why did that lead to a dispute between Tim, Kevin and Euro?

24   A.  He shouldn't have been selling in the building.

25   Q.  Who shouldn't have been?

I9B6POL3                          Williams – direct

1   A.   Euro.

2   Q.   Why wasn't he allowed to sell drugs in that building?

3   A.   Because we was selling drugs in there.

4   Q.   That was your building?

5   A.   That was our building.

6   Q.   You said Mr. Polk sold crack cocaine; right?

7   A.   Yes.

8   Q.   So why would he care if Euro was selling weed in this

9   building?

10  A.   It didn't matter who was selling what.  If we all down with

11  each other and hanging with each other, this is what we do.

12  Q.   What do you mean this is what we do?

13  A.   Stop whoever that is messing with us or messing with our

14  money and on our block.

15  Q.   Euro was messing with your money by selling weed in that

16  building in your view?

17  A.   Yes.

18  Q.   To your knowledge had Euro sought permission from you or

19  Mr. Polk or Moss or Kevin or Tim to sell drugs in 1055

20  University Avenue?

21  A.   No.  He had no permission.

22  Q.   Was he sharing the money he was making from selling drugs

23  in that building with you guys?

24  A.   No.

25              MR. KROUSE:  Mr. Concepcion, can you put on the screen

1    for the witness only what has been marked as Government

2    Exhibit 6.

3    Q.  Mr. Williams, who does this photograph depict?

4    A.  Euro.

5            MR. KROUSE:  The government offers Government

6    Exhibit 6 and Government Exhibit 6A with the name Euro.

7            MR. LIND:  No objection.

8            THE COURT:  Admitted into evidence.

9            (Government's Exhibit 6 and 6B received in evidence)

10           MR. KROUSE:  Permission to -- 6B, excuse me -- publish

11   the nameplate with the name Euro.

12           THE COURT:  Yes.

13           MR. KROUSE:  Mr. Concepcion, can you publish that

14   exhibit, please.

15           THE COURT:  When will it be a convenient time to take

16   a lunch break?

17           MR. KROUSE:  This is a convenient time right here,

18   Judge.  Thank you.

19           THE COURT:  Are you going to put that on the screen

20   first?

21           MR. KROUSE:  I believe it is on the screen, your

22   Honor.

23           THE COURT:  Ladies and gentlemen, we're going to take

24   the lunch break.  Don't discuss the case.  Keep an open mind.

25   I will ask you to be back in the jury room by 2:15.

I9B6POL3                         Williams – direct

1          We're ahead of schedule and I want to keep us that

2    way.   We'll see where we are at the end of the day.

3               (Jury excused)

4               (Continued on next page)

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

I9B6POL3                    Williams - direct

1                (In open court; jury not present)

2                THE COURT:  We'll continue at 2:15.

3                MR. KROUSE:  Your Honor, are we intending to bring the

4        jury in at 2:15, or will we have an opportunity to talk about

5        some outstanding issues?

6                THE COURT:  If you have issues, you can raise them at

7        that time.

8                MR. KROUSE:  Thank you, Judge.

9                (Recess)

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

I9BHPol4

```
                           AFTERNOON SESSION

                              2:15 p.m.

              (In open court; jury not present)

              THE COURT:  Did you have something you wanted to

      address before getting the jury?

              MR. KROUSE:  Your Honor, just the issue of the phone

      transcripts.  Mr. Lind and I were just discussing those, and I

      think we are close to an agreement, but that's one issue

      because those are coming in during this portion of the

      testimony.

              THE COURT:  So what is still at issue?

              MR. KROUSE:  I'll leave it to Mr. Lind, I think.  The

      government wants to play all the seven calls that we indicated

      to him, as well as the transcripts.  My understanding is he has

      no issue with several of them but has not told me if he does or

      doesn't.

              MR. LIND:  A couple of them I don't have an issue

      with, Judge.  Some of them I have an issue with, and I know the

      government is going to -- I know their response, but I have an

      issue with the other party to the conversation's responses

      coming in and what -- maybe they're admissible, but I don't

      think as like substantive evidence.  Maybe it's to provide

      context or something like that, but it's --

              THE COURT:  Well, if this is a conversation with the

      defendant, these are either admissions or statements by a party
```

I9BHPol4

1    opponent that would be admissible.

2              MR. LIND:  No, I understand about the defendant, but

3    what about the person that the defendant is talking to?

4              THE COURT:  The conversation that the defendant had

5    with a third party would be admissible, I mean, unless you --

6              MR. LIND:  What I'm saying is the defendant's part of

7    it, yes.

8              THE COURT:  Right.

9              MR. LIND:  But what about the other person that he's

10   speaking to?

11             THE COURT:  Well, as long as the defendant's engaged

12   in the conversation and is either adopting those statements or

13   is commenting upon those statements, they would be admissible.

14   If you give me an example of something that you say should be

15   attributed to the speaker but not used against the defendant, I

16   can consider that, but I'm not sure what specific --

17             MR. LIND:  I can give you an example, Judge.  It would

18   be 801T.

19             THE COURT:  801T?

20             MR. LIND:  Yeah.

21             THE COURT:  OK.

22             MR. LIND:  On the second page.

23             THE COURT:  Yes.

24             MR. LIND:  About two-thirds of the way down, TK says:

25   The Brody called me.  The Brody called me today and called me

I9BHPol4

1    the day before yesterday.  He said to tell you that you all

2    niggers was at the -- he loves you.  You know, I don't think

3    that that's -- it's somewhat innocuous, but I don't think that

4    should come in.

5            Further down he says:  So what they -- what they

6    talk -- what they talking about with your bail and shit.

7            THE COURT:  But I'm not sure what you say the legal

8    ground is for its inadmissibility.  It's not hearsay.  It's not

9    being offered for the truth of what that witness is saying.

10           MR. LIND:  Well, as long as the jury's told that, it's

11   not -- you know, I wouldn't have a problem with that, Judge.

12           THE COURT:  If you can fashion some sort of

13   instruction, I'll consider it, but I'm not sure what I should

14   tell the jury specifically about the conversations.  I mean,

15   these are conversations between the defendant and a third

16   person.  And, obviously, the evidence against the defendant is

17   statements that he made in that conversation.

18           MR. LIND:  I'm sorry, Judge.  I apologize.

19           THE COURT:  That's all right.

20           MR. KROUSE:  Your Honor, I'll also make the point that

21   under completeness, it gives context.  You obviously can't play

22   one end of the conversation and not the other.  It would make

23   no sense.  Mr. Polk in these conversations is engaging with the

24   other person he's talking to and adopting some of those

25   statements.  So even to take the one that Mr. Lind pointed out,

I9BHPol4

1    Mr. Polk is saying, in our view:  We got Buddha Man trying to

2    say that the guns belong to him.  He's not trying to hold no

3    guns.  Basketballs, in our view, is guns.  And the cooperating

4    witness will place some of that into context.  And then TK says

5    the Brody called him, and he says he will be home next month,

6    and they'll work something out.  Then Polk says, Tell him I

7    love him, and Kevin's going to take the demonstration, which is

8    the gun, the gun charge that he's facing, so I'm going to be

9    out and all that.

10          So it's all a back-and-forth conversation between

11   Mr. Polk and whoever he's talking to.  I think your Honor's

12   exactly right that the parts of Mr. Polk are plainly admissible

13   as party admissions, and the third parties are also admissible,

14   because otherwise the conversation would make no sense.

15          THE COURT:  Yes, I don't see any specific -- I mean, I

16   haven't gone through it obviously in detail, although I did

17   look through these conversations.  It's a little difficult for

18   me to get all of the relevance of the conversations because I

19   don't know if I'm approaching this the way the jury's

20   approaching it.  For example, that very first conversation, I

21   don't know what that conversation's supposed to be about or

22   what the relevance of that conversation is supposed to be.  I

23   assume you have some -- there's some reason you believe that

24   conversation was relevant.

25          800T, is there something of substance in that

I9BHPol4

1    conversation that --

2            MR. KROUSE:  Yes, your Honor, just that Mr. Polk

3    mentions Buddha Man as somebody that he's trying to get bail

4    money from, and that's, in the government's view, corroborative

5    of Mr. Williams saying that Buddha Man, a person named Buddha

6    Man, was also part of their conspiracy.

7            He also then mentions Tim, and says Tim's going to

8    take it, right, and in the government's view, he's talking

9    about the gun.  So it's a very short call.

10           THE COURT:  Right.

11           MR. KROUSE:  I will not belabor the point, but we

12   think it does have --

13           THE COURT:  Are all these conversations already in

14   evidence?

15           MR. KROUSE:  They're not, your Honor.

16           THE COURT:  How are you going to establish them?

17           MR. KROUSE:  There's a stipulation from Mr. Lind --

18   that the parties have entered into about the authenticity and

19   that these are authentic prison calls, and we will then offer

20   the prison calls before Mr. Williams goes into them.  Mr. Lind

21   reserved his right to object based on relevance or any other

22   grounds, and that's why we're resolving that here.

23           THE COURT:  And this witness has some context for some

24   of these phone calls?

25           MR. KROUSE:  He'll be able to identify the

I9BHPol4

1   participants.  So some of the phone calls where the transcripts

2   are labeled UM and UF --

3                THE COURT:  Right.

4                MR. KROUSE:  -- he will recognize their voices and

5   could identify their voices, and he'll also be able to explain

6   some of the terminology that's being used.

7                THE COURT:  All right.  We'll have to take it

8   objection by objection.  Overall, I can't say that these

9   conversations are inadmissible, given the fact that these are

10  phone conversations by the defendant with other individuals.

11  I'm going to allow them, but I'll allow you to object as to any

12  particular prejudicial portion that you think might exist.  But

13  it seems to me that it's relevant and the relevance outweighs

14  its probative value, given the fact that it does demonstrate a

15  relationship between these people and some conversation that

16  the government contends is real conversations related to the

17  charges in this case.

18                MR. LIND:  OK, Judge.  I just have one last comment.

19                THE COURT:  Yes.

20                MR. LIND:  That's on 808T, which is --

21                THE COURT:  I'm sorry.  Which one did you say?  808?

22                MR. LIND:  808T.

23                THE COURT:  I don't think I have an eight.  Is that in

24  a different binder?

25                MR. FOLLY:  Should also be on the screen.

I9BHPol4

1          THE COURT:  I have 806T and then I have --

2          MR. LIND:  I think he just brought it up on the

3   screen, Judge.

4          THE COURT:  Is that in the second binder?

5          MR. KROUSE:  It might be in the second binder as 808T,

6   supplemental material.

7          THE COURT:  Oh, OK.  Yes.

8          MR. LIND:  Just for the Court's information, that's

9   the reason why when I was cross-examining Mr. Lombardo

10  yesterday, I brought up that the search warrant was for the

11  gun.

12         THE COURT:  OK.

13         MR. LIND:  Because your Honor sort of told me I

14  couldn't go into that aspect, but that's the reason why,

15  because they were looking for a gun in the safe in his

16  apartment and there was none.

17         THE COURT:  All right.  I don't think I ultimately

18  said you couldn't ask him about that.  I don't think that was

19  my ruling.

20         MR. LIND:  I forget what the exact ruling was.

21         THE COURT:  What did you want?

22         MR. LIND:  No, I'm just pointing it out, Judge --

23         THE COURT:  Right.

24         MR. LIND:  -- that it wasn't coming in out of nowhere.

25         THE COURT:  Oh, no, I understand that.  Did you get

I9BHPol4

1    daily copy?  Hand me the transcript.  Let me go back and look

2    at that.

3            With regard to the relevance, I'm going to leave it up

4    to the government to establish that.  As long as they lay the

5    proper foundation, I'm going to allow the conversation.

6            So why don't we continue.  Let's get the witness back,

7    put the witness in the box.

8            MR. KROUSE:  Your Honor, I'm going to use the

9    restroom.

10           THE COURT:  All right.

11           (Pause)

12           THE COURT:  Let's bring the jury in.

13           (Continued on next page)

14

15

16

17

18

19

20

21

22

23

24

25

I9BHPol4                        Williams - Direct

1              (Jury present)

2              THE COURT:  You can be seated.  Thank you.

3              You can continue, Mr. Krouse.

4              MR. KROUSE:  Thank you, your Honor.

5    CICERO WILLIAMS, resumed.

6    DIRECT EXAMINATION CONTINUED

7    BY MR. KROUSE:

8    Q.  Good afternoon, Mr. Williams.

9    A.  Good afternoon.

10   Q.  When we broke for lunch, you were discussing or testifying

11   about Mr. Polk shooting Euro outside 1055 University Avenue,

12   correct?

13   A.  Yes.

14   Q.  And that was on July 25, 2015?

15   A.  Yes.

16   Q.  And you were testifying that you and Mr. Polk were driving

17   together in a silver Toyota Camry that night, correct?

18   A.  Yes.

19   Q.  And that the two of you are the only people in the car?

20   A.  Yes.

21   Q.  Now, when Mr. Polk saw Euro that night while you were

22   driving, what, if anything, did he say?

23   A.  They had an argument the night before about him selling in

24   the building.

25   Q.  And by "him," who do you mean selling in the building?

1   A.   Euro.

2   Q.   And that Euro was selling what in the building?

3   A.   Marijuana.

4   Q.   What's the building?

5   A.   1055.

6   Q.   Is that 1055 University Avenue?

7   A.   Yes.

8   Q.   You testified that this led to a dispute between Euro and

9   who else?

10  A.   Polk and Kevin and Tim.

11  Q.   What was the nature of that dispute?

12  A.   It was about him selling in the building.

13  Q.   About Euro selling in the building?

14  A.   Yes.

15  Q.   Why was he not allowed to sell in that building?

16  A.   Because that was our building.  Only we could sell in it.

17  Q.   And that goes for any type of drug, correct?

18  A.   Yes.

19  Q.   When Polk saw Euro on this night, now I'm talking about

20  July 25, 2015, what, if anything, did he do?

21  A.   Basically, we pulled up, and he told me about the situation

22  from last night, the night before, and he jumped out and

23  approached him, approached the guy.

24  Q.   Approached whom?

25  A.   Euro.

1    Q.  And you said "he jumped out."  Mr. Polk jumped out?

2    A.  Yes.

3    Q.  Of what?

4    A.  Out of the Camry.

5    Q.  The car that you were driving in?

6    A.  Yes.

7    Q.  After Mr. Polk jumped out of the Camry, what, if anything,

8    did you do?

9    A.  I jumped out with him.

10   Q.  Before Mr. Polk jumped out, did you have an opportunity to

11   see whether Mr. Polk was armed?

12   A.  Yes, before -- before he jumped out, I knew he was armed.

13   Q.  How did you know he was armed?

14   A.  He had it on his lap.

15   Q.  Had what on his lap?

16   A.  The gun.

17   Q.  Were you able to see which gun Mr. Polk had on his lap?

18   A.  It was a .40.

19   Q.  A .40 caliber?

20   A.  Yes.

21   Q.  And is that one of the pistols that you previously

22   testified was shared amongst your group?

23   A.  Yes.

24   Q.  So after you saw Mr. Polk with the pistol in his lap, what

25   did he do after that?

1    A.  He jumped out and approached him.

2    Q.  Did he take the gun with him?

3    A.  Yes.

4    Q.  Now, once Mr. Polk got out with the firearm and approached

5    Euro, what did you observe?

6    A.  They yelling back and forth at each other.

7    Q.  Who was yelling back and forth at each other?

8    A.  Euro and Polk.

9    Q.  Where were you standing when they were yelling back and

10   forth at each other?

11   A.  By the driver -- by the driver's side of the door.

12   Q.  So you were closer to the car still?

13   A.  Yes.

14   Q.  Was anyone else present that you knew during this

15   confrontation between Euro and Polk?

16   A.  Kevin and Tim.

17   Q.  Were they both also present?

18   A.  Yes.

19   Q.  Is Kevin Government Exhibit 2 that's on the board?

20   A.  Yes.

21   Q.  Is Tim Government Exhibit 4 that's on the board?

22   A.  Yes.

23   Q.  Now, after Mr. Polk and Euro were arguing, what did you

24   observe?

25   A.  Polk raising -- Polk raising a gun at him.

1   Q.  By raising the gun at him, what do you mean?

2   A.  Pointing it at him.

3   Q.  So you observed Mr. Polk point the gun at Euro?

4   A.  Yes.

5   Q.  Then what did you observe?

6   A.  Mr. Polk try to shoot him.

7   Q.  What do you mean tried to shoot him?

8   A.  Basically, the gun jammed.  It wasn't a bullet in the

9   chamber, so he looked at me, asked me what's wrong with the

10  gun.  I told him to cock the gun back.

11  Q.  Could you -- let's break that down.

12          You said there was no bullet in the chamber.  What

13  does that mean?

