I9CAAPOL1

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
------------------------------x

UNITED STATES OF AMERICA,

           v.                              17 CR 649 (GBD)

TERRELL POLK,

             Defendant.

------------------------------x

                              New York, N.Y.
                              September 12, 2018
                              9:45 a.m.

Before:

                 HON. GEORGE B. DANIELS,

                              District Judge
                              - and a Jury -

                      APPEARANCES

GEOFFREY S. BERMAN,
    United States Attorney for the
    Southern District of New York
MICHAEL KIM KROUSE
NICHOLAS FOLLY
MAX NICHOLAS
    Assistant United States Attorneys

RICHARD B. LIND
    Attorney for Defendant

ALSO PRESENT:

JONATHAN CONCEPCION, U.S. Attorney's Office Paralegal
JESSICA ALVARADO, NYPD

I9CAAPOL1

1          (Trial resumed; Jury not present)

2          THE COURT:  Good morning.

3          All our jurors are here.  Is there anything you need

4    to address?

5          MR. LIND:  I think there's some issue from the

6    government -- playing the post-arrest statement portions of it.

7    Not the whole thing and --

8          THE COURT:  What is the issue?

9          MR. LIND:  I don't know.  Must be an issue with the

10   government.

11         MR. KROUSE:  Your Honor, it's not proper cross to just

12   play portions of Mr. Williams' post-arrest statement which is

13   my understanding of what Mr. Lind intents to do.

14   Mr. Williams -- just for the Court's background -- Mr. Williams

15   when he was arrested in November of 2016 gave a post-arrest

16   statement that was recorded.  The government's provided that

17   recording to Mr. Lind.  There's also a 302 report of that

18   post-arrest statement which was also provided.

19         The government is fine with Mr. Lind asking

20   Mr. Williams questions and then if those answers are

21   inconsistent with his post-arrest statement, asking him or

22   confronting him with it and saying, Didn't you say during your

23   post-arrest statement, "X" and then see what Mr. Williams says

24   but he can't just get up and play the recording of

25   Mr. Williams's post-arrest statement?  It's hearsay.  It's not

I9CAAPOL1

proper cross-examination.  It's not evidence that confident for

the defense to admit.  So he can certainly confront

Mr. Williams for any inconsistencies between what he says now

and what he said in his post-arrest but he can't just get up

and play the recording.

THE COURT:  What did you want to do?

MR. LIND:  I wanted to play portions of it where for

one thing the agent, I guess the detective was there.  She is

talking about how long they have been looking for him.  And I

think that that's important in order to show that the

indictment that he was charged with in 2016, the investigation

for that goes back at least a year, maybe a year and a half

during the same period that he claims that he was involved with

my client who is not charged in the 2016 indictment.

THE COURT:  I'll sorry.  I am confused.  I am not sure

what the 2016 indictment you are referring to.

MR. LIND:  He was indicted.  He mentioned it on the

stand.  He got charged with about 20 other people for selling

drugs, firearms, and I don't know if your Honor remembers this

at the end of the day --

THE COURT:  Well, was he arrested with any of these

individuals?

MR. LIND:  No, he wasn't.

THE COURT:  What does that have to do with your

client?

I9CAAPOL1

1          MR. LIND:  What it has to do with my client is that

2     during the same period that they are investigating this -- and

3     also if he denies various allegations in the indictment he gets

4     up, he denies that he was shooting at this guy Lasin in the

5     park.

6          MR. KROUSE:  He testified that on direct, your Honor.

7     He testified about shooting --

8          MR. LIND:  Then there can't be any problem.

9          THE COURT:  Stop.  Stop.  One at a time.  I am just

10    trying to hear factually from you -- are you trying to impeach

11    him with a prior inconsistent statement?  It's inconsistent

12    with what he testified to on direct or else what are you trying

13    to do?

14         MR. LIND:  Well, it's not inconsistent necessarily

15    with what he said on direct.  For example, did the detective

16    tell him during that course of that interview that they have

17    been investigating him and these other people for a year, year

18    and a half.

19         THE COURT:  What other people?

20         MR. LIND:  The other people in that indictment.

21         THE COURT:  But that's not your client or any of the

22    people that he put on this board, right?

23         MR. LIND:  Not necessarily, judge.  But what I'm

24    saying is he is eventually indicted.

25         THE COURT:  Right.  And he's done a lot of illegal

I9CAAPOL1

 1   things.  So he is indicted for one of the illegal things he

 2   did.

 3          MR. LIND:  For three illegal things.  But it's in the

 4   exact same neighborhood as Mr. Polk was supposed to be

 5   allegedly in the same exact neighborhood.  And they didn't

 6   indict Mr. Polk.  And what I'm saying is, that's what he was

 7   doing in 2014 and 2015.

 8          THE COURT:  With Mr. Polk?

 9          MR. LIND:  No.  With others.

10          THE COURT:  OK.  What does that have to do with

11   Mr. Polk?

12          MR. LIND:  It shows that he was in fact working with

13   this other group.  We was working with Mr. Polk.

14          MR. KROUSE:  Mr. Polk was in prison during that

15   period, your Honor.

16          MR. LIND:  No, he wasn't.

17          THE COURT:  Slow down.  Mr. Lind, what is it that you

18   want to ask this witness and how do you want to pose it?

19          MR. LIND:  Let me get my notes, judge.

20          THE COURT:  OK.  I just want to know in your

21   questioning of this witness how you want to utilize these

22   statements.  If he said something previously on direct or at

23   some other time and you're claiming that there's a prior

24   inconsistent statement, that's one thing.

25          If you are just trying to get a fact out of him, then

I9CAAPOL1

1    the question is do you ask him that fact before you start

2    playing prior statements?  If he denies the fact, then you can

3    play the statement and confront him with it.  If he admits the

4    fact, then I'm not sure what the purpose is of playing some

5    recording.  I'm not sure what is on the recording yet.

6            MR. KROUSE:  Your Honor, I think that's right as far

7    as it goes on the impeachment of prior inconsistent statements

8    as long as those facts are relevant in any way to this trial.

9    So if Mr. Lind is trying to elicit from this witness what the

10   detectives told him, which is hearsay, about what they were or

11   were not doing in the neighborhood during this period and who

12   they were investigating and whether or not Mr. Polk was

13   indicted on the Flybridge indictment or whether or not

14   Mr. Williams committed crimes and other people in addition to

15   Mr. Polk.  It's confusing to the jury.

16           It's not relevant to this case.  It's completely

17   improper cross to try to elicit through this witness what the

18   NYPD officers or the FBI was investigating in this

19   neighborhood.  I think he can get out that Mr. Williams was

20   indicted with other people and that's why he was arrested in

21   November of 2016 and he can certainly challenge certain

22   statements he made during post-arrest statements that were

23   inconsistent with what he is saying today.  But he can't try to

24   get in these hearsay statements that detectives made to him and

25   then he certainly can't just then play these recordings in open

I9CAAPOL1

1    court with no proper purpose when the easiest way and the

2    proper way to do it is to ask a question and if the answer is

3    inconsistent with a previous statement, then say didn't you on

4    this date say this which is different.  And then if he says

5    "yes, I said that" then that's the end of that inquiry.

6            THE COURT:  Mr. Lind, do you have some sort of

7    transcript.

8            MR. LIND:  On the recording, no, judge.

9            THE COURT:  So let's start with this.  What is it that

10   you want to play?  What part of the conversation?

11           MR. LIND:  Well, what I want to play is the part where

12   he says that he --

13           THE COURT:  He was not involved in robberies?

14           MR. LIND:  Yes.  That's part of it.  I forget what was

15   brought out on direct.  Was that brought out?

16           THE COURT:  He obviously said -- he did say -- well, I

17   think he did say he was involved in robberies.  Did he?

18           MR. LIND:  No, he didn't.

19           THE COURT:  On the stand?

20           MR. KROUSE:  He made one statement about when somebody

21   owed him a drug that he went to their friend's house and pulled

22   a gun and took their phones and money.  I think he might not

23   view that as a robbery because he was going to just hold that

24   and then when he was paid he would give it back.

25           THE COURT:  Does his plea agreement reference

I9CAAPOL1

1    robberies?

2            MR. KROUSE:  No, your Honor.

3            THE COURT:  Does it say he is getting coverage for the

4    robberies?

5            MR. LIND:  Judge?

6            MR. KROUSE:  And mr. Lind is certainly free to ask

7    him, did you commit robberies as well?  And if he says "no" and

8    he had previously said yes or whatever, he can challenge.  We

9    just want to go in the proper order.

10           THE COURT:  I understand, your argument.  I am just

11   trying to get the facts.

12           Mr. Lind, what do you want to play?

13           MR. LIND:  For example, he'll say he said during the

14   interview that he was a hustler, selling drugs but he wasn't a

15   stick-up guy.  OK?

16           THE COURT:  OK.

17           MR. LIND:  Now, that wasn't true.  And I don't think

18   that was elicited by the government.

19           THE COURT:  And how extensive is the tape recording

20   you want to play?

21           MR. LIND:  There are many.

22           THE COURT:  How many portions?

23           MR. LIND:  There was a -- I would say it's a couple

24   minutes all together.  It's hard to tell, judge, because I put

25   down when this particular statement ends.  I don't have when it

I9CAAPOL1

1     ends.

2           THE COURT:  How many different statements do you want

3     to play?

4           MR. LIND:  The government itself has admitted that he

5     lied at the interview.

6           THE COURT:  I'm ignorant here.  You've got to give me

7     some more information.

8           MR. LIND:  About the stick-up guy that he didn't do

9     the park robbery.  I don't think that was brought up on

10    cross-examination on direct-examination.

11          THE COURT:  Are all the portions that you want to play

12    inconsistent with what he testified to yesterday?

13          MR. LIND:  No.

14          THE COURT:  OK.  So what portion --

15          MR. LIND:  Are they inconsistent?  He now admits that

16    he was a stick-up guy, that he committed robberies.

17          THE COURT:  What did he say on the tape?

18          MR. LIND:  On the tape he said he didn't commit --

19          THE COURT:  That is inconsistent with what he

20    testified to.

21          MR. LIND:  What he told them.

22          THE COURT:  All right.  So are the portions that you

23    want to play, are they inconsistent with the testimony he gave

24    yesterday?

25          MR. LIND:  Yes.

I9CAAPOL1

1              THE COURT:  OK.

2              MR. LIND:  Judge, if you want to I can go over these

3    right now.

4              THE COURT:  I just want a feel for it so I know what

5    I'm ruling on.  Give me one example of what you want to play.

6    What's the first thing you want to play and ask him about?

7              MR. LIND:  That he was never a stick-up guy.

8              THE COURT:  On the tape he makes the comment "I was

9    never a stick-up guy".

10             MR. LIND:  Yes.

11             THE COURT:  And you want to say to them that that was

12   false?

13             MR. LIND:  Right.  That was a false statement, OK,

14   that he wasn't involved in this robbery.  I guess in Nelson

15   Park; is that right?  The shooting in Nelson Park.

16             MR. KROUSE:  He testified that he committed that

17   shooting, your Honor, on direct.  So, that's not inconsistent.

18             THE COURT:  One at a time.

19             Mr. Lind, what is it --

20             MR. LIND:  I am asking him about the stuff that he

21   said back then.

22             THE COURT:  Is it inconsistent with what he said --

23             MR. LIND:  On the stand --

24             THE COURT:  Yes.

25             MR. LIND:  That part not inconsistent.

I9CAAPOL1

1          THE COURT:  So, what point are you trying to make by

2     playing that portion?

3          MR. LIND:  That he wasn't a stick-up guy.

4          THE COURT:  When?  Yesterday or on the tape?

5          MR. LIND:  On the tape that.

6          THE COURT:  He said he wasn't a stick-up guy and you

7     want to play that and say that that was false?

8          MR. LIND:  Right.

9          THE COURT:  OK.  And what else is the subject matter?

10         MR. LIND:  Trying to look here, judge.  I'm sorry.

11         THE COURT:  I'm trying to figure out how extensive

12    this is.

13         MR. LIND:  No, sir, it's not going to be very

14    extensive.

15         THE COURT:  And what the subject matter is?

16         MR. KROUSE:  Your Honor, if I may just draw the

17    distinction of what we're objecting to.  We're certainly not

18    objecting to Mr. Lind challenging the witness with prior

19    statements that he made in a post-arrest interview and saying

20    that those statements he made in that interview are

21    inconsistent with what he is saying now.  There's just a way to

22    do that and it doesn't involve playing the video.

23         THE COURT:  It doesn't preclude him from playing the

24    video.  If it's on the video and it's a prior inconsistent

25    statement, he can play it for the witness and ask the witness

I9CAAPOL1

1   did he make that statement.

2          MR. KROUSE:  But he can ask that question without the

3   video.

4          THE COURT:  Right.  But he can ask the question with

5   the video.  There is nothing to prevent him from saying we have

6   a video of you saying something different.  Let me play the

7   video for you.  When you said that, was that true?

8          MR. KROUSE:  The video is not evidence, your Honor.

9          THE COURT:  No, it's not evidence.  The question and

10  the answer is evidence.

11         MR. KROUSE:  The answer is evidence.

12         THE COURT:  But the jury is entitled to know what it

13  is he said.

14         MR. KROUSE:  I agree with that completely, your Honor.

15  And I believe that Mr. Lind can say, Mr. Williams, "Are you a

16  stick-up artist"?  And he can say "No, I'm not" or something

17  like that.  Then he can say didn't you in a previous statement

18  say that you --

19         THE COURT:  I understand he can do that if he wants to

20  do that but my final question is usually this.  You've got to

21  have two things to object.  You've got to have a ground to

22  object and a reason to object.

23         What's your reason for objecting?  Why don't you want

24  this played?

25         MR. KROUSE:  The video is not evidence, your Honor.

I9CAAPOL1

1          THE COURT:  Why don't you want the jury to hear the

2     evidence?

3          MR. KROUSE:  Because the video is not in evidence.

4          THE COURT:  That's not a reason to --

5          MR. KROUSE:  It can't be published.

6          THE COURT:  If the video was a confession you wouldn't

7     have a reason not to the play the video.  Why do you not

8     want --

9          MR. KROUSE:  If it was a confession by this witness I

10    would have a reason because it's hearsay, your Honor.

11         THE COURT:  That's your ground.  That's not your

12    reason.  What's your good reason that you don't want the jury

13    to hear it?

14         MR. KROUSE:  There is a couple reasons, your Honor.

15    The video is not in evidence so it's being published to the

16    jury even though it's not admitted evidence?

17         THE COURT:  How does that hurt you?  What is the

18    reason you don't want that?

19         MR. KROUSE:  Because it could confuse the jury about

20    the reason why the video is being played.  Depending on how it

21    comes out, Mr. Lind can ask the question, you gave a previous

22    post-arrest statement, correct?  And he will say "yes" to that.

23    Mr. Lind can ask him a question that somehow touches on what

24    was said in that post-arrest statement.

25         THE COURT:  I know all of that.  But the fact is if

I9CAAPOL1

1    this had been a transcript it wouldn't be the same.  If he read

2    from the transcript and said, didn't you give a deposition and

3    weren't you asked this question and didn't you give this

4    answer?  It doesn't make the transcript evidence.  It's a

5    question.  If he plays the video, if it was a video deposition

6    he could do that.  If it's a video statement that he made and

7    it's inconsistent with what he said at trial, the jury is

8    entitled to see what he said, how he said it and whether or not

9    they believed he was telling the truth then or now.

10        MR. KROUSE:  But if Mr. Lind says in the post-arrest

11   statement didn't you say you weren't a stick-up guy and then

12   Mr. Williams says, yes, I said that in my post-arrest

13   statement, then there is no inconsistencies, then why play the

14   video that's not in evidence?

15        THE COURT:  Again, why not?  Why are we fighting about

16   this?

17        MR. KROUSE:  Because the witness in that scenario

18   would have just admitted that he said that.  So it's cumulative

19   to then play the video where he then didn't say that.

20        THE COURT:  I understand.

21        Mr. Lind, play the video.  Let's go and move forward.

22   Ask your question and let's move.

23        MR. KROUSE:  Your Honor, Mr. Lind from our

24   understanding doesn't have the ability able to play the video

25   so he is relying on the government to do that.

I9CAAPOL1

```
 1              THE COURT:  You are assisting him?

 2              MR. KROUSE:  We will assist him but if he could

 3    provide us with some timestamps, something that could --

 4              MR. LIND:  Timestamp on the video?

 5              MR. KROUSE:  Exactly.

 6              THE COURT:  I just want us to efficiently move this.

 7    We have the jury here on time and we're 20 minutes late.

 8              (Pause)

 9              MR. KROUSE:  Your Honor, it would have been helpful to

10    the government to know that Mr. Lind was going to do this

11    before this morning.

12              THE COURT:  That's a keen perception of the obvious.

13    What else do you want to say?

14              MR. KROUSE:  Then we could have viewed what portions

15    he was playing.

16              THE COURT:  What do you want me to do, agree with you?

17              MR. KROUSE:  We want to be able to have an opportunity

18    to look at what he wants to play to see if we have any other

19    objections.  For instance, if we understand the Court's ruling

20    to be that Mr. Lind can confront the witness himself with

21    statements he made.  But it sounds to me that Mr. Lind also

22    wants to play other hearsay statements made by detectives such

23    as, we were looking for you for a long time.  That's plainly

24    inadmissible and has nothing to do with the witness.  It may

25    not even be true.  It might be something detectives are just
```

I9CAAPOL1

1   saying to butter up the defendant.

2          So we just need to know what portions of the video

3   Mr. Lind wants to use.  So our suggestion, your Honor, in the

4   interest of keeping moving efficiently with the jury is to have

5   Mr. Lind do other portions of his cross-examination with the

6   witness this morning, take the morning break depending on how

7   long it is going to be and then during the break have Mr. Lind

8   show us what he intends to confront the witness with because

9   right now we're just flying blind and have no idea what's going

10  to be played.

11         THE COURT:  I only half agree with you.  It was your

12  responsibility to find that out before you made the objection,

13  if you have any objection.  I am not particularly empathetic

14  with that position.

15         Mr. Lind, I'm going to let you do it the way you want

16  to do it.  How do you want to do it?

17         MR. LIND:  I'd like to move forward, judge.  I think

18  it'll take five minutes.

19         THE COURT:  You'll get five minutes but you are not

20  getting any more than that.

21         MR. LIND:  We have get this set up, judge.

22         THE COURT:  You have five monies.  Otherwise, you'll

23  have to go without.

24         (Pause)

25         THE COURT:  Let me bring in the jury.

1          (Jury present)

2          THE COURT:  You could be seated, ladies and gentlemen.

3          Good morning, ladies and gentlemen.  I apologize for

4   the delay but we have been having a little bit of a technical

5   difficulty with the equipment here and we were resolving some

6   issues that don't concern you.  Let me assure you that usually

7   in the long run it saves us time resolving these issues before

8   you come out rather than delaying the trial.

9          Right now I believe that we are still on schedule to

10  finish the witnesses by no the later than tomorrow.  So if we

11  do that I am going to anticipate hopefully having summations

12  and closing arguments of the parties, instructing you on the

13  law and sending you in to begin deliberations on Friday.  So

14  that's my plan at this point.  Again, I want to keep us on

15  schedule or maybe even try to move that up a little bit.

16         So we're now cross-examination, Mr. Lind?

17         MR. LIND:  Thank you.

18         Good morning, Mr. Williams.

19  CICERO WILLIAMS,

20       called as a witness by the Government,

21       having been duly sworn, testified as follows:

22  DIRECT EXAMINATION

23  BY MR. LIND:

24  Q.  Mr. Williams, yesterday during your testimony you knew

25  every question that was going to be asked of you, correct?

1    A.   Say that again.

2    Q.   Yesterday before during your testimony, you knew every

3    question the government was going to ask of you, correct?

4    A.   No.

5    Q.   What questions did you not know before?

6    A.   I can't really say offhand but it was the questions he was

7    asking me, so I just answered them truthfully.

8    Q.   But you had gone over that numerous times with the

9    prosecutor before you testified, correct?

10   A.   We went over a couple of things but like I said, most of

11   times they asked questions for other things.

12   Q.   I don't know what you mean by that?

13   A.   Other situations about the proffer and what I got to be

14   truthful of.

15   Q.   When you say "proffer" what do you mean by "proffer"?

16   A.   Assisting the government with the things that, the crimes I

17   had committed.

18   Q.   How many hours did you spend going over your testimony with

19   the government before you testified yesterday?

20   A.   A lot of hours.

21   Q.   20/30, hours?

22   A.   Maybe.

23   Q.   Maybe more?

24   A.   Maybe.

25   Q.   Now at none of those sessions was there an attorney

1    present, right?

2    A.  No, sir.

3    Q.  Unlike when you met the government during the first times

4    you met with them, your attorney was present then, correct?

5    A.  Yes, sir.

6    Q.  And each time the government went over stuff during the

7    proffer sessions, your attorney was there, correct, and

8    protected your rights, right?

9    A.  He was there a couple of times.  Then after that he wasn't

10   there.

11   Q.  Isn't it a fact that you're under the government's complete

12   control in determining what to say here, correct?

13   A.  I can't say that.  Under complete control is just me

14   cooperating and giving them assistance, the true things I was

15   doing out there in the streets.

16   Q.  And you have to testify truthfully according to the

17   government otherwise your deal is ripped up, correct?

18   A.  Yes.

19   Q.  And what you have to testify to is what you went over with

20   the government; isn't that correct?

21   A.  About what I had told them.

22   Q.  But they came up with the questions, right?  And you know

23   what the questions are and you know what the answers should be,

24   correct?

25   A.  It shouldn't be hard because what I told them was the truth

1    and that's the questions that they asked me.  So I just

2    answered truthfully.

3    Q.  Now, you have had a long criminal history, correct?

4    A.  Yes, I do.

5    Q.  We went over part of that yesterday; do you remember that?

6    A.  Yes.

7    Q.  Now, the government asked you, were you ever arrested for

8    those charges.  Do you remember going over the charges with the

9    government yesterday?

10   A.  Yes, I do.

11   Q.  What were the charges that you were arrested for; do you

12   remember testifying about that?

13   A.  Selling crack cocaine, possession of handguns, shootings

14   and tampering with a witness.

15   Q.  I am not talking about your present charges.  I am talking

16   about the ones where you brought it up to the government,

17   otherwise, they would have never known about that.  Do you

18   remember going over those yesterday?

19   A.  Yes.

20   Q.  That has nothing to do with intimidating a witness,

21   correct?  That wasn't in the indictment.  That wasn't something

22   that you brought up to them?

23   A.  Yes.

24   Q.  You had charges in 1996, 1997 -- I forget the years but

25   they were like 20/25 years ago.  Do you remember those charges?

I9CAAPOL1                    Williams - Cross

1   A.   Yeah.  It was a long time ago.

2   Q.   And you were never arrested or convicted or prosecuted

3   under any of those charges, correct?

4   A.   No.

5   Q.   And the reason why you've disclosed it to the government is

6   because the government told you you'd better tell us everything

7   because otherwise you are going to become worthless as a

8   witness.  Somebody's going to bring that up, find out about it

9   and you are going to be exposed as a liar, correct?

10  A.   Not in that way.  They told me just to tell the truth,

11  everything what happened in my life.  So for me admitting it

12  and want to get through with this part of my life and the

13  situation of my life, so I just told to them everything that I

14  knew and everything that I did.

15           MR. LIND:  One moment, judge?

16           THE COURT:  Yes.

17           (Pause)

18  Q.   In 1996 you were charged with firing at other people.  Do

19  you remember that, firing at another person?  Do you remember

20  testifying about that yesterday?

21  A.   I never had got arrested for that 1996.

22  Q.   You weren't arrested for that but that's what you did,

23  right?

24  A.   Yes, I admitted to that.

25  Q.   And did you do that to hurt the person?

1    A.   Yes.  They was trying to hurt me truthfully.

2    Q.   My question is, did you try to hurt the person back?

3    A.   Yes, because he was trying to hurt me.

4    Q.   That's not my question.  Can you answer my question please?

5    A.   Yes.

6    Q.   OK.  And that's why you shot him, right?

7    A.   Shot at him.

8    Q.   And there was another shooting in 2002, correct?

9    A.   Yes.

10   Q.   Now, the 1996 shooting occurred in Mount Vernon; do you

11   remember testifying about that?

12   A.   Yes, I did.

13   Q.   You were living in Mount Vernon, correct?

14   A.   Yes.

15   Q.   And you had been living in Mount Vernon for a number of

16   years before 1996, correct, about three our four years?

17   A.   No, not before all that happened.

18   Q.   Well, how many years before 1996 were you living in Mount

19   Vernon?

20   A.   I was living in Mount Vernon I was back -- that was back in

21   1994 I was back and forth from the Bronx to Mount Vernon but I

22   was still living in the projects in High bridge.

23   Q.   You were also living in Mount Vernon, correct?

24   A.   Yes.  My mother had a house in Mount Vernon.

25   Q.   That's where you were living, right?

1    A.  I was living in Highbridge but I was back and forth.

2    Q.  What portion of your time were you spending in Mount

3    Vernon?

4    A.  Whenever I wanted to come up there when I was going to

5    school cause I was in school up there but basically, I was just

6    I was playing a lot of hooky and being very rebellious to my

7    mother and just doing what I want every since I was like 15

8    years old, 14/15 years old.

9    Q.  Now, you went into drug dealing when you were 14/15 years

10   old?

11   A.  You could say when I was about 16.

12   Q.  And that was up in Mount Vernon?

13   A.  No.  In the Bronx.

14   Q.  But this shooting occurred in Mount Vernon, correct?

15   A.  Yes.

16   Q.  Why were you up there then?

17   A.  As I said, I was going to school and I know a couple of

18   friends that I met up there and I started hanging out with them

19   as well.  So I was, it was just a back and forth thing that I

20   was doing.

21   Q.  In fact, most of the time you were living in Mount Vernon;

22   isn't that correct?

23   A.  I can't say that.  It was like most of my best friends was

24   in the Bronx.  My childhood friends was in the Bronx.  So, I

25   was really in the Bronx a lot but when I come up to Mount

1   Vernon I be up there a couple of weeks, you know.

2   Q.  Didn't you tell the jury yesterday that you only lived in

3   the projects?  You didn't mention Mount Vernon at all, did you?

4   A.  I did only live -- I really did only --

5   Q.  You mentioned Mount Vernon yesterday?

6   A.  No, I didn't mention Mount Vernon yesterday.

7   Q.  Why not?

8   A.  Because like I just said, it was all of my childhood

9   friends is from the Bronx.  So most of my time was in the

10  Bronx.  I stopped going to school in Mount Vernon and just

11  completely just dropped out because all my friends was in the

12  Bronx.  Yeah, I met some friends in Mount Vernon and I got into

13  that situation, the shooting up there and after that I just

14  completely cut Mount Vernon off.

15  Q.  You didn't go to Mount Vernon after 1996; is that what you

16  are telling us?

17  A.  Yeah.  I went up there to see my mother and hang with my

18  other family that live up there.

19  Q.  For a significant period of time you would go up there,

20  right?

21  A.  Yes, I would go up there.

22  Q.  Then there was another shooting in 2002, correct?

23  A.  Yes.

24  Q.  And that's with a guy named Chris; you shot a guy named

25  Chris?

1   A.  Yes.

2   Q.  And it was your territory.  Where did that shooting occur

3   in the Bronx?

4   A.  In the Bronx, yes.

5   Q.  There were three or four shots fired?

6   A.  Yes.

7   Q.  And did you shoot those shots?

8   A.  Yes, I did.

9   Q.  Why were you trying to kill Chris?

10  A.  He was shooting at me.

11  Q.  That's not my question.  My question is, were you trying to

12  kill Chris?

13  A.  If somebody -- I was shooting cause I was trying to protect

14  myself.  But on the other hand, that it was five other people

15  out there shooting, you know so.

16  Q.  Were you trying to kill Chris by shooting at him, yes or

17  no?

18  A.  I was protecting myself, yes, I was --

19  Q.  It's a simple question, Mr. Williams.  Were you trying to

20  kill him?

21  A.  I was trying to get him -- yeah, you could say that.

22  Q.  And no, can you say that that's the question?  Were you

23  trying to kill him?

24  A.  I was trying to just let him know that I'm protected too,

25  you know.

1    Q.  Now, then there was another shooting that occurred in 2007;

2    do you remember that?

3    A.  Yes.

4    Q.  What happened then?

5    A.  Me and this gentleman that I knew for a long time, we had a

6    fight, a fistfight and the next day I approached him.  He shot

7    me in my arm.  In my shoulder, I mean.  And when I got better

8    and I got out the hospital.  I saw him and I shot him, sir.

9    Q.  You were looking to kill him, right?

10   A.  I was looking to harm him because he harmed me.

11   Q.  You were looking to kill him, right; yes or no?

12   A.  Yes.

13   Q.  And then in 2009 there was another shooting, correct, that

14   you were involved in?

15   A.  Yes.

16   Q.  And what was the person that you shot who was involved in

17   the shooting?

18   A.  I think we were just talking about that same shooting.

19   Q.  That's the same one?

20   A.  Yeah.

21   Q.  Wasn't there a shooting in 2009, as well?

22   A.  Yes.  That was on the concourse.

23   Q.  Now, were you trying to kill the person that you shot at

24   that day?

25   A.  On what year?

I9CAAPOL1                    Williams - Cross

1    Q.   2009.

2    A.   I didn't shoot nobody in 2009.  That was the other

3    shooting.

4    Q.   Then in the summer of 2015 you pistol whipped someone --

5    I'm sorry.  Let me back up.

6         In the winter of 2013 you went to get a gun and you

7    shot an individual; is that correct?

8    A.   2000 and what?

9    Q.   2013, winter of 2013.

10   A.   Yes.

11   Q.   And you shot someone?

12   A.   Yes, sir.

13   Q.   And you were looking to kill that person, right?

14   A.   I wasn't wanting to kill him but when I shot at them.  It

15   was a lot of them.  And at the time the guy had hit my friend

16   mother with a cake in her face.  And at that time I was angry

17   and I was mad.  Any time you shoot a gun, sometimes you don't

18   mean to try to kill a person but bullets, they ain't got no

19   name.  Once it goes out the chamber any like, it could hit you

20   any kind of way and anybody could wrongful get hurt and die.

21   Q.   So let me see if I understand something.  Someone threw a

22   cake at your mother?

23   A.   At my friend's mother.

24   Q.   Your friend's mother?

25   A.   Yes.

1    Q.   And to retaliate against a cake you decided to shoot and

2    kill someone is that your testimony?

3    A.   At the time when I approached the gentleman, it was a lot

4    of them you know.

5    Q.   But let's talk about the guy that you shot at, not talk

6    about everyone.

