```
I9d6pol1
```

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
------------------------------x

UNITED STATES OF AMERICA,

        v.                              17 CR 649 (GBD)

TERRELL POLK,

          Defendant.

------------------------------x

                                New York, N.Y.
                                September 13, 2018
                                9:30 a.m.

Before:

                  HON. GEORGE B. DANIELS,

                                  District Judge
                                - and a Jury -

                     APPEARANCES

GEOFFREY S. BERMAN,
    United States Attorney for the
    Southern District of New York
MICHAEL KIM KROUSE
NICHOLAS FOLLY
MAX NICHOLAS
    Assistant United States Attorneys

RICHARD B. LIND
    Attorney for Defendant

ALSO PRESENT:

JONATHAN CONCEPCION, U.S. Attorney's Office Paralegal
JESSICA ALVARADO, NYPD

I9d6pol1

```
 1              (In open court; jury present)

 2              THE COURT:  Is the government prepared to rest before

 3    the jury?

 4              MR. FOLLY:  Yes, your Honor.

 5              THE COURT:  Do you want to make a motion at the close

 6    of the government's case, Mr. Lind?

 7              MR. LIND:  Yes.

 8              THE COURT:  Why don't you formally tell me what the

 9    motion is.

10              MR. LIND:  The motion that the government has not

11    satisfied its burden of proof, and I think it is under Rule 29

12    I move to dismiss the case.

13              THE COURT:  Does the government want to be heard at

14    all on that motion?

15              MR. KROUSE:  Your Honor, the government's position is

16    that the motion should be denied.  The government has

17    introduced evidence that would if the jury credits it satisfy

18    each of the elements of the offenses charged.  There are four

19    counts in this indictment.  One is a narcotics conspiracy.

20              There is amble testimony from Cicero Williams that he

21    was engaged in a drug dealing crew with Mr. Polk as well as

22    other individuals such as Mr. Moss, Mr. Corbett and Mr. Smith.

23    All of that testimony has been received into evidence.  Mr.

24    Williams, to be a little more detailed, testified about

25    activities that the group did together, such as steering
```

I9d6pol1

customers, supplying each other, possessing firearms that they

shared amongst each other that they used to protect their drug

territory of the all of which would go if the jury credited it

to the first element that there was an agreement between one or

more people to violate the laws of the United States, namely,

to distribute narcotics.

The two substances charged in the first count are

crack cocaine and marijuana.  Mr. Williams testified

extensively about his own activity selling crack cocaine as

well as Mr. Moss and Mr. Corbett and as well as Mr. Polk.

Personally seeing Mr. Polk selling crack cocaine, supplying him

with crack cocaine, steering customers to him and receiving

customers from him.

As to the marijuana, there is also testimony from Mr.

Williams that he also occasionally sold marijuana and that one

member of the conspiracy, Mr. Smith, exclusively sold marijuana

on behalf of the crew.  There is also testimony that the first

shooting that the government introduced evidence about, which

is the July 25th shooting outside 1055 University Avenue, that

that shooting stemmed from a dispute over who could sell

marijuana within that building, that Mr. Cropper was selling

marijuana in that building without permission which led to a

dispute between him and Mr. Smith and Mr. Polk intervened and

fired shots at Mr. Cropper and hitting him.

So the government as to Count One has introduced

I9d6pol1

1    substantial evidence about the conspiracy and about both

2    substances charged.

3            Count Two is the substantive crack cocaine possession

4    with intent to distribute.  For that the government had

5    introduced through Probation Officer Joseph Lombardo that 34

6    bags -- individual baggies which totaled around 3.5 grams of

7    crack cocaine were recovered from Mr. Polk's bedroom on the

8    nightstand next to his bed.  That is sufficient evidence in the

9    government's view if the jury would credit it that all the

10   elements of that count were also satisfied, which is that

11   Mr. Polk possessed with the intent to distribute and that the

12   substance was crack cocaine, which there is a stipulation

13   between the parties on.

14           On the intent to distribute, the government has also

15   introduced evidence that when crack cocaine is distributed, it

16   is packaged in these individual twists with about .1 grams in

17   every individual bag and that aligns with what the testing

18   showed for substance that was recovered from his nightstand.

19           As to Count Three, your Honor, which is the 924(c),

20   again the government has introduced evidence of multiple guns

21   being discharged and used by Mr. Polk.  There are two

22   shootings -- the July 25th shooting and the August 4th

23   shooting.  The testimony from Mr. Williams is that those guns

24   were shared and held for the purpose of protecting the

25   narcotics conspiracy between him, Mr. Polk and the other

I9d6pol1

1    participants in the conspiracy.  So the element that the

2    firearms need to be used and carried in connection with the

3    narcotics conspiracy or were possessed in furtherance of that

4    conspiracy would be satisfied through Mr. Williams's testimony

5    if the jury credits it.

6         The enhancement that the firearm was discharged would

7    be satisfied by the testimony and video surveillance evidence

8    showing that Mr. Polk used firearms that were possessed and

9    used and carried in furtherance and in connection with this

10   narcotics conspiracy and they were discharged on those two

11   dates.

12        As to Count Four, which is the possession of

13   ammunition by a convicted felon, that has three elements and

14   two of them are stipulated to here.  Mr. Polk does have a prior

15   felony conviction, and that the ammunition that was recovered

16   from 1055 University Avenue traveled in interstate commerce.

17   So the only element remaining is that Mr. Polk possessed that

18   ammunition.  If the jury credits the testimony that Mr. Polk is

19   in fact the individual on the video firing the weapon, the .40

20   handgun, at Mr. Cropper and that the shell casings came from

21   that handgun, then that element would also be satisfied.

22        So the government has introduced substantial evidence

23   for each of the elements for each of the counts and therefore

24   submits that Mr. Lind's motion should be denied.

25             THE COURT:  I am going to deny the motion.  I find

I9d6pol1

1    that there is sufficient direct and circumstantial testimony

2    including the testimony of the cooperating witness for the jury

3    to find the defendant guiling beyond a reasonable doubt if they

4    were to credit all of that testimony.

5         All of our jurors are here.  Let's first wind up on

6    the jury charge.  Let's start with the verdict sheet.  I made

7    some changes in the verdict sheet.

8         What are the suggestions?

9         MR. NICHOLAS:  We're good with what the Court did.

10        THE COURT:  Does everyone have a final version?

11        MR. LIND:  I have a copy of the final version.  May I

12   just quickly looking at it, Judge?

13        THE COURT:  Yes.

14        The main thing I changed was Question 3.  It basically

15   reads, How do you find the defendant, Tyrell Polk, with respect

16   to the charge of using and carrying a firearm during and in

17   relation to or possessing a firearm in furtherance of the

18   narcotics conspiracy.

19        And then A asks:  If you find the defendant guilty of

20   Count Three of the indictment, did the defendant, Tyrell Polk,

21   discharge that firearm.

22        MR. LIND:  That's fine, Judge.

23        MR. NICHOLAS:  I don't know if this matters, but I was

24   noticing this in Subparagraph A we had had yesterday it was

25   discharged the firearm.

I9d6pol1

| | |
|---|---|
| 1 | THE COURT:  Yes.  Going back to the statute in order |
| 2 | to make clear that the jury is relying on the firearm that they |
| 3 | find, I think it makes more sense to say "that firearm."  They |
| 4 | can use two different firearms on that. |
| 5 | MR. NICHOLAS:  Understood, your Honor. |
| 6 | THE COURT:  That is the reason why I said that. |
| 7 | MR. NICHOLAS:  Okay. |
| 8 | MR. LIND:  I have two requests. |
| 9 | THE COURT:  Sure. |
| 10 | MR. LIND:  One is with regard to the felon in |
| 11 | possession, Judge. |
| 12 | THE COURT:  Yes. |
| 13 | MR. LIND:  I think there should be some language to |
| 14 | the effect that the fact that he has a prior felony should not |
| 15 | be used against him. |
| 16 | THE COURT:  I have the language that you requested |
| 17 | yesterday.  That language is on page 101 and the top of 102. |
| 18 | MR. LIND:  Fine, Judge. |
| 19 | THE COURT:  That is what I was looking for. |
| 20 | MR. LIND:  One other request, Judge.  Your Honor had |
| 21 | mentioned this before with regard to the prison calls, whatever |
| 22 | the other parties besides Mr. Polk say is not to be considered |
| 23 | evidence.  I think there was some language to that effect that |
| 24 | your Honor was talking about. |
| 25 | Do you remember that, Judge? |

I9d6pol1

| | |
|---|---|
| 1 | THE COURT:  I remember that part of that related |
| 2 | conversation.  I am not sure what you think would be an |
| 3 | appropriate instruction to give at this point with regard to |
| 4 | those conversations. |
| 5 | MR. LIND:  I forget exactly what your Honor said, but |
| 6 | I agreed with it at the time.  It was something to the effect |
| 7 | that it is not to be considered as substantive evidence.  It is |
| 8 | sort of like their responses are really not evidence. |
| 9 | THE COURT:  I am not quite sure what responses you are |
| 10 | referring to. |
| 11 | MR. LIND:  Whatever the other parties to the |
| 12 | conversation said should not be considered substantive |
| 13 | evidence.  I think that is what your Honor says.  Maybe the |
| 14 | government has a different recollection than I do. |
| 15 | MR. KROUSE:  I don't recall the Court saying that. |
| 16 | The government argued that it is substantive evidence.  We're |
| 17 | introducing a phone call.  Mr. Polk is on one side of that |
| 18 | phone call.  That is clearly admissible.  The rest of the phone |
| 19 | call is evidence of completeness.  How else would the jury be |
| 20 | able to assess the meaning of the phone call and the meaning of |
| 21 | Mr. Polk's words? |
| 22 | So from the government's perspective, the entire phone |
| 23 | call is in evidence and the jury can consider it however they |
| 24 | want.  Mr. Lind can of course argue that certain statements |
| 25 | made by other people are not statements made by his client so |

I9d6pol1

1    the jury should disregard it or whatever; but there doesn't

2    need to be any instruction about that because from the

3    government's perspective, all of these phone calls are admitted

4    into evidence.

5            Furthermore, the statements made by these people

6    Mr. Polk is adopting those statements in the course of the

7    conversation.  He is responding to them.  He is answering

8    questions.  He is following up on statements made by other

9    people.  To understand the phone call, you need to have both

10   sides of the conversation and the government feels it was

11   admitted.

12           MR. LIND:  I already stipulated to the phone calls

13   coming in.  The question is what is the probative value of the

14   responses.  They are not coconspirators.  Your Honor, I forgot

15   the exact language your Honor had used, but there was something

16   to the effect that it is like background or something to that

17   effect.

18           THE COURT:  Well, I don't know of an appropriate

19   instruction here with regard to those conversations.  I am not

20   sure those conversations are any different than any other

21   wiretaps or any other recorded conversations that the

22   government would engage in.  All of those conversations would

23   be admissible against the defendant that he engaged in,

24   particularly to the extent that those conversations were either

25   in furtherance of the drug activity or statements by the

I9d6pol1

1    defendant.

2              If there is some argument that you want to make or you

3    have some specific language that you want to propose.  I cannot

4    think of an appropriate way to instruct the jury that somehow

5    they should only consider half the conversation and not

6    consider the entire conversation that the defendant was engaged

7    in, the back and forth in the conversation.  I don't think

8    there is an appropriate statement for me to give to them in the

9    nature of that evidence against the defendant.

10              Did you have something else, Mr. Lind?

11              MR. LIND:  No, Judge.

12              THE COURT:  Government?

13              MR. NICHOLAS:  The only thing I want to take back up

14    if I could, your Honor, is yesterday we had identified the

15    language what is now page 35 of the Court's instruction saying

16    that we would challenge it.  It is the language in the middle

17    of the page 35 that a witness who believes that he or she may

18    be able to obtain their own freedom or receive a lighter

19    sentence by giving testimony favorable to the U.S. Attorney has

20    a motive to testify falsely.  The Court's law clerk was kind

21    enough to hand me the Sand and point me to 7-11, where I think

22    some of that language comes from.

23              We would submit that the Sand Instruction is 7-5 on

24    accomplice testimony is sufficient for this.  I think that the

25    statement in the jury charge that a witness who believes that

I9d6pol1

1    in substance they may be able to get a lighter sentence by

2    giving favorable testimony has a motive to testify falsely

3    falls in the bucket of argument that Mr. Lind can make.

4              As far as Judge Sand's treatise goes, the instruction

5    that the Court is taking from 7-11 starts with -- the second

6    sentence of that instruction is that there is evidence that the

7    government agreed to dismiss some charges against the witness.

8    I don't think we dismissed charges against Mr. Williams.  It is

9    a cooperation agreement.  He has pleaded guilty.  It is almost

10   the opposite.  He had to plead guilty a bunch of things that he

11   wouldn't otherwise have had to pled guilty to.  Had he not

12   cooperated, we wouldn't even have known about them.

13             THE COURT:  Well, that doesn't change whether or not

14   the witness is attempting to obtain his own freedom or receive

15   a lighter sentence.

16             MR. NICHOLAS:  The witness certainly wants a lower

17   sentence.  No question about that.

18             THE COURT:  Or wants to obtain his freedom.

19             MR. NICHOLAS:  Agreed.  No question about that.  He

20   testified to that.  That is obviously on the record.  Mr. Lind

21   will argue from that.  We don't dispute that.

22             Our argument is that the language in 7-11 that the

23   Court is taking from the bottom of 7-11 comes from an overall

24   instruction that doesn't apply here because this isn't a case

25   where we agreed to dismiss some charges against the witness.

I9d6pol1

1    It is the opposite.  So we think he has had to take additional

2    charges as a cooperator.  And I don't know that it works that

3    way -- it does work that way here.

4              THE COURT:  I don't think that changes anything.  The

5    government has given the witness some incentive to believe that

6    he can obtain a lighter sentence or he can obtain his freedom

7    by cooperating with the government.

8              MR. NICHOLAS:  True.  As he testified what the

9    government has instructed him is that in order to get a 5K

10   letter he has to tell the truth.  The government hasn't said to

11   him, Testify in a way that helps us and you will get a letter.

12   He testified to that on the stand.  He said I have been told

13   that I have to tell the truth.  Respectively we don't think the

14   7-11 instruction fits here.  We think the 7-5, accomplice

15   testify, does.

16             The 7-5 instruction, your Honor, I printed it out.  I

17   can hand it up and Mr. Lind has it.  It is in the book

18   obviously.

19             The 7-5 instruction in Sand has a full paragraph that

20   says, You should ask yourselves whether an accomplice witness

21   would benefit more by lying or telling the truth.  Was their

22   testimony made up in any way because they are hoping they will

23   receive favorable treatment by testifying falsely, or did they

24   believe that their interest would be best served by testifying

25   truthfully, and then it goes up.  So it tees it up.

I9d6pol1

| | |
|---|---|
| 1 | THE COURT:  Was that part of your request to charge? |
| 2 | MR. NICHOLAS:  I can check, your Honor.  I want to |
| 3 | give the Court back a copy of Sand, too.  I will hand it up to |
| 4 | your Honor's law clerk. |
| 5 | Your Honor, it was at pages 54 to 55 of our requested |
| 6 | charge.  We can hand it up if the Court doesn't have the ECF |
| 7 | open. |
| 8 | THE COURT:  I have it. |
| 9 | MR. NICHOLAS:  54 to 55.  I think that generally |
| 10 | tracks Sand 7-5.  If the Court preferred 7-5 to what we have in |
| 11 | our request to charge, then that's fine with us.  We just |
| 12 | object to seven-11. |
| 13 | THE COURT:  You say as opposed to 7-11 is what we |
| 14 | have? |
| 15 | MR. NICHOLAS:  Yes.  The language the Court has now |
| 16 | tracks 7-11.  We would ask that it either track 7-5 or that it |
| 17 | track what we proposed and submitted in other trials, which is |
| 18 | 54 to 55 of our requested charge. |
| 19 | THE COURT:  Mr. Lind, what is your position? |
| 20 | MR. LIND:  I don't see the part in your Honor's |
| 21 | instructions that they object to. |
| 22 | MR. NICHOLAS:  I can show it to Mr. Lind, your Honor. |
| 23 | THE COURT:  All right. |
| 24 | (Pause) |
| 25 | MR. LIND:  Judge, the sentence that they want out I |

I9d6pol1

1    have seen in virtually every charge.

2            THE COURT:  What you are asking for I think is in

3    essence already in my charge.  The language that you are

4    requesting is almost word for word out of 7-5.

5            MR. NICHOLAS:  Then we think that is sufficient, your

6    Honor, to get the point across to the jury that a cooperator's

7    testimony has to be scrutinized carefully and you should ask

8    yourself:  Does he have an incentive to lie or incentive to

9    tell the truth.  If that is already communicated to them, then

10   we don't think the sentence that -- I would point your Honor to

11   page 55 of our requested charge we have the question -- we have

12   a paragraph that ends with the question:  Or did the witness

13   believe that his interest would be best served by testifying

14   truthfully.

15           THE COURT:  We already have the language, You should

16   request ask yourself whether the cooperating witness would

17   benefit by lying or telling the truth.  If you believe the

18   witness was motivation by personal gian, consider if the

19   motivation was one that would cause him or her to lie, or was

20   it one that would cause him or her to tell the truth if this

21   motivation colored his testimony.

22           MR. NICHOLAS:  Is the Court reading from the Court's

23   charge?

24           THE COURT:  Yes.

25           MR. NICHOLAS:  So, your Honor, we would think that,

I9d6pol1

1    which I think probably tracks 7.5, is enough.  Look, I can only

2    speak from personal experience.  The part from 7-11 that is in

3    there later and that -- sorry, earlier on page 35 of the

4    Court's charge we're objecting to one sentence.

5              THE COURT:  Right.

6              MR. NICHOLAS:  I haven't seen that in charges in the

7    trials I have done.  I know Mr. Lind has done more than I have.

8    We're asking to strike that one sentence.

9              MR. LIND:  I object to that, Judge.  I think that is

10   perfectly appropriate.  It is put in every charge I have seen.

11             THE COURT:  I have modified the sentence from "a

12   witness who realizes" to "a witness who believes."

13             MR. LIND:  That's find.

14             THE COURT:  I don't think it is appropriate to say

15   that the witness realizes he can get a benefit because the

16   government's argument is he never gets the benefit.  So if he

17   believes that he could obtain his freedom by giving testimony

18   to the U.S. Attorney, that is a motivation to lie.  That is

19   basically what it says.  It doesn't mean he was going to lie.

20   It might be a motivation for him for the jury to consider.

21             MR. NICHOLAS:  I think that that reasoning includes

22   the assumption that lying would be favorable to the U.S.

23   Attorney.

24             THE COURT:  No, not favorable to the U.S. Attorney.

25   Favorable to the witness if they can deceive the U.S. Attorney.

I9d6pol1

1          MR. NICHOLAS:  To me it doesn't follow that if a

2      witness may believe that he or she may be able to obtain his

3      freedom or receive a lighter sentence by giving favorable

4      testimony that that creates a motive to testify falsely.

5      Because in this case the truthful testimony does inculpate the

6      defendant and is favorable to the government.

7          THE COURT:  Well, it doesn't say truthful testimony.

8      It says favorable testimony.

9          MR. NICHOLAS:  Right.

10          THE COURT:  It assumes that the favorable testimony is

11      not truthful.

12          MR. NICHOLAS:  Right.  But that is an assumption that

13      I think is wrong here.  It is argument.  Mr. Lind can certainly

14      get up and argue, Look, Williams is just going to say whatever

15      he thinks the government wants to hear.  He doesn't care what

16      is true and what is not.  That is argument.

17          I think having it here confuses the issue.  The Court

18      already has the 7-5 in here.  That is sufficient.  I think the

19      part of the Court's charge is what is normally in jury charges.

20      This sentence jumped out at me because I haven't seen it in a

21      charge.  And I think it comes from a charge in Sand that is

22      predicated in part on a plea agreement where the government has

23      agreed to dismiss charges against a witness.

24          THE COURT:  I don't agree with that.  It doesn't say

25      anything about dismissing charges.