14  A.  It means there wasn't a bullet in that -- in the head.

15  Q.  Do you need a bullet in the head before you can fire it?

16  A.  Yes.

17  Q.  When you said "cock the gun back," what's that mean?

18  A.  That means cock it back so the bullet could go in the

19  chamber.

20  Q.  After you said that to Mr. Polk, what, if anything,

21  happened?

22  A.  He shot -- he shot -- he shot Euro.

23  Q.  Did Mr. Polk cock the gun back before he shot him?

24  A.  Yes.

25  Q.  Where were you standing or sitting at the time that the

1   shooting happened?

2   A.  I jumped in the passenger seat and was looking out the

3   window of the driver's seat -- no, of the driver's seat.

4   Q.  You jumped in the driver's side seat of the Camry?

5   A.  Yes.

6   Q.  Why'd you do that?

7   A.  I did that two reasons:  Cameras was right there, and I was

8   just getting out of that situation.

9   Q.  What did you think was about to happen?

10  A.  Somebody about to get shot.

11  Q.  You said cameras were right there.  What do you mean by

12  that?

13  A.  Cameras is -- they was right on us, so me getting out of

14  the situation 'cause I know police going to check the cameras.

15  Q.  So after Mr. Polk cocked the gun back, what did you

16  observe?

17  A.  Him shooting at him, Euro.

18  Q.  Oh, shooting at Euro?

19  A.  Yes.

20  Q.  Did you personally see Polk fire his weapon at Euro?

21  A.  Yes.

22  Q.  Did you see whether or not any of the shots hit Euro?

23  A.  No.

24  Q.  After Polk started shooting, what did you do?

25  A.  I drove off.

I9BHPol4                     Williams - Direct

1   Q.  In the Camry?

2   A.  Yes.

3   Q.  Why did you drive away?

4   A.  Once the shots fired, I figured to get out of the -- get

5   out of the scene.  Get off the scene.

6   Q.  Did you see what Polk, Kevin, and Tim did when the shots

7   started firing?

8   A.  I can't really see -- I can't really see them because I was

9   driving the car, but once he started shooting, I just rolled up

10  the block.

11  Q.  After you started driving, where did you go?

12  A.  In the back of the projects.

13  Q.  What do you mean the "back of the projects"?

14  A.  Back of the projects where Terrell live.

15  Q.  Which project building that?

16  A.  1145.

17  Q.  Is that also University Avenue?

18  A.  Yes.

19  Q.  Why did you go there?

20  A.  To get away -- to get away from the scene and police might

21  be coming to the scene.

22          MR. KROUSE:  Mr. Concepcion, can you put on the screen

23  what's in evidence as Government Exhibit 202 -- sorry, 204.

24  Q.  Mr. Williams, when you said you went to the back of the

25  projects, can you circle on the screen for the jury what you

1    mean by that.

2    A.  (Witness complies.)

3    Q.  Around that vicinity?

4    A.  Yeah.

5    Q.  That was right after the shooting, correct?

6    A.  Yes.

7    Q.  Can you also circle on the screen 1055 University Avenue

8    where the shooting occurred.

9    A.  (Witness complies.)

10          MR. KROUSE:  Let the record reflect the witness has

11   circled 1055 University Avenue as the building directly south

12   of the projects and then 1155 University Avenue as the building

13   within the projects.

14   Q.  Did you meet anyone else in this vicinity that you went

15   after the shooting?

16   A.  I met Terrell, Kevin, and Tim.

17   Q.  They also went to that location after the shooting, it

18   appears?

19   A.  Yes.

20   Q.  Did you and Polk and Kevin and Tim discuss anything while

21   you were meeting at that location?

22   A.  Just to go back down the block and try to holla at the

23   victim baby mother and tell her that it was a big

24   misunderstanding for she don't call police.

25   Q.  By "the victim," you mean Euro?

I9BHPol4                     Williams - Direct

1   A.  Yes.

2   Q.  Who knew Euro's baby's mother?

3   A.  I knew her.

4   Q.  What was the purpose of going to speak to her?

5   A.  So she don't call police and he won't come -- and he won't

6   call police.

7   Q.  By "he," you mean Euro in that sentence, correct?

8   A.  Yes.

9   Q.  Did you also decide anything else when you met in that

10  location?

11  A.  Yeah.  I asked Kevin to go down the block and pick up the

12  shells.

13  Q.  Can you explain what that means to the jury.

14  A.  It means from the situation that happened, that the handgun

15  that he had used, shells pop out of the gun once you fire it.

16  So we told Kevin to go down the block and pick up the shells so

17  police don't get them.

18  Q.  Why did you want Kevin to pick up the shells so the police

19  wouldn't get them?

20  A.  So we wouldn't get locked up.

21  Q.  Because those shells were evidence of the shooting?

22  A.  Yes.

23  Q.  Did Kevin go to pick up the shells at the scene of the

24  shooting?

25  A.  Yes.

1    Q.  After he went to pick up the shells, did he return?

2    A.  Yes.

3    Q.  How did he get back to the scene of the shooting?

4    A.  On a bike.

5    Q.  When he returned, did he have anything in his possession?

6    A.  Yes.

7    Q.  What did he have?

8    A.  Two shells.

9    Q.  How do you know Kevin had two shells when he came back?

10   A.  Because I saw them.

11   Q.  You mentioned that it was decided that someone would speak

12   to the victim's baby's mother, correct?

13   A.  Yes.

14   Q.  Who specifically went to speak to the victim's baby's

15   mother?

16   A.  It was me.

17   Q.  Did you go speak to her?

18   A.  Yes.

19   Q.  What did you say to her?

20   A.  I told her it was just a big misunderstanding and ain't

21   nothing going to happen to her baby father if he come back, and

22   the problem is dissolved, and she shouldn't worry.

23   Q.  As far as you know, did Euro cooperate with the police

24   investigation into his shooting?

25   A.  As far as I know, no.

I9BHPol4                          Williams - Direct

1   Q.  Let's now look at a video of the shooting you just

2   described.

3          Mr. Concepcion, could you please play Government

4   Exhibit 701A, which is in evidence.

5          And I'll ask you first, Mr. Williams, to press clear

6   on the screen, if you could.

7          And I'll ask you to pause in certain parts, so if you

8   could play Government Exhibit 701A.

9          (Video played)

10         MR. KROUSE:  Mr. Concepcion, could you pause here.

11  Q.  I'll ask, Mr. Williams, can you read the date and time

12  stamp on this video?

13  A.  7/25/2015.

14  Q.  Is that July 25, 2015?

15  A.  Yes.

16  Q.  And what's the timestamp say?

17  A.  12:05.

18  Q.  Is that a.m. or p.m.?

19  A.  A.m.

20         MR. KROUSE:  Mr. Concepcion, can you move ahead to

21  timestamp 12:22:24.  Could you play from this part.

22         (Video played)

23         MR. KROUSE:  Pause here.  It's at 12:22:29.

24  Q.  Mr. Williams, do you recognize the vehicle entering the

25  frame of the video here?

I9BHPol4                    Williams - Direct

1   A.  Yes.

2   Q.  What vehicle is that?

3   A.  That's the Camry we was driving.

4   Q.  Is that the silver Camry that you testified about?

5   A.  Yes.

6        MR. KROUSE:  Mr. Concepcion, can you continue playing

7   the video.

8        (Video played)

9        MR. KROUSE:  Can you pause here, 12:22:46.

10  Q.  Who got out of the driver's seat of that vehicle?

11  A.  Terrell.

12  Q.  That's Terrell Polk, the defendant?

13  A.  Yes.

14  Q.  Who got out of the passenger side of that vehicle?

15  A.  Me.

16  Q.  Who is Mr. Polk speaking to once he gets out of the video?

17  Who's sort of on the right side of the screen?

18  A.  Euro.

19       MR. KROUSE:  Mr. Concepcion, can you continue playing.

20       (Video played)

21       MR. KROUSE:  Can you pause here.

22  Q.  What does it appear that Mr. Polk and Euro are doing here?

23  A.  They discussing -- they discussing -- they discussing about

24  the situation that happened the night before.

25  Q.  And you were sort of by the car here, correct?

1    A.  Yes.

2             MR. KROUSE:  Mr. Concepcion, can you continue playing.

3             (Video played)

4             MR. KROUSE:  Pause here, please.  12:23:11.

5    Q.  Where are you now on this video?

6    A.  By that car, still by the car.

7    Q.  Where is Mr. Polk?

8    A.  On the sidewalk.

9    Q.  Where is Euro?

10   A.  On the sidewalk.

11   Q.  Sort of diagonal to Mr. Polk?

12   A.  Yes.

13            MR. KROUSE:  Mr. Concepcion, can you continue playing

14   the video.

15            (Video played)

16            MR. KROUSE:  Can you pause here, 12:23:18.

17   Q.  Mr. Williams, who's the individual walking up in the

18   striped tank top?

19   A.  Kevin.

20   Q.  Is that Kevin Government Exhibit 2?

21   A.  Yes.

22   Q.  Where are you now in this video?

23   A.  Jumping inside the driver's seat.

24   Q.  Can you remind the jury, why did you go into the driver's

25   seat of the car at this point?

1  A.  To -- to get away from the situation.

2  Q.  What did you think was about to happen here?

3  A.  Somebody's about to get shot.

4         MR. KROUSE:  Mr. Concepcion, can you continue playing

5  the video, please.

6         (Video played)

7         MR. KROUSE:  Pause here.

8  Q.  First, who is the person who just walked up in the black

9  shirt?

10  A.  Tim.

11  Q.  What is Mr. Polk doing here?

12  A.  Aiming the gun at Euro.

13  Q.  You basically answered the question, but what's in

14  Mr. Polk's hand here?

15  A.  A gun.

16  Q.  Which gun was it that you saw him take out of that car?

17  A.  A .40.

18  Q.  A .40 caliber pistol?

19  A.  Yes.

20         MR. KROUSE:  Mr. Concepcion, can you continue playing.

21         (Video played)

22         MR. KROUSE:  Pause there.

23  Q.  Can you remind the jury why Mr. Polk pointed the gun but

24  didn't fire immediately?

25  A.  Because there wasn't --

1              MR. LIND:  Objection, Judge, to repetition.

2              THE COURT:  Overruled.  He can answer.

3    A.  It wasn't a bullet in the chamber.

4    Q.  So after he tried to fire and it failed to fire, what, if

5    anything, did Mr. Polk do?

6    A.  He looked at me and asked me why it ain't firing.  I told

7    him to cock it back.

8    Q.  And then what did Mr. Polk do?

9    A.  He cocked it back and then shot him.

10             MR. KROUSE:  Mr. Concepcion, can you continue playing

11   the video.

12             (Video played)

13             MR. KROUSE:  Pause there.

14   Q.  What did Mr. Polk just do?

15   A.  He shot him.

16   Q.  At Euro?

17   A.  Yes.

18   Q.  What is Kevin doing here?  He's sort of going off the

19   screen, but what is he also doing?

20   A.  He pointed the gun at him, shooting at Euro too.

21   Q.  Do you recognize the gun Kevin was holding at this time?

22   A.  Yes.

23   Q.  What is it?

24   A.  A revolver.

25   Q.  Is that one of the revolvers or one of the guns -- is the

1    revolver one of the guns that you testified that you as a group

2    shared?

3    A.  Yes.

4    Q.  What are you doing at this point?

5    A.  Driving up the block.

6           MR. KROUSE:  Mr. Concepcion, can you continue playing

7    the video.

8           (Video played)

9           MR. KROUSE:  Pause at 12:23:52.

10   Q.  Mr. Williams, who's that running back into the frame?

11   A.  Euro.

12          MR. KROUSE:  You can continue playing, Mr. Concepcion.

13          (Video played)

14          MR. KROUSE:  You can stop there.  So that was a little

15   bit broken up.  Mr. Concepcion, can you now play the video

16   continuously from timestamp 12:22:25 to this point. This is

17   fine.

18          (Video played)

19          MR. KROUSE:  Now, Mr. Concepcion, can you go back a

20   little bit to 12:23:30.

21          (Video played)

22          MR. KROUSE:  Pause there.

23   Q.  Now, Mr. Polk is holding a gun here, correct, Mr. Williams?

24   A.  Yes.

25   Q.  Which hand is he holding the gun in?

1    A.  His left.

2    Q.  His left hand.

3           Mr. Concepcion, could you move ahead to the 12:34:33

4    timestamp.

5           (Video played)

6           MR. KROUSE:  Pause here.

7    Q.  Mr. Williams, who is this returning to the scene of the

8    shooting on a bicycle?

9    A.  Kevin.

10   Q.  And that's paused at 12:34:38 seconds.

11          Mr. Concepcion, can you play again.

12          (Video played)

13          MR. KROUSE:  Pause there, 12:34:54.

14   Q.  What does it appear that Kevin just did?

15   A.  Picking up the shells.

16   Q.  How many shells did it appear that he just picked up?

17   A.  Two.

18   Q.  Let's now look at the same shooting from a different angle.

19          Mr. Concepcion, can you please play Government

20   Exhibit 701B, which is in evidence.  Please move ahead to the

21   12:23 timestamp.

22          (Video played)

23          MR. KROUSE:  Pause here, 12:23:13.

24   Q.  Again, who's that walking up in the striped shirt,

25   Mr. Williams?

I9BHPol4                              Williams - Direct

1   A.  Kevin.

2           MR. KROUSE:  You can play, Mr. Concepcion.

3           (Video played)

4           MR. KROUSE:  Pause here.

5   Q.  Who is this that -- this is paused at 12:23:23.

6           Mr. Williams, who is this walking up in the black

7   T-shirt?

8   A.  Tim.

9           MR. KROUSE:  You can play again, Mr. Concepcion.

10  Thank you.

11          (Video played)

12  Q.  Who is that pointing another firearm at 12:23:37?

13  A.  Kevin.

14          MR. KROUSE:  Play again, Mr. Concepcion.

15          (Video played)

16          MR. KROUSE:  Pause there at 12:23:37 still.

17  Q.  Who is that in the white shirt who just ran back into the

18  video or ran into the video?

19  A.  Polk.

20  Q.  And that's Terrell Polk, the defendant?

21  A.  Yes.

22          MR. KROUSE:  You can play now, Mr. Concepcion.

23          (Video played)

24  Q.  What does it appear that these men are doing now?

25  A.  Running up the block.

1              MR. KROUSE:  Paused at 12:23:52.

2    Q.  Mr. Williams, who is that running back into the frame?

3    A.  Euro.

4              MR. KROUSE:  If you could play again, Mr. Concepcion.

5              (Video played)

6              MR. KROUSE:  Pause there, 12:23:59.

7    Q.  Do you know where Euro just entered?

8    A.  1055.

9    Q.  Is that where the entrance of 1055 University Avenue is?

10   A.  Yes.

11   Q.  You testified before that Euro lived in 1055 University

12   Avenue, correct?

13   A.  Say that again.

14   Q.  You said before that Euro lived in 1055 University Avenue,

15   is that right?

16   A.  Yes.

17   Q.  Now I'm going to show you some photographs.

18             Mr. Concepcion, can you bring on the screen Government

19   Exhibit 903, which is in evidence.

20             Mr. Williams, who's that in the back seat of the car

21   of this photograph?

22   A.  Kevin.

23   Q.  And who's that in the front passenger seat of the car?

24   A.  Tim.

25             MR. KROUSE:  Mr. Concepcion, can you bring on the

1    screen Government Exhibit 904, which is in evidence.

2    Q.   Who is this a photograph of?

3    A.   Kevin.

4    Q.   What's Kevin wearing in this photograph?

5    A.   Tank top, striped shirt.

6    Q.   What about on the bottom half?

7    A.   Blue -- blue shorts.

8    Q.   What kind of shoes?

9    A.   White sneakers.

10          MR. KROUSE:   Mr. Concepcion, can you bring on the

11   screen Government Exhibit 701B-1, which is in evidence.

12   Q.   Who's that person in this still shot from the surveillance

13   video?

14   A.   Kevin.

15   Q.   Is it fair to say he's wearing the same thing?

16   A.   Yes.

17          MR. KROUSE:   Mr. Concepcion, can you bring on the

18   screen Government Exhibit 905, which is in evidence.

19   Q.   Who's this a photograph of?

20   A.   Tim.

21   Q.   And what's Tim wearing?

22   A.   Black T-shirt.

23   Q.   Does he have any jewelry on?

24   A.   Yes.

25   Q.   What kind of jewelry?

I9BHPol4                         Williams - Direct

1    A.  A little chain on.

2           MR. KROUSE:  Mr. Concepcion, can you bring on the

3    screen Government Exhibit 701B-2, which is in evidence.

4    Q.  Who's this person?

5    A.  Tim.

6    Q.  Fair to say he's wearing the same thing?

7    A.  Yes.

8    Q.  Mr. Williams, you just testified this first shooting

9    happened on July 25, 2015, correct?

10   A.  Yes.

11   Q.  Directing your attention to about ten days later, August 4,

12   2015, can you tell the jury what happened that day.