7    A.   Because I'm talking about the guy that I shot at because he

8    was with the gentleman that when I approached him I felt like

9    my life is in danger.  I only brung the gun because it was a

10   lot of them and I felt like my life was in danger.  Once they

11   surround me, so I pulled out and I shot one of them.

12   Q.   Now, then in summer of 2015 you pistol-whipped someone.  Do

13   you remember testifying about that?

14   A.   Yes.

15   Q.   And who was the person that you pistol-whipped?

16   A.   It was a kid, a gentleman that, from my hood from my block

17   in Highbridge that I thought he was -- we had a argument about

18   him talking to my girlfriend.  And that situation escalated, me

19   hitting him with my gun.

20   Q.   And tell us what it means to pistol whip.  You take a

21   pistol and you beat someone over the face with it?

22   A.   Basically, I took my gun and I hit him in the face with it.

23   Q.   Which end?  The forward end or the handle?  What did you

24   hit him with?

25   A.   The side of the gun.

I9CAAPOL1                    Williams - Cross

1   Q.  And how many times did you hit him in the face with the

2   side of the gun?

3   A.  Like twice, three times.

4   Q.  And was unconscious after you did this?

5   A.  He was on the floor but he wasn't unconscious or anything.

6   Q.  Was he bleeding?

7   A.  Yes, sir.

8   Q.  And the reason you pistol whipped him was what?

9   A.  Because we had an argument about my girl and him trying to

10  get with my girl and about a girlfriend thing.

11  Q.  So it was about a girlfriend thing and he had not fired at

12  you, right?

13  A.  No, sir.

14  Q.  He had not pistol whipped you, right?

15  A.  No, sir.

16  Q.  So in order to resolve this argument about your girlfriend

17  you decided to pistol whip him, correct?

18  A.  Yes, sir.

19  Q.  Is that the first time you ever pistol-whipped someone?

20  A.  Yes, sir.

21  Q.  Is that the last time?

22  A.  Yes, sir.

23  Q.  Now, apart from these cases that you supposedly brought to

24  the government's attention, you had a number of convictions,

25  correct?

1    A.  Yes.

2    Q.  You had a conviction in 1995 for robbery right?

3    A.  Yes, when I was young.

4    Q.  OK.  So you were about 15 years old?

5    A.  Yes, sir.

6    Q.  When did that robbery take place?

7    A.  In the Bronx, sir.

8    Q.  You got 20 months in detention for that, correct?

9    A.  Yes, sir.

10   Q.  And then in November of 2007 you were arrested for criminal

11   possession of marijuana, assault on a police officer; do you

12   recall that?

13   A.  No, sir.

14   Q.  Do you remember pleading guilty to resisting arrest?

15   A.  You said in the '97?

16   Q.  Not '97.  2007.

17   A.  Yes, I remember that, sir.

18   Q.  Now that your memory is refreshed; do you recall that?

19   A.  Yes, I do.  I thought you said "'97", that's why.

20   Q.  Maybe I did.  I meant 2007.

21   A.  I remember me getting arrested.

22   Q.  You were convicted of that, right?

23   A.  Yes, I pled guilty to that.

24   Q.  So unlike these cases where the government asked you about

25   yesterday, they didn't ask you about this one in the '95

1    robbery.  They didn't ask you about this arrest and conviction

2    in November 2007, right?

3    A.  It was so long, long time ago that I had forgot about it

4    so.

5    Q.  Now, in 2003 you pled guilty to criminal possession of a

6    controlled substance?

7    A.  2003.

8    Q.  Yes.

9    A.  Yes.

10   Q.  And in 2006 you pled guilty to criminal possession of a

11   controlled substance again with intent to sell; do you recall

12   that?

13   A.  2006?  I really don't know that one right there.

14   Q.  You don't recall that one?

15   A.  Yes, I don't.

16   Q.  Now, in 2013 you were convicted of criminal facilitation;

17   do you recall that?

18   A.  In 2013?

19   Q.  Yes.

20   A.  Yes, I do.

21   Q.  How much time did you get for that; do you recall?

22   A.  I didn't get no time.

23   Q.  All these convictions are in state court, correct?

24   A.  Yes.

25   Q.  Now, in October of 2016 you pled guilty to criminal

1    possession of a controlled substance again; do you recall that?

2    A.   In 2016?

3    Q.   Yes.

4    A.   Controlled substance?  For my violation?

5    Q.   No.  It's separate -- are you talking about violation of

6    supervised release?

7    A.   Yes, "2016" you said?

8    Q.   You were no longer on supervised release in October of

9    2016, were you?  I think this is state case?

10   A.   Yeah.  I was not on probation or nothing like that in 2016.

11   You said when, in October?

12   Q.   Yes.

13   A.   2016 October the feds had issued a warrant out for me.

14   Q.   OK.  I am talking about a state case.  You were still on

15   the street in October of 2016, correct?

16   A.   October 2015.

17   Q.   Sixteen?

18   A.   Sixteen?  Yes.  I was on the run.  They had issued a

19   warrant out for me on October the 5th of 2016.

20   Q.   Now, these are the state charges and then the government

21   went into yesterday, you were charged with a number of federal

22   charges; do you recall that?

23   A.   Yes, I was charged with some federal charges.

24   Q.   And the first one is in 2011 and 2012 you were charged with

25   distributing initially charged with distributing crack and

1    possessing a firearm; do you remember that?

2    A.  Yes.

3    Q.  And possessing a firearm is a consecutive sentence to the,

4    would be a consecutive sentence to the drug charge, right?

5    A.  Yes.

6    Q.  Five years, right?

7    A.  When I had came to the feds my lawyer, I think he got it

8    thrown, that gun charge thrown out and I pled to the crack

9    cocaine.

10   Q.  All right.  Your attorney got it changed to an information,

11   correct?

12   A.  A what?

13   Q.  An information?  Which is a different type of charge.  Do

14   you remember you pled guilty to an information in 2017.  That's

15   something that doesn't have to go to a grand jury do you

16   remember that?

17   A.  When I pled guilty too what in 2017?  I was locked up in

18   2017.

19   Q.  I'll get to that in a minute.  I'll get to your most recent

20   charge.  Do you remember going over with Mr. Krouse your most

21   recent charges that you pled guilty to?

22   A.  For the indictment?

23   Q.  For the indictment?

24   A.  Yes.

25   Q.  It's not an indictment though.  It is an information, OK.

1    I'm not trying to confuse you but it's an information rather

2    than an indictment, correct?

3    A.  That's what you said.

4    Q.  OK.  Now you pled guilty to that and you faced zero to 20

5    years.  Do you remember who you pled guilty in front of?

6    A.  What year I pled guilty to?

7    Q.  I think it was 2012?

8    A.  Yes.

9    Q.  In this courthouse?

10   A.  Yes.

11   Q.  Do you remember who you pled guilty in front of?

12   A.  Yes.

13   Q.  Who was it?

14   A.  It was Judge Daniels.

15   Q.  OK.  And you were facing a number of years and he gave you

16   two years, right?

17   A.  Yes, sir.

18   Q.  Which is a very reasonable sentence, correct?

19   A.  Yes, sir.

20   Q.  Given your criminal background, right?

21   A.  Yes.

22   Q.  And in fact, you got out a few months after you were

23   sentenced?

24   A.  Yes.

25   Q.  And you were placed on supervised release, right?

I9CAAPOL1                         Williams - Cross

1    A.  Yes.

2    Q.  And supervised release is like state parole, state

3    probation, right?

4    A.  Yes.

5    Q.  You just -- you were supposed to obey the law, comply with

6    the law, correct?

7    A.  Yes.

8    Q.  But you didn't, right?

9    A.  No, sir.

10   Q.  And one of the provisions on your judgment of sentencing

11   was a provision that stated that you should not possess a

12   firearm, correct?

13   A.  Yes.

14   Q.  You knew that, right?

15   A.  Yes, sir.

16   Q.  And you violated that how many times?

17   A.  A lot of times.

18   Q.  Ten, 20, 50?

19   A.  A lot.

20   Q.  So it meant nothing to you, right?

21   A.  It did mean something to me.

22   Q.  Then why didn't you obey it?

23   A.  I wasn't in a right state of mind and as well as me going

24   back to the streets and trying to get money to feed my family

25   and then trying to cope with the pressure that I got in my life

1   and I just basically just stopped listening and went back to

2   the streets to sell drugs.  I didn't have no job.  I was trying

3   to get one and I really just got tired of it and fell back into

4   the same habit that got me in jail in the first place.

5   Q.  Well, doesn't supervised release don't they provide for you

6   to have an outlet to deal with your drug problem?

7   A.  Yes, sir.

8   Q.  Did you ever attend any of those sessions that they have

9   for you?

10  A.  Yes.

11  Q.  OK.  But you stopped attending them, right?

12  A.  Yes.

13  Q.  And what was the reason that you stopped attending them?

14  A.  Like I said, it was I got desperate and I lost hope of a

15  lot of things that was going on in my life and the first thing

16  I did was start smoking marijuana and got back into the

17  negativity that was -- it's no easy to get back into when

18  you're living in the part of -- that I live in and when you

19  come outside, that's all you see, people selling drugs and

20  people holding guns and a lot of negative, just a lot of

21  negative activity that is going on.  So I admit falling a

22  victim and falling back into the same thing that got me here in

23  the first place.  I ain't --

24  Q.  Well, you started selling drugs again, right?

25  A.  Yes, sir.

1  Q.  Even though you knew that it was a violation of the terms

2  of your supervised release right?

3  A.  Yes, sir.

4  Q.  And you started selling drugs because you wanted to make

5  money for your family; is that right?

6  A.  Yes.

7  Q.  You wanted to make money for yourself, right?

8  A.  I wanted to provide and I was just thinking about all the

9  material things and thinking about what I don't got and I just

10  got caught up.  It's like I ain't mean to -- how to say this --

11  it's like when I got sentenced and the judge let me go.  I did

12  get up and tell the judge that I would not do it again.  That

13  wasn't -- I was with that.  I admit to that that that was my

14  angle not to get back in trouble.  I swear that was my angle.

15  And I just really, really got back out there and me constantly

16  going to programs and trying to get a job and you know, they

17  denying me a few times.  I had to go back and get my GED.  I

18  didn't complete that and I just got real frustrated in order to

19  get a good job you got to have a GED, you know so.

20        Things I felt it might sound like a excuse but I just

21  felt real like hopeless and that's the only thing that I really

22  knew in my life was selling drugs.  So I went right back to it.

23  Q.  You also went back, I could understand that maybe you

24  wanted to support yourself and your family but that doesn't

25  require you to shoot people, does it?  Did that require yo

1   shoot people?

2   A.  Just by you being out on the street selling drugs, anything

3   could happen and you're dealing with different kind of people.

4   You are not dealing with people like you or people like y'all,

5   nine to five.  I'm dealing with people that everybody is just

6   scheming and everybody is just out for they self and a lot of

7   people do get killed over drug money and over materials, a lot

8   of material things.

9           So by you being out on the streets and selling drugs

10  you got to have something to protect yourself whoever you are

11  with even if yourself with you just by yourself and you against

12  the world.  If you got friends and other people that's doing

13  the same thing, as well as you, we all gonna have guns.  We all

14  gonna drugs, sell drugs and whoever feel like they gone take

15  our stuff or come where we live at and get our customers and we

16  feel like they violating, yes, we gone do every means

17  necessary.

18  Q.  So, if I understand you correctly, every one has a gun so

19  you had to have a gun; is that right?

20  A.  It's just a way of life.

21  Q.  But you were violating the other people weren't on

22  supervised release, were they?

23  A.  Say that again.

24  Q.  The other people were not on supervised release, as far as

25  you know, right?

1  A.  Some was and some wasn't.

2  Q.  And you were violating the terms of supervised release?

3  A.  Yes, I was, sir.

4  Q.  You told the judge that you were going to live up to the

5  supervised release that he imposed but you immediately went out

6  and started selling drugs.  You immediately went out and

7  started to violate the law and to shoot people, correct?

8  A.  I didn't -- it's just like you don't wake up in the morning

9  and say I am just going to shoot somebody.  It doesn't happen

10  like that.  You know.  If the problem comes your way, then as a

11  result to that that's how it goes where we come from and where

12  we live.

13  Q.  And then putting aside for a moment the gun part of it, you

14  started selling drugs again, right?

15  A.  Yes, I started selling drugs.

16  Q.  And you pled guilty to being in possession of 31 bags of

17  marijuana; do you remember that?

18  A.  Yes, sir.

19  Q.  It's a felony, right?

20  A.  I think it's a misdemeanor.

21  Q.  OK.  How many months did you get for that?

22  A.  I got four months, sir.

23  Q.  Then you went back on supervised release again.  That was

24  in 2013, correct, summer of 2013, correct?

25  A.  I'm not for sure but I did, after that I did come out and

I9CAAPOL1                    Williams - Cross

1   start selling drugs, sir.

2   Q.  And you went in again.  You came out again.  You start

3   selling drugs again, right?

4   A.  Yes, sir.

5   Q.  You used a weapon to shoot people, correct?

6   A.  Like I said you just don't --

7   Q.  Just answer my question; yes or no?

8   A.  I have did.  I have, yes.

9   Q.  How many people did you shoot at and hit?

10  A.  Say that again.

11  Q.  How many people did you shoot at and hit?

12  A.  One person.

13  Q.  What year was that?

14  A.  That was when the guy shot me.

15  Q.  Now --

16  A.  As well, if I could rephrase that.  It was two people.  The

17  incident with my friend mother when I came home and before then

18  it was the incident when the guy shot me and I shot him back.

19  Q.  And you came back in again for violation of supervised

20  release, correct?

21  A.  Yes.

22  Q.  And that was in July or the summer of 2015, correct?

23  A.  I think it was in August or July.

24  Q.  But that's when you went into jail?

25  A.  Yes.

1  Q.  And the judge this time really gave you a break.  You had

2  violated the law then you came in and you violated supervised

3  release and you violated again, right?

4  A.  Yes, sir.

5  Q.  And were you selling drugs at that point?

6  A.  Yes, sir.

7  Q.  Were you using weapons?

8  A.  Yes.

9  Q.  He gave you 60 days, right?

10  A.  Yes, he did.

11  Q.  Then the feds got you again in 2016, November of 2016,

12  correct?

13  A.  Yes.

14  Q.  And you were indicted on three charges, right?

15  A.  Yes.

16  Q.  You were indicted for drugs, selling drugs, conspiracy to

17  sell drugs, right?

18  A.  Yes.

19  Q.  And conspiracy to -- I'm sorry -- possession of firearms

20  and discharging them, correct?

21  A.  Yes.

22  Q.  And then eventually a third charge was added; do you

23  remember.

24  A.  Yes.

25  Q.  And that was with the Flybridge group, correct?

1    A.  Yes.

2    Q.  The Flybridge group, the timeframe for that activity was

3    around 2014, 2016, correct?

4    A.  Yes.

5    Q.  And the place where the Flybridge group was doing all this

6    criminal activity was on around 165 Street and Ogden Avenue?

7    What was the location?

8    A.  Flybridge is all over.  It comes to the projects all the

9    way to Nelson/Anderson.  Everybody know each other.  So

10   everybody call each other "Flybridge".

11   Q.  So is it fair to say then in 2014 you were dealing with the

12   Flybridge people, not with Mr. Polk, correct?

13   A.  In 2000 and what?

14   Q.  '14 to 2015.

15   A.  Like I said, from Highbridge from when me and Polk lived to

16   throughout Anderson, Nelson, we all know each other.  So we all

17   mess with each other.

18   Q.  Mr. Polk wasn't indicted in that case, was he?

19           MR. KROUSE:  Objection, your Honor.

20           THE COURT:  Sustained.

21   Q.  The time period is the same time period as in this case,

22   right?

23   A.  Say that again.

24   Q.  The timeframe for the Flybridge case was about the same as

25   the indictment in this case, right?

1              MR. KROUSE:  Objection, your Honor.

2              THE COURT:  Overruled.

3              You can answer.

4    Q.  Do you remember that the -- you've seen the indictment in

5    the Flybridge case, haven't you?

6    A.  Yes, sir.

7              MR. LIND:  I'd like to offer it as Defendant's Exhibit

8    A.

9              MR. KROUSE:  Objection.

10             THE COURT:  Let me see the exhibit.

11             Come up to the side bar.

12             (Continued on next page)

13

14

15

16

17

18

19

20

21

22

23

24

25

1              (At the sidebar)

2              THE COURT:  What do you want to prove, Mr. Lind, by

3      the allegations in this indictment?

4              MR. LIND:  What he was charged with and that the time

5      frame is the same as the allegations in this indictment.

6              THE COURT:  Well, you can ask him what he was charged

7      with, whether he was aware of what he was charged with.

8              MR. LIND:  Okay.  Fine.

9              THE COURT:  I'm not sure what else that you wanted to

10     do with it.

11             MR. LIND:  All right.  Fair enough, Judge.

12             THE COURT:  Okay.

13             (In open court)

14     BY MR. LIND:

15     Q.  Now, do you recall that the time period for the allegations

16     in the Flybridge indictment were from 2014 to 2016?

17     A.  Yes.

18     Q.  And you remember that you were charged with a conspiracy to

19     sell drugs, correct?

20     A.  Yes.

21     Q.  You were also charged in one count with firing at a guy

22     named Lacen.  Do you remember that?

23     A.  Yes.

24     Q.  When was that?

25     A.  It was December 2015.  I'm not sure.

I9CKPOL2                    Williams - Cross

 1  Q.  It was like May of 2015, right?

 2  A.  I don't know exactly the month, but I know it was the

 3  summertime.  It was hot.

 4  Q.  Was that in a park?

 5  A.  Yes.

 6  Q.  Was that Nelson Park?

 7  A.  Yes.

 8  Q.  Do you remember being interviewed by the government after

 9  you were arrested?

10  A.  Yes, sir.

11  Q.  And you realized you were being charged with that count,

12  right?

13  A.  Yes.

14  Q.  You denied that you shot Mr. Lacen, correct?

15          MR. KROUSE:  Your Honor, time frame?

16          MR. LIND:  Time frame for what?

17          MR. KROUSE:  What he is asking about.  Mr. Lind said

18  when you were interviewed by the government, and now he's --

19          THE COURT:  Don't argue.

20          MR. LIND:  I'll give it a time frame.

21  BY MR. LIND:

22  Q.  Do you remember shortly after you were arrested, you were

23  interviewed by a bunch of people, law enforcement officials?

24  A.  Yes.

25  Q.  And you made a postarrest statement, correct?  Or you

I9CKPOL2                    Williams - Cross

1  talked to them anyway, correct?

2  A.  Yes.

3  Q.  And they told you your Miranda rights, you said you could

4  proceed without an attorney being present, right?

5  A.  Yes.

6  Q.  Do you remember that they asked you about the shooting that

7  you committed -- that you were alleged to have committed in

8  Nelson Park?  Do you remember being asked about that?

9  A.  Yes.

10  Q.  And you denied that you did it, correct?

11  A.  Yes.

12  Q.  And that was false, correct?

13  A.  I wasn't -- I wasn't planning on cooperating.

14  Q.  No, no.  My question is:  Was that false, or was it true?

15  A.  In that testimony right there, I was telling the truth, and

16  then I was -- and then I was -- and then I wasn't.  There were

17  some things I was telling the truth about and some things I

18  wasn't.

19  Q.  Well, were you telling the truth when you told them that

20  you had not -- you were not involved in the shooting of

21  Mr. Lacen?  Yes or no.

22  A.  Yes.

23  Q.  You were telling them the truth?

24  A.  I was -- no, I wasn't telling them the truth.  I told them

25  I was there at the scene, but I told them I didn't fire no gun.

1    Q.   And that was a lie?

2    A.   Yes, it was.

3    Q.   Eventually you pled guilty to three charges in the case --

4    in the other case to which you pled guilty.  Do you remember?

5    A.   Yes.

6    Q.   You pled guilty to selling drugs, correct?

7    A.   Yes.

8    Q.   You pled guilty to discharging a firearm, correct?

9    A.   Yes, sir.

10   Q.   And that was the firearm that was fired at Mr. Lacen,

11   correct?  Or were there other shootings that you were also

12   charged with?

13   A.   No, that was the only shooting.

14   Q.   And then you were also charged with intimidating a witness?

15   A.   Yes, I was.

16   Q.   And you pled guilty to all three of those charges, correct?

17   A.   Yes, I did.

18   Q.   When did you -- I withdraw that.

19        In the period between when you were released from jail

20   on the supervised release term until 2016, when you were

21   arrested in the federal charges, you continued to engage in

22   violence, correct?

23   A.   Yes.  I was in the possession of a handgun, and I was still

24   selling crack cocaine, but as far as -- when I came home from

25   my last violation, I didn't get in no more trouble.

1    Q.  You had handguns, right?

2    A.  Yes.

3    Q.  You didn't use them to shoot at anyone?

4    A.  No, sir.

5    Q.  And you kept on selling crack cocaine, though, right?

6    A.  Yes, I did.

7    Q.  With the guys from the Flybridge group, right?

8    A.  Really with people that's from my projects.  We all know

9    each other as well.  Like I said, we all help each other out.

10   We all hang on the same corners, and we all look out for each

11   other.  But the people I was hanging with was Polk, Buddha Man,

12   Tyrell, and Tim.

13   Q.  2015, when you got out, Mr. Polk was in jail, right?

14   A.  Two thousand what?

15   Q.  '15.

16          In October 2015, when you got off of supervised

17   release, okay --

18   A.  Yes.

19   Q.  -- until when you got arrested in November of 2016,

20   Mr. Polk wasn't around, was he?

21   A.  No, he wasn't around.

22   Q.  So you couldn't have been selling drugs with him, he was in

23   jail, right?

24   A.  Yes.  But what I'm trying to say is before that, everything

25   that I did with Mr. Polk was before I got violated on my last

1   violation.  So any other crime that I did with him, that was

2   before then.  Other than to -- when I came home, I was doing

3   that with other people that was out there, like Buddha, Tim,

4   and other people from other blocks.

5   Q.  Now, you told us yesterday what you want to have as your

6   sentence.  Do you recall that?

7   A.  Yes.

8   Q.  You want to have time served?

9   A.  I said that as far as the lowest -- like the lowest

10  sentence possible.  I think anybody would say that, you know.

11  Q.  You're the one who said it?

12  A.  Yes, I did.

13  Q.  And you want to get time served -- despite all the things

14  you did, you don't think you should get any more time than time

15  served, do you?

16  A.  It's not up to me, it's up to the judge.  And I just feel

17  like me telling the truth, and me trying to get this part of my

18  chapter of my life over with, and about me telling the truth,

19  and getting everything off my chest is the right thing to do

20  for me moving forward on, so...

21  Q.  But you want time served, right?

22  A.  If it's possible, yes.

23  Q.  Now, talking about the gun on University Avenue -- do you

24  remember that?

25  A.  Say that again.

I9CKPOL2                    Williams - Cross

```
 1   Q.  There was a gun that was used allegedly by Mr. Polk on
 2   University Avenue.  Do you recall that?
 3   A.  Yes, sir.
 4   Q.  You said yesterday that it was a Glock .40?
 5   A.  Yes, sir.
 6   Q.  Do you remember telling someone that you thought it was a
 7   .380 pistol?  Do you remember telling someone that?
 8   A.  No, sir.
 9          MR. LIND:  Can I just have a moment, Judge?
10          May I have one moment, Judge?
11          THE COURT:  Yes.
12          (Pause)
13          MR. LIND:  I think I found it.
14          I'm sorry, Judge.  I apologize to you and the jury.
15   Q.  Do you remember telling the government during a proffer
16   session that Kev and Tyrell shot at Euro outside of 1055
17   University Avenue and that Williams believes that Terrell used
18   the .380 pistol?
19   A.  They must have got it confused when I was telling them
20   that, but I guarantee he shot the guy with a .40 caliber.
21   Q.  Okay.  So they got it confused when they took that down?
22   A.  Yeah, because Kevin had a .38 revolver.
23   Q.  Do you remember telling them at a later point that Terrell
24   Polk used a .9 millimeter gun --
25   A.  No.
```

1   Q.   -- during that shooting?

2   A.   No, I don't recall that.

3   Q.   Do you remember telling them, in discussing the shooting at

4   Anderson Avenue, that Terrell used a .9 millimeter and that Kev

5   used a .380 revolver?

6   A.   Anderson Avenue?  No, sir.

7   Q.   Not Anderson.   University Avenue?

8   A.   Say that again.

9   Q.   Yes.

10          Do you remember telling them in an interview on

11   September 20, 2017, that Terrell used a .9 millimeter in

12   connection with the shooting of Euro?

13   A.   I remember telling them that he used the .40 caliber.

14   Q.   So they got that wrong when they were interviewing you?

15   A.   They had to.

16   Q.   Now let's talk about the shooting on Anderson Avenue.

17          You found out about that not from Mr. Polk, but you

18   heard about it on TV, right?

19   A.   Say that again?

20   Q.   Yes.

21          You testified yesterday that you found out about that

22   from Mr. Polk, about the shooting on Anderson Avenue?

23   A.   Yes, I did.

24   Q.   Do you remember telling the government that you found out

25   about it by watching TV?

A.  I found out about it by Polk and watching the TV, Channel

12.

Q.  But you didn't mention Polk, you mentioned watching it on

TV, correct?  Do you remember that?

A.  I remember telling them both.  Why would I say that?

Q.  Mr. Polk told you that -- according to you, that the reason

for the shooting was a beef between -- about women between Polk

and this guy, Ryan.  Do you remember telling them that?

A.  I remember telling them that the beef occurred with Kevin

in situations that I had with individuals that hang out with

Ryan, and him and Ryan didn't like each other as well on

account of Terrell messing with his child's mother.  So they

didn't like each other just because of that, so our problem

with each other is just like fuel to the fire.

Q.  Well, you weren't there when this occurred, right?

A.  No, sir.

Q.  And Mr. Polk told you that this had to do with him sleeping

with Ryan's babysitter, right?

A.  No, he never told me that.

Q.  What did he tell you, then?

A.  He told me that he had caught Ryan, and it's pertaining to

the situation that happened in the car with me -- with Kevin,

with Bubba taking Kevin out the car, telling him he can't be in

the car, pulling out a gun out on Kevin, and Kevin came back to

us and told us, and we went over there and approached Bubba

1   with our guns, and further on from that day, it was like a go,

2   it was a beef for all of us.

3   Q.  Now, the shotgun that you were talking about during your

4   testimony yesterday that was supposedly used during the

5   shooting at Anderson Avenue --

6   A.  Yes.

7   Q.  -- you told the authorities that you gave him -- who gave

8   him the sawed-off shotgun?

9   A.  He got it himself.

10  Q.  From whom?

11  A.  From a friend that he knew about.

12  Q.  So he got the shotgun himself?

13  A.  Yes.

14  Q.  You didn't give it to him?

15  A.  I didn't give it to him.

16  Q.  Didn't you tell the authorities that you gave him the

17  shotgun?

18  A.  I told the authorities that we all shared all the guns that

19  we had.  I told them all the guns that we possessed, and that

20  we shared these guns, and that was one of the guns that we

21  shared.

22  Q.  Did you tell the authorities, on or about February 23,

23  2017, that you had sold --

24  A.  Two thousand and what?

25  Q.  '17.

I9CKPOL2                        Williams - Cross

1    A.  Yes.

2    Q.  -- that you had sold Rell the shotgun that he used to

3    commit the shooting on Anderson Avenue?

4    A.  No.

5    Q.  Once again, they made a mistake about what you told them,

6    correct?

7    A.  I'm just telling you the truth.  He got that -- the other

8    guns -- some of the guns in our possession, and I bought that

9    from somebody else as well as he bought the shotgun and a

10   revolver from whoever he bought it from.

11   Q.  Didn't you also tell them that he got the shotgun from a

12   kid in the projects?

13   A.  Yes, I did.

14   Q.  So which one is it?  Is that the person who sold him the

15   shotgun?

16   A.  Yes, it got to be.  I didn't get into details.  He told me

17   he got it from a kid in the projects.

18   Q.  Now, Mr. Polk was not part of any conspiracy until 2014,

19   correct?

20   A.  Say that again?

21   Q.  Mr. Polk was not part of your gang until 2014, March of

22   2014, correct?

23   A.  2014, I came home, but two thousand -- before 2014, he's

24   like my childhood friend.  He's --

25   Q.  He was in jail from 2007 to 2014, right?

1    A.  So we know each other for -- since we was young.  We

2    consult with each other, and that's the reason why we did

3    anything for each other.  As far as us hanging with each other,

4    selling drugs, if I got problems with somebody, he got problems

5    with somebody, as well as Buddha Man, Kevin, Tim, we all -- you

6    know, that was just the --

7    Q.  I'm talking about the time period from 2013 to 2017.  He

8    wasn't around in 2013, right?  Mr. Polk was not around in 2013?

9    A.  Then he came home the beginning of 2014.

10   Q.  By the way, we have a lot of exhibits here about various

11   matters.  Did you have any telephone calls that you had

12   regarding the period from 2014 to 2015, before he went into

13   prison, that commemorate any sales of you with drugs?

14   A.  The phones that we had, we throw them away.  We had them

15   one week, and the next week, we don't, but I don't think so.

16   Q.  You have nothing regarding any videos or anything like

17   that, right?

18   A.  No, sir.

19   Q.  Nothing regarding any documents or anything like that that

20   would corroborate your testimony?

21   A.  No, sir.

22   Q.  During the period that you sold drugs to Mr. Polk, it was

23   12 or 18 months, right?

24   A.  From then, 12, 18 months?

25   Q.  From March of 2014 to August of 2018.

I9CKPOL2                        Williams - Cross

```
 1   A.  August 2018?
 2   Q.  I'm sorry, not '18.  2015.
 3           You said in your testimony that you sold to him sixty
 4   to a hundred grams of crack during that period, right?
 5   A.  I said about four or five times.  I don't -- 15 to
 6   20 grams, he had purchased, that I had got from my connect, my
 7   supplier, because he -- Terrell can't get to his supplier, so I
 8   went to my supplier and got work -- drugs from him to give to
 9   him.
10   Q.  Now, 100 grams of crack is less than four ounces, right?
11   A.  No.
12           You said it's less than four ounces?
13   Q.  Yes.
14   A.  Yeah.
15   Q.  It's about three and a half ounces of crack during an
16   entire year and a half?
17   A.  Yeah, three ounces.  28 a gram, an ounce.
18           MR. LIND:  May I have a moment, Judge, to talk to my
19   client?
20           THE COURT:  Yes.
21           Do you want to take a break, Mr. Lind?
22           MR. LIND:  Yes.
23           THE COURT:  Ladies and gentlemen, why don't we take a
24   15-minute break.  Don't discuss the case.  Keep an open mind.
25           (Jury not present)
```

I9CKPOL2                          Williams - Cross

1          (Recess)

2          THE COURT:  Mr. Lind, are you ready to continue?

3          MR. LIND:  Yes.

4          THE COURT:  All right.  So let's get the jury.

5          (Jury present)

6          MR. LIND:  May I proceed, Judge?

7          THE COURT:  Yes, sir.

8   BY MR. LIND:

9   Q.  Mr. Williams, you sold Terrell Polk, we were talking about

10  just before, some crack for resale, right?