I9d6pol1

1          MR. NICHOLAS:  I think the charge in Sand at 7-11

2     does.  I don't have it in front of me, but I think the top of

3     7-11 says that the government in this case has agreed to

4     dismiss certain charges against the witness and goes on from

5     there.  That is not the context for Mr. Williams because we

6     haven't agreed to dismiss anything.  It's the opposite.

7          THE COURT:  I am not sure what the government has

8     agreed not to charge him with.  There are a lot of things that

9     he has confessed to that the government has agreed not to

10    charge him.

11         MR. NICHOLAS:  But that is all in his cooperation

12    agreement.  The issue that I think arises is the context for

13    7-11 in Sand is almost the opposite of what has happened here.

14    Here he has had to eat a bunch of charges because he is

15    cooperating and had he not cooperated --

16         THE COURT:  7-11 doesn't give him immunity.

17         MR. NICHOLAS:  I agree, your Honor.  My recollection

18    of 7-11 is the first two sentences include the concept of the

19    government has agreed to dismiss charges against the witness.

20    It is not like we're dismissing anything against him.

21         THE COURT:  What difference would that make?

22         MR. NICHOLAS:  I just point it out that that is the

23    context for the language from that charge.

24         THE COURT:  How does that make that language even more

25    or less relevant?

I9d6pol1

1          MR. NICHOLAS:  Well, if we were dismissing charges

2     against Williams, I think that would create a more a bias

3     situation.

4          THE COURT:  Why?  I am not sure I agree with it.  In

5     this case the witness has a greater incentive if you ask me to

6     give testimony that is favorable to the government because he

7     knows if he doesn't do that, the government can withhold the 5K

8     letter.  I am not sure.

9          MR. NICHOLAS:  Maybe I can propose a compromise,

10    because I don't disagree with the fact --

11         THE COURT:  This is an instruction that I have given

12    maybe 30 times and it hasn't been a determinative factor in the

13    case.

14         MR. NICHOLAS:  I understand, your Honor.

15         THE COURT:  It is a standard instruction that has been

16    approved by the Second Circuit.  Mr. Lind has a right to argue

17    that this guy has an interest in the outcome of this case.  He

18    hopes that he can curry favor with the government so the

19    government will be nice to him and let him go.

20         MR. NICHOLAS:  I agree that he has an right to argue

21    that.  We would be happy in keeping in this sentence at page 35

22    of the Court's charge, The witness may believe that he may be

23    able to obtain his freedom or get a lighter sentence by giving

24    testimony that is favorable.  The problem we have with the

25    equation of that with motive to testify falsely.  I don't know

I9d6pol1

what the basis is to equate favorable testimony with a motive
to lie, because there is nothing to indicate that lying would
be favorable to the government.

MR. LIND:  Judge, I am sorry.  I apologize.  May I
interrupt?

I cannot recall any case where that language is not
in.  For the government to say I can make these arguments, that
is one thing for me to make an argument.  The Court will
instruct the jury that whatever I say is not evidence.  It is
meaningless.  If it is in the charge, it a completely different
thing.  Your Honor, I totally and vigorously object to this.
It is in every charge I experienced that there is a motive to
lie.

THE COURT:  I think particularly as I modified that
language it is appropriate language for the jury to consider.
Both sides can argue obviously what they will about whether or
not he has a greater motive to tell the truth or a greater
motive to lie.  That is what the issue is always about.

I think Mr. Lind wants this in, I am going to leave it
as it has been modified by me and the parties can argue what
they will.

MR. NICHOLAS:  Thank you, your Honor.

THE COURT:  Anything else?

MR. NICHOLAS:  Not from the government, your Honor.

THE COURT:  I bolded the changes that I made.  As I

I9d6pol1

1    say on 35 I change that word to "believe."  I am going to drop

2    44 and 45, specific investigative techniques.  55 I am

3    dropping -- most of 55 and 56.  I made a slight change to what

4    the government requested.  I just thought it was more

5    appropriate in another section.  On page 71 I am probably going

6    to drop the "for example."  The language in the same paragraph

7    that says, "A conspirator's liability is not measured by the

8    extent or duration of his participation," the language that the

9    government wanted that "the defendant need not be a member of

10   the conspiracy for the entire time that it exists," I put that

11   right after that.

12             MR. NICHOLAS:  Understood, your Honor.

13             THE COURT:  I took out "brandished" on page 87 and 89.

14             As I indicated, Mr. Lind, on 101 I put in the language

15   that you requested.

16             All the jurors have been waiting for us.  Are we ready

17   to proceed with summations?

18             MR. KROUSE:  Your Honor, just to put on record there

19   is a CD, Government Exhibit 900.  On that CD is what is marked

20   as 900 A, which is the video from the cell phone of the three

21   men driving in a car.  That has been published to the jury

22   multiple times, including on Mr. Lind's cross-examination.  In

23   reviewing the transcript, it appears that 900 A was not

24   separately admitted as an exhibit.

25             THE COURT:  A was what?

I9d6pol1

1          MR. KROUSE:  That is just the video.

2          THE COURT:  I don't have a recollection that you

3     offered the telephone in evidence.

4          MR. KROUSE:  We did not, no.  The telephone is not in

5     evidence, the physical telephone itself.  900 is a CD.  That is

6     in.  900 A is on that CD.  We didn't separately offer 900 A.

7          THE COURT:  You can offer it.

8          MR. KROUSE:  We'll stand up and say the government

9     offers 900 A, which has previously been shown to the jury.

10         MR. LIND:  Was there a conversation on that or was it

11    just a photo?

12         MR. KROUSE:  Just the video.

13         MR. LIND:  I think that is in already; right?

14         MR. KROUSE:  It is not according to the transcript.

15         THE COURT:  Okay.

16         MR. KROUSE:  We'll rest after that, your Honor.

17         MR. LIND:  Judge, may I take five minutes to get some

18    water?

19         THE COURT:  Three minutes.

20         What are you getting?

21         MR. LIND:  Water.

22         THE COURT:  I will give you water.  You can have my

23    water.  Do you want the whole pitcher?

24         MR. LIND:  No.

25         THE COURT:  The only other matter is whether the Court

I9d6pol1

1    wants to inquire about Mr. Polk's decision whether or not to

2    testify.

3              MR. LIND:  Let me talk to him.

4              THE COURT:  Do you intend to call any witnesses on

5    behalf of Mr. Polk?

6              MR. LIND:  No.

7              May I also talk to him about his testimony if

8    possible?

9              THE COURT:  Sure.

10             (Pause)

11             MR. LIND:  Mr. Polk is not going to testify.  I have

12   spoken to him about it, Judge.  That's our decision.

13             THE COURT:  I will consider your motion renewed after

14   you have rested.

15             Let's bring out the jury and have both sides rest and

16   we'll move forward in summation.

17             (In open court; jury present)

18             THE COURT:  Anything further on behalf of the

19   government?

20             MR. KROUSE:  Your Honor, the government offers

21   Government Exhibit 900 A.

22             THE COURT:  Any objection?

23             MR. LIND:  No objection.

24             THE COURT:  That is admitted into evidence.

25             (Government's Exhibit 900 A received in evidence)

1           THE COURT:  Anything further?

2           MR. KROUSE:  No, your Honor.  The government rests.

3           THE COURT:  Mr. Lind, are you going to call any

4    witnesses?

5           MR. LIND:  No, your Honor.  The defendant rests.

6           THE COURT:  Ladies and gentlemen, both sides have

7    rested.  We'll move onto the closing arguments of the lawyers.

8    Let me remind you two things before we begin.  One, what the

9    lawyers say is not evidence; and two, it is your recollection

10   of the testimony that controls.  With those two reminders,

11   we'll start with the closing argument by the government I

12   believe given by Mr. Folly.

13          MR. FOLLY:  On July 25th, 2015, Terrell Polk, the

14   defendant, shot Euro on the sidewalk in front of 1055

15   University Avenue in the Bronx, right here on this sidewalk

16   where families and young children had been walking just minutes

17   before Polk shot Euro.  Polk shot Euro, whose real name is

18   Joaquin Cropper five times, blowing two holes through Cropper's

19   knee as he tried to run for his life.  You saw the live video

20   of that shooting at this trial and you saw Euro limping after

21   he was shot.

22          Euro made the mistake of trying to sell drugs at 1055

23   University Avenue without the permission of Polk or anyone in

24   Polk's crew so Polk just shot him just like that five times.

25   He did it with other members of his crew.  Kevin Corbett joined

1    right in and pulled out his revolver and also shot at Euro.  He

2    was also there with Cicero Williams and Timothy Smith, two more

3    members of this violent drug crew.

4           Polk didn't even wait two weeks before he committed

5    another shooting in the same neighborhood.  You learned at this

6    trial that just 10 days later on August 4th Polk chased another

7    crack dealer named Ryan into a store.  Ryan was with a

8    bystander who came into this court and testified, Juan Rios.

9    You heard how Ryan and Rios hid in the back of that store in a

10   storage room.  They leaned against the door and they tried to

11   keep Polk out; but, ladies and gentlemen, that is a hard thing

12   to do when someone is chasing you with a sawed-off shotgun.  So

13   Polk just blew a hole straight through the door and he hit Ryan

14   and he also hit Rios with the blast from that shotgun and then

15   he ran out of the store leaving behind him a pool of blood.

16          Ladies and gentlemen, these two shootings tell you

17   what this case is all about.  They show you that Polk and his

18   crew carried guns.  They show that you Polk and his crew shot

19   rival drug dealers.  They show you that Polk and his crew were

20   willing to do whatever it took to protect their drug turf.

21          Now, this has been a short trial, but you have seen

22   and heard a lot of evidence throughout this week.  This morning

23   I am going to walk through that evidence with you and discuss

24   how the evidence shows you beyond a reasonable doubt that Polk

25   is guilty as charged.  There are four charges in this case and

I9d6pol1                    Summation - Mr. Folly

1    we're going to go through each of them one by one and show you

2    how the evidence proves the defendant's guilt.  Let's start at

3    the beginning.  Let's start with Count One.

4           Count One charges Polk with being a member of a

5    narcotics conspiracy.  The conspiracy was to distribute crack

6    cocaine and marijuana at some point during the period of 2013

7    through 2017.  Later today Judge Daniels is going to give you

8    the instructions on the law and you should follow those

9    instructions, but I expect that Judge Daniels will tell you

10   that Count One has two basic elements.  First, that a narcotics

11   conspiracy existed and second that the defendant knowingly

12   joined that conspiracy.  I expect Judge Daniels will tell you

13   that conspiracy is simply an agreement to break the law.

14          Now, how do you know that Polk was a member of this

15   drug conspiracy?  I expect that Judge Daniels will tell you

16   that the coconspirators don't typically sit around a table and

17   write out a written agreement to break the law.  That is just

18   silly.  Your common sense tells you that drug dealing

19   operations don't work that way.  No one is sitting around

20   drawing up contracts about how they are going to sell drugs

21   together.  So you will need to look at the actions of the

22   members of Polk's crew and Polk to understand how this

23   conspiracy worked; and their actions, ladies and gentlemen,

24   speak louder than words.

25          You have seen how Polk's crew control the drug sales

I9d6pol1                    Summation - Mr. Folly

1    at 1055 University Avenue and throughout the Highbridge public

2    housing protects.  They controlled that area through violence

3    and you have seen some of that violence on video.  Polk's crew

4    decided who could sell in their territory.  They supplied each

5    other with drugs.  They shared customers.  They shared guns and

6    they protected their turf together.

7          So let's go through some of that evidence you heard

8    about Polk's drug crew.  Who were the members of the drug

9    conspiracy in this case?  Polk; Moss, who they called Buddha

10   Man; Cicero Williams, who you heard from at this trial; Kevin

11   Corbett; and Timothy Smith.  Those were the members of this

12   crew.  They controlled the drug sales at 1055 and throughout

13   the Highbridge projects, and you cannot sell in this area if

14   you were an outsider.

15         The evidence you saw throughout this trial showed you

16   exactly how this crew operated.  You saw videos.  You saw the

17   crack right next to Polk's bed.  You saw more crack from the

18   undercover buys and you also saw guns that this crew used in

19   their drug operation.  During this trial you also heard from

20   one of the key members of this drug conspiracy, Cicero

21   Williams.  He gave you an inside view into how this conspiracy

22   operated.

23         Williams was from Highbridge and he had known Polk and

24   he had known Moss his entire life.  He had sold drugs with both

25   of them for years.  He was a member of this crew and he

1    explained to you at length and in detail about how Polk and the

2    other members of this crew would sell drugs and carry guns to

3    protect their drug operation.

4            Now, I expect when Mr. Lind gets up here and speaks to

5    you, he is going to tell you that you shouldn't believe

6    Williams.  Ladies and gentlemen, of course he is going to say

7    that.  He is going to say that because Williams's testimony is

8    absolutely devastating against Polk.  It demonstrates Polk's

9    guilt on every count in this case.  But, ladies and gentlemen,

10   when you look at all of the other evidence in this case, you

11   will see that it backs up Williams over and over again.

12           Think about how often you saw evidence throughout this

13   trial that backed up the things that Williams told you.

14   Williams told you that Polk was a crack dealer and one of the

15   very first things you saw at this trial on the first day was

16   the crack that was seized next to Polk's bed.  Williams told

17   that you Polk shot Euro because Euro was selling marijuana at

18   1055 on the Tory that Polk and his crew controlled.  Then you

19   saw that shooting on video, ladies and gentlemen, and you saw

20   the bags of marijuana that were found on Euro that same night.

21           (Continued on next page)

22

23

24

25

1        MR. FOLLY:  Williams told you that Polk confessed to

2   him about shooting Ryan with the shotgun.  And you heard from

3   the victim about that same shooting who described it to you

4   just like Williams did because Polk had told Williams exactly

5   how it went down.  These are just a few examples and we'll go

6   through more in more detail in a few minutes.  But Williams

7   gave you an inside view into how this drug operation worked and

8   you saw that Polk was right at the center of it.

9        Now as you saw, the conspiracy itself was very simple.

10   Terrell Polk, Jamel Moss, Timothy Smith, Kevin Corbett and

11   Cicero Williams all worked together to sell drugs.  They did it

12   in Highbridge right where they grew up.

13        Here are Government Exhibits 202 and 204.  And

14   Williams explained to you that this is where Polk, Moss,

15   Corbett, Smith and Williams all sold drugs.  This was their

16   territory.  They controlled this area.  They sold crack cocaine

17   and as you heard, Smith also sold marijuana.

18        It wasn't just Williams who told you about this drug

19   territory.  Remember Detective Prior's testimony about the

20   undercover buy she did in May 2013.  She went to an apartment

21   in 1055 University Avenue to buy crack and who was there?

22   Jamel Moss and Kevin Corbett.  Kevin Corbett answered the door

23   and Jamel Moss who the UC knew as "Buddha" was there as well.

24   Then the next time Detective Prior went to 1055 University

25   Avenue Moss sold her the crack himself right here, right by

this 1055 University Avenue gate.

Now you'll remember that Polk was in jail during this time and he wasn't out until March 2014.  That's when he joined this conspiracy.  But this is where the conspiracy was operating from the very beginning.  This was always their turf and these were always the members who were involved.  And it's not just Williams and it's not just Detective Prior who showed you who the members of this conspiracy were and where they operated.  You even have video evidence of it.

On July 25, 2015 you saw four members of this drug crew right here on this video during the Euro is shooting.  There is Polk.  He's got his gun raised.  He's shooting at Euro.  There's Williams in the car, the silver Camry on the left.  There's Tim Smith in the black shirt and there's Kevin Corbett in the striped shirt with the blue hat.  Then just two days later after Polk shot Euro here they are again driving around in the very same car that Polk and Williams drove to that shooting.  Polk is driving again.  Tim Smith is in the passenger seat and Kevin Corbett is in the backseat.  Polk is together with two of the very same guys just two days after they shot Euro driving the exact same car.

Next, later that month, later in August about a month after the Euro shooting you heard from Sergeant Schoefer who told you about the car stop.  Who was in that car, ladies and gentlemen?  Who was in that car with a loaded gun?  Polk was

1   the driver and once again he's in the car with Kevin Corbett

2   and Timothy Smith and in the back of that car is a loaded .9

3   millimeter pistol.

4           And also remember those prison calls you listened to

5   during the trial?  Those were Polk's prison calls.  We'll come

6   back to those and go through them in a little more detail.  But

7   remember Polk and Tim, how they were talking about how Tim

8   needed Polk back out there, how Tim needed Polk out of jail and

9   back on the streets.  And you know exactly why.  Because Polk

10  was willing to shoot for Tim.  He was willing to protect him.

11  He was willing to help Tim handle his drug disputes with rivals

12  like Euro.

13          And you know what else is on those calls.  Polk is

14  talking about Buddha and you know who Buddha is.  That's Jamel

15  Moss right there, another member of this crew.  And he's also

16  talking about Kevin.  And you know who Kevin is.  That's Kevin

17  Corbett, another member of this crew who helped Polk shoot

18  Euro.

19          Ladies and gentlemen, Polk is not just reading names

20  out of the phone book.  It's not a coincidence that the people

21  he is talking about are all members of this drug conspiracy.

22          So ladies and gentlemen, the testimony by the

23  witnesses in this case and the other forms of evidence you've

24  seen throughout this trial tell you that Polk, Williams, Moss,

25  Corbett and Smith were all members of this drug conspiracy.

```
 1            Now, what are some of the ways that the members of
 2   this conspiracy actually worked together to sell drugs?  You
 3   heard about steering.  You learned about how members of this
 4   drug crew would steer customers to each other.  Williams told
 5   you that if one member of this crew ran out of drugs they would
 6   send that customer to other members of the crew.
 7            Ladies and gentlemen, they're not doing this out of
 8   charity.  They're doing this because they're working together
 9   in a drug conspiracy.  That's them having each other's backs.
10   Williams also explained to you that if a member of this drug
11   crew ran out of drugs they would help supply each other.  For
12   example, Williams told you that in 2014 and 2015 he supplied
13   Polk with crack four to five times with an average of 15 to 20
14   grams each sometime.  That means that Williams, just Williams
15   supplied Polk with between 60 and 100 grams of crack.
16            Before I go any further I want to briefly discuss the
17   issue of drug weight because you are going to see in the jury
18   charge one of the questions is "How much crack was involved in
19   this conspiracy"?  You'll be asked to choose one of three
20   levels.  Less than 28 grams of crack, more than 28 grams of
21   crack or more than 280 grams of crack.  And I expect that Judge
22   Daniels is going to tell you that you should consider the crack
23   that Polk sold as part of this conspiracy and also the crack
24   that was sold by his co-conspirators as part of that conspiracy
25   if it was reasonably foreseeable to Polk.
```

1          Here, you easily get weight beyond 280 grams.  This is

2     basic math.  First, we just discussed the 60 to 100 grams of

3     crack that Williams sold to Polk when Polk ran out.  That right

4     there just based on the drugs that Williams sold to Polk is

5     already more than 28 grams.  It's way more than 28 grams.  So

6     you're already in the second level right there just based on

7     what Williams sold to Polk.

8          And you know that this conspiracy involved way more

9     crack than just what Williams gave to Polk.  There were four

10    members of this crew who were all selling crack, Williams,

11    Moss, Corbett and of course Polk.  And Williams explained to

12    you that members of this drug crew were selling crack around

13    the clock.  This was a seven day a week job.  They were always

14    open for business.  On average just Williams himself was

15    selling between 100 and 150 grams of crack every month.

16         So what does all this mean?  What is all this math

17    about?  It means that if you just take the most conservative

18    amount of drugs that just Williams was selling in a period of

19    two months, just two months and you add that to the crack that

20    Williams gave to Polk, you're already over 30 grams of crack.

21    You are already up to the third level just with those two

22    things.  And that doesn't even count all of the other months

23    that this crew was selling crack throughout this conspiracy and

24    it doesn't even count all of the other crack that the other

25    members of this crew were also selling.