13   A.  Somebody got shot.

14   Q.  Who got shot?

15   A.  A kid named Ryan.

16   Q.  And who shot Ryan?

17   A.  Terrell.

18   Q.  And that's Terrell Polk, the defendant?

19   A.  Yes.

20   Q.  Did you know Ryan?

21   A.  Yes, from the neighborhood.

22   Q.  How did you know him?

23   A.  From the neighborhood, just being out there.

24   Q.  And do you know what Ryan did to support himself?

25   A.  Sold crack cocaine.

1    Q.  Did you know him to sell crack cocaine?

2    A.  Yes.

3    Q.  Were you present when Polk shot Ryan?

4    A.  No.

5    Q.  How did you learn about this shooting?

6    A.  From him telling me.

7    Q.  When did Mr. Polk tell you that he shot Ryan?

8    A.  When I went to his house.

9    Q.  When in relation to the shooting did you go to his house?

10   A.  That day in, like, the afternoon.  About 12:00, 1 o'clock.

11   Q.  So you went to Mr. Polk's house around 12:00 or 1 o'clock?

12   A.  Yes.

13   Q.  And did Mr. Polk say when he committed the shooting?

14   A.  Early in the morning sometime.

15   Q.  So earlier that same day?

16   A.  Yes.

17   Q.  Where did Mr. Polk tell you the shooting took place?

18   A.  On 162 and Anderson.

19   Q.  By "Anderson," you mean Anderson Avenue?

20   A.  Yes.

21   Q.  And 162 is 162nd Street?

22   A.  Yes.

23        MR. KROUSE:  Mr. Concepcion, can you put on the screen

24   Government Exhibit 201, which is in evidence.

25   Q.  Mr. Williams, is 162nd Street on this map?

1   A.  Yes, it is.

2   Q.  Is Anderson Avenue on this map?

3   A.  Yes.

4   Q.  Can you circle the intersection of those two streets.

5   A.  (Witness complies.)

6   Q.  Did Mr. Polk say whether the shooting happened inside or

7   outside?

8   A.  Said it was inside a grocery store.

9   Q.  Inside of a store, he said?

10  A.  Yeah.

11          MR. KROUSE:  Mr. Concepcion, can you put on the

12  witness screen what's been marked as Government Exhibit 535 for

13  identification, just for the witness.

14  Q.  Mr. Williams, could you clear that circle.

15          Mr. Williams, do you recognize this photograph?

16  A.  Yes.

17  Q.  What does it depict?

18  A.  It's Anderson, 162 and Anderson.

19  Q.  Is this a fair and accurate photograph of this area of the

20  Bronx, 162 and Anderson?

21  A.  Yes.

22          MR. KROUSE:  The government offers Government

23  Exhibit 535.

24          MR. LIND:  I have no objection.

25          THE COURT:  It will be admitted into evidence.

1         (Government's Exhibit 535 received in evidence)

2             MR. KROUSE:  May we publish the defendant, your Honor?

3             THE COURT:  Yes.

4         (Photograph published to the jury)

5    BY MR. KROUSE:

6    Q.  Do you know where in this photograph the shooting happened?

7    A.  In the deli, deli store right there.

8    Q.  What's the sign say of that store?

9    A.  Tobacco shop deli.

10            MR. KROUSE:  Let the record reflect it's towards the

11   right portion of that photograph.

12            Mr. Concepcion, can you put on the screen what's been

13   marked as Government Exhibit 534 for identification.

14   Q.  Is this a photograph of the same building, just a different

15   angle?

16   A.  Yes.

17            MR. KROUSE:  Actually, I think this is already in

18   evidence.  Could Mr. Concepcion publish the exhibit, please.

19            (Photograph published to the jury)

20   Q.  Can you point out in a moment for the jury where the

21   shooting took place.

22   A.  (Witness complies.)

23            MR. KROUSE:  Let the record reflect Mr. Williams is

24   circling the tobacco deli and tobacco shop in Government

25   Exhibit 534.

1   Q.  Now, Mr. Williams, what specifically did Mr. Polk tell you

2   about how the shooting happened at this store?

3   A.  He had saw him earlier in the morning, and he was driving

4   and he had saw him, and he hopped out on him and chased him

5   inside the store.

6   Q.  When you said he saw him, who saw who?

7   A.  Terrell saw Ryan.

8   Q.  And you said Terrell was driving, correct?

9   A.  Yes.

10  Q.  Did he say which vehicle he was driving?

11  A.  The silver Camry we were driving.

12  Q.  Is that the same silver Camry from the first shooting,

13  July 25, 2015?

14  A.  Yes.

15  Q.  When you said Terrell said he hopped out on him, can you

16  describe to the jury what that means.

17  A.  That means he -- he hopped out on him, like, to confront

18  him.

19  Q.  To confront whom?

20  A.  Ryan.

21  Q.  And what did Mr. Polk say happened after he jumped out of

22  the car and confronted Ryan?

23  A.  He said once he jumped out of the car, he started running.

24  Q.  Ryan started running?

25  A.  Yeah.

1   Q.  Did Mr. Polk say whether he was carrying anything when he

2   got out of the car?

3   A.  Yeah.

4   Q.  What did he say he had on him?

5   A.  Shotgun.

6   Q.  Once Ryan started running from Mr. Polk, what did Mr. Polk

7   say happened?

8   A.  He ran inside the store, tried to lock himself in the

9   bathroom.

10  Q.  What did Mr. Polk say he did after Ryan tried to lock

11  himself in the bathroom?

12  A.  He said he started kicking on the door, but they was

13  holding the door.  He was holding the door, and he shot through

14  the -- he shot through the door.

15  Q.  Shot through the door with what weapon?

16  A.  With the shotgun.

17  Q.  Did Mr. Polk say whether he shot one time or multiple

18  times?

19  A.  Once.

20  Q.  A single shot with the shotgun?

21  A.  Yes.

22  Q.  Now, is this the same shotgun you previously testified was

23  one of the guns shared by you and your crew?

24  A.  Yes.

25  Q.  Can you describe that shotgun.

1    A.  Silver, short, had tape on the handle.

2    Q.  By "short," you said before that's a sawed-off shotgun?

3    A.  Yes.

4    Q.  When Mr. Polk told you about this shooting, did he say

5    whether he was looking for Ryan that day or just happened to

6    see him?

7    A.  Basically, he would say he was looking for him from

8    previous situation that had occurred.

9    Q.  Did Mr. Polk expect to see Ryan at this 12 o'clock time

10   frame that day?

11   A.  I don't think he expected to see him.

12   Q.  So he just happened to see him and then jumped out on him?

13   A.  Yes.

14   Q.  Now, was Mr. Polk injured at all in this shooting?

15   A.  Yes.

16   Q.  How was he injured?

17   A.  On his hand.

18   Q.  Can you describe how he was injured or what the injury

19   appeared to be?

20   A.  From the blast of the shotgun, the hammer on the shotgun

21   caught his hand, and it had ripped his hand.

22          MR. KROUSE:  Mr. Concepcion, could you please play

23   Government Exhibit 702A, which is in evidence.

24          Mr. Williams, before that could you press clear on

25   your screen.  Thank you.

1              (Video played)

2              MR. KROUSE:  Can you pause here, Mr. Concepcion.

3    Q.  Mr. Williams, do you recognize this vehicle that's just

4    driven onto the screen of this video surveillance?

5    A.  Yes.

6    Q.  What vehicle is it?

7    A.  Silver Camry.

8    Q.  And that's the same vehicle you were in on the July 25,

9    2015, shooting?

10   A.  Yes.

11             MR. KROUSE:  Mr. Concepcion, can you please play the

12   video.

13             (Video played)

14             MR. KROUSE:  Can you pause there.

15   Q.  Mr. Williams, what are people on the street doing after the

16   individual ran into the store?

17   A.  They running.

18   Q.  Mr. Williams, you just said that Mr. Polk told you he shot

19   Ryan on this day, correct?

20   A.  Yes.

21   Q.  And that he ran, chased Ryan into this store, and shot

22   through the door?

23   A.  Yes.

24   Q.  And you mentioned that Ryan sells drugs as well, correct?

25   A.  Yes.

1    Q.  Was Ryan associated with other people in the neighborhood?

2    A.  Yes, a lot of people.

3    Q.  Who else was he associated with?

4    A.  "Bubba," PJ, a lot of people.

5    Q.  Before Ryan was shot, were you aware of a confrontation

6    that Polk had with other people associated with Ryan?

7    A.  Yes.

8    Q.  Where did that confrontation take place?

9    A.  In Nelson park.

10          MR. KROUSE:  Mr. Concepcion, can you put on the screen

11   Government Exhibit 202, which is in evidence.

12   Q.  Mr. Williams, is Nelson park on this screen?

13   A.  Yes.

14   Q.  Could you circle it for the jury.

15   A.  (Witness complies.)

16          MR. KROUSE:  Let the record reflect the witness is

17   circling a landmark labeled "Nelson Playground."

18   Q.  Can you tell the jury about what happened during that

19   confrontation.

20   A.  A kid named Bubba took Kevin out of the park with a gun;

21   told him he can't be in the park.

22   Q.  By "took Kevin out of the park," what do you mean by that?

23   A.  He pulled the gun out on him and told him to get out the

24   park.

25   Q.  Who did that?

1   A.   A kid named Bubba.

2   Q.   Kevin's the same Kevin that you've been testifying about,

3   correct?

4   A.   Yes.

5   Q.   After Bubba pulled the gun on Kevin, what, if anything, did

6   Kevin do?

7   A.   He came and got me and Terrell.

8   Q.   And he told you what happened?

9   A.   Yes.

10  Q.   What did you and Terrell do then?

11  A.   We went back to the park and -- with our guns and

12  approached Bubba.

13  Q.   You said you went back with your guns.  What gun did you

14  have?

15  A.   I had a .40 on me.

16  Q.   What gun did Kevin have, if any?

17  A.   He had the resolver.

18  Q.   What gun did Polk have, if any?

19  A.   And he had an assault rifle.

20  Q.   Are those three guns three of the guns that you testified

21  about sharing with the rest of the members of the crew?

22  A.   Yes.

23  Q.   What about the other side?  Did anyone on that side have a

24  gun?

25  A.   Bubba.

1          MR. KROUSE:  Mr. Concepcion, can you put on the screen

2     just for the witness what's been marked for identification as

3     Government Exhibit 531.

4          Mr. Williams, could you press clear on your screen.

5     Thank you.

6     Q.  Do you recognize this photograph?

7     A.  Yes.

8     Q.  What is it?

9     A.  A picture of Nelson park.

10         MR. KROUSE:  The government offers Government

11    Exhibit 531.

12         MR. LIND:  No objection.

13         THE COURT:  It will be admitted into evidence.

14         (Government's Exhibit 531 received in evidence)

15         MR. KROUSE:  May we publish the exhibit, your Honor?

16         THE COURT:  Yes.

17         (Photograph published to the jury)

18    BY MR. KROUSE:

19    Q.  Is this where the armed confrontation between -- I'll wait.

20         Is this where the armed confrontation between you,

21    Mr. Polk and Kevin and Bubba on the other side happened?

22    A.  Yes.

23    Q.  Was anyone shot as a result of this armed confrontation in

24    Nelson park?

25    A.  No.

1    Q.   Why was no one shot?

2    A.   It was a lot of kids in the park.

3    Q.   What happened after you had the armed standoff?

4    A.   We left the park.

5    Q.   Around how long after this confrontation in Nelson park did

6    Polk shoot Ryan?

7    A.   Probably a day or two later.

8    Q.   What was Ryan's relationship with Bubba?

9    A.   They friends.

10   Q.   Did Polk say anything to you about Ryan after he shot him?

11   A.   Say that again.

12   Q.   Did Polk say anything about Ryan when he told you that he

13   had shot him?

14   A.   Just that he shot him.

15   Q.   Did he say anything about Ryan himself?

16   A.   That he caught one of them, you know, from -- for his

17   friend doing that to our friend, that's all.

18        MR. LIND:   I couldn't hear the witness, Judge.   Could

19   he repeat his answer.

20        THE COURT:   Could you just speak up closer to the mic.

21   A.   He told me that he caught Ryan, he shot Ryan, on payment as

22   Bubba doing it to -- pulling the gun out on my friend.

23   Q.   So because Bubba pulled a gun on Kevin, Polk shot Ryan?

24   A.   Yes.

25   Q.   You testified that Mr. Polk drove a silver Camry when he

I9BHPol4                          Williams - Direct

1   shot Euro on July 25, 2015, correct?

2   A.  Yes.

3   Q.  And you testified that Mr. Polk drove the same silver Camry

4   when he shot Ryan on August 4, 2015, correct?

5   A.  Yes.

6   Q.  Did you know where that Camry came from?

7   A.  It came from a female that live in Highbridge that we

8   supply drugs to.

9   Q.  Was she a crack customer of yours?

10  A.  Yes.

11  Q.  Did you sell her crack?

12  A.  Yes.

13  Q.  Did Mr. Polk also sell her crack?

14  A.  Yes.

15  Q.  What was this customer's name?

16  A.  Dee Dee.

17  Q.  How long have you known Dee Dee?

18  A.  Ever since I came home from jail in 2012.

19  Q.  And did Polk also know Dee Dee?

20  A.  Yes.

21  Q.  How did Polk know Dee Dee?

22  A.  The same way I knew her, from being on the block, buying --

23  buying crack.

24  Q.  Why was Polk able to use the silver Camry if it belonged to

25  Dee Dee?

1    A.  For a favor.  For a favor.  We use the car, we give her

2    drugs.

3    Q.  How much crack was Polk required to give to Dee Dee in

4    return for using her car?

5    A.  It depends.  You might give her ten dimes, ten cracks.

6    Q.  About $100 worth of crack?

7    A.  Yeah, like, two days, something like that.

8            MR. KROUSE:  Mr. Concepcion, could you show the

9    witness only what's been marked for identification as

10   Government Exhibit 7.

11   Q.  Mr. Williams, do you recognize this person?

12   A.  Yes.

13   Q.  Who is it?

14   A.  Dee Dee.

15           MR. KROUSE:  The government offers Government

16   Exhibit 7.

17           MR. LIND:  No objection.

18           THE COURT:  It will be admitted into evidence.

19           (Government's Exhibit 7 received in evidence)

20           MR. KROUSE:  The government also offers Government

21   Exhibit 7A, a nameplate with the name Dee Dee.

22           THE COURT:  Any objection?

23           MR. KROUSE:  7B, your Honor.

24           MR. LIND:  No, I have no objection.

25           THE COURT:  It would be admitted into evidence.

1            (Government's Exhibit 7B received in evidence)

2            MR. KROUSE:  May we publish the exhibit, your Honor?

3            THE COURT:  Yes.

4            (Photograph published to the jury)

5            MR. KROUSE:  Mr. Concepcion.

6    BY MR. KROUSE:

7    Q.  Do you recall what state license plate was on the Camry,

8    Mr. Williams?

9    A.  Florida plates.

10           MR. KROUSE:  Mr. Concepcion, could you show the

11   witness what's marked for identification as Government

12   Exhibit 538.

13   Q.  Mr. Williams, do you recognize this photograph?

14   A.  Yes.

15   Q.  What is it?

16   A.  The Camry we were driving.

17   Q.  And that's the silver Camry with the Florida plates?

18   A.  Yes.

19           MR. KROUSE:  The government offers Government

20   Exhibit 538.

21           MR. LIND:  No objection.

22           THE COURT:  It will be admitted into evidence.

23           (Government's Exhibit 538 received in evidence)

24           MR. KROUSE:  May we publish the exhibit, your Honor?

25           THE COURT:  Yes.

1              (Exhibit published to the jury)

2              MR. KROUSE:  Mr. Concepcion, could you also show the

3    witness what's been marked for identification as 537 and 536 in

4    order.

5    BY MR. KROUSE:

6    Q.  On 536 -- excuse me, on 537, Mr. Williams, do you recognize

7    this exhibit?

8    A.  Yes.

9    Q.  What is it?

10   A.  The Camry we was driving.

11   Q.  And moving to Government Exhibit 536.  Mr. Williams, do you

12   recognize this photograph?

13   A.  Yes.

14   Q.  What is it?

15   A.  The Camry we was driving, inside the Camry.

16   Q.  Excuse me?

17   A.  The inside of the Camry we was driving.

18             MR. KROUSE:  The government offers Government

19   Exhibit 537 and 536.

20             MR. LIND:  No objection.

21             THE COURT:  It will be admitted into evidence.

22             (Government's Exhibits 536 and 537 received in

23   evidence)

24             MR. KROUSE:  Mr. Concepcion, can you publish

25   Government Exhibit 537.

1              (Photograph published to the jury)

2     BY MR. KROUSE:

3     Q.  Mr. Williams, is this a picture of the Camry in the front?

4     A.  Yes.

5              MR. KROUSE:  Mr. Concepcion, could you publish 536.

6              (Photograph published to the jury)

7     Q.  And what is this a photo of?

8     A.  The inside of the Camry.

9              MR. KROUSE:  Mr. Concepcion, can you put on the screen

10    Government Exhibit 900A, which is in evidence.  Could you play

11    this video.