11  A.  Say that again?

12  Q.  You sold Mr. Polk crack, so he could sell that, correct?

13  A.  He bought some product from -- cocaine, so he could cook it

14  up and sell crack.

15  Q.  Okay.  So that was -- now, when Mr. Polk converted it to

16  crack and sold it, he didn't give you any of the profits from

17  that, did he?

18  A.  No, as I don't give him a profit from mine.

19  Q.  Right.  So you were not a partnership in terms of selling

20  this crack, right?

21  A.  No, it's not a partnership, but the way we was selling

22  crack at, not anybody could come over there and sell crack if

23  they wasn't with us.

24  Q.  I understand that.

25          But your financial arrangement had nothing to do with

1    you selling him crack or cocaine, right?

2    A.  All it is is just looking out for each other.

3    Q.  No.  What I'm asking about is your financial arrangement

4    with him when you sold him cocaine, which he could convert into

5    crack, right?

6            That was just like an arrangement where you were the

7    seller, and he was the buyer, nothing more, correct?

8    A.  I was doing a favor for him.

9    Q.  You were giving him crack -- or cocaine because his other

10   supplier was not around, right?

11   A.  Yes.

12   Q.  Or had none?

13   A.  Yes.

14   Q.  Now, going back to the agreement that you have with the

15   government, right now you're facing a mandatory minimum of 20

16   years, correct?

17   A.  Yes, sir.

18   Q.  Are you a career offender under the guidelines?

19   A.  I don't think so.  I'm not sure, sir.

20   Q.  Well, do you have any other narcotics convictions?

21   A.  Yes, that I got locked up for.  I did my two years.

22   Q.  Do you have any crimes of violence convictions?

23   A.  No, not -- besides the indictment that I had copped out to

24   when I first got arrested.

25   Q.  So that's the only crime of violence you have?

1    A.  That I got convicted to -- convicted for.

2    Q.  The way things stand now, unless you get a letter from the

3    government, you have to do at least 20 years, correct?

4    A.  Say that again?

5    Q.  The way things stand now, unless you get the government to

6    write you a letter -- unless the government writes a letter on

7    your behalf, you're going to be doing at least 20 years for the

8    crimes you admit?

9    A.  Yes.

10   Q.  And even if your attorney wrote the best letter in the

11   world to the judge, the judge can't go under 20 years, correct?

12   A.  The judge can do what he want.

13   Q.  He can go under 20 years?  Is that your understanding?

14   A.  That is my understanding, that the judge can do what he

15   want.  If I got a letter, and if I was truthful and

16   corroborated --

17   Q.  But that's what I'm asking.  Let's say the government

18   didn't write you a letter, let's say your attorney wrote you a

19   letter, right, and it was a great letter, could the judge go

20   under 20 years?  Yes or no.

21   A.  No.  The government got to write the letter.

22   Q.  Right.  So you're depending on the government writing you a

23   letter, right?

24   A.  That was part of the agreement, me being truthful, me being

25   honest, tell the truth for the crimes that I committed, and

1    what the crimes that I did with others, being assistance to

2    them.

3    Q.  So the government is getting something, and you're getting

4    something, right?  You're living off each other, correct?

5    A.  If you say so.

6    Q.  Well, I'm asking you.

7    A.  It's part of the agreement.

8            MR. LIND:  I have nothing further.

9            THE COURT:  Any further questions?

10            MR. KROUSE:  Yes, your Honor, briefly.

11            THE COURT:  Sure.

12   REDIRECT EXAMINATION

13   BY MR. KROUSE:

14   Q.  Good morning, Mr. Williams.

15   A.  Good morning.

16   Q.  Do you recall Mr. Lind asking you about a few drug

17   convictions you had in the state in the past?

18   A.  Yes.

19   Q.  You testified on direct examination that you sold drugs

20   essentially continuously from the age of 15 until you were

21   arrested on this case, correct?

22   A.  Yes, sir.

23   Q.  Isn't it fair to say that sometimes when you sold drugs,

24   you were arrested by the NYPD?

25   A.  Yes.

I9CKPOL2                      Williams - Redirect

1   Q.  And then you were convicted of a few of those offenses,

2   correct?

3   A.  Yes.  I pleaded guilty, but no jail time.

4   Q.  You pled guilty to a few drug offenses in the state,

5   correct?

6   A.  Yes, sir.

7   Q.  You recall Mr. Lind asking you about several of the

8   shootings and the assault that you testified to on direct

9   examination yesterday.  Do you remember those questions?

10  A.  Yes.

11  Q.  For those shootings -- the one in 1996, the one in 2002,

12  the one in 2007, and for the ones in 2015 -- you've never been

13  charged with any of those shootings, correct?

14  A.  No.

15  Q.  You've never been arrested for any of those shootings?

16  A.  No.

17          MR. LIND:  Judge, asked and answered yesterday.

18          THE COURT:  Overruled.  I'll let that stand.  Let's

19  move on.

20  Q.  And you've never been convicted of any of those offenses,

21  correct?

22  A.  No.  For the one in 2015.

23  Q.  That's this case, correct?  That's what you pled guilty to

24  in this case?

25  A.  For the indictment, I came and got arrested for.  I got --

1    I pled guilty to that.

2             MR. LIND:  Judge, I object to the question.  I don't

3    know what he means by this case, the 2015 --

4             THE COURT:  I'm not sure the witness is following you

5    either.

6             MR. KROUSE:  Yes, your Honor.  I'll clarify.

7    BY MR. KROUSE:

8    Q.  When you told the jury about all these offenses that you

9    were not arrested for or convicted for, how did the government

10   know about those crimes that you committed?

11   A.  I had told them.  I had told them.

12   Q.  So you told the government about committing those crimes,

13   correct?

14   A.  Yes.

15   Q.  Do you recall Mr. Lind asking a few questions about

16   statements that you made to the government in proffer sessions?

17   A.  Yes.

18   Q.  And you recall Mr. Lind referring to notes that were taken

19   during those proffer sessions?

20   A.  Yes.

21   Q.  Now, when you had these proffer sessions and discussions

22   with the government, was there someone generally taking notes

23   of what you were saying?

24   A.  Yes.

25   Q.  And those are the notes Mr. Lind is referring to, correct?

1  A.  Yes.

2  Q.  Did you take those notes?

3  A.  No, sir.

4  Q.  Did you ever review those notes for accuracy?

5  A.  No.

6  Q.  Have you ever even seen those notes?

7  A.  No.

8  Q.  You recall Mr. Lind asking you about this Flybridge group,

9  correct?

10  A.  Yes.

11  Q.  Is it fair to say that you, in addition to committing

12  crimes with Mr. Polk, Mr. Moss, Tim, and Kevin, also committed

13  various crimes with other people?

14  A.  Yes.

15  Q.  And the government asked you about those other crimes that

16  you committed with other people, correct?

17  A.  Yes.

18  Q.  And you were truthful about your involvement in those

19  crimes with other people, correct?

20  A.  Yes, I did -- yes, I was.

21  Q.  Do you recall Mr. Lind asking you about documentation that

22  might corroborate your drug conspiracy with Mr. Polk?  Do you

23  recall those questions?

24  A.  Yes.

25  Q.  And you recall him asking if you had any recorded phone

1   calls that you could play that would corroborate what you're

2   saying here?

3   A.  No.  I told him I don't have no phone calls.  I never have

4   no phone calls.

5   Q.  Do you recall saying -- testifying that you threw out your

6   phones once a week, around that pace?

7   A.  Once every two weeks, we change our phone number or we

8   throw our phone away.

9   Q.  And did you do that to avoid having recorded phone calls

10  and avoid having records --

11          MR. LIND:  Objection to leading, Judge.

12          THE COURT:  Yes, I'm going to sustain as to the

13  leading.

14  Q.  Why did you throw out your phones every two weeks?

15  A.  For somebody might be listening, law enforcement might be

16  listening, and it's not good to have the same phone.  And you

17  on the street dealing drugs and doing the things we was doing,

18  it's not good to have a phone for too long.

19  Q.  You don't want records out there, correct?

20  A.  No.

21          MR. LIND:  Objection to leading, Judge.

22          THE COURT:  I'll overrule it.  I'll let that stand.

23          MR. KROUSE:  Nothing further, your Honor.

24          MR. LIND:  Just very brief, Judge?

25          THE COURT:  Sure.

RECROSS EXAMINATION

BY MR. LIND:

Q.  You were asked a question on redirect -- I'm sorry, on cross or whatever by Mr. Krouse about the Flybridge group.  You remember that?

A.  Yes.

Q.  That you engaged in illegal activity with them at the same time that you were engaged in illegal activity with Mr. Polk and the other people whose names and faces are on that board, correct?

A.  Yes.

Q.  Do you remember telling the jury at least twice yesterday that your dealings in drugs and narcotics activity was six to seven days a week with this group, with the group of Mr. Polk and the other people, from 2014 to 2015?  Do you remember telling them that yesterday?

A.  Yes.

Q.  So which is it?  You had, what, a couple of seconds to spend with the other group or you had a couple of seconds to spend with Mr. Polk and these other people?

A.  It's not about having a couple of seconds.  It's we all from the same block.  Everybody is a block away from each other, so we interact with each other all day, every day.

Q.  But that's not the same group, right?  The Flybridge group is not the same group as Mr. Polk is involved in, correct?

I9CKPOL2                          Williams - recross

A.  That's what they -- that's what they call us cuz we all

from Highbridge.  So they just say Flybridge, but we all from

different blocks, but --

Q.  Are you saying that Mr. Polk, Mr. Moss, Mr. Smith,

Mr. Corbett were all part of the Flybridge group?

A.  As far as -- I'm from the projects, and --

Q.  No.  My question is:  Are they all part of the Flybridge

group?  Very simple question.

A.  They call -- they call Highbridge Flybridge, so, yes.

Q.  They were not indicted, though, in that indictment?

        MR. KROUSE:  Objection, your Honor.

        THE COURT:  Sustained.

Q.  Isn't it a fact that after 2014 -- 2014, 2015, you were

dealing primarily with this Flybridge group, not with Mr. Polk?

A.  I don't know exactly what he was doing with individuals --

other individuals on the block.  Everybody -- we don't discuss

about everything we do with everybody, but we all interact with

each other.

Q.  But were you part of the same group?  You weren't part of

the Highbridge group, with these people, you were part of the

Flybridge group; isn't that right?

A.  It's the same thing.  We all from Highbridge.  There's

no -- we from the projects, and they from Summit, Nelson,

Ogden, a block away or two blocks away.  We all interact with

each other.

I9CKPOL2                         Prior - Direct

1   Q.  In other words, you interact, but they're separate

2   entities, aren't they?

3   A.  Yes.

4              MR. LIND:  Nothing further.

5              THE COURT:  Any further questions?

6              MR. KROUSE:  No, your Honor.  Thank you.

7              THE COURT:  You can step down.

8              (Witness excused)

9              THE COURT:  Are you prepared to move forward with the

10  next witness?

11             MR. FOLLY:  Yes, your Honor.

12             THE COURT:  All right.  Why don't you call the

13  government's next witness.

14             MR. FOLLY:  The government calls Detective Claressa

15  Prior.

16   CLARESSA PRIOR,

17       called as a witness by the Government,

18       having been duly sworn, testified as follows:

19             THE LAW CLERK:  Please state and spell your name for

20  the record.

21             THE WITNESS:  Detective Prior, P-r-i-o-r.

22             MR. FOLLY:  May I inquire, your Honor?

23             THE COURT:  Yes, sir, Mr. Folly.

24

25

1    DIRECT EXAMINATION

2    BY MR. FOLLY:

3    Q.   Detective Prior, where do you work?

4    A.   Sixth Precinct.

5    Q.   Is the Sixth Precinct part of the New York City Police

6    Department?

7    A.   Yes.

8    Q.   What is your title there?

9    A.   Detective, investigator.

10   Q.   How long have you been a detective for?

11   A.   Approximately about six years.

12   Q.   In total, how many years have you been at the NYPD?

13   A.   Thirteen.

14   Q.   Before you became a detective in your current squad, what

15   was your title?

16   A.   Undercover.

17   Q.   What does it mean to be an undercover officer?

18   A.   Basically work as a -- still work as a police officer in an

19   undercover capacity where we gain intelligence, you make

20   narcotic buys sometimes, more or less.

21   Q.   When you say you work in an undercover capacity, what do

22   you mean by that?

23   A.   Undercover capacity whereas you're not in uniform.  The

24   people you're around, they don't necessarily know that you're a

25   police officer.

1    BY MR. FOLLY:

2    Q.  What types of assignments did you have as an undercover

3    officer?

4    A.  Assignments included "case buys" and "buy and bust".

5    Q.  Let's talk about both of those for just a moment.  What is

6    "case buy"?

7    A.  A case buy is where you would make a buy and the individual

8    that you are buying from is not arrested immediately.

9    Q.  What about a "buy and bust"?

10   A.  That was where s you would make a buy and the person would

11   be arrested at that same day.

12   Q.  When you participate in a case buy or a buy and bust, what

13   is your role?

14   A.  Sorry.  Can you repeat that?

15   Q.  When you are participating in a case buy or a buy bust,

16   what is your role?

17   A.  Have several roles.  As undercover you can ghost, you can

18   buy or you can gain intelligence.

19   Q.  Can you explain to the jury what it means when you say "you

20   can ghost"?

21   A.  "Ghost" is another role of an undercover or someone who

22   used to be an undercover.  You are basically the eyes and ears

23   to the team and you make sure the undercover is safe.

24   Q.  And you said another role is "you can buy".  Can you

25   explain what that means?

1  A.  "Buy" meaning that you would buy narcotics in the situation

2  I was in.

3  Q.  And the last one you said was intelligence gathering.  What

4  did you mean by that?

5  A.  In intelligence gathering you would just take information

6  that you would gain from being outside on the street and relate

7  back to your team.

8  Q.  In addition to your role as an undercover, as well as

9  ghost, are there other law enforcement officers who are

10  involved in undercover purchases?

11  A.  Yes.

12  Q.  Who are those other officers?

13  A.  Your field team.

14  Q.  What is the role of the field team?

15  A.  The field team they actually make the arrest and they also

16  make sure the undercover is safe.

17  Q.  As an undercover officer did you purchase crack cocaine at

18  times?

19  A.  Yes.

20  Q.  Approximately, how many undercover purchases of crack

21  cocaine did you make?

22  A.  About 50.

23  Q.  About 50?

24  A.  Fifty.

25  Q.  Directing your attention to May 25, 2013, were you involved

1    in an undercover purchase of crack cocaine on that day?

2    A.  Yes.

3    Q.  Where did that undercover purchase take place?

4    A.  In the Bronx in front of 1055 University Place.

5    Q.  Who did you purchase the crack cocaine from on that date?

6    A.  JD Buddha.

7    Q.  What do you mean when you say "JD"?

8    A.  That's the name that he, the person or whomever you buy

9    from is referred to as John Doe and then you have another --

10   you use something that you can identify that person to and

11   they're "JD" and whatever that item is, Whether it's something

12   that they wear or the name or what have you but it's always

13   "JD" first that's how we always refer to some people when he

14   engage with.

15   Q.  In other words, is everyone you buy narcotics from as a UC

16   referred to as "JD"?

17   A.  Yes.

18   Q.  Was Buddha the particular name that you knew this subject

19   by?

20   A.  Yes.

21           MR. FOLLY:  Mr. Concepcion, can you please publish

22   what is in evidence as Government Exhibit Three.

23   Q.  Detective Prior, do you recognize this individual?

24   A.  Yes.

25   Q.  Who is it?

1    A.   JD Buddha.

2    Q.   Prior to May 25, 2013 had you met Buddha before?

3    A.   Yes.

4    Q.   Approximately, when did you first meet him?

5    A.   About, I would say month or two before that date.

6    Q.   Where did you first meet him?

7    A.   1055 University Place, Apartment 1 Frank.

8    Q.   And when you met him on that date were you in your role as

9    an undercover officer?

10   A.   Yes.

11   Q.   Can you describe how you met him on that date?

12   A.   Sure.  I went to the apartment to look for someone else

13   that I had purchased narcotics from at another time and another

14   individual opened the door and then he came JD Buddha came to

15   the door and I spoke to him and asked him for the person I was

16   looking for.

17   Q.   Who were you looking for on that occasion?

18   A.   JD Gray.

19   Q.   Was that another subject in your narcotics investigation?

20   A.   Yes.

21        MR. FOLLY:  Mr. Concepcion, can you publish what's in

22   evidence as Government Exhibit two.

23   Q.   Detective Prior, do you recognize this individual?

24   A.   Yes.

25   Q.   Who is it?

1   A.  That's the person that opened the door.

2   Q.  That's the person that opened the door when you went to the

3   apartment?

4   A.  Yes.

5   Q.  And who else was present in the apartment?

6   A.  JD Buddha.

7   Q.  Can you describe the apartment to the jury?

8   A.  Sure.  The apartment was pretty small.  It's more or less

9   like a trap house where there is any furniture, a mattress on

10  the floor.  It didn't give the appearance that anyone was

11  actually living there.

12  Q.  Can you describe what you observed inside the apartment?

13  A.  Sure.  A chair and a mattress on the floor.

14  Q.  Was there anything on the mattress?

15  A.  No, no sheets.

16  Q.  You mentioned that Buddha was present in the apartment on

17  that day?

18  A.  Yes.

19  Q.  What, if anything, did he say to you?

20  A.  He basically just told me that the person --

21          MR. LIND:  Objection, judge.

22          THE COURT:  Overruled.

23          You can answer.

24  A.  He told me the person I was looking for wasn't there.

25  Q.  What did you do at that point?

1    A.  I left.

2    Q.  Directing your attention back to May 25, 2013.  Did you see

3    Buddha on that date?

4    A.  Yes.

5    Q.  Where was that?

6    A.  In front of 1055 University.

7    Q.  Is that the same location where you first met Buddha?

8    A.  Yes.

9    Q.  What happened when you saw him?

10   A.  We engaged in drug related conversation.  I gave him U.S.

11   currency in exchange for four twists of crack cocaine.

12   Q.  What is a twist of crack?

13   A.  A twist of crack is the package.  It is an actual twist

14   where the crack is placed into.

15   Q.  And what is the packaging made of?

16   A.  Plastic.

17   Q.  How did you pay him for it?  How much did you pay him for

18   it?

19   A.  $40.

20   Q.  So that was ten dollars a twist?

21   A.  Yes.

22          MR. FOLLY:  If we could go to what's in evidence as

23   Government Exhibit 530.

24          (Pause)

25   Q.  Do you recognize this?

I9CAAPOL3                      Prior - Direct

1    A.   Yes.

2    Q.   How do you recognize it?

3    A.   How do I recognize it?   That's the location where I

4    purchased narcotics from JD Buddha.

5    Q.   Looking at this photo, can you describe for the jury where

6    Buddha gave you the narcotics?

7    A.   Sure.   Right in front of the black gate.

8               MR. FOLLY:   Your Honor, if we could briefly just read

9    in a portion of a stipulation.   We had previously read in one

10   paragraph and now we'll read the second paragraph.

11              THE COURT:   Yes.

12              MR. FOLLY:   The parties stipulate that the substance

13   contained in Government Exhibit 103 was sold by Jamel Moss to

14   an undercover law enforcement officer on May 25, 2013 and is

15   assigned voucher number 2000213241.   The substance contained in

16   Government Exhibit 103 was analyzed by forensic chemists and

17   tested positive for the presence of cocaine base, commonly

18   known as "crack cocaine".   The crack cocaine contained in

19   Government Exhibit 103 weighed approximately .16 grams.

20              Your Honor, at this time the government would offer

21   Government Exhibit 1000 which is the stipulation, as well as

22   Government Exhibit 103 which is the item referenced in

23   stipulation.

24              MR. LIND:   I have no objection.

25              THE COURT:   That'll be admitted into evidence.

1          (Government's Exhibit 103 AND 1000 received in

2     evidence)

3          MR. FOLLY:  Permission to approach, your Honor?

4          THE COURT:  Yes.

5          (Pause)

6          MR. FOLLY:  Your Honor, can we publish this to the

7     jury?

8          THE COURT:  That's 103?

9          MR. FOLLY:  Yes, your Honor.

10         THE COURT:  Yes.

11         (Pause)

12    Q.  Detective Prior, do you recognize part of that exhibit?

13    A.  Yes.

14    Q.  What part do you recognize?

15    A.  The right side there's an undercover bag here that I used

16    for the buy with JD Buddha.

17    Q.  Can you read aloud the date listed there?

18    A.  Sure.  May 25, 2013.

19    Q.  And the name?

20    A.  JD Buddha.

21    Q.  Can you also read aloud the location?

22    A.  Front of 1055 University.

23    Q.  Now, if you look at the other side of that exhibit, there

24    appears to be some items there, small plastic items.  Do you

25    recognize those?

1   A.  Yes.

2   Q.  What are they?

3   A.  Twists of crack.

4   Q.  If you could show just the witness what's been marked as

5   Government Exhibit 103-A.  Do you recognize that?

6   A.  Yes.

7   Q.  How do you recognize it?

8   A.  It's the twists of crack, a picture of this.

9   Q.  It's a picture of the exhibit next to you there?

10  A.  Yes.

11  Q.  Did you review that photograph before testifying today?

12  A.  Yes.

13  Q.  Is it a fair and accurate photo of what's in the Government

14  Exhibit 103?

15  A.  Yes.

16          MR. FOLLY:  Your Honor, the government offers

17  Government Exhibit 103-A.

18          MR. LIND:  No objection.

19          THE COURT:  It'll be admitted into evidence.

20          (Government's Exhibit 103-A received in evidence)

21  Q.  Detective Prior --

22          MR. FOLLY:  Could we please publish that to the jury?

23          THE COURT:  Yes.

24  Q.  And Detective Prior, when you were referring to the twists

25  of crack, using the touchscreen there could you circle those

I9CAAPOL3                        Prior - Cross

 1    for the jury.

 2              (Pause)

 3              MR. FOLLY:  Thank you.  You can take that down.

 4    Q.  Detective Prior, after the date May 25, 2013, did you have

 5    any additional interactions with Buddha?

 6    A.  No.

 7              MR. FOLLY:  No further questions.

 8              THE COURT:  Cross-examination?

 9              MR. LIND:  Just a few questions.

10              THE COURT:  Sure.

11    CROSS-EXAMINATION

12    BY MR. LIND:

13    Q.  Good afternoon, detective.

14    A.  Good afternoon.

15    Q.  Other than I guess, Buddha --

16    A.  Yes.

17    Q.  That's the only person you bought drugs from on that

18    occasion, correct?

19    A.  No.

20    Q.  Who else?

21    A.  JD Gray.

22    Q.  Other than those two gentlemen, no one else, correct?

23    A.  No.

24              MR. LIND:  I have nothing further.

25              THE COURT:  Any further questions?

1             MR. FOLLY:  No, your Honor.

2             THE COURT:  Thank you, detective.

3             You can step down.

4             MR. FOLLY:  The government calls Detective Patterson

5    at this time.

6     SCOTT PATTERSON,

7          called as a witness by the Government,

8          having been duly sworn, testified as follows:

9    DIRECT EXAMINATION

10   BY MR. FOLLY:

11   Q.  Good afternoon, Detective Patterson?

12   A.  Good afternoon.

13   Q.  Where do you work?

14   A.  Night Watch NYPD.

15   Q.  What is your title there?

16   A.  Detective.

17   Q.  How long have you been a detective at the NYPD?

18   A.  Approximately, 15 years.

19   Q.  What are your responsibilities as a Night Watch detective?

20   A.  To respond to different type of crimes and investigations

21   throughout the night hours of between 12 and eight a.m.

22   Q.  Directing your attention to July 25, 2015, were you

23   involved in a NYPD investigation on that date?

24   A.  Yes, I was.

25   Q.  What was the nature of the investigation?

1    A.   It was a male shot investigation.

2    Q.   What steps did you take during the investigation?

3    A.   Response to the hospital which was Bronx Lebanon Hospital

4    in the Bronx, interviews of police officers, victims and

5    doctors.

6    Q.   Approximately, when did you arrive at the Bronx Lebanon

7    Hospital?

8    A.   Approximately, 0545 hours.

9    Q.   What happened when you arrived at the hospital?

10   A.   First thing when we arrived, I spoke to the officers who

11   were there prior to my arrival, got a story from them and spoke

12   to the victim, spoke to the doctors and just continued the

13   investigation at the hospital from there.

14   Q.   You mentioned that one of the things you did was speak to

15   the victim.  Where was the victim at the time that you spoke

16   with him?

17   A.   He was in one of the beds in the ER of the hospital.

18   Q.   Did you eventually view the victim's property?

19   A.   Yes.

20   Q.   What type of property did the victim have?

21   A.   It consisted of clothing, sneakers, keys, U.S. currency.

22   Q.   Was there anything else inside of the property?

23   A.   Yes.  In one of the sneakers, the right sneaker was two

24   bags of what I thought was, what I think is marijuana, large

25   bags and a knife.

I9CAAPOL3                          Patterson - Direct

1   Q.  Can you explain for the jury why you believed that the item

2   in those bags was marijuana?

3   A.  It was the way that it was packaged.  It was a large bag

4   with smaller bags within the large bag.  Also was a green leafy

5   substance.

6          MR. FOLLY:  If we could show the witness what's been

7   mark as Government Exhibits 511 and 512.

8          (Pause)

9   A.  Yes.

10  Q.  And that's 512?

11  A.  Yes.

12  Q.  Do you recognize those?

13  A.  Yes.

14  Q.  What are they?

15  A.  Those are photos that I took of the property that I laid

16  out.

17         MR. FOLLY:  Your Honor, the government offers

18  Government Exhibits 511 and 512.

19         MR. LIND:  No objection.

20         THE COURT:  It'll be admitted into evidence.

21         (Government's Exhibits 511 and 512 received in

22  evidence)

23  Q.  When did you take --

24         MR. FOLLY:  Can we please publish these to the jury?

25         (Pause)

1          MR. FOLLY:  And 512.

2          (Pause)

3    Q.  When did you take these two photographs?

4    A.  At the hospital when I went to the property.

5    Q.  You mentioned that one of the items you found in the

6    victim's property was marijuana.

7          MR. FOLLY:  Can we go back to Government Exhibit 11.

8          (Pause)

9    Q.  Can you circle on screen which items you are referring to

10   as the marijuana?

11   A.  Sure.

12         (Pause)

13         MR. FOLLY:  Let the record reflect the witness has

14   circled the two plastic bags that appear to be in the right

15   shoe in this photograph with the green leafy substance inside

16   of them.

17   Q.  Did you have any further involvement in this investigation

18   after July 25, 2015?

19   A.  No.

20         MR. FOLLY:  No further questions, your Honor.

21         THE COURT:  Any questions?

22         MR. LIND:  I don't have any questions.

23         THE COURT:  Thank you, sir.  You can step down.

24         THE WITNESS:  Thank you.

25         THE COURT:  Mr. Krouse.

1           MR. KROUSE:  Your Honor, at this time the government

2    would like to read a stipulation between the parties which is

3    marked as Government Exhibit 1003.

4           Your Honor, the parties stipulate that on July 13,

5    2015 Delisa Harris rented a 2015 Toyota Camry with Florida

6    license plate number 122PRA from an EZ Rental car location in

7    Fort Lauderdale, Florida.  Ms. Harris provided the following

8    address 125B West 158 Street, Apartment Five, Bronx, New York

9    10452.

10          According to the New York Department of Motor

11   Vehicles, the DMV, Government Exhibit 7 is a DMV photograph of

12   Delisa Harris who lives at 125B West 168 Street, Apartment 5A,

13   Bronx, New York 10452.

14          On August 7, 2015, the Toyota Camry with Florida

15   license plate number 12PRA was found in the Bronx and seized by

16   New York City Police Department.

17          The government offers Government Exhibit 1003.

18          THE COURT:  Any objections?

19          MR. LIND:  No.

20          THE COURT:  It'll be admitted into evidence.

21          MR. KROUSE:  The government also offers Government

22   Exhibit 7B which is the nameplate "Delisa Harris".

23          THE COURT:  Any objection?

24          MR. LIND:  No.

25          THE COURT:  It'll be admitted into evidence.

1              (Government's Exhibits 1003 and 7B received in

2      evidence)

3              MR. KROUSE:   The government calls Detective Kegham

4      Jarjokian.

5       KEGHAM JARJOKIAN,

6           called as a witness by the Government,

7           having been duly sworn, testified as follows:

8      DIRECT EXAMINATION

9      BY MR. KROUSE:

10     Q.  Good afternoon, Officer Jarjokian.

11     A.  Good afternoon.

12     Q.  Officer Jarjokian, where do you currently work?

13     A.  Patrol Bureau Bronx Evidence Collection Unit.

14     Q.  Is that part of the New York Police Department?

15     A.  Yes, it is.

16     Q.  What is your title with the evidence collection unit?

17     A.  Police officer.

18     Q.  How long have you been with the NYPD?

19     A.  Eighteen years.

20     Q.  How long have you been with the evidence collection unit?

21     A.  Thirteen years.

22     Q.  What are your duties and responsibilities as an officer

23     with the evidence collection unit?

24     A.  We respond to all felony crimes to assist detectives with

25     their investigation through forensic fingerprinting and DNA

1   photography.

2   Q.   "Photography" what does that mean?

3   A.   Photos.

4   Q.   Taking photos?

5   A.   Yes.

6   Q.   You also recover any evidence that's at the scene?

7   A.   We do, yes.

8   Q.   Do you recall responding to an incident on August 4, 2015?

9   A.   Yes.

10  Q.   What sort of incident?

11  A.   It was two males shot.

12  Q.   Where were those two men shot?

13  A.   The address is --

14  Q.   Just without reading from anything what in general where

15  were the two men shot?

16  A.   It was in a store.

17  Q.   And do you recall where geographically it was?

18  A.   Anderson Avenue.

19  Q.   And is that in the Bronx?

20  A.   In the Bronx.

21       MR. KROUSE:   Mr. Concepcion, can you place on the

22  screen what's been admitted into evidence as Government Exhibit

23  201.