1          So your common sense tells you that Polk and the other

2     members of this crew, ladies and gentlemen, would not need an

3     arsenal of guns, a shotgun, a revolver, handguns, an assault

4     rifle, if they were selling a couple grams of crack.  It

5     doesn't make any sense, ladies and gentlemen.  You would not go

6     through all that trouble and carry around all those guns if you

7     were just selling a few grams of crack.  So you know that Polk

8     sold way more than 280 grams of crack during this conspiracy.

9          So we've talked about steering.  We've talked about

10     supplying.  We've talked about sharing customers.  But the

11     members of this drug conspiracy also worked together at sharing

12     guns.  You've seen and heard a lot of evidence about guns at

13     this trial.  You know by now that guns are an essential part of

14     how this drug crew operated.

15          They used those guns to protect their territory.  The

16     July 25, 2515 shooting is a perfect example.  Polk shot at Euro

17     on that day because Euro was selling in their drug turf.  And

18     you heard about all of the other ways that this crew used and

19     carried guns in order to protect themselves from other drug

20     dealers who wanted to harm them or who wanted to steal their

21     turf.

22          So ladies and gentlemen, Polk was in a conspiracy with

23     Moss, Corbett, Smith and Cicero Williams to sell drugs.  That

24     conspiracy was ongoing and it involved way more than 280 grams

25     of crack.  The drug operation was so important to Polk and the

1    other members of this conspiracy that they were willing to

2    shoot rivals in order to protect that operation, in order to

3    protect their turf.  That's Count One.  That's the evidence

4    that shows you the defendant is guilty of Count One.

5              Now there's a second drug count in this case which is

6    Count Two.  This count is very straightforward.  I expect Judge

7    Daniels will instruct you that it has two elements.

8              First, that on or about February 3, 2017, Polk

9    intentionally and knowingly possessed crack cocaine with the

10   intent to distribute it.

11             And second, that the substance involved was in fact

12   cocaine base.

13             There is no dispute at all in this case about the

14   second element.  You saw the stipulations to that at trial.

15             There is no dispute that what's in this bag, ladies

16   and gentlemen, is crack.  So there's only one element left for

17   this count and that's whether Polk actually possessed that

18   crack with the intent to distribute it.

19             Ladies and gentlemen, of course he did.  Of course he

20   possessed that crack with the intent to distribute it.  It was

21   found right next to his bed in his apartment.  And I expect

22   Judge Daniels will explain to you that Polk did not need to

23   have had actual physical possession of the crack to be guilty

24   of this count.  In other words, that crack did not literally

25   have to be in his hand when Officer Lombardo happened to show

1    up at his apartment.  It's enough that Polk had the ability to

2    exercise substantial control over that crack and here Polk

3    clearly did.  It was in his apartment.  It was in his bedroom

4    and it was right next to his bed.  So he could pick it up and

5    he could go sell it any time that he wanted.  And that's why it

6    was there.  So Polk obviously possessed that crack.

7           Let's be clear.  He didn't possess it by accident.  He

8    possessed it so that he could sell it.  All of the evidence

9    you've heard throughout this trial tells you that and so does

10   your common sense.  Polk was a crack dealer.  And the twists of

11   crack next to his bed were packaged so that he could sell them

12   to his customers.  You saw exactly how that crack was packaged,

13   small twists of crack or hits of crack right inside of the bag.

14   Officer Lombardo told you that there were dozens of these small

15   twists inside of that bag.  And you also heard from Williams

16   who told you that this is exactly how crack is packaged when

17   it's getting ready to be sold to customers.  So this count is

18   easy, ladies and gentlemen.  Polk possessed the crack next to

19   his bed on February 3, 2017, so that he could sell it to

20   customers.  He's guilty of Count Two.

21           So those are the drug counts.  Now I am going to move

22   on and discuss the gun and the ammunition counts.  But as I do

23   that, keep in mind that the evidence of the gun and ammunition

24   counts is also powerful evidence that Polk was in a drug

25   conspiracy because the reason that Polk was using and carrying

1   all these guns was in order to protect his drug turf.

2          Let's start with Count Three.  This count is about

3   Polk using and carrying guns, guns that you know and that you

4   saw were fired.

5          Count Three has three elements.

6          First, that at some point between 2013 and 2017, Polk

7   used or carried a firearm or any combination of those acts.

8          Second, that Polk used or carried a firearm during and

9   in relation to the drug trafficking conspiracy charged in Count

10  One.

11         And third, Polk acted knowingly, which I expect Judge

12  Daniels will tell you just means that he knew what he was

13  doing.  In other words, that he took those actions in question,

14  deliberately and voluntarily.

15         Now, we're also going to ask you to find that the guns

16  that Polk had were discharged at some point.  In other words,

17  were any of the guns that Polk kept as a part of his business

18  as a drug dealer ever discharged?  The answer is obviously,

19  yes.  You know that for so many different reasons and we'll

20  discuss them in just a minute.  You know without question that

21  Polk used and carried guns.  You've seen overwhelming evidence

22  throughout this trial of Polk's use of guns.  This crew had an

23  arsenal of guns.  We've talked about them, a .40 caliber

24  pistol, a revolver, a sawed-off shotgun, an assault rifle and a

25  .9 millimeter handgun.

1          The first way you know that Polk carried and used

2     those guns is because you saw it yourself at this trial.   You

3     saw Polk fire the .40 caliber pistol in Euro.   You saw Kevin

4     Corbett fire the revolver at Euro in the same video.   Then you

5     saw and heard evidence about Polk using a shotgun to shoot at

6     Rios and Ryan just ten days later.   Then you also saw the .9

7     millimeter pistol that was recovered from Polk's car later that

8     same month.   So you know that guns were an essential part of

9     how Polk's crew operated.   They used them to protect their

10    territory.

11         The July 25, 2015 shooting of Euro is the perfect

12    example of this.   This entire shooting, ladies and gentlemen,

13    is on video.   At 12:22 in the morning on July 25, 2015, here

14    you see Polk arriving in this car at 10:55 University Avenue

15    with Cicero Williams.   Polk gets out of that car and

16    immediately goes up to Euro to confront him.   You see Polk

17    walking there approaching Euro.   Polk is animated.   You can

18    tell by his body language he's upset.   Let's continue.   Look at

19    his body language.   Why is Polk upset?   Why is he here yelling

20    at Euro in middle of the night?

21         Ladies and gentlemen, he's not talking to Euro about

22    the weather.   You know exactly what he is saying to Euro

23    because Williams told you Williams was there but also because

24    of your common sense when you watch this video.   He's saying,

25    Get off my turf.   That's what he's saying.   He's saying, If you

don't stop selling drugs here we're going to have a problem.
And Euro is about to find out just how serious Polk is when he
says that, just how serious Polk is about protecting his drug
turf.

Keep something in mind.  Polk sold crack, not weed,
not marijuana.  But Timothy Smith was a part of this drug crew,
sold marijuana in 1055 University Avenue and Polk had Smith's
back just like that prison call showed you.  These guys
protected their turf together.  So Terrell Polk had no problem
pulling out his gun and handling this dispute with Euro
shooting him five times to send a message that no one was going
to sell in 1055 University Avenue without this crew's
permission.  So let's go back to this video.

You remember how this plays out.  Williams understands
what's about to happen so what does he do?  He gets back in the
car.  He knows there's cameras here and he's right.  And within
less than a minute, two more members of this crew, who by now
you are very familiar with, show up.  There's Kevin Corbett in
the striped shirt talking to Polk.  There's Tim Smith right
behind him in the black shirt.  Williams told you who they were
but you also saw photos taken from Timothy Smith's phone on the
same day of Smith and Corbett.  And they were wearing the exact
same clothes that they're wearing in this video.  That's
Government Exhibits 905 and 904.

And when you watch this video, ladies and gentlemen,

1    it's obvious these guys are together.  They're in a group.

2    Corbett goes straight up to Polk and starts talking to him.

3    And in a few seconds in this video you'll see that Corbett

4    joins him.  He pulls out his revolver and starts shooting at

5    Euro alongside Polk.

6         You're seeing live evidence of a drug crew protecting

7    its turf.  And you remember what happens next.  Polk takes out

8    his .40 caliber pistol and he squeezes the trigger.  At first

9    nothing happens.  Everyone seems a little confused.  You even

10   see Euro completely freeze on this video.  He doesn't start

11   running because nothing has come out of the gun yet.  So Polk

12   turns to Williams and asks, what's wrong with the gun.  And

13   Williams tells him, you need to cock the gun back.  In other

14   words, you need to put a bullet in the chamber before you can

15   start shooting.  And that's exactly what Polk does.  He puts a

16   round in the chamber and he starts to shoot at Euro.  And he

17   doesn't just shoot him once.  He shoots him five times.

18        (Video playing)

19        And as I said before, it's not just Polk.  Corbett's

20   right there next to him shooting as well.  And you know what

21   the effects of this shooting were, ladies and gentlemen.  You

22   saw Euro limping on that video after the shooting and you saw

23   his hospital records and you saw that he had two holes in his

24   knee from this shootout.  You also saw the shell casings, the

25   shell casings that were recovered from this shooting.

1         So there's only one question that's left about this

2    shooting whether the shooter on that video is Terrell Polk.

3         Ladies and gentlemen, of course that's Terrell Polk.

4    You've sat through this trial and you know that any suggestion

5    that that is not Terrell Polk on this video is completely

6    absurd.  You had an eyewitness who came into this courtroom and

7    told you that Polk committed this very shooting, that he saw

8    Polk with his own two eyes watched Polk shoot Euro.  Cicero

9    Williams was at the scene of this crime.

10        And think about all the other evidence that backs up

11   what Williams told you about this shooting.  Williams told you

12   the exact type of gun that Polk used to shoot Euro.  He told

13   you it was a .40 caliber gun, a .40 caliber pistol.  And sure

14   enough, the shell casings recovered from the 1055 shooting were

15   all .40 caliber rounds and they were all from the same gun.

16        How did Williams know the exact type of gun that Polk

17   used on that night?  Because he was there.  Because he saw the

18   gun in the car right before Polk got out and started shooting

19   at Euro because he told Polk, you got to cock it back before

20   you can start to shoot.

21        Here is another example.  Williams testified that Euro

22   was selling marijuana in 1055 and that's why Polk shot him.

23   And when Detective Patterson went to the hospital the night of

24   the shootings and Detective Patterson interviewed Euro, what

25   did he find in his property?  He found baggies of marijuana.

1    How did Williams know what Euro was doing?  How did he know

2    that he was selling marijuana at 1055?  Polk.  Polk told him.

3    He told him right before he got out of the car and shot him.

4           One last example.  Williams told you that after this

5    shooting the members of this crew all got together and tried to

6    figure out what they were going to do.  They had just done a

7    shooting right at a location where there was surveillance

8    cameras.  So they had to do something.  One of the things they

9    did, they sent Ken Corbett back to the scene to pick up the

10   shell casings from that shooting, to clean-up any evidence that

11   would tie that shooting back to Polk's crew.  And guess what?

12   When you look at the video right there is Kevin Corbett picking

13   up those shell casings off the ground, but he missed some.  So

14   you saw those remaining shell casings at this trial.  And you

15   learned that they all came from the same gun, a .40 caliber

16   pistol.  So the tape corroborates Williams because Williams was

17   there and Williams saw exactly what happened.  He was there and

18   he saw Polk shoot Euro.

19          Ladies and gentlemen, there's even more evidence that

20   Polk was the shooter.  Remember that silver Toyota Camry that

21   kept coming up throughout this trial, the same Camry that had

22   the gearshift tested for DNA?  Polk's DNA was on that

23   gearshift.  That was the testimony that you heard yesterday

24   from Heather Nelson.  And it's no mystery why Polk's DNA was on

25   the gearshift of that car.  Polk drove that car.  He drove that

car to the July 25, 2015 shooting.  He drove that same car to

the August 4, 2015 shooting which was ten days later.  So let's

look at that car.  Here it is, the silver Camry, a silver

Toyota Camry with Florida license plate number 112PRA.  The

person who was driving this same car was the shooter at the

July 25 shooting and the August 4 shooting, just 10 days later

and Polk's DNA is right on the gearshift.  Here is a picture of

the July 25, 2015 shooting.  And here's another picture of the

silver Camry at the August 4 shooting.

          Then let's go back and look at the car that had Polk's

DNA on the gearshift.  See the black grill in the front of the

car of the Toyota, same silver color, same Florida license

plate, same car, ladies and gentlemen.  And not only was Polk's

DNA on the gearshift of that car but Polk was also on video

driving that same car just two days later.  This is the video

from Tim Smith's phone two days after the July 25 shooting.  It

shows Polk driving that car.  And when you look at this video

on the interior of this car is all this red distinct stitching.

And, ladies and gentlemen, when you look at the photos of the

car that had Polk's DNA on it, the interior of that car is

identical.

          How did Polk end up driving around in some rental car

from Florida?  Williams explained that to you.  He told you

that Polk had a crack customer named Deedee who gave Polk the

car in exchange for crack.  Williams told you that the rental

1    car was a silver Camry and he even told you that it had a

2    Florida license plate.  Williams also identified a picture of

3    Deedee.  And you know that everything Williams told you about

4    this rental car is true.  The parties stipulated that the

5    person in this photograph, the person Williams identified

6    Deedee was the crack customer who had lent this car in exchange

7    for crack to Polk is someone named Delisa Harris.  And guess

8    what?  The parties also stipulated that Delisa Harris rented

9    this very same Toyota Camry.

10           So there's no question.  There's no doubt, ladies and

11   gentlemen, that Polk was the one driving around in this Toyota

12   Camry, that he was the one who did both of these shootings.

13           Just based on the July 25 shooting you already have

14   enough evidence to convict Polk of Count Three.  The shooting

15   of Euro also proves to you beyond a reasonable doubt that Polk

16   used or carried a firearm during and in relation to his

17   narcotics conspiracy.  That makes him guilty of Count Three.

18   Period.

19           But the evidence on Count Three, ladies and gentlemen,

20   does not end there because Polk did the exact same thing ten

21   days later.  The August 4 shooting where he took the same car

22   and shot two more people is another way you can find him guilty

23   of Count Three.  Let's talk about that shooting for just a

24   moment.

25           You saw the video at trial of Polk arriving at that

1    shooting driving the same silver Camry running into the store

2    and running back out afterwards.  Here is the video.

3              (Video playing)

4              There's Polk arriving in the silver Camry.  He runs

5    into that store and you also know what's happening inside of

6    that store.  Polk fires a shot and everyone outside of that

7    store starts running.  If you look at that video you can see

8    the terror on those people's faces because it's the middle of

9    the day in broad daylights and Polk is running into a store and

10   blowing a shotgun blast through a door at two people.

11             You heard how horrifying this experience was from Juan

12   Rios, the first witness you heard at this trial.  He didn't

13   want to be here testifying.  You could tell that from his body

14   language.  He was forced to come in here with a subpoena.  You

15   heard him say that.  And you know why he didn't want to be

16   here, ladies and gentlemen.  Mr. Rios was chased by a stranger

17   with a shotgun.  He had to hide for his life in the back room

18   of a store while he pressed himself up against a door to try to

19   stop the person who was pursuing him from getting in.  Mr. Rios

20   was shot with a shotgun straight through a door.  He had his

21   leg and his hand blown apart by the blast from that shotgun.

22   He had seven holes blown into his leg.  And you heard from the

23   ballistics expert, Detective Fox, who explained to you what a

24   shotgun blast is designed to do at close range.

25             Ladies and gentlemen, it's designed to hit the target.

And you saw the damage yourself.  You saw the victim's horrific
injuries and you saw the back room after this shooting.  It was
a blood bath.  It was like a scene from a horror movie.  But
this was real life.  This happened.  And this man Terrell Polk
did that shooting.  So of course, Mr. Rios did not want to come
into this courtroom and have to relive any of what happened to
him on that day.

        You saw the photos from this shooting, the hospital
records of the shooting victims and the shotgun buckshot from
the scene of the shooting.  No one disputes that this shooting
happened.  So the only issue, ladies and gentlemen, is whether
or not once again Terrell Polk was the shooter.  Ladies and
gentlemen, of course he was.  Of course, he was.  The evidence
is overwhelming and we'll just go through that briefly.

        First, we've already discussed the silver Camry.  This
is one of the links between the July 25 shooting and the
August 4 shooting ten days later.  So the silver Camry was at
both shootings.  Polk was driving that same silver Camry on
video two days after the July 25, 2015 shoot something.  And of
course Polk's DNA is on the gearshift of that car.  So that's
one way, just one way you know that Polk was the shooter on
August 4.

        Another way you know that Polk was the shooter is that
he told Cicero Williams all about it.  On the same day he did
the shooting he confessed to Cicero Williams about what

happened.  He told Williams all the horrifying details that

only someone who was actually there at that shooting would be

able to know.  Let's really focus on Williams' testimony about

that August 4 shooting for a moment.

        What did he say that Polk told him happened?  Polk

told Williams he was driving the Toyota Camry which we know he

was because you saw it right there on the screen on that video

and he told that you he saw someone named Ryan and you saw the

hospital records and you know that one of the victims from this

shooting was named Ryan Jefferson.  So Williams got that detail

right.  And you know why he got it right, ladies and gentlemen.

Polk told him.

        Second, Polk told Williams that as he pulled up he got

out of his car and he chased after Ryan into the back of the

store.  Polk said he tried to get into the bathroom door and

when he couldn't kick it in, he took his shotgun and blasted

one, one shot through that door.  Look at the testimony about

these shootings.

        Look how Rios' testimony is completely consistent with

what Williams told you that Polk had told him about that

shooting.  Think about that for a minute.  How could Williams

know the exact sequence of these events, the exact details of

what had happened on that day unless Polk had told him?

Williams knew that Polk had tried to force that door open in

that back room and when he couldn't, he blasted a hole through

1    it, one single shot.  Again, how could Williams know that

2    unless Polk had told him?  He wouldn't.

3         It also matches up perfectly with the buckshot that

4    was recovered from the scene and the injuries to those victims.

5    Remember Detective Fox told you that the buckshot recovered at

6    that shooting was consistent with ammunition that had been

7    fired from a shotgun right down to the exact details.  The

8    story that Williams told you about what had happened matches up

9    with the story that Juan Rios told you when he testified in

10   front of you.  It matches up with the photographs from this

11   scene and it matches up with the surveillance video.  So you

12   know that Polk is the one who carried and shot that shotgun on

13   August 4.

14        Let's talk about another way that you know that Polk

15   carried and used guns.  He talked about it.  He talked about it

16   a lot all over those prison calls.  Those calls were all from

17   September 2015 just the next month after Polk had shot Ryan and

18   shot Rios.  Let's look at just a few of them.  Here in this

19   call Polk is talking about demonstrations that he has, two of

20   them.  And later in the call Polk is talking about Buddha Man

21   and how Buddha ain't been trying to hold no basketballs.  Two

22   days later Polk talks to another member of his crew, Timothy

23   Smith.  Smith tells Polk there's a dispute with someone named

24   "Noon" and you know this is Timothy Smith because Williams

25   listened to that call and recognized his voice.  And in this

1    call Tim is telling Polk how during that incident he had gone

2    to get Steph Curry and when he came back with Steph Curry

3    someone named "Noon" was hiding out.

4            Let's look at one more nine days later.  Here is Polk

5    talking about basketballs again, this time with his girlfriend.

6    He asks her, Do you still have my basketball in my safe?

7    Demonstrations?  A basketball in a safe?  Steph Curry?  Guns.

8    Ladies and gentlemen, your common sense tells you exactly what

9    these conversations are about.  And you know exactly why

10   Terrell Polk is speaking in code on his prison calls.  His

11   calls are being recorded and you know that because you listened

12   to them right here at this trial.  So he's not going to go

13   around using words like "shotgun" and "assault rifle" when he

14   is talking about guns on his recorded calls.  But ladies and

15   gentlemen, this isn't Morse Code.  And when you look at the

16   words of these calls you know exactly what Polk is talking

17   about.  Guns.