12             (Video played)

13             (Continued on next page)

14

15

16

17

18

19

20

21

22

23

24

25

```
 1              MR. KROUSE:  Can we pause here, Mr. Concepcion.
 2    Q.  Who are the three people in this vehicle, Mr. Williams?
 3    A.  Kevin, Polk and Tim.
 4    Q.  Who is seated where?
 5    A.  Tim is in the passenger, Kevin is in the backseat, and
 6    Terrell is driving.
 7    Q.  Do you recognize the interior of this vehicle that is in
 8    this video?
 9    A.  Yes.
10    Q.  Which vehicle is it?
11    A.  Camry.
12    Q.  The same silver Camry that was used in both shootings?
13    A.  Yes.
14    Q.  After the shooting on August 4th, 2015, did you or Mr. Polk
15    continue to drive that Camry?
16    A.  No.
17    Q.  Why not?
18    A.  Because it had been -- been on the news and it is too hot
19    to be driving.
20    Q.  What do you mean by "it is too hot to be driving"?
21    A.  It means police might being be looking for it.
22    Q.  Because of its involvement in crime?
23    A.  Yes.
24    Q.  So what did you or Mr. Polk do with the silver Camry after
25    it had been involved in these two shootings?
```

1   A.  Gave it back to the person.  Gave it back to the person who

2   rented the car.

3   Q.  You said the person who rented the car.  What was your

4   understanding of how Dee Dee had access to this Camry?

5   A.  She rented it.  She got it off her credit card or she paid

6   for it.

7   Q.  She didn't own the vehicle; correct?

8   A.  No.

9   Q.  Once you gave the vehicle back to Dee Dee, did there come a

10  time that Mr. Polk started driving a different vehicle?

11  A.  Yes.

12  Q.  How did you learn about this different vehicle Mr. Polk was

13  using?

14  A.  He bought a vehicle from some guy he knew.

15  Q.  What kind of vehicle had he bought?

16  A.  Chrysler.

17  Q.  This was a vehicle that Mr. Polk purchased?

18  A.  Yes.

19  Q.  Was it properly registered with the authorities?

20  A.  I don't think so.

21  Q.  Did you go back to federal prison on August 13th, 2015?

22  A.  Yes.

23  Q.  So around nine days after the second shooting?

24  A.  Yes.

25  Q.  Why did you go back to prison?

1    A.   Dirty urine.  Smoking marijuana and not reporting to my

2    probation officer.

3    Q.   Were you also on supervised release at that time?

4    A.   Yes.

5    Q.   We'll get into that later, but were those violations of the

6    terms and conditions of your supervised release?

7    A.   Yes.

8    Q.   Is that why you went back to federal prison?

9    A.   Yes.

10   Q.   Did Mr. Polk purchase the Chrysler before or after you went

11   back to federal prison on August 13th?

12   A.   Before.

13   Q.   Did you later learn about a car stop involving Mr. Polk,

14   Mr. Corbett and Mr. Smith that occurred while you were in

15   prison?

16   A.   Yes.

17   Q.   To be clear you were in prison at the time of that car

18   stop; correct?

19   A.   Yes.

20   Q.   Did you get out of prison on October 2015?

21   A.   Yes.

22   Q.   A couple months later?

23   A.   Yes.

24   Q.   When you got out of prison, did you learn about that car

25   stop from anyone who you sold drugs with?

I9b6pol5                         Williams - direct

1    A.   Yes.

2    Q.   Who did you learn about that car stop from?

3    A.   Buddha Man.

4    Q.   Buddha Man is Jamel Moss, Government Exhibit 3?

5    A.   Yes.

6    Q.   What did Buddha Man tell you about that car stop?

7          MR. LIND:  I will object to that, Judge.  It is

8    hearsay.

9          THE COURT:  I am going to sustain that.

10         MR. KROUSE:  Your Honor, I will lay a foundation for a

11   coconspirator statement.

12         MR. LIND:  I don't like these comments, Judge.

13         THE COURT:  Don't argue in front of the jury.

14         MR. LIND:  I apologize.

15         THE COURT:  Both of you.

16   BY MR. KROUSE:

17   Q.   Mr. Williams, when you got off prison in October 2015, did

18   you continue committing crimes?

19   A.   Yes, I did.

20   Q.   What crimes did you continue to commit?

21   A.   Selling crack cocaine and possession of handguns.

22   Q.   Who did you continue to commit those crimes with in October

23   of 2015?

24   A.   Jamel Moss and Tim.

25   Q.   Now, you just testified that there was a car stop involving

1    a gun in August 2015; correct?

2    A.  Yes.

3    Q.  When you got out in October of 2015, was Mr. Polk in or out

4    of jail on that charge?

5    A.  In jail.

6    Q.  Was Kevin in or out of jail on that charge?

7    A.  In jail.

8    Q.  Was Tim in or out of jail on that charge?

9    A.  He was out.

10   Q.  What about Mr. Moss?

11   A.  He was out.

12   Q.  Do you know why Tim was out?

13   A.  I think he got bailed out.

14   Q.  After you got out on your own charge and you continued

15   selling drugs, who were the two people you worked with you just

16   said?

17   A.  Buddha Man and Tim.

18   Q.  Did you continue committing other crimes?

19   A.  Yes.

20   Q.  What other crimes did you commit with those two men?

21   A.  Having guns on me.  Possession of guns -- firearms.

22   Q.  After you got out, did you learn about the details of the

23   August 2015 car stop that occurred while you had been in jail?

24   A.  Yes.

25   Q.  Who did you learn about the details of that car stop from?

I9b6pol5                          Williams – direct

1    A.   Buddha.

2    Q.   Is Buddha Man Jamel Moss?

3    A.   Yes.

4    Q.   He is the individual you were selling drugs with before you

5    went in jail and then after; correct?

6    A.   Yes.

7    Q.   What did Mr. Moss tell you about the details around that

8    stop?

9              MR. LIND:  Objection again, Judge.

10             THE COURT:  Why don't we do this:  Ladies and

11   gentlemen, we'll take a 15-minute break.  Don't discuss the

12   case.  Keep an open mind.  We'll resolve this so we can save

13   some time.

14             (Jury excused)

15             THE COURT:  You can step down.

16             (Witness excused)

17             (Continued on next page)

18

19

20

21

22

23

24

25

1              (In open court; jury not present)

2              THE COURT:  Mr. Krouse, what did you intend to elicit

3    from this?

4              MR. KROUSE:  Your Honor, the government intends to

5    elicit that Mr. Moss told Mr. Polk about the nature of --

6              THE COURT:  Slow down.

7              Mr. Moss told?

8              MR. KROUSE:  Mr. Williams, excuse me, about the

9    circumstances of this car stop that occurred while Mr. Williams

10   was incarcerated.

11             THE COURT:  Okay.

12             MR. KROUSE:  We believe we have laid the proper

13   foundation that this was an ongoing criminal conspiracy that

14   Mr. Polk was a part of.  We believe this is in the nature of an

15   update for the status of the conspiracy for Mr. Williams.  And

16   Mr. Williams is in prison and he gets out of prison and Mr.

17   Moss is telling him why Mr. Polk and that Kevin Corbett -- Mr.

18   Corbett are no longer around.  They were stopped in this

19   vehicle.  There was a gun in the vehicle.  Mr. Moss told Mr.

20   Williams what the gun was and that they were incarcerated as a

21   result.  It is actually a fairly limited --

22             THE COURT:  What is the purpose?

23             MR. KROUSE:  The further purpose would be to establish

24   that this was a gun that was not familiar to Mr. Williams.  One

25   of the things that Mr. Lind intends to argue we believe based

1   on previous comments and based on his opening is that this gun

2   that was seized in the car stop on August 26th did not have

3   Mr. Polk's DNA on it.

4            THE COURT:  Okay.

5            MR. KROUSE:  In one of the phone calls Mr. Polk says,

6   My DNA is not going to be on that gun.  You have to handle the

7   gun wild times, many times, for your DNA to be on it.  Mr.

8   Williams's testimony that Mr. Moss told him that the gun that

9   was seized in the August 26th car stop was a new gun, not a gun

10  they had previously used in committing their crimes, which in

11  the government's view would go a long way to explaining why

12  Mr. Polk's DNA is not on the gun and the two coconspirators'

13  DNA is on it.  Mr. Polk would not have handled it.

14           THE COURT:  In what way is the conspiracy to sell

15  drugs continuing after all of the defendants have been

16  arrested?

17           MR. KROUSE:  So, your Honor, I believe the testimony

18  is that Mr. Moss and Mr. Smith are both out.  Mr. Williams is

19  out.  The only two people incarcerated are Mr. Polk and

20  Mr. Corbett.

21           THE COURT:  Who is selling drugs?

22           MR. KROUSE:  I believe the testimony is that Mr.

23  Williams is selling drugs with Mr. Moss.

24           THE COURT:  No.  Mr. Williams is in jail.

25           MR. KROUSE:  Once Mr. Williams is out.

I9b6pol5                         Williams - direct

1          THE COURT:  Okay.

2          MR. KROUSE:  He is only in jail for 60 days.

3          THE COURT:  I don't remember any testimony that he was

4   selling drugs after he got out of prison.

5          MR. KROUSE:  I believe there is testimony.  I can go

6   back over that ground.  There is some testimony.  I believe I

7   asked the witness:  When you were released from prison on your

8   supervised release violation, did you continue committing

9   crimes?  And he said, Yes.  And I said, Which crimes?  He said,

10  selling drugs and carrying firearms.  I said, Who did you

11  commit those crimes with?  He said, I committed them with Mr.

12  Moss and Tim Smith, because Kevin and Moss were incarcerated at

13  the time.

14          I believe that was the testimony, but I can also go

15  over it.  Assuming that we're able to establish that, we

16  believe that the conspiracy is ongoing.  There would also be

17  further testimony.  It is out of order, but I could go to that

18  to cover the fact that Mr. Polk was then released on the gun

19  charge in December of 2016.  And Mr. Williams was told by a

20  coconspirator that Mr. Polk had taken over drug sales or crack

21  cocaine sales in a building that Mr. Williams previously was

22  controlling before he went in on his federal charge that he is

23  incarcerated on now.  So our view is that the conspiracy then

24  as to Mr. Polk he rejoined the conspiracy in December of 2016

25  and then there has already been testimony that on February 2017

I9b6pol5                    Williams - direct

1    the search was executed on Mr. Polk's residence and crack

2    cocaine was recovered.

3            As your Honor knows the timeline of the conspiracy as

4    charged is 2013 to 2017.  The government fully acknowledges

5    that Mr. Polk was incarcerated for periods of time during that

6    charged period; but we believe that there is evidence that

7    would show that the conspiracy continued after August 26, 2015

8    in general because there were still people out -- Mr. Moss, Mr.

9    Williams and Mr. Smith.  But even as to Mr. Polk, the

10   conspiracy continued because he was continuing to sell drugs

11   once he got out in December of 2016 and continued doing that

12   until he was arrested in February of 2017.

13           THE COURT:  I am not sure I understand how this

14   conversation furthered that conspiracy, that it was in

15   furtherance of the conspiracy.

16           MR. KROUSE:  I think it is in furtherance of it, your

17   Honor, because it was to update a core member of the conspiracy

18   about what happened while he was in prison.  So Mr. Williams is

19   in prison from August 13th until October of 2015.  So a period

20   of around 60 days.  I think he got a little bit of good time in

21   there.  So he is in prison and he gets out.  Mr. Moss is giving

22   him the update about what happened while he was gone.

23           Three of their coconspirators were arrested with a gun

24   in their car.  Two of them remained incarcerated.  Mr. Williams

25   wanted to know which gun was seized, and he found out it was a

1   new gun.  We believe that that is relevant evidence especially

2   in light of the fact that Mr. Lind is going to and has made a

3   big deal in his opening about the fact that the DNA of Mr. Polk

4   is not on that gun.  That is a fact and that will be elicited

5   by the government from the DNA expert; but it is a fact that

6   can be explained in part by the fact that this is a new gun, at

7   least according to Mr. Moss in updating Mr. Williams about the

8   status of the conspiracy.

9              THE COURT:  Just remind me what kind of handgun was it

10  in the car, a .40?

11             MR. KROUSE:  In the car stop it was a 9-millimeter

12  pistol.

13             THE COURT:  A 9 millimeter?

14             MR. KROUSE:  Yes, your Honor.

15             THE COURT:  We haven't had the testimony I don't

16  believe yet as to these shells, that the shells at the shooting

17  were not a 9 millimeter shell.

18             MR. KROUSE:  No, your Honor.  That is the .40.

19             THE COURT:  Okay.  That is a different gun.

20             I don't remember what did he testify to about a

21  9-millimeter?

22             MR. KROUSE:  He testified they also had a 9-millimeter

23  pistol, your Honor, as one of their five guns that they shared;

24  but his testimony would be that the one that was seized was not

25  that gun.  It was a new gun according to Mr. Moss.  While Mr.

1    Williams was gone, a new gun was procured and that was the gun

2    that was seized in the vehicle.

3            THE COURT:  You said that there is something on the

4    tape about this that you intend to play?

5            MR. KROUSE:  Well, just that Mr. Polk then in his

6    prison phone calls says, My DNA is not going to be on that gun.

7    You have to handle the gun wild times to get your DNA on it.

8    And Mr. Williams will explain wild times means many times.  So

9    part of the government's explanation to the extent it needs to

10   be explained for why Mr. Polk's DNA is not on the gun is that

11   he didn't handle this gun many times because it was a new gun.

12           THE COURT:  Remind me which charge is involved with

13   this gun?

14           MR. KROUSE:  So the government's view is we can

15   convict on all charges.

16           THE COURT:  Well, I want to know specifically.

17   Obviously the last count is possession of ammunition.  So that

18   is nothing to do with this gun.

19           MR. KROUSE:  Correct, your Honor.

20           THE COURT:  The count before that is using and

21   brandishing a weapon in furtherance of a drug conspiracy.

22           MR. KROUSE:  And discharging.  Yes, your Honor.  So

23   using, possessing and brandishing.

24           THE COURT:  That is not this gun?

25           MR. KROUSE:  It could be this gun.

1            THE COURT:  Well, what evidence is there that this gun

2       was brandished or fired?

3            MR. KROUSE:  If the jury decided that they wanted to

4       only convict on the use or possession of firearms in

5       furtherance of drug trafficking, they could convict based on

6       this gun that was found in the car, that this was a gun that

7       was being used and possessed in furtherance of the drug

8       trafficking conspiracy by the members of the conspiracy and

9       that Mr. Polk either aided or abetted that or knew about that

10      himself.

11           THE COURT:  You proposed a verdict sheet?

12           MR. KROUSE:  We did not yet, your Honor.

13           THE COURT:  You are going to have to articulate the

14      proof, what it is that you say is included in that count.  It

15      is clear that that gun was neither brandished nor fired at this

16      point.  Maybe there will be evidence, but I assume that your

17      position is not that that was the gun that was brandished or

18      fired?

19           MR. KROUSE:  No, your Honor.  That is correct.

20           THE COURT:  So that is not the basis on which you are

21      charging him.  In what way do you claim that that gun is a part

22      of this charge?

23           MR. KROUSE:  Your Honor, may I have one moment?

24           THE COURT:  Sure.

25           (Pause)

1            MR. LIND:  Judge, also if the government could show me

2       the reference to where he says it you have to handle it a lot

3       of times for your DNA to be on it.  I didn't see it here.

4            THE COURT:  I did see that.  What transcript is that?

5       I think it is the second transcript maybe.

6            MR. KROUSE:  It's 806 T.

7            THE COURT:  The way it is charged, you clearly do not

8       contend that that gun was brandished or discharged.

9            MR. KROUSE:  That's correct, your Honor.

10           THE COURT:  Okay.

11           MR. KROUSE:  But on the verdict sheet what we think

12      the verdict sheet will have is a part that says were the guns

13      used or possessed in furtherance of the drug trafficking

14      activity in this case.  That is guilty or not guilty.  The next

15      question is were the guns brandished.  The next question is

16      were the guns discharged.  It is possible that the jury could

17      conclude that Mr. Polk is guilty of the first part of that

18      question, was a gun possessed, because this is the only

19      physical gun that is in evidence in this case.  The others are

20      ones used in videos.  It is possible that in deliberations the

21      jury could say, Well, we know this gun was possessed and

22      carried and it was by members of the drug conspiracy and we

23      don't believe the argument by the defense that his DNA not

24      being on it somehow means he had no idea it was there.  So

25      we'll convict him on the possession and use and carry of a

1    firearm in furtherance of drug trafficking and then not convict

2    him on brandish and discharge.  They can base that on the

3    single gun that is now in evidence.