24  Q.   Officer Jarjokian, do you see 950 Anderson Avenue marked on

25  this map?

1   A.   Yes.

2   Q.   Is that where the store was located that you responded to?

3   A.   Yes.

4         MR. KROUSE:   Mr. Concepcion, can you place on the

5   screen Government Exhibit 535.

6         (Pause)

7   Q.   Officer Jarjokian, do you recognize this photograph?

8   A.   Yes.

9   Q.   What is it?

10  A.   This is a photo that I took of the intersection West 162

11  and Anderson Avenue where the store was.

12  Q.   Do you see the store located at 950 Anderson in this

13  photograph?

14  A.   Yes.

15  Q.   Where is it?

16  A.   It's on the right-hand side, tobacco shop.

17        MR. KROUSE:   Mr. Concepcion, can you place on the

18  screen Government Exhibit 534.   And is this just a different

19  angle of the same area?

20  A.   Yes.   The front of the location.

21  Q.   Do you see the tobacco shop in this photograph?

22  A.   Yes.

23  Q.   Where is it in the photo?

24  A.   On the left hand side.

25  Q.   Officer Jarjokian, you mentioned that you responded to a

1   shooting that occurred at 950 Anderson Avenue on August 4,

2   2015, correct?

3   A.  Yes.

4   Q.  What was your understanding of how many people had been

5   shot?

6   A.  Two.

7   Q.  When you got to the scene of the incident were the victims

8   of the shootings still there?

9   A.  No.

10  Q.  Were you able to determine where in the store the victims

11  had been shot?

12  A.  Yes.

13  Q.  Where had they been shot?

14  A.  In the back room, the rear of the location.

15  Q.  And can you generally describe the layout of the store for

16  the jury?

17  A.  It's a grocery store, also tobacco products that leads to

18  the hallway at the back with another room in the back that's

19  for stocking.

20  Q.  When you say "for stocking" what do you mean by that?

21  A.  Supplies to restock the shelves, like an office/stock room.

22  Q.  Is there anything else in that back room?

23  A.  A bathroom.

24          MR. KROUSE:  Mr. Concepcion, can you place on the

25  screen for just the witness what has been marked --

1            Actually, your Honor, may I approach the witness?

2            THE COURT:  Yes.

3  Q.  Officer Jarjokian, I am handing you a stack of photographs

4  marked Government Exhibit 501 through 510.  Could you flip

5  through those photographs and then look up when you're done.

6            (Pause)

7  Q.  Officer Jarjokian, do you recognize the photographs of

8  Government Exhibit 501 to 510?

9  A.  Yes.

10 Q.  How do you recognize them?

11 A.  The photos that I took of the crime scene.

12 Q.  Are those the photos you took on August 4, 2015 when you

13 responded to 950 Anderson Avenue?

14 A.  Yes.

15           MR. KROUSE:  The government offers Government Exhibit

16 501 through 510 and all the exhibits in between.

17           THE COURT:  Any objection?

18           MR. LIND:  No.

19           THE COURT:  They'll be admitted into evidence.

20           (Government's Exhibits 501 - 510 received in evidence)

21           MR. KROUSE:  Mr. Concepcion, may we publish those

22 exhibits to the jury?

23           THE COURT:  Yes.

24           MR. KROUSE:  Mr. Concepcion, could you place on the

25 screen for everyone what's been admitted into evidence as

1    Government Exhibit 501.

2              (Pause)

3    Q.  Now, Officer Jarjokian, can you describe what this

4    photograph depicts?

5    A.  This is a picture from leaning into the back storage room

6    for the outside looking in.

7    Q.  Where were you saning when you took the photograph?

8    A.  In the store facing the back room.

9    Q.  And then through that open door is the back room?

10   A.  Yes.

11             MR. KROUSE:  Mr. Concepcion, can you put on the screen

12   what's been admitted as Government Exhibit 504.

13             (Pause)

14   Q.  Officer Jarjokian, where were you standing when you took

15   this photograph?

16   A.  I'm in the back room you but in the corner.

17   Q.  And directing your attention to the door frame that's on

18   the right toward the right of the photograph when you are

19   facing it -- it's little bit ajar.  What's that door frame lead

20   to or door lead to?

21   A.  The right side is the bathroom and to my left is the

22   entrance door to the back room.

23   Q.  The door on the left of the photograph is the entrance from

24   the store into the back room?

25   A.  Yes.

I9CAAPOL3                        Jarjokian - Direct

1   Q.  And you said that the door on the right, that's to the

2   bathroom?

3   A.  Yes.

4   Q.  And Officer Jarjokian, it may be obvious but what is the

5   red stuff that's on the floor and on the walls in this

6   photograph?

7   A.  Blood.

8           MR. KROUSE:  Mr. Concepcion, can you put on the screen

9   what's been admitted as Government Exhibit 502.

10          (Pause)

11  Q.  Officer Jarjokian, what does this photograph depict?

12  A.  We call it a BIM, ballistics impact marking, which shows

13  where the projectile hit the actual surface.

14  Q.  And when you say "the projectile" what do you mean by that?

15  A.  The bullet.

16  Q.  So is this a bullet hole?

17  A.  A bullet hole, correct.

18  Q.  And what is this door that's being depicted in this

19  photograph?

20  A.  That's the door that separates the main to the back room,

21  the entrance.

22  Q.  The main store from the back room?

23  A.  Yes.

24  Q.  In addition to taking photographs, did you also recover

25  items of evidence for the scene of the shooting?

1    A.  Yes, I did.

2    Q.  What did you recover?

3    A.  Five deformed bullets.

4    Q.  And what, if anything, did you do to mark where those five

5    deformed bullets were when you found them?

6    A.  I put down numbered markers.

7            MR. KROUSE:  Mr. Concepcion, could you put on the

8    screen Government Exhibit 507.

9            (Pause)

10   Q.  Officer Jarjokian, what does this photographer show?

11   A.  Marker number one and on the floor next to it is a deformed

12   bullet.

13   Q.  Could you circle what the deformed bullet is on the screen.

14           (Pause)

15           MR. KROUSE:  Let the record reflect that the witness

16   has circled towards the center of the photograph a gray item on

17   the floor next to the cup that says "one".

18           Officer Jarjokian, can you press clear on that screen.

19           (Pause)

20           MR. KROUSE:  Mr. Concepcion, can you put on the screen

21   Government Exhibit 508.

22           (Pause)

23   Q.  Officer Jarjokian, what does that photograph show?

24   A.  Marker number two with a deformed bullet on the floor next

25   to it.

I9CAAPOL3                    Jarjokian - Direct

1    Q.  Can you circle on your screen the deformed bullet.

2             (Pause)

3             MR. KROUSE:  Let the record reflect the witness has

4    circled an item located in the middle and toward the bottom of

5    the photograph.

6             Officer Jarjokian, can you press clear again.

7             Mr. Concepcion, can you put on the screen Government

8    Exhibit 509.

9             (Pause)

10   Q.  Officer Jarjokian, what does this photograph show?

11   A.  Marker number three with the deformed bullet.

12   Q.  And could you again circle the deformed bullet in this

13   photograph?

14            MR. KROUSE:  And again, let the record reflect that

15   Officer Jarjokian has circled an item in the middle of the

16   photograph next to the cup that says "three".

17            Can you clear the screen again.  Thank you.

18            Mr. Concepcion, can you put on screen Government

19   Exhibit 510.

20   Q.  Officer Jarjokian, what does that photograph show?

21   A.  It's markers numbered "four" and "five" with two deformed

22   bullets.

23            MR. KROUSE:  Can you circle the two deformed bullets

24   in this photograph.

25            (Pause)

1          MR. KROUSE:  Let the record reflect the witness has

2     circled two items towards the left of the photograph next to

3     the cups that say "five" cr "four".

4     Q.  Officer Jarjokian, did you also take a photograph that

5     shows where in the back room all of those five deformed bullets

6     were recovered?

7     A.  Yes.

8          MR. KROUSE:  Mr. Concepcion, can you put on the screen

9     Government Exhibit 506.

10         (Pause)

11    Q.  What does this photograph show?

12    A.  It's and overall view standing outside looking into the

13    back room where everything was prior to collection.

14    Q.  And these, "where everything was" you mean the numbered

15    cups show where the deformed bullets were?

16    A.  Correct.

17    Q.  Before you took this photograph had you moved any of the

18    deformed bullets that were recovered for the scene?

19    A.  They were not moved.

20    Q.  After you took this photograph did you pick up the deformed

21    bullets?

22    A.  Yes, I did.

23    Q.  What, if anything, did you do with them?

24    A.  I packaged them and then I did a voucher with a request for

25    lab.

1  Q.  And by "voucher" what does that mean?

2  A.  Voucher is an, we itemize exactly what is being collected.

3  It has pedigree information, my information, the location and

4  basically everything that I am going to be sending in.

5          MR. KROUSE:  Your Honor, may I approach the witness?

6          THE COURT:  Yes.

7          MR. KROUSE:  I am handing the witness what has been

8  marked as Government Exhibit 104 for identification.

9  Q.  Officer Jarjokian, do you recognize this exhibit?

10  A.  Yes.

11  Q.  What is it?

12  A.  These are the five deformed bullets that was collected.

13  Q.  Were you shown this exhibit before you were called to

14  testify today?

15  A.  Yes.

16  Q.  Did you review the voucher paperwork associated with these

17  five bullet fragments?

18  A.  Yes.

19  Q.  And did you identify this exhibit as the bullet fragments

20  that you found on August 4, 2015 inside 950 Anderson Avenue?

21  A.  Yes, I did.

22  Q.  Did you initial the exhibit sticker?

23  A.  Yes, I did?

24          MR. KROUSE:  Your Honor, the government offers

25  Government Exhibit 104.

I9CAAPOL3                     Jarjokian - Direct

1              MR. LIND:  Just have one moment, judge?

2              THE COURT:  Yes.

3              (Pause)

4              MR. KROUSE:  Your Honor, may I approach the witness?

5              THE COURT:  Yes.

6              MR. KROUSE:  The government is retrieving Government

7    Exhibit 104 for the witness and handing it to defense counsel

8    for examination.

9              (Pause)

10             MR. LIND:  Just one question?

11             THE COURT:  Yes.

12   VOIR DIRE EXAMINATION

13   BY MR. LIND:

14   Q.  Your initials are where on this?

15   A.  On the yellow it says "KJ".

16   Q.  And then your initials appear anywhere else on this form?

17   A.  Just on the package.

18   Q.  There are two initials, is it this one over here?  It has a

19   May date?

20   A.  What does it say?

21   Q.  May of 2015, is that the date?

22   A.  No.  I did the yellow sticker.

23             (Pause)

24   Q.  Do you know whose initials there are on this?

25   A.  I put my initials "KJ".

1  Q.  On the exhibit yourself?

2  A.  I don't know.  Unless it's KJ, it's not me.

3  Q.  OK.  So what did you do after you -- you put the bullets in

4  the package?

5  A.  In a separate package prior to this, yeah.

6  Q.  OK.  And then it went in this?

7  A.  Then it was put into that.

8  Q.  Then what happened after that?

9  A.  I put it in different packaging and it's sent to the lab

10  differently than what you have in your hand.  That's not my

11  case.

12  Q.  OK.  So then what's this?  After it had gone to the lab?

13  A.  I guess when lab does their analysis and they send it back

14  that's how they package it.  I package it differently than when

15  it comes back.

16         MR. LIND:  There's a chain of custody issue here,

17  judge.  I don't know --

18  Q.  Did you look at the bullets when they came back?

19  A.  When I looked for -- yes, we looked at it, yes.

20  Q.  When they came back from the lab.

21  A.  Yes.

22  Q.  OK.  And were they the same bullets that were sent there?

23  A.  The same bullets, yes.

24         MR. LIND:  I have no objection.

25         THE COURT:  Then it will be admitted in evidence.

1                (Government's Exhibit 104 received in evidence)

2                MR. KROUSE:  May I approach the witness?

3                THE COURT:  Yes.

4                (Pause)

5    BY MR. KROUSE:

6    Q.  The government's handling the witness what's been admitted

7    in into evidence as Government Exhibit 104.

8                Officer Jarjokian, do you see on the back of that

9    package voucher paperwork?

10   A.  Yes.

11   Q.  And what's on that paperwork?  What's reflected on that?

12   A.  It's the five items that were submitted, unknown caliber,

13   only information that belongs with that.

14   Q.  Who does that show vouchered that evidence?

15   A.  Myself.

16   Q.  So your name is on that voucher paperwork?

17   A.  Yes.

18   Q.  Your identifying information is also on that paperwork?

19   A.  Yes.

20   Q.  Officer Jarjokian, could you take out of the exhibit the

21   items that are stored within it, namely, the bullets.  How many

22   bullets are in that package?

23   A.  Five.

24   Q.  Do you recognize those deformed bullets?  Are they the

25   deformed bullets that you recovered from the scene on

1    August 34, 12015 within 950 Anderson avenue?

2    A.  Yes.

3            MR. KROUSE:  Your Honor, could we put on the screen

4    just for the witness -- excuse me.

5            Mr. Concepcion, Government Exhibit 539.

6            (Pause)

7    Q.  Officer Jarjokian, do you see that photograph?

8    A.  Yes.

9    Q.  What does it depict?

10   A.  The five deformed bullets that was collected.

11   Q.  Looking at photograph and looking at the five deformed

12   bullets that you have in front of you, are they the identical

13   five deformed bullets?

14   A.  Yes.

15           MR. KROUSE:  The government offers Government Exhibit

16   539.

17           MR. LIND:  No objection.

18           THE COURT:  It'll be admitted into evidence.

19           (Government's Exhibit 539 received in evidence)

20           MR. KROUSE:  May we publish the exhibit, your Honor?

21           THE COURT:  Yes.

22           (Pause)

23           MR. KROUSE:  Then may we publish the physical exhibit

24   as well, your Honor?

25           THE COURT:  Yes.  How do you want to do that?

1          MR. KROUSE:  I'll approach the witness, your Honor.

2          THE COURT:  OK.

3          MR. KROUSE:  The government's approaching the witness

4     stand and is collecting the five deformed bullets and the

5     envelope itself and publishing it the jury.

6          (Pause)

7          MR. KROUSE:  No further questions, your Honor.

8          MR. LIND:  I have no questions, your Honor.

9          THE COURT:  Thank you, sir.  You can step down.

10          Mr. Krouse, how long is your next witness?

11          MR. KROUSE:  Your Honor, approximately 20 to 25

12     minutes.

13          THE COURT:  OK.  Do we have much more after that?

14          MR. KROUSE:  No, your Honor.  There are three more

15     witnesses I believe.

16          THE COURT:  Oh, you do have three more witnesses?

17          MR. KROUSE:  Including this one.

18          THE COURT:  All right.  So can we take about ten

19     minutes and then we'll take a lunch break.  Go ten minutes with

20     that witness.

21          MR. KROUSE:  Yes, your Honor.

22          THE COURT:  And we're still on schedule.  Why don't we

23     do this.  Let's take the lunch break.  I'm going to ask you to

24     be back like 2:10.  I believe there's a possibility we may

25     finish the witnesses today.  So if we can, then I will give you

1    the case tomorrow.  So I want to start promptly at 2:10 and see

2    how far we get this afternoon.

3           MR. KROUSE:  Your Honor, the only thing is the

4    exhibits are still with the jury.

5           THE COURT:  We can wait till then.

6           (Pause)

7           THE COURT:  You should know any exhibits you want to

8    review in the jury room, just give us a note and I'll send it

9    in.

10          (Pause)

11          THE COURT:  OK.  Ladies and gentlemen, I'll see you at

12   2:10.  We'll continue promptly at that time.

13          (Jury not present)

14          THE COURT:  Mr. Krouse, you have three more witnesses.

15   Do you think we'll finish them this afternoon?

16          MR. KROUSE:  Yes, your Honor.

17          THE COURT:  I am going to give both sides what I am

18   working on as jury instructions and the verdict form.  There

19   are some things that I left out that I thought were

20   unnecessary, literally.  I just thought the instructions were

21   too long and too complicated for what is a simpler case.

22          So look and make sure that if there's something

23   missing that you think is important, let me know if there is

24   something if there that you think we don't need and

25   specifically, look over the verdict form.  I think it's

I9CAAPOL3                    Jarjokian - Direct

1    consistent with the way the evidence has been presented and the

2    way the parties were arguing it.  But after both sides rest

3    we'll go through it this afternoon and then we'll continue with

4    the charging conference in the morning.

5           What I'll probably do if we are going to sum up

6    tomorrow is have us come back at 9:30 and have the jury come

7    back at 9:45 so we can finalize the jury instructions and begin

8    summations at 9:45.  So I'll see everyone at 2:10.

9           (Luncheon Recess)

10          (Continued on next page)

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

I9CKPOL4

```
 1              (In open court; jury not present)
 2              MR. LIND:  Judge, I have a brief legal question.
 3              THE COURT:  Sure.
 4              MR. LIND:  I've raised it with the government.
 5              I'd like to be able to have either the expert or
 6    myself read into evidence excerpts from a study by The National
 7    Academy of Sciences regarding forensic science and, in
 8    particular, an excerpt relating to ballistics and toolmarks
 9    tests and validity.  An identical portion of this article was
10    admitted in the Gil case.  That was one of the cases that was
11    cited on appeal.  Judge Koeltl admitted it as a learned
12    treatise.
13              In fact, the witness in that case was Detective Fox,
14    who recognized it as authoritative.
15              THE COURT:  That's who is testifying here?
16              MR. LIND:  Yes.
17              So I can show you, your Honor --
18              THE COURT:  Well, let me figure out whether there's
19    some disagreement, and then I'll resolve the dispute.
20              MR. LIND:  I can tell you there is.
21              THE COURT:  So you want do what with it?
22              MR. LIND:  I want him or I can read it into evidence.
23              THE COURT:  Read how much of it?
24              MR. LIND:  Very little.  Just like two paragraphs.
25              THE COURT:  All right.
```

I9CKPOL4

1        And let me see it.

2            MR. LIND:  I'll bring up a copy, Judge.

3            THE COURT:  What's the government's position?

4            MR. FOLLY:  Your Honor, our position is if Mr. Lind

5   were to lay the proper foundation on cross-examination and

6   satisfy these requirements under Rule 803(18)(A) and (B), that

7   it might be appropriate at that time to only read it, but not

8   admit it as an exhibit.

9            MR. LIND:  That's what I was saying.

10           THE COURT:  Which paragraphs?

11           MR. LIND:  Let me go to them, Judge.  Just one second,

12   Judge?

13           (Pause)

14           THE COURT:  In the abstract, I have no problems with

15   you -- if they're proffering him as an expert, with you asking

16   if he's aware of a certain treatise and he's aware of certain

17   conclusions that are reached in that treatise by the person who

18   wrote that treat.  That seems to be fair game with experts.

19   You can ask whether he agrees or disagrees with that.  I'm not

20   quite sure what -- again, because you're springing it on me,

21   I'm not quite sure what is the substance of what you want to

22   put in.

23           MR. LIND:  There are two paragraphs, Judge.  I'm not

24   trying to slow this down.

25           THE COURT:  What page are you on?

I9CKPOL4

1          MR. LIND:  Let me see.  There are two excerpts.

2     One -- the second one is on toolmarks, it's on page 154.  Do

3     you see the numbers are in the upper --

4          THE COURT:  Yes.  154, I have it.

5          MR. LIND:  So it says, "Toolmark and firearms analysis

6     suffers from the same limitations discussed above for

7     impression evidence because not enough" -- well, it's that

8     paragraph, Judge.

9          THE COURT:  Okay.  Let me read it.

10          Okay.  What's the second part?

11          MR. LIND:  The second one is the next page, Judge,

12     beginning with "Although."

13          THE COURT:  Okay.  How long a treatise is this?

14          MR. LIND:  It's at least 155 pages.  I think it's

15     probably like 500 pages, Judge.

16          THE COURT:  Oh.  Okay.

17          And you want --

18          MR. LIND:  Either the expert or I can read it into

19     evidence.  Under the rule, it cannot be admitted into evidence,

20     the particular exhibit.

21          THE COURT:  The substance of what you want is the

22     portion -- two of the three paragraphs under "Summary

23     Assessment"?

24          MR. LIND:  That's correct, Judge.

25          THE COURT:  The first one and the second or the first

I9CKPOL4

1    one and the bottom?

2            MR. LIND:  And the last one beginning with "Although"

3    on page 155.

4            THE COURT:  What do you want to ask him about it?

5            MR. LIND:  Well, is he aware that there's a deficiency

6    in toolmark analysis?

7            THE COURT:  Okay.

8            MR. LIND:  Because a lot of it, which he agreed to in

9    his testimony before Judge Koeltl, that --

10           THE COURT:  Was this put before him in his testimony

11   before Judge Koeltl?

12           MR. LIND:  Yes.  I have it right here.  If your

13   Honor -- I can bring it up.

14           THE COURT:  Well, just summarize for me what happened

15   in front of Judge Koeltl, if that's what you want to similarly

16   do.

17           MR. LIND:  Well, I think the defense attorney in that

18   case asked if he could read it, you know, that he wants to

19   present this --

20           THE COURT:  Okay.

21           MR. LIND:   -- as a learned treatise, and the judge

22   recognized it.

23           THE COURT:  Okay.  All right.

24           So he's acknowledged -- in the past, he's acknowledged

25   that this is a learned treatise?

I9CKPOL4

1          MR. LIND:  Right.

2          THE COURT:  That he's aware of?

3          MR. LIND:  Yes.

4          THE COURT:  And you want to ask him about whether or

5     not -- you want to ask him what conclusions or determinations

6     were made in that treatise?

7          MR. LIND:  Yes.

8          THE COURT:  Are you going to ask him whether he agrees

9     or doesn't agree with that?

10         MR. LIND:  Yes, or both.

11         THE COURT:  In the abstract, I don't have a problem

12    with it.  It just depends on what form you want to do it in and

13    what makes the most sense in the most efficient and the fast

14    way of presenting it to him.  I don't know if he is going to

15    say, yeah, I agree with that, but there's another portion that

16    says X.

17         MR. LIND:  If he says that -- or he may say -- in the

18    case in front of Judge Koeltl, which was three years ago, he

19    basically just read it, and he didn't have much of a

20    disagreement.

21         THE COURT:  Anybody ask him anything about it?

22         MR. LIND:  Yes.  I mean, the defense attorney asked

23    him about it.

24         THE COURT:  He didn't ask him whether he agreed with

25    it or disagreed with it?

I9CKPOL4

1          MR. LIND:  Well, I'll tell you -- I'm sorry, Judge.

2     Let me just get back to my --

3          THE COURT:  Look, I'll turn to the government and see

4     how violently they object to this, but I don't have any problem

5     with you putting before him or putting before the jury page 154

6     and 155 and asking him whatever you want to ask him about it,

7     about those conclusions.  And if there is some other portion

8     that he thinks is relevant that he wants to identify, and he

9     and the government can identify some other portion and put that

10    before the jury.

11         MR. LIND:  Well, in the other case, before even

12    looking at it, he says, well, to go back to this report that we

13    are talking about in 2008, NHH's chairman, Dr. Raul, actually

14    wrote an affidavit saying that this report has nothing to do

15    with firearms identification based on toolmarks.  That's what

16    his response was to that.

17         THE COURT:  That was this witness' response?

18         MR. LIND:  Yes.

19         THE COURT:  So he thinks it doesn't change -- he

20    disagrees with it?

21         MR. LIND:  Yes.

22         THE COURT:  All right.  So that's fine.  I'm just

23    trying to figure out what the government doesn't want you to

24    do.  That's what I'm trying to figure out.

25         MR. LIND:  I think it's anything I want to do, Judge.

I9CKPOL4

1          THE COURT:  What and why is usually what I ask.

2          What do you want me to limit him to, or do you want

3     him to go to his heart's content?

4          MR. FOLLY:  Your Honor, the government's only concern

5     is whether or not this is established as a reliable authority

6     through this witness.  We've never seen this before, so --

7          THE COURT:  Only the witness can tell us -- your

8     witness can tell us whether or not this is a reliable authority

9     that he's consulted, he's aware of.  I assume he's given that

10    kind of testimony in the past, that he's aware of it, he's

11    consulted with it, he's an expert, and this other guy is an

12    expert.  Whether or not he agrees with -- they agree on

13    everything is a different question.  The question here is

14    whether or not -- I mean, Mr. Lind, are you challenging him as

15    an expert?

16         MR. LIND:  No.

17         THE COURT:  Okay.  Are you challenging the reliability

18    of his methodology, or are you just challenging the sufficiency

19    of his conclusion?

20         MR. LIND:  No.  What I'm challenging, Judge, is

21    that -- like I think this report also says the same thing, that

22    there's a spectrum here.

23         THE COURT:  Right.

24         MR. LIND:  DNA is one end of the spectrum, toolmarks

25    and fingerprints analysis are on the other end of the spectrum.

1        THE COURT:  Okay.

2        MR. LIND:  That is not as reliable as DNA analysis or

3   like blood analysis.

4        THE COURT:  Right.

5        MR. LIND:  So because there are different parts of his

6   toolmark ballistics --

7        THE COURT:  Right.

8        MR. LIND:  -- but the final -- I think there's class

9   characterizations, and then there are more specific, and the

10  second category of itemizing or identifying certain things is a

11  subjective analysis.

12       THE COURT:  Okay.

13       Before I get back to them:  You put this issue in a

14  different context now than when we started, because now the

15  question is -- you say that you didn't want him to testify

16  about the certainty of his conclusion.  If you're going to

17  challenge whether or not this science is as good a science as

18  some other science, then you may be opening the door to whether

19  or not, based on his experience and expertise, whether he is

20  confident in his conclusion here that this bullet came from

21  this gun.

22       MR. LIND:  Well, your Honor, I can't tell that until I

23  hear the direct testimony.  At that point, I'll raise this

24  again with your Honor.

25       THE COURT:  Right.  But I can't limit him in that

1      regard, if that's the challenge, about whether or not the

2      science that he's using, that he should be less confident of

3      those conclusions.

4                   MR. LIND:  No, I don't think that's where it is.  What

5      he did in the other case, Judge, also, is that he recognized

6      that part of the analysis is subjective.

7                   THE COURT:  Right, okay.

8                   MR. LIND:  That's all I really want to get to here.

9                   THE COURT:  As I say -- let me put it to you this way:

10     Clearly, I don't know -- and the government can tell me

11     otherwise -- I don't know of any restriction that I can put on

12     you with regard to the type of questions you ask him about his

13     experience, his analysis, whether or not his science, whether

14     or not he knows of other people in the field who are experts,

15     whether he's read certain treatises, whether he's read certain

16     portions of treatises, and whether he agrees with that portion

17     or disagrees with that portion.  That avenue of inquiry, I

18     think, is perfectly appropriate for any expert.

19                   As you see, if you look at the proposed jury

20     instructions, I'm going to give the jury the standard

21     instruction on expert witnesses and tell them that, look, you

22     listen to the guy, and you make up your own mind whether or not

23     that makes sense, is basically what the instructions say.

24                   So with regard to your wanting to inquire about a

25     treatise that he's aware of and whether he's aware of what that

I9CKPOL4

1   treatise says, anything in particular, whether he agrees with

2   it or disagrees with it, I don't think that there is, in the

3   abstract, a basis for me to say you can't inquire in that way.

4           Does the government think I should restrict him with

5   regard to that inquiry?

6           MR. FOLLY:  No, your Honor.

7           THE COURT:  All right.

8           So then the question really is:  What do you want to

9   do with the piece of paper?  And whether the government is

10  going to object to you putting in some or all -- because I

11  don't know what he is going to say when you ask him about page

12  154.  He may respond:  Yeah, 154 says that, but if you go back

13  to page 57, it says a different thing.  So I don't know whether

14  or not each side is going to want parts of the treatise, all of

15  the treatise, none of the treatise, depending on what he has to

16  say.

17          So you tell me:  What is the manner in which you want

18  to proceed?

19          MR. LIND:  Well, I guess I'll wait for the expert's

20  testimony, and then I can decide, Judge, and then maybe we can

21  take like a two-minute break at the sidebar, and I can tell you

22  what I want to do.

23          THE COURT:  I guess the question really remains

24  whether or not you're going to offer something as an exhibit, a

25  portion of this as an exhibit.

I9CKPOL4

1          MR. LIND:  The rule says it doesn't come in as an

2     exhibit.  It's just something that's read.

3          THE COURT:  All right.

4          MR. LIND:  That's what it says in the rule.

5          THE COURT:  Yes.  And I understand that, and I don't

6     know what Judge Koeltl did in his case, but I have a lot of

7     respect for Judge Koeltl, I'm sure he did it the right way.

8          Look, you always have the right to ask the expert --

9     to quote something to the expert and ask the expert is he aware

10    of that, and does he agree with it.

11         MR. LIND:  Right.

12         THE COURT:  Now, how much of it -- I mean, we don't

13    want to sit here and have you read for 20 minutes out of the

14    thing.

15         MR. LIND:  No, Judge.  I'll show you the two

16    paragraphs I want to do.  I think it would take five minutes,

17    at most.

18         In the other case, like your Honor -- I wanted to

19    obviously bring this up before cross-examination, so we didn't

20    have to spend all that time with the jury here, but I want to

21    hear what he has to say.

22         THE COURT:  Okay.

23         MR. LIND:  And then my point, Judge -- and I think

24    I've said this a couple of times -- is just to sort of

25    emphasizing that this is a subjective analysis rather than --

I9CKPOL4

1    he may -- I don't think --

2              THE COURT:  He may come right out and tell you that

3    right away, concede that.  Let's take it step by step, hear

4    what he has to say, and see what your inquiry is, and then see

5    if the government has either an objection to your questions or

6    to admission of some portion of this as an exhibit, and we can

7    deal with it as it comes in, okay?  But I'm not going -- at

8    this point right now, I'm not going to restrict you in the way

9    you want to proceed.  Proceed the way you want, and if the

10   government has an objection, then I'll see if it's appropriate

11   for me to stop you.

12             MR. LIND:  Thank you, Judge.

13             THE COURT:  So let's bring the jury in.

14             Do you have anything else?

15             MR. KROUSE:  No, your Honor.

16             THE COURT:  Let's bring the jury in, and let's

17   continue.

18             And the government believes it has three more

19   witnesses?

20             MR. KROUSE:  Yes, your Honor.

21             THE COURT:  You can get your witness.

22             MR. KROUSE:  We have a stipulation first, your Honor.

23             THE COURT:  Okay.  He can sit in the audience.

24             (Continued on the next page)

25

I9CKPOL4

1            (Jury present)

2            THE COURT:  Mr. Krouse?

3            MR. KROUSE:  Thank you, your Honor.

4            Your Honor, at this time, the government would like to

5     read a stipulation between the parties, Government Exhibit

6     1007.