18           So ladies and gentlemen, there is no question that

19   Polk used and carried guns and that those guns were discharged.

20   You saw two of those shootings and you saw Polk in his own

21   words talk about his guns on his prison calls.  And you know

22   exactly why he was using and carrying all those guns.  He

23   carried them because he was a part of a violent drug crew.  He

24   carried them and he used them so that he could protect his drug

25   turf.  He used them and he carried them so that his crew could

1   maintain control over this area of the Bronx where they were

2   running their drug operation.

3          You've seen overwhelming evidence at this trial where

4   Polk used and carried guns in connection with his drug dealing.

5   Even aside from what you saw, even on video Williams told you

6   that Polk and Williams and members of his crew had guns on them

7   nearly every single day.  Why?  Because dealing crack cocaine

8   is a very dangerous business and you've seen that throughout

9   this trial.  You've seen that again and again on the videos and

10  in these shootings.  Members of this crew like Polk, Williams

11  and Corbett, they carried guns as a matter of course.

12         That's why Polk and that's why Kevin Corbett had

13  loaded guns at the ready on the night of the Euro shooting.

14  And that's why Terrell Polk when he was driving around at noon

15  in the middle of the day was carrying a loaded sawed-off

16  shotgun.  And that's also why Polk and his crew had a .9

17  millimeter pistol in the back of Polk's car less than a month

18  later.  And you remember what you heard about that gun.  That

19  gun like all the other guns was loaded and ready to be used.

20         Now Polk's DNA is not on that gun but Smith's and

21  Corbett's DNA is and that's because the members of this crew

22  all used and shared these guns.  That's because being a member

23  of this crew meant that you had to be willing to shoot.  It

24  meant using and carrying guns.  It meant being willing to shoot

25  on sight in order to protect their drug territory.  So you know

1    that Polk used and carried guns and you know that he did it

2    directly in support of his participation in this drug

3    conspiracy.

4            Ladies and gentlemen, the bottom line is that Polk is

5    guilty of Count Three for many, many reasons, the July 25

6    shooting of Euro, the August 4 shooting of Ryan and Rios, the

7    fact that he carried around other guns on other occasions as

8    part of being involved in this drug conspiracy, all of that

9    makes him guilty of Count Three.  And you know that he

10   discharged those guns, that he shot those guns because you've

11   seen evidence about two of those shootings throughout this

12   week.  It's on tape.  You saw it with your own eyes.  You heard

13   testimony about it and you also saw ballistics evidence and

14   medical records.

15           So let's turn to Count Four the very last count for

16   you to consider in this case.  Let's make this one very, very

17   simple, ladies and gentlemen.  This photograph right here with

18   Polk shooting Euro with that .40 caliber gun makes Polk guilty

19   of Count Four.  That's it.  That's all there is to it.  The

20   elements of Count Four are very straightforward.

21           First, Polk was briefly convicted of a crime

22   punishable by imprisonment for a term exceeding one year.

23           Second, that on or about July 25, 2015, Polk knowingly

24   possessed ammunition.

25           And third, that Polk's possession of that ammunition

1  was in or affecting interstate or foreign commerce.

2          Ladies and gentlemen, the parties have stipulated to

3  the first element.  So that's not even in dispute.

4          Ladies and gentlemen, the parties have also stipulated

5  that the ammunition recovered on the morning of the shooting

6  was not manufactured in New York.

7          I expect that Judge Daniels will instruct you that

8  ammunition that came from any other country or state to New

9  York has traveled in interstate commerce.  So that's already

10 two out of the three elements.  So the only thing at issue here

11 is whether Polk is the one who possessed this ammunition here.

12 And you already know the answer to that.  We've talked about

13 that at length.  Polk possessed that ammunition because Polk

14 fired those bullets at Euro.  That is the ammunition that came

15 from the .40 caliber gun that he fired at Euro.

16         How do you know that that ammunition came from Polk's

17 gun?

18         First, you saw him fire that gun on the video and

19 we've talked about all the ways you know that Polk is the one

20 who is the shooter on that video.

21         Second, you saw the shell casings that were recovered

22 from the location of that shooting at 1055 University Avenue.

23         And you saw exactly where they were found right there

24 right next to that ice freezer, right where you would expect

25 them to be found right where Polk had shot Euro that same day

1    that those shell casings were found.  And you also know that

2    they all came from the same gun and that they were all .40

3    caliber bullets.  So this charge is easy, ladies and gentlemen.

4    You know that Polk was the shooter and you know that these .40

5    caliber shell casings came from that same gun that Polk used to

6    fire at Euro.  Polk is guilty of Count Four.

7            Ladies and gentlemen, this is not a close case.  You

8    have seen videos of Polk's crimes.  You have heard Polk's words

9    on tape.  You have seen the crack cocaine that was recovered

10   from right next to Polk's bed and you have heard from a

11   cooperating witness who is on the inside of this crew and

12   committed crimes right alongside Polk who was right there the

13   same night that Polk shot Euro.  You've heard from law

14   enforcement witnesses.  You've heard from the victims of one of

15   Polk's senseless acts of violence.  Polk was a part of a drug

16   crew.  It was a crew that fiercely protected its turf that sold

17   drugs, that sold crack cocaine to the Highbridge public housing

18   community, that engaged in shootings in order to protect that

19   territory.  And Polk was a very important member of that crew

20   because he was someone who was willing to shoot to protect that

21   territory.  The evidence in this trial has proved

22   overwhelmingly that Polk is guilty as charged.

23           THE COURT:  Ladies and gentlemen, before we continue I

24   am going to give you a short ten-minute break.  Don't discuss

25   the case keep and open mind until I finally give you the case.

1          (Jury not present)

2          (Continued on next page)

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

 1                  (In open court; jury not present)

 2                  THE COURT:  Mr. Lind, are you ready to proceed?

 3                  MR. LIND:  Yes.  May I make a request of the Court?

 4                  THE COURT:  Yes.

 5                  MR. LIND:  I am looking for a portion of the

 6      transcript from yesterday.

 7                  THE COURT:  You want a transcript from yesterday?

 8                  MR. LIND:  Yes, Judge.

 9                  THE COURT:  Yes.

10                  MR. LIND:  Thank you very much, Judge.

11                  THE COURT:  Let's get the jury.

12                  (In open court; jury present)

13                  THE COURT:  You can be seated, ladies and gentlemen.

14                  MR. LIND:  May I proceed?

15                  THE COURT:  Yes.

16                  MR. LIND:  Thank you.

17                  Good morning, ladies and gentlemen.

18                  A couple things which were noticeably absent from the

19      government's summation this morning, this issue of burden of

20      proof beyond a reasonable doubt.  If this were a civil case

21      where we would have to go 50/50, that would be one story; but

22      this is a criminal case where the burden of proof is beyond a

23      reasonable doubt.  The Judge will instruct you about reasonable

24      doubt.  It is a doubt obviously founded on reason and arises

25      out of the evidence or lack of evidence.  Burden of proof

1    beyond a reasonable doubt must be so convincing that a person
2    like you, each of you, would not hesitate to rely on it in
3    important affairs of your own life.
4              Now, I submit to you that, but obviously it is your
5    decision that counts, that the government has failed in a
6    number of respects and I will go through them.  The government
7    has talked about all these guns that Mr. Polk has.  First of
8    all, I would like to start out with the one in the car.
9    Remember, the incident in the car with these two other men.
10   You heard testimony from the government's own expert that his
11   DNA isn't on that gun.  The DNA of the other two occupants of
12   the car do have their DNA on it.  The government I think sort
13   of intimated during the testimony, Well, they may have made it
14   cleaner or something like that.
15             The government's own exhibit shows that Mr. Polk
16   didn't know anything about that.  This is Government
17   Exhibit 807 T, the transcript of a conversation between Mr.
18   Polk and an unknown male on September 7th, 2015.  Mr. Polk
19   says, "Dumb ass nigger.  Dumb ass nigger."  Now, Mr. Polk is
20   not Cary Grant.  He is not using the most sophisticated
21   language in the world, but that shouldn't be a basis for you to
22   find him guilty.
23             "Dumb ass nigger has a basketball on him."  Now, we
24   have heard what a basketball may mean, which is a gun.  "And he
25   didn't ever tell me, B.  In my car he had it.  I said, 'What?'"

1   Is that enough to show you he didn't know that?  If the DNA is

2   not enough to show you that he didn't know that gun was in the

3   car, I submit this puts it over that issue.

4            Let's go to the Anderson Avenue situation.  The

5   government had Mr. Williams testify about Anderson.  He

6   testified about a lot of stuff, but they had him testify about

7   the Anderson Avenue situation.  Noticeably he didn't testify --

8   he didn't ID him coming out of the car.  Think about that.  He

9   didn't ID him coming out of the car.  Reasonable doubt arises

10  out of the evidence or the lack of evidence.  He didn't ID him

11  coming out of the car.

12           Now, I am not disputing the DNA.  His hands are on the

13  gearshift.  His imprint, his DNA is on the gearshift; but that

14  was just one person that they talked about.  They didn't talk

15  about the 50 or hundreds of other people who could have had

16  their DNA on that gearshift.  He didn't testify that that was

17  that man.

18           Nor did the other person, Juan Rios.  He came to

19  court.  He didn't like coming to court.  No one is disputing

20  that.  The government didn't ask him -- and they have the

21  burden of proof -- Do you recognize that man?  Is he the man

22  who ran after you into that store?  Reasonable doubt arising

23  out of the lack of evidence.  Now, Williams claims that he gave

24  him all the details and this and that shortly after the event,

25  but you have to trust Williams's own account that that was the

1    source of where that information came from rather than as he

2    told the prosecutors he heard about it on TV.  He heard about

3    it on TV.

4            Now, let me go to the more troubling issue, which is

5    the one on University Avenue on July 25th, 2015.  There is an

6    issue where Mr. Williams does identify him.  Do you remember

7    that?  The government just went over that.  I asked him on

8    cross: -- I think it was yesterday.  Things go back so quickly.

9    "Q.  There was a gun that was used allegedly by Mr. Polk on

10   University Avenue.

11   "A.  Yes, sir."

12           Notably in their summation from what I recall, they

13   kept saying a .40 gun.  They didn't say it was a .40 Glock.  Do

14   you remember that?  So I asked this question:

15   "Q.  There was a gun that was used allegedly by Mr. Polk on

16   University Avenue?

17   "A.  Yes, sir.

18   "Q.  You told us on Tuesday that it was a Glock .40?

19   "A.  Yes, sir."

20           Do you remember that?

21           The government's expert, who has testified 320 times

22   as an expert, remember, I was questioning him about the firing

23   pin?  I don't remember if you remember this from yesterday if

24   you don't mind.

25   "Q.  So you determined that this was shot out of a weapon with

I9d6pol3                    Summation - Mr. Lind

1   a hemispherical firing pin;" --

2              Do you remember this at all?

3              -- "is that correct?

4   "A.   That is correct.

5   "Q.   A Glock does not have a hemispherical firing pen; does it?

6   "A.   They have an elliptical firing pin."

7              Now, what does that mean?  What was I trying to get

8   at?  Because the casings had an impression on the back of them,

9   which would show what type of firearm hit that casing, and it

10  wasn't a Glock.  There was a little bit of back and forth.

11             Now, ladies and gentlemen, I also told to you and the

12  government has invited you to look at this film.  Look at the

13  film of Mr. Polk driving in that car with the two other

14  gentleman.  Remember, he has two tattoos on his arms.  Very

15  pronounced tattoos on his arm.  Look at the video from

16  University Avenue and see if that matches.

17             Now, I want to go now to talk about this drug

18  conspiracy, which is really part and parcel of the issue in

19  Count One.  Mr. Williams testified that there was no

20  partnership between him and Mr. Polk.  Do you remember?  I

21  asked him about that.  He said he sold him stuff.  Yeah, he

22  sold him stuff; but that doesn't make that person a partner or

23  a coconspirator of you.  Williams was buying stuff and selling

24  stuff for himself, not for Mr. Polk.

25             Now, also you have got to remember in Mr. Williams'

1    testimony that he may have a motivation to lie in order to get

2    out of jail.  That is a motivation, ladies and gentlemen.  He

3    told you, I have done all this bad stuff, and I will go into it

4    in a minute, and I want to get time-served.  Here is a man who

5    has shot at people, killed people and tried to kill people with

6    his guns.

7            Every time a court like Judge Daniels would give him a

8    break -- remember these breaks he got when he got out on

9    supervised release?  Each time he would get out, he would

10   resume drug-dealing, resume using crack and other drugs and

11   then be rounded up again.  Finally, it got to the point in 2016

12   when he was arrested.  He was arrested with other guys from the

13   Highbridge area, not Mr. Polk or none of these other people you

14   have heard about like Smith and these other people.  He was

15   charged with selling drugs, for using weapons and intimidating

16   a witness in connection with that case.  None of these other

17   people who he was supposedly in a partnership, a conspiracy

18   with were charged in that case.  Only Williams.

19           Now, the government's witness told you it couldn't

20   have been a Glock, but Williams told you it was a Glock.  Who

21   do you believe in a situation like that?  That was part of the

22   picture he tried to present to prove that Mr. Polk was guilty

23   of that shooting.

24           Now, what I would like to go through briefly some of

25   the crimes that Mr. Williams has been involved with.  First of

I9d6pol3                    Summation - Mr. Lind

all, he was involved in a shooting that year, 1996.  Around six

years later he was involved in another shooting at 1055

University Avenue.  A few years later he was involved in

another crime at 1055 University Avenue.  In 2007 another

shooting.  In 2009 another shooting.  These shootings were

intended not to scare people.  They were intended to kill them.

These are crimes that the government itself brought up.

          And then one of the shootings -- I don't know if you

remember this -- was because of some hideous thing that someone

did.  You know what they did?  They hit my friend's mom in the

face with a cake, and that gave him license to try to shoot to

kill those people.  That is the kind of guy Williams is.  And

then the summer of 2015 he also used to commit an assault on

another person.  Those are just the arrests.

          On my cross-examination I brought up all of the crimes

that he was actually convicted for.  The government made a big

deal in their presentation with Mr. Williams that of all the

cases in which he was arrested, but they did not make any deal

about the convictions that he actually had.

          Now, I want to go first very briefly to the testimony

about narcotics, Count One, which is corroboration.  A lot of

the other crimes that may have had some corroboration for,

there is absolutely no corroboration for the drug-dealing, the

amount drugs.  There are no videos.  There are no photos.

Aside from Williams, there is no testimony from anyone about

1    this alleged drug conspiracy that my client was involved in.

2    Oh, I saw him.  There is nothing to corroborate.

3           There is not enough to convict Tyrell Polk of a

4    conspiracy to sell crack, much less 280 grams of crack.  He

5    told you that he sold Mr. Polk 60 to 100 grams of crack during

6    the space of a year and a half that Mr. Polk was out.  Where is

7    the proof even of that other than his testimony?  That is his

8    testimony.  Not corroborated.

9           In fact, it was brought out he was charged in another

10   indictment and he was charged in that case with narcotics

11   dealing with a completely different set of people.  Do you

12   remember this in 2016?  He pled guilty to that.  Narcotics

13   dealing with a completely different set of people during the

14   same time period as this case.  Those are the people that

15   became involved with him, not Terrell Polk.

16          So I have talked about the guns.  I told you that an

17   essential element here is that the Glock that he was mentioning

18   was in fact the gun that was used that day.  He would know

19   everything.  He would know that it was a Glock because he

20   testified that that was the gun that he brought.  That was the

21   gun that he used.

22          Also there is also a prison tape about, remember, once

23   again about a basketball being in a safe.  Do you remember this

24   supposedly with the drugs?  The Probation officers came,

25   remember this, in early 2017.  They went to Mr. Polk's

1    apartment and they did a search.  They found some crack.  They

2    looked in the safe because they were looking for a gun in the

3    safe.  There was no gun in the safe.  There was crack, ladies

4    and gentlemen, but there was no gun in the safe.

5            I want to go very briefly with the crimes that he

6    committed.  Each one of these crimes he wanted to kill someone

7    or virtually all of these crimes he wanted to kill someone.

8    There was one in '97.  There was in 2007.  There were a series

9    of crimes of violence that he was engaged in.  This is the man

10   that wants to get out of jail, who wants to get time-served.

11           Folks, I am about to conclude.  Each of you were

12   selected because apparently you have common sense and this is

13   an important moment, an important day for Mr. Williams and his

14   family.  I am not looking for sympathy here.  I have no right

15   to do that, but I am looking to each of you for justice.  If

16   you have any doubts, ladies and gentlemen -- I submit there are

17   substantial doubts -- you should have them now not after this

18   case.  There is no second chance for Terrell Polk.  You should

19   consider not only the evidence but the lack of evidence in this

20   case.  When you do, I believe you will feel that there are

21   reasons to doubt the government's proof.

22           Thank you.

23           THE COURT:  Any further rebuttal by the government?

24           MR. KROUSE:  Yes, your Honor.  Thank you.

25           Ladies and gentlemen, I will be quick.  I am not going

1    to get up here and go over everything that Mr. Folly already

2    told you.  I know that you have been sitting here patiently

3    listening to all the evidence and paying close attention and we

4    thank you for that.  I am sure you are anxious to get to your

5    deliberations.

6           Mr. Lind just made a lot of different arguments to

7    you, and I just want to address a couple of them.  Now, to be

8    completely clear the defense has no burden in this case.  The

9    burden is with the government, and we embrace that burden.  It

10   is always with the government.  Here, the government has met

11   its burden to prove this case beyond a reasonable doubt.

12          Mr. Lind started by focusing on that burden, on the

13   proof beyond a reasonable doubt.  I want to dispel any mystery.

14   There is nothing magical about proof beyond a reasonable doubt.

15   That is the burden that is applied in every single criminal

16   case in every courthouse in the United States and it has been

17   throughout our history.  The question is whether there is any

18   reasonable doubt.  When you look at all the evidence, has the

19   government proven its case beyond a reasonable doubt?  Here, we

20   have.

21          Mr. Lind talked first about the gun that was in the

22   car.  I just want to make sure there is no confusion about the

23   guns are in the case.  The testimony that you heard is that the

24   crew at issue, the conspiracy, shared five guns.  There is a

25   .40 gun and a 9-millimeter gun, both of which are pistols; a

revolver; a sawed-off shotgun; and an assault rifle.  The first
gun used in the first shooting, that is .40 gun and that is why
there were .40 shell casings recovered at the scene.  The
second gun that was used in second shooting is a sawed-off
shotgun.  That is why there were pellets that were recovered at
scene because it was from a shotgun blast.  The third gun that
was recovered in the car three weeks after the second shooting,
the car that Terrell Polk was driving, that is a 9-millimeter.
That is a completely different gun from the two shootings.

        The guns used in the shooting were never presented to
you in evidence.  So don't distracted by the DNA evidence about
that third gun.  The government is an open book.  We have told
you there is no DNA from Terrell Polk on that gun.  That
doesn't mean he never handled it.  You heard the testimony of
Ms. Nelson the variety of reasons why someone's DNA may not be
on it.  Someone might have held it a month ago and two weeks
ago and it might have wiped off.  It might not have gotten on
there in the first place.  No one is saying his DNA is on the
gun and it doesn't matter for all the charges in this case.

        The guns that were used in the shootings were the .40
gun and the shotgun.  This third gun is just another gun, a
9-millimeter gun that the crew used and that the crew had with
them in that car and you heard testimony that gun didn't just
magically appear there.  The other two occupants of the car,
their DNA was on that gun.  That corroborates Mr. Williams when

1   he says that everybody in this conspiracy shared guns
2   constantly.
3           Mr. Lind made much about the ballistics, just to stick
4   with the gunpoint on the .40 shell casing.  Pay attention to
5   the transcript that Mr. Lind cited to you.  Those are not
6   Cicero Williams's words.  Those are Mr. Lind's words.  He said,
7   .40 Glock?  And Mr. Williams said, Yes.  In his own testimony
8   when the government asked what kind of gun was it, Mr. Williams
9   answer was a .40 pistol.  Glock came from Mr. Lind and Mr. Lind
10  put that in there or it is in there and now he is arguing from
11  it.  The significance is that a Glock has this hemispherical
12  firing pin versus an elliptical firing pin.
13          Mr. Williams never said anything about a Glock on his
14  direct testimony.  His testimony was that it was a .40 pistol.
15  you know that testimony was correct because the three shell
16  casings that were recovered from the scene of that shooting
17  were from a .40 pistol.  It was from the same .40 pistol.
18          On the DNA point that Mr. Lind raised, I touched on
19  this briefly about the DNA on the gun and how irrelevant that
20  is to any of the shootings here and in any of the major conduct
21  that the government has proven.  You know what DNA evidence is
22  relevant to the shooting?  It is that Mr. Polk's DNA was a
23  perfect match for the car that was used for both shootings and
24  the DNA was on the gearshift of the car.  You know who touches
25  the gearshift of the car?  The person who is driving the car.