4             THE COURT:  That would be a little difficult since you

5    contend that you got him on video shooting two people.

6             MR. KROUSE:  That's what our contention is, your

7    Honor, but it is possible that --

8             THE COURT:  You think it is really possible the jury

9    could find that.  It would be a repugnant verdict for the jury

10   to find that he possessed one gun and didn't brandish and fire

11   others?

12            MR. KROUSE:  It is possible, your Honor.  Our view of

13   the proof is that it is not a likely or correct verdict, but it

14   is possible.  So the government does want to retain the ability

15   to argue -- and we have admitted this gun into evidence.  The

16   gun is here.  The car stop is in -- that this was a firearm

17   carried and used and possessed in furtherance of the drug

18   conspiracy.  Mr. Lind can make all his arguments about how DNA

19   exclusion means that Mr. Polk was completely blind to the fact

20   that the gun was in his car.  We can make the countervailing

21   arguments that it wasn't and he knew it was there.  He just

22   didn't handle it wild times and so therefore his DNA wasn't on

23   it.

24            Our view is the gun is fair game for Count Three and

25   we want to remain the ability to argue it and this

1    coconspirator statement that the gun that was seized from that

2    vehicle was a new gun is helpful to that argument and I think

3    it is clearly in furtherance of the conspiracy because Mr. Moss

4    was updating Mr. Williams about the status of the conspiracy.

5                THE COURT:  Mr. Lind.

6                MR. LIND:  Well, I object, Judge.  Obviously I think

7    that it is historical.  He is telling him about a historical

8    matter.

9                Also, I think is it a real stretch about this whole

10   thing with DNA.  How many times do you have to touch it for it

11   to be on the gun?

12               THE COURT:  At least once.

13               MR. LIND:  Right.  I don't think that that is there.

14               Also, Judge, this whole idea of possession, it is

15   possession only that presumption theory in state court.  I

16   don't know if that applies here.  He doesn't have constructive

17   possession.  He doesn't have actual possession of it.  There is

18   no dispute about that.  So what is his constructive possession

19   of that gun?  The presumption theory that you can use in state

20   court doesn't apply here I submit.

21               MR. KROUSE:  I believe the constructive possession

22   instruction would be included here and constructively Mr. Polk

23   if he knew about the gun could have constructively possessed

24   it.  It is in his car.

25               THE COURT:  What is the evidence of drug activity

1    after the July 25th, 2015 car stop?

2              MR. KROUSE:  So it is august 26th.  About a month

3    later.

4              THE COURT:  August 26th.  Remind me what evidence is

5    before this jury that there was drug activity after that?

6              MR. KROUSE:  So Mr. Williams has testified that he was

7    released from his supervised release violation on October 2015.

8    So about a month and a half later.  When he got out, he

9    continued selling crack cocaine and carrying firearms.  More of

10   that evidence will come out when we go through his own criminal

11   history, but the testimony that is in now is that he was

12   selling crack cocaine and carrying firearms.

13             THE COURT:  With whom?

14             MR. KROUSE:  With Mr. Moss and Mr. Smith who are both

15   out.  Only Mr. Polk and Mr. Corbett who are in prison at the

16   time.  Furthermore, Mr. Williams will explain that he continued

17   selling drugs with Mr. Moss and Mr. Smith up until his own

18   arrest again in November of 2016 and that he then went into

19   prison.  Mr. Polk then got out of December of 2016.  It will be

20   elicited that Mr. Polk then took over drug sales where Mr.

21   Williams had been selling drugs.  Then there is an additional

22   piece of drug evidence, which is the drugs that were seized

23   from Mr. Polk's residence in February of 2017.

24             THE COURT:  Okay.

25             MR. KROUSE:  So that three-month period when Mr. Polk

 1   is out, the government's view is that he continued selling

 2   drugs and there are drugs that were admitted into evidence.

 3              THE COURT:  What was the date of the search warrant?

 4              MR. KROUSE:  February 3rd, 2017.

 5              MR. LIND:  Selling those drugs, Judge, is on his own.

 6              THE COURT:  I don't know that.

 7              MR. LIND:  Well, Mr.--

 8              THE COURT:  Who says that?

 9              MR. LIND:  Certainly not in connection with Mr. -- he

10   is in jail at that time, Mr. Williams.

11              When did he get arrested, October of 2016?  He is

12   already a part of the conspiracy.  So this ongoing drug stuff

13   is not part of the conspiracy involving Mr. Williams.

14              THE COURT:  Well, it doesn't have to involve Mr.

15   Williams.  It has to involve one or more of these individuals

16   on this charge.

17              MR. LIND:  This is obviously an individual sale, the

18   one in February of 2017.

19              THE COURT:  I don't know that.  It wasn't an actual

20   sale.

21              MR. LIND:  I mean possession.

22              THE COURT:  He knows whose drugs they were.  He knows

23   who he was selling with when he was selling.

24              MR. LIND:  Judge, you have less than a two-month

25   period when he is out and he is caught with three grams of

1    crack.  That's it.  To allow the government to bring in this

2    hearsay, it is really -- I have no chance to cross-examine

3    Moss.  He is filling in someone who just gets back from prison.

4    Meanwhile, my client is in prison.  It is being used against

5    him.  He is no longer a member of the conspiracy at that time.

6          THE COURT:  I can't say he is no longer a member of

7    the conspiracy.  That's a determination for the jury to make.

8    I don't know what evidence there is that he is no longer

9    possessing or distributing drugs since he is arrested in 2017.

10         MR. LIND:  No.  I am talking about when he goes in in

11   2015.

12         THE COURT:  Who goes in?

13         MR. LIND:  When Polk goes in for this arrest.

14         THE COURT:  Right.  The government calls that a

15   temporary absence.

16         MR. LIND:  What?

17         THE COURT:  The government calls it a temporary

18   absence.

19         MR. LIND:  Well, it is more than temporary.  It is

20   good for about 15 months.  15 or 18 months.  At that point when

21   he comes out, what's his name is already in.  It is not part of

22   any conspiracy involving him.

23         THE COURT:  Let me ask one more question and then I

24   will think about it and we'll take a five-minute break.

25         When does this conversation supposedly have taken

I9b6pol5                         Williams - direct

1    place?

2              MR. KROUSE:  Shortly after Mr. Williams gets out of

3    prison in October of 2015.

4              THE COURT:  2015.

5              MR. KROUSE:  So about a month and a bit after the car

6    stop on August 6th, 2016.

7              THE COURT:  Let me think about it and I will come back

8    and give you a ruling.

9              (Recess)

10             THE COURT:  This is my position:  Quite frankly it is

11   a chronology of events I am trying to keep straight.  If you

12   have or can offer further testimony that indicates that the

13   defendant and this witness or others were involved in drug

14   activity after this conversation or at the time of this

15   conversation, then I will allow it.  I believe it is in

16   furtherance the conspiracy.  I think that here the search

17   warrant in 2017 obviously that obviously there is sufficient

18   evidence for a jury to conclude that there was a conspiracy

19   among these individuals and it is reasonable to conclude that

20   the defendant was involved in drug activity at the time the

21   drugs were seized from his apartment if they were to conclude

22   that.

23             If this witness or other evidence indicates that after

24   the defendant was arrested in the car with that gun that there

25   was further coordinated drug activity with any of these

I9b6pol5                      Williams - direct

individuals, I believe that the conversation between those two,

if one or both of those two are part of that continuing

conspiracy, I believe that is admissible as a coconspirator

statement.  And I think that at least at this point there is

sufficient evidence to indicate that there was a conspiracy and

that the defendant joined that conspiracy and there is no

evidence that the defendant withdrew from that conspiracy.

I think the only other closer question is whether

there is sufficient evidence for it to be presented to indicate

that at the time of these conversations post the gun being

seized in the car that there is evidence that these individuals

continued to be in the same conspiracy as charged here for a

period of time during and or beyond that conversation given the

argument to be made about whether or not this is his DNA on the

gun or whether or not it is his gun or handled the gun.  I

think it is a clearly relevant issue and probative if it is

sufficient as a coconspirator statement is more probative than

prejudicial given the nature of that issue.

If you have further testimony to give to further

establish the ongoing conspiracy, then it will be helpful if

you can elicit that before you go into this area.  At this

point I think if you can establish that, you can elicit the

coconspirator statements.

MR. LIND:  First of all, Judge, I think there is

evidence of his withdrawing.  He is in jail.

I9b6pol5                          Williams – direct

1           THE COURT:  That is not a withdrawal.  It has to be

2    some sort of repudiation of the crime.  Being in jail that may

3    prevent you from being actively involved, but that is not an

4    affirmative withdrawal.

5           MR. LIND:  Secondly, Judge, I take exception to your

6    ruling just for the record.

7           THE COURT:  Sure.

8           Let's bring the witness back.

9           Let's bring in the jury.

10          (Continued on next page)

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

I9b6pol5                         Williams - direct

1           (In open court; jury present)

2           THE COURT:  You can be seated.

3           Mr. Krouse, you may continue.

4           MR. KROUSE:  Thank you, your Honor.

5    BY MR. KROUSE:

6    Q.  Mr. Williams, you testified that you went back to federal

7    prison on August 13th, 2015; correct?

8    A.  Yes.

9    Q.  And then you were released on that supervised release

10   violation about 60 days later; correct?

11   A.  Yes.

12   Q.  That was October 2015?

13   A.  Yes.

14   Q.  When you got out of prison in October 2015 was that the end

15   of your supervised release?

16   A.  Yes.

17   Q.  Did you commit crimes after you were released from federal

18   prison in October 2015?

19   A.  Yes.

20   Q.  What kinds of crimes did you commit after you were released

21   in October of 2015?

22   A.  Still selling crack cocaine and possession of handguns.

23   Q.  Did you commit those crimes by yourself or with others?

24   A.  With others.

25   Q.  In that time frame of October 2015 -- starting in October

I9b6pol5                         Williams - direct

1    of 2015, who were you committing those crimes with?

2    A.   Buddha, Tim.

3    Q.   Buddha is Jamel Moss, Government Exhibit 3?

4    A.   Yes.

5    Q.   And Tim is Timothy Smith, Government Exhibit 4?

6    A.   Yes.

7    Q.   What kind of drugs were you selling along with Mr. Moss and

8    Tim?

9    A.   I was selling crack cocaine.

10   Q.   You mentioned continuing to possess firearms; correct?

11   A.   Yes.

12   Q.   Were those firearms exclusively yours or were they also

13   shared?

14   A.   They were shared.

15   Q.   Mr. Williams, you went back to prison again in November of

16   2016; correct?

17   A.   Yes.

18   Q.   That is the charge that you are in prison for now; correct?

19   A.   Yes.

20   Q.   Now, in that time period between October 2015 to

21   November 2016, you testified you were selling crack cocaine;

22   correct?

23   A.   Yes.

24   Q.   Was Mr. Polk in prison during that entire time period?

25   A.   Yes.

1    Q.  So you were selling crack cocaine with Mr. Moss and Tim;

2    correct?

3    A.  Yes.

4    Q.  When you got out of prison in October of 2015, did you have

5    a conversation with Mr. Moss about a car stop that had occurred

6    on August 26, 2015?

7    A.  Yes.

8    Q.  What, if anything, did Mr. Moss tell you about that car

9    stop?

10   A.  He said Terrell, Kevin and Tim got arrested for a gun.

11   Q.  Did Mr. Moss say which car was involved in that car stop?

12   A.  Yes.

13   Q.  What car was it?

14   A.  The Chrysler.

15   Q.  Is that the car that you saw Mr. Polk drive in before you

16   went to prison in August of 2015?

17   A.  Yes.

18   Q.  Is that a different car than the Toyota Camry that you

19   testified was involved in both shootings?

20   A.  Yes.

21   Q.  You mentioned the gun that was found in that car.  What, if

22   anything, did Mr. Moss tell you about that gun?

23   A.  He said it was a new gun.  It wasn't a regular gun that we

24   had.

25   Q.  By "regular gun that you had," what do you mean by that?

I9b6pol5                          Williams - direct

1    A.  The guns that I had told you about.

2    Q.  So the testimony that there were five guns that you shared

3    amongst your group?

4    A.  Yes.

5    Q.  So what did Mr. Moss tell you about this gun that was in

6    the car?

7    A.  It was a new gun.

8    Q.  That it wasn't one of those five?

9    A.  Yeah.  It wasn't one of the five.

10   Q.  When you got out of prison in October of 2015, you said

11   that you continued possessing firearms; correct?

12   A.  Yes.

13   Q.  Did you have access to the same five guns that you had

14   access to before you went to prison on August 2015?

15   A.  No.

16   Q.  Why not?

17   A.  Because they was missing.

18   Q.  What do you mean they were missing?

19   A.  I left it with Terrell and the guns -- the guns wasn't

20   there when I came home.

21   Q.  So those five guns were no longer around; correct?

22   A.  Yes.

23   Q.  But you said you were possessing firearms; correct?

24   A.  Yes.

25   Q.  Where did you get those additional firearms?

1  A.  I purchased them for some money.

2              MR. KROUSE:  Your Honor, at this time the government

3  will read a stipulation between the parties.

4              THE COURT:  Yes.

5              MR. KROUSE:  This is Government Exhibit 1002.

6              The parties stipulate that Government Exhibits 800,

7  801, 802, 803, 806, 807, and 808 are recorded phone calls made

8  from prison in August and September of 2015.

9              Government Exhibit 800 is a true and correct copy of a

10  portion of a telephone conversation between Terrell Polk and a

11  female caller made on August 30th, 2015, while Polk was in

12  prison.

13              Government Exhibit 801 is a true and correct copy of a

14  portion of a telephone conversation between Terrell Polk and a

15  male caller made on September 6th, 2015 while Polk was in

16  prison.

17              Government Exhibit 802 is a true and correct copy of a

18  portion of the telephone conversation between Terrell Polk and

19  a male caller made on September 7th, 2015, while Polk was in

20  prison.

21              Government Exhibit 803 is a true and correct copy of a

22  portion of a telephone conversation between Terrell Polk and a

23  male caller made on September 13th, 2015, while Polk was in

24  prison.

25              Government Exhibit 806 a true and correct copy of a

portion of a telephone conversation between Terrell Polk and a

female caller made on September 29th, 2015 while Polk was in

prison.

          Government Exhibit 807 is a true and correct copy of a

portion of a telephone conversation between Terrell Polk and a

male caller made on September 7th, 2015 while Polk was in

prison.

          Government Exhibit 808 is a true and correct copy of a

portion of a telephone conversation between Terrell Polk and a

female caller made on September 15th, 2015 while Polk was in

prison.

          Government Exhibit 800 T, 801 T 802 T, 803 T, 806 T,

807 T and 808 T are true and correct transcripts of the true

and accurate voice attributions of the recorded conversations

marked respectively as Government Exhibits 800, 801, 802, 803,

806, 807 and 808.

          The speakers are identified in the left-hand column of

Government Exhibits 800 T, 801 T, 802 T, 803 T, 806 T and 808

T.

          The right-hand column of Government Exhibits 800 T,

801 T, 803 T, 806 T, 807 T, and 808 T contains true and

accurate transcriptions of the conversations contained in

Government Exhibits 800, 801, 802, 803, 806, 807 and 808.

          Your Honor, the government offers Government Exhibits

800, 801, 802, 803, 806, 807, 808 and the accompanying

1    transcripts.

2             THE COURT:  Subject to our previous conversation they

3    will be received in evidence.

4             (Government's Exhibits 800, 801, 802, 803, 806, 807,

5    808 accompanying transcripts received in evidence)

6    Q.  Mr. Williams, I am going to play a few prison phone calls

7    and I will ask you some questions about who is talking and what

8    some of the terminology means in these calls.

9             MR. KROUSE:  Mr. Concepcion, can you please play

10   Government Exhibit 800 and put the transcript 800 T on the

11   screen for the jurors to follow along.

12            Can you zoom in.

13            Thank you.

14            (Audio played)

15            MR. KROUSE:  Pause there.

16   Q.  Whose voice is that, the male voice talking?

17   A.  Terrell.

18   Q.  Is that the defendant?

19   A.  Yes.

20   Q.  Can you remind the jury who Buddha Man is who Mr. Polk just

21   mentioned?

22   A.  A friend of ours.

23   Q.  What is Buddha Man's real name?

24   A.  Jamel Moss.

25   Q.  That is Government Exhibit 3 on the board; correct?

I9b6pol5                          Williams - direct

1    A.  Yes.

2             MR. KROUSE:  Mr. Concepcion, please continue.

3             (Audio played)

4             MR. KROUSE:  Pause there, Mr. Concepcion.

5    Q.  Mr. Williams, what is your understanding of what about Polk

6    meant when he said, Tim is going to take it; right?