7            Just starting with Terrell, Mr. Concepcion.

8            "The parties stipulate that Terrell Polk, the

9     defendant, resided at 1145 University Avenue, Apartment 4-A, in

10    the Bronx, New York, from March 18, 2014, until August 26,

11    2015, and from December 13, 2016, until February 3, 2017."

12           The government offers Government Exhibit 1007.

13           MR. LIND:  No objection.

14           THE COURT:  It will be admitted into evidence.

15           (Government's Exhibit 1007 received in evidence)

16           MR. KROUSE:  The government also has another

17    stipulation between the parties.  This is Government Exhibit

18    1006.

19           "The parties stipulate that on January" --

20           MR. LIND:  I think that's wrong.

21           MR. KROUSE:  That's a typo.  It should be July 25th,

22    excuse me, your Honor.  I'll correct the version that will be

23    an exhibit.

24           -- "that On July 25, 2015, New York City Police

25    Department NYPD officers recovered three .40 caliber shell

1    casings from the sidewalk and street in front of 1055

2    University Avenue in the Bronx, New York.  The three .40

3    caliber shell casings were invoiced by the NYPD under the

4    invoice number 200451574 and are marked as Government Exhibits

5    102-A, 102-B, and 102-C.

6              "Government Exhibit 533 is a true and accurate

7    photograph of Government Exhibits 102-A, 102-B, and 102-C.

8              "Government Exhibit 102-A is a .40 caliber Smith &

9    Wesson cartridge casing manufactured by Sellier & Bellot.

10   Government Exhibit 102-A was manufactured outside the State of

11   New York.

12             "Government Exhibit 102-B is a .40 caliber Smith &

13   Wesson cartridge casing manufactured by Wolf.  Government

14   Exhibit 102-B was manufactured outside the State of New York.

15             "Government Exhibit 102-C is a .40 caliber Smith &

16   Wesson cartridge casing manufactured by Remington Peters.

17   Government Exhibit 102-C was manufactured outside the State of

18   New York."

19             Your Honor, the government offers the stipulation, as

20   corrected with the correct date on page 1, Government Exhibit

21   1006.

22             MR. LIND:  No objection.

23             THE COURT:  Then that will be admitted as corrected.

24             (Government's Exhibit 1006 received in evidence)

25             MR. KROUSE:  The government also offers Government

I9CKPOL4

1        Exhibit 102-A, 102-B, and 102-C, which are the shell casings

2        themselves, your Honor.

3                    MR. LIND:  Do you have them?

4                    MR. KROUSE:  Yes.

5                    MR. LIND:  No objection.

6                    THE COURT:  It will be admitted into evidence.

7                    (Government's Exhibits 102-A, 102-B, and 102-C

8        received in evidence)

9                    MR. KROUSE:  The government also offers Government

10       Exhibit 533, which is a photograph of the three shell casings.

11                   THE COURT:  Any objection?

12                   MR. LIND:  I just want to see it, Judge.

13                   THE COURT:  Oh, okay.

14                   MR. KROUSE:  Can you put it on the screen,

15       Mr. Concepcion, for the parties?

16                   MR. LIND:  I have no objection.

17                   THE COURT:  They will be admitted into evidence.

18                   (Government's Exhibit 533 received in evidence)

19                   MR. KROUSE:  The government also offers, on

20       stipulation between the parties, photographs taken on July 25,

21       2015, in front of and around 1055 University Avenue in the

22       Bronx.  They are marked Government Exhibit 513, Government

23       Exhibit 514, Government Exhibit 515, and Government Exhibit

24       516, Government Exhibit 517, Government Exhibit 518, and

25       Government Exhibit 519.

I9CKPOL4

1           MR. LIND:  May I take a look?

2           One second, Judge?

3           THE COURT:  Sure.

4           (Pause)

5           MR. LIND:  No objection.

6           THE COURT:  They will be admitted into evidence.

7           (Government's Exhibits 513, 514, 515, 516, 517, 518,

8    and 519 received in evidence)

9           MR. KROUSE:  Your Honor, we may publish first

10   Government Exhibit 533 for the jury?

11          THE COURT:  Yes.

12          MR. KROUSE:  And then may I publish Government

13   Exhibits 102-A, B, and C, which are in the evidence bag, by

14   handing it to Juror No. 1?

15          THE COURT:  Yes.

16          MR. KROUSE:  Thank you, your Honor.

17          Your Honor, may the government also publish the

18   photographs that have been admitted from the scene at 1055

19   University Avenue on July 25, 2015?

20          THE COURT:  Yes.

21          MR. KROUSE:  Mr. Concepcion, can you put on the screen

22   for everyone Government Exhibit 513.

23          Now Exhibit Government Exhibit 514.

24          Government Exhibit 515.

25          Government Exhibit 516.

I9CKPOL4                        Fox - Direct

1              Government Exhibit 517.

2              Government Exhibit 518.

3              And Government Exhibit 519.

4              Thank you, your Honor.

5              MR. FOLLY:  At this time, the government calls

6    Detective Jonathan Fox.

7     JONATHAN FOX,

8         called as a witness by the Government,

9         having been duly sworn, testified as follows:

10             THE LAW CLERK:  Please state and spell your name for

11   the record.

12             THE WITNESS:  Detective Jonathan, J-o-n-a-t-h-a-n, Fox

13   F-o-x, Shield 443, of the New York City Police Department.

14             THE COURT:  You can be seated.

15             THE WITNESS:  Thank you.

16             MR. FOLLY:  May I proceed, your Honor?

17             THE COURT:  Yes, sir.

18   DIRECT EXAMINATION

19   BY MR. FOLLY:

20   Q.  Good afternoon, Detective Fox.

21   A.  Good afternoon.

22   Q.  Where do you work?

23   A.  I work at the police laboratory, specifically the firearms

24   analysis section, of the New York City Police Department.

25   Q.  How long have you been with the NYPD?

1    A.  Twenty years.

2    Q.  What rank are you?

3    A.  I'm a detective.

4    Q.  How long have you been a detective?

5    A.  Since 2006.

6    Q.  How long have you been in the firearms analysis section?

7    A.  Since 2004.

8    Q.  What are your duties and responsibilities in the firearms

9    analysis section?

10   A.  We test firearms and ammunition for operability.  We also

11   microscopically examine ballistic evidence, such as cartridge

12   casings, bullets, and bullet fragments.

13   Q.  When you say cartridge casings, bullet fragments, bullets,

14   shell casings, what do you mean by those terms?

15   A.  Those are projectiles or those are pieces of evidence that

16   are actually fired out of a firearm.

17           Essentially, there's four components to a cartridge.

18   There's the cartridge casing, the primer, inside the cartridge

19   casing is the gunpowder propellent, and then the bullet.  A

20   cartridge is fired out of a firearm, and when certain pieces of

21   that cartridge come in contact with the firearm, they leave

22   marks on that cartridge casing or bullet, and we examine those

23   pieces to determine if they were fired from one firearm or

24   multiple firearms.

25   Q.  Where does a casing go when it is fired from a gun?

1    A.   If you fire a cartridge out of a semiautomatic handgun, the

2    semiautomatic handgun, when it's done firing, the cartridge is

3    designed to eject the cartridge casing from the particular

4    firearm.  So in a cartridge casing, which is loaded through a

5    magazine, the magazine is placed in the firearm, you pull the

6    slide rearward.  When the slide goes forward, a cartridge from

7    the top of the magazine will be placed in the chamber.  When

8    you press the trigger of a semiautomatic handgun, a firing pin

9    strikes the back of the cartridge casing, hitting the primer.

10   When the primer is struck, it causes a spark.  That spark

11   ignites the gunpowder propellant.  When gunpowder is lit, it

12   turns into a gas.  When the gas builds up enough pressure, it

13   forces the bullet out of the firearm.

14        After that process, everything has an equal and

15   opposite reaction.  The slide comes rearward on the

16   semiautomatic handgun.  There's a hook that they call an

17   extractor on the slide that pulls the cartridge out of the

18   chamber of the firearm and ejects if from the semiautomatic

19   handgun.  They call that a cycle fire.

20   Q.   That was a lot of information, Detective Fox.

21        When you discharge from a semiautomatic handgun, does

22   the shell casing get ejected from the gun?

23   A.   Yes, it does.

24   Q.   What about if you're firing a revolver?

25   A.   Well, when firing a bullet out of a revolver, the only

1   thing that leaves the revolver is the actual bullet.  To unload

2   or to eject the cartridge casings, you must manually unlock a

3   cylinder from the frame of the revolver and manually take out

4   the cartridge casings from that particular firearm.

5   Q.  Does the casing come into contact with anything when it is

6   fired from the firearm?

7   A.  Yes.  So in a semiautomatic handgun, when the cartridge

8   casing is rested -- or resting in the firearm, and the firearm

9   is ready to be fired, the base of the cartridge casing is

10  resting up against the firearm called the breechface.  In the

11  middle of that breechface, there's a hole.  We call that hole

12  an aperture.  And behind that breechface is a firing pin.  So

13  when the firing pin goes through that aperture or hole and

14  strikes the back of the cartridge casing, it leaves an indent

15  in the cartridge.  So when the firing pin strikes the back of

16  the casing, it leaves an indent in the casing, which leaves

17  marks on the inside of the cartridge.

18          When a firing pin strikes the primer, it causes an

19  explosion, and the -- when it's fired, the base of that

20  cartridge casing will slam up against the firearm.  So if

21  there's any marks on that firearm, they will then be impressed

22  onto the cartridge casing itself after being fired.

23  Q.  Have you received any special training to perform your

24  duties as a firearms examiner?

25  A.  Yes, I have.

I9CKPOL4                          Fox - Direct

Q.   What sort of training?

A.   When I was first assigned to the police laboratory, I was
trained on how to test firearms and ammunition for operability.
Essentially, any firearm or ammunition that comes into the
police lab, we must test fire that firearm to see if that
firearm is operable or inoperable.

          That initial training program lasted six months.  I
sat with senior members of the firearms analysis section,
observed them do their casework.

          We took armorist courses.  These are courses that are
given by gun manufacturers.  They teach us how to take apart
their firearms, and how to reassemble their firearms, and show
us how their particular firearms are manufactured.

          I also took written and oral presentations and
examinations, and at the end of that six-month training
program, upon passing a competency test, I was able to perform
firearm examinations.

          Upon completing that, I then went into the microscopic
training section of the police laboratory.  This training
program lasted 18 months.  And we're trained under AFTE,
A-F-T-E.  AFTE stands for The Association of Firearm Tool Mark
Examiners.  They set the standard of toolmark identification
within that field.  Once again, written, practical, oral
examinations and presentations.

          The majority of our time, though, the training

1    consisted of looking at ballistic evidence under a microscope,

2    learning how characteristics from a firearm are left on a

3    bullet and cartridge casing when it's fired, identifying

4    sufficient individual characteristics or identifying individual

5    characteristics from a particular firearm, and how it's left on

6    a bullet or cartridge casing.

7            And at the end of that training program, I was given

8    four competency tests.  Two of those competency tests are given

9    outside the New York City Police Department.  There's a

10   collaborative testing service.  They would send me a

11   microscopic examination.  I would complete the examination.  I

12   would send my results back to them.  They would let me know if

13   I pass or fail.

14           Every year that I've been trained as a microscopist, I

15   also take a proficiency test.

16   Q.  What have been the results of those proficiency tests?

17   A.  I have passed them.

18   Q.  Can you describe for the jury what a comparison microscope

19   is?

20   A.  A comparison microscope, that's what we use to perform

21   microscopic examinations.  It's essentially two microscopes

22   combined through an optical bridge.  That optical bridge allows

23   me to look at two different pieces of evidence at the same

24   exact time.

25           When I'm doing my examination, I'm looking for a

1  sufficient agreement of the individual characteristics that are

2  created during the manufacturing process of the firearm.  So

3  when the gun manufacturers use tools to manufacture their

4  weapons, the tool -- the marks from the tools are then left

5  inside the firearm.  Those toolmarks are characteristics.

6  They're unique to that particular firearm, like a fingerprint.

7        When the cartridge casing or bullet is fired out of a

8  firearm, marks from that firearm will then be left on the

9  bullet as it travels through the barrel of the firearm, and the

10  casing, as it hits the breechface and the firing pin, will

11  leave marks on that casing as well.  Like I said, those marks

12  are unique to that particular firearm.

13        My comparison microscope allows me to look at two

14  different pieces of evidence at the same exact time, and I'm

15  trying to match those individual characteristics to determine

16  if I have enough agreement to say that two cartridge casings

17  are fired from the same firearm.  I can also use it to say that

18  they are fired from different firearms as well.

19  Q.  How long have you been doing microscopic comparison

20  analysis?

21  A.  Since 2007.

22  Q.  Approximately how many comparisons have you done?

23  A.  Thousands.

24  Q.  Have you ever testified before?

25  A.  Yes, I have.

I9CKPOL4                        Fox - Direct

1    Q.  Is that in state court, federal court, or both?

2    A.  In both.

3    Q.  About how many times have you testified before?

4    A.  I've testified over 350 times.

5    Q.  Were you qualified as an expert each time?

6    A.  Yes, I was.

7            MR. FOLLY:  Your Honor, the government offers

8    Detective Fox as an expert in the field of firearms analysis

9    and microscopic comparison.

10           THE COURT:  Any objection?

11           MR. LIND:  No objection.

12           THE COURT:  You can inquire on that basis.

13   BY MR. FOLLY:

14   Q.  Detective Fox, did you examine certain evidence in

15   connection with this case?

16   A.  Yes, I have.

17   Q.  What evidence have you examined?

18   A.  I examined three cartridge casings -- they were .40 caliber

19   cartridge casings -- and unsuitable deformed pieces of lead,

20   all that we determined to be consistent with buckshot.

21   Q.  I'm going to show you first what's in evidence as

22   Government Exhibits 102-A, 102-B, and 102-C.  If you could have

23   a look at the items inside of the envelope.

24           Have you had a chance to look at those?

25   A.  Yes, I have.

1    Q.  Do you recognize them?

2    A.  Yes, I do.

3    Q.  What are they?

4    A.  These are three cartridge casings that I performed a

5    microscopic comparison on with this particular case.  I

6    recognize each piece of evidence because each casing has my

7    initials and the unique lab number associated with that case.

8    Q.  When you say each casing has your initials, can you

9    describe for the jury what you mean by that?

10   A.  My initials and the lab number are etched on to each

11   particular cartridge casing.

12           MR. FOLLY:  Can we publish what's in evidence as

13   Government Exhibit 533.

14   Q.  Do you recognize that photograph?

15   A.  Yes, I do.

16   Q.  How do you recognize it?

17   A.  I recognize it -- it's a photo of the three cartridge

18   casings that I examined.

19   Q.  What, if any, analysis did you conduct of these three

20   items?

21   A.  I conducted a microscopic comparison, trying to determine

22   if all three cartridge casings were fired from the same firearm

23   or different firearms.

24   Q.  Can you walk us through the procedure you followed to

25   compare each of these items to each other?

I9CKPOL4                          Fox - Direct

A.   When I receive these items, I inventory every item that I
received.  I made sure when I received the items, that they
were sealed, and the seals were not broken.  I etched each
piece of evidence with my initials, the item number, and the
unique lab number.  I performed cartridge case notes.
Essentially what that is is, it describes what evidence I have,
what type of ammunition, who manufactured the type of
ammunition, and what kind of characteristics were on that type
of evidence when I received it.

        After I did that, I performed microscopic comparison,
which consisted of me looking at each piece or each cartridge
casing against each other using the comparison microscope.
When I'm looking at this piece of evidence or these cartridge
casings on a comparison microscope, I'm looking at two at the
same time, and I am trying to match up if any -- if there's any
individual characteristics left behind from the firearm after
its being fired, and then I would complete my examination and
come publish my results.
Q.   What were you able to determine, if anything, when
comparing these casings to each other?
A.   My microscopic examination concluded that all three
cartridge casings were fired from the same firearm based on the
sufficient agreement of the individual characteristics of the
firing pin and breechface impressions.
Q.   Now I'm going to show you what's in evidence as Government

1    Exhibit 104.

2                Do you recognize that?

3    A.   Yes.

4    Q.   How do you recognize it?

5    A.   These are five deformed lead -- unsuitable lead balls that

6    we deemed to be consistent with buckshot.  I recognize them

7    because I performed an examination for this particular case.

8    Q.   You say they were deemed to be consistent with buckshot.

9    Can you describe for the jury what buckshot is?

10   A.   Buckshot is common projectiles that go inside a shot shell.

11               I described earlier what a live cartridge was, how the

12   bullet sticks out of the top of the cartridge.  The way

13   buckshot works is that with a shot shell, you don't see the

14   projectiles.  The projectiles are actually in the shot shell,

15   and they're typically little, round lead balls.

16               Once you fire the buckshot, the round balls are pushed

17   out of the shot shells and out of the front of the -- whatever

18   is firing it, and they tend to disburse at a wider pattern than

19   that of a regular bullet.

20               When I examined these shot shells, I weighed and

21   measured them, and it became -- I determined them to be

22   consistent with buckshot, which is used to be fired out of a

23   shot shell.

24   Q.   What type of firearms are used to fire buckshot?

25   A.   Buckshot can be fired out of a shotgun.  It can also be

1    fired out of certain types of revolvers.

2    Q.  What happens when buckshot is fired?  Starting first what

3    happens when buckshot is fired out of a shotgun?

4    A.  Like I said, generally the reason why buckshot is

5    manufactured is it's to hit an object that's closer to you.  It

6    has a better chance of hitting it.  Some shot shells could hold

7    12 buckshot, some could hold, depending on the size, a lot more

8    buckshot, but the whole purpose of the reason for having

9    buckshot is when it's fired out of a shotgun or the revolver,

10   it creates a wider pattern, so it's easier to hit something

11   closer to you as opposed to firing one bullet.

12        It's essentially, in this particular case, five

13   bullets fired out of one shot shell or out of one casing, so to

14   speak.  So the general purpose of a shotgun is to have a better

15   chance of hitting your target with different projectiles.

16   Q.  You also mentioned that you found this buckshot was

17   unsuitable.  What does that mean?

18   A.  Unsuitable means that there was no individual

19   characteristics left behind from the firearm.  We use -- the

20   way we identify two pieces of evidence being fired from the

21   same firearm, we base it on individual characteristics, meaning

22   characteristics from the firearm left on a projectile as it

23   leaves the firearm.

24        In this particular case, these lead balls did not have

25   any individual characteristics left on it when being fired,

I9CKPOL4                          Fox - Cross

1    which is consistent with buckshot.

2              MR. FOLLY:  No further questions, your Honor.

3              THE COURT:  Cross-examination, Mr. Lind?

4              MR. LIND:  Yes.

5    CROSS-EXAMINATION

6    BY MR. LIND:

7    Q.  Good afternoon.  I have some questions about -- you do a

8    microscopy worksheet, correct, in connection with your duties?

9    A.  Excuse me?

10   Q.  You do a microscopy worksheet?

11   A.  I do, yes.

12   Q.  And you did that in this case, correct?

13   A.  I did, yes.

14   Q.  And you did that with respect to both the buckshot and the

15   cartridge casing, correct?

16   A.  Yes.

17   Q.  Now, the -- for the three cartridge casings, there's a

18   title of identifying marks against the firing pin.  You see

19   that?

20   A.  I don't have that in front of me.

21             MR. LIND:  Could someone place his 3500 in front --

22   should I go up?  I'll approach him.

23             MR. FOLLY:  Sure.

24             MR. LIND:  May I approach, Judge?

25             THE COURT:  Yes.

I9CKPOL4                         Fox - Cross

1   BY MR. LIND:

2   Q.  Do you see that that's the firing pin?

3   A.  Yes.

4   Q.  What does that mean, the firing pin?

5   A.  It's the shape of the firing pin impression that's left.

6   So in this particular case, that's hemispherical, which means

7   it's a round shape.  Some firing pins are elliptical or

8   rectangular, others are circular, and others could be --

9   depending on what type of firearm, could be a square, circle,

10  hemispherical, elliptical.

11  Q.  So you determined that this was shot out of a weapon with a

12  hemispherical firing pin; is that correct?

13  A.  That's correct.

14  Q.  A Glock does not have a hemispherical firing pin, does it?

15  A.  They have elliptical firing pins.

16  Q.  So that's a different type?

17  A.  Yes.

18  Q.  So in your analysis, you were using the wrong firing pin,

19  correct?

20  A.  Excuse me?

21  Q.  Well, your analysis says that this came out of a

22  hemispherical firing pin, correct?

23  A.  Well, we don't have the firearm recovered in this

24  particular case.

25  Q.  Well, then why did you put down hemispherical?  Because of

1   the impression on the back?

2   A.   Well, Glock firearms typically have elliptical firing pins,

3   but no Glock firearm was recovered in this case.  These

4   particular cartridge casings were fired out of a firearm that

5   had a hemispherical firing pin impression.

6   Q.   And a Glock has an elliptical firing pin, correct?

7   A.   Yes.

8   Q.   So the weapon that they were all fired out of was not a

9   Glock, correct?

10  A.   I didn't compare it to any weapon.

11  Q.   But you determined that the gun that this was fired -- the

12  weapon that this was fired out of was a weapon with a

13  hemispherical firing pin, correct?

14  A.   Correct.

15  Q.   And a Glock does not have a hemispherical firing pin,

16  correct?

17  A.   Glock makes their guns --

18  Q.   No, my question is very simple.  Glock does not have a

19  hemispherical firing pin, yes or no?

20  A.   I don't know.  I didn't compare it to a Glock.

21  Q.   Well, do you remember testifying in other cases regarding

22  types of firing pins?  Do you remember testifying --

23  A.   I do.  And Glock also makes hemispherical firing pin

24  impressions now, and they also make elliptical firing pins.

25  I'm not saying it wasn't fired from a gun, but I didn't compare

1    it to a particular firearm.

2    Q.  Well, do you remember testifying in front of a federal

3    court in August of 2015, in front of Judge Koeltl?

4    A.  Maybe.

5    Q.  And do you remember being asked this question and giving

6    these answers:

7    "Q.  So a computer can't make a cartridge casing match?

8    "A.  It cannot, no.

9    "Q.  Only a human being can make a cartridge casing match?

10   "A.  Correct."

11          MR. LIND:  One moment, Judge.  I have a --

12   "Q.  Now, going back to the firing pin, Taurus uses a circular

13   firing pin, correct?

14   "A.  Yes, they do.

15   "Q.  Glock uses an elliptical or oval firing pin?

16   "A.  Glock uses an elliptical.  I believe to describe Taurus's

17   firing pin as a hemispherical type firing pin."

18          Do you remember being asked those questions and giving

19   that testimony?

20   A.  I don't.

21          MR. LIND:  May I approach, Judge?

22          THE COURT:  Yes.

23   Q.  I show you --

24   A.  No, I believe that I gave the testimony.  I just don't

25   remember the testimony.

1   Q.  Okay.  But you testified that Glock has an elliptical, not

2   a hemispherical firing pin, correct?

3   A.  What I'm telling you is that Glock typically has elliptical

4   firing pins.  They also make firearms now that don't have

5   elliptical firing pins.  I'm not saying that three cartridge

6   casings that I examined in this case aren't fired from a

7   firearm that I never compared it to.

8   Q.  Now, when you say they now have hemispherical firing pins,

9   as of when?

10  A.  I don't know as of the date they're manufactured.

11  Q.  You gave this testimony on August 4, 2015.  On August 4,

12  2015, you stated that Glock had an elliptical firing pin.

13            And that was true as of August 4, 2015, correct?

14  A.  Correct.

15  Q.  Now, you talked about characteristics, correct?

16  A.  Yes.

17  Q.  There are two different types of characteristics in doing

18  firearm analysis, correct?

19  A.  Correct.

20  Q.  There's class characteristics, right?

21  A.  Yes.

22  Q.  And individual characteristics of the particular casing or

23  bullet, right?

24  A.  Correct.

25  Q.  The more difficult analysis is the individual

1  characteristics analysis, correct?

2  A.  Well, that's what we use to identify if it's been fired

3  from the same particular firearm.

4  Q.  So a computer cannot make a cartridge casing match, right?

5  A.  What we're saying is we use the computer to see if there's

6  a potential match.  We'll never say that two cartridge casings

7  match each other just based on it being a match on a computer.

8  We physically pull the evidence, and look at the evidence under

9  a microscope, and confirm if it's a match or not.

10  Q.  So it's fair to say only a human being can make a cartridge

11  casing match, correct?

12  A.  As far as the procedure of New York City Police Department,

13  only a microscopist can say that two cartridge casings are a

14  match.

15  Q.  And that is a human being, a microscopist?

16  A.  Yes, it is.

17  Q.  That's because, essentially, it's a subjective test in

18  deciding about individual characteristics?  Yes or no?

19  A.  Yes.

20  Q.  Now, you're familiar with a study by the National Academy

21  of Forensic Science in the United States, are you not?

22  A.  I am, yes.

23  Q.  There was a 2009 article.  Do you remember that?

24  A.  Yes.

25  Q.  Or book.  It was actually a book, right?

I9CKPOL4                          Fox - Cross

1    A.  I read -- I didn't read the whole book, I just read the

2    article.

3    Q.  And part of it was talking about toolmark and firearms

4    analysis.  Do you recall that?

5    A.  Yes.

6    Q.  You've given your opinion on that analysis, correct?  Do

7    you recall testifying about that?

8    A.  I believe so.

9              MR. LIND:  Now, may I read this portion, Judge, and

10   see what the witness' analysis is, or may I ask him to read it?

11             THE COURT:  Well, why don't you pose it in the form of

12   a question and see --

13             MR. LIND:  Okay.

14   BY MR. LIND:

15   Q.  Do you remember part of the portion regarding toolmark

16   analysis said that, although some studies have been performed

17   under degree of similarity that can be found between marks made

18   by different tools and the variability in marks made by an

19   individual tool, the scientific knowledge base for toolmark and

20   firearms analysis is fairly limited?  Do you recall reading

21   that?

22   A.  Yes.

23   Q.  Now, is that the fact or not?

24   A.  No.  That's what they investigated, but they also didn't

25   finish investigating.  They said more research needs to be

1    done.  A lot of that had to do with ballistic imaging and

2    making matches based on computer images, and a lot of that

3    didn't take into account all the validation studies that we use

4    in determining if two things are fired from the same firearm.

5    Q.  Well, do you recall, also, that the article or publication

6    said, but the capsule summary suggests a heavy reliance on

7    subjective findings?  Do you remember -- that's what you just

8    said.  To make the individual characteristics analysis, you are

9    relying on your own subjective analysis, correct?

10   A.  That's correct.

11   Q.  And that's a limitation in toolmark analysis, correct?

12   A.  I don't know if it's a limitation.  It's just based -- it's

13   a subjective -- we make our opinions -- or we make our

14   examinations and our conclusions based on what we see under a

15   microscope and what we concluded.

16   Q.  But the conclusion is based on your own subjective

17   analysis, right?

18   A.  Yes.

19   Q.  Not based on a microscope, not based on a machine that can

20   make a more objective analysis, right?

21   A.  Correct.

22   Q.  One other sentence:  "Overall, the process for toolmark and

23   firearms comparisons lacks the specificity of the protocols set

24   for, say, 13 STR DNA analysis."

25             Is that right?

1  A.  I believe so.  That being said, analyzing DNA is far

2  different than analyzing two projectiles fired from a firearm.

3            MR. LIND:  I have nothing further.

4            THE COURT:  Any further questions, Mr. Folly?

5            MR. FOLLY:  No further questions, your Honor.

6            THE COURT:  Thank you, sir.

7            You can step down.

8            THE WITNESS:  Thank you, your Honor.

9            (Witness excused)

10           THE COURT:  Would you call the government's next

11 witness.

12           MR. KROUSE:  Yes, your Honor.

13           The government calls Criminalist Heather Nelson.

14  HEATHER NELSON,

15      called as a witness by the Government,

16      having been duly sworn, testified as follows:

17           THE LAW CLERK:  Please state and spell your name for

18 the record.

19           THE WITNESS:  Heather Nelson, N-e-l-s-o-n.

20           THE COURT:  You can inquire, Mr. Krouse.

21           MR. KROUSE:  Thank you, your Honor.

22 DIRECT EXAMINATION

23 BY MR. KROUSE:

24 Q.  Good afternoon, Ms. Nelson.

25 A.  Good afternoon.

1    Q.  Where do you currently work?

2    A.  I'm currently employed at the Office of the Chief Medical

3    Examiner in the Department of Forensic Biology.

4    Q.  Is there a shorthand way to refer to the Office of the

5    Chief Medical Examiner?

6    A.  The OCME.

7    Q.  And is OCME a private or public organization?

8    A.  We're a public organization.

9    Q.  Is OCME part of the NYPD?

10   A.  No, we are not.  We are under the Department of Health.

11   Q.  How long have you worked for OCME?

12   A.  It will be 12 years in November.

13   Q.  I think you mentioned this, but do you work within a

14   particular unit of OCME?

15   A.  Yes.  In the Department of Forensic Biology.

16   Q.  What, generally, does OCME's Department of Forensic Biology

17   do?

18   A.  We perform DNA testing on crime scene evidence.

19   Q.  Who submits most of the evidence that you perform analysis

20   on?

21   A.  The NYPD.

22   Q.  Ms. Nelson, what is your title with the OCME?

23   A.  I am a criminalist, level IV.

24   Q.  About how long have you had that title?

25   A.  Just over four years.

1    Q.  What duties and responsibilities do you have as a

2    criminalist, level IV?

3    A.  As a criminalist, level IV, I will examine evidence for

4    biological material, such as blood, semen, saliva, or skin

5    cells.  I will then send that on for DNA testing.  I will

6    perform the steps of the DNA process.  I will then interpret

7    the results from the DNA testing and write reports.

8              I also do technical review of other analyst's reports.

9    I testify in court as needed.  And I also supervise other

10   criminalists in the laboratory.

11   Q.  Before you became a criminalist, level IV, what other

12   titles did you hold within OCME?

13   A.  I was a criminalist, level I, II, and III.

14   Q.  What's the highest level of criminalist at OCME?

15   A.  IV.

16   Q.  How do you advance from one level to the next, all the way

17   up to IV?

18   A.  It's a promotional process, as well as educational

19   requirements at certain levels.

20   Q.  You said you have been at OCME about 12 years, correct?

21   A.  Yes.

22   Q.  Before that, where did you work?

23   A.  I was at the Connecticut state forensics lab for a year.

24   Q.  Before that?

25   A.  The university of Connecticut.

1   Q.   And then were you in school before that?

2   A.   Yes.

3   Q.   Could you please describe your educational background?

4   A.   I have a Bachelor's of Science in molecular and cell

5   biology from the University of Connecticut, as well as a

6   Master's of Science in applied genetics, also from the

7   University of Connecticut.

8   Q.   Is OCME's forensic biology lab accredited to conduct

9   forensic DNA analysis?