1    The person who needs to change the gears.

2          You heard the testimony.  There was one DNA profile on

3    that gearshift.  One major donor.  This whole argument that the

4    government didn't test any of these other people is irrelevant.

5    There was one profile.  The question was whose DNA was that

6    profile.  Whose DNA matched that profile.  The testimony you

7    heard is that Terrell Polk's DNA was the perfect match for that

8    profile.  That is his DNA on the gearshift.  He is the person

9    driving the car and the car is at both shootings and the person

10   who committed both shootings was the driver.

11         You it see it on the video.  The driver gets out of

12   the car on July 25th with a .40 gun and shoots Euro.  The

13   driver gets out of the car on August 4th with a sawed-off

14   shotgun and chases two people into a store and blasts through

15   that door shiting Ryan and Juan Rios.  So the only DNA that

16   matters in this case is the DNA that is a perfect match for

17   Terrell Polk on the car that is used in both shootings.

18         Mr. Lind talks about it the drug conspiracy and acts

19   like all the members had to get together and sign a contract to

20   join into this conspiracy.  This is not an LLP.  They are not

21   incorporating a business out here.  They are coming together to

22   commit crimes.  That would be ridiculous.  What they are doing

23   is banding together because dealing drugs is dangerous and you

24   have to have other people who have your back.

25         Mr. Williams explained that to you.  It is dangerous.

I9d6pol3                    Summation - Mr. Lind

People want to come in, take your territory, take your money.
You have to be able to defend yourself.  You need guns for that
and you need other people who are willing to shoot for you, to
back you up, to send you customers, to supply you when your
supplier doesn't have anymore drugs and you are out.  They are
working together.

          That is all the law requires.  They agreed together to
work together.  You don't need a record.  The government
doesn't need to admit into evidence a signed contract with all
the members.  That is not what the law requires.  What it
requires is what you have heard, which is that this group came
together to sell drugs and they did all these things to help
each other -- steering, supplying sharing guns.  When the
rubber hit the road, when it got dangerous, when there was a
dispute, they took those guns and they used them to threaten
people and to shoot at people.  That is a criminal conspiracy.
It's a conspiracy to deal drugs, which is what Mr. Polk is
charged with.

          Now, Mr. Lind also mentioned tattoos.  He mentioned
that on cross-examination.  He did that in his closing as well.
Mr. Polk has tattoos on his arm.  Use your common sense.  The
video that Mr. Lind is talking about from the first shooting is
in the middle of the night.  It is midnight.  It is dark
outside.  Mr. Polk is a distance from the camera.  You can't
even get a good look at the person's arms.  Of course you

I9d6pol3                    Summation - Mr. Lind

cannot distinguish something as detailed and as fine as a

tattoo.  On that one I will leave it at that.  Use your common

sense.  You are not going to see identifying details like a

tattoo on a video like that.

Finally, Mr. Lind spend a lot of time attacking

Mr. Williams, and he has to do that.  Mr. Williams's is

evidence against his client is absolutely devastating.  He is

an eyewitness to the shooting.  So of course Mr. Lind is going

to spend a lot of time trying to distract you from the real

evidence in this case and to try to throw enough mud at Cicero

Williams that you decide not to listen to his testimony.

Ladies and gentlemen, Mr. Williams is not on trial

here.  Mr. Polk is.  The question is not whether you like

Mr. Williams or approve of his conduct.  We're not asking you

to be friends with Mr. Williams.  The question is what the

evidence shows in this case and whether it proves beyond a

reasonable doubt that Mr. Polk committed the four offenses that

he is charged with.  And the answer to that question, which is

the only question that is before you, is yes.

Because Mr. Lind spent so much on Mr. Williams I will

say a few things.  Now, keep in mind the judge is going to

instruct you on this, but you, the jury, you are the ultimate

deciders on whether Mr. Williams told you the truth.  You are

the deciders of his credibility and so pay attention to his

demeanor.  You were here.  You watched it.  He took an oath to

tell the truth and he testified before you.  You can tell from
his demeanor he was not thrilled to do it.  He didn't want to
get up here and tell the truth about the crimes that one of his
best friends had committed that he had known since they were
young.  It is his cooperation agreement that requires it.  It
required him to tell the truth about the crimes that he
committed that he participated in with others and that he
witnessed.

          Mr. Williams told you that his understanding of the
cooperation agreement was that if he lied that cooperation
agreement would get ripped up.  Mr. Lind talked about
Mr. Williams's incentives a lot.  His only incentive is to tell
the truth.  How do you know Mr. Williams did that?  You know
that because his testimony is corroborated by all of the other
independent evidence in this case.  Mr. Williams may be a lot
of things, but he is not a magician.

          He cannot conjure up evidence out of thin air.  He
cannot tell you about a shooting that happened and then there
is a video that corroborates the exact details of that
shooting.  He cannot tell that you Mr. Polk pointed the gun,
pulled trigger and it didn't fire and he looked over to the car
and then Mr. Williams said, Cock it back, and he cocked it back
and started firing and have that magically appear on the video
exactly as he described it.  He cannot tell you that Corbett
went back on his bike to pick up shell casings and came back

1    with two of them and have that show up on the video that he is

2    riding up on a bike, Corbett, bending down and picking up two

3    shell casings.

4          He cannot describe the second shooting in great

5    detail.  How it was one gunshot, how they chased them into the

6    back room, how they used a shotgun and have that corroborated

7    by the medical records, the video and the ballistics and where

8    the lead balls were recovered.  If Mr. Williams was such a

9    liar, why wouldn't he say that he was there at that shooting or

10   he was a passenger in the Camry when Mr. Polk saw Ryan run into

11   the store?  Because that is not the truth.  The truth is that

12   Mr. Polk told Mr. Williams about it after the shooting

13         Mr. Williams can't describe how Euro was shot because

14   he was a marijuana dealer at 1055 and then when Euro goes to

15   the hospital for treatment, he is found with bags of marijuana.

16   Mr. Williams did not plant those bags of marijuana on Euro.

17   Mr. Williams cannot describe how a woman named Dee Dee rented a

18   Toyota Camry from Florida with Florida plates and brought it up

19   to the Bronx and let Terrell Polk drive it and it magically

20   turns out that the record shows a woman named Delisa Harris who

21   looks just like Dee Dee went down to Florida, rented a car with

22   those same plates and brought it back to the Bronx and had that

23   car recovered in the Bronx.

24         He cannot describe how the Camry was used by Polk at

25   two shootings and then when the Camry is recovered, Polk's DNA

1    is on the gearshift.  Mr. Williams did not plant that DNA

2    there.  When you think about whether Mr. Williams told you the

3    truth, think about how all of his testimony is corroborated by

4    the independent evidence.  It is not some amazing coincidence

5    that Mr. Williams's testimony lines up with all the other

6    independent evidence.  That is what happens when you tell the

7    truth.

8          Now, little details tell you everything you need to

9    know.  Why would Mr. Williams say he told Terrell Polk to cock

10   the gun back?  Why would he implicate himself in the shooting?

11   Because he was there and because he said that.  He told

12   Mr. Polk to cock the gun back and Mr. Polk did it and then shot

13   Euro.

14         The truth is the defense wants to have it both ways.

15   They want you to believe Mr. Williams when he says that he

16   committed all these crimes -- that he shot someone because

17   someone smashed a cake into his friend's mom's face, that he

18   used a Glock 40, which isn't even if the words that Cicero

19   Williams used.  They want you to believe Mr. Williams when he

20   says that; but when he says that he personally witnessed

21   Terrell Polk pull out a .40 gun and shoot Euro, suddenly they

22   don't want you to listen to anything that Mr. Williams has to

23   say.  It doesn't work that way.

24         I am about to sit down.  You now have heard all of the

25   evidence in this case.  You know the four charges Mr. Polk

1    faces.  You know that Mr. Polk in a 10-day period shot three

2    people in two separate incidents.  You know that he pulled out

3    a .40 gun and fired five shots and you heard in this case

4    bullets don't have a name on them.  When Mr. Polk fired those

5    five shots, he didn't know where they were going to go.  This

6    is a residential community.

7         You heard testimony at least one of those shots hit

8    Mr. Cropper, Euro, right in the knee.  You heard that Mr. Polk

9    chased two men into a store with a sawed-off shut gun, an

10   extremely dangerous weapon, fired a shotgun blast through that

11   door and hit two people, including a person who had nothing do

12   with anything and who was just in the wrong place at the wrong

13   time.

14        The government has proven Terrell Polk's guilt beyond

15   a reasonable doubt and we ask that you return the only verdict

16   that is consistent with the evidence, the law, and your own

17   common sense, that Terrell Polk is guilty.

18        THE COURT:  Ladies and gentlemen, this is what we're

19   going to do.  Your lunch has arrived.  We'll take a short lunch

20   break.  And then I will instruct you on the law and have you

21   begin your deliberations.  So I am going to let you go ahead

22   and eat your lunch.  You don't have to stay in the jury room.

23        I am going to bring you back out by 1:20 and then I

24   will give you instructions on the law.  My instructions might

25   take about 45 or 50 minutes.  So I will give you the

I9d6pol3                          Summation - Mr. Lind

1    instructions on the law and have you begin your deliberations.

2                Don't discuss the case.  Keep an open mind.  Have

3    lunch and then I will see you at 1:20 and I will give you

4    instructions.

5                (Jury excused)

6                (In open court; jury not present)

7                THE COURT:  We'll continue promptly at 1:20.

8                (Luncheon recess)

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

I9DAAPOL4                    Jury Charge

AFTERNOON SESSION

1:20 p.m.

THE COURT:  Ladies and gentlemen, you are about to
enter your final duty, which is to decide the fact issues in
the case.  Before you do that, I will instruct you on the law.

I told you at the very start of the trial that your
principal function during the taking of testimony would be to
listen carefully and observe each witness who testified. it has
been obvious to me and to counsel that you have faithfully
discharged this duty.  It is evident that you followed the
testimony with close attention.  I ask you to give me that same
careful attention, as i instruct you on the law.  Role of the
court you have now heard all of the evidence in the case as
well as the final arguments of the lawyers for the parties.  My
duty at this point is to instruct you as to the law. it is your
duty to accept these instructions of law and apply them to the
facts as you determine them, just as it has been my duty to
preside over the trial and decide what testimony and evidence
is relevant under the law for your consideration.

On these legal matters, you must take the law as I
give it to you. if any attorney has stated a legal principle
different from any that i state to you in my instructions, it
is my instructions that you must follow.

You should not single out any instruction as alone
stating the law, but you should consider my instructions as a

1   whole when you retire to deliberate in the jury room.  You

2   should not, any of you, be concerned about the wisdom of any

3   rule that i state. regardless of any opinion that you may have

4   as to what the law may be or ought to be it would violate your

5   sworn duty to base a verdict upon any other view of the law

6   than that which i give you.  Role of the jury your final role

7   is to pass upon and decide the fact issues that are in the

8   case.  You, the members of the jury, are the sole and exclusive

9   judges of the facts.  You pass upon the weight of the evidence;

10  you determine the credibility of the witnesses; you resolve

11  such conflicts as there may be in the testimony, and you draw

12  whatever reasonable inferences you decide to draw from the

13  facts as you have determined them.  I shall later discuss with

14  you how to pass upon the credibility or believability of the

15  witnesses.

16          In determining the facts, you must rely upon your own

17  recollection of the evidence, what the lawyers have said in

18  their opening statements, in their closing arguments, in their

19  objections, or in their questions is not evidence. in this

20  connection, you should bear in mind that a question put to a

21  witness is never evidence. it is only the answer which is

22  evidence. but you may not consider any answer that i directed

23  you to disregard or that I directed struck from the record. do

24  not consider such answers.  Nor is anything i may have said

25  during the trial or may say during these instructions to be

1   taken in substitution for your own independent recollection.
2   what I say is not evidence.
3          The evidence before you consists of the answers given
4   by witnesses, the sworn testimony they gave, as you recall it
5   and the exhibits that were received in evidence and the
6   stipulations of the parties.  A stipulation is an agreement
7   among the parties that a certain fact is true or that if a
8   certain witness were called, he or she would give certain
9   testimony, you should regard any agreed facts as true.
10          Since you are the sole and exclusive judges of the
11  facts, I do not mean to indicate any opinion as to the facts or
12  what your verdict should be.  The rulings I have made during
13  the trial are not any indication of my views of what your
14  decision should be as to whether or not the guilt of the
15  defendant has been proven beyond a reasonable doubt.  Testimony
16  and exhibits in general.
17          Exhibits which have been marked for identification but
18  not received may not be considered by you as evidence.  Only
19  those exhibits admitted into evidence may be received in the
20  jury room during your deliberations.
21          Anything you may have seen or heard about this case
22  outside the courtroom is not evidence and must be entirely
23  disregarded.  You should consider the evidence in light of your
24  own common sense and experience.
25          Let me again emphasize that a lawyer's question is not

evidence.  At times, a lawyer may have incorporated into a

question a statement which assumed certain facts to be true and

asked the witnesses if the statement was true.  If the witness

denies the truth of a statement and if there is no evidence in

the record proving that the assumed fact is true, then you may

not consider the fact to be true simply because it was

contained in the lawyer's question.  For example, if a witness

was asked the question, "Do you have a red automobile?", you

would not be permitted to consider as true the assumed fact

that the witness owns an automobile, unless the witness

indicates that he or she does, or unless there is some other

evidence in the record that the witness owns an automobile.  In

short, questions are not evidence; answers are.  Juror

obligations in determining the facts, the jury is reminded that

before each member was accepted and sworn to act as a juror he

or she was asked questions concerning competency,

qualifications, fairness and freedom from prejudice and bias.

on the faith of those answers, the juror was accepted by the

parties. therefore, those answers are as binding on each of the

jurors now as they were then, and should remain so, until the

jury is discharged from consideration of this case.  The

government as a party you are to perform the duty of finding

the facts without bias or prejudice as to any party.  You are

to perform your final duty in an attitude of complete fairness

and impartiality.  The case is important to the government, for

1   the enforcement of criminal laws is a matter of prime concern

2   to the community.  Equally, it is important to the defendant,

3   who is charged with serious crimes.  The fact that the

4   prosecution is brought in the name of the United States of

5   America entitles the government to no greater consideration

6   than that accorded to any other party to a litigation.  By the

7   same token, it is entitled to no less consideration.  In this

8   regard, all parties, whether government or individuals, stand

9   as equals at the bar of justice.  Improper considerations:

10  race, religion, national origin, sex or age your verdict must

11  be based solely upon the evidence developed at trial or the

12  lack of evidence.  It would be improper for you to consider, in

13  reaching your decision as to whether the government sustained

14  its burden of proof, any personal feelings you may have about

15  the defendant's race, religion, national origin, sex, or age.

16  All persons are entitled to the presumption of innocence and

17  the government has the burden of proof, as I will discuss in a

18  moment.  It would be equally improper for you to allow any

19  feelings you might have about the nature of the crimes charged

20  to interfere with your decision making process.

21          To repeat, your verdict must be based exclusively upon

22  the evidence or the lack of evidence in the, case.  Sympathy

23  under your oath as jurors you are not to be swayed by sympathy.

24  You are to be guided solely by the evidence in this case.  The

25  crucial, hard-core question that you must ask yourselves as you

1    sift through the evidence is: has the government proven the

2    guilt of the defendant beyond a reasonable doubt?

3            It is for you alone to decide whether the government

4    has proven that the defendant is guilty of the crimes charged

5    solely on the basis of the evidence and subject to the law as I

6    charge you.  It must be clear to you that once you let fear or

7    prejudice, or bias or sympathy interfere with your thinking

8    there is a risk that you will not arrive at a true and just

9    verdict.

10           If you have a reasonable doubt as to a defendant's

11   guilt, you should not hesitate for any reason to find a verdict

12   of not guilty.  But on the other hand, if you should find that

13   the government has met its burden of proving the defendant's

14   guilt beyond a reasonable doubt, you should not hesitate

15   because of sympathy or any other reason to render a verdict of

16   guilty.  Conduct of counsel it is the duty of the attorney for

17   each side of a case to object when the other side offers

18   testimony or other evidence which the attorney believes is not

19   properly admissible.  Counsel also have the right and duty to

20   ask the Court to make rulings of law and to request conferences

21   at the side bar out of the hearing of the jury.  All those

22   questions of law must be decided by me, the Court.  You should

23   not show any prejudice against an attorney or his client

24   because the attorney objected to the admissibility of evidence,

25   or asked for a conference out of the hearing of the jury or

1    asked the Court for a ruling on the law.  As I already

2    indicated, my rulings on the admissibility of evidence do not

3    indicate any opinion about the weight or effect of such

4    evidence.  You are the sole judges of the credibility of all

5    witnesses and the weight and effect of all evidence.

6            You do not have to accept the testimony of any witness

7    who has not been contradicted or impeached, if you find the

8    witness not to be credible.  You also have to decide which

9    witnesses to believe and which facts are true.  To do this you

10   must look at all the evidence, drawing upon your own common

11   sense and personal experience.

12           In a moment, I will discuss the criteria for

13   evaluating credibility.  For the moment, however, you should

14   keep in mind that the burden of proof is always on the

15   government and the defendant is not required to call any

16   witnesses or offer any evidence, since he is presumed to be

17   innocent.

18           There are two types of evidence which you may properly

19   use in deciding whether a defendant is guilty or not guilty.

20   One type of evidence is called direct evidence.  Direct

21   evidence is where a witness testifies to what he saw, heard or

22   observed.  In other words, when a witness testified about what

23   is known to him of his own knowledge by virtue of his own

24   senses, what he sees, feels, touches or hears.  That is called

25   direct evidence.

1          Circumstantial evidence is evidence which tends to

2     prove a disputed fact by proof of other facts.  There is a

3     simple example of circumstantial evidence which is often used

4     in this courthouse.

5          Assume that when you came into the courthouse this

6     morning the sun was shining and it was a nice day.  Assume that

7     the courtroom blinds were drawn and you could not look outside.

8     As you were sitting here, someone walked in with an umbrella

9     which was dripping wet.  Somebody else then walked in with a

10    raincoat which also was dripping wet.

11         Now, you cannot look outside of the courtroom and you

12    cannot see whether or not it is raining, so you have no direct

13    evidence of that fact but on the combination of facts which I

14    have asked you to assume, it would be reasonable and logical

15    for you to conclude that it had been raining.  That is all

16    there is to circumstantial evidence.  You infer on the basis of

17    reason and experience and common sense from an established

18    fact the existence or the nonexistence of some other fact.

19         Circumstantial evidence is of no less value than

20    direct evidence.  It is a general rule that the law makes no

21    distinction between direct and circumstantial evidence, but

22    simply requires that before convicting a defendant, the jury

23    must be satisfied of the defendant's guilt beyond a reasonable

24    doubt from all of the evidence in the case.

25         During the trial the attorneys have asked you to infer

1    on the basis of your reason, experience and common sense, from

2    one or more established facts, the existence of some other

3    facts.  An inference is not a suspicion or a guess.  It is a

4    reasoned, logical decision to conclude that a disputed fact

5    exists on the basis of another fact which you know exists.

6    There are times when different inferences may be drawn from

7    facts, whether proved by direct or circumstantial evidence.