7             MR. LIND:  Objection, Judge.

8             THE COURT:  Overruled.

9             You can answer.

10   A.  Meaning that Tim going to take the charge.

11   Q.  Who is Tim?

12   A.  Tim is a friend of ours that we just discussed now.

13   Q.  He is depicted there in Government Exhibit 4 on the board;

14   correct?

15   A.  Yes.

16            MR. KROUSE:  Mr. Concepcion, you can continue.

17            (Audio played)

18            MR. KROUSE:  Mr. Concepcion, can you please play

19   Government Exhibit 801 and do the same thing with the

20   transcript.

21            (Audio played)

22            MR. KROUSE:  Pause there.

23   Q.  Mr. Williams, two individuals were named there, TK and

24   Beaker.

25            Do you know who those people are?

I9b6pol5                          Williams - direct

1    A.   Yes.

2    Q.   Who is TK?

3    A.   TK is a friend of mine from the projects.

4    Q.   And do you know what TK's involvement is with Mr. Polk?

5    A.   He just a good friend of ours that be out there with us.

6    Q.   Is he involved in any illegal activities?

7    A.   Yes.

8    Q.   What is TK involved in?

9    A.   Crack.   Selling crack cocaine.

10   Q.   Does he sell crack cocaine with you and other members of

11   this crew that you have been testifying about?

12   A.   No.

13   Q.   Does he sell crack cocaine independently?

14   A.   Yes.

15   Q.   What about Beaker?

16   A.   I never knew him of selling crack cocaine.

17   Q.   What did Beaker do?

18   A.   He just be around.   He just be around and everything.

19   Q.   Is he a friend of yours?

20   A.   Yes.

21          MR. KROUSE:   Mr. Concepcion, can you continue playing.

22          (Audio played)

23          MR. KROUSE:   Pause it.

24   Q.   Mr. Williams, what is your understanding of what Mr. Polk

25   means when he says "demonstrations" in that context?

1    A.  It is a phrase that we mean that about the guns that we

2    had.

3    Q.  You testified previously that demonstrations is a word that

4    you used for guns?

5    A.  Yes.

6              MR. KROUSE:  Mr. Concepcion, can you continue.

7              (Audio played)

8              MR. KROUSE:  Pause there.

9    Q.  Mr. Williams, when Mr. Polk says that Buddha Man hasn't

10   been trying to hold no basketballs, what is your understand

11   being what basketballs means in that context?

12   A.  To me it means that he wasn't been trying to hold no guns

13   down.

14   Q.  By "he," who do you mean?

15   A.  Buddha Man.

16             MR. KROUSE:  Mr. Concepcion, can you continue.

17             (Audio played)

18             MR. KROUSE:  Pause there.

19   Q.  Mr. Williams, the reference to the "Brodie called me," do

20   you have an understanding of what the Brodie means here?

21   A.  That was me.

22   Q.  How do you know it is you?

23   A.  He is pertaining to something that we share in and I was

24   locked up at that time.  So he is just showing that he got the

25   stuff that me and him -- that he was holding onto.

1  Q.  By "sharing," who are you talking about?  You and who else

2  sharing what?

3  A.  Me, Buddha, Terrell, Tim.

4  Q.  Sharing what?

5  A.  Guns.

6          MR. KROUSE:  Mr. Concepcion, can you continue playing.

7          (Audio played)

8          MR. KROUSE:  Pause there.

9  Q.  When Mr. Polk says, Kev is going to take the demonstration,

10  what is your understanding of what that means?

11  A.  Take the charge.

12  Q.  Take the charge for what?

13  A.  For the gun charge that they have him with.

14  Q.  What does demonstration mean in that context?

15  A.  A gun.

16          MR. KROUSE:  Mr. Concepcion, can you continue.

17          (Audio played)

18          MR. KROUSE:  Pause there.

19  Q.  Now, when Polk says Tim there, who is he referring to?

20  A.  Tim.

21  Q.  That is Tim who is in Government Exhibit 4 that you have

22  been testifying about?

23  A.  Yes.

24  Q.  He testified that he was involved in the car stop where the

25  gun was recovered; correct?

I9b6pol5                        Williams - direct

1   A.  Yes.

2          MR. KROUSE:  Mr. Concepcion, you can continue.

3          (Audio played)

4          MR. KROUSE:  Pause there.

5   Q.  Now, first who was Beaker?

6   A.  Beaker is a friend of ours.

7   Q.  When Mr. Polk says Buddha Man, that is who you testified

8   today, Jamel Moss; correct?

9   A.  Yes.

10  Q.  What is Mr. Polk to your understanding of what he is saying

11  when he says, With Buddha Man now all of a sudden there is no

12  beef no more because we're locked up?

13  A.  Me and Polk is locked up.  And since they -- they are the

14  only ones out there, so everybody is -- the people that we had

15  problems with, now they chilling together and hanging out

16  together.  The situation is dead.  It is irrelevant now.

17  Q.  Who were the people you were having a beef with before you

18  and Mr. Polk were locked?

19  A.  Ryan, Bubba, PJ.

20  Q.  Ryan is the victim of the second shooting of August 4th,

21  2015; correct?

22  A.  Yes.

23         MR. KROUSE:  You can go on, Mr. Concepcion.

24         (Audio played)

25         MR. KROUSE:  Pause there.

1   Q.   Now, Mr. Williams, when Mr. Polk says, Kev is going to take

2   the demonstration, what is your understanding of what that

3   means?

4   A.   Take the charge.

5   Q.   The charge for the car stop?

6   A.   Yes.

7   Q.   What is your understanding of what Mr. Polk means when he

8   says, I had too much money on me?  What does that mean?

9   A.   The money that he had in his pocket.  He had $300 in his

10   pocket.

11   Q.   Why would that be too much money?

12   A.   He just wanted his money.  That was his money.

13   Q.   That he provided to Tim?

14   A.   Yes.

15           MR. KROUSE:  Mr. Concepcion, could you put on the

16   screen Government Exhibit 806 and put up the transcript 806 T.

17           Thank you.

18           Zoom in on the transcript for that.

19           (Audio played)

20           MR. KROUSE:  Pause there.

21   Q.   Mr. Williams, do you understand what it means to handle

22   that shit wild times?

23   A.   That means a lot of times.

24   Q.   Wild times means a lot of times?

25   A.   Yes.
                 (Continued on next page)

1    BY MR. KROUSE:

2    Q.  When Officer Polk says, "That's not my demonstration,"

3    what's "demonstration" mean in that context?

4    A.  Mean that it's not his.

5    Q.  And that's the gun from the car stop?

6    A.  Yes.

7    Q.  And "demonstration" means gun there, correct?

8    A.  Yes.

9         MR. KROUSE:  Mr. Concepcion, can you put on the screen

10   Government Exhibit 803 with the accompanying transcript.

11        (Audio played)

12        MR. KROUSE:  Pause it.

13   Q.  In this context, what is this individual who's selling --

14   who's saying, "Why your girl don't want to sell the joint?"

15   What does he mean by "the joint" in this context?

16   A.  To me, it is sell a gun.

17   Q.  And when he said she wants to give her -- wants me to give

18   her six for it, what's six mean in that context?

19   A.  $600.

20        MR. KROUSE:  You can continue playing, Mr. Concepcion.

21        (Audio played)

22   Q.  When Mr. Polk said, "What are you talking about that big

23   thing?" what's your understanding of what the big thing is?

24        MR. LIND:  Objection, Judge.

25        THE COURT:  I'm going to sustain it as to the form of

1    the question unless there's some foundation for him to know.

2               MR. KROUSE:  Yes, your Honor.

3    Q.  Do you have an understanding of what that big thing might

4    be?  That is a yes-or-no question, Mr. Williams.

5    A.  Yes.

6    Q.  What's that understanding based on?

7    A.  It means one of the guns that we have, one of the big guns

8    that we had.

9               MR. KROUSE:  You can continue playing the

10   transcript -- you can continue playing the call.

11              (Audio played)

12   Q.  Mr. Williams, when this individual says she wanted to give

13   you four for right that day, do you have an understanding of

14   what the four is referring to?

15              MR. LIND:  Objection again, Judge.

16              THE COURT:  You can answer.

17   Q.  You can answer, Mr. Williams.

18   A.  That means one of the guns that we had.

19   Q.  What does four mean in that context?

20   A.  400.

21   Q.  $400?

22   A.  Yes.

23              MR. KROUSE:  Mr. Concepcion, can you play Government

24   Exhibit 802.

25              (Audio played)

1    MR. KROUSE:  Can you pause there, Mr. Concepcion.

2  Q.  Mr. Williams, do you recognize the voice of the person

3  who's speaking to Terrell here?

4  A.  Yes.

5  Q.  Who is that?

6  A.  Tim.

7  Q.  And Tim is the person on the board there at Government

8  Exhibit 4?

9  A.  Yes.

10  Q.  And he is the one speaking to Mr. Polk, correct?

11  A.  Yes.

12    (Audio played)

13    MR. KROUSE:  Mr. Concepcion, can you continue playing.

14

15    (Audio played)

16    MR. KROUSE:  Can you pause there.

17  Q.  Mr. Williams, what does "it's lit" mean?

18  A.  That mean the beef that we had is still going on.

19    MR. KROUSE:  Mr. Concepcion, can you continue playing.

20    (Audio played)

21    MR. KROUSE:  Can you pause there.

22  Q.  Mr. Williams, Tim Smith, who you testified is the

23  unidentified male in this call, mentioned two people, PJ and

24  Noon.  Do you recognize those names?

25  A.  Yes.

1   Q.   Who are they?

2   A.   Individuals that be with Ryan.

3   Q.   Who's Ryan?

4   A.   Ryan is the person that got shot.

5   Q.   And that's the second shooting August 4, 2015, that you

6   testified about?

7   A.   Yes.

8            (Audio played)

9            MR. KROUSE:  Mr. Concepcion, you can continue playing.

10

11           (Audio played)

12           MR. KROUSE:  Pause there.

13  Q.   Now, when Tim says, "Beaker behind me," what's your

14  understanding of what that means?

15  A.   That means Beaker behind him.  Beaker walking behind him as

16  he going to 1065.

17  Q.   Is Beaker a person you previously testified about?

18  A.   Yes.

19  Q.   And he was previously on a phone call with Mr. Polk that we

20  just played?

21  A.   Yes.

22           MR. KROUSE:  Mr. Concepcion, you can continue.

23           (Audio played)

24           MR. KROUSE:  Pause there.

25  Q.   Mr. Williams, what's your understanding of what "Steph

1  Curry" means in this context?

2  A.   It's another phrase.  Like another phrase that we talking

3  about a gun, going to get a gun.

4  Q.   And could you tell the jury, someone may not know, who

5  Steph Curry is.

6  A.   Steph Curry is a basketball player.  We call him, like, a

7  shooter.

8  Q.   Why would you use "Steph Curry" as a term for a gun?

9  A.   Like I said earlier, this is -- this is a phrase some

10  people don't catch on to it.

11  Q.   And why is "Steph Curry" specifically used as a term for a

12  gun?

13  A.   Just for people that don't supposed to know what he going

14  to get and for law enforcement not to know.

15  Q.   Who's Steph Curry, if you can say again?

16  A.   A basketball player.  We call him a shooter.

17  Q.   He's a shooter?

18  A.   He, like, good shots, shoot.

19         MR. KROUSE:  Mr. Concepcion, you can continue playing.

20         (Audio played)

21         MR. KROUSE:  Pause there.

22  Q.   Mr. Polk says, "I should be out."  What's your

23  understanding of out of where?

24  A.   Out of jail.

25  Q.   And what's your understanding of what Mr. Smith means when

1    he says, "Yo, I need you out here, man"?

2    A.   He need him out here so he can hold him down.

3    Q.   What do you mean by "hold him down"?

4    A.   Like for protection.

5    Q.   So who needs who to hold who down?

6    A.   Tim.

7    Q.   Needs?

8    A.   Terrell to hold him down.

9    Q.   And again, hold him down, what's the plain meaning of that?

10   A.   That means being by his side, making sure nothing happen to

11   him.

12   Q.   To protect him?

13   A.   Yes.

14           MR. KROUSE:  Mr. Concepcion, can you play Government

15   Exhibit 807.

16           (Audio played)

17           MR. KROUSE:  Can you pause here.

18   Q.   When Mr. Polk says, "Had a basketball on him and didn't

19   even tell me, b," what's your understanding of what basketball

20   means in that context?

21   A.   A gun.

22           MR. KROUSE:  You can go ahead, Mr. Concepcion.

23           (Audio played)

24           MR. KROUSE:  Pause.

25   Q.   Mr. Williams, what's your understanding of what Mr. Polk

1    means by "I should be lit"?  What's that mean in that context?

2    A.  He should be coming home.

3           MR. KROUSE:  Mr. Concepcion, could you play Government

4    Exhibit 808.

5           (Audio played)

6    Q.  Mr. Williams, in the previous call you testified

7    basketball, your understanding in that context, is that's a

8    gun, correct?

9    A.  Yes.

10   Q.  And here when Mr. Polk says, "You still got my basketball

11   in my safe, right?" what's your understanding of what that

12   means?

13   A.  Gun.

14   Q.  A gun where?

15   A.  In his safe.

16          MR. KROUSE:  Mr. Concepcion, you can complete the

17   call.

18          (Audio played)

19          MR. LIND:  Judge, may I request a sidebar for a

20   moment?

21          THE COURT:  Yes.

22          (Continued on next page)

23

24

25

1          (At sidebar)

2          THE COURT:  Yes.

3          MR. LIND:  My request is that the jury be told that

4    I'm not the attorney -- I was not the attorney for Mr. Polk in

5    connection with this state case that's mentioned here.  It may

6    not be pejorative the way they're talking about it, what the

7    attorney's doing, but nonetheless, I really would like the jury

8    to know that I wasn't the attorney that's being referred to

9    there.

10          THE COURT:  I don't have any problems with that.  Do

11   you want to stipulate to that?

12          MR. KROUSE:  We have no objection to that, your Honor.

13          THE COURT:  OK.  Why don't you put that on the record.

14          MR. LIND:  If you don't mind, Judge.

15          THE COURT:  All right.  Tell me what you want me to

16   say.

17          MR. KROUSE:  You could say, your Honor, there was a

18   mention of an attorney.

19          MR. LIND:  Couple mentions.

20          MR. KROUSE:  -- couple mentions of an attorney by

21   Mr. Polk in the prison phone calls.  I will instruct you that

22   Mr. Lind, who presently represents Mr. Polk, is not his

23   attorney during the time period of these phone calls, something

24   like that.

25          MR. NICHOLAS:  Was not the attorney being mentioned in

I9BHPol6                        Williams - Direct

1    the call.

2              MR. KROUSE:  He is not the attorney being mentioned.

3              THE COURT:  OK.

4              MR. LIND:  Thank you.

5              (Continued on next page)

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

 1              (In open court; jury present)

 2              THE COURT:  Before we continue, ladies and gentlemen,

 3     there was a reference on the transcript, on the call, about a

 4     lawyer who's representing Mr. Polk.  The parties have agreed

 5     that that lawyer is not Mr. Lind.  Mr. Lind was not the lawyer

 6     at that time.  The parties have stipulated to that.

 7     BY MR. KROUSE:

 8     Q.  Mr. Williams, you testified earlier that you got out of

 9     prison in October of 2015, correct?

10     A.  Yes.

11     Q.  And you testified that you continued selling crack cocaine

12     after you got out of prison in October 2015, correct?

13     A.  Yes.

14     Q.  With the individuals who were not in prison at that time

15     who were part of your crew, correct?

16     A.  Yes.

17     Q.  After October 2015, once you got out, were you selling

18     crack in a particular location?

19     A.  Yes.

20     Q.  What location were you selling crack?

21     A.  166 and University.

22     Q.  Is that the same area that you were previously selling

23     crack cocaine?

24     A.  Yes.

25     Q.  Were you also selling crack out of an apartment during that

I9BHPol6                    Williams - Direct

1    time period?

2    A.  Yes, across the street from 1075.

3    Q.  And what was that apartment?

4    A.  It was on the first floor.  Think it was 1B, 1A.  I'm not

5    for sure.

6    Q.  And whose apartment was that?

7    A.  It was Billy, a guy named Billy.

8    Q.  And who is Billy?

9    A.  Billy was a crack addict that I had selling drugs for me.

10   Q.  How much crack cocaine was being sold each month from

11   Billy's apartment?

12   A.  Say 100, 150 grams, 120 grams a month.

13   Q.  And you were then later arrested again by federal

14   authorities, correct?

15   A.  Yes.

16   Q.  When were you arrested again?

17   A.  In November 27, 2016.

18   Q.  So about a year later?

19   A.  Yes.

20   Q.  After you were arrested -- during that time period from

21   October 2015 to November 2016, was Mr. Polk in or out of jail

22   during that time period?

23   A.  Say that again.

24   Q.  Was Mr. Polk in or out of jail from October 2015 to

25   November 2016 when you went back in?

1   A.  Yes.

2   Q.  Was he in or out of jail?

3   A.  He was in jail.

4   Q.  After you were arrested in November of 2016, did Mr. Polk

5   get out of jail?