10  A.   Yes, we are.

11  Q.   And whom is the lab accredited by?

12  A.   We are accredited by the American Quality Standards

13  Institute, National Accreditation Board, as well as the New

14  York State Commission on Forensic Science.

15  Q.   What does it mean to be accredited as a forensic biology

16  lab?

17  A.   It means that we meet or exceed certain standards that are

18  set forth by these agencies.

19  Q.   Approximately how many DNA cases would you estimate OCME's

20  lab handles each year?

21  A.   Tens of thousands.

22  Q.   What, if any, training have you personally received that's

23  specific to DNA testing?

24  A.   So for each technique that we perform in the laboratory, we

25  first watch an experienced analyst perform that technique.  We

1    then will perform that technique while an experienced analyst

2    watches us.  We will then perform the technique independently.

3    And then we perform a competency test for every technique we do

4    in the laboratory.

5            What a competency test is, is where the results are

6    known to our supervisor, but they're unknown to ourself.  We

7    perform the technique, and our supervisor will tell us whether

8    we pass or fail.

9    Q.  If you pass these competency tests, are you then able to

10   perform the tests on your own?

11   A.  Yes, we are.

12   Q.  How many DNA tests would you estimate that you personally

13   performed during your career?

14   A.  Thousands.

15   Q.  You said you're also a supervisor in the lab, correct?

16   A.  Yes.

17   Q.  How many DNA tests that were performed by others would you

18   say that you have reviewed while you've been at OCME?

19   A.  Hundreds.

20   Q.  Could you please describe some of the cases you've worked

21   on, just generally speaking?

22   A.  I've worked on all sorts of crime types, including

23   homicides, sexual assaults, assaults, burglaries, and

24   robberies, and criminal possession of a weapon.

25   Q.  Now, when you're analyzing an object to see whether that

1    object has DNA on it, how do you go about doing that?  How do

2    you get the objects sampled to test in the first place?

3    A.  We will first receive the evidence from our evidence unit.

4    Our evidence unit will take the evidence from NYPD and keep it

5    in a secure locked facility until an analyst will go and

6    retrieve the evidence to examine it.  We will then mark the

7    markings of the packaging and make sure it has been properly

8    sealed before we open it.

9            We will then open the item and examine it for

10   biological materials, whether we're looking for blood, semen,

11   saliva, or skin cells.  We will then take any stainings that we

12   see, or in the matter of skin cells where we can't see the skin

13   cells from the naked eye, we will cut usually a swab that's

14   taken from an item or swab that item ourselves and send that on

15   for DNA testing.

16   Q.  You mentioned swabs.  What are swabs?

17   A.  So swabs are kind of like a Q-tip where it's a wooden stick

18   with cotton on the end.

19   Q.  What's the significance of the swab in your practice of

20   analyzing DNA evidence?

21   A.  So swabs are routinely used to pick up skin cells from an

22   item.

23   Q.  What role, if any, does OCME play in preparing the swabs of

24   any item, like firearms or any other item that you're

25   analyzing?

1    A.  So for firearms, we do not -- it's our procedure not to

2    accept any firearms to our laboratory.  So the NYPD lab will

3    actually swab the areas of the gun for us and submit the swabs

4    for us to test.  For certain other items, such as bottles or

5    knives, we will actually receive some of those items and

6    actually swab them ourselves.

7    Q.  What if the item is something really large, like a vehicle,

8    would you swab the item yourself, or would the NYPD do that?

9    A.  The NYPD would do that as well.

10   Q.  Does OCME provide any training to the NYPD on how to

11   properly swab items to recover DNA?

12   A.  Yes, we have.

13   Q.  Ms. Nelson, have you previously testified in court cases

14   about DNA analysis performed on physical evidence?

15   A.  Yes, I have.

16   Q.  Approximately how many times have you testified?

17   A.  Fifty.

18   Q.  In how many of those instances were you testifying as an

19   expert in the field of DNA analysis?

20   A.  All of them.

21              MR. KROUSE:  Your Honor, we ask that Ms. Nelson be

22   qualified as an expert in DNA analysis.

23              MR. LIND:  No objection.

24              THE COURT:  You can inquire on that basis.

25              MR. KROUSE:  Thank you, your Honor.

I9CKPOL4                         Nelson - Direct

1    BY MR. KROUSE:

2    Q.  Now, let's discuss how the laboratory goes about testing

3    DNA.

4            First, can you explain to the jury what exactly DNA

5    is?

6    A.  So DNA is the genetic material that makes us who we are.

7    We get half of our DNA from our mom and half of our DNA from

8    our dad.  99 percent of our DNA is the same amongst all of us.

9    We have two eyes, two ears, a nose, a mouth.  There is

10   approximately 1 percent of our DNA that's unique, and it's

11   within that 1 percent that we look at.

12   Q.  You mentioned this, but does the lab test, in certain

13   instances, DNA that's left behind on objects?

14   A.  Yes, we do.

15   Q.  What kind of objects, generally?

16   A.  It's a whole variety of objects, but it includes bottles,

17   knives, weapons, guns.

18   Q.  In this case, what two items did you analyze?

19   A.  We received swabs from a vehicle, including the steering

20   wheel and the gearshift, as well as swabs from a gun that was

21   recovered.

22   Q.  You said a swab is like a Q-tip with, like, a wooden

23   handle.  What would have provided the DNA on that object that

24   was then swabbed off of it with that Q-tip?

25   A.  For the swaps from the gun, as well as the swabs from the

1  vehicle, we were looking for skin cells.

2  Q.  When the NYPD submits swabs of touched objects, like guns

3  or cars, is there always enough DNA on those swabs to be tested

4  by your lab?

5  A.  No.

6  Q.  Can you explain that?

7  A.  Because we're dealing with skin cells, it depends on a lot

8  of variables, but, ultimately, we're looking for who touched

9  that object.  So because of that, depending on how long someone

10  may have touched that item or if they shed any of their skin

11  cells onto that item when they touched it will depend if we

12  retrieve any DNA from that swab.

13  Q.  Are there other factors that might explain whether or not

14  there would be sufficient DNA left behind on an object?

15  A.  Yes.  Depending on how long someone may have touched

16  something, as well as if they had just washed their hands

17  previously, they may not leave any DNA or much DNA on the

18  object once they touch it after their wash their hands.

19  Q.  I guess how long ago they touched it, would that also

20  affect whether or not there were skin cells left behind?

21  A.  Yes.

22  Q.  When there is enough DNA on a swab, what steps does OCME

23  follow to determine whether there is DNA on that swab?

24  A.  So in the DNA process, we first will examine the evidence.

25  When we submit it for the DNA testing, the first part of DNA

1   testing is called extraction, and this is where we are going to

2   break open the cells, whether it's the skin cells, or the blood

3   cells, or the sperm cells, to release the DNA from that sample.

4        We then perform a technique called quantitation, and

5   this is where we see how much DNA we have in that sample.  If

6   we have enough to go on for the rest of the process, it will

7   then get moved on to the next step, which is called PCR

8   amplification, and this where we're making millions and

9   millions of copies of certain locations on the DNA that we're

10  looking at, and this is because we need to be able to visualize

11  the DNA.

12       That then gets put onto a machine where it generates

13  the data for us, so then we can interpret the data and generate

14  the DNA profile.

15  Q.  You mentioned the end state of that series of steps is that

16  you develop a DNA profile.  Can you explain what a DNA profile

17  is?

18  A.  So we look at 15 different locations on the DNA, including

19  a sex determining region, so we'll know whether it's a male or

20  a female.  Those 15 locations are visualized from that machine,

21  and in those 15 locations, we see the form of numbers.  So I

22  wouldn't be able to tell you hair color, eye color, or

23  anything.  What we see is in the form of numbers.

24       If we string those numbers up through all 15 of those

25  locations, that's what we call a DNA profile.  It's kind of

1    like a genetic barcode.

2    Q.   In situations where you are able to develop a DNA profile

3    from a swab coming from a touched object, does that profile

4    always correlate to one person, or can it correlate to multiple

5    people?

6    A.   It could be either from one individual or from multiple

7    individuals.  So because we get DNA -- half of our DNA from our

8    mom and half from our dad, at each of those locations, we're

9    going to see for one individual, at most, two numbers, meaning

10   they got one number from their mom and one from their dad.

11           If we see multiple locations with more than two

12   numbers, that's indicative of a mixture, meaning we have more

13   than one person's DNA from that sample.

14   Q.   Now, Ms. Nelson, for this case, did you use a particular

15   program to analyze a mixture of DNA?

16   A.   Yes, I did.

17   Q.   Can you explain what program that is?

18   A.   The computer program is called the Forensic Statistical

19   Tool.  So for mixtures -- there's certain types of mixtures

20   that we can see.  The first type of mixture is where we can see

21   that one person left more of their DNA than the other, and in

22   that case, we would have a major contributor and possibly a

23   minor contributor to the mixture.

24           In other mixtures, if individuals contribute about the

25   same amount of DNA, and we're unable to tell the individual

1    contributors, those are just suitable for comparison, meaning

2    we'll take a known sample from a known individual and compare

3    their numbers from their DNA profile to the numbers that we see

4    in the mixture of DNA in the sample to see if they're possibly

5    included as a possible contributor.  If they are, then we will

6    perform a statistic on that using this computer program called

7    the Forensic Statistical Tool.  What this does is it's

8    performing a likelihood ratio.  What a likelihood ratio is it's

9    looking at two different scenarios and coming up with what's

10   the more probable scenario.

11   Q.  Now, you mentioned that in this case, you analyzed swabs

12   from both a gun and also from the vehicle, correct?

13   A.  Yes.

14   Q.  Did you compare those swabs to known DNA samples from

15   particular individuals?

16   A.  Yes, I did.

17   Q.  There were three DNA samples obtained from individuals

18   through a bottle that they used, correct?

19   A.  That is correct.

20   Q.  Can you explain how OCME obtains a DNA sample, a known DNA

21   sample from an abandoned bottle?

22   A.  So the bottle is sent to our laboratory where we will

23   examine it.  So what we do is we take one of those cotton swabs

24   with a wooden stick, and we'll swab the mouth area of the

25   bottle, so the outer part of the mouth, as well as the inner

1   part of the mouth, and if it came received with a cap on the

2   bottle, we'll also swab the interior part of the cap as well.

3   That swab is then sent on for the DNA process, so we can

4   generate a DNA profile from it.

5   Q.  And you can generate a DNA profile based on whoever used

6   that bottle?

7   A.  Yes.

8   Q.  Was there also a DNA sample for a known individual obtained

9   through a buccal swab?

10  A.  Yes, there was.

11  Q.  Can you explain to the jury what a buccal swab is?

12  A.  So a buccal swab is that same type of cotton swab that is

13  applied, put into someone's mouth, and the inside of the cheek

14  is rubbed to obtain some skin cells onto that swab.  That swab

15  is then cut and sent on for the DNA process where we obtain a

16  DNA profile.

17  Q.  After obtaining a DNA sample from a known individual, how

18  can you compare that sample to the DNA that was found on an

19  object?

20  A.  So, again, we have the numbers at the different locations

21  for the known individual.  We'll then look at those numbers

22  that we have from the mixture and see if we see the numbers

23  from that individual at those locations in the mixture as well.

24  If we do, then we will perform the statistical calculation as

25  well.

I9CKPOL4                         Nelson – Direct

Q.  So you're looking to see the extent to which the barcodes

match?

A.  Yes.

          MR. KROUSE:  Your Honor, at this time, the government

would like to read a stipulation, Government Exhibit 1004.

          THE COURT:  Yes.

          MR. KROUSE:  The parties have stipulated that:  "The

DNA swabs received by the New York City Office of the Chief

Medical Examiner and associated with voucher number 2000455460

were taken on August 7, 2015, from a 2015 Toyota Camry with

Florida license plate number 122PRA.

          "Item 1 is a swab of the steering wheel.

          "Item 2 is a swab of the gearshift.

          "Item 3 is a swab of the interior door.

          "The DNA swabs received by the New York City Office of

the Chief Medical Examiner and associated with voucher number

2000461970 were taken on August 27, 2015, from a Kel-Tec .9

millimeter semiautomatic pistol (the pistol) that has been

marked as Government Exhibit 101.

          "Item 1 is a swab of the trigger/trigger guard of the

pistol.

          "Item 2 is a swab of the front/back strap/grips of the

pistol.

          "Item 3 is a swab of the slide grip groove/magazine

release of the pistol.

1              "The DNA sample received by the New York City Office

2      of the Chief Medical Examiner and associated with voucher

3      number 2000462034 was taken from a bottle used by Terrell Polk.

4              "The DNA sample received by the New York City Office

5      of the Chief Medical Examiner and associated with voucher

6      number 2000462052 was taken from a bottle used by Kevin

7      Corbett.

8              "The DNA sample received by the New York City Office

9      of the Chief Medical Examiner and associated with voucher

10     number 2000462048 was taken from a bottle used by Timothy

11     Smith.

12             "The DNA sample received by the New York City Office

13     of the Chief Medical Examiner and associated with voucher

14     number 6000011470 was taken from Terrell Polk."

15             The government offers Government Exhibit 1004.

16             MR. LIND:  I have no objection.

17             THE COURT:  It will be admitted into evidence.

18             (Government's Exhibit 1004 received in evidence)

19     BY MR. KROUSE:

20     Q.  Ms. Nelson, the stipulation that was just read mentioned

21     voucher number 6000011470 was a sample taken from Terrell Polk,

22     correct?

23     A.  Yes.

24     Q.  Was that a buccal swab taken from Terrell Polk?

25     A.  Yes, it was.

1   Q.  Ms. Nelson, did you generate reports as part of your

2   responsibility for testing the DNA in this case?

3   A.  Yes, I did.

4            MR. KROUSE:  Mr. Concepcion, if you can put on the

5   screen Government Exhibit 401, the first page, for Ms. Nelson,

6   and then 402, 403, 404, 405.

7   Q.  Are these all reports that you generated in the course of

8   your analysis of the DNA in this case?

9   A.  Yes, it is.

10  Q.  Do you know who any of the individuals identified in this

11  report are in real life?

12  A.  No, I do not.

13  Q.  Would you recognize any of them in this courtroom today if

14  they were present?

15  A.  No, I cannot.

16  Q.  And who prepared all of these reports that are marked as

17  Government Exhibits 401 through 405?

18  A.  I did.

19  Q.  Were these reports prepared and maintained in the regular

20  course of business at OMCE?

21  A.  Yes, they were.

22  Q.  Were they prepared close in time to the time when the

23  underlying testing was done?

24  A.  Yes, they were.

25            MR. KROUSE:  Your Honor, the government offers

I9CKPOL4                         Nelson - Direct

1    Government Exhibits 401, 402, 403, 404, and 405.

2              THE COURT:  Any objection?

3              MR. LIND:  May I have just one second, Judge?

4              THE COURT:  Yes.

5              MR. LIND:  May I be heard at the sidebar, Judge?

6              THE COURT:  Yes.

7              (Continued on next page)

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

I9CAAPOL5                      Nelson – Direct

1                    MR. LIND:  May I be heard at the side bar?

2                    THE COURT:  Yes.

3                    (Continued on next page)

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

I9CAAPOL5                        Nelson - Direct

1          (side bar)

2          MR. LIND:  Judge, I am missing one for Terrell Polk

3     and the swab of his mouth for the weapon in the car.

4          MR. KROUSE:  So that's in 404.  All the Terrell Polk

5     sufficient is 404.

6          MR. LIND:  I am talking about the gun.  I am sorry,

7     judge.

8          MR. KROUSE:  So it says there's DNA profile.

9          MR. LIND:  OK.  Just say it's on the flip side.

10          MR. KROUSE:  I am going to do it on the screen so

11     it'll come in.

12          THE COURT:  OK.

13          MR. LIND:  I just was raising that I didn't see that.

14          (Continued on next page)

15

16

17

18

19

20

21

22

23

24

25

1            (In open court)

2            MR. KROUSE:  Your Honor, the government offers

3     Government Exhibits 401 through 405.

4            MR. LIND:  No objection.

5            THE COURT:  It'll be admitted into evidence.

6            (Government's Exhibits 401 - 405 received in evidence)

7     BY MR. KROUSE:

8     Q.  Ms. Nelson, one item analyzed in this case was a gun,

9     correct?

10    A.  Yes.

11    Q.  What items did your lab receive in order to test whether

12    the gun had DNA on it?

13    A.  We received three swabs from the gun.  The swab from the

14    trigger/trigger guards, swabs from the front and back strap and

15    swabs from the slide.

16    Q.  Are those three different areas on a gun?

17    A.  Yes, they were.

18    Q.  And are those three areas likely to be touched by a person?

19    A.  Yes.

20            MR. KROUSE:  Mr. Concepcion, can you put Government

21    Exhibit 401 on the screen for everyone and please go to page

22    six.

23            (Pause)

24    Q.  Ms. Nelson, is the voucher for the gun swabs?

25    A.  Yes, it is.

1    Q.  And it shows three different locations.  And are those the

2    three different locations you just testified about?

3    A.  Yes.

4    Q.  What is the invoice number at the top for the voucher?

5    A.  It is 2000461970.

6    Q.  Did you record the voucher number from the swabs of the gun

7    anywhere in your report?

8    A.  Yes, I did.

9           MR. KROUSE:  Mr. Concepcion, can you bring up page two

10   of the report.

11          (Pause)

12   Q.  Do you see the voucher number associated with the three gun

13   swabs on this page of your report?

14   A.  Yes, I do.

15   Q.  What is it?

16   A.  2000461970.

17   Q.  What did you do with the swabs of the gun that you received

18   from the NYPD?

19   A.  So they were first examined.  Meaning, they were taken out

20   from the evidence unit, the documentation of the packaging was

21   documented.  It was then opened and the swab was then, the

22   cotton portion was cut and sent on for DNA testing.

23   Q.  Was each swab tested together or were they each tested

24   separately?

25   A.  Separately.

1              MR. KROUSE:  Mr. Concepcion, can you bring up page one

2     of Government Exhibit 401.

3              (Pause)

4     Q.  Ms. Nelson, I am directing your attention to the results

5     and conclusions that you drew from your analysis of the DNA

6     swabs from the gun.  Could you read your results and

7     conclusions?

8     A.  Human DNA sufficient for STR DNA typing was detected on the

9     swab from the trigger/trigger guard and from the swab of the

10    front back strap and grips.

11    Q.  What does that mean in plain terms?

12    A.  That means that at that quantitation stage where we see how

13    much DNA that we have in a sample, each of those samples from

14    those swabs had enough to go on for SDR DNA testing.

15    Q.  As to the trigger/trigger guard, what was the determination

16    of what type of DNA was on that swab?

17    A.  So for the trigger/trigger guard, that was a mixture of DNA

18    from at least two people that was detected from that sample.

19    This was a mixture of DNA where we were able to determine that

20    one person contributed more of their DNA than the other.  The

21    person that contributed more of their DNA was deemed a major

22    contributor to this sample and was given the designation of

23    "Male Donor A".  This just means that we have an unknown

24    profile and we just use the letters of the alphabet to

25    distinguish the different DNA profile.

1          The DNA profile of the minor contributor to this

2   mixture could not be determined and the results for the minor

3   contributor are not suitable for a comparison.  This means that

4   there was not enough information in the mixture to say anything

5   about a minor contributor.

6          MR. KROUSE:  Mr. Concepcion, could you zoom-out of

7   that and then zoom-in to the second paragraph on the report.

8   Q.  Ms. Nelson, is that where you concluded that there was one

9   major male contributor, Male Donor A?

10  A.  Yes.

11  Q.  Was that the swab of the trigger/trigger guard, correct?

12  A.  Correct.

13  Q.  Now as to the analysis of the swab for the front/back

14  strap/grips of the gun, what was your result?

15         MR. KROUSE:  And if Mr. Concepcion, if you could

16  zoom-in on the last two paragraphs.

17  A.  So for the swab from the front/back strap and grip, there

18  was a mixture of DNA found in the sample as well.  However, for

19  this sample we were not able to determine that one person

20  contributed more of their DNA to the other.  So this mixture is

21  just suitable for comparison.

22  Q.  So there is no major donor "A" or minor donor that was

23  detected on this part of the gun?

24  A.  That's correct.

25         MR. KROUSE:  Now, Mr. Concepcion, could you

```
 1    actually --
 2    Q.  Actually, Ms. Nelson, you said there were three different
 3    locations of the gun that were swabbed.  Just for a sake of
 4    completeness, did you also look at the slide, grip,
 5    groove/magazine release of the gun?
 6    A.  Yes.
 7    Q.  Was there enough DNA to analyze for that swab?
 8    A.  No.  So there was an insufficient amount of DNA detected in
 9    that sample.  So that didn't go on for further DNA testing.
10    Q.  Did there come a time when you compared the DNA found on
11    these two locations, the trigger/trigger guard and the
12    front/back trap and grip to known DNA samples of individuals?
13    A.  Yes.
14    Q.  Did you compare the DNA on the gun to three different
15    individuals?
16    A.  Yes, I did.
17    Q.  You said that but how did you initially obtain DNA samples
18    from those three individuals?
19    A.  They were from bottles that were submitted that were used
20    by each of the three individuals.  Those bottles were then
21    swabbed at our laboratory and sent on for DNA testing where we
22    obtained a DNA profile.  And that DNA profile for each of those
23    individuals was compared to the samples.
24         MR. KROUSE:  Mr. Concepcion, could we start with
25    Government Exhibit 404.
```

1   Q.  Ms. Nelson, could you read at the top whose DNA was being

2   analyzed for this report?

3   A.  Terrell Polk.

4   Q.  And was the voucher number for the bottle submitted for

5   Mr. Polk recorded in your report?

6   A.  Yes, it was.

7          MR. KROUSE:  Mr. Concepcion, could you go to page two

8   of this report.

9   Q.  Do you see the voucher number on this document?

10  A.  Yes, I do.

11  Q.  What is it?

12  A.  2000462034.

13         MR. KROUSE:  Mr. Concepcion, can you bring on the

14  screen Government Exhibit 403 and go to page two.

15         (Pause)

16  Q.  And is the voucher number for the bottle for Timothy Smith

17  also recorded here?

18  A.  Yes, it is.

19  Q.  And it says there are bottles submitted for Timothy Smith?

20  A.  Yes.

21  Q.  Can you read that voucher number?

22  A.  It is 2000462048.

23         MR. KROUSE:  Mr. Concepcion, can you bring on the

24  screen Government Exhibit 402 and also go to page two.

25  Q.  Do you see the voucher number for the bottle submitted for

1    Kevin Corbett?

2    A.  Yes, I do.

3    Q.  And it's misspelled.  I guess it says "Crobett".  What's

4    the voucher number there?

5    A.  2000462052.

6    Q.  And you testified that you created DNA profiles based on

7    the bottles that each of these men used, correct?

8    A.  Yes.

9    Q.  And what did you do with each of those DNA profiles?

10   A.  They were then compared to the results of the swabs from

11   the gun.  So the DNA profile from the Male Donor A was compared

12   to each of these three individuals to see if any of them

13   matched that Male Donor A profile.  Then for the other swab

14   from the front and back strap, that was just a mixture for

15   comparison those individual DNA profiles, so for each of their

16   DNA profiles, the numbers at each of the locations was looked

17   to see if they were in the mixture at those locations.  If most

18   or all of their numbers were seen in that mixture, they were

19   considered possible a contributor to that mixture and then we

20   performed a likely ratio statistic.

21   Q.  So if they were deemed a possible contributor to the

22   mixture, then you calculated some sort of probability that they

23   would have been the person who touched that gun, correct?

24   A.  Correct.

25              MR. KROUSE:  Let's take each individual one at a time

1    and start with Mr. Polk.

2            Mr. Concepcion, can you bring on the screen Government

3    Exhibit 404 and could you go to page six.

4            (Pause)

5            MR. KROUSE:  Could you zoom-in on the results and

6    conclusions to the bottom?

7            (Pause)

8    Q.  Ms. Nelson, what was the result of the comparison between

9    the DNA on the gun and Mr. Polk's DNA sample from the abandoned

10   bottle?

11   A.  The donor to the bottle submitted for Terrell Polk is

12   excluded when compared to other samples where comparisons could

13   be made.

14   Q.  That's for the gun, correct?

15   A.  That's correct.

16   Q.  What does it mean to be excluded as a contributor?

17   A.  That means that he was not the Male Donor A profile that we

18   determined from the trigger/trigger guard swab.  And when

19   comparing his numbers to the numbers in the mixture for the

20   front and back straps, either there weren't very many or none

21   at all of his numbers seen in that mixture.  Therefore, he was

22   excluded as a possible contributor.

23   Q.  Based on the DNA test performed on the gun, do you have an

24   opinion about whether the DNA of Terrell Polk was on the gun

25   that was swabbed for DNA?

1    A.  We did not detect his DNA, no.

2    Q.  What is your opinion?

3    A.  He is not on the gun.

4    Q.  Just to review what, are some of the sources of DNA on the

5    human body that might have been left behind on a gun?

6    A.  Most likely skin cells from someone that would have touched

7    the gun.  Also, if someone is in close proximity and may have

8    been talking over the gun, they may have spit and left some of

9    their DNA on the gun as well.

10   Q.  Are some individuals less likely and more likely to leave

11   DNA behind on objects that they touched?

12   A.  Yes, they are.

13   Q.  Are there reasons for that?

14   A.  Yes.  Again, if someone just what washed their hands prior

15   to touching an object, they may not leave any skin cells behind

16   because in washing their hands they would have shed off any

17   skin cells available on their hands.  If someone was sweating

18   they may leave more skin cells behind than others.

19   Environmental factors can come into play.  If someone touches

20   on item but then it's, water comes in contact with that item,

21   it may away any skin cells that may have been left behind.

22   Q.  Can the type of object make any difference as to whether

23   DNA is left behind or not?

24   A.  Yes.  Certain surfaces, smoother surfaces may not detect as

25   much DNA and a person may not leave as much DNA behind as

1    opposed to some type of object that has crevices or some type

2    of place where the skin cells can kind of collect.

3    Q.  Based on the facts that you've testified to in your

4    training and experience, is it possible for someone to hold or

5    touch an object but not leave enough of their own DNA behind to

6    be detectable in your testing?

7    A.  Yes.

8    Q.  Were you able to conclusively say whether or not somebody

9    touched an object?

10   A.  No, I cannot.

11           MR. KROUSE:  Let's turn now to Timothy Smith.  Can you

12   bring up Government Exhibit 403 and go to page six please and

13   zoom-in on the results and conclusions all the way to the

14   bottom.

15   Q.  Ms. Nelson, could you read your results and conclusions for

16   your analysis of the DNA of Mr. Smith?

17   A.  So based on the comparison in the DNA profile of the donor

18   to the bottle submitted for Timothy Smith to the mixture found

19   on the front, back strap and grips, he is included as a

20   possible contributor and therefore, a likely ratio is

21   calculated.

22           The results from the likelihood ratio are that the DNA

23   mixtures found on the swab of the front, back strap and grip is

24   approximately 134 millions times more probable if the sample

25   originated from a donor to the bottle submitted for Timothy

1    Smith and two unknown unrelated persons than if originated from

2    three unknown unrelated persons.   Therefore, there is very

3    strong support that the donor to the bottle submitted for

4    Timothy Smith and two unknown unrelated persons contributed to

5    the mixture rather than three unknown unrelated persons.

6    Q.   So the likelihood ratio in this case is 134 million times

7    more probable, correct?

8    A.   A hundred and thirty-four millions times more probable that

9    the sample original from the DNA donor to the bottle submitted

10   to for Smith and two unknown unrelated persons.

11   Q.   Based on your testing, do you have an expert opinion about

12   whether the DNA of Timothy Smith was on the gun that was

13   swabbed for DNA?

14   A.   He is included as a possible contributor.

15            MR. KROUSE:   Let's move to Mr. Corbett.

16            Could you bring up Government Exhibit 402 and then go

17   to page six please and then zoom-in on to the results and

18   conclusions at the bottom.

19            (Pause)

20   Q.   What was the result of your comparison between the DNA on

21   the gun and the DNA for Mr. Corbett?

22   A.   The DNA donor to the bottle submitted for Kevin Corbett

23   matches the DNA profile from Male Donor A from the swab to the

24   trigger/trigger guard.

25   Q.   Can you remind the jury who Male Donor A is from your

I9CAAPOL5                         Nelson - Direct

1    analysis of the gun.

2    A.  It was the major contributor to that mixture.

3    Q.  And when you say that Mr. Corbett's DNA profile matches the

4    Male Donor A profile, what does that mean?

5    A.  Because we were able to determine that one person left more

6    of their DNA than the other, we have an actual DNA profile of

7    that major contributor and the DNA profile of the major

8    contributor is the same as that of Kevin Corbett.

9    Q.  You said before DNA profiles like the bar code that's left

10   behind, correct?

11   A.  Yes.

12   Q.  And so Kevin Corbett's bar code matched the bar code of the

13   DNA profile that was on the gun?

14   A.  Yes, the donor to the bottle submitted for him yes.

15   Q.  And the DNA profile of Male Donor A, if you could go on and

16   read a statistic that's on that same results conclusions line.

17   A.  So the DNA profile of Male Donor A is expected to be found

18   in approximately one greater than 6.8 trillion people.  So what

19   this means is there is approximately 6.8 billion people on the

20   planet earth.  We would expect to find the DNA profile in one

21   in 1000 on the planet earth.

22           MR. KROUSE:  Moving to the next page of this exhibit

23   and zooming in on based on the comparison all the way to the

24   bottom.

25           (Pause)

Q.   Did you also compare Mr. Corbett's DNA profile to the swab
of the front back strap and grip which is another part of the
gun?

A.   Yes, I did.

Q.   What was the result of your analysis?

A.   So again, this mixture was just suitable for comparison.
So looking at the numbers in the DNA profile of the donor to
the bottle submitted for Kevin Corbett and those that were
found in the mixture, he is included as a possible contributor
and therefore a likelihood ratio was calculated.  So for that
likely ratio the DNA mixture found on the swab of the front,
back strap and grip is approximately 518 millions times more
probable that the sample originating from the donor to the
bottle submitted for Kevin Corbett and two unknown unrelated
persons than if this originated from three unknown unrelated
persons.  Therefore, there is very strong support that the
donor for the bottle submitted for Kevin Corbett and two
unknown unrelated persons contributed to this mixture rather
than three unknown unrelated individuals.