8    The government asks you to draw one set of inferences, while

9    the defense asks you to draw another.  It is for you and you

10   alone, to decide what inferences you will draw.  The process of

11   drawing inferences from facts in evidence is not a matter of

12   guesswork or speculation.  An inference is a deduction or

13   conclusion which you, the jury, are permitted to draw but not

14   required to draw from the facts which have been established by

15   either direct or circumstantial evidence.

16         In drawing inferences, you should exercise your common

17   sense.  So while you are considering the evidence presented to

18   you, you are permitted to draw, from the facts which you find

19   to be proven, such reasonable inferences as would be justified

20   in light of your experience.

21         Here again, let me remind you that whether based upon

22   direct or circumstantial evidence or upon the logical

23   reasonable inferences drawn from such evidence, you must be

24   satisfied of the guilt of the defendant beyond a reasonable

25   doubt before you may convict.

1              You have had an opportunity to observe all of the

2      witnesses.  It is now your job to decide how believable each

3      witness was in his or her testimony.  You are the sole judges

4      of the credibility of each witness and of the importance of his

5      or her testimony.  You will now have to decide where the truth

6      lies.  An important part of that decision will involve making

7      judgments about the testimony of the witnesses you have

8      listened to and observed.  In making those judgments, you

9      should carefully scrutinize all of the testimony of each

10     witness, the circumstances under which each witness testified

11     and any other matter in evidence which may help you to decide

12     the truth and the importance of each witness' testimony.

13              Your decision whether or not to believe a witness may

14     depend on how that witness impressed you.  Was the witness

15     candid, frank and forthright?  Or, did the witness seem as if

16     he or she was hiding something, being evasive or suspect in

17     some way?  How did the way the witness testified on direct

18     examination compare with the way the witness testified on

19     cross-examination?  Was the witness consistent in his testimony

20     or did he contradict himself?  Did the witness appear to know

21     what he or she was talking about and did the witness strike you

22     as someone who was trying to report his or her knowledge

23     accurately?  How much you choose to believe a witness may be

24     influenced by the witness' bias.  Does the witness have a

25     relationship with the government or the defendant which may

I9DAAPOL4                    Jury Charge

affect how he or she testified?  Does the witness have some

incentive, loyalty or motive that might cause him or her to

shade the truth?  Or does the witness have some bias, prejudice

or hostility that may have caused the witness consciously or

not to give you something other than a completely accurate

account of the facts he testified to?

        Even if the witness was impartial, you should consider

whether the witness had an opportunity to observe the facts he

or she testified about.  And you should also consider the

witness' ability to express himself or herself.  Ask yourselves

whether the witness' recollection of the facts stand up in

light of all other evidence.

        In other words, what you must try to do in deciding

credibility is to size a person up in light of his or her

demeanor, the explanations given, and in light of all the other

evidence in the case, just as you would in any important matter

where you are trying to decide if a person is truthful,

straightforward and accurate in his or her recollection.

        In deciding the question of credibility, remember that

you should use your common sense, your good judgment, and your

experience.  Interest in the outcome in evaluating credibility

of the witnesses, you should take into account any evidence

that the witness who testified may benefit in some way from the

outcome of this case.  Such an interest in the outcome creates

a motive to testify falsely and may sway the witness to testify

1    in a way that advances his own interests.  Therefore, if you

2    find that any witness whose testimony you are considering may

3    have an interest in the outcome of this trial, then you should

4    bear that factor in mind when evaluating the credibility of his

5    or her testimony and accept it with great care.

6          This is not to suggest that every witness who has an

7    interest in the outcome of a case will testify falsely.  It is

8    for you to decide to what extent, if at all, the witness

9    interest has affected or colored his or her testimony.

10         You have heard the testimony of law enforcement

11   officials.  The fact that a witness may be employed as a law

12   enforcement official does not mean that his or her testimony is

13   necessarily deserving of more or less consideration or greater

14   or lesser weight than that of an ordinary witness.  At the same

15   time, it is quite legitimate for defense counsel to attack the

16   credibility of a law enforcement witness on the grounds that

17   his or her testimony may be colored by a personal or

18   professional interest in the outcome of the case.

19         It is your decision, after reviewing all the evidence,

20   whether to accept the testimony of the law enforcement witness

21   and to give to that testimony whatever weight, if any, you find

22   it deserves.

23         You have heard testimony from a cooperating witness

24   who pled guilty to criminal charges against him.  The law

25   allows the use of cooperating witness testimony and such

 1    testimony is properly considered by the jury. the testimony of

 2    a cooperating witness may be enough in itself to support a

 3    conviction if the jury finds that the testimony established

 4    guilt beyond a reasonable doubt.  It is also the case that

 5    cooperating witness testimony must be scrutinized with great

 6    care and viewed with special caution.  A cooperating witness

 7    may be facing fairly long maximum sentences and hoping for a

 8    reduced sentence or to avoid prosecution.

 9              The decision of who will be prosecuted is a decision

10    solely within the discretion of the United States Attorney's

11    Office.  For a defendant who pleads guilty, the U.S. Attorney's

12    Office decides whether to submit a letter to the sentencing

13    court.  And the sentencing court, according to its own

14    determination, decides what sentence to ultimately impose.

15              Because of the possible interest a cooperating witness

16    may have in testifying, let me say a few things that you may

17    want to   consider during your deliberations on the subject of

18    cooperating witnesses.

19              The fact that a witness is testifying pursuant to a

20    cooperation agreement should be considered by you as bearing on

21    his or her credibility.  It does not follow, however, that

22    simply because a person has admitted participation in one or

23    more crimes, he or she is incapable of giving a truthful

24    version of what happened.  However, you should bear in mind

25    that a witness who has entered into such an agreement has an

1   interest in this case different than any ordinary witness.  A

2   witness who believes that he or she may be able to obtain their

3   own freedom or receive a lighter sentence by giving testimony

4   favorable to the U.S. Attorney, has a motive to testify

5   falsely.  Therefore, you must examine that testimony with

6   caution and weigh it with great care.  If, after scrutinizing

7   the testimony, you decide to accept it, you may give it

8   whatever weight, if any, you find it deserves.

9          The testimony of a government cooperating witness

10  should be given such weight as it deserves in light of the

11  facts and circumstances before you, taking into account the

12  witness's demeanor and candor, the strength and accuracy of his

13  or her recollection, his or her background, and the extent to

14  which his or her testimony is or is not corroborated by other

15  evidence in the case.  You should, of course, consider whether

16  the testimony was motivated by reward or self-interest.  You

17  should ask yourself whether the cooperating witnesses would

18  benefit more by lying or by telling the truth.  If you believe

19  the witness was motivated by personal gain, consider if the

20  motivation was one that would cause him or her to lie or was it

21  one that would cause him or her to tell the truth and if this

22  motivation colored the testimony.  Obviously, you should reject

23  the testimony if you find it was false.  If you are satisfied

24  that the testimony is true, you should accept it.  You may also

25  accept parts and reject parts of the cooperating witness's or

I9DAAPOL4                         Jury Charge

1    of any witness's, testimony.

2            One final note in this regard, it is of no concern of

3    yours why the U.S. Attorney made an agreement with this

4    witness.  Your sole concern is to decide whether the witness

5    has given truthful testimony in this case before you.  In sum,

6    you should look to all of the evidence in deciding what

7    credence and what weight, if any, you will give to a witness'

8    testimony.

9            In this case, I have permitted certain witnesses to

10   testify as expert witnesses and to express their opinions about

11   matters that are in issue.  An expert witness may be permitted

12   to testify to an opinion on those matters about which he or she

13   has special knowledge, skill, experience and training.  Such

14   testimony is presented to you on the theory that someone who is

15   experienced and knowledgeable in the field can assist you in

16   understanding the evidence or in reaching an independent

17   decision on the facts.

18           In weighing this opinion testimony, you may consider

19   the witness' qualifications, his or her opinions, the reasons

20   for testifying, as well as all of the other considerations that

21   ordinarily apply when you are deciding whether or not to

22   believe a witness' testimony.  You may give the expert

23   testimony whatever weight, if any, you find it deserves in

24   light of all the evidence in this case.  You should not,

25   however, accept the testimony of an expert witness merely

I9DAAPOL4                          Jury Charge

because I allowed the witness to testify as an expert.  Nor

should you substitute it for your own reason, judgment and

common sense.  The determination of the facts in this case

rests solely with you.

         You have heard testimony from police officers that

evidence was seized during a search of the defendant's car and

apartment.  I instruct you that a search as described by the

officers is an entirely permissible and appropriate law

enforcement action and any evidence that you find was

discovered and seized during such a search is properly

admissible as evidence in this case.  Whether you approve or

disapprove of any search should not enter into your

deliberations.  As with any witness, it is entirely your

decision as jurors whether and to what extent you credit a

police officer's testimony.  However, I instruct you that you

are to give full consideration to any evidence that you

conclude was obtained during a search along with all other

evidence in the case because the government's use of such

evidence would be entirely lawful.

         Use of recordings audio and video recordings of

conversations have been admitted into evidence.  Whether you

approve or disapprove of the recording of those conversations

may not enter your deliberations.  I instruct you that these

recordings were made in a lawful manner, that no one's

rights were violated and that the government's use of this

1    evidence is entirely lawful.

2           You must, therefore, regardless of any personal

3    opinions, give this evidence full consideration along with all

4    the other evidence in the case in determining whether the

5    government has proved beyond a reasonable doubt the guilt of

6    the defendant.

7           In addition, the government has been permitted to hand

8    out typed transcripts which it prepared containing the

9    government's interpretation of what appears on the recordings

10   that have been received as evidence.  Those were given to you

11   only as an aid or guide to assist you in listening to the

12   recordings.  You alone should make your own interpretation of

13   what appears on the recordings based on what you heard.  If you

14   think you heard something differently than what appeared on the

15   transcript, then what you heard is controlling.

16          You have heard evidence during the trial that

17   witnesses may have discussed the facts of the case and their

18   testimony with the lawyers before the witnesses appeared in

19   court.  Although you may consider that fact when you are

20   evaluating a witness' credibility, I should tell you that there

21   is nothing either unusual or improper about a witness meeting

22   with lawyers before testifying so that the witness can be aware

23   of the subjects he or she will be questioned about, focus on

24   those subjects and have the opportunity to review relevant

25   exhibits before being questioned about them in court.  Such

consultation helps conserve your time and the Court's time.  In
fact, it would be unusual for a lawyer to call a witness
without such consultation.

        Again, the weight you give to the fact or nature of
the witness' preparation for his or her testimony and what
inferences you draw from such preparation, are matters
completely within your discretion.

        The question of possible punishment of the defendant
is of no concern to the jury and should not in any sense enter
into or influence your deliberations.  The duty of imposing
sentence rests exclusively upon the Court.  Your function is to
weigh the evidence in the case and to determine whether or not
the defendant is guilty beyond a reasonable doubt, solely upon
the basis of such evidence.  Under your oath as jurors, you
cannot allow a consideration of the punishment which may be
imposed upon the defendant, if he is convicted, to influence
your verdict, in any way, or in any sense, enter into your
deliberations.

        The defendant did not testify in this case.  Under our
constitution he has no obligation to testify or to present any
other evidence because it is the prosecution's burden to prove
the defendant guilty beyond a reasonable doubt.  That burden
remains with the prosecution throughout the entire trial and
never shifts to the defendant.  The defendant is never required
to prove that he is innocent.  You may not attach any

1  significance to the fact that the defendant did not testify.

2  No adverse inference against him may be drawn by you because he

3  did not take the witness stand.  You may not consider this

4  against the defendant in any way in your deliberations in the

5  jury room.

6       Although the defendant has been indicted, you must

7  remember that an indictment is only an accusation.  It is not

8  evidence.  The defendant has pled not guilty to that

9  indictment.  Also, the fact that the defendant was arrested and

10 held in federal custody is not evidence of his guilt.

11      As a result of the defendant's plea of not guilty, the

12 burden is on the prosecution to prove guilt beyond a reasonable

13 doubt.  This burden never shifts to a defendant for the simple

14 reason that the law never imposes upon a defendant in a

15 criminal case the burden or duty of calling any witness or

16 producing any evidence.  The law presumes the defendant to be

17 innocent of all the charges against him.  I therefore, instruct

18 you that the defendant is to be presumed by you to be innocent

19 throughout your deliberations until such time, if ever, you as

20 a jury are satisfied that the government has proven him guilty

21 beyond a reasonable doubt.

22      The defendant begins the trial here with a clean

23 slate.  This presumption of innocence alone is sufficient to

24 acquit a defendant unless you as jurors are unanimously

25 convinced beyond a reasonable doubt of his guilt, after a

1    careful and impartial consideration of all of the evidence in

2    this case.

3            If the government fails to sustain its burden, you

4    must find the defendant not guilty.  This presumption was with

5    the defendant when the trial began and remains with him even

6    now as I speak to you and will continue with the defendant into

7    your deliberations unless and until you are convinced that the

8    government has proven his guilt beyond a reasonable doubt.

9            I have said that the government must prove the

10   defendant guilty beyond a reasonable doubt.  The question

11   naturally is, what is a reasonable doubt?  The words almost

12   define themselves.  It is a doubt based upon reason and common

13   sense.  It is a doubt that a reasonable person has after

14   carefully weighing all of the evidence.  It is a doubt which

15   would cause a reasonable person to hesitate to act in a matter

16   of importance in his or her personal life.  Proof beyond a

17   reasonable doubt must, therefore, be proof of such a convincing

18   character that a reasonable person would not hesitate to rely

19   and act upon it in the most important of his or her own

20   affairs.  A reasonable doubt is not a caprice or whim.  It is

21   not a speculation or suspicion. it is not an excuse to avoid

22   the performance of an unpleasant duty and it is not sympathy.

23           In a criminal case, the burden is at all times upon

24   the government to prove guilt beyond a reasonable doubt.  The

25   law does not require that the government prove guilt beyond all

possible doubt.  Proof beyond a reasonable doubt is sufficient
to convict.  This burden never shifts to the defendant, which
means that it is always the government's burden to prove each
of the elements of the crimes charged beyond a reasonable
doubt.

If, after fair and impartial consideration of all of
the evidence you have a reasonable doubt, it is your duty to
acquit the defendant.  On the other hand, if after fair and
impartial consideration of all the evidence you are satisfied
of the defendant's guilt beyond a reasonable doubt, you should
vote to convict.

With these preliminary instructions in mind, let us
turn to the charges against the defendant, as contained in the
indictment.

Each of the counts in the indictment constitutes a
separate offense or crime.  You must consider each count of the
indictment separately and you must return a separate verdict on
each count in which the defendant is charged.

Count One of the indictment charges that the defendant
conspired with others that is, agreed with others between in or
about 2013 through in or about 2017, to distribute and to
possess with intent to distribute: (1) 280 grams and more of
cocaine base, commonly referred to as "crack cocaine"; and (2)
a quantity of marijuana.  Conspiracy generally a conspiracy is
a kind of criminal partnership, a combination or agreement of

two or more persons to join together to accomplish some

unlawful purpose.

        The crime of conspiracy is separate and distinct from

the actual violation of any specific federal laws, which the

law refers to as "substantive crimes." indeed, you may find a

defendant guilty of the crime of conspiracy even though the

substantive crime which was the object of the conspiracy was

not actually committed.  Congress has deemed it appropriate to

make conspiracy, standing alone, is a separate crime, even if

the conspiracy is not successful.

        The government must prove beyond a reasonable doubt

the following two elements:

        First, the existence of the conspiracy as charged in

the indictment; in other words, that there was, in fact, an

unlawful agreement or understanding by two or more persons to

violate the narcotics laws as alleged.

        Second, that the defendant knowingly became a member

of the particular conspiracy charged; that is, that he

knowingly associated himself with the conspiracy, and

participated in that conspiracy.

        The first element which the government must prove

beyond a reasonable doubt to establish the offense of

conspiracy is that two or more persons entered the unlawful

agreement as charged in the indictment.  In order for the

government to satisfy this element, you need not find that the

alleged members of the conspiracy met together and entered into
any express or formal agreement.  Similarly, you need not find
that the alleged conspirators stated, in words or writing, what
the scheme was, its object or purpose, or every precise detail
of the scheme or the means by which its object or purpose was
to be accomplished.  What the government must prove is that
there was a mutual understanding, either spoken or unspoken,
between two or more people to cooperate with each other to
accomplish an unlawful act.

You may, of course, find that the existence of an
agreement to disobey or disregard the law has been established
by direct proof.  However, since conspiracy is, by its very
nature, characterized by secrecy, you may also infer its
existence from the circumstances of this case and the conduct
of the parties involved.

In a very real sense, then, in the context of
conspiracy cases, actions often speak louder than words.  In
this regard, you may, in determining whether an agreement
existed here, consider the actions and statements of all of
those you find to be participants as proof that a common design
existed on the part of the persons charged to act together to
accomplish an unlawful purpose.

The unlawful agreement as charged in Count One or
object of the conspiracy, is to distribute and possess with the
intent to distribute crack cocaine and marijuana.

1          In order to prove this charge against the defendant,

2     the government must establish beyond a reasonable doubt that

3     the unlawful agreement to possess and distribute narcotics was

4     an object of the conspiracy in which the defendant

5     participated.

6          Now I have used the terms "distribution" and

7     "possession with the intent to distribute."  What do those

8     terms mean?  I begin with the term "distribution."

9          The word "distribution" means the actual,

10    constructive, or attempted transfer of a controlled substance.

11    to distribute simply means to deliver, to pass over, to hand

12    over something to another person, or to cause it to be

13    delivered, passed on, or handed over to another.  Distribution

14    does not require a sale.

15         What does "possession with intent to distribute" mean?

16    I will first discuss the concept of "possession," and then

17    discuss the concept of "intent to distribute."

18         To "possess" means to have something within a person's

19    control.  This does not necessarily mean that the defendant

20    must hold it physically, that is, have actual possession of it.

21    As long as the item is within the defendant's control, he

22    possesses it.  If you find that the defendant either had actual

23    possession of the item or that he had the power and intention

24    to exercise control over it, even though it was not in his

25    physical possession, you may find that the government has

1   proven possession.

2          Actual possession is what most of us think of as

3   possession.  That is, having physical custody or control of an

4   item.  For example, if you find that the defendant had the

5   drugs on his person, you may find that he had possession of the

6   drugs.  However, a person need not have actual physical custody

7   of an item in order to be in legal possession of it.  If an

8   individual has the ability and intent to exercise substantial

9   control over an item that he does not have in his physical

10  custody, then he is in possession of that item.

11         The law also recognizes that possession may be sole or

12  joint.  If one person alone possesses it, that is sole

13  possession.  However, it is possible that more than one person

14  may have the power and intention to exercise control over the

15  item.  This is called "joint possession".  If you find that the

16  defendant had such power and intention, then he possessed the

17  item under this element even if he possessed it jointly with

18  another.

19         Proof of ownership of the item is not required.  To

20  satisfy this element, you must also find that the defendant

21  knowingly possessed the item.  This means that he possessed the

22  item purposely and voluntarily and not by accident or mistake.

23  However, the government is not required to prove that the

24  defendant knew that he was breaking the law.  That is what is

25  meant by "possession."

1          In order to prove "possession with intent to

2     distribute," the government must prove beyond a reasonable

3     doubt that it was a goal of the conspiracy to possess a

4     controlled substance with a purpose to transfer it to another

5     person.

6          Finally, I instruct you that, as a matter of law,

7     cocaine base and marijuana are all "controlled substances."

8     The second element which the government must prove beyond a

9     reasonable doubt to establish the offense of conspiracy is that

10    the defendant knowingly, willfully, and voluntarily became a

11    member of the conspiracy.  If you are satisfied that the

12    conspiracy charged in the indictment existed, you must next ask

13    yourselves who the members of that conspiracy were.  In

14    deciding whether the defendant whom you are considering was, in

15    fact, a member of the conspiracy, you should consider whether

16    the defendant knowingly and willfully joined the conspiracy.

17    Did he participate in it with knowledge of its unlawful purpose

18    and with the specific intention of furthering its business or

19    objective as an associate or worker?