6   A.  Say that again.

7   Q.  After you were arrested again in November of 2016, did

8   Mr. Polk get out of jail?

9   A.  Yes.

10  Q.  When did he get out of jail?

11  A.  Probably about three weeks or four weeks after I was locked

12  up.

13  Q.  So is that December of 2016?

14  A.  Yes.

15  Q.  When you later went into federal custody, did you learn who

16  took over crack sales from Billy's apartment?

17  A.  Yes.

18  Q.  How did you learn that?

19  A.  TK had told me.

20  Q.  Did anyone else tell you?

21  A.  No.

22  Q.  Just TK?

23  A.  Yes.

24  Q.  Now, Mr. Williams, we're going to go through some of the

25  other serious crimes you've committed now, and you've already

I9BHPol6                    Williams - Direct

1    testified about some of those crimes including distributing

2    drugs, correct?

3    A.  Yes.

4    Q.  And possessing firearms?

5    A.  Yes.

6    Q.  Involvement in shootings?

7    A.  Yes.

8    Q.  Let's start going back to 1996.  Were you involved in a

9    shooting that year?

10   A.  Yes.

11   Q.  Can you tell the jury about that shooting.

12   A.  I was living in Mount Vernon, and I had problems with a few

13   individuals up there.  And me and a friend of mines, we went to

14   approach the situation, the problems that we had, and one thing

15   led to another, I started shooting.

16   Q.  And were you the only person armed in that confrontation?

17   A.  Yes.

18   Q.  How many gunshots did you fire?

19   A.  Two.

20   Q.  Did you fire them in the direction of other people?

21   A.  Yes.

22   Q.  Did you ever learn whether anyone was hit when you'd fired

23   those two gunshots?

24   A.  Yeah, I learned that nobody was hit.

25   Q.  Did you tell the government about this shooting during your

1   meetings with the government?

2   A.  Yes.

3   Q.  At the time you told the government about this shooting,

4   had you ever been charged with this shooting?

5   A.  No.

6   Q.  Had you ever been arrested for this shooting?

7   A.  No.

8   Q.  Had you ever been convicted of this shooting incident?

9   A.  No.

10  Q.  Moving to 2002, around six years later, were you involved

11  in another shooting in 1055 University Avenue in that year?

12  A.  Yes.

13  Q.  Can you tell the jury about that shooting.

14  A.  Me -- me, Buddha Man, and the kid named "Hooty", we had

15  problems with another kid from our projects named Chris and

16  "Naval" for dealing in 1055 where I was hustling at, getting

17  money at.  And one thing led to another for them hustling in

18  our building, and we started shooting at each other.

19  Q.  You said you were with two other people.  Who were those

20  people?

21  A.  Buddha Man and a kid named Hooty.

22  Q.  And Buddha Man's Jamel Moss, Government Exhibit 3?

23  A.  Yes.

24  Q.  And you said your group started shooting at this other

25  group of individuals, correct?

1  A.  Yes.

2  Q.  And what was the nature of the dispute that you had with

3  this other group?

4  A.  It was for drugs, selling in our territory.

5  Q.  And by your territory, you mean this building, 1055

6  University Avenue, correct?

7  A.  Yes.

8  Q.  And that's the same location of the first shooting you

9  testified about with Euro?

10  A.  Yes.

11  Q.  How many shots did you fire at these other two individuals

12  on that occasion?

13  A.  Like three or four shots.

14  Q.  And did those other individuals fire back at you?

15  A.  Yes.

16  Q.  And out of these shots, was anybody hit?

17  A.  No.

18  Q.  Did you tell the government about this shooting during your

19  meetings with the government?

20  A.  Yes.

21  Q.  At that time you told the government about this shooting,

22  had you ever been charged with this shooting?

23  A.  No.

24  Q.  Had you ever been arrested for it?

25  A.  No.

1    Q.  Had you ever been convicted for this shooting?

2    A.  No.

3    Q.  Moving ahead five years from there, were you also involved

4    in a shooting in 2007?

5    A.  Yes.

6    Q.  Can you tell the jury about that shooting and your

7    involvement in it.

8    A.  Me, Buddha Man, my brother was on the Concourse, and we

9    shot at the persons that shot at my brother.

10   Q.  By "the Concourse," what do you mean?

11   A.  In the Bronx.

12   Q.  Grand Concourse?

13   A.  Grand Concourse.

14   Q.  You said you were with Buddha Man.  That's Jamel Moss,

15   Government Exhibit 3?

16   A.  Yes.

17   Q.  You said you were with your brother as well?

18   A.  Yes.

19   Q.  Who fired the shots in this incident?

20   A.  My brother.

21   Q.  How many shots did your brother fire?

22   A.  About two shots.

23   Q.  Were you armed during this incident?

24   A.  Yes.

25   Q.  Did you fire any shots?

1    A.  No.

2    Q.  Was Buddha Man armed in this incident?

3    A.  Yes.

4    Q.  Did he fire any shots?

5    A.  No.

6    Q.  The two shots that your brother fired, did they hit

7    anybody?

8    A.  No.

9    Q.  Did you tell the government about this shooting incident

10   during your meetings with the government?

11   A.  Yes.

12   Q.  At the time you told the government about this shooting,

13   had you ever been charged with this shooting?

14   A.  No.

15   Q.  Had you ever been arrested for this shooting?

16   A.  No.

17   Q.  Or convicted for it?

18   A.  No.

19   Q.  In 2009, did you commit another shooting?

20   A.  Yes.

21   Q.  Can you tell the jury about that shooting incident.

22   A.  2009, I had shot the kid that shot me.

23   Q.  And who is the kid that shot you?

24   A.  A kid named Stanley.

25   Q.  Where did Stanley shoot you?

1    A.  In my shoulder.

2    Q.  Why did he shoot you in your shoulder?

3    A.  Just about an argument.  We was just outside, just fussing

4    with each other, and we started fighting.  And later on the

5    next day, he shot me.

6    Q.  After Stan shot you in the shoulder, what, if anything, did

7    you do?

8    A.  I shot him.

9    Q.  Where did you shoot him?

10   A.  I think in the leg.

11   Q.  Was anyone else hit in that shooting?

12   A.  No.

13   Q.  Did you tell the government about this shooting during your

14   meetings with the government?

15   A.  Yes.

16   Q.  At the time you told the government about shooting Stan,

17   had you ever been charged with that shooting?

18   A.  No.

19   Q.  Had you ever been arrested for it?

20   A.  No.

21   Q.  Had you ever been convicted of it?

22   A.  No.

23   Q.  Did you also commit a shooting during the winter of 2013?

24   A.  Yes.

25   Q.  Can you tell the jury about that shooting.

1    A.  Some young individuals from -- from our way that live in

2    Highbridge --

3    Q.  By "young individuals," how old are you talking?

4    A.  Eighteen, 19 years old, most probably 20 years old.

5    Q.  OK.

6    A.  They hit my friend moms in the face with a cake.  And my

7    friend, my friend moms came to me and told me what had

8    happened, and I went to get my gun, and I shot one of them.

9    Q.  Now, when you said your friend's mom, which friend was

10   this?

11   A.  Buddha Man.

12   Q.  When you say that they hit her in the face with a cake,

13   what does that mean?

14   A.  They had a cake from the store and smacked -- ran up on her

15   and smacked her with it.

16   Q.  Did you know why they smacked her in the face with a cake?

17   A.  They was just probably smoking weed and thinking it was

18   funny.

19   Q.  And after you learned about that, you said this, but what

20   did you do?

21   A.  I went to get my gun, and I approached the individual.  And

22   one thing led to another, and I wind up shooting one of them.

23   Q.  Where did you shoot that individual?

24   A.  I think the kid got shot in his butt.

25   Q.  Did he survive the shooting?

1    A.  Yes.

2    Q.  Did you tell the government about this shooting which

3    occurred in 2013 when you met with the government?

4    A.  Yes.

5    Q.  At the time you told the government about committing this

6    shooting, had you ever been arrested for this shooting?

7    A.  No.

8    Q.  Had you ever been charged with it?

9    A.  No.

10   Q.  Had you ever been convicted of it?

11   A.  No.

12   Q.  In the summer of 2015, did you also use a gun to commit an

13   assault on another person?

14   A.  Yes.

15   Q.  Can you explain to the jury what happened there.

16   A.  I saw a kid that was -- I thought was approaching my baby

17   mother, was trying to get with her.  And I ran up on him,

18   smacked him with my gun, pistol-whipped him with my gun.

19   That's it.

20   Q.  Can you explain what it means to pistol-whip somebody.

21   A.  Having a gun and just smacking them in the face with it.

22   Q.  And that's what you did to this individual?

23   A.  Yes.

24   Q.  Where on his body did you hit him?

25   A.  In his face.

I9BHPo16                        Williams - Direct

1    Q.  Was he injured?

2    A.  Yes.

3    Q.  What were the extent of his injuries?

4    A.  He had a gash on his face.

5    Q.  Did you fire the weapon at this individual?

6    A.  No.

7    Q.  Did you tell the government about committing this assault

8    during your meetings with the government?

9    A.  Yes.

10   Q.  At the time you told the government about this assault, had

11   you ever been charged with it?

12   A.  No.

13   Q.  Had you ever been arrested for it?

14   A.  No.

15   Q.  Have you ever been convicted of it?

16   A.  No.

17   Q.  That same summer were you also involved in a shooting with

18   TK?

19   A.  Yes.

20   Q.  Could you describe what happened in that case.

21   A.  Buddha Man, he had got into some trouble with another kid,

22   and the same kids that he had got in a problem with saw TK and

23   jumped him.  And TK came back to me, and I grabbed my gun and

24   we went over there to handle it.  And TK asked for my gun so he

25   could put the work in, shoot at the kids.  That mean shoot at

1   the kids.  And that's what he did.

2   Q.  And you said that TK got jumped by this group, correct?

3   A.  Yes.

4   Q.  Why did the group jump TK?

5   A.  On account of him hanging with us and people knowing he be

6   with us sometimes.  That's why that happened.

7   Q.  Why did this group have a problem with your group to the

8   point where they would jump TK?

9   A.  Because my friend, like I said, Buddha Man, had a problem

10  with this individual from taking his weed and things like that.

11  And one thing led to another, they started fighting, and that's

12  how the beef started.

13  Q.  And then TK got jumped as a result of that beef?

14  A.  Yes.

15  Q.  You said TK went back to shoot at this group of people,

16  correct?

17  A.  Yes.

18  Q.  Do you know what gun he used to shoot at that group?

19  A.  .40.

20  Q.  Is that the .40 caliber?

21  A.  Yes.

22  Q.  Is that the same .40 caliber gun that was shared amongst

23  your group?

24  A.  Yes.

25  Q.  Was it the same .40 caliber that was used in the 1055

1    University Avenue shooting of Euro?

2    A.  Yes.

3    Q.  Where did TK get that gun to fire at this other group?

4    A.  He got it from me.

5    Q.  When you gave TK the gun, what did TK do?  Where'd he go?

6    A.  He went to -- he went where the people was.  I was on one

7    corner.  I was on one side of the street and he on the other

8    side, and he start shooting at them.

9    Q.  And you went with him?

10   A.  Yes.

11   Q.  Were you armed as well?

12   A.  No.

13   Q.  After TK fired at the group, what did you do?

14   A.  I ran one way and TK ran one way.

15   Q.  Did you tell the government about your involvement in this

16   shooting during your meetings with the government?

17   A.  Yes.

18   Q.  At the time you told the government about this shooting,

19   had you ever been charged with it?

20   A.  No.

21   Q.  Arrested for it?

22   A.  No.

23   Q.  Convicted of it?

24   A.  No.

25   Q.  That same summer, 2015 again, were you also involved in a

I9BHPo16                    Williams - Direct

1    shooting in Nelson park?

2    A.   Yes.

3    Q.   Could you describe what happened in that shooting.

4    A.   Individuals, some individuals from that neighborhood owed

5    me money and -- for a drug debt, and I approached them:

6    Where's your friend at?  He owe me money.  You all hang

7    together.  I know you know where he at.  And me pulling out my

8    gun, taking they phones, digging in they pockets and taking the

9    little money that they had on them and telling them to go and

10   find they friend unless it's going to be trouble.

11           Further on that day, I went to Nelson park, sat there

12   smoking weed.  After probably like half an hour, I gave Tim the

13   phones back that I took from the individuals, 'cause he was

14   with me the whole time, and I told him to give back the phones

15   and everything.  And as he was going to give the individuals

16   back they phone, one individual knocked Tim out, punched him in

17   his face.  He dropped to the floor.  They -- the two

18   individuals pulled they guns out and got over Tim.  By the time

19   they start shooting at him, I started shooting at them, and

20   then they start shooting back at me.

21   Q.   This confrontation happened in Nelson park?

22   A.   Yes.

23   Q.   And that's the same Nelson park that you previously

24   testified about an armed confrontation?

25   A.   Yes.

1  Q.  And these two individuals, when you say they knocked Tim

2  out, what does that mean?

3  A.  That means they punched him in the face and he fell to the

4  floor.

5  Q.  And then they pulled out their weapons, did it appear to

6  you that they were about to fire at Tim?

7  A.  Yes.

8  Q.  So what did you do in response to that?

9  A.  Start shooting at them.

10 Q.  And did they then shoot back at you?

11 A.  Yes.

12 Q.  Was anybody hit as a result of this exchange of gunfire?

13 A.  No.

14 Q.  Now, did you tell the government about this shooting

15 incident during your meetings with the government?

16 A.  Yes.

17 Q.  At the time you committed this shooting, were you arrested

18 by the NYPD?

19 A.  Say that again.

20 Q.  After you committed this shooting, were you arrested at the

21 scene?

22 A.  No.

23 Q.  But was this shooting incident one of the shooting

24 incidents you were charged with in your federal case?

25 A.  Yes.

1   Q.   At the time you told the government about this shooting,

2   had you yet been convicted of that charge?

3   A.   No.

4   Q.   While you were involved in these various shootings that you

5   just testified about from 1996 to 2015, were you also selling

6   drugs?

7   A.   Yes.

8   Q.   Is it fair to say you were selling drugs continuously while

9   you were out of prison?

10  A.   Yes.

11  Q.   What kinds of drugs were you selling?

12  A.   Crack cocaine, little bit of marijuana.

13  Q.   And in March 2011, were you arrested on a federal charge?

14  A.   Say that again.

15  Q.   In March 2011, were you arrested on a federal charge?

16  A.   Yes.

17  Q.   What was that charge?

18  A.   Possession of marijuana.

19  Q.   This is your first federal conviction in March 2011?

20  A.   Yes.

21  Q.   What was that charge for?

22  A.   Possession of marijuana, 2 ounces of marijuana.

23  Q.   So not your supervised release violation.  I'm talking

24  about the underlying conviction for the first charge that you

25  had.

1    A.  They gave me four months.

2    Q.  Mr. Williams, just listen to the question.  Sorry.

3           For your first federal conviction, not the supervised

4    release violation --

5    A.  Oh.

6    Q.  -- the conviction itself, what was the charge in that case?

7    A.  Oh, for selling crack cocaine.

8    Q.  Were you charged with anything else other than selling

9    crack cocaine in that instance?

10   A.  No.

11   Q.  And this was March 2011?

12   A.  Yes.

13   Q.  Did you plead guilty to that charge?

14   A.  Yes.

15   Q.  What sentence did you receive for it?

16   A.  Two years.

17   Q.  Did you serve two years in prison for that charge?

18   A.  Yes.

19   Q.  Were you also sentenced to supervised release?

20   A.  Yes.

21   Q.  How many years of supervised release did you receive?

22   A.  Three years.

23   Q.  What is supervised release?  Can you describe that for the

24   jury.

25   A.  Supervised release is they give you a probation officer to

1  help you maintain in society, to get your life together.

2  Q.  Are there conditions imposed on you for supervised release?

3  A.  Yes.

4  Q.  What are those conditions?

5  A.  Curfew, trying to maintain employment, and making sure I --

6  I keep -- I keep my appointments, my visiting them.

7  Q.  Is one of the conditions that you stop committing crimes?

8  A.  Yes.

9  Q.  Did you stop committing crimes while you were on supervised

10 release?

11 A.  No.

12 Q.  Once you were released from prison in November 2012, did

13 you continue committing crimes?

14 A.  Yes.

15 Q.  In May 2013, did you admit to a violation of supervised

16 release?

17 A.  Yes.

18 Q.  What was the violation of supervised release?

19 A.  For possession of marijuana.

20 Q.  This is the possession of marijuana you were previously

21 talking about, correct?

22 A.  Yes.

23 Q.  And this was a violation of your supervised release?

24 A.  Yes.

25 Q.  Were you sentenced to jail as a result of that violation?

I9BHPol6                        Williams - Direct

1    A.  Yes.

2    Q.  What were you sentenced to?

3    A.  Four months.

4    Q.  After your four months were up and you were released again,

5    did you continue committing crimes?