Q.   So based on the results of your testing both for the
trigger/trigger guard and also from, back strap and grip, do
you have an opinion about whether the DNA of Kevin Corbett was
on the gun that was swabbed for DNA?

A.   Yes, it was.

Q.   And what is your opinion?  Sorry.

1  A.  That he is a contributor on the gun.

2  Q.  Ms. Nelson, up to a point you just testified about your DNA

3  testing of the gun in this case, correct?

4  A.  Yes.

5  Q.  And comparing that gun to three different people, correct?

6  A.  Yes.

7  Q.  Did you also perform tests on swabs taken from a car?

8  A.  Yes, I did.

9  Q.  What items did you receive to test for a car?

10  A.  We received three swabs from the car.  One was from the

11  steering wheel.  One was from the gearshift and a third was

12  from the door handle.

13  Q.  How did the lab receive those swabs?

14  A.  They were packaged and sealed.

15  Q.  Who took those swabs?

16  A.  The NYPD.

17        MR. KROUSE:  Mr. Concepcion, could you put on the

18  screen Government Exhibit 405.

19        (Pause)

20        MR. KROUSE:  Could you go to page six please.

21  Q.  Is this the voucher for the swabs of the DNA from the car?

22  A.  Yes, it is.

23  Q.  And what is the voucher number for this item?

24  A.  It is 2000455460.

25  Q.  Are the identifying details of the car included on this

1   voucher?

2   A.  Yes, it is.

3   Q.  And what are those identifying details?

4   A.  It is a 2015 Camry with Florida license plate 122PRA.

5   Q.  And you testified to this already but where in the vehicle

6   were the swabs taken?

7   A.  From the steering wheel, the gearshift and the front

8   driver's side interior door handle.

9   Q.  Once your lab received the swabs from these three swabs

10  from the car, what did you do with them?

11  A.  The swab from the steering wheel and the swab from the

12  gearshift were then examined for biological material.  In this

13  case we were going -- skin cells again and they were cotton

14  swabs like I spoke about before.  So each of the swabs were

15  documented and then cut for the DNA process.

16  Q.  You said that is for the steering wheel and the gearshift?

17  A.  Yes.

18  Q.  Why not the vehicle interior door that was also swabbed?

19  A.  It's a lab policy that we don't routinely do door swabs

20  when we have the steering wheel and the gearshift.

21  Q.  Now was each of these two swabs that were sent on for

22  testing analyzed together or were they analyzed separately?

23  A.  Separately.

24          MR. KROUSE:  Mr. Concepcion, if you could move to page

25  two of this report.

Q.  Did you record, Ms. Nelson, the voucher number of the swabs
that you received from the car?

A.  Yes, I did.

Q.  Could you read the voucher number for the swabs from the
car?

A.  2000455460.

        MR. KROUSE:  Moving to page one, Mr. Concepcion, could
you zoom-in on the resulting conclusions from page one from the
top to the bottom.

Q.  What did you conclude about the swabs that you received
from the car?

A.  Human DNA sufficient for SDR DNA typing was detected on the
swab from the steering wheel as well as the swab from the
gearshift.  For the swab from the gearshift we had detected a
DNA profile from male.  It was one person's DNA and that was
Male Donor A.

        For the swab from the steering wheel we detected a
mixture of DNA and this mixture was one where an individual's
contributors could not be determined.  So we weren't able to
tell who contributed more DNA than the other.  So in this case
the results were just suitable for comparison.

Q.  To be clear, your analysis of the swab of the gearshift you
said you were able to defect Male Donor A, correct?

A.  Correct.

Q.  Is that by a definition DNA profile of one person?

1   A.  Yes.

2   Q.  That's the DNA bar code that you testified to earlier,

3   correct?

4   A.  Yes.

5   Q.  Did there come a time when you compared the DNA from the

6   car to the DNA from another person?

7   A.  Yes, I did.  I just want to note that Male Donor A is a

8   different Male Donor A.  For each case individually we start

9   with the alphabet, so we start with "A".  So any unknown

10  profile would be Male Donor A.

11  Q.  Thank you for that clarification.  So because this was a

12  different item that you're analyzing this Male Donor A isn't

13  the same person as the Male Donor A on the gun, correct?

14  A.  That's correct.

15  Q.  Now, did there come a time when you compared the DNA

16  profile from the car to a known DNA sample from another person?

17  A.  Yes, I did.

18  Q.  Did that known DNA sample come from could from Polk?

19  A.  Yes, it was.

20  Q.  What kind of sample was that?

21  A.  That was a buccal swab.

22  Q.  Can you explain what a buccal swab?

23  A.  That's where that cotton swab is placed on the inside of

24  the cheek and rubbed on the inside of cheek to collect some

25  skin cells.  That swab is then cut and sent on to the DNA

1  process.

2  Q.  The DNA profile is then made for that individual who is

3  swabbed, correct?

4  A.  That's correct.

5        MR. KROUSE:  Mr. Concepcion, can you go to page 12 of

6  Government Exhibit 404.

7  Q.  Is there a voucher number associated with the DNA sample

8  from Terrell Polk in your report?

9  A.  Yes.

10  Q.  What is that number?

11  A.  6000011470.

12  Q.  And did you compare this DNA sample from Mr. Polk to the

13  Male Donor A DNA sample that was obtained from the gearshift of

14  the vehicle?

15  A.  Yes, I did.

16        MR. KROUSE:  Mr. Concepcion, can you go to page 10 of

17  this report and could you zoom-in on "results and conclusions".

18  Q.  Ms. Nelson, if you could read in your results and

19  conclusions from that analysis?

20  A.  So the first thing that was done was we compared the DNA

21  profile that was taken from the swab of Terrell Polk to the DNA

22  profile that we obtained from the bottle submitted for Terrell

23  Polk and they were the same DNA profile.  The DNA profile of

24  Terrell Polk then matched the DNA profile of Male Donor A from

25  the swab of the gearshift.

1  Q.  Can you explain what that match means again?

2  A.  So for the swab from the gearshift we had one individual's

3  DNA profile and the DNA profile is that of Terrell Polk.

4  Q.  So the two bar codes matched together, correct?

5  A.  Yes.

6  Q.  And did you calculate a statistic at the bottom?

7  A.  Yes.  The DNA profile of Male Donor A is expected to be

8  found in approximately one and greater than 6.8 trillion

9  people.  So again, there's approximately 6.8 billion people on

10 the planet earth.  So we would expect to see that in

11 approximately one thousand planet earths.

12 Q.  Do you have an opinion about whether the DNA on a car

13 gearshift matched the DNA sample for Terrell Polk?

14 A.  Yes, it does.

15 Q.  What is that opinion?

16 A.  It does match.

17          MR. KROUSE:  Your Honor, no further questions.

18          THE COURT:  Cross-examination?

19          MR. LIND:  Just a few questions, judge.

20          THE COURT:  Sure.  Then we'll take a break.

21 CROSS-EXAMINATION

22 BY MR. LIND:

23 Q.  You were talking about the gun, the weapon?

24 A.  Yes.

25 Q.  And you compared, you tested three different donors,

1    correct?

2    A.  Yes.

3    Q.  Mr. Smith, Mr. Polk and Mr. Corbett, right?

4    A.  That's correct.

5    Q.  And Mr. Polk did not have his DNA on the gun?

6    A.  He was excluded as a contributor, yes.

7    Q.  And you mentioned in part sometimes DNA does not show up on

8    various items because of its surface, correct, do you remember?

9    A.  It's possible, yes.

10    Q.  So the DNA of Mr. Corbett and Mr. Smith showed up on the

11    same item, correct?

12    A.  Yes.

13    Q.  So it wasn't, you can't say with any scientific certainty

14    that it was a result of, the surface of the gun was the reason

15    that Mr. Polk's DNA was not on that gun, right?

16    A.  I wouldn't be able to say that.

17    Q.  Now, you only got one sample to test against the gearshift

18    and the steering wheel, correct?

19    A.  I'm no sure what sample --

20    Q.  You are talking about I think the sample in 405, the one

21    from the car.  DNA was tested in terms of gearshift and the

22    steering wheel, correct?

23    A.  Yes.

24    Q.  And Mr. Polk's DNA was tested against that, correct?

25    A.  Yes.

1   Q.  You don't know from your testing when that DNA adhered to

2   either of those two items, do you?

3   A.  No, I do not.

4   Q.  Did you test anyone else's DNA on that gearshift or

5   steering wheel?

6   A.  I believe the other two individuals were compared to those

7   as well.

8   Q.  And what was the result?  Did not have DNA on the gearshift

9   or steering wheel?

10  A.  I would have to look in my files.

11  Q.  You can't recall?

12  A.  I can't recall.

13          MR. LIND:  I have nothing further.

14          THE COURT:  Anything further?

15          MR. KROUSE:  Just briefly, your Honor.

16  REDIRECT EXAMINATION

17  BY MR. KROUSE:

18  Q.  Ms. Nelson, just to be clear, the DNA profile you obtained

19  from the gearshift was a Male Donor A, a single person's DNA

20  profile, correct?

21  A.  Yes.

22  Q.  When you compared that single person DNA profile to the DNA

23  profile of Mr. Polk, it was a perfect match, correct?

24  A.  Yes, it was.

25          MR. KROUSE:  No further question, your Honor.

1          MR. LIND:  Nothing, your Honor.

2          THE COURT:  Ladies and gentlemen, I am going to give

3     you a ten-minute break and we'll see where we are.  Don't

4     discuss the case and keep an open mind.  We'll be back in ten

5     minutes.

6          (Jury not present)

7          THE COURT:  You can step down.  What's the

8     government's intention?  Do you have another witness?

9          MR. KROUSE:  Just one more, your Honor.

10          THE COURT:  How long?

11          MR. KROUSE:  It'll be a short one.  It's for the

12     medical records.

13          THE COURT:  So let's take a ten-minute break.  We'll

14     do that witness and send the jury home.

15          (Recess)

16          MR. KROUSE:  Your Honor, before we bring the jury in,

17     our understanding from consulting with the defense is there is

18     no defense case.  After this witness the government anticipates

19     that it'll be done putting in its evidence but we would like an

20     opportunity overnight to review the transcripts to make sure

21     all of our exhibits have been properly admitted and then we

22     would anticipate in the morning if we need to bring in

23     additional exhibits.  We'll do that if not then, we'll rest at

24     that point.  Our understanding is the defense will rest.

25          THE COURT:  That's fine.  You don't have to rest this

1    afternoon.  Once you finish this witness we'll adjourn for the

2    day.  I usually tell the jury that if there are any further

3    witnesses, we'll hear them tomorrow morning.  If there are no

4    further witnesses then we're going to move into summations.

5              MR. KROUSE:  Thank you, your Honor.

6              THE COURT:  So you can make a final decision.

7    Obviously, the defendant can change his mind too if he wants

8    to.

9              MR. KROUSE:  Yes, your Honor.

10             On the charge conference is it -- our preference would

11   be to have the charge conference after the jury is dismissed

12   for the day.

13             THE COURT:  We are going to do both.  We're discussing

14   it after they're dismissed this afternoon and then we'll

15   discuss it again in the morning.

16             MR. KROUSE:  Thank you, your Honor.

17             THE COURT:  All right.  Let's get the jury in.

18             (Jury present)

19             THE COURT:  You can be seated, ladies and gentlemen.

20             Government calls its next witness.

21             MR. FOLLY:  The government calls Jonathan Concepcion.

22             THE COURT:  You can begin, Mr. Folly.

23             MR. FOLLY:  Thank you, your Honor.

24             Before we proceed with questions, the government

25   offers Government Exhibit 102 which is a stipulation that was

1    previously read into the record but had not been offered as

2    evidence?

3              THE COURT:  Any objection.

4              MR. LIND:  No, judge.

5              THE COURT:  It'll be admitted.

6              (Government's Exhibit 102 received in evidence)

7              MR. FOLLY:  I would like to read into the record two

8    paragraphs from Government Exhibit 1005.  We previously read

9    into the record paragraph three of that same stipulation.

10             Looking first at paragraph one:

11             The parties stipulate that on July 25, 2015, Joaquin

12   Cropper was shot in front of 1055 University Avenue in the

13   Bronx, New York.  Joaquin Cropper was admitted into the Bronx

14   Lebanon Hospital on the same day, July 25, 2015, where he

15   received medical treatment for a one gunshot wound to his left

16   knee.

17             Government Exhibit 301 is a true and accurate copy of

18   business records maintained by Bronx Lebanon Hospital from

19   Joaquin Cropper's hospital visit on July 25, 2015.  Government

20   Six is a true and correct photograph of Joaquin Cropper.

21             Paragraph two reads as follows:

22             On or about August 4, 2015, Ryan Jefferson was shot

23   inside of a store located at 950 Anderson Avenue in the Bronx,

24   New York.  Ryan Jefferson was admitted to Lincoln Medical and

25   Mental Health Hospital on the same day, August 4, 2015, where

1    he received medical treatment for a gunshot wound to his right

2    elbow.  Government Exhibits 528 and 529 are true and accurate

3    photographs taken on August 4, 2015 of the gunshot wound to

4    Ryan Jefferson's right elbow.  Government Exhibit 302 is a true

5    and accurate copy of the business records maintained by Lincoln

6    Medical and Mental Health Hospital from Ryan Jefferson's

7    Hospitals visit on August 4, 2015.

8              Your Honor, at this time we would offer into evidence

9    this stipulation which is Government Exhibit 105 as well as

10   Government Exhibits 301, 302 and 303, as well as Government

11   Exhibits 528 and 529.

12             MR. LIND:  Just one moment, judge?

13             THE COURT:  Yes.

14             (Pause)

15             MR. LIND:  I have no objection, judge.

16             THE COURT:  They'll be admitted into evidence.

17             (Government's Exhibits 1005, 301 -303, 528 and 529

18   received in evidence)

19             MR. FOLLY:  Your Honor, we also offer Government

20   Exhibit 6B which is the nameplate for "Joaquin Cropper".

21             MR. LIND:  I have no objection.

22             THE COURT:  It'll be admitted into evidence.

23             (Government's Exhibit 6B received in evidence)

24             MR. FOLLY:  Please publish for the jury Government

25   Exhibit 528.

1           (Pause)

2           MR. FOLLY:  Can we now turn to 529.  We can take that

3    done.

4     JONATHAN CONCEPCION,

5           called as a witness by the Government,

6           having been duly sworn, testified as follows:

7    DIRECT EXAMINATION

8    BY MR. FOLLY:

9    Q.  Mr. Concepcion, where do you work?

10   A.  At the U.S. Attorney's Office in the Southern District.

11   Q.  How long have you worked there?

12   A.  A little over a year.

13   Q.  What is your title?

14   A.  Paralegal specialist.

15   Q.  What are your duties and responsibilities as a paralegal

16   specialist?

17   A.  We help organize discovery productions.  We do co-sign

18   interviews.  We run deliveries to chambers, tasks in that

19   general nature.

20   Q.  You also help to prepare cases for trial?

21   A.  I do.

22   Q.  During the course of your duties as paralegal, did there

23   come a time when you began to work on this case?

24   A.  Yes, about six weeks ago.

25   Q.  What type of work have you done during that time?

1  A.  I sat in on witness preparation.  I've helped to organize

2  3500 and the exhibits.

3  Q.  On the witness stand beside you are Government Exhibits

4  301, 302 and 303 in that binder there.  Do you recognize those

5  documents?

6  A.  Yes.

7  Q.  What type of documents are in that binder?

8  A.  Medical records.

9  Q.  Let's look first at what's in evidence as Government

10 Exhibit 301.  Look at the top of the page.  Are these the

11 medical records for Joaquin Cropper?

12 A.  Yes, they are.

13 Q.  Looking at the top of the page where it says "date", can

14 you read that aloud?

15 A.  7/25/15.

16 Q.  Looking directly below that at the diagnosis line, can you

17 read that aloud?

18 A.  GSW femur fracture.

19 Q.  Looking directly below that, can you read the reason for ED

20 visit aloud?

21 A.  Gunshot wound.

22        MR. FOLLY:  Can we zoom out a little bit to the full

23 page.

24 Q.  Further down at page in the box that's titled "pain

25 management", can you read that aloud, pain level before

1    medicine?

2    A.  Ten out of 10.

3              MR. FOLLY:  Can we publish the next page of that

4    exhibit and can we blow up the body diagram on the left.

5    Q.  Mr. Concepcion, can you read aloud the letters next to the

6    arrows shown there next to that body diagram?

7    A.  The top is an "H" and the bottom is "GSW".

8    Q.  Turning to the next page now, can you read aloud the first

9    sentence of the "treatment plan one"?

10   A.  Patient H/B GSW to the left knee with two holes, surgery

11   with ortho consult, called pre-op labs.

12             MR. FOLLY:  You can stop there.

13             Can we please go to Government Exhibit 302.

14   Q.  Mr. Concepcion, do you recognize this exhibit?

15   A.  I do.

16   Q.  What is this?

17   A.  Medical records for Ryan Jefferson.

18   Q.  Let's go to the upper right-hand corner first.  What name

19   is listed there?

20   A.  Jefferson Ryan.

21   Q.  That's Jefferson, comma, Ryan?

22   A.  Yes.

23   Q.  Now turning to page two, can you see where there's a trauma

24   activation line with a check.  Can you read aloud what that

25   says at the very top a little bit further up where the

1    checkmark is on the upper portion right next to the first

2    checkmark on the left?

3    A.   The date 8/4/15.

4    Q.   Right next to that?

5    A.   Tier one trauma activation.

6    Q.   There is a checked box next to that?

7    A.   Yes.

8    Q.   What about the arrival time that's listed here?

9    A.   12:18.

10   Q.   Can you also read the chief complaint aloud which is listed

11   a little further down?

12   A.   GSW to "R" elbow.

13            MR. FOLLY:   Let's turn now to the fifth page of these

14   records.   Can you blow-up the body diagram on the right?

15   Q.   Mr. Concepcion, can you read aloud the letters written next

16   to the arrow shown there with the circle?

17   A.   GSW.

18            MR. FOLLY:   Can we now publish page 12.   Before we

19   keep going with page 12, can we just go back to the fifth page

20   for a second.   Now, in the lower right-hand corner there's an

21   identified injury location and type.   Can we blow that up

22   please.

23   Q.   And can you read aloud the GSW entry?

24            MR. FOLLY:   And highlight that.

25   A.   Gunshot wound.

1                MR. FOLLY:  Return now to page 12.  And if we could

2    blow up the section that is titled "report" in the middle of

3    the page, that whole large paragraph there.

4    Q.  And looking just at the report line can you go to the third

5    sentence and read that aloud?

6    A.  Large soft tissue.  Defect is seen posteriorly overlying

7    left elbow.

8    Q.  Can you actually read the sentence before that, the third

9    sentence?

10   A.  Metallic fragments are seen overlying medial distal

11   humerus.

12               MR. FOLLY:  No further questions, your Honor.

13               MR. LIND:  I have no questions, judge.

14               THE COURT:  Thank you, sir.  You can step down.

15               THE WITNESS:  Thank you.

16               THE COURT:  Anything further at this point this

17   afternoon?

18               MR. KROUSE:  No, your Honor.  Thank you.

19               THE COURT:  Ladies and gentlemen, we're going to

20   adjourn for the day.  This is what we're going to do tomorrow.

21               If there are any further witnesses, we'll hear them

22   first thing tomorrow morning.  If there are no further

23   witnesses, we will go right into the summations.  We'll call

24   closing arguments of the lawyers.  I will instruct you on the

25   law and I will send you in to begin your deliberations.

1          What we're going to do is as soon as you arrive

2     tomorrow we are going to take your lunch order.  So if I can

3     get you into the jury room to begin your deliberations before

4     lunch we're just going to send your lunch right into the jury

5     room.  We'll pay for lunch tomorrow.  So you just order from

6     the menu when you first arrive.

7          We are going to be working here before you get here.

8     I'm going to ask you to be here before 9:45 so we can start

9     early.  As I say, if there is any further evidence to be

10    offered we'll have it then but there's a good chance if there

11    is no further evidence to be offered at this point, then we

12    will begin with the summations tomorrow morning at 9:45 and see

13    if I can get the case to you for your deliberation by

14    lunchtime.  OK?

15         So don't discuss the case.  Keep an open mind until I

16    finally give the case to you.  I'll see you tomorrow morning at

17    9:45.

18         (Jury not present)

19         THE COURT:  OK.  Why don't you just remind me

20    tomorrow, Mr. Lind.  I'll let you make your motions after the

21    government indicates that they are going to rest.

22         MR. LIND:  I appreciate that, judge.

23         THE COURT:  Then you can renew it after you rest.

24         I am still working on the charge.  Let's start talking

25    about it.  Let's first sort of backward.  If you looked at the

1  verdict sheet and do you want it in that form or do you want

2  some changes to the verdict sheet?

3            MR. NICHOLAS:  Good afternoon.  Feels weird to talk.

4            THE COURT:  It's been a pleasure talking to you.

5            MR. NICHOLAS:  Your Honor, I think we have a small

6  handful of proposed changes.  It may be actually easier to work

7  backward and I don't even know if the defense will object to

8  these.

9            MR. LIND:  Your Honor, I misplaced my copy.  Is there

10  an extra copy?

11            THE COURT:  We can print you one.

12            MR. LIND:  Thank you.

13            MR. NICHOLAS:  Your Honor, starting at page two on

14  Count Three, we take your Honor's, if you look at subparagraph

15  A, I think your Honor's conflating "brandished" and

16  "discharged" I think on purpose because your Honor's view is

17  probably that the evidence of brandished and discharged are

18  identical in this case.

19            (Continued on next page)

20

21

22

23

24

25

I9CKPOL6

1          THE COURT:  Is there some separate analysis under the

2    facts?

3          MR. NICHOLAS:  No, we agree with you, Judge, so we

4    would just submit that we just strike "brandish," and we'll

5    just go with discharge.  I don't think there's any evidentiary

6    basis to find brandish without a discharge in this case, and I

7    think it would simplify things.

8          I assume there's no objection to that.

9          THE COURT:  Mr. Lind?

10         MR. LIND:  That's fine with me, Judge.

11         THE COURT:  All right.

12         So I will strike "brandish."

13         MR. NICHOLAS:  We'll just go with discharge.

14         We've noted the pages in the Court's current draft

15   charge -- I know the Court's still working on it -- where

16   "brandish" is mentioned, but we're fine with going with just --

17   the only question --

18         THE COURT:  Well, it probably still fits in

19   relationship to the charge.  I mean, when we're talking about

20   use, carry, brandish is part of that.

21         MR. NICHOLAS:  There may be a very limited amount that

22   we would propose taking out.

23         So anyway, your Honor, in connection with that,

24   though, with paragraph 3(a), our understanding of the law is

25   that the actual -- the discharge itself does not have to be in

I9CKPOL6

1    furtherance.  It's just that the gun obviously has to be

2    carried in furtherance -- carried in relation to or in

3    furtherance, but the firing does not have to be in furtherance.

4    So we would just suggest rephrasing paragraph (a) to say, "If

5    you find the defendant guilty of Count Three of the indictment,

6    was one or more firearms discharged by Terrell Polk."

7              THE COURT:  I see.

8              MR. NICHOLAS:  It's just a small change.

9              THE COURT:  "If you find the defendant guilty of

10   Count Three of the indictment, did the defendant, Terrell Polk,

11   discharge" --

12             MR. NICHOLAS:  "One or more firearms."  "Discharge a

13   firearm or discharge one or more firearms."

14             MR. LIND:  And you are taking out "in furtherance"?

15             THE COURT:  That's what you're suggesting.  What's

16   your position?

17             MR. NICHOLAS:  Well, your Honor, we'd actually -- what

18   might be even cleaner is we could have the question:  "If you

19   find the defendant guilty of Count Three, answer the following

20   question:  A firearm possessed or used during or in furtherance

21   of the narcotics conspiracy was discharged," and then you could

22   have "proven" or "not proven."  I've just seen that done

23   before.

24             THE COURT:  Give me that language again.

25             MR. NICHOLAS:  "A firearm possessed or used during or

I9CKPOL6

in furtherance of a narcotics conspiracy was discharged."  And
then you'd have a space for "proven" and a space for "not
proven."

          MR. LIND:  I disagree with that, Judge.  I think that
it doesn't give them the opportunity to just say that it was
carried.

          MR. NICHOLAS:  Well, that's the predicate.  They have
to find that before they then get to this next question.

          MR. LIND:  But I think it conflates the two, Judge.  I
mean, it could be just possession.  Or does it have to be both
under your --

          MR. NICHOLAS:  Can I show you?

          MR. LIND:  Yes.

          MR. NICHOLAS:  Your Honor, I'm just showing Mr. Lind
the...

          THE COURT:  Why don't I just say, "Did the defendant,
Terrell Polk, discharge that firearm?"

          MR. NICHOLAS:  I think there's more than one firearm
at issue, but I take your Honor's point that you want --

          THE COURT:  There's more than one firearm at issue in
three, also.

          MR. NICHOLAS:  Correct, your Honor.

          THE COURT:  It just says, "carry a firearm."

          MR. NICHOLAS:  Right.

          Just one moment?  Let me just confer.

I9CKPOL6

1          THE COURT:  Yes.

2          (Pause)

3          MR. NICHOLAS:  Your Honor, what we propose is a

4    compromise, which is paragraph (a) would read, "If you find the

5    defendant guilty of Count Three of the indictment, was one or

6    more firearms" -- "was one or more of those firearms

7    discharged?"  Or one or more of the firearms referenced in

8    Count Three discharged or something like that.  That ties it to

9    the narcotics conspiracy, and I just --

10          THE COURT:  Say it again.

11          MR. NICHOLAS:  "If you find the defendant guilty of

12    Count Three of the indictment, was one or more of the

13    firearms" --

14          MR. LIND:  Discharged.

15          THE COURT:  How is that different than, did the

16    defendant discharge a firearm?

17          MR. LIND:  Judge, I suggest that it just be that Count

18    Three, paragraph 3, should remain the same, and that (a) should

19    just be, "If you find the defendant guilty of Count Three, did

20    the defendant discharge a firearm?"

21          THE COURT:  That's what you proposed originally.

22          MR. NICHOLAS:  The "of firearm" just has to be linked

23    to the narcotics conspiracy.

24          THE COURT:  Yes, but one or more firearms doesn't do

25    that.  It doesn't do anything different than a firearm.  That's

I9CKPOL6

1    why I proposed "the firearm."

2              MR. LIND:  The paragraph 3 already links it to the

3    narcotics conspiracy.

4              THE COURT:  That was your argument, paragraph 3 --

5              MR. LIND:  It's automatically -- if they find that --

6              MR. NICHOLAS:  We'd be fine with that, Judge.

7              THE COURT:  Just "discharge a firearm"?

8              MR. NICHOLAS:  That would be fine.  It sounds like the

9    defense is proposing that.  We don't have an objection to it.

10             MR. LIND:  That's amazing.

11             MR. NICHOLAS:  Because it's a subparagraph of 3, we

12   think it's clear.

13             THE COURT:  Right.  Look, it says the -- the first

14   question, "How do you find defendant, Terrell Polk, with

15   respect to the charge of using and carrying a firearm during

16   and in relation to the narcotics conspiracy charged in Count

17   One of the indictment?"  If they check guilty, then the

18   question is, "If you find the defendant guilty of Count Three

19   of the indictment, did the defendant, Terrell Polk, discharge a

20   firearm?"

21             MR. NICHOLAS:  I think the safer thing would be "the

22   firearm" instead of "a firearm."  I know that as it were inures

23   to the benefit of the defendant, but I think it's safer.

24             THE COURT:  That's fine.  That's what I proposed

25   initially, "discharged the firearm."

I9CKPOL6

1          MR. NICHOLAS:  "Discharged the firearm."

2          THE COURT:  "The" instead of "that"?

3          MR. NICHOLAS:  Just one moment, your Honor.

4          "The" is fine, your Honor, with us.

5          MR. LIND:  And then will you take out of "in

6    furtherance of the narcotics conspiracy" in subparagraph (a)?

7          MR. NICHOLAS:  Yes.

8          MR. LIND:  I think the government wants to take that

9    out, right?

10          MR. NICHOLAS:  Yes.  That was the change.

11          MR. LIND:  I don't object to that, Judge.

12          MR. NICHOLAS:  So, to be clear, paragraph (a) would

13    read, "If you find the defendant guilty of Count Three of the

14    indictment, did the defendant, Terrell Polk, discharge the

15    firearm?"

16          THE COURT:  All right.

17          MR. NICHOLAS:  And then, Judge, moving just up one

18    level, to paragraph 3, we would just propose adding -- this is

19    before you get to (a), currently it reads, "How do you find the

20    defendant, Terrell Polk, with respect to the charge of using

21    and carrying a firearm during and in relation to the narcotics

22    conspiracy?"  The Court's proposed charge, we think, correctly

23    also includes the option of possessing a firearm in furtherance

24    of the conspiracy, so we think that the question in Count Three

25    should be "with respect to the charge of using and carrying a

I9CKPOL6

firearm during and in relation to the narcotics conspiracy, or
possessing a firearm in furtherance of that conspiracy, charged
in Count One of the indictment."

        THE COURT:  That seems to complicate it a little more
than -- I don't know if you want to complicate it.  I don't see
how you can use or carry a firearm and not possess it.  How can
you discharge it without possessing it?

        THE MARSHAL:  Your Honor, I agree with that.  The
question, though, is whether they could -- theoretically, the
jury could find, okay, he possessed -- let's say that for some
reason, the jury decides that we don't find that the defendant
fired the shots in the video, but based on his prison calls
where he's referring to -- he's telling somebody, did you take
the basketball out of the safe, we do think he possessed a
firearm.  He wouldn't have necessarily used or carried --

        THE COURT:  I think you probably shouldn't have tried
this case if that's -- because there would be no real theory to
look at this evidence and a reasonable jury could conclude
that.

        MR. LIND:  I don't understand what he's doing.  I
don't know what he's talking about.  The one in the safe has
nothing --

        THE COURT:  What it really comes down to is what you
are reasonably going to argue to this jury.  So tell me what
you're reasonably going to argue to this jury.  What's the

1   crime that you want them to convict him on?

2            If the crime that you want them to convict him of is

3   the gun that you say he was seen on the camera firing at

4   somebody or the shotgun that you claim that the evidence

5   indicates that he blew through the door, then -- which makes

6   sense, then that's not much of a danger.  I don't know what

7   other possession you think that Count Three -- you're going to

8   argue that Count Three is relying upon a gun that they hadn't

9   seen or the gun in the car.

10           MR. NICHOLAS:  Well, there was testimony from the

11  cooperating witness that everybody in the conspiracy possessed

12  guns because they needed those as kind of tools of the trade.