20         In that regard, it has been said that in order for a

21    defendant to be deemed a participant in a conspiracy, he must

22    have had a stake in the venture or its outcome.  You are

23    instructed that, while proof of a financial interest in the

24    outcome of a scheme is not essential, if you find that the

25    defendant had such an interest, that is a factor which you may

1    properly consider in determining whether or not the defendant

2    was a member of the conspiracy charged in the indictment.

3            As I mentioned a moment ago, before the defendant can

4    be found to have been a conspirator, you must first find that

5    he knowingly joined in the unlawful agreement or plan.  The key

6    question, therefore, is whether the defendant joined the

7    conspiracy with an awareness of at least some of the basic aims

8    and purposes of the unlawful agreement.  It is important for

9    you to note that the defendant's participation in the

10   conspiracy may be established by independent evidence of his

11   own acts or statements, as well as those of the other alleged

12   co-conspirators, and the reasonable inferences which may be

13   drawn from them.

14           The defendant's knowledge is a matter of inference

15   from the facts proved.  In that connection, I instruct you that

16   to become a member of the conspiracy, the defendant need not

17   have known the identities of each and every other member, nor

18   need he have been apprized of all of their activities.

19           Moreover, the defendant need not have been fully

20   informed as to all of the details or the scope of the

21   conspiracy in order to justify an inference of knowledge on his

22   part.  Furthermore, the defendant need not have joined in all

23   of the conspiracy's unlawful objectives.  The extent of a

24   defendant's participation has no bearing on the issue of a

25   defendant's guilt.  A conspirator's liability is not measured

1    by the extent or duration of his participation.  The defendant

2    need not be a member of the conspiracy for the entire time that

3    it exists.  Indeed, each member may perform separate and

4    distinct acts and may perform them at different times.  Some

5    conspirators play major roles, while others play minor parts in

6    the scheme.  An equal role is not what the law requires. in

7    fact, even a single act may be sufficient to draw the defendant

8    within the ambit of the conspiracy.

9            I want to caution you, however, that the defendant's

10   mere presence at the scene of the alleged crime does not by

11   itself make him a member of the conspiracy.  Similarly, mere

12   association with one or more members of the conspiracy does not

13   automatically make the defendant a member.  A person may know,

14   or be friendly with, a criminal, without being a criminal

15   himself.  Mere similarity of conduct or the fact that they may

16   have assembled together and discussed common aims and interests

17   does not necessarily establish membership in the conspiracy.

18           I also want to caution you that mere knowledge or

19   acquiescence, without participation, in the unlawful plan is

20   not sufficient.  Moreover, the fact that the acts of a

21   defendant, without knowledge, merely happen to further the

22   purposes or objectives of the conspiracy, does not make the

23   defendant a member.  More is required under the law. what is

24   necessary is that the defendant must have participated with

25   knowledge of at least some of the purposes or objectives of the

1    conspiracy and with the intention of aiding in the

2    accomplishment of those unlawful ends.

3            In sum, the defendant, with an understanding of the

4    unlawful character of the conspiracy, must have intentionally

5    engaged, advised, or assisted in it for the purpose of

6    furthering the illegal undertaking.  He thereby becomes a

7    knowing and willing participant in the unlawful agreement, that

8    is to say, a conspirator.

9            a final note on "quantity" if, and only if, you

10   conclude that the government has proved beyond a reasonable

11   doubt that the defendant is guilty of participating in the

12   conspiracy charged in count one, you must then determine the

13   quantity of the controlled substances involved.  You need not

14   determine the precise quantity.  Instead, if you reach the

15   question of quantity, the verdict form you will receive will

16   contain a separate question asking whether the government has

17   proved beyond a reasonable doubt that the conspiracy that the

18   defendant joined involved 280 grams or more of crack cocaine,

19   28 grams or more of crack cocaine or a lesser amount.  Your

20   finding on quantity must be unanimous in the sense that all of

21   you must agree that the conspiracy involved at least the

22   quantity you indicate.

23           Thus, for example, if all of you agree that the

24   conspiracy involved 280 grams or more of mixtures and

25   substances containing a detectable amount of crack cocaine, you

should indicate that on the verdict form.  If, however, some of
you conclude that the conspiracy involved 28 grams or more of
crack cocaine, but the rest of you conclude that it involved
280 grams or more of crack cocaine, you must indicate 28 grams
or more of crack cocaine on the verdict form, because all of
you would only be in agreement that the conspiracy involved 28
grams or more of crack cocaine.  If you conclude that the
government has not proved beyond a reasonable doubt that the
conspiracy involved at least 28 grams of crack cocaine, then
you may also indicate that on the verdict form.

          In making your determination about the quantity of
controlled substances involved in the conspiracy charged in
count one, you should include whatever quantity was involved in
any act or acts in which the defendant personally and directly
participated.  That is, if you find that the defendant
personally and directly participated in jointly undertaken drug
trafficking, he is personally responsible for the full quantity
of drugs involved that were reasonably foreseeable to him.  In
addition, each conspirator is also responsible for any quantity
of narcotics distributed by his coconspirators, as long as the
quantities were known, or reasonably foreseeable, to him, and
were within the scope of the charged conspiracy.

          "Reasonably foreseeable" means that the defendant
could have reasonably anticipated the type and quantity of
drugs involved in the conspiracy.  This is so because when

1    people enter into a conspiracy to accomplish an unlawful end,

2    they become agents or partners of one another in carrying out

3    the conspiracy.  In determining the factual issues before you,

4    you may consider against the defendant any acts or statements

5    made by any of the people who you find, under the standards I

6    have already described, to have been his co-conspirators, even

7    though such acts or statements were not made in his presence,

8    or were made without his knowledge.

9          If you conclude that the government has proven beyond

10   a reasonable doubt that the conspiracy charged in count one

11   existed, you must next determine the second question, which is

12   whether the defendant participated in the conspiracy with

13   knowledge of its unlawful purpose and in furtherance of its

14   unlawful objective.

15         As you can see, this element concerns a defendant's

16   state of mind.

17         Direct proof of state of mind is not always available.

18   Indeed, it would be a rare case where it could be shown that a

19   person wrote or stated that, as of a given time in the past, he

20   committed an act with a certain state of mind. such direct

21   proof is not required.

22         You have been instructed that in order to sustain its

23   burden of proof, the government must prove that the defendant

24   acted knowingly.  A person acts knowingly if he acts

25   intentionally and voluntarily, and not because of ignorance,

mistake, accident, or carelessness. whether the defendant acted

knowingly may be proven by the defendant's conduct and by all

of the facts and circumstances surrounding the case.

        The government must also prove beyond a reasonable

doubt that the defendant acted intentionally.  Before you can

find that the defendant acted intentionally, you must be

satisfied beyond a reasonable doubt that the defendant acted

deliberately and purposefully.  That is, defendant's acts must

have been the product of defendant's conscious objective rather

than the product of a mistake or accident.  The ultimate facts

of knowledge and criminal intent, though subjective, may be

established by circumstantial evidence, based upon a person's

outward manifestations, words, conduct, acts, and all the

surrounding circumstances disclosed by the evidence and the

rational or logical inferences that may be drawn therefrom.

        What is referred to as "drawing inferences from

circumstantial evidence" is no different from what people

normally mean when they say, "use your common sense."  Using

your common sense means that, when you come to decide, for

example, whether the defendant possessed narcotics with an

intent to distribute, you don't limit yourself to just what he

said, but you also look at what he did and what others did in

relation to him and, in general, everything that occurred.

        As I have instructed you, circumstantial evidence, if

believed, is of no less value than direct evidence. in either

1    case, the essential elements of the crime charged must be

2    established beyond a reasonable doubt.  It is not necessary

3    that a defendant join a conspiracy at its inception or be fully

4    informed as to all the details of the conspiracy to justify an

5    inference of knowledge on his part. to have guilty knowledge, a

6    defendant need not have known the full extent of the conspiracy

7    or all of its activities or all of its participants.  It is not

8    even necessary that the defendant know every other member of

9    the conspiracy. in fact, a defendant may know only one other

10   member of the conspiracy and still be a coconspirator.  Nor is

11   it necessary that a defendant receive any monetary benefit from

12   participating in the conspiracy or have a financial stake in

13   the outcome, so long as he in fact participated in the

14   conspiracy in the manner I have explained.

15          I now want to turn your attention to the offense

16   charged in Count Two of the indictment and instruct you on the

17   elements of that offense.  Count Two charges the defendant with

18   the crime of possessing with intent to distribute a controlled

19   substance on or about February 3, 2017.

20          In order to prove the defendant guilty of Count Two,

21   the government must prove each of the following elements beyond

22   a reasonable doubt:

23          1.  On or about February 3, 2017, the defendant

24   possessed crack cocaine with the intent to distribute it;

25          2.  The defendant did so intentionally and knowingly

1   as I have already defined those terms.

2          3.  I now want to turn your attention to the firearms

3   offense charged in Count Three of the indictment and instruct

4   you on the elements of that offense.

5          It is a violation of federal law for any person,

6   "during and in relation to any drug trafficking crime to use or

7   carry a firearm," or, "in furtherance of any such crime, to

8   possess a firearm."

9          Count Three charges Terrell Polk as follows:

10          "From at least in or about 2013 through in or about

11   2017, in the Southern District of New York and elsewhere,

12   Terrell Polk, the defendant, during and in relation to a

13   federal narcotics trafficking crime, namely, the narcotics

14   conspiracy charged in Count One of this indictment, knowingly

15   did use and carry firearms, and, in furtherance of such crime,

16   did possess firearms, and did aid and abet the use, carrying,

17   and possession of firearms, some of which were discharged."

18          In order to prove the defendant guilty of Count Three,

19   the government must prove each of the following elements beyond

20   a reasonable doubt:

21          1.  The defendant committed a drug trafficking crime

22   as charged in count One;

23          2. On or about the dates alleged the indictment, the

24   defendant used and carried a firearm during and in relation to

25   the specified drug trafficking conspiracy charged in Count One,

or that the defendant possessed a firearm in furtherance of the

specified drug trafficking conspiracy charged in Count One;

        3.   The defendant acted knowingly.

        As I will explain in a few minutes, if you find that

the government has satisfied its burden as to each of these

elements, then you must also determine whether the government

has proved beyond a reasonable doubt that the defendant

discharged the firearm.

        The first element the government must prove beyond a

reasonable doubt is that the defendant committed a federal drug

trafficking crime.  The defendant is charged in Count One of

the indictment with conspiracy to distribute and possess with

intent to distribute a controlled substance.

        The second element the government must prove beyond a

reasonable doubt for Count Three is that the defendant either

used and carried a firearm during and in relation to the drug

trafficking crime charged in Count One, or that he possessed a

firearm in furtherance of that drug trafficking crime.

        As I have explained, to meet its burden as to Count

Three, the government must prove the second element of count

three in either one of two ways.

        first, the government may prove beyond a reasonable

doubt that the defendant "used" or "carried" a firearm "during

and in relation to" the drug trafficking offense.

        A.   In order to prove that the defendant used the

firearm, the government must prove beyond a reasonable doubt an active employment of the firearm by the defendant during and in relation to the commission of the drug trafficking crime.  This does not mean that the defendant must actually fire or attempt to fire the weapon.  Although, those would obviously constitute use of the weapon.  Brandishing, displaying, or even referring to the weapon so that others present knew that the defendant had the firearm available if needed all constitute use of the firearm.

B.  Carry in order to prove that the defendant carried the firearm, the government must prove beyond a reasonable doubt that the defendant had the weapon within his control so that it was available in such a way that it furthered the commission of the crime.

C.  A firearm is carried "in relation to" a drug trafficking offense if the firearm had some purpose or effect with respect to the drug crime.  That requirement is satisfied if the firearm facilitated or had the potential to facilitate, the drug trafficking offense.

On the other hand, this requirement is not satisfied if the carrying of the firearm was entirely unrelated to the drug crime.

As I have explained, the government may also establish the second element of Count Three by proving that the defendant possessed the firearm in furtherance of the drug trafficking

I9DAAPOL4                    Jury Charge

crime.

         A.   "in furtherance" to possess a firearm "in
furtherance" of a narcotics crime means that the firearm helped
promote, accomplish, advance or achieve the goal or objective
of the underlying offense.  The mere presence of a firearm at
the scene of drug trafficking is not enough.  The firearm must
have had some nexus or link to the drug trafficking crime, that
is, some purpose or effect, with respect to the underlying drug
offense, such as where the firearm is readily accessible to
protect drugs, drug proceeds, or the drug dealer himself.

         Count Three.  If you find the defendant guilty on
Count Three, then you must then make an additional finding:
Whether the government has proven beyond a reasonable doubt
that the defendant "discharged" the firearm.

         There is a place on the verdict form in which to
record your determinations.  The jury must be unanimous as to
whether the firearm was discharged.  The term "discharge" means
to fire or shoot.

         Count Four.  I now want to turn your attention to the
offense charged in the fourth and final count of the
indictment.  It is a violation of federal law for any person
"who has been convicted in any court of, a crime punishable by
imprisonment for a term exceeding one year to possess in or
affecting commerce, any ammunition, or to receive any
ammunition which has been shipped or transported in interstate

or foreign commerce."

Count Four of the indictment charges as follows:

"On or about July 25, 2015, in the Southern District of New York and elsewhere, Terrell Polk, the defendant, after having been convicted in a court of a crime punishable by imprisonment for a term exceeding one year, knowingly did possess in and affecting commerce ammunition, which had previously been shipped and transported in interstate and foreign commerce.

In order to prove the defendant guilty of Count Four, the government must prove each of the following elements beyond a reasonable doubt:

1.  The defendant previously was convicted of a crime punishable by imprisonment for a term exceeding one year, or in other words, a felony;

2.  On or about the dates specified in the indictment, the defendant knowingly possessed ammunition;

3. the defendant's possession of the ammunition was in or affecting interstate or foreign commerce.

Element one – prior felony conviction to satisfy the first element, you need to find beyond a reasonable doubt that the defendant was, in fact, convicted of a felony and that the conviction was prior to the possession of the ammunition as charged in the indictment.

The government need not prove that the defendant knew

that his prior conviction was punishable by a term of

imprisonment for a term exceeding one year, nor is it necessary

for the defendant to have been sentenced to imprisonment for

more than one year.

I instruct you that the prior conviction that is an

element of the offense is only to be considered by you for the

fact that it exists and nothing else.  You are not to consider

it for any other purpose.  You may not consider the prior

conviction in deciding whether the defendant was in knowing

possession of the ammunition as charged in the indictment.

Element two – knowing possession the second element

that the government must prove beyond a reasonable doubt is

that, on or about July 25, 2015, the defendant knowingly

possessed ammunition.

Element Three – firearm in or affecting commerce the

third element that the government must prove beyond a

reasonable doubt is that the defendant possessed the ammunition

in or affecting interstate or foreign commerce.  This means

that the government must prove that at some point prior to the

defendant's possession, the ammunition crossed a state line or

the united states border.  For example, if the ammunition came

from any other state or country to New York, then it was

transported or shipped in interstate commerce.

It is not necessary that the government prove that the

defendant himself carried it across a state line, nor must the

government prove who carried it across or how it was

transported.  It is also not necessary for the government to

prove that the defendant knew that the firearm had previously

traveled in interstate commerce.

        In addition, to the elements of each offense, you must

consider whether any act in furtherance of the crimes occurred

within the Southern District of New York.

        You are instructed that the Southern District of New

York encompasses, among other places, Manhattan and the Bronx.

In this regard, the government need not prove that the crimes

themselves were committed in this district or that the

defendant himself was present here.  It is sufficient to

satisfy this element if any act in furtherance of the crimes

occurred within this district.

        If you find that the government has failed to prove

that any act in furtherance of the crimes occurred within this

district then you must acquit.

        You are about to go into the jury room and begin your

deliberations.  If during those deliberations you want to see

any of the exhibits, they will be sent to you in the jury room

upon request. if you want any of the testimony read, that can

also be done.  But, please remember that it is not always easy

to locate what you might want, so be as specific as you

possibly can in requesting exhibits or portions of testimony

which you may want.

1          Your requests for exhibits or testimony, in fact any

2     communication with the court should be made to me in writing,

3     signed by your foreperson and given to one of the marshals.  I

4     will respond to any questions or requests you have as promptly

5     as possible, by having you return to the courtroom so I can

6     speak with you in person.  In any event, do not tell me or

7     anyone else how the jury stands on the issue of whether or not

8     the defendant's guilt has been proven until after a unanimous

9     verdict is reached.  When you have reached a unanimous verdict,

10    just send us a note indicating that you have reached a verdict

11    without telling us what that verdict is.

12         When you get into the jury room, before you begin your

13    deliberations, you should select someone to be the foreperson.

14    the foreperson will be responsible for signing all

15    communication to the Court and for handing them to the marshal

16    during your deliberations.  We will take your signed and dated

17    verdict sheet from your foreperson when you return to court,

18    and after your foreperson announces your verdict in open court.

19         Now I'm going to give you the verdict form.  It has

20    several questions as describe by the parties and myself.  The

21    first question says:

22         How do you find the defendant, Terrell Polk, with

23    respect to the charge of conspiracy to distribute and possess

24    with intent to distribute crack cocaine and marijuana?

25         You either check "not guilty" or the "guilty" box.

1          Under that question one is "A":

2          If you find the defendant guilty of Count One of the

3    indictment indicate the quantity of crack cocaine you find the

4    conspiracy involved.

5          The choices are 280 grams or more, 28 grams or more,

6    less than 28 grams.

7          Under Count Two:

8          How do you find the defendant, Terrell Polk, with

9    respect to the charge of possession with the intent to

10   distribute a quantity of crack cocaine on or about February 3,

11   2017?

12         Then as to Count Three:

13         How do you find the defendant, Terrell Polk, with

14   respect to the charge of using and carrying a firearm during

15   and in relation to, or possessing a firearm in furtherance of

16   the narcotics conspiracy?

17         And then under three, you're also asked a question

18   under "A":

19         If you find the defendant guilty of Count Three of the

20   indictment, did the defendant, Terrell Polk, discharge that

21   firearm?

22         And then Count Four the question is:

23         How do you find the defendant, Terrell Polk, with

24   respect to the charge of possession of ammunition on or about

25   July 25, 2015, after having been convicted of a crime

I9DAAPOL4                          Jury Charge

punishable by imprisonment for a term exceeding one year?

Once you have checked the "not guilty" or "guilty" boxes and answered all the questions, your foreperson should sign the verdict sheet and date it and bring it out with you after you send us a separate note saying that you've reached a verdict.

The government, in order to prevail, must prove the essential elements of each charge by the required degree of proof, as already explained in these instructions. If it succeeds, your verdict should be guilty; if it fails, it should be not guilty. to report a verdict either guilty or not guilty, it must be unanimous.

Your function is to weigh the evidence in the case and determine whether or not the defendant has been proven guilty of the crimes charged.

(Continued on next page)

I9d6pol5                          Charge

1              THE COURT:  Each juror is entitled to his or her

2      opinion.  Each should, however, exchange views with his or her

3      fellow jurors.  That is the very purpose of jury deliberations

4      to discuss and consider the evidence and listen to the

5      arguments of your fellow jurors, to present your individual

6      views and to consult with one another and to reach an agreement

7      based solely and wholly upon the evidence if you can do so

8      without violence to your own individual judgment.  Each of you

9      must decide the case for yourself after consideration with your

10     fellow jurors of the evidence in the case.

11             You should not hesitate to change an opinion after

12     discussion with your fellow jurors appears to be erroneous.

13     However, if after carefully considering all the evidence and

14     the arguments of your fellow jurors, you entertain a

15     conscientious view that differs from the others, you are not to

16     yield your position simply because you are outnumbered.  Your

17     final voted must reflect your conscientious determination as to

18     how the issues should be decide.  Your verdict as I say as a

19     juror, whether guilty or not guilty on each count, must be

20     unanimous.

21             If you do not understand or have forgotten any portion

22     of my instructions, you may request that any portion of my

23     instructions be read back, clarified or explained.

24             Let me see is the lawyers at side bar.

25             (Continued on next page)

I9d6pol5                        Charge

1              (At the side bar)

2              THE COURT:  Other than what we discussed earlier, does

3    the government have any exceptions to the charge?

4              MR. KROUSE:  No.

5              THE COURT:  Defense?

6              MR. LIND:  I have none.

7              THE COURT:  I am going to excuse the alternates.

8              MR. KROUSE:  Yes, Judge.

9              (Continued on next page)

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

1           THE COURT:  First, Mr. Askan and Mr. Campbell, you

2     have 12 jurors ahead of you to begin deliberations.  I want to

3     thank you for your service as jurors in this case.  Obviously

4     if we lost one of the first 12, we wouldn't have been able to

5     continue without an alternate juror.

6           At this point in time I wanted to thank you for your

7     participation and excuse you from any further jury service at

8     this time.  If you have anything in the jury room, you can pick

9     it up.  Thank you very much.

10          (Alternates excused)

11          THE COURT:  Swear in the marshal.

12          (Marshal sworn)

13          THE COURT:  As soon as the other two clear out, ladies

14    and gentlemen, you can retire to begin your deliberations.

15          Ladies and gentlemen, you may now retire to begin your

16    deliberations.

17          (Jury deliberations resumed; time noted 2:28 p.m.)

18          THE COURT:  If we get a note for exhibits, we don't

19    have to reconvene as long as you agree on what exhibit is being

20    requested.  You can send it straight in.  If there is any other

21    note asking for any other questions or instructions from the

22    Court, we will gather together and bring the jury back out.

23          Give us information on how to reach you in 10 minutes

24    so you can get back here.

25          (Recess pending verdict)

1          THE COURT:  I have a note from the jury that reads:

2    Can we have elements of each count as given by Judge Daniels;

3    and two, can we re-watch video of July 2015?

4          What I handed you are just those portions of the

5    instructions which just have the elements.  I propose that I

6    either read it to them again, or I can send in these four

7    pages.  Those are the elements of the four counts as I read it

8    to them.

9          MR. LIND:  I would think it might be more sensible to

10   send in a copy.

11         THE COURT:  I think that is probably what they are

12   asking us to do.  I don't want to do that unless you both sides

13   think it is appropriate.

14         MR. KROUSE:  The government agrees.  We can send in

15   just these.

16         THE COURT:  So what I am going to do is these are the

17   four counts with just the elements.  I am going to bring them

18   out.  We'll play them the video, and then I will have the court

19   officer give them these four pages of the elements of each

20   count.

21         Are we all set with the video?

22         MR. KROUSE:  Yes, your Honor.  It is all teed up.

23         THE COURT:  Let's bring them in.

24         (Continued on next page)

25

I9d6pol5                         Charge

1              (In open court; jury present)

2              THE COURT:  You can be seated.

3         Ladies and gentlemen, we have your note which reads,

4    Can we have elements of each count as given by Judge Daniels;

5    and two, can we re-watch video of July 2015?

6         We have the video set up.  We'll let you watch that.

7    What I am going to do is I put each one of the counts on one

8    page with the elements.  I will send that right in to you if

9    that is what you are asking for with the consent of the

10   parties.  You will have those.  If you want something more in

11   terms of instructions, send us another note.

12        We'll play the video for you and then we'll let you

13   continue your deliberations.

14        (Video played)

15        MR. KROUSE:  Your Honor, can we have a brief side bar?

16        THE COURT:  You want to cut this off at this point?

17        MR. KROUSE:  We have a proposal for your Honor.

18        THE COURT:  Are you going to stop it?

19        MR. KROUSE:  We paused it for now.

20        THE COURT:  Come up.

21        MR. KROUSE:   your Honor, it is our fault we should

22   have raised this before the jury came in, but that concludes

23   the shooting aspect this video.

24        THE COURT:  Okay.

25        MR. KROUSE:  In evidence there is the person Kevin

1    Corbett coming back on the a bike and picking up the shell

2    casings.  That is 14 minutes later.  We can ask Mr. Concepcion

3    to move it ahead 14 minutes because nothing happens for the

4    next 14 minutes.

5              THE COURT:  Okay.

6              MR. KROUSE:  Also, the jury's note wasn't entirely

7    clear.  There are two different angles, two camera views.  We

8    can play the shooting.

9              THE COURT:  How long is that?

10             MR. KROUSE:  That's a minute.

11             THE COURT:  Okay.

12             MR. KROUSE:  Our proposal would be to move 14 minutes

13   ahead on this and let them see the other part of the video

14   shown to them at trial, stop it and then load up the second

15   video and play that portion, the one-minute portion.

16             MR. LIND:  My suggestion, Judge, would be to ask them

17   if they want to see it.  I don't have any problem with them

18   showing the other angle, but I don't think they are asking for

19   the guy picking up the casings.

20             THE COURT:  All right.  I will ask them.

21             (Continued on next page)

22

23

24

25

I9d6pol5

```
1              (In open court; jury present)
2              THE COURT:  Ladies and gentlemen, on this video, there
3    is the portion that you saw about the person on the bike coming
4    back.  That is 14 minutes later.
5              Do you want us to move it up to that portion?
6              JUROR:  Yes, please.
7              THE COURT:  Also, there is another video from a
8    different angle that is in evidence.  We'll play that for you
9    also.  That is about a minute.
10             JUROR:  Yes.
11             THE COURT:  Why don't we move up about 13 minutes or
12   so and play that portion and then we'll play the other portion.
13             Just tell me what timing you are going up to.  From
14   what to what?
15             MR. KROUSE:  Your Honor, we're starting at the
16   timestamp 12:34:18.
17             THE COURT:  Okay.
18             (Video played)
19             MR. KROUSE:  We're stopping the video at 12:35:06 and
20   bringing up Government Exhibit 701 B.
21             We'll move ahead in this video to the 12:22:54, your
22   Honor.
23             (Video played)
24             MR. KROUSE:  We're stopping at 12:24:03 and moving
25   ahead to 12:34.
```

I9d6pol5                          Charge

1              (Video played)

2              MR. KROUSE:  Stopping at 12:35:08, your Honor.

3              THE COURT:  Ladies and gentlemen, you can continue

4      your deliberations.

5              (Jury deliberations resumed; time noted: 3:25 p.m.)

6              THE COURT:  We'll wait until we get another note.

7              (Recess pending verdict)

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

I9d6pol5                      Charge

```
 1              THE COURT:  We have a note.  They said they want to
 2     listen to the phone calls from jail with the transcripts on the
 3     monitor.  They want to review the video paused at approximately
 4     12:23 on View 1 and 12:23 on View 2.  In both views we want to
 5     see the shooters leaving the scene.
 6              And can we have the transcripts of the jail phone
 7     calls to review the material in the di liberation room?
 8              What does the government have?
 9              MR. KROUSE:  We have the transcripts here, your Honor,
10     in the folders and we can cue up the recordings and play them
11     for the jury.  Everything is prepared.  It is just a question
12     of which order you want to go in.
13              THE COURT:  I usually go in the order that they ask.
14              Do you have the phone calls with the transcripts on
15     the monitor for them to listen to?
16              MR. KROUSE:  We will, your Honor.  The same way that
17     we played them during trial.  We start with 800 and then just
18     go through all of the ones that we admitted into evidence.
19              THE COURT:  Do you know what they are asking for in
20     terms of the video that is keyed up?
21              MR. KROUSE:  I think so, your Honor.  We have those
22     timestamps that they gave us.  I would suggest maybe playing 10
23     seconds before and then play it and try pausing it at the time
24     they are asking for.
25              THE COURT:  They want to the see the shooters leaving
```

I9d6pol5                          Charge

1    the scene.

2              MR. KROUSE:  Yes, your Honor.  I think we get the

3    intent and we'll try to satisfy that.

4              THE COURT:  What do you want to do with the

5    transcripts?

6              MR. KROUSE:  We have them here.  We have no objection

7    to sending them back to the jury.

8              THE COURT:  Mr. Lind?

9              MR. LIND:  I don't have any objection to anything that

10   they have asked for, Judge.

11             THE COURT:  Let's start out with bringing them out,

12   put the transcripts on their screens and playing the calls.

13   We'll do video again where they want it.  And then we'll send

14   them back in with the transcripts.

15             Let's bring the jury in.

16             I find it a little difficult to read this.  Are you

17   sure they can read this?

18             MR. KROUSE:  Does that work, your Honor?

19             THE COURT:  Yes.  That's better.

20             (Continued on next page)

21

22

23

24

25

```
 1                  (In open court; jury present)
 2                  THE COURT:  You can be seated.
 3                  Ladies and gentlemen, we have your second note.  It
 4        reads:  Can we listen to phone calls from jail with the
 5        transcripts on the monitor?
 6                  We're all set up and do that for you first.
 7                  Then you say, Can we review the video of July 2015
 8        paused at approximately 12:23:37 of View 1 and 12:25 on View 2.
 9        I think they have that set up to go afterwards.
10                  You say you are particularly interested in both views,
11        that you wanted to see the shooters leaving the scene.
12                  Then you ask:  Can we have the transcripts of the jail
13        phone calls to review in the jury deliberations room?
14                  We're putting those together and we'll send those in
15        when you go back in.
16                  Let's go to the phone calls themselves and we'll play
17        those for you first.
18                  (Audio played)
19                  (Video played)
20                  THE COURT:  Is that okay?
21                  JUROR:  Yes.
22                  THE COURT:  You can continue.
23                  (Jury deliberations resumed; time noted: 4:09 p.m.)
24                  THE COURT:  We'll wait to see if we get another note.
25
```

I9d6pol5                        Charge

1          (Recess pending verdict)

2          THE COURT:  We have a note, which reads:  Can you

3    please clarify the time frame on the verdict sheet,

4    specifically what is the time frame for Count One A?

5          Before I tell you what I intend, why don't I see how

6    each side wants to proceed.

7          MR. KROUSE:  Your Honor, the parties have conferred

8    and I think we're on the same page that the answer should be

9    2013 to 2017.

10         MR. LIND:  That's correct, Judge.

11         THE COURT:  How do you want me to answer the question?

12         MR. KROUSE:  Your Honor, it could be as simple as:

13   The time frame for Count One is in or about 2013 to in or about

14   2017, which is the language that tracks the indictment.

15         MR. LIND:  They are only asking for One A.

16         MR. KROUSE:  So the time frame for One A is in or

17   about 2013 to in or about 2017.

18         THE COURT:  I am willing to do that, but I am not sure

19   that answers the thrust of their question.  I think what they

20   are trying to figure out obviously is what drugs would the

21   defendant be responsible for once he joined the conspiracy.

22         What is the government's thought as to the start date?

23         MR. KROUSE:  The government's thought is to instruct

24   the jury that it would be March 2014 to February 2017.  That

25   will be time frame for One A.

1              THE COURT:  Mr. Lind.

2              MR. LIND:  On reflection, Judge -- and I am glad that

3     you brought up the point that you did -- I think Count Two is a

4     substantive count.

5              THE COURT:  No.  It is talking about Count One A.

6              MR. LIND:  I know.  I am talking about 2017.

7              THE COURT:  Right.

8              MR. LIND:  I don't think that anything past when he

9     goes into jail in August or September of 2015 should count.

10             THE COURT:  Well, I don't think that that is

11    technically correct.  If you and I were in business together

12    and I went on two weeks' vacation, you cannot say that the two

13    weeks I was on vacation don't count, that we are no longer

14    business partners when I come back from vacation.  So I am not

15    sure I agree with that theory.

16             you do see what I am trying to concentrate on.  Let me

17    tell you what I have and then we can work from there so we can

18    make sure we're responding appropriately to that.

19             What I intend or propose to say is:  The indictment

20    charges a conspiracy from in or about 2013 through in or about

21    2017.  Each coconspirator is responsible for any amount of

22    drugs possessed or distributed by all members of the conspiracy

23    that is reasonably foreseeable to him after he joins the

24    conspiracy.

25             MR. KROUSE:  Yes, your Honor.  That is fine with the

1    government.

2              THE COURT:  I think that is consistent with the law

3    and the proof.

4              MR. LIND:  That's fine, Judge.

5              THE COURT:  So it is up to them to figure out what is

6    reasonably foreseeable.  If they think that he joined the

7    conspiracy at a time that is consistent with the evidence that

8    they have heard, it is up to them to determine whether or not

9    after he joined that conspiracy what amount of drugs was

10   foreseeable to him that the members of that conspiracy were

11   involved in.  That seems to be consistent.

12             MR. LIND:  The other problem with that, Judge, is --

13   and that perhaps I should have requested an instruction to

14   this -- after he is in jail for a year and a half, I think he

15   has withdrawn from the conspiracy.  I think it is different

16   than when you have business partners.

17             THE COURT:  Well, the problem is that there is no

18   evidence in this record that he withdrew from the conspiracy.

19   That argument may have been at least a more colorable argument

20   or stronger argument if in February of 2017 they didn't execute

21   a search warrant for his house and they found a distribution

22   quantities of drugs.

23             So the question is not whether he stopped possessing

24   drugs with the intent to distribute them.  The only question at

25   that point is whether he was doing it on his own and doing it

1    in a different conspiracy, and there is no evidence being

2    proffered by the defense or by the government that the drugs

3    that were found in his bedroom were somehow drugs that he was

4    selling with a different group of people.

5              MR. LIND:  Or selling them on his own, Judge.

6              THE COURT:  Or selling them on his own.  It is up to

7    the jury to determine whether he was selling them on his own.

8              See, that doesn't matter because that goes to a

9    different question than they are asking about.  They are asking

10   what is the time frame of Count One A.  The time frame of Count

11   One A is whatever time period they find that he is a member of

12   the conspiracy between 2013 and 2017.  In their view he is out

13   of the conspiracy.  I am not sure any evidence supports that or

14   they want to decide that he is not a member of the conspiracy

15   while he is in jail.

16             MR. LIND:  I agree with you, Judge.  I think, though,

17   it should be 2014 to 2017.

18             THE COURT:  I don't have any problem saying after he

19   joined the conspiracy in 2014.

20             MR. LIND:  Right.  That is what I am saying.

21             THE COURT:  If that is what you want me to say.

22             MR. LIND:  Right.

23             THE COURT:  The only reason I didn't put that in there

24   is that it is a direct reference to your client as opposed to

25   the generic what I said is all members of the conspiracy.  Any

1   amount of drugs possessed or distributed by all members of the

2   conspiracy that is reasonably foreseeable to a coconspirator

3   after he joins the conspiracy.

4            MR. LIND:  That's bitter.

5            JUROR:  The indictment charges a conspiracy from in or

6   about 2013 through in or about 2017.  Each coconspirator is

7   responsible for any amount of drugs possessed or distributed by

8   all members of the conspiracy that is reasonably foreseeable to

9   him after he joined the conspiracy.

10           Now, if you want to say after he joined the conspiracy

11  in 2014, obviously that is a specific reference to your client.

12  This is just a generic saying any conspirator wherever they

13  joined the conspiracy they are responsible for whatever amount

14  of drugs that is foreseeable to that coconspirator after he

15  joined the conspiracy.

16           MR. LIND:  Judge, I think it is better rather than

17  focusing on my client to give the generic terminology.

18           MR. KROUSE:  We agree with that, your Honor.

19           THE COURT:  I will read it one more time.

20           The indictment charges a conspiracy from in or about

21  2013 through in or about 2017.  Each coconspirator is

22  responsible for any amount of drugs possessed or distributed by

23  all members of the conspiracy that is reasonably foreseeable to

24  him after he joins the conspiracy.

25           MR. LIND:  Fine, Judge.

I9d6po15                     Charge

1              THE COURT:  I will tell them that they can go back and

2       send us a note either immediately or if they want to deliberate

3       further if they think they are close they can deliberate

4       further, but we'll come home if they send us a note and

5       continue tomorrow.

6              Let me bring them out and see if that is responsive to

7       their note.

8              (Continued on next page)

1          (In open court; jury present)

2          THE COURT:  Ladies and gentlemen, please be seated.

3          Ladies and gentlemen, we have your note.  It reads:

4   Can you please clarify the time frame from the verdict sheet,

5   specifically what is the time frame for Count One A?

6          I am going to give you this instruction, and I will

7   read it twice:  The indictment charges a conspiracy from in or

8   about 2013 through in or about 2017.  Each coconspirator is

9   responsible for any amount of drugs possessed or distributed by

10  all members of the conspiracy that is reasonably foreseeable to

11  him after he joined the conspiracy.

12         I will say is one more time.  The indictment charges a

13  conspiracy in or about 2013 through in or about 2017.  Each

14  coconspirator is responsible for any amount of drugs possessed

15  or distributed by all members of the conspiracy that is

16  reasonably foreseeable to him after he joins the conspiracy.

17         Now, I am going to let you go back in.  If you want to

18  adjourn for the day, give us a note.  If you want to deliberate

19  a little longer, we'll wait for you if you think you are close.

20  Otherwise, as soon as you want to go home and come back

21  tomorrow, if that is what you want to do, send us a note and

22  we'll abide by your wishes.

23         I will let you go back in and decide what you want to

24  do.

25         (Jury deliberations resumed; time noted 4:40 p.m.)
           (Recess pending verdict)

I9d6pol5                    Charge

1          THE COURT:  I have a note from the jury indicating

2     that they reached a verdict.  We'll take them out and take the

3     verdict from the foreperson.

4               (In open court; jury present)

5          THE COURT:  You can be seated, ladies and gentlemen.

6          Ladies and gentlemen, we have your note, which

7     indicates that you reached a verdict.  I am going to ask my law

8     clerk to take the verdict from the foreperson at this time.

9          THE LAW CLERK:  How do you find the defendant, Terrell

10    Polk, with respect to the charge of conspiracy to distribute

11    and possess with intent to distribute crack cocaine and

12    marijuana, guilty or not guilty?

13          THE FOREPERSON:  Guilty.

14          THE LAW CLERK:  Indicate the quantity of crack cocaine

15    you find the conspiracy involved?

16          THE FOREPERSON:  280 grams or more.

17          THE LAW CLERK:  With respect to Count Two how do you

18    find the defendant, Terrell Polk, with respect to the charge of

19    possession with the intent to distribute the quantity of crack

20    cocaine on or about February 3rd, 2017, guilty or not guilty?

21          THE FOREPERSON:  Guilty.

22          THE LAW CLERK:  With respect to Count Three how do you

23    fine the defendant, Terrell Polk, with respect to the charge of

24    using and carrying a firearm during and in relation to or

25    possessing a firearm in furtherance of the narcotics

1  conspiracy, guilty or not guilty?

2            THE FOREPERSON:  Guilty.

3            THE LAW CLERK:  Did the defendant, Terrell Polk,

4  discharge that firearm?

5            THE FOREPERSON:  Yes.

6            THE COURT:  With respect to Count Four how do you find

7  the defendant, Terrell Polk, with respect to the charge of

8  possession of ammunition on or about July 25th, 2015 after

9  having been convicted of a crime punishable by imprisonment for

10  a term exceeding one year, guilty or not guilty?

11            THE FOREPERSON:  Guilty.

12            THE COURT:  Ladies and gentlemen, I want to thank you

13  for your jury service.  Obviously jury service is one of the

14  most important responsibilities we all have as citizens.  Our

15  system could not work unless we had people who were able and

16  willing to serve fairly and impartially.  We recognize it can

17  be a major or minor disruption in your professional and

18  personal lives.

19            With the thanks of the Court, I am going to discharge

20  you from any further jury service.  Thank you very much.

21            (Jury discharged)

22            THE COURT:  I am going to schedule sentencing for

23  January 17th at 10:00.

24            MR. LIND:  Fine, Judge.

25            THE COURT:  I will see all the parties at that time.

I9d6pol5                          Charge

 1              MR. KROUSE:  Thank you.

 2              MR. LIND:  5:00, Judge?

 3              THE COURT:  10:00.

 4                              o0o

I9d6pol5                          Charge

                          GOVERNMENT EXHIBITS

Exhibit No.                                       Received

  900 A    . . . . . . . . . . . . . . . . . 614