6    A.  Yes, I did.

7    Q.  You continued selling crack cocaine with the same group?

8    A.  Yes.

9    Q.  In July 2015, did you admit to another violation of

10   supervised release?

11   A.  Yes.

12   Q.  What was that violation?

13   A.  Dirty urine, smoking marijuana, and not reporting to

14   probation.

15   Q.  By dirty urine, is one of the conditions that you not use

16   drugs?

17   A.  Yes.

18   Q.  Are you tested to enforce that condition?

19   A.  Yes.

20   Q.  In this instance, you were caught using drugs, correct?

21   A.  Yes.

22   Q.  For that violation were you sentenced to jail again?

23   A.  Yes.

24   Q.  How long were you sentenced?

25   A.  Sixty days.

1    Q.  You went back to jail, you previously testified, on

2    August 13, 2015, correct?

3    A.  Yes.

4    Q.  That's around nine days after this second shooting that you

5    testified to?

6    A.  Yes.

7    Q.  The shooting with the shotgun, correct?

8    A.  Yes.

9    Q.  After you got out on that 60-day violation, it was

10   October 8, 2015, correct?

11   A.  Yes.

12   Q.  When you got out on that charge, was that the end of your

13   supervised release?

14   A.  Yes.

15   Q.  After you got out, you testified that you continued

16   committing crimes, correct?

17   A.  Yes.

18   Q.  You continued selling drugs?

19   A.  Yes.

20   Q.  Carrying guns?

21   A.  Yes.

22   Q.  Then you were arrested again federally in November 2016,

23   correct?

24   A.  Yes.

25   Q.  And that's what you're in jail for currently, right?

1   A.   Yes.

2   Q.   The day you were arrested federally, did you give a

3   postarrest statement?

4   A.   Yes.

5   Q.   Were you completely truthful in that postarrest statement?

6   A.   No.

7   Q.   Why were you not completely truthful with the officers who

8   arrested you on that day?

9   A.   Basically, I was -- I was lying, like, to try -- basically,

10  I was just lying just thinking I'm gonna get out of my trouble.

11  Q.   Fair to say you were trying to talk your way out of the

12  charges you had?

13  A.   Yes.

14  Q.   After a few months from getting arrested in November 2016,

15  after a few months did you decide to cooperate with the

16  government?

17  A.   Yes.

18  Q.   When was your first meeting with the government?

19  A.   Think in February.

20  Q.   February of what year?

21  A.   2017.

22  Q.   Were you truthful with the government in that first

23  meeting, February 2017?

24  A.   Yes, I was.

25  Q.   Around how many times have you met with the government?

1   A.  Probably like 20 times.  More than 20 times.

2   Q.  During those meetings with the government, do you provide

3   information about the crimes you've committed and the crimes

4   other people have committed?

5   A.  Yes.

6   Q.  And have you been completely truthful with the government

7   in all of those meetings?

8   A.  Yes, I was.

9   Q.  Now, were some of those meetings also used to prepare for

10  trial?

11  A.  Some.

12  Q.  So out of those 20 minutes, not all of them were used to

13  prepare for trial, correct?

14  A.  Yes.

15  Q.  What was the purpose of the other meetings that were not

16  used to prepare for trial?

17  A.  Assisting the government what I had done in the streets

18  with others and with myself.

19  Q.  To provide information about those activities?

20  A.  Yes.

21  Q.  As part of your cooperation, were you required to disclose

22  to the government all of the crimes you've ever committed?

23  A.  Yes.

24  Q.  Did you do that?

25  A.  Yes.

1  Q.  Does that include crimes that you've talked about during

2  your testimony today?

3  A.  Yes.

4  Q.  Does it include crimes that you've never been charged with?

5  A.  Yes.

6  Q.  Crimes you've never been arrested for?

7  A.  Yes.

8  Q.  Crimes you've never been convicted of?

9  A.  Yes.

10  Q.  Dealing crack cocaine, you talk about that with the

11  government?

12  A.  Yes, I did.

13  Q.  Talked about assaults?

14  A.  Yes.

15  Q.  Carrying guns?

16  A.  Yes.

17  Q.  Shooting incidents?

18  A.  Yes.

19  Q.  Mr. Williams, you've pleaded guilty to your charges in this

20  case, correct?

21  A.  Yes.

22  Q.  What crimes did you plead guilty to?

23  A.  Possession of a firearm, shootings, selling crack cocaine,

24  as well as a little marijuana.

25  Q.  Are there any other charges that you pled guilty to?

1    A.  Tampering with a witness.

2    Q.  On that tampering with a witness charge, can you explain

3    what made you guilty of that offense.

4    A.  While I was on the run, I approached somebody baby mother

5    and -- to tell her to tell her baby father to switch up the

6    story on me because I figure he was the one that was telling on

7    me.

8    Q.  And you wanted him to change his story that he was giving?

9    A.  Yeah.

10   Q.  And you wanted him to lie for you?

11   A.  Yes.

12   Q.  Did you threaten this person's baby's mother?

13   A.  No.

14   Q.  Did you threaten this person himself?

15   A.  No.

16   Q.  Because of your guilty plea, what is your understanding of

17   the mandatory minimum sentence you face?

18   A.  Twenty years.

19   Q.  What is your understanding of the maximum sentence you face

20   as a result of your guilty plea?

21   A.  Life.

22   Q.  When you pled guilty, did you enter into a cooperation

23   agreement with the government?

24   A.  Yes.

25   Q.  Mr. Williams, in front of you on the stand there's a -- I

1   guess it can go on the screen as well, but on the stand there's

2   a binder in front of you.

3   A.  Yes.

4   Q.  Mr. Williams, if you could grab the binder, the last tab in

5   that binder is an item that's been marked as 3501-62.  Do you

6   see that document?

7   A.  Yes.

8   Q.  Can you flip through that document and then look up when

9   you're done.

10  A.  (Witness complies.)

11  Q.  Mr. Williams, could you look at the last page of the

12  document.  Do you see some signatures on that page?

13  A.  Yes.

14  Q.  Do you see your signature on that page?

15  A.  Yes.

16  Q.  What is this document?

17  A.  It's a -- it's a letter.

18  Q.  Is this your cooperation agreement with the government?

19  A.  Yes.

20  Q.  Did you sign this document?

21  A.  Yes.

22  Q.  Do you recognize it?

23  A.  Yes.

24          MR. KROUSE:  The government offers 3501-62 into

25  evidence, your Honor.

1      MR. LIND:  Well, with the prior objection, Judge.

2      THE COURT:  Yes.  Subject to our previous discussion,

3  it will be admitted into evidence.

4      MR. KROUSE:  Thank you, your Honor.

5      (Government's Exhibit 3501-62 received in evidence)

6  BY MR. KROUSE:

7  Q.  Mr. Williams, as you understand it, what are your

8  obligations under this cooperation agreement?

9  A.  Just to tell the truth.

10 Q.  Is it also providing substantial assistance?

11 A.  Yes.

12 Q.  Can you describe what substantial assistance is in the

13 context of the meetings that you have with the government.

14 A.  By me telling the truth and giving assistance to the

15 government, they'll write a letter for me, 5K1 letter.

16 Q.  And that's the second question.  If you meet your

17 obligations under this cooperation agreement, what's your

18 understanding of what the government will do?

19 A.  Give me a letter, 5K1 letter.

20 Q.  What's your understanding of who writes that 5K1 letter?

21 A.  The government.

22 Q.  And what's your understanding of who receives that letter?

23 A.  The judge.

24 Q.  And what's your understanding of the types of information

25 that goes into that 5K1 letter?

1  A.  All the things that I committed out there in the streets

2  and from -- the bad things and the good things I have done.

3  Q.  So is it a full picture of you as a person?

4  A.  Yes.

5  Q.  When you say all the things you've committed out on the

6  streets, you're referring to the crimes that you've committed,

7  correct?

8  A.  Yes.

9  Q.  Is it your understanding that those crimes that you

10  committed go into the 5K1 letter?

11  A.  Yes.

12  Q.  When you say "the good things," what do you mean by that?

13  A.  As far as me telling the truth about what I was doing out

14  on the street and who I was doing it with, just -- just holding

15  my end of the bargain towards the letter.

16  Q.  And providing information about that to the government?

17  A.  Yes.

18  Q.  Are you also obligated to testify at a trial if there is a

19  trial?

20  A.  Yes.

21  Q.  To your understanding, what effect can the 5K1 letter have

22  on your possible sentence?

23  A.  Go under my mandatory minimum.

24  Q.  Meaning that the judge could go under your mandatory

25  minimum?

1   A.  Yes.

2   Q.  What is your mandatory minimum in this case, if you can

3   remind the jury?

4   A.  Twenty years.

5   Q.  Are you hoping to get a sentence below 20 years in prison?

6   A.  Yes.

7   Q.  What sentence are you hoping to get?

8   A.  Time served.

9   Q.  Have you been promised a 5K1 letter as you sit here today?

10  A.  Yes, If I -- if I tell the truth and do what I supposed to

11  do.

12  Q.  So sitting here today, do you know whether you will receive

13  a 5K1 letter or not?

14  A.  Yes.

15  Q.  Do you know if you will meet those conditions?

16  A.  Just -- they told me to tell the truth, and I should meet

17  the conditions.

18  Q.  And that is a condition of you receiving the 5K1 letter,

19  correct?

20  A.  Yes.

21  Q.  Have you been promised any particular sentence as you sit

22  here today?

23  A.  No.

24  Q.  What is your understanding of what happens if you do not

25  tell the truth today?

1   A.  I would get the maximum sentence.

2   Q.  What would happen to your cooperation agreement?

3   A.  It would get ripped up.

4   Q.  To your understanding, does the outcome of this trial

5   affect whether you get a 5K1 letter or not?

6   A.  No.

7   Q.  To your understanding, what is it that you have to do to

8   get a 5K1 letter today?

9            MR. LIND:  Objection, Judge.

10            THE COURT:  Overruled.

11            You can answer that question.

12   A.  Basically, just tell the truth and just be honest.

13            MR. KROUSE:  No further questions, your Honor.

14            THE COURT:  All right.  Shall we adjourn for the day?

15            MR. LIND:  That would be fine with me, Judge.

16            THE COURT:  Ladies and gentlemen, it's after

17   5 o'clock.  We're going to adjourn for the day.  We're ahead of

18   schedule, so I'm hopeful that we'll finish the witnesses no

19   later than Thursday and be able to give the case to you to

20   begin your deliberations on Friday.  I'd like to keep us ahead

21   of schedule, maybe might even be able to push that up another

22   day, but I don't want to promise that now.  But at this point I

23   think I'm confident that we can get the case to you by Thursday

24   at the latest.

25            So don't discuss the case.  Keep an open mind.  I'm

1    going to ask you to be in earlier tomorrow.  I'm going to ask

2    everyone to try to be prompt.  9:45 I'd like to start so we can

3    make sure we can stay on schedule or even knock off another

4    half day or a day off the schedule.  So I'll see you tomorrow

5    morning at 9:45, and we'll continue at that time.

6                    (Jury excused)

7                    (Continued on next page)

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

1               (Jury not present)

2               THE COURT:  All right.  We'll continue 9:45 tomorrow.

3          How many more witnesses do you have after this?

4               MR. KROUSE:  Your Honor, we have seven witnesses,

5     really six fact witnesses and then one witness we'll put on the

6     stand to go through a couple of the medical records which are

7     already in evidence, but they're relatively short witnesses.

8     Two of them are expert witnesses, however, so it may take a

9     little more time.  But depending on how long the

10    cross-examination takes, we would anticipate completing those

11    additional witnesses.

12              THE COURT:  All right.  Mr. Lind, how long do you

13    think you'll be on cross?

14              MR. LIND:  I don't know.  Maybe an hour and a half,

15    two hours.

16              THE COURT:  OK.

17              MR. LIND:  May I make a request, Judge?

18              THE COURT:  Yes.

19              MR. LIND:  I've been so tied up, I didn't have a

20    chance to put in the e-voucher for the transcript.  If I do it

21    tonight -- I forget how it works.

22              THE COURT:  Well, I think it's being done anyway,

23    right?  So you can put in the voucher; I'll sign it.

24              MR. LIND:  OK.

25              THE COURT:  I think it's been -- obviously, it's been

1    ordered.  We've been getting it.

2              MR. LIND:  OK.  All right.

3              THE COURT:  Sign the form; I'll order it.

4              MR. LIND:  OK.  Thank you.

5              MR. KROUSE:  Your Honor, could we inquire whether

6    there's a defense case at all?  We haven't been informed of any

7    witnesses the defense intends to call.

8              MR. LIND:  May I just talk to my client?

9              THE COURT:  Sure.

10             (Counsel conferred with defendant)

11             MR. LIND:  No, Judge, there won't be any defense case.

12             THE COURT:  All right.  Let's see if we can still

13   finish the witnesses tomorrow, and we'll be ready to have a

14   charging conference and have summations and charge Thursday.

15   Otherwise, if we spill over till Thursday, we'll see if we can

16   do it on Friday.

17             MR. KROUSE:  Your Honor, just to flag it for the

18   Court, there is one outstanding legal issue that will affect, I

19   believe, the first witness that we'll call after Mr. Williams,

20   or that we plan to.  It's an undercover officer concerning the

21   2013 crack purchase or sale made by Mr. Moss and Mr. Corbett.

22   This was an issue that was raised in the briefing regarding

23   prior acts relative to the conspiracy that Mr. Lind has

24   objected to because it didn't involve his client.

25             THE COURT:  Well, at this point I think that there's

I9BHPol6                        Williams - Direct

1   enough in this record for me to make a determination that the

2   government has proffered evidence sufficient to demonstrate a

3   conspiracy; and, therefore, the conspiracy -- one could

4   conclude that the conspiracy began before the defendant's

5   participation and then the defendant joined that ongoing

6   conspiracy if the jury were to find that testimony and evidence

7   to be credible on that basis.

8           At this point I believe that such evidence of when the

9   conspiracy started and who is in the conspiracy, when the

10  defendant joined that conspiracy, I think any evidence in that

11  regard is admissible at this point based on the evidence that's

12  been offered so far.  OK.

13          MR. KROUSE:  Thank you, your Honor.

14          THE COURT:  All right.  I'll see you at 9:45.

15          (Adjourned to September 12, 2018, at 9:45 a.m.)

16

17

18

19

20

21

22

23

24

25

1                          INDEX OF EXAMINATION

2     Examination  of:                           Page

3      ENRIQUE SANTOS

4     Direct By Mr. Krouse . . . . . . . . . . . . 159

5     Cross By Mr. Lind  . . . . . . . . . . . . . 181

6     ROSALIND JAIME

7     Direct By Mr. Folly  . . . . . . . . . . . . 183

8     CICERO WILLIAMS

9     Direct By Mr. Folly  . . . . . . . . . . . . 204

10                        GOVERNMENT EXHIBITS

11    Exhibit No.                              Received

12     701 A1, A2, A3, A4, A6, 701 B1, B2, B3   . . 159

13     901    . . . . . . . . . . . . . . . . . . . 166

14     902    . . . . . . . . . . . . . . . . . . . 172

15     900    . . . . . . . . . . . . . . . . . . . 174

16     903    . . . . . . . . . . . . . . . . . . . 176

17     904    . . . . . . . . . . . . . . . . . . . 178

18     110    . . . . . . . . . . . . . . . . . . . 180

19     532    . . . . . . . . . . . . . . . . . . . 188

20     201    . . . . . . . . . . . . . . . . . . . 190

21     702, 702A, and 702B  . . . . . . . . . . . 191

22     702A-1, 702A-2, and 702B-1   . . . . . . . 194

23     1B    . . . . . . . . . . . . . . . . . . . 208

24     3, 3A, 3D  . . . . . . . . . . . . . . . . . 210

25     2B    . . . . . . . . . . . . . . . . . . . 211

```
 1    4B      . . . . . . . . . . . . . . . . . . 212

 2    5 and 5A    . . . . . . . . . . . . . . . 214

 3    200   . . . . . . . . . . . . . . . . . . 215

 4    204   . . . . . . . . . . . . . . . . . . 217

 5    6 and 6B    . . . . . . . . . . . . . . . 244

 6    535   . . . . . . . . . . . . . . . . . . 278

 7    531   . . . . . . . . . . . . . . . . . . 285

 8    7   . . . . . . . . . . . . . . . . . . . 288

 9    7B    . . . . . . . . . . . . . . . . . . 289

10    538   . . . . . . . . . . . . . . . . . . 289

11    536 and 537   . . . . . . . . . . . . . . 290

12    800, 801, 802, 803, 806, 807, 808 . . . . . . 320

13           accompanying transcripts

14    3501-62   . . . . . . . . . . . . . . . . 362
```