13           THE COURT:  Right.

14           MR. NICHOLAS:  And there were prison calls where the

15  defendant is on tape talking about having a gun in his safe.

16           MR. LIND:  But, Judge, they didn't find one there.  I

17  don't understand how -- that gets very confusing.

18           MR. NICHOLAS:  That goes to the weight, though,

19  Mr. Lind.  We understand --

20           THE COURT:  You want to argue to the jury that there's

21  some unknown gun that you haven't found that he's being charged

22  with?

23           MR. NICHOLAS:  We just want to have the option of

24  saying to the jury -- I'm not giving the closing, but in sum

25  and substance, look, it's on tape, but, in addition, you also

1    know from the prison calls that he possessed --

2              THE COURT:  Well, let me think about it.

3              MR. NICHOLAS:  Okay.

4              THE COURT:  I'll tell you what I'm trying to avoid is

5    I'm trying to avoid any argument that one could believe that

6    the jury didn't unanimously find the facts.  And if you give

7    them too many choices, then I need to know what choices they're

8    unanimously making.  If you want to make some theory that

9    there's some gun that they haven't seen that you say is this

10   crime, I'm not going to let a third of the jury find beyond a

11   reasonable doubt there was such a gun, a third of the jury find

12   beyond a reasonable doubt that it was one of the guns that they

13   possessed, and a third of the jury decide that it's the gun in

14   the car.  You've got to focus this jury.  You've got to be

15   confident in your case and focus this case.  This is not about

16   a phantom gun.  The jury is going to be -- I don't think that's

17   even a credible argument to make to this jury.

18             And I don't know what evidence there is that --

19   there's clearly no evidence that he used another gun.  Maybe

20   you're right, maybe there's some evidence that maybe they

21   had -- but I'm not sure what gun you're talking about.  What

22   gun are you talking about?

23             MR. NICHOLAS:  Well, your Honor, first of all, I don't

24   disagree at all about the primary thrust of the case.  I

25   totally agree with the Court on that.  I think it's just a

I9CKPOL6

1    matter of preserving the option for the jury.  We're obviously

2    confident in the case, but we don't want to just give up

3    another option that we think would be available to them if --

4              THE COURT:  I know, but the other problem I have with

5    this is that it creates a different problem with question (a)

6    because question (a) -- you can't apply question (a) to that.

7    Some gun that he possessed in the safe?  There's absolutely no

8    evidence that he discharged such a gun, so you can't ask the

9    question that way.  You can't have the jury say, we don't

10   believe he fired the shotgun, we don't believe he fired the

11   pistol on tape, but we believe he may have had a gun in the

12   safe, and then have the jury say to you that he discharged the

13   firearm.

14             MR. NICHOLAS:  I think if they only found that -- if

15   for some reason they concluded that he didn't discharge the

16   guns on the tape, but he did have one in the safe, we agree

17   with the Court --

18             THE COURT:  They would say no.

19             MR. NICHOLAS:  -- they would just answer no to

20   question (a), and that's okay.

21             MR. LIND:  But, Judge, there was no gun in the safe.

22   He's talking about a gun in the safe.  They go to his place,

23   they look in the safe, there's no gun there.  I think it's a

24   terrific appellate argument, and really --

25             MR. NICHOLAS:  That search was a year and a half

1        later, Judge.

2                MR. LIND:  So how do they know that there was a gun in

3        the safe?  Because he's talking about it?

4                MR. FOLLY:  He said --

5                MR. LIND:  He could have --

6                MR. NICHOLAS:  With respect, your Honor, he says -- on

7        a prison call, he asks somebody if his gun is still in the

8        safe.  I recognize he uses a code word, but we would argue

9        that's very compelling evidence.

10               Look, I think the jury would be perfectly entitled to

11       answer no to (a).

12               THE COURT:  Well, then, you're going to have to add

13       "in furtherance of a crime" to that language because that is

14       required, "to possess a gun in furtherance of the crime."

15               MR. NICHOLAS:  That's paragraph 3, but not (a).  (a)

16       is just the discharge.

17               THE COURT:  But it's not in 3.  You're going to have

18       to add it.

19               MR. NICHOLAS:  Oh, paragraph 3, we would add it,

20       Judge.  You're absolutely right, we would -- the language we

21       would add to just 3 is "and in relation to the narcotics

22       conspiracy charged in Count One, or possessed a firearm in

23       furtherance of that conspiracy."

24               THE COURT:  I have to tip in Mr. Lind's favor on this

25       one.  If you want possession, I cannot ask the jury whether or

I9CKPOL6

1    not that gun was discharged, because there's absolutely no

2    evidence in this case that some phantom gun that was in the

3    safe was discharged.  I can't ask them that because if they

4    come back with a verdict, I can't explain which gun they're

5    talking about.

6            So you've got to figure out how complicated you want

7    this to be.

8            MR. NICHOLAS:  So, your Honor, the Court's point is

9    well taken.  We may, in the morning, come back with some

10   proposed language for the -- that accommodates the Court's

11   concern.  One thing that it could do is in paragraph (a),

12   paragraph (a) would say, "If you find the defendant guilty of

13   Count Three of the indictment, did the defendant, Terrell Polk,

14   discharge a firearm that he carried during and in" -- "that he

15   used and carried during and in relation to the narcotics

16   conspiracy."  That would solve it.  I take the Court's point

17   that it makes it a little more complicated.

18           MR. LIND:  There's absolutely no evidence that he did

19   that, Judge.

20           THE COURT:  Did what?

21           MR. LIND:  With regard to the firearm in the safe,

22   there's absolutely --

23           THE COURT:  No, he's not talking about the firearm in

24   the safe.

25           MR. LIND:  Okay.

I9CKPOL6

1          MR. NICHOLAS:  So, your Honor, that's one possibility.

2      It makes it a little more complicated.  That's a risk that

3      we --

4          MR. LIND:  Judge, I am going to object to anything

5      regarding a firearm -- a nonexistent firearm in the safe.  The

6      fact that he's talking about it --

7          MR. NICHOLAS:  We can certainly argue to the jury that

8      he possessed firearms, and that that prison call indicates

9      that.  If Mr. Lind wants to say, ladies and gentlemen, it's

10     just words, then that's -- he can argue that.

11         MR. LIND:  And they go --

12         THE COURT:  Look, you can argue whatever you think is

13     consistent with the evidence, but it seems to me that the

14     jury -- unless you say it to the jury, the jury is not thinking

15     that this charge has anything to do with a gun that's in the

16     safe.  That's not in their mind.  That is only going to be

17     placed in their mind if you say it.  And if you say it, quite

18     frankly, my opinion is you're weakening the case, not

19     strengthening the case because that's not what the jury is

20     thinking about, and they're going to wonder why you're talking

21     about some phantom gun when you claim that he shot two people

22     in the street.

23         MR. NICHOLAS:  The Court's point is well taken.  We'll

24     sleep on it, and if there's -- if we do want to propose

25     integrating the possession language into paragraph 3, we'll

I9CKPOL6

1    propose specific language first thing in the morning.  We'll

2    sleep on it given the Court's points.

3              THE COURT:  Look, I think that there is -- I think

4    that both the gun in the car and the gun -- and the reference

5    to a gun possibly being in the safe is evidence that these

6    individuals used and carried firearms.  I think that's further

7    evidence of that, and that buttresses any claim that the guns

8    that were on the video or the shootings that were on the video

9    weren't -- that they weren't using and carrying guns.  But I

10   don't think that there is any way that I can tell the jury that

11   they have a possibility to determine that there was either a

12   gun in the safe that was discharged or the gun in the car was

13   discharged.

14             MR. NICHOLAS:  We don't disagree with that.  And --

15             THE COURT:  Unless you exclude those possibilities and

16   then try to --

17             MR. NICHOLAS:  If we proposed language -- the Court's

18   point is very well taken.  We'll sleep on it.

19             If we do propose adding the possession language to

20   paragraph 3, then we will add language to (a) that makes it

21   clear that the discharge language only applies to what was used

22   and carried.  But let us sleep on it, your Honor.  The Court's

23   point is well taken.

24             THE COURT:  All right.

25             I think I have a pretty good idea of how this case is

I9CKPOL6

1    before this jury.  The charges here -- for example, he's not

2    even formally charged with a particular weapon on a particular

3    day.

4            MR. NICHOLAS:  Correct.  Though I think that may

5    militate in favor of the integrating possession, but all the

6    Court's points are very well taken.  We'll stick for now with

7    the amendment to paragraph (a), and we'll sleep on -- so, your

8    Honor --

9            THE COURT:  On the jury form?

10           MR. NICHOLAS:  The only other suggestion we have for

11   the jury is:  In Count One, as the Court notes in paragraph 1,

12   one of the objects of the conspiracy was marijuana.  We just

13   wanted to make sure that paragraph (a), subparagraph (a),

14   accommodates for the possibility for the jury to find the

15   marijuana object and not the crack object.  That's important

16   because under 21, U.S.C., 841, it's a (b)(1)(D) charge, which

17   would carry different implications.

18           THE COURT:  Right.  Well, not the marijuana, the

19   marijuana doesn't.

20           MR. NICHOLAS:  I'm sorry?

21           THE COURT:  The crack cocaine does.

22           MR. NICHOLAS:  The crack cocaine -- only the marijuana

23   would apply to (b)(1)(D), so we want --

24           THE COURT:  That's not going to enhance the penalty.

25           MR. NICHOLAS:  Agreed, but it would lower it.  So, for

I9CKPOL6

1   example, theoretically, the jury could say, okay, this

2   conspiracy involved marijuana but we don't know if it involved

3   crack.  So they could find guilty on paragraph 1, then go to

4   paragraph (a) and say where is the option for marijuana.  I'm

5   not saying that's what we think is likely.  I'm --

6           THE COURT:  How a jury could do that when you went to

7   his house and you found packaged crack cocaine --

8           MR. NICHOLAS:  Your Honor, all we would ask, for

9   now -- again, I take the Court's points -- we would just

10  propose --

11          THE COURT:  You want to drop marijuana altogether?

12          MR. NICHOLAS:  No, we don't want to do that, your

13  Honor, but what we might do is, as we think about paragraph 3,

14  the same way we'll think about whether to propose an extra box

15  for paragraph 1(a) -- and maybe we will, maybe we won't, and if

16  we do, it will be for the Court's consideration in the morning.

17  But we just wanted to flag that for the Court.

18          THE COURT:  See, that's the only other thing, because,

19  appropriately, you only charged him in Count Two with

20  possession of crack cocaine.  The crack cocaine was seized from

21  his apartment.

22          MR. NICHOLAS:  Correct, your Honor.  But the evidence

23  showed that part of the conspiracy was to sell marijuana and,

24  obviously, he protected another member of the conspiracy, who

25  had a conflict over turf for marijuana.

I9CKPOL6

1          THE COURT:  So what do you want to argue to the jury?

2          MR. NICHOLAS:  Your Honor, I don't want to speak to

3     that because I'm not giving the summation, and it's premature.

4     I just wanted to reserve the right, if we may propose an

5     additional box in paragraph (a), and if we do, we'll bring it

6     the Court's attention first thing in the morning.

7          THE COURT:  As you see, one of the ways I analyze is

8     this is, I try to figure out what it is that you're reasonably

9     going to argue to this jury based on these facts.  I don't

10    think you're reasonably going to argue to this jury, based on

11    these facts, that he was somehow involved only in the marijuana

12    conspiracy.

13         THE MARSHAL:  We will not be arguing that the

14    defendant was only involved in marijuana.

15         THE COURT:  Or that any view of this evidence could

16    lead a reasonable jury conclude that.

17         MR. NICHOLAS:  I agree with your Honor on that.  We

18    would just respectfully ask to reserve the right to add a

19    box -- to propose an additional line on that.

20         THE COURT:  Look, I've thought about a lot of these

21    issues already, but that's why I fashioned it this way.

22         Think about:  Why isn't that addressed by (a)?

23         MR. NICHOLAS:  Is the Court's point that if they

24    answer guilty to paragraph 1, and then didn't check any box in

25    (a), then we could all assume that, okay, they found that he

I9CKPOL6

1    participated in the conspiracy but he only did marijuana?

2              THE COURT:  No, would I never say that.  I don't think

3    any reasonable jury could conclude that on these facts.

4              MR. NICHOLAS:  Okay.

5              THE COURT:  I don't think any unreasonable jury could

6    conclude that on these facts.  You said the guy had crack

7    cocaine in his apartment.  Is there anyplace that he personally

8    had marijuana?

9              MR. NICHOLAS:  No.  The Court's point is well taken.

10   All I'm proposing is just, I just wanted to flag --

11             THE COURT:  Mr. Lind?

12             MR. LIND:  I'm sorry, Judge?

13             THE COURT:  You want do it the way they want to do it?

14             MR. LIND:  No, I don't.

15             THE COURT:  All right.  Let's think about it.  And you

16   can come back to me tomorrow.

17             MR. NICHOLAS:  We'll think about it, your Honor, and

18   the Court's point is well taken.

19             Did the Court want to move on to the charge now?

20             THE COURT:  Yes.

21             MR. NICHOLAS:  Okay.

22             THE COURT:  I usually split it up in halves, the first

23   half of the general instruction, basically between 1 to page

24   56.  Is there anything, before we get to the substantive

25   construction, where you wanted to modify the language, add

I9CKPOL6

1   something, an instruction?

2           MR. LIND:  Judge, I never reviewed this at all.  May I

3   have a few minutes to review this?  I haven't reviewed it all.

4           THE COURT:  Sure, sure.  We're going to talk about it

5   again tomorrow morning.  You don't have to argue it now.  Just

6   flag it for me if you know some things that you want me to

7   concentrate on now.

8           The government has some things already?

9           MR. NICHOLAS:  We do, your Honor.  I'm sorry --

10          THE COURT:  That's all right.

11          THE MARSHAL:  -- to burden the Court.

12          THE COURT:  I sit here every day --

13          MR. NICHOLAS:  So, your Honor.

14          THE COURT:  -- whether you're here or not.

15          MR. NICHOLAS:  Your Honor, on page 35, the Court has a

16  sentence in the middle -- this is the section on cooperating

17  witnesses, and the Court writes:  "A witness who realizes that

18  he or she may be able to obtain their own freedom or receive a

19  lighter sentence by giving testimony favorable to the

20  U.S. Attorney has a motive to testify falsely."

21          THE COURT:  Okay.

22          MR. NICHOLAS:  Your Honor, respectfully, we would

23  submit that that's argument.  Mr. Lind can certainly say that.

24          THE COURT:  I think that's the standard language out

25  of Sand's charge.  I didn't make that up.

I9CKPOL6

1          MR. NICHOLAS:  No, I know, I'm sure -- I assume the

2     Court has used it before.  I don't recall seeing it in trials

3     I've done.  I could be wrong.  I didn't compare this to

4     another -- I just read this, frankly, while the testimony was

5     going on, so I haven't compared it.  I would just ask for the

6     chance to review some other charges and check that, because on

7     its face, to me, it sounds like that's what Mr. Lind will say,

8     but, actually, the motive is to tell the truth because that's

9     how he gets the 5K.

10          MR. LIND:  Then I guess it must be struck from the

11     charge.

12          THE COURT:  Say it again.

13          MR. LIND:  If I agree with it but they don't, I guess

14     we should eliminate it.

15          THE COURT:  The whole -- oh, you mean the witness?

16          MR. LIND:  The witness.

17          THE COURT:  Well, let's put it this way:  Look and see

18     if either Mr. Lind agrees with you or it's not in the standard

19     Sand charge, I will drop it.

20          MR. NICHOLAS:  Understood, your Honor.

21          THE COURT:  If it's in the standard Sand charge and

22     Mr. Lind wants to keep it in, then I'll keep it in.

23          MR. NICHOLAS:  Understood.  I am assuming Mr. Lind is

24     going to want to keep it in, so I will check Sand when I get

25     back to the office.

I9CKPOL6

1          THE COURT:  I'm pretty sure I have used it in the

2     past, and I think I've taken it straight out of the language of

3     Sand.

4          MR. NICHOLAS:  So, your Honor, the only other one we

5     had before page 50 or so was on page 44.  The Court has the

6     standard instruction for specific investigation techniques not

7     required.  I don't know that --

8          THE COURT:  You don't want it?  I can take it out.

9          MR. NICHOLAS:  Mr. Lind hasn't argued that now.  We

10    would propose it just be in brackets.  If Mr. Lind argues it in

11    closing, we would ask for it, but if he doesn't, it may just

12    add an issue that's --

13         MR. LIND:  I don't think I will, Judge, but if I

14    don't, then --

15         THE COURT:  All right.

16         MR. NICHOLAS:  Maybe for now, we can just put it in

17    brackets.

18         THE COURT:  Usually it's the government that wants

19    this, not the defense.

20         MR. NICHOLAS:  Right.  And if he argues it, we'll ask

21    that it be reinstated, but if he doesn't make an argument he

22    hasn't made yet, I think we don't need it.

23         THE COURT:  Okay.

24         MR. NICHOLAS:  That was all for the general stuff,

25    your Honor.

I9CKPOL6

1        THE COURT:  I had some corrections already in the

2   general stuff.  I will drop that unless you tell me to put it

3   back.

4        On page 56, all of that is repetitive, after the first

5   sentence.  All of that has been said before.  I'm just dropping

6   the rest of that page, that the indictment is not evidence.  I

7   think if you go back to page -- I forget which page, a previous

8   page is where all of that is.

9        So on that page, it's just going to say, "With these

10  preliminary instructions in mind, let us turn to the charges

11  against the defendant as contained in the indictment," and I

12  will drop the rest.

13        MR. LIND:  But, Judge, I would request that the next

14  sentence, "I remind you that an indictment itself is not

15  evidence" --

16        THE COURT:  All I'm saying is, I already have that in

17  there.  Let me go back.  It's already in here on another page.

18        MR. LIND:  Okay.

19        THE COURT:  Page 50, "As a result of defendant's plea

20  of not guilty, the burden is on the prosecution to prove guilt

21  beyond a reasonable doubt.  This burden never shifts to the

22  defendant for the simple reason that the law" -- no, "although

23  the defendant has been indicted, you must remember that an

24  indictment is only an accusation; it is not evidence.  The

25  defendant has pled not guilty to that indictment.  Also, the

I9CKPOL6

1    fact that the defendant was arrested and held in federal

2    custody is not evidence of his guilt."

3              That's the same thing on page --

4              MR. LIND:  All right.

5              THE COURT:  -- 56 that says, "I remind you that an

6    indictment is not evidence.  It merely describes the charges

7    against the defendant.  It's an accusation.  It may not be

8    considered by you as evidence of the defendant's guilt.  Also,

9    the fact the defendant was arrested or held in custody is not

10   to be considered by you as evidence of his guilt."

11             And then:  "Reaching your determination of whether the

12   government has proved the defendant guilty beyond a reasonable

13   doubt, you may consider only the evidence introduced or lack of

14   evidence," all that language is already in there.

15             MR. LIND:  Okay.

16             THE COURT:  I'm going to drop it.

17             Okay.  Let's go further to the substantive.  There are

18   some corrections that I'm making already.

19             If you go to page 64, the next to last line, the last

20   word on the next to last line says "firearm."  I'm going to

21   change that word to "item."

22             Same thing on the next page --

23             MR. LIND:  I'm sorry, Judge, what page?  64?

24             THE COURT:  64, yes.  The last word of the next to

25   last sentence.

1          MR. LIND:  That is --

2          THE COURT:  It says "firearm."  I'm changing that to

3     "item."  So they can apply to both drugs and guns.

4          The next page, the same thing, where it says "firearm"

5     in the second line, I'm changing that to "item."  I'll go

6     through it and make sure I don't miss something.

7          In the next paragraph, in the third line, it says,

8     "having physical custody or control of an object."  I'm going

9     to change that word to "item," because I don't want to confuse

10    it with the object of the conspiracy.  I don't want to use

11    those words for two different meanings.

12         Same thing on the third line from the bottom, "control

13    over an object," it says, it will say "control over an item."

14         MR. LIND:  Where was -- I see, Judge.

15         THE COURT:  I'm changing it to "item," both, those two

16    pages where it says "firearm" and where it says "object."  As a

17    matter of fact, I see another one I just missed.

18         MR. LIND:  Another object?  I see one.

19         THE COURT:  Yes, four before the bottom, fourth or

20    fifth line.  I will read through it.

21         MR. LIND:  There's one three lines from the bottom

22    also, Judge.

23         THE COURT:  Three from the bottom?

24         MR. NICHOLAS:  And I think the Court probably already

25    caught --

I9CKPOL6

```
 1                THE COURT:  Yes, I have.

 2                MR. NICHOLAS:  -- page 66.

 3                THE COURT:  Page 66?

 4                MR. NICHOLAS:  Also, it has I think there's some

 5      references to firearms.

 6                THE COURT:  Okay.  Yes, I see three.

 7                MR. NICHOLAS:  And then the next paragraph, Judge,

 8      that starts with, "To satisfy this element," I think also

 9      contains mention of firearms.

10           I think the paragraph that starts with, "To satisfy

11      this element," it may be that that paragraph is meant to be

12      somewhere else and was put here.

13                THE COURT:  Yes, I agree.

14                MR. NICHOLAS:  It may be a cut-and-paste thing.

15                THE COURT:  Yes.

16                MR. LIND:  Then, in the next sentence there, Judge, on

17      page 66, four lines from the bottom, also it says "firearm."

18                THE COURT:  Yes.  I see two in that paragraph.

19                MR. LIND:  Then there's another one --

20                THE COURT:  It says "weapon."  Wait a minute.  Is this

21      in the firearm section?

22           Yes, we changed this position.  I'll have to change

23      that last paragraph on 66.

24           All right.  I'm going to move the sentence to the

25      firearms section.  "It also means that he knew that the weapon
```

I9CKPOL6

1   was a firearm" -- I don't even know why I need that.  Is there

2   any reason I need that language at all?

3            MR. NICHOLAS:  I'm sorry, your Honor, which?

4            THE COURT:  "It also means that he knew that the

5   weapon was a firearm."

6            MR. LIND:  Where is this, Judge?  What page?

7            THE COURT:  That's at the bottom of that same page.

8            MR. NICHOLAS:  That one I do remember from -- I would

9   keep it -- I think it's in every charge -- but it's up to the

10   Court.

11            THE COURT:  If you want it, I'll keep it, but I'll

12   just move it to the firearms section.

13            MR. NICHOLAS:  Yes, agree with that.

14            THE COURT:  But that's not an issue here for the jury.

15            And you had some other stuff that you wanted to

16   identify for me now?

17            MR. NICHOLAS:  Just a small handful of others, Judge.

18            On page 71, in the paragraph starting "Moreover," the

19   second sentence in that paragraph is, "Furthermore, the

20   defendant need not have joined in all of the conspiracy's

21   unlawful objectives," we would propose adding:  "or have been a

22   member of the conspiracy for the entire duration of its

23   existence."

24            I'm just not sure that's stated that explicitly

25   anywhere.  I think --

I9CKPOL6

1          THE COURT:  I thought that was in --

2          MR. NICHOLAS:  I think the Court does have language

3    about -- the Court does use the word "duration" at one point,

4    but I just think it would be clearer.

5          THE COURT:  Where are you?

6          MR. NICHOLAS:  I'm on 71, end of the first paragraph,

7    "Furthermore, the defendant need not have joined in all of the

8    conspiracy's unlawful objectives."  We propose adding there,

9    comma, "or have been a member of the conspiracy for the entire

10   duration of its existence."

11         THE COURT:  I see.

12         What's the specific language?  Where is it that you

13   want --

14         MR. NICHOLAS:  Your Honor, it was at page 71.

15         THE COURT:  Where are you lifting that language from?

16   Did you have that in one of your charges?

17         MR. NICHOLAS:  No.  That's an original, but I think

18   it's definitely the law, and I just thought it would be

19   clear --

20         THE COURT:  What's the language you want?

21         MR. NICHOLAS:  Let me just go back to the page, to get

22   it right.  Your Honor, it was at the end of the sentence that

23   starts, "Furthermore."  So after the words "unlawful

24   objectives," we would propose, comma, "or have been a member of

25   the conspiracy for the entire duration of its existence."

I9CKPOL6

| | |
|---|---|
| 1 | THE COURT:  "Nor have been a member of the conspiracy |
| 2 | for its entire duration"? |
| 3 | MR. NICHOLAS:  Right.  So the full sentence would |
| 4 | read:  "Furthermore, the defendant need not have joined in all |
| 5 | of the conspiracy's unlawful objectives, nor have" -- yes, your |
| 6 | Honor -- "nor have been a member of the conspiracy for the |
| 7 | entire duration of its existence" or "for its entire duration" |
| 8 | may be easier.  "For its entire duration" is fine. |
| 9 | THE COURT:  All right. |
| 10 | Anything else? |
| 11 | MR. NICHOLAS:  No, your Honor.  Only that the language |
| 12 | as to brandishing starts at page 96.  So we would just right |
| 13 | now, at the bottom of that page, for example, there's a |
| 14 | paragraph on defining brandishing, meaning displaying the full |
| 15 | thing.  We wouldn't want that because it would confuse the |
| 16 | issue. |
| 17 | THE COURT:  So what do you want out? |
| 18 | MR. NICHOLAS:  Page 96, just the references to |
| 19 | "brandished," if we can just have it as discharged, we're happy |
| 20 | to drop "brandished" from the verdict form. |
| 21 | MR. LIND:  So we should also drop it from the second |
| 22 | paragraph, I think. |
| 23 | MR. NICHOLAS:  That's fine with us.  We're fine |
| 24 | dropping the word "brandish." |
| 25 | THE COURT:  So you just want to use "discharge"? |

I9CKPOL6

1          MR. NICHOLAS:  Yes, your Honor.  For the reasons the

2     Court has articulated about the nature of the proof, we think

3     it's simpler.

4          MR. LIND:  And the title, I guess, Count Three, Judge?

5          THE COURT:  I don't read the titles.

6          MR. LIND:  Okay.  The jury doesn't get a copy of the

7     charge?

8          THE COURT:  Only if you tell me to send it in.  I

9     usually do not.  I don't want to waste their time with it

10    unless they need it, but if they ask for it to be sent in, I

11    will sanitize it without the titles --

12         MR. LIND:  Okay.

13         THE COURT:  -- and send it in without the title.

14         MR. LIND:  Very good.

15         THE COURT:  So "The jury must be unanimous as to

16    whether the firearm was discharged."  Are you going to read to

17    them the indictment?  Is that your intention at this point?  Or

18    are you just going to summarize the charge?

19         MR. NICHOLAS:  Mr. Folly is doing the closing, but

20    he's certainly not going to -- I don't think he's going to

21    explicate the indictment.  I think he does intend to tell the

22    jury what he anticipates the Court will tell the jurors what

23    the elements are of each charge.  So his closing is rooted in

24    something, but he's not going to read the indictment.

25         MR. LIND:  Judge, I just noticed on page 101 -- I'm

I9CKPOL6

1    sorry if I'm interrupting -- about the prior felony conviction.

2    I think there should be some language to the effect -- I recall

3    this in some other case, where the fact that he has a prior

4    felony conviction should not be held against him, something to

5    that effect.  I mean, it's just there because it's an element

6    of the offense.

7              THE COURT:  No, I understand that.  I thought it was

8    in there.  I may have dropped it when I was dropping some other

9    portions.  What page are you looking at?

10             MR. LIND:  101.

11             THE COURT:  All right.  Let me look.  I did have some

12   language.  I'll look and see if I can get some language.

13             If you find some language that you prefer, let me know

14   tomorrow.  Otherwise, I'll look for something.

15             MR. LIND:  Okay.

16             THE COURT:  Okay.  So I'll work on those.

17             Anything else we can discuss now, or we can discuss

18   the rest in the morning?

19             MR. LIND:  Yes.

20             MR. NICHOLAS:  No.

21             Thank you, your Honor.

22             THE COURT:  That's good.  I'll see you at 9:30.  We'll

23   finalize this at 9:45.  Hopefully, before 10:00 o'clock we can

24   start summation.

25             MR. KROUSE:  Thank you, your Honor.

I9CKPOL6

1            THE COURT:  All right.  See you.

2            (Adjourned to September 13, 2018 at 9:30 a.m.)

3                            *  *  *

```
 1                        INDEX OF EXAMINATION

 2    Examination of:                          Page

 3    CICERO WILLIAMS

 4    Direct By Mr. Lind . . . . . . . . . . . . . 390

 5    Redirect By Mr. Krouse . . . . . . . . . . . 433

 6    Recross By Mr. Lind  . . . . . . . . . . . . 438

 7    CLARESSA PRIOR

 8    Direct By Mr. Folly . . . . . . . . . . . . 441

 9    Cross By Mr. Lind  . . . . . . . . . . . . . 451

10    SCOTT PATTERSON

11    Direct By Mr. Folly . . . . . . . . . . . . 452

12    KEGHAM JARJOKIAN

13    Direct By Mr. Krouse . . . . . . . . . . . . 457

14    JONATHAN FOX

15    Direct By Mr. Folly . . . . . . . . . . . . 491

16    Cross By Mr. Lind  . . . . . . . . . . . . . 503

17    HEATHER NELSON

18    Direct By Mr. Krouse . . . . . . . . . . . . 511

19    Cross By Mr. Lind  . . . . . . . . . . . . . 548

20    Redirect By Mr. Krouse . . . . . . . . . . . 550

21    JONATHAN CONCEPCION

22    Direct By Mr. Folly . . . . . . . . . . . . 555

23                       GOVERNMENT EXHIBITS

24    Exhibit No.                              Received

25     103 AND 1000   . . . . . . . . . . . . . . 449
```

 1   103-A   . . . . . . . . . . . . . . . . 450

 2   511 and 512   . . . . . . . . . . . . . 454

 3   1003 and 7B   . . . . . . . . . . . . . 457

 4   501 - 510   . . . . . . . . . . . . . . 461

 5   104   . . . . . . . . . . . . . . . . . 470

 6   539   . . . . . . . . . . . . . . . . . 471

 7   1007   . . . . . . . . . . . . . . . . . 487

 8   1006   . . . . . . . . . . . . . . . . . 488

 9   102-A, 102-B, and 102-C   . . . . . . . . 489

10   533   . . . . . . . . . . . . . . . . . 489

11   513, 514, 515, 516, 517, 518, and 519   . . . 490

12   1004   . . . . . . . . . . . . . . . . . 525

13   401 - 405   . . . . . . . . . . . . . . 530

14   102   . . . . . . . . . . . . . . . . . 553

15   1005, 301 -303, 528 and 529   . . . . . . . 554

16   6B   . . . . . . . . . . . . . . . . . . 554

17

18

19

20

21

22

23

24